

1  JUSTIN T. BERGER (SBN 250346)
   jberger@cpmlegal.com
2  SARVENAZ J. FAHIMI (SBN 226148)
   sfahimi@cpmlegal.com
3  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
4  840 Malcolm Road
   Burlingame, CA 94010
5  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
6
7  *Attorneys for Relators*

8           **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10         LACV18 08311-PA-ASx

11                                    CASE NO.

12  **[UNDER SEAL]**,

                Plaintiffs,            **COMPLAINT FOR MONEY**
13                                     **DAMAGES AND CIVIL PENALTIES**
        v.                             **FOR:**
14

15  **[UNDER SEAL]**,

16               Defendant.            1. **Violations of the Federal False**
                                          **Claims Act, §§ 3729(a)(1)(a) and**
17                                        **(a)(1)(b);**
                                       2. **Violations of the California False**
18                                        **Claims Act, Cal. Gov. Code**
                                          **§12652; and**
19                                     3. **Violations of the California**
                                          **Insurance Frauds Prevention**
20                                        **Act, Cal. Ins. Code §1871.7**
21
22
23                                     **DEMAND FOR JURY TRIAL**

24      **[FILED IN CAMERA AND UNDER SEAL**
         **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
25
26
27
28

LAW OFFICES      **COMPLAINT**
COTCHETT, PITRE &
McCARTHY, LLP

FILED
CLERK, U.S. DISTRICT COURT
SEP 2 6 2018
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

PAID
SEP 2 6 2018
Clerk, US District Court
COURT 4612

1   JUSTIN T. BERGER (SBN 250346)
    jberger@cpmlegal.com
2   SARVENAZ J. FAHIMI (SBN 226148)
    sfahimi@cpmlegal.com
3   COTCHETT, PITRE & McCARTHY, LLP
    San Francisco Airport Office Center
4   840 Malcolm Road
    Burlingame, CA 94010
5   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
6
7   *Attorneys for Relators*
8
            IN THE UNITED STATES DISTRICT COURT
9
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
11                                          CASE NO.
12  **UNITED STATES OF AMERICA** *ex*
    *rel.* **IONM LLC**, a Delaware corporation;
13  **STATE OF CALIFORNIA** *ex rel.*       **COMPLAINT FOR MONEY**
    **IONM LLC**, a Delaware corporation; and  **DAMAGES AND CIVIL PENALTIES**
14  **LOS ANGELES COUNTY** *ex rel.*        **FOR:**
    **IONM LLC**, a Delaware corporation;
15              Plaintiffs,                  1. **Violations of the Federal False**
16                                              **Claims Act, §§ 3729(a)(1)(a) and**
            v.                                  **(a)(1)(b);**
17                                          2. **Violations of the California False**
    **UNIVERSITY OF SOUTHERN**                 **Claims Act, Cal. Gov. Code**
18  **CALIFORNIA**, a California corporation    **§12652; and**
19              Defendant.                   3. **Violations of the California**
                                                **Insurance Frauds Prevention**
20                                              **Act, Cal. Ins. Code §1871.7**
21
22                                          **DEMAND FOR JURY TRIAL**
23
24                    [FILED IN CAMERA AND UNDER SEAL
25                    PURSUANT TO 31 U.S.C. § 3730(b)(2)]
26
27
28
    LAW OFFICES
    COTCHETT, PITRE &      **COMPLAINT**
    McCARTHY, LLP

# TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 4 |
| III. | PARTIES | 4 |
|  | A. Relator | 4 |
|  | B. Defendant | 5 |
| IV. | OVERVIEW OF THE SCHEME | 5 |
|  | A. Statutory Background | 5 |
|  | 1. Federal False Claims Act | 5 |
|  | 2. The California False Claims Act | 7 |
|  | 3. California Insurance Frauds Prevention Act | 8 |
|  | B. IONM Billing Background and Defendant's Fraudulent Scheme | 9 |
|  | 1. Intraoperative Neurophysiologic Monitoring (IONM) | 9 |
|  | 2. Ear, Nose and Throat (ENT) Surgeries Require In-Person Monitoring | 11 |
|  | 3. Current Procedural Terminology ("CPT") Codes and Reimbursement Guidelines | 11 |
|  | 4. Evidence of Defendant's Fraudulent Conduct | 13 |
|  | i. Fraudulent billing for "In-Room" monitoring when monitoring was performed remotely or not at all | 14 |
|  | ii. Upcoding at USC Keck by misrepresenting location of physician monitoring as "In Room" | 20 |
|  | iii. Fraudulent billing for ENT procedures where physician monitoring not provided | 21 |
|  | iv. Falsification of provider name in order to maximize billing | 22 |

|   |   | v. | Misrepresentations to L.A. County in connection with the MSOA and/or MSAA and/or PSA Contract.......... 24 |
|   |   | vi. | Chat logs show lack of monitoring....................................... 24 |
| V. | CAUSES OF ACTION....................................................................... | | 26 |
| VI. | PRAYER FOR RELIEF ..................................................................... | | 33 |
| VII. | JURY DEMAND ................................................................................. | | 35 |

1      Plaintiffs the United States of America ("United States"), State of California,

2 and Los Angeles County, by and through Relator IONM, LLC (hereinafter, "Relator")

3 allege as follows:

## I.    INTRODUCTION

5      1.    Relator brings this action on behalf of the United States, the State of

6 California, and Los Angeles County, to recover losses sustained as a result of

7 fraudulent practices arising out of the Intraoperative Neurophysiological Monitoring

8 ("IONM") Division under the Department of Neurology at the Keck School of

9 Medicine at the University of Southern California.

10      2.    Defendant UNIVERSITY OF SOUTHERN CALIFORNIA ("USC") is a

11 California corporation based in Los Angeles.  USC is the owner of the Keck School of

12 Medicine and the Keck Medical Center which operates the Keck Hospital of USC. The

13 USC Department of Neurology operates under the Keck School of Medicine.

14      3.    IONM attempts to minimize neurological morbidity during high-risk

15 neurosurgical, orthopedic, peripheral nerve, cardiothoracic, ear, nose and throat

16 ("ENT"), and vascular surgeries.

17      4.    Defendant has perpetrated a fraud on the taxpayers and private insurance

18 companies by falsifying records and billing for IONM services not provided.  The

19 fraud occurs in connection with services at both USC Keck Hospital and at the Los

20 Angeles County Medical Center (now known as, and hereinafter referred to as

21 "LAC+USC Medical Center," or "LAC+USC"), at which USC provides IONM

22 services pursuant to negotiated annual contract.

23      5.    Defendant's fraud takes several forms.  For example, Defendant billed for

24 IONM services simply not performed.  To seek reimbursement for IONM professional

25 oversight, a physician must continuously monitor the procedure in real time,

26 communicate analysis of the data to the surgical team, and document the IONM

27 physician's involvement in the patient's medical record.  At both USC Keck and

28 LAC+USC, Defendant systematically failed to meet these basic requirements of IONM

1   oversight.  Defendant placed thousands of patients at risk by failing to provide

2   continuous oversight of surgical cases, instructed the permanent deletion of chat logs

3   from the patients' medical records to hide the lack of communication between

4   physician and technologist, and attempted to avoid liability by not signing procedure

5   notes in the patients' medical records.

6         6.     In another example of persistent fraud, Defendant billed for IONM

7   services not rendered for nearly all the ENT surgeries performed at both USC Keck

8   and LAC+USC.  The IONM machine used to perform most of the monitoring of ENT

9   surgeries at USC Keck and LAC+USC requires that analysis of the IONM data be

10  performed in-person, in the operating room.  The machine cannot transmit streaming

11  data to locations outside of the operating room, and therefore remote monitoring is not

12  possible.  Despite this, Defendant repeatedly billed third-party payers for professional

13  oversight of ENT surgeries at both USC Keck and LAC+USC using incorrect CPT

14  codes.  This is not a case of simple error; real-time physician monitoring was occurring

15  neither remotely nor in-person, putting patients at significant risk of neurologic injury

16  during these critical surgeries.  In addition, Defendant also billed for physician

17  oversight of ENT surgeries using in-room CPT codes when no IONM physician was

18  actually present in the operating room for the duration of time billed.

19        7.     Additionally, USC has repeatedly engaged in systematic billing

20  manipulation by upcoding charges to maximize insurance reimbursement.

21  Specifically, because reimbursement rates for "in-room" monitoring are typically

22  higher than for "remote" monitoring, USC often bills for units of "in-room"

23  monitoring when monitoring occurred remotely or not at all, or falsely inflates the

24  amount of "in-room" monitoring time in order to maximize reimbursement.

25        8.     In addition, USC has routinely falsified records and billed under the

26  provider numbers of physicians who did not actually provide the oversight.  This

27  fraudulent "switching" of providers was done in order to avoid certain billing rules and

28  maximize insurance reimbursement.  In particular, some commercial insurers allow

physicians to bill for the time spent monitoring multiple surgeries simultaneously. In contrast, Medicare, United Health Care, Worker's Compensation carriers, and Medicare Advantage plans restrict physician reimbursement of time monitored to one surgery at any given moment, even if the physician is providing oversight to multiple surgeries simultaneously. To evade these rules, USC routinely switches the names of the monitoring physicians in a fraudulent scheme to misrepresent the provider of service.

9. This egregious fraud has significant real-life consequences for patients, as evidenced by thousands of surgeries where patients' lives were put at risk. The core purpose of IONM monitoring is to identify changes in signals generated by the patient that could reflect stress or impact to the neurological systems of patients during surgery. When such signals are detected by physicians, the operating surgeons are immediately notified so that they can modify the course of the surgery to avoid damage to the nervous system. Without *real-time*, *continuous* monitoring and analysis by qualified physicians, the IONM services are essentially worthless. USC is reimbursed generously for IONM services that are supposed to be performed by highly trained physician specialists; not by IONM technologists who lack the credentials to make such critical clinical decisions. These fraudulent schemes have put the health and welfare of thousands of patients at risk.

10. USC's actions have resulted in numerous violations of the Federal False Claims Act, the California False Claims Act, and California Insurance Code Section 1871.7. This is a *qui tam* action to recover treble damages, civil penalties, attorneys' fees, and costs for Relator on behalf of both the United States and the State of California.

11. The Relator, through deep investigation and inside knowledge of Defendant's operations, has obtained non-public, direct evidence supporting the allegations in this Complaint. Among other evidence, Relator has obtained and/or compiled based on first-hand information records of medical billing, scheduling,

1   financial records, and other evidence that show the submission of fraudulent medical

2   billing that underlie the scheme at issue.

3   **II.   JURISDICTION AND VENUE**

4       12.    This Court has jurisdiction over the False Claims Act ("FCA") causes of

5   action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law.

6   This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732,

7   which confers jurisdiction for claims brought under the FCA on the District Courts of

8   the United States.

9       13.    Additionally, this Court has supplemental jurisdiction over the other

10  claims in this action pursuant to 31 U.S. Code § 3732(b), as they arise from the same

11  transaction or occurrence as the federal claims.  The Court also has supplemental

12  jurisdiction pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in

13  the action that they form part of the same case or controversy.

14      14.    Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendant transacts

15  business in this District, and the fraudulent conduct was committed here.

16  **III.  PARTIES**

17      **A.    Relator**

18      15.    Plaintiffs in this action are the United States of America, State of

19  California, and Los Angeles County, by and through Relator IONM LLC.

20      16.    Relator's members have direct and independent knowledge of the

21  information on which these allegations are based.  Its members have access to financial

22  information, provider records, patient notes, and other documentation of the

23  Defendant's ongoing scheme.

24      17.    The facts alleged in this Complaint are based entirely upon Relator's

25  members' personal observations and investigation, as well as documents in their

26  possession.

27  / / /

28  / / /

**B.  Defendant**

18.  Defendant USC, through the Keck School of Medicine, provides medical education, training and clinical services, throughout numerous departments, serving the Los Angeles area. The Keck School of Medicine is part of Keck Medicine of USC, the University of Southern California's medical enterprise and one of two university-owned academic medical centers in the Los Angeles area.

19.  In addition to Defendant's onsite clinical services at the USC hospital, Defendant also offers services at LAC+USC through the Los Angeles County Department of Public Health's Medical School Operating Agreement ("MSOA") fund and/or Medical School Affiliation Agreement ("MSAA"), and/or Professional Services Agreement ("PSA") contracts that are negotiated annually.  Under the MSOA and/or MSAA and/or PSA, Los Angeles County pays USC several hundred thousand dollars per year to perform both the professional and technical IONM services for surgeries conducted at LAC+USC and covered by a variety of payers—including Medi-Cal, Medicare, and private insurers.

## IV.  OVERVIEW OF THE SCHEME

### A.  Statutory Background

#### 1.  Federal False Claims Act

20.  The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(1)(1)(A) (2009).

21.  The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer,

1  employee, or agent of the United States; or (ii) is made to a contractor, grantee, or

2  other recipient, if the money or property is to be drawn down or used on the

3  Government's behalf or to advance a Government program or interest, and if the

4  United States Government (i) provides or has provided any portion of the money or

5  property requested or demanded; or (ii) will reimburse such contractor, grantee, or

6  other recipient for any portion of the money or property which is requested or

7  demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

8       22.    As amended by FERA, the FCA also makes a person liable to the United

9  States government for three times the amount of damages which the government

10  sustains because of the act of that person, plus a civil penalty, for each instance in

11  which the person "knowingly makes, uses, or causes to be made or used, a false record

12  or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B)

13  (2009).

14       23.    The FCA defines the terms "knowing" and "knowingly" to mean that a

15  person, with respect to information:  (1) "has actual knowledge of the information"; (2)

16  "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in

17  reckless disregard of the truth or falsity of the information." 31 U.S.C. §

18  3729(b)(1)(A) (2009).  The FCA further provides that "no proof of specific intent to

19  defraud" is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2009).

20       24.    On behalf of the United States of America, Relator alleges that over the

21  course of the past decade, Defendant has violated the FCA by "knowingly" submitting

22  false claims for payment to Medicare.  In addition, through Defendant's contract for

23  services with the County of Los Angeles, Defendant "knowingly" caused submission

24  of false claims to Medicare by the County of Los Angeles. Relator alleges, during this

25  same time period, that Defendant knowingly concealed and/or knowingly and

26  improperly avoided an obligation to pay or transmit money to the U.S. government by

27  obtaining reimbursement related to their submissions of false claims for payment to

28  Medicare.  This conduct is ongoing.

## 2.     The California False Claims Act

25.     The California False Claims Act ("CFCA") provides in pertinent part that a person is liable to the State of California for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Cal. Gov. Code § 12651(a)(1).

26.     The California False Claims Act defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions: (A) is presented to an officer, employee, or agent of the state or of a political subdivision; (B) is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions (i) provides or has provided any portion of the money, property, or service requested or demanded; or (ii) reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service which is requested or demanded." Cal. Gov. Code § 12651(b)(1).

27.     On behalf of the State of California, Relator alleges that over the course of the past decade, Defendant violated the California False Claims Act by "knowingly" submitting false claims for payment to Medi-Cal.   In addition, through Defendant's contract for services with the County of Los Angeles, Defendant "knowingly" caused submission of false claims to Medi-Cal by the County of Los Angeles.

28.     Moreover, Defendant has knowingly violated the CFCA by defrauding Los Angeles County—a political subdivision of California.  As described herein, Defendant has fraudulently induced the County to enter into the MSOA and/or MSAA and/or PSA contracts pursuant to which USC is supposed to provide IONM services at LAC+USC, and has failed to provide those services in violation of the contracts.

1    29.   The conduct described herein is ongoing.

**3.    California Insurance Frauds Prevention Act**

3    30.   The California Insurance Frauds Prevention Act ("CIFPA") provides that
4 any person or entity who knowingly submits, or causes the submission of, a false or
5 fraudulent claim to a private insurer in California for payment or approval is liable for
6 a civil penalty of up to $10,000 for each such claim, plus three times the amount of the
7 damages sustained by the insurer. Cal. Ins. Code § 1871.7(b). The Court may also
8 grant equitable relief to protect the public.

9    31.   The CIFPA empowers and encourages any interested person to bring a
10 civil action under Ins. Code § 1871.7 against those who submit, or cause to be
11 submitted, false or fraudulent claims against insurers.

12    32.   A complaint brought pursuant to § 1871.7 is required to be filed in camera
13 and under seal for sixty (60) days to allow the government to conduct its own
14 investigation without the knowledge of Defendant, and to determine whether to join in
15 the suit. Further, a copy of the complaint and written disclosure of substantially all
16 material evidence shall be served on the District Attorney of the county in which the
17 matter is filed and Insurance Commissioner of the State of California. Relator has
18 compiled with these requirements. Simultaneously with the filing of the Complaint in
19 this action, Relator provided written disclosure of substantially all material evidence
20 regarding the allegations contained in the Complaint to the Los Angeles District
21 Attorney's Office and to the office of the Insurance Commissioner of the State of
22 California. Relator also offered complete cooperation in any potential investigation
23 initiated by the above-referenced government entities.

24    33.   Relator is an original source for all of the information contained in this
25 Complaint as defined by California Insurance Code section 1871.7. Relator has direct
26 and independent knowledge of the information on which the allegations contained
27 herein are based, and has voluntarily provided this information to the District Attorney
28 and Commissioner before filing the present action.

34.     Relator alleges that over the course of the past decade, Defendant has violated the CIFPA by "knowingly" submitting false claims to private insurers in California.  Additionally, Defendant "knowingly" caused false claims to be submitted to private insurers through its work with the County of Los Angeles.

35.     Based on the foregoing laws, Relator seeks, though this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendant knowingly made or caused to be made in connection with their fraudulent scheme.

36.     The conduct described herein is ongoing.

**B.     IONM Billing Background and Defendant's Fraudulent Scheme**

    **1.     Intraoperative Neurophysiologic Monitoring (IONM)**

37.     IONM is a sub-specialty of neurology and utilized to minimize neurological morbidity during- neurosurgical, orthopedic, peripheral nerve, cardiothoracic, ENT, and vascular surgeries where the nervous system is at risk.  The goal of such monitoring is to identify changes in brain, spinal cord, and peripheral nerve function prior to irreversible damage.  IONM monitoring by the oversight physician can take place either in the operating room or remotely.  At USC Keck and LAC+USC, most monitoring is performed when the IONM physician is outside of the operating room.

38.     Standard of care in the industry requires a continuously open, bilateral communication channel between the IONM physician and the IONM technologist who is present in the operating room.  This is typically a typewritten live chat, run through an IONM software program.  These "Chat Logs" thus document which physician monitored the surgery, and reflect the physician's interpretation and communication of both baseline signals and subsequent data acquired throughout the entire course of the surgery.  After the physician conveys analysis of the data to the technologist via the Chat Log, the technologist then relays this information to the surgeon and documents it in a separate "Event Log" that is part of the IONM data file.

39.    IONM technologists are not licensed or permitted to exercise independent clinical judgment or provide feedback relating to analysis of the data to the surgeons without physician input.

40.    Standard of care requires that the IONM physician continually monitor the surgery at all times and relay interpretation of the incoming real-time data, even when no significant changes in the neurophysiological signals have occurred. The IONM physician must be licensed in the state and privileged at the specific hospital where the surgery is being performed in order to provide intraoperative neurophysiologic monitoring oversight. As the Current Procedural Terminology codes ("CPT" codes) indicate per Defendant's training materials, the IONM physician is responsible for real-time interpretation of data and is responsible for continually assessing the data and communicating the assessment to the technologist, who subsequently communicates this to the surgeon.  (See Exhibit 1.)  Both physician interpretation of the data and communication of that analysis between physician and technologist must be explicitly documented.  A lack of communication does not imply implicit communication.  As Defendant's own training materials state, "provisions" must be in place for "continuous and immediate communication."  (See Exhibit 1.)  As described above, this communication should be documented through "Chat Logs" between the technologist and IONM physician.

41.    IONM fellowship training is available at some academic institutions. IONM fellowships are non-accredited and are not governed by the Accreditation Council for Graduate Medical Education (ACGME).  These trainees are often neurologists who seek subspecialized training in the field of IONM.  During fellowship, trainees are taught by established IONM physicians who teach the fellows how to appropriately monitor IONM cases.  The training program also usually encourages the fellow to perform research in the field.  After completing an IONM fellowship, the graduate may be eligible to seek subspecialty board certification.

/ / /

### 2.   Ear, Nose and Throat (ENT) Surgeries Require In-Person Monitoring

42.   Ear, Nose and Throat ("ENT") surgeries at USC Keck and LAC+USC often utilize a specific type of monitoring equipment called the "NIM" machine.   The manufacturer of the NIM machine, Medtronic, provides detailed specifications for its equipment confirming that it cannot send real-time streaming data through the internet to a remote location.  Chat logs and electronic event logs are not available with the NIM machine.  Nor does the NIM machine generate a data file for retrospective analysis.  Therefore, any surgery monitored using the NIM machine requires the IONM physician to be physically present in the operating room throughout the entire duration of the surgery in order to provide appropriate patient care in real-time. Because physician oversight can only be performed in in the operating room, CPT codes specific to remote monitoring cannot be used.

### 3.   Current Procedural Terminology ("CPT") Codes and Reimbursement Guidelines

43.   Current Procedural Terminology codes ("CPT" codes) recognized by insurers for IONM services include G0453, 95940, and 95941.  These CPT codes allow the oversight physician to bill for time monitored (also known as the "time component").  Prior to 2013, the CPT code used for billing time monitored was CPT 95920.

44.   In addition to billing for time monitored, the oversight physician may also bill for the modalities monitored, often referred to as the "base codes".  These codes include but are not limited to somatosensory evoked potentials (SEPs), motor evoked potentials (MEPs), electromyography (EMG), and electroencephalography (EEG).

45.   Under any of these codes, the IONM physician must continuously monitor the surgery in order to bill insurance the professional fees.  If continuous monitoring is not provided, neither the time component nor the base codes should be billed because appropriate oversight was not given.

46.     CPT Code 95940 is specified for continuous IONM <u>in the operating room</u>, which is one-on-one monitoring requiring personal attendance.  Each unit of CPT code 95940 represents 15 minutes of monitoring time, rounded to the nearest 15 minute interval.  All insurers accept the "in-room" CPT code 95940.

47.     CPT Code 95941 is specified for continuous IONM from <u>outside</u> the operating room, remote or nearby, <u>or</u> for monitoring of more than one surgery while in the operating room.  Each unit of CPT 95941 represents one hour of monitoring time, rounded to the nearest hour.  Medi-Cal and commercial insurers (other than United Healthcare) accept CPT 95941.

48.     HCPCS Code G0453 is specified for continuous IONM from <u>outside</u> the operating room, remote or nearby.  Each unit of G0453 represents 15 minutes of monitoring time, rounded to the nearest 15 minute interval.  The insurers who require usage of G0453 include Medicare, United Healthcare, Worker's Compensation, and Senior HMOs.

49.     Medicare developed CPT Code G0453 to be used in place of CPT 95941 because it does not pay the professional time component for multiple *simultaneous* monitoring surgeries—which is allowed under CPT 95941.  United Healthcare, Worker's Compensation carriers, and Senior HMO's have since followed Medicare's rule in this regard.

50.     Notably, all three of these CPT codes require *continuous* monitoring of the IONM signals by qualified physicians.  USC's own internal training materials emphasize this point, stating, in pertinent part:

> "CPT introductory language and AMA coding guidance is clear that in order to bill these codes (+95940, +95941, or G0453) the service must be performed by a monitoring professional who is **SOLELY DEDICATED** to performing the intraoperative neurophysiologic monitoring and is available to intervene at all times during the service as necessary."

(Exhibit 2, at 14.  Emphasis in original.)

/ / /

/ / /

51.     As described above, along with each monitoring code, the physician typically also bills "base" codes that describes the particular modalities being monitored.  Examples of common base codes include somatosensory evoked potentials or SEP (CPT 95938), motor evoked potentials or MEP (CPT 95939), electroencephalography or EEG (CPT 95822), and EMG (CPT 95861).  Because professional oversight was not performed continuously, Defendant should not have submitted claims for such base codes.  In other words, for every false monitoring code billed, Defendant typically submitted false base code charges as well.

52.     In most instances, USC also charged payers for the work provided by the technologist under the "technical component" of base codes or monitoring codes.  Because Defendant failed to provide professional IONM oversight, Defendant's claims for the technical component were false and fraudulent.  Because the IONM procedure was not performed as required by standard of care, all payments including monies paid for technologists and oversight physicians were false and fraudulent.

53.     Prior to 2013, the only CPT code designed for IONM monitoring (on top of the base codes) was 95920.  CPT 95920 could be used for in-room or remote monitoring, and each unit represented one hour of monitoring.  Under CPT 95920, Medicare only allowed remote monitoring of one surgery at a time.

### 4.     Evidence of Defendant's Fraudulent Conduct

54.     Over the course of the past decade, Defendant has perpetrated a fraud on taxpayers and insurance companies by falsifying medical records, billing and receiving monies for IONM services not rendered, and falsifying documents to misrepresent time spent performing purported patient care at USC Keck and LAC+USC Medical Center in order to receive inflated funding.  The fraudulent schemes described in this complaint have occurred at the direction of, or with the knowledge of, high ranking members of the USC Keck Division of Neurology, including:  Helena Chang Chui, M.D. ("Dr. Chui"), the Chair of Neurology, Andres Gonzalez, M.D. ("Dr. Gonzalez"), IONM Division Chief, and Parastou Shilian, D.O. ("Dr. Shilian"), Senior Attending.  It

1   is likely that Drs. Gonzalez and Chui have perpetrated these frauds since 2006, and Dr.

2   Shilian since 2011.  Dr. Chui is Professor and Chair of Neurology at Defendant's Keck

3   School of Medicine.  She leads the entire Department of Neurology including the

4   IONM physicians and LAC-USC technologists, manages the Department's budget and

5   negotiates the annual MSOA and/or MSAA and/or PSA funding from LAC+USC.  Dr.

6   Gonzalez is an Assistant Professor of Neurology and the IONM Division Chief who

7   directs the Surgical Neurophysiology Program at Defendant's Keck Hospital of USC

8   and the L.A. County-USC Medical Center.  Dr. Shilian is an Assistant Professor of

9   Neurology and Senior Attending for the IONM Division, at Defendant's Keck School

10  of Medicine.  Drs. Gonzalez and Shilian provide IONM clinical services based on a set

11  weekly schedule, distributed by Dr. Chui, under which only one attending physician is

12  "in charge" of clinical decisions on a given day.  As detailed below, despite this set

13  schedule, in order to maximize reimbursement, USC instituted a "group billing"

14  scheme pursuant to which it bills payers under the names of physicians who did not

15  perform the service.

16      55.    Defendant repeatedly fraudulently billed Medicare, Medi-Cal, and private

17  insurers for IONM oversight at both USC Keck and LAC+USC by, among other

18  things, billing for services not provided, upcoding, and falsifying/switching the names

19  of the monitoring physician to maximize reimbursement.  The following cases provide

20  examples of the multiple fraudulent and false aspects of USC's procedures at both

21  USC Keck and LAC+USC hospitals.

22          i.      **Fraudulent billing for "In-Room" monitoring when
23                  monitoring was performed remotely or not at all**

24      56.    Patient DF, a 65-year-old, underwent surgery at LAC+USC on August 15,

25  2017.  USC provided IONM services for the surgery.  USC falsely certified that it

26  provided eight units of in-room "Continuous IONM" under CPT code 95940.  USC

27  listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any

28  other USC IONM monitoring physician, was present in the operating room during the

1  surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
2  exits to the operating room.  (See Exhibit 3.)  USC's internal billing records for the
3  surgery are attached hereto as Exhibit 4.  Patient DF was insured by Los Angeles
4  County's In-Home Support Services program, which is funded through a mix of local,
5  state, and federal taxpayer dollars.  As indicated in the surgical notes, during the
6  procedure, there was a critical change in IONM signals which prompted the
7  neurosurgeon to perform an urgent and unplanned, additional surgical procedure.  At
8  the end of the entire surgery, IONM signals were still significantly reduced.  (See
9  Exhibit 3.)  The IONM note was signed only by the technologist, not Dr. Gonzalez or
10  any other monitoring physician, thereby reflecting and confirming that necessary
11  oversight was not provided.  This failure directly violates standard medical practice
12  and various payer requirements.

13      57.    Patient MG, a 61-year-old, underwent surgery at LAC+USC on March 2,
14  2018.  USC provided IONM services for the surgery.  USC falsely certified that it
15  provided seven units of in-room "Continuous IONM" under CPT code 95940.  USC
16  listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any
17  other USC IONM monitoring physician, was present in the operating room during the
18  surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
19  exits to the operating room.  Patient MG was insured by Medi-Cal.  The IONM note
20  was signed only by the technologist, not Dr. Gonzalez or any other monitoring
21  physician, thereby reflecting and confirming that necessary oversight was not
22  provided.  This failure directly violates standard medical practice and various payer
23  requirements.

24      58.    Patient QTH, a 62-year-old, underwent surgery at LAC+USC on March 2,
25  2018.  USC provided IONM services for the surgery.  USC falsely certified that it
26  provided six units of in-room "Continuous IONM" under CPT code 95940.  USC
27  listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any
28  other USC IONM monitoring physician, was present in the operating room during the

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and exits to the operating room.  Patient QTH was insured by Los Angeles County's In-Home Support Services program, which is funded through a mix of local, state, and federal taxpayer dollars. The IONM note was signed only by the technologist, not Dr. Gonzalez or any other monitoring physician, thereby reflecting and confirming that necessary oversight was not provided.  This failure directly violates standard medical practice and various payer requirements.

59.     Patient LL, a 32-year-old, underwent surgery at LAC+USC on June 5, 2015.  USC provided IONM services for the surgery.  USC falsely certified that it provided in-room "Continuous IONM" under CPT code 95940.  USC listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any other USC IONM monitoring physician, was present in the operating room during the surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and exits to the operating room.  Patient LL was insured by Medi-Cal.

60.     Patient HL, a 54-year-old, underwent surgery at LAC+USC on December 19, 2017.  USC provided IONM services for the surgery.  USC falsely certified that it provided eight units of in-room "Continuous IONM" under CPT code 95940.  USC listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any other USC IONM monitoring physician, was present in the operating room during the surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and exits to the operating room.  Patient HL was insured by Medi-Cal. As indicated in the surgical notes, there were neurological complications during the surgery.  At the end of the surgery, the patient was woken up in the operating room and demonstrated complete loss of motor function on the right side of his body.  The IONM note was signed only by the technologist, not Dr. Gonzalez or any other monitoring physician, thereby reflecting and confirming that necessary oversight was not provided.  This failure directly violates standard medical practice and various payer requirements.

/ / /

61.     Patient MM, a 60-year-old, underwent surgery at LAC+USC on January 6, 2017.  USC provided IONM services for the surgery.  USC falsely certified that it provided four units of in-room "Continuous IONM" under CPT code 95940.  USC listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any other USC IONM monitoring physician, was present in the operating room during the surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and exits to the operating room.  Patient MM was insured by Medi-Cal Managed Care.  As indicated in the surgical notes, there were neurological complications during the surgery, and MM awoke the day after surgery with complete loss of motor function on her left side. The IONM note was signed only by the technologist, not Dr. Gonzalez or any other monitoring physician, thereby reflecting and confirming that necessary oversight was not provided.  This failure directly violates standard medical practice and various payer requirements.

62.     Patient KP, a 30-year-old, underwent surgery at LAC+USC on July 17, 2015.  USC provided IONM services for the surgery.  USC falsely certified that it provided in-room "Continuous IONM" under CPT code 95940, which lasted six and a half hours, according to the technologist's report.  USC listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any other USC IONM monitoring physician, was present in the operating room during the surgery, as evidenced by the final OR Intraoperative Record, which tracks all entries and exits to the operating room.  Patient KP was insured by Medi-Cal Managed Care. The IONM note was signed only by the technologist, not Dr. Gonzalez or any other monitoring physician, thereby reflecting and confirming that necessary oversight was not provided.  This failure directly violates standard medical practice and various payer requirements.

63.     Patient LSG, a 21-year-old, underwent surgery at LAC+USC on March 28, 2018.  USC provided IONM services for the surgery.  USC falsely certified that Shilian provided in-room "Continuous IONM" under CPT code 95940, which lasted

1  three and a half hours before it was discontinued.  USC listed Dr. Shilian as the
2  monitoring physician.  In fact, neither Dr. Shilian, nor any other USC IONM
3  monitoring physician, was present in the operating room during the surgery, as
4  evidenced by the final OR Intraoperative Record, which tracks entries and exits to the
5  operating room.  Patient LSG was insured by Medi-Cal.  The IONM note was signed
6  only by the technologist, not Dr. Shilian or any other monitoring physician, thereby
7  reflecting and confirming that necessary oversight was not provided.  This failure
8  directly violates standard medical practice and various payer requirements.

9      64.    Patient ES, a 68-year-old, underwent surgery at LAC+USC on January
10  19, 2018.  USC provided IONM services for the surgery.  USC falsely certified that it
11  provided six units of in-room "Continuous IONM" under CPT code 95940.  USC
12  listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any
13  other USC IONM monitoring physician, was present in the operating room during the
14  surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
15  exits to the operating room.  Patient ES was insured by Medicare. As indicated in the
16  surgical notes, there were neurological complications during the surgery, and ES lost
17  significant motor function in her upper right arm.  The IONM note was signed only by
18  the technologist, not Dr. Gonzalez or any other monitoring physician, thereby
19  reflecting and confirming that necessary oversight was not provided.  This failure
20  directly violates standard medical practice and various payer requirements.

21      65.    Patient CS, a 51-year-old, underwent surgery at LAC+USC on March 2,
22  2018.  USC provided IONM services for the surgery.  USC falsely certified that it
23  provided six units of in-room "Continuous IONM" under CPT code 95940.  USC
24  listed Dr. Gonzalez as the monitoring physician.  In fact, neither Dr. Gonzalez, nor any
25  other USC IONM monitoring physician, was present in the operating room during the
26  surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
27  exits to the operating room.  Patient CS was insured by Medi-Cal Managed Care.  The
28  IONM note was signed only by the technologist, not Dr. Gonzalez or any other

1   monitoring physician, thereby reflecting and confirming that necessary oversight was
2   not provided.  This failure directly violates standard medical practice and various payer
3   requirements.

4       66.    Patient MS, a 61-year-old, underwent surgery at LAC+USC on March 28,
5   2018.  USC provided IONM services for the surgery.  USC falsely certified that it
6   provided five units of in-room "Continuous IONM" under CPT code 95940.  USC
7   listed Dr. Shilian as the monitoring physician.  In fact, neither Dr. Shilian, nor any
8   other USC IONM monitoring physician, was present in the operating room during the
9   surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
10  exits to the operating room.  Patient CS was insured by Medi-Cal Managed Care.  The
11  IONM note was signed only by the technologist, not Dr. Shilian or any other
12  monitoring physician, thereby reflecting and confirming that necessary oversight was
13  not provided.  This failure directly violates standard medical practice and various payer
14  requirements.

15      67.    Patient DV, a 38-year-old, underwent surgery at LAC+USC on July 7,
16  2016.  USC provided IONM services for the surgery.  USC falsely certified that it
17  provided five units of in-room "Continuous IONM" under CPT code 95940.  USC
18  listed Dr. Shilian as the monitoring physician.  In fact, neither Dr. Shilian, nor any
19  other USC IONM monitoring physician, was present in the operating room during the
20  surgery, as evidenced by the final OR Intraoperative Record, which tracks entries and
21  exits to the operating room.  Patient DV was insured by Medi-Cal.  The IONM note
22  was signed only by the technologist, not Dr. Shilian or any other monitoring physician,
23  thereby reflecting and confirming that necessary oversight was not provided.  This
24  failure directly violates standard medical practice and various payer requirements.

25      68.    As these examples show, USC's physicians did not provide continuous
26  oversight as required by standard of care, the MSOA and/or MSAA and/or PSA
27  contracts, and the CPT codes under which the services were billed.  As to surgeries at
28  LAC+USC, this directly violated the MSOA and/or MSAA and/or PSA contracts

1    under which Los Angeles County was paying USC significant amounts of taxpayer

2    money, and also caused the County to submit false claims for payment to Medicare,

3    Medi-Cal, and private insurers.

4          69.    Ironically, Drs. Gonzalez and Shilian did not sign IONM notes for the

5    LAC+USC surgeries that they were supposed to have monitored, presumably out of a

6    misguided fear of being held liable for harm suffered by patients during those surgeries

7    and being prosecuted for ordering technologists to submit fraudulent billing of "in-

8    room" physician services under the physicians' provider numbers.

9          ii.    **Upcoding at USC Keck by misrepresenting location of**
                  **physician monitoring as "In Room"**
10

11         70.    At USC Keck, Defendant defrauded insurance by billing codes for "in

12   room" monitoring (CPT 95940) in combination with "remote" monitoring (CPT

13   95941) in the same surgery.  Defendant repeatedly misrepresented location of service

14   to fraudulently obtain higher reimbursements and knowingly took advantage of the

15   significantly higher reimbursement rates that USC contracted with commercial insurers

16   for performing in-room IONM monitoring compared to remote IONM monitoring.

17         71.    Patient TV was a 63 year-old woman who underwent spine surgery at

18   USC Keck on March 5, 2018.  The total duration of intraoperative monitoring was 9

19   hours.  Dr. Shilian billed the patient's insurance, Blue Shield PPO, 9 units of CPT

20   95940 for in-room monitoring in addition to 7 units of CPT 95941 for remote

21   monitoring.  The detailed operating room log from the surgery recorded 26 different

22   individuals who entered and exited the surgery including the 4 USC IONM

23   technologists who made 14 entries and exits.  Despite the fact that Dr. Shilian charged

24   insurance for 9 units of in-room monitoring for this surgery, there is no documentation

25   of her presence in the operating room.  (Exhibit 11).

26   / / /

27   / / /

28   / / /

           iii.       **Fraudulent billing for ENT procedures where physician monitoring not provided**

72.    As described above, in nearly all Ear, Nose and Throat ("ENT") surgeries at both USC Keck and LAC+USC, IONM is performed using a machine (NIM) that does not allow for remote monitoring; the monitoring physician must be present in the operating room. USC nonetheless fraudulently billed for remote IONM monitoring for ENT surgeries performed at USC Keck and in person IONM monitoring for ENT surgeries performed at both USC Keck and LAC+USC despite the fact that OR records will show the physician was never in the operating room for these cases. Moreover, on cases at LAC+USC, for which USC was being paid directly through MSOA and/or MSAA and/or PSA funding to provide IONM services by technologists and physicians, USC did not provide physician oversight of ENT surgeries, in violation of the terms of its contract with LAC+USC and the standard of care.

73.    For example, patient JQ underwent ENT surgery at LAC+USC on September 18, 2017. An IONM technologist was present, but USC provided no in-person or remote physician monitoring of the procedure. The technologist was an outside vendor hired by USC to perform IONM technologist services during this ENT surgery. During the surgery, the technologist provided interpretation of the NIM data to the surgical team without physician oversight which is not the standard of care. Thereafter, he sent an email to Defendant's IONM administrative assistant citing concern that the lead USC IONM technologist informed him there is no professional oversight of ENT surgeries at the hospital. Specifically, the vendor technologist wrote: "I was told…there was no remote oversight, nor Medical Report for these cases, just the handwritten Event Log and Tech Billing Sheet. Again, there was no neurologist oversight." (See Exhibit 5.)

74.    On June 12, 2018, patient EH underwent ENT surgery at Keck Hospital. Dr. Gonzalez fraudulently claimed to have monitored the surgery remotely for two hours, and billed the insurer—Anthem Blue Cross—for two units of G0453.

75. On July 17, 2018, patient AK underwent ENT surgery at Keck Hospital. Dr. Gonzalez fraudulently claimed to have monitored the surgery remotely for three hours, and billed the insurer—Aetna Student Health—for three units of CPT code 95941. Moreover, the medical record indicates that Dr. Gonzalez did not sign the IONM note despite billing for the case.

76. On June 12, 2018, patient RL underwent ENT surgery at Keck Hospital. Dr. Gonzalez fraudulently claimed to have monitored the surgery remotely for five hours, and billed the insurer—Anthem Blue Cross—for five units of CPT code 95941.

77. On April 27, 2018, patient GP underwent ENT surgery at Keck Hospital. Dr. Shilian fraudulently claimed to have monitored the surgery remotely for 1.75 hours, and billed the insurer—Medicare—for seven units of G0453.

### iv. Falsification of provider name in order to maximize billing

78. As described above, certain insurers, including Medicare, United Healthcare, Worker's Compensation carriers, and Senior HMO do not pay for the time spent monitoring more than one surgery at a time. Medi-Cal and certain commercial carriers do. Accordingly, if a physician was monitoring two surgeries at a time, and one of those surgeries was for a patient covered by Medicare, United Healthcare, Worker's Compensation, or Senior HMO, then USC simply falsified the record of one of the surgeries, switching the monitoring physician's name to another; typically a physician that was not scheduled to make clinical IOM decisions on that particular day at all.

79. The most straightforward evidence of this scheme are charges that Drs. Gonzalez and Shilian billed on days that they were not even available for IONM services. Per the division policy set by Dr. Chui, Dr. Gonzalez does not perform any IONM monitoring services on Mondays, which is considered his "academic day"—reserved for administrative and academic duties. Similarly, Dr. Shilian does not perform any IONM monitoring services on Thursdays; her "academic day."

80.     Nonetheless, Drs. Gonzalez and Shilian fraudulently billed for hundreds of IONM monitoring services on Mondays and Thursdays for the past several years.

81.     For example, patient EN underwent surgery at Keck Hospital on February 12, 2018—a Monday.  USC fraudulently billed the IONM monitoring services under Dr. Gonzalez' name, when in fact he provided no monitoring.  USC fraudulently billed Medicare for 12 units of CPT code G0453 in addition to several base codes.

82.     Patient LM, a 73 year-old Medicare patient, underwent surgery at Keck Hospital on December 7, 2017—a Thursday.  Despite not providing clinical IONM care, Dr. Shilian fraudulently billed the patient's Medicare Advantage plan for 24 units of CPT code G0453 in addition to several base codes.

83.     Attached hereto as Exhibit 6 is an internal spreadsheet listing 107 examples of IONM monitoring services at USC Keck fraudulently billed by Drs. Gonzalez and Shilian in 2017, for surgeries on dates on which they could not have provided such services because they fell on their "academic days."

84.     Dr. Shilian even billed for IONM services when she was out of the country, on vacation in Italy (and even if she actually provided remote monitoring services while on vacation, Medicare does not allow medical services to be provided from outside of the United States).  Specifically, patient DW underwent surgery at Keck Hospital on August 15, 2017.  Dr. Shilian was out of the country on that date. Dr. Shilian nonetheless fraudulently billed Medicare for 33 units of CPT code G0453 in addition to several base codes.  Notably, the Event Log for the surgery indicates that there was a critical drop in IONM signals during the procedure, which the technologist communicated to whichever physician was supposedly monitoring the surgery— without documentation in the Event Log of any reply by the neurologist. (See Exhibit 10).

85.     This switching of physician names was not a mistake.  USC knowingly and intentionally falsified the names of the performing physicians in order to maximize reimbursement.

### v.   Misrepresentations to L.A. County in connection with the MSOA and/or MSAA and/or PSA Contract

86.    In connection with the MSOA and/or MSAA and/or PSA contract with USC, Los Angeles County requires USC, twice yearly, to certify the time actually spent by USC's physicians for work at LAC+USC.  These certifications are referred to as "Provider Time Studies" (PTS).  In an internal e-mail, USC described the purposes of PTS as follows:

> "All providers of these services are required to complete a Provider Time Study (PTS) survey twice a year in order to be in compliance with the county, state and federal government's cost reporting mandates; and to supply verification that the Keck School of Medicine is meeting its MSOA contractual service obligations."

(Exhibit 7.)

87.    USC falsified the PTS for at least one of its IONM physicians, fraudulently reporting that 100% of that physician's time was dedicated to providing IONM monitoring services—or being "on call"—at LAC+USC.  In fact, for the past several years, the IONM division policy set by Dr. Chui and memorialized in a schedule Dr. Chui distributed to the IONM physicians on June 29, 2018, strictly limited each IONM physician to certain days of the week on which they could make clinical decisions at both USC Keck and LAC+USC.

88.    As indicated in USC's own internal documents, these PTS reports were material not only to USC's cost reporting mandates, but also verification of USC's compliance—or lack thereof—with its MSOA and/or MSAA and/or PSA contract with Los Angeles County.

### vi.   Chat logs show lack of monitoring

89.    As described above, typewritten real-time chat logs serve as the bilateral communication channel between the operating room and the IONM physicians engaged in remote monitoring.  The chat logs for surgeries monitored by USC physicians further evidence the failures to monitor described above, and also highlight

1  additional problems with USC's IONM services which is the reason why Drs.

2  Gonzalez and Shilian ordered the chat logs deleted.

3      90.   For example, patient RD, a 77 year-old Medicare patient, underwent

4  surgery at Keck Hospital on April 22, 2016.  According to the Event Log, which is the

5  IONM technologist's real-time record of the surgery, the procedure commenced at

6  approximately 3:00 p.m.  However, the first record in the Chat Log, which should

7  record all communications between the technologist and the monitoring physician, did

8  not occur until 4:48 p.m.  That communication was from Dr. Gonzalez to the

9  technologist, and reads: "text me if any changes."  This is a blatant admission by Dr.

10  Gonzalez that he was not continuously monitoring, and had no intention of doing so.

11  Instead, he left the monitoring responsibility to the technologist, a fundamental breach

12  of the standard of care.  Worse still, one hour and twenty-two minutes later, the

13  technologist attempted to communicate a problem to Dr. Gonzalez via the Chat Log:

14  "Lt triceps & biceps 50% down from baseline."  This is precisely the type of issue that

15  the monitoring physician is responsible for recognizing and interpreting, and for

16  communicating feedback or a recommendation to the operating surgeon.  There was no

17  response from Dr. Gonzalez, however, and the surgery ended 45 minutes later.

18  Despite this utter failure to monitor the surgery, Dr. Gonzalez billed for two and a half

19  hours of monitoring (10 units of G0453) on top of multiple base codes.

20      91.   Similarly, patient BG, a 71 year-old Medicare patient, underwent surgery

21  at Keck Hospital on August 4, 2015.  The Chat Log reflects no communication

22  between the monitoring physician (Dr. Shilian) and the technologist until two and a

23  half hours into the surgery.  The technologist writes: "dr. Shilian / are you there / are

24  you there?"  There is no response from Dr. Shilian.  As reflected in the Event Log, the

25  technologist was attempting to reach Dr. Shilian because there was a problem:

26  neurological signals in the left arm were down significantly from baseline.  The

27  technologist never received a response from Dr. Shilian, and the technologist, nurse,

28  and surgeon were left on their own to troubleshoot.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

92.    Knowing that Chat Logs such as these lay bare the deficiencies of USC's IONM monitoring, Drs. Gonzalez and Shilian instructed IONM technologists and staff to simply delete all Chat Logs.  Attached hereto as Exhibit 8 are Meeting Minutes from a June 27, 2018 Department meeting wherein staff were reminded to "Stop saving chat logs."  The instruction was reiterated at a meeting on July 18, 2018, as reflecting in the Meeting Minutes.  (Exhibit 9.)  This bold destruction of evidence—and part of patients' medical records—is without excuse.

*****

93.    The schemes described above have led to fraud, waste, abuse, and thousands of violations of the False Claims Act, California False Claims Act, and California Insurance Fraud Protections Act.  Defendant's schemes (1) caused the submission of false claims for reimbursement for both the professional and technical components of IONM services at USC Keck Hospital; (2) caused the submission of false claims for reimbursement for both the professional and technical components of IONM services at LAC+USC; (3) fraudulently induced Los Angeles County to enter into the MSOA and/or MSAA and/or PSA contracts under which USC was paid to provide services by IOM technologists and IOM physicians at LAC+USC; and (4) submitted false claims for payment to Los Angeles County under the MSOA and/or MSAA and/or PSA contracts.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### ON BEHALF OF THE UNITED STATES
#### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
#### PRESENTING FALSE CLAIMS

#### (31 U.S.C. § 3729(a)(1)(A))

94.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

95.    Defendant knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

96.    Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare and Medicaid program that were higher than they were permitted to claim or charge by applicable law for in-person monitoring physician services, among other things.

97.    Defendant knowingly submitted false claims to Medicare with the incorrect monitoring physician's name in order to circumvent Medicare's limit of reimbursement for one surgery at a time, per monitoring physician.

98.    Defendant knowingly made false claims and certifications that physicians remotely monitored surgeries, when in fact, only a technologist monitored.

99.    Defendant knowingly made false certifications that physicians provided services during ENT surgeries.

100.    Defendant knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

101.    The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**SECOND CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**MAKING OR USING FALSE RECORDS OR STATEMENTS**
**MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS**

**(31 U.S.C. § 3729(a)(1)(B))**

102.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

/ / /

COMPLAINT                                                                                         27

103.   Defendant knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

104.   Defendant knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare program.  Among other things, Defendant knowingly submitted false claims for Medicare and Medicaid business.

105.   The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### THIRD CAUSE OF ACTION

**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**RETENTION OF PROCEEDS TO WHICH NOT ENTITLED**

**(31 U.S.C. 3729(A)(1)(G))**

106.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

107.   Defendant knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit money property to the United States, or knowingly concealed or knowingly improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

108.   Defendant received far more money from the Medicaid and Medicare programs than they were entitled.  Defendant knew that they had received more money than they were entitled to, and avoided their obligation to return the excess money to the United States.

109.   The conduct of Defendant violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
### PRESENTING FALSE CLAIMS

### (Cal. Gov. Code § 12651, subd. (a)(1))

110.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

111.   Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

112.   Defendant's false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

113.   The State of California sustained damages because of Defendant's acts, in amounts to be proved at trial.

## FIFTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
### MAKING OR USING FALSE RECORDS OR STATEMENTS TO OBTAIN
### PAYMENT OR APPROVAL OF FALSE CLAIMS

### (Cal. Gov. Code § 12651, subd. (a)(2))

114.   Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

115.   Defendant knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims approved by the State of California, in violation of the California False Claims Act.

116.   Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims involving State funds, in violation of the California False Claims Act.

/ / /

/ / /

117.  Defendant's false records or statements had the natural tendency to influence, or capable of influencing, the payment or receipt of money, property, or services.

118.  The State of California sustained damages because of Defendant's acts, in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA
### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
### INADVERTENT SUBMISSION OF FALSE CLAIMS

### (Cal. Gov. Code § 12651, subd. (a)(8))

119.  Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

120.  Defendant was the beneficiary of inadvertent submissions of false claims, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California within a reasonable time after discovery of the false claims.

121.  To the extent any of Defendant's complained of acts were inadvertent at the time committed, Defendant subsequently discovered they had engaged in fraudulent billing practices and failed to disclose the facts to the State of California within a reasonable time of such discovery.

122.  Defendant's false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

123.  The State of California sustained damages because of Defendant's acts, in amounts to be proved at trial.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

**COMPLAINT**

30

## SEVENTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA
### CALIFORNIA FRAUDS PREVENTION ACT
### Cal. Ins. Code §1871.7 et seq. and Cal. Pen. Code § 550 et seq.

### (Cal. Ins. Code 1871.7; Cal. Pen. Code 550(a)(5))

124.  Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

125.  This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 et seq., as amended ("the Act").  The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim.  Cal. Ins. Code § 1871.7(b).

126.  Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.  Cal. Ins. Code § 1871.1(e).

127.  Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550.  Section 550 of the Penal Code prohibits the following activities, among others:

> (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
>
> ******
>
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
>
> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
>
> *****
>
> (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

128.   By virtue of the acts described in this Complaint, Defendant knowingly presented, or caused to be presented, false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment from insurers, in violation of Penal Code § 550(a) and Cal. Ins. Code § 1871.7(b).  The claims were false or fraudulent because, among other things:

- Defendant knowingly sought, and falsely represented that it was entitled to reimbursement in excess of amounts it was owed;

- Defendant knowingly sought and falsely represented that it was entitled to reimbursement for services not actually performed;

- Defendant knowingly sought, and falsely represented that it was entitled to, reimbursement for treatment that did not meet the required conditions set out by insurers for reimbursement.

129.   Defendant either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

130.   This conduct was a substantial factor in causing damages as detailed herein.

1    131.   The California State Government is entitled to receive three times the

2  amount of each claim for compensation submitted in violation of Cal. Ins. Code §

3  1871.7.  Additionally, the California State Government is entitled to the maximum

4  penalty of $10,000 for each and every violation alleged herein.

5  **VI.    PRAYER FOR RELIEF**

6         WHEREFORE, Plaintiff the United States of America, by and through Relator,

7  prays for relief against Defendant as follows:

8  **Pursuant to the False Claims Act:**

9  **TO THE UNITED STATES OF AMERICA AND QUI TAM PLAINTIFF:**

10         1.    For civil penalties of up to the maximum statutory amount to be imposed

11              for each and every false and fraudulent claim for payment submitted,

12              presented, or caused to be submitted to be presented to Medicare for

13              payment;

14         2.    For treble damages resulting to the Medicare system from the conduct of

15              Defendant;

16         3.    For pre- and post-judgment interest;

17         4.    For reasonable attorneys' fees, costs, and expenses incurred in bringing

18              this case; and

19         5.    That Qui Tam Plaintiff be awarded the maximum percentage of recovery

20              allowed to him pursuant to the False Claims Act.

21  **Pursuant to the California False Claims Act:**

22  **TO THE PEOPLE OF CALIFORNIA AND QUI TAM PLAINTIFF:**

23         6.    For the maximum allowable civil penalties to be imposed for each and

24              every false and fraudulent claim for payment submitted, presented, or

25              caused to be submitted to presented to Medi-Cal for payment;

26         7.    For treble damages resulting to the Medi-Cal system from the conduct of

27              Defendant, and each of them;

28         8.    For pre- and post-judgment interest;

9.      For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

10.     That Qui Tam Plaintiff be awarded the maximum percentage of any recovery allowed to them pursuant to the California False Claims Act.

**Pursuant to the California Insurance Frauds Prevention Act:**

**TO THE PEOPLE OF CALIFORNIA AND QUI TAM PLAINTIFF:**

11.     For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted or presented to an insurance company;

12.     For an assessment of three times the amount of each claim for compensation made by Defendant;

13.     For pre- and post-judgment interest;

14.     For reasonable attorneys' fees, costs, and expenses incurred in bringing this case;

15.     For an award of such other and further relief as this Court deems just and proper; and

16.     That the Qui Tam Plaintiff be awarded the maximum percentage of any recovery allowed to him pursuant to Cal. Ins. Code § 1871.7.


Dated: September 26, 2018            COTCHETT, PITRE & McCARTHY, LLP

                                     By: _____

                                         JUSTIN T. BERGER
                                         SARVENAZ J. FAHIMI
                                     *Attorneys for Relator*

1

## VII.  JURY DEMAND

2          Plaintiffs demand a jury trial on all issues so triable.

3

4   Dated: September 26, 2018                 **COTCHETT, PITRE & McCARTHY, LLP**

5

6                                              By: _____

7                                                    JUSTIN T. BERGER
                                                     SARVENAZ J. FAHIMI
8
                                               *Attorneys for Relator*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**                                                                    35

# EXHIBIT 1

# Model Coverage Policy



## Principles of Coding for Intraoperative Neurophysiologic Monitoring (IOM) and Testing[1]

### BACKGROUND

Intraoperative neurophysiologic monitoring (IOM) and testing are medical procedures that have been in standard practice for almost 30 years. The procedures allow monitoring of neurophysiologic signals during a surgical procedure whenever the neuroaxis is at risk as a consequence of either the surgical manipulation or the surgical environment. IOM is an umbrella monitoring term and includes electroencephalography (EEG), cranial nerve evoked potentials (EPs), brain-stem auditory EPs (BAEPs), motor EPs (MEP), somatosensory EPs (SEP), nerve conduction, and electromyography (EMG) signals. Much like the other instrumental clinical monitoring technologies,

such as cardiac or capnic monitoring, randomized controlled trials establishing efficacy of IOM have not been done. Current best data, accumulated over the past two decades, have been derived through comparisons with historical controls and in the number of complications avoided through IOM. Difficulties in procedural blinding would impede accumulation of randomized controlled data. This status is not unlike that of intraoperative transesophageal echocardiography (TEE) or perioperative echocardiography (POE), two other widely-endorsed monitoring technologies (Memtsoudis et. al., 2006, Ng 2009). Both neurophysiologic IOM and TEE/POE are recognized medical practice standards reliant on experience, case series and retrospective analyses.

IOM is of value in surgeries at diverse locations. The types of diseases for which monitoring is helpful also vary. For instance IOM may be necessary for carotid endarterectomies, removal of cortical-hemispheric lesions, extirpation of epileptic foci, brain stem surgeries, spinal corrections and peripheral nerve repairs to name some examples. IOM is used in neurosurgery, orthopedic, vascular, cardiothoracic and other surgical specialties. A compilation of recent reviews for these various areas is available (Nuwer, 2008). This policy addresses only surgical intraoperative monitoring and does not address monitoring performed in radiologic suites. The quality, extent and type of monitoring are dependent on the nature and location of the lesions. The utility of monitoring is exquisitely reliant on the rigors of the monitoring procedure and protocols, and the clinical expertise of the

monitoring physician. We list below several significant instances each of which has independently demonstrated the value of IOM in averting neural injuries during surgery.

[1] Approved by the AAN Board of Directors on February 10, 2012; replaces previous AANPA policy (2010-12).

#### 1. Value of EEG Monitoring in Carotid Surgery

Carotid occlusion, incident to carotid endarterectomies, poses a high risk for cerebral hemispheric injury. EEG monitoring is capable of detecting cerebral ischemia, a serious prelude to injury. Studies of continuous monitoring established the ability of EEG to correctly predict risks of postoperative deficits after a deliberate, but necessary, carotid occlusion as part of the surgical procedure (Redekop & Ferguson, 1992; Cloughesy et al., 1993; Woodworth et al., 2007). The surgeon can respond to adverse EEG events by raising blood pressure, implanting a shunt, adjusting a poorly functioning shunt, or performing other interventions.

#### 2. Multicenter Data in Spinal Surgeries

An extensive multicenter study conducted in 1995 demonstrated that IOM using SEP reduced the risk of paraplegia by 60% in spinal surgeries (Nuwer et al., 1995). The incidence of false negative cases, wherein an operative complication

occurred without having been detected by the monitoring procedure, was small: 0.06% (Nuwer et al., 1995).

#### 3. Technology Assessment of Monitoring in Spinal Surgeries

A technology assessment by the McGill University Health Center (Erickson et al., 2005) reviewed 11 studies and concluded that spinal IOM is capable of

substantially reducing injury in surgeries that pose a risk to spinal cord integrity. It recommended combined SEP/MEP monitoring, under the presence or constant availability of a monitoring physician, for all cases of spinal surgery for which there is a risk of spinal cord injury.

#### 4. Value of Combined Motor and Sensory Monitoring

Numerous studies of post-surgical paraparesis and quadriparesis have shown that both SEP and MEP monitoring had predicted adverse outcomes in a timely fashion (Schwartz et al., 2007; Lee et al., 2006; Nuwer

Principles of Coding for Intraoperative Neurophysiologic
Monitoring (IOM) and Testing Model Coverage Policy


AMERICAN ACADEMY OF
NEUROLOGY®

et al., 1995; Jones et al., 2003; Meyer et al., 1988; Pelosi et al., 2002; Hilibrand et al., 2004; Langeloo et al. 2003; Mostegl et al. 1988; Eggspuehler et al 2007; Leung et al. 2005; Khan et al., 2006; Sutter et al., 2007; Weinzieri et al., 2007). The timing of the predictions allowed the surgeons the opportunity to intervene and prevent adverse outcomes. The two different techniques (SEP and MEP) monitor different spinal cord tracts. Sometimes, one of the techniques cannot be used for practical purposes, for anesthetic reasons, or because of pre-operative absence of signals in those pathways. Thus, the decision about which of these techniques to use needs to be tailored to the individual patient's circumstances.

### 5. Protecting the Spinal Cord from Ischemia during Aortic Procedures

Studies have shown that IOM accurately predicts risks for spinal cord ischemia associated with clamping the aorta or ligating segmental spinal arteries (MacDonald & Janusz, 2002; Jacobs et al., 2000; Cunningham et al., 1987; Kaplan et al., 1986; Leung et al., 2005). IOM can assess whether the spinal cord is tolerating the degree of relative ischemia in these procedures. The surgeon can then respond by raising blood pressure, implanting a shunt, re-implanting segmental vessels, draining spinal fluid, or through other interventions.

### 6. Common Types of Alerting Events Observed During Monitoring

Another recent study (Lee et al., 2006) described types of neurophysiologic alerts and correlated them with postoperative neurological deficits that occurred during the course of 267 procedures involving anterior cervical spine surgery utilizing EMG, transcranial electrical motor and somatosensory evoked potential monitoring. In this study, 18.4 % of cases resulted in at least one intraoperative neurophysiologic alert; and major alerts believed to be related to specific intraoperative surgical maneuvers were identified in 4.6% of the patients monitored. In 88% of the patients with relevant amplitude loss that was thought to be related to the surgical procedure, the signal response returned once appropriate intraoperative corrective measures were taken.

### 7. Value of EMG Monitoring

Selective posterior rhizotomy in cerebral palsy significantly reduces spasticity, increases range of motion, and improves functional skills (Staudt et al., 1995). Electromyography during this procedure can assist in selecting specific dorsal roots to transect. EMG can also be used in peripheral nerve procedures that pose a risk of injuries to nerves (Nuwer, 2008).

### 8. Futility of Monitoring Inappropriate Pathways

In order to be useful, monitoring should assess the appropriate sensory or motor pathways. Incorrect pathway monitoring could miss detection of neural compromise. Examples of "wrong pathway" monitoring have been shown to have resulted in adverse outcomes (Lesser et al., 1986).

### 9. Value of Spinal Monitoring using SSEP and MEPs

According to a recent review of spinal monitoring using SSEP and MEPs by the Therapeutics and Technology Assessment Subcommittee of the AAN and the American Clinical Neurophysiology Society, IOM is established as effective to predict an increased risk of the adverse outcomes of paraparesis, paraplegia, and quadriplegia in spinal surgery (4 Class I and 7 Class II studies) (Nuwer et al., 2012). Surgeons and other members of the operating team should be alerted to the increased risk of severe adverse neurologic outcomes in patients with important IOM changes (Level A).

## NEUROPHYSIOLOGIC TECHNIQUES USED IN IOM

Several neurophysiologic testing modalities are useful during IOM. The location and type of surgery determine the chosen testing modality. The tests and codes listed here may be used individually or in combination.

- Electroencephalography (EEG);
  - With direct physician supervision, use codes 95822 plus 95940 and/or 95941
  - With general physician supervision, use code 95955
- Electrocorticography (ECoG);
  - Use code 95829
- Direct cortical stimulation to localize function;
  - Use codes 95961, 95962

- Deep brain stimulation electrode placement
  - Use codes 95961, 95962
- Pallidotomy site stimulation;
  - Use codes 95961, 95962
- Somatosensory evoked potential (SEP) monitoring
  - Use codes 95925, 95926, 95927, or 95938 plus 95940 and/or 95941

## Principles of Coding for Intraoperative Neurophysiologic Monitoring (IOM) and Testing Model Coverage Policy


AMERICAN ACADEMY OF NEUROLOGY®

- Intraoperative SEP identification of the sensorimotor cortex
  - Use codes 95961, 95962
- Motor evoked potentials (MEP)
  - Use codes 95928, 95929, or 95939 plus 95940 and/or 95941
- Mapping the descending corticospinal tract
  - Use codes 95928, 95929, or 95939 plus 95940 and/or 95941
- Brainstem auditory evoked potentials
  - Use code 92585 plus 95940 and/or 95941
- Peripheral nerve stimulation and recording
  - Use one code from among codes 95907-95913, plus 95940 and/or 95941

- Oculomotor, facial, trigeminal and lower cranial nerve monitoring
  - Use codes 95867, 95868 and/or 95933 plus 95940 and/or 95941
- EMG monitoring and testing of peripheral limb pathways
  - Use codes 95861, 95862 or 95870 plus 95940 and/or 95941
- Pedicle screw stimulation
  - Use codes 95861, 95862 or 95870 plus 95940 and/or 95941
- Selective dorsal rhizotomy rootlet testing;
  - Use codes 95861, 95862 or 95870 plus 95940 and/or 95941
- Transcranial electrical MEPs (tceMEPs) for external anal and urethral sphincter muscles monitoring.
  - Use code 95870 plus 95940 and/or 95941

### LIMITATIONS ON COVERAGE

To derive optimal benefits from this technology it is incumbent on the IOM team to understand the limits of the technology, listed below.

#### 1. Use of Qualified Personnel

IOM must be furnished by qualified personnel. For instance, the beneficial results of monitoring with SSEPs demonstrated by the 1995 multicenter study (Nuwer et al., 1995) showed fewer neurological deficits with experienced monitoring teams. While false positive events were significant in only 1% of cases, the negative predictive value for this technique was over 99%. Thus, absence of events during monitoring signifies and assures safety of the procedure. In general it is recommended that the monitoring team strive to optimize recording and interpreting conditions such that:

- A well-trained, experienced technologist, present at the operating site, is recording and monitoring a single surgical case; and
- A monitoring clinical neurophysiologist supervises the technologist.

#### 2. Effects of the Depth of Anesthesia and Muscle Relaxation

The level of anesthesia may also significantly impact on the ability to interpret intraoperative studies; therefore, pre-operative planning and continuous communication between the anesthesiologist and the monitoring team is expected.

#### 3. Recording Conditions

It is also expected that a specifically trained technologist or non-physician monitorist, preferably with credentials from the American Board of Neurophysiologic Monitoring or the American Board of Registration of Electrodiagnostic

Technologists (ABRET), will be in continuous attendance in the operating room, with either the physical or electronic capability for real-time communication with the supervising physician.

#### 4. Monitoring Necessity

Intraoperative monitoring is not medically necessary in situations where historical data and current practices reveal no potential for damage to neural integrity during surgery. Monitoring under these circumstances will exceed the patient's medical need (Social Security Act (Title XVIII); Medicare Benefit Policy Manual).

#### 5. Communications

Monitoring may be performed from a remote site, as long as a well-trained technologist (see detail above) is in continuous attendance in the operating room, with either the physical or electronic ability for prompt real-time communication with the supervising monitoring physician.

#### 6. Supervision Requirements

Different levels of physician supervision apply to different kinds of IOM procedures. Code 95940 supervision require continuous physician monitoring in the operating room (OR). Code 95941 supervision require continuous physician monitoring which can be provided online or in the operating room (OR). Codes 95961-95962 (Functional cortical localization with brain stimulation) require personal physician supervision in the OR.

# Principles of Coding for Intraoperative Neurophysiologic Monitoring (IOM) and Testing Model Coverage Policy



## USE OF CODES 95940, 95941 AND THEIR BASE PROCEDURE CODES

1. IOM is a procedure that describes ongoing electrophysiologic testing, and monitoring performed during surgical procedures. It includes only the time spent during an ongoing, concurrent, real-time electrophysiologic monitoring.

2. Time spent in clinical activities, other than those above, should not be billed under 95940 and/or 95941. The time spent performing or interpreting the baseline electrophysiologic studies must not be counted as intraoperative monitoring, but represents separately reportable procedures.

   For example, 95940 and 95941 are distinct from performance of specific types of pre-procedural baseline electrophysiologic studies (95860, 95861, 95867, 95868, 95907-95913. 95933, 95937) or other interpretation of specific types of baseline electrophysiologic studies (95985, 95922, 95925-95930, 95938, 95939).

   The supervising physician time spent in the operating room includes the time from entering until leaving the operating room, except for the time spent interpreting the baseline testing. For remote monitoring, it includes time from initiating to discontinuing monitoring except for the time spent interpreting the baseline testing.

3. Note that the supervision requirements for each underlying test or primary test modality vary, and must be met (Medicare Benefit Policy Manual). For example, cortical mapping during monitoring requires personal supervision.

4. Codes 95940 and 95941 may not be reported by the surgeon or anesthesiologist performing an operative procedure, since it is included in the global package if they serve as the IOM supervising physician.. The surgeon performing an operative procedure may not bill other 90000 series neurophysiology testing codes for intraoperative neurophysiology testing (e.g., 92585, 95822, 95860, 95861, 95867, 95868, 95870, 95907-95913, 95925-95939) since they are also included in the global package (Medicare Benefit Policy Manual). However, when IOM or baseline procedures are performed by a different, monitoring physician during the procedure, it is separately reportable by the monitoring supervising physician.

5. Codes 95940 and 95941 is performed in the hospital setting. Monitoring of a patient with codes 95940 and 95941 should use hospital site of service (site 21), or hospital outpatient surgery center (site 22), even if the monitoring physician is located in an office. When supervising and interpreting IOM on a hospitalized patient, the supervising physician codes uses modifier -26.

6. Code 95940 requires one-on-one monitoring. Simultaneous cases cannot be coded with 95940. Code 94941 allows for reporting simultaneous cases without division of time between them. The number of cases monitored at any one time will vary, but should not exceed the requirements for providing adequate attention to each. For example, a 2010 AAN survey of IOM practitioners shows that on average 90% of monitoring hours are spent monitoring three (3) or fewer simultaneous cases and that practitioners rarely monitor more than six (6) cases simultaneously (2010 AAN Survey of IOM Practitioners – unpublished).

## CPT/HCPCS CODES

AMA CPT® Copyright Statement: CPT codes, descriptions, and other data are copyright 2016 American Medical Association. All Rights Reserved. Applicable FARS/DFARS Clauses Apply.

Codes 95940, 95941 describe ongoing neurophysiologic monitoring, testing, and data interpretation distinct from performance of specific type(s) of baseline neurophysiologic study(s) performed during surgical procedures. When the service is performed by the surgeon or anesthesiologist, the professional services are included in the surgeon's or anesthesiologists's primary

services code(s) for the procedure and are not reported separately. Do not report these codes for automated monitoring devices that do not require continuous attendance by a professional qualified to interpret the testing and monitoring.

Recording and testing are performed either personally or by a technologist who is physically present with the patient during the service. Supervision is performed either in the operating room or by real time connection outside the operating room. The monitoring professional must be solely dedicated to performing the intraoperative neurophysiologic monitoring

# Principles of Coding for Intraoperative Neurophysiologic Monitoring (IOM) and Testing Model Coverage Policy

 AMERICAN ACADEMY OF NEUROLOGY®

and must be available to intervene at all times during the service as necessary, for the reported time period(s). For any given period of time spent providing these services, the service takes full attention and, therefore, other clinical activities beyond providing and interpreting of monitoring cannot be provided during the same period of time.

Throughout the monitoring, there must be provisions for continuous and immediate communication directly with the operating room team in the surgical suite. One or more simultaneous cases may be reported (95941). When monitoring more than one procedure, there must be the immediate ability to transfer patient monitoring to another monitoring professional during at he surgical procedure should that individual's exclusive attention be required for another procedure. Report 95941 for all remote or non-one-on-one monitoring time connected to each case regardless of overlap with other cases.

Codes 95940, 95941 include only the ongoing neurophysiologic monitoring time distinct from performance of specific type(s) of baseline neurophysiologic study(s), or other services such as intraoperative functional cortical or subcortical mapping. Codes 95940 and 95941 are reported based upon the time spent monitoring only, and not the number of baseline tests performed or parameters monitored. The time spent performing or interpreting the baseline neurophysiological study(ies) should not be counted as intraoperative monitoring, but represents separately reportable procedures. When reporting 95940 and 95941, the same neurophysiologic study(ies) performed at baseline should be reported not more than once per operative session. Baseline study reporting is based upon the total unique studies performed. For example, if during the course of baseline testing and one-on-one monitoring, two separate nerves have motor testing performed in conjunction with limited single extremity EMG, then 95885 and 95907 would be reported in addition to 95940. For procedures that last beyond midnight, report services using the day on which the monitoring began and using the total time monitored.

Code 95940 is reported per 15 minutes of service. Code 95940 requires reporting only the portion of time the monitoring professional was physically present in the operating room providing one-on-one patient monitoring and no other cases may be monitored at the same time. Report continuous intraoperative neurophysiologic monitoring in the operating room (95940) in addition to the services related to monitoring from outside the operating room (95941).

Code 95941 should be used once per hour even if multiple methods of neurophysiologic monitoring are used during the time. Code 95941 requires the monitoring of neurophysiological data that is collected from the operating room continuously on-line in real time via a secure data link. When reporting 95941, real-time ability must be available through sufficient data bandwidth transfer rates to view and interrogate the neurophysiologic data contemporaneously.

Report 95941 for all cases in which there was no physical presence by the monitoring professional in the operating room during the monitoring time or when monitoring more than one case in an operating room. It is also used to report the time of monitoring physically performed outside of the operating room in those cases where monitoring occurred both within and outside the operating room. Do not report 95941 if the monitoring lasted 30 minutes or less.

Intraoperative neurophysiology monitoring codes 95940 and 95941 are each used to report the total duration of respective time spent providing each services, even if that time is not in a single continuous block.

95940    Continuous intraoperative neurophysiology monitoring in the operating room, one on one monitoring requiring personal attendance, each 15 minutes (List separately in addition to code for primary procedure)

95941    Continuous intraoperative neurophysiologic monitoring, from outside the operating room (remote or nearby) or for monitoring of more than one case while in the operating room, per hour (List separately in addition to code for primary procedure)

*(Use 95940 & 95941 in conjunction with the study performed, 92585, 95822, 95860-95870, 95907-95913, 95925-95939)*

*(For time spent waiting on standby before monitoring, use 99360) (For electrocorticography, use 95829)*

*(For intraoperative EEG during nonintracranial surgery, use 95955)*

*(For intreaoperative functional cortical or subcortical mapping, see 95961- 95962)*

*(For intraoperative neurostimulator programming and analysis, see 95970- 95979)*