1   MARLAN B. WILBANKS (GEORGIA SBN 758223 - Admitted Pro Hac Vice)
2   mbw@wilbanksgouinlock.com
    SUSAN S. GOUINLOCK (GEORGIA SBN 303217 - Admitted Pro Hac Vice)
3   ssg@wilbanksgouinlock.com
    WILBANKS & GOUINLOCK, LLP
4   3490 Piedmont Road, NE, Suite 1010
5   Atlanta, Georgia 30305
6   Telephone: (404) 842-1075

7   ALICE CHANG (SBN 239761)
8   alicechangjdmba@gmail.com
    1301 Kenwood Road, Unit 159B
9   Seal Beach, CA 90740
10  Telephone: (714) 507-6161

11  ELIOT J. RUSHOVICH (SBN 252343)
12  eliot@riselawfirm.com
    LISA M. WATANABE-PEAGLER (SBN 258182)
13  lisa@riselawfirm.com
14  ELISSA A. WAIZMAN (SBN 329959)
    elissa@riselawfirm.com
15  RISE LAW FIRM, PC
16  8383 Wilshire Boulevard, Suite 315
    Beverly Hills, CA 90211
17  Telephone: (310) 728-6588

18
    *Attorneys for Relators and Plaintiff-Relator*
19

```
                              FILED
                    CLERK, U.S. DISTRICT COURT

                        9/20/21

                 CENTRAL DISTRICT OF CALIFORNIA
                 BY:_____SE_____DEPUTY
```

20                 **IN THE UNITED STATES DISTRICT COURT**

21             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

22

23                                    | **CASE NO. CV 18-08311-ODW(AS)**

24  **[UNDER SEAL]**,                 |
                                      | **FOURTH AMENDED COMPLAINT**
25             Plaintiffs,            | **FOR MONEY DAMAGES AND**
                                      | **CIVIL PENALTIES FOR:**
26         v.
                                      |     1.  **Violations of the Federal False**
27                                    |         **Claims Act, §3729(a)(1)(A)**
28  **[UNDER SEAL]**,                 |

Defendants.

**2. Violations of the Federal False Claims Act §3729(a)(1)(B)**

**3. Violations of the Federal False Claims Act §3729(a)(1)(G)**

**4. Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(1); Cal. Bus. & Prof Code §§ 650 and 650.1; Cal. Welf. & Inst. Code §14107.2**

**5. Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(2)**

**6. Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(7)**

**7. Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(8)**

**8. Violations of the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871.7; Cal. Pen. Code 550**

**9. Retaliation in Violation of Cal. Lab. Code § 1102.5**

**10. Retaliation in Violation of the False Claims Act 31 U.S.C. § 3730(h); Cal. False Claims Act Gov't Code § 12653; Cal. Insurance Fraud Prevention Act § 1871, *et seq.***

**11. Violations of Cal. Lab. Code § 6310, *et seq*.; Cal. Health and Safety Code § 1278.5, *et seq.***

**12. Violations of Cal. Bus. and Prof. Code § 510**

**13. Unfair Competition, Cal. Bus. and Prof. Code § 17200**

**14. Wrongful Termination in Violation of Public Policy**

**15. Violations of Cal. Lab. Code § 1050**

16. Defamation
17. Private Attorney General Act, Cal. Lab. Code § 2699.5
18. Harassment in Violation of Cal. Gov't. Code § 12940(j)(1)
19. Failure to Prevent Harassment in Violation of Cal. Gov't Code § 12940(k)
20. Negligent Hiring, Supervision and/or Retention
21. Intentional Infliction of Emotional Distress

**<u>DEMAND FOR JURY TRIAL</u>**

**[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

MARLAN B. WILBANKS (GEORGIA SBN 758223 – Admitted Pro Hac Vice)
mbw@wilbanksgouinlock.com
SUSAN S. GOUINLOCK (GEORGIA SBN 303217 -Admitted Pro Hac Vice)
ssg@wilbanksgouinlock.com
WILBANKS & GOUINLOCK, LLP
3490 Piedmont Road, NE, Suite 1010
Atlanta, Georgia  30305
Telephone: (404) 842-1075

ALICE CHANG (SBN 239761)
alicechangjdmba@gmail.com
1301 Kenwood Road, Unit 159B
Seal Beach, CA 90740
Telephone: (714) 507-6161

ELIOT J. RUSHOVICH (SBN 252343)
eliot@riselawfirm.com
LISA M. WATANABE-PEAGLER (SBN 258182)
lisa@riselawfirm.com
ELISSA A. WAIZMAN (SBN 329959)
elissa@riselawfirm.com
RISE LAW FIRM, PC
8383 Wilshire Boulevard, Suite 315
Beverly Hills, CA 90211
Telephone: (310) 728-6588

*Attorneys for Relators and Plaintiff-Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**.; **STATE OF CALIFORNIA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY,** | **CASE NO. CV 18-08311-ODW(AS)** **FOURTH AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR:** **1. Violations of the Federal False Claims Act, §3729(a)(1)(A)** |

**M.D**; **LOS ANGELES COUNTY** *ex rel.*
**IONM LLC**, a Delaware corporation and
*ex rel.* **JUSTIN CHEONGSIATMOY,**
**M.D.**; and **JUSTIN**
**CHEONGSIATMOY, M.D.**, in his
individual capacity,

               Plaintiffs,

       v.

**UNIVERSITY OF SOUTHERN**
**CALIFORNIA**, a California corporation;

       and

**USC CARE MEDICAL GROUP, INC.**,
a California corporation,

              Defendants.

2. **Violations of the Federal False Claims Act §3729(a)(1)(B)**
3. **Violations of the Federal False Claims Act §3729(a)(1)(G)**
4. **Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(1); Cal. Bus. & Prof Code §§ 650 and 650.1; Cal. Welf. & Inst. Code §14107.2**
5. **Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(2)**
6. **Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(7)**
7. **Violations of the California False Claims Act, Cal. Gov. Code §12651(a)(8)**
8. **Violations of the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871.7; Cal. Pen. Code 550**
9. **Retaliation in Violation of Cal. Lab. Code § 1102.5**
10. **Retaliation in Violation of the False Claims Act 31 U.S.C. § 3730(h); Cal. False Claims Act Gov't Code § 12653; Cal. Insurance Fraud Prevention Act § 1871, *et seq.***
11. **Violations of Cal. Lab. Code § 6310, *et seq.*; Cal. Health and Safety Code § 1278.5, *et seq.***
12. **Violations of Cal. Bus. and Prof. Code § 510**
13. **Unfair Competition, Cal. Bus. and Prof. Code § 17200**
14. **Wrongful Termination in Violation of Public Policy**
15. **Violations of Cal. Lab. Code § 1050**

16. Defamation
17. Private Attorney General Act, Cal. Lab. Code § 2699.5
18. Harassment in Violation of Cal. Gov't. Code § 12940(j)(1)
19. Failure to Prevent Harassment in Violation of Cal. Gov't Code § 12940(k)
20. Negligent Hiring, Supervision and/or Retention
21. Intentional Inflict of Emotional Distress

**<u>DEMAND FOR JURY TRIAL</u>**

**[FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

## **TABLE OF CONTENTS**

**Page No.**

I.    **INTRODUCTION** ........................................................................ 1

II.   **JURISDICTION AND VENUE** ............................................. 5

III.  **PARTIES** ................................................................................ 5

A.        Plaintiffs and Relator ........................................................ 5

    B.     Defendants ................................................................... 6

IV.  **DEFENDANTS VIOLATED THE FEDERAL FALSE CLAIMS ACT, PHYSICIAN SELF-REFERRAL AND ANTI-KICKBACK STATUTES, THE CALIFORNIA FALSE CLAIMS ACT AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT** ........................................................ 7

    A.     Statutory Background ............................................................ 7

         1.    Federal False Claims Act ............................................ 7

         2.    The Medicare and Medicaid Programs............................ 9

         3.    The Physician Self-Referral Statute (PSR) .................... 13

         4.    The Anti-Kickback Statute (AKS)................................... 16

         5.    The California False Claims Act ..................................... 18

         6.    California Insurance Frauds Prevention Act ................... 19

    B.     Background for Defendants' Fraudulent Schemes ................... 20

         1.    Intraoperative Neurophysiologic Monitoring (IONM) ................. 20

         2.    Supervision Requirement of Resident Surgeons by Teaching Surgeons under GME and Medicare Regulations ……………………....23

         3.  IONM Current Procedural Terminology Codes and Reimbursement..27

4.    USC's Policies Show Knowledge and Intent to Defraud...............32

5.    USC's Submission of False Claims ................................................45

i.     False Claims related to Monitoring in the Operating Room ........................................................................................45

ii.    False Claims related to Remote Monitoring .......................49

iii.   False Claims related to Misrepresentation of Provider........59

iv.    False Claims related to Monitoring of ENT Surgeries.........65

v.     False Claims related to Both IONM Professional and Technical Components of the Time and Base Codes...…….69

vi.    False Claims and Patient Injuries associated with USC Surgeons and Neurologists at LAC+USC; Fraudulent Contracts ...............................................................................97

C.    Reporting and Retaliation Timeline........................................... 145

D.    Additional Patient Harm and Deaths at USC Keck and LAC+USC ...... 168

E.    False Claims Resulting from Referrals Tainted by Violations of Physician Self-Referral and Anti-Kickback Statutes…………………………………….208

1.    Neurologists…………………………………………………..209

2.    Surgeons…………………………………………………………213

3.    False Claims and Statements…………………………………217

V.    **CAUSES OF ACTION**................................................................. 220

VI.   **PRAYER FOR RELIEF** ............................................................. 248

VII.  **JURY DEMAND** ........................................................................251

Plaintiffs the United States of America (the "United States"), the State of California, and Los Angeles County, by and through Relators IONM, LLC and Justin Cheongsiatmoy, M.D. (hereinafter each individually and collectively referred to as "Relator" or "Qui Tam Plaintiff") and Justin Cheongsiatmoy, M.D., in his individual capacity, allege as follows:

## I.  **INTRODUCTION**

1.     This is a case about death, deception and USC.  While it may not come as a complete shock to hear those words used in the same sentence – given the string of scandals that USC has faced over the past few years – the facts of this case are beyond surprise and reach into the realms of the unfathomable, the deplorable, the absolute worst.  It involves hundreds of millions of dollars stolen from taxpayers, decade-long fraudulent schemes condoned by individuals at the highest levels of the university, hundreds of avoidable patient deaths and injuries and thousands of unsupervised, unsafe surgeries below the standard of care.

2.     The facts of this case are so damning that USC has done everything in its power to try to cover up the truth.  Indeed, as explained in detail below, when a rising star USC Professor, Justin Cheongsiatmoy, M.D., courageously attempted to "blow the whistle" on the unscrupulous and illegal acts taking place at USC Keck Hospital and Los Angeles County Medical Center, rather than heeding his concerns, USC responded by unceremoniously firing him and taking further steps to ensure he would never work again.  While the facts in this case at times may sound like excerpts from a horror movie, this is real life and real people have been permanently affected and deserve justice.

3.     This lawsuit is intended to shed light on the illegal and outrageous practices at USC over the last decade, to disgorge USC of the gargantuan profits it received through deception and deviance, to redress the harm brought upon the USC Professor and esteemed physician who tried to change things, and to send a message to

1   those who support USC that the time is now to call for fundamental changes at the

2   University so none of this conduct ever happens again.

3       4.    Justin Cheongsiatmoy, M.D. brings this action on behalf of himself, the

4   United States, the State of California, and Los Angeles County, to recover severe

5   losses sustained as a result of: (i) fraudulent and unsafe medical practices arising from

6   illegal practices by the USC Intraoperative Neurophysiological Monitoring (IONM)

7   Program which includes USC Departments of Neurology, Neurosurgery, Orthopedic

8   Surgery and Otolaryngology (ENT) Surgery at the Keck School of Medicine at the

9   University of Southern California, and (ii) false claims from illegal practices including

10  but not limited to reimbursement for medical services not rendered in thousands of

11  unsupervised and unsafe surgeries and prohibited referrals by physicians who received

12  kickbacks and other illegal remuneration.

13      5.    Defendant UNIVERSITY OF SOUTHERN CALIFORNIA is a California

14  corporation based in Los Angeles.  USC is the owner of the Keck School of Medicine

15  and the Keck Medical Center which operates Keck Hospital of USC ("USC Keck

16  Hospital").

17      6.    USC Keck Hospital, USC Norris Cancer Hospital, and USC Verdugo

18  Hills Hospital are each separately licensed general acute care hospitals that are

19  operating divisions of USC. The hospitals are part of the University of Southern

20  California (USC).  Each hospital operates under the control and ownership of USC.

21      7.    The USC Intraoperative Neurophysiological Monitoring (IONM) Program

22  includes the USC Departments of Neurology, Neurosurgery, Orthopedic Surgery and

23  Otolaryngology (ENT) Surgery which all operate under the Keck School of Medicine.

24  The Keck School of Medicine is part of the University of Southern California (USC).

25      8.    Defendant USC CARE MEDICAL GROUP, INC ("USC Care Medical

26  Group") is a California corporation based in Los Angeles. USC Care Medical Group is

27  a faculty practice plan that is used as a vehicle to deliver professional medical services

28  to patients of hospitals and outpatient facilities affiliated with Keck Medicine of USC

including LAC+USC Medical Center. USC Care Medical Group's sole corporate member is USC.

9.    Since USC is the sole corporate member of USC Care Medical Group for all time periods relevant to this Complaint and USC Keck Hospital and Keck School of Medicine are both part of the University of Southern California, Defendants are collectively referred to herein as "USC."

10.    Intraoperative Neurophysiological Monitoring ("IONM") is meant to protect against life-threatening patient harm such as paralysis and death during high-risk neurosurgical, orthopedic, peripheral nerve, cardiothoracic, ear, nose and throat ("ENT"), and vascular surgeries.

11.    USC has perpetrated a fraud on taxpayers and private insurance companies by falsifying records and billing for surgical services not provided for since as early as the year 2008.  The fraud occurs in connection with services at both USC Keck Hospital and at various affiliates including but not limited to Los Angeles County Medical Center ("LAC+USC Medical Center," or "LAC+USC").

12.    LAC+USC Medical Center is a public hospital owned and operated by the County of Los Angeles ("Los Angeles County" or "County") to provide care for all patients including those that are medically indigent and those otherwise without access to health care.  The payer mix for LAC+USC is predominantly funded by taxpayers and is comprised of underserved patients insured primarily through Medicare and Medicaid (Medi-Cal).

13.    Defendants submitted and/or caused to be submitted thousands of false claims for charges associated with illegal referrals and fraudulent surgical services billed through USC Care Medical Group, USC Keck Hospital and LAC+USC Medical Center.  USC also received fraudulent monies directly and indirectly from USC Keck Hospital and LAC+USC Medical Center including but not limited to those from illegal referrals and surgical services through various government contracts.

14.     The primary purpose of IONM monitoring is to identify immediately critical changes in neurological signals generated by a patient during surgery that forewarn impending damage to the nervous system.  When such signals are detected by the IONM physician who is required to be monitoring the surgery in real-time, the IONM physician is supposed to notify the surgeon immediately so the surgeon can take action to avoid life-threatening injury to the patient.

15.     The primary purpose of supervision of resident surgeons by teaching surgeons is to provide surgeons training with the appropriate level of supervision during surgeries while avoiding risk to the patients' welfare and safety.  For this reason, the Accreditation Council for Graduate Medical Education ("ACGME" or "GME") mirrors Medicare and patient safety and billing regulations requiring a teaching surgeon to be physically present during all critical and key portions of a procedure and immediately available to furnish services during the entire procedure throughout all critical portions of the surgery.

16.     Without appropriate teaching supervision of a resident surgeon who is enrolled in a GME training program, and without real-time, continuous IONM monitoring by a qualified physician supervising the IONM technologist -- the entire surgical procedure, all IONM services, hospital stays, facility fees and other associated charges with the surgery are essentially worthless.

17.     For over a decade, USC's fraudulent schemes have placed the health and welfare of thousands of patients at risk at both USC Keck Hospital and LAC+USC Medical Center.  USC has caused thousands of false claims totaling hundreds of millions of dollars for surgical services performed by unsupervised GME resident surgeons.  In direct violation of all patient safety and billing standards, USC routinely scheduled the same teaching surgeon to "supervise" simultaneous surgeries occurring concurrently at both USC Keck Hospital and LAC+USC Medical Center.  This pattern and practice of USC's negligent supervision has led to significant patient harm including paralysis and death.

18.     Relator, through deep investigation and inside knowledge of USC's operations, has obtained non-public, direct evidence supporting the allegations in this Complaint.  Among other evidence, Relator has obtained and/or compiled based on first-hand review of records including financial records, scheduling, medical billing and other evidence that show USC and its affiliates knowingly caused the submission of thousands of false claims and fraudulently induced, received and retained monies through fraudulent practices as described in this Complaint.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over the False Claims Act ("FCA") causes of action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law. This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the FCA on the District Courts of the United States.

20.     Additionally, this Court has supplemental jurisdiction over the other claims in this action pursuant to 31 U.S. Code § 3732(b), as they arise from the same transaction or occurrence as the federal claims.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as they are so related to the FCA claims in the action that they form part of the same case or controversy.

21.     Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact business in this District, and the fraudulent conduct was committed here.

22.     Relator has made the appropriate disclosures in compliance with 31 U.S.C. § 3730(b)(2), Cal. Gov't Code § 12652(c)(3) and Cal. Ins. Code §1871.7.

## III.     PARTIES

### A.     Plaintiffs and Relator

23.     Plaintiffs in this action are the United States of America, the State of California, and Los Angeles County, by and through Relators IONM LLC and Justin Cheongsiatmoy, M.D., and Justin Cheongsiatmoy M.D. in his individual capacity.

24.     Relator has direct and independent knowledge of the information on which these allegations are based.  Relator has access to financial information, provider records, patient notes, surgical operative reports, and other documentation of USC's violations of billing and patient safety requirements.

25.     Relator-Plaintiff Justin Cheongsiatmoy, M.D. formed IONM LLC for the purposes of filing the original qui tam action and is its only member, and as such, he is source of all allegations set forth in the Complaint.

26.     Justin Cheongsiatmoy, M.D. subspecializes in IONM and is the former USC Assistant Professor of Neurology and Los Angeles County contractor (Contractor # c078853) who blew the whistle to the highest level of USC and Los Angeles County.

27.     The facts alleged in this Complaint are based entirely upon Relators' personal observations and investigation, as well as documents in its and his possession.

**B.     Defendants**

28.     Defendant USC, through the Keck School of Medicine and USC Keck Hospital provides medical education, training and clinical services, throughout numerous departments, serving the Los Angeles area. The Keck School of Medicine is part of Keck Medicine of USC, the University of Southern California's medical enterprise and one of two university-owned academic medical centers in the Los Angeles area.

29.     Defendant USC Care Medical Group is the medical faculty practice plan for USC to provide services to patients of Keck Medicine of USC and its affiliates including LAC+USC.  USC Care Medical Group reimburses USC for the use of its employees and other operating costs.  USC Care Medical Group submits claims for reimbursement to payers for physicians' professional services at USC Keck hospital. Reimbursement for professional services performed by USC physicians at LAC+USC MC are billed through LAC+USC MC as the location of service.

30.     USC Keck Hospital and LAC+USC Medical Center submit claims for reimbursement to payers for the technical component of IONM services and for

surgical and facilities fees relating to inpatient and outpatient hospital services associated with surgeries provided at their hospitals.

31.     In addition to USC's onsite clinical services at USC Keck, USC also offers services at affiliates including but not limited to LAC+USC which are billed directly to payers.  Through contracts between the two institutions, Los Angeles County pays USC at least $170 million dollars annually for patient care services including but not limited to the surgical services billed through LAC+USC Medical Center to a variety of payers—including Medi-Cal, Medicare, and private payers.

32.     .  In addition to submitting false claims to the County of Los Angeles as to the volume or time of contractual services, USC also caused thousands of false claims at LAC+USC Medical Center which were submitted to payers for both the professional and technical component of surgical services and for facility fees relating to inpatient and outpatient hospital services associated with surgeries performed in without qualified attending or teaching surgeons.

33.     For over a decade, USC has been reimbursed billions of dollars through the Los Angeles County Department of Public Health's Medical School Operating Agreement ("MSOA") fund and/or Medical School Affiliation Agreement ("MSAA"), and/or Professional Services Agreement ("PSA") and/or other contracts.

## IV.     DEFENDANTS VIOLATED THE FEDERAL FALSE CLAIMS ACT, PHYSICAN SELF-REFERRAL AND ANTI-KICKBACK STATUTES, THE CALIFORNIA FALSE CLAIMS ACT AND THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

### A.     Statutory Background

#### 1.     Federal False Claims Act

34.     The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person or entity is liable to the United States government for three times the amount of damages the government

sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(1)(1)(A) (2009).

35. The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

36. As amended by FERA, the FCA also makes a person liable to the United States government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

37. The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A) (2009). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2009).

38. On behalf of the United States of America, Relator alleges that since at least the year 2008, USC violated the FCA by "knowingly" submitting false claims for payment to Medicare and Medicaid. In addition to submitting false claims to the

County of Los Angeles as to the volume or time of services, USC "knowingly" caused submission of false claims to Medicare and Medicaid by the County of Los Angeles. Relator alleges, during this same time period, that USC knowingly concealed and/or knowingly and improperly avoided an obligation to pay or transmit money to the U.S. government by obtaining reimbursement related to their illegal referrals and submissions of false claims for payment to Medicare and Medicaid.

## 2. The Medicare and Medicaid Programs

39. The United States Attorney's Office for the Central District of California prosecutes fraud against Medicare, Medicaid (Medi-Cal), and other federal health insurance contracts and programs. Medicare and Medicaid provide healthcare primarily for the poor, disabled and elderly.

40. The Department of Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services (CMS), an agency of HHS.

41. The Office Inspector General Health and Human Services (OIG HHS) is responsible for combatting waste, fraud and abuse in Medicare and Medicaid programs by holding wrongdoers accountable, recovering misspent public funds and ensuring quality and safety to "protect this country's most vulnerable citizens."

42. Noridian Healthcare Solutions, LLC (Noridian) is the Medicare Administrative Contractor (MAC) for the California region.

43. Part A of the Medicare Program authorizes payment for institutional care, including hospital inpatient care. See 42 U.S.C. §§1395c-1395i-4.

44. Part B of the Medicare Program primarily covers physician and other ancillary services. See 42 U.S.C.§1395k.

45. Providers who wish to be eligible to participate in Medicare Part A must sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains certification, in relevant part:

 I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal False Claims Act, Anti-Kickback Statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare.

46.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

47.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

48.     At all relevant times, USC and its affiliates including USC+LAC were enrolled as Medicare and Medicaid providers and USC submitted or caused to be submitted claims to Medicare and Medicaid both for specific inpatient and outpatient services provided to individual beneficiaries as well as claims for general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

49.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report.  Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

50.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. See 42 U.S.C.§1395g(a); 42 C.F.R.§413.20.  See also 42 C.F.R.§405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. See 42 C.F.R.§§405.1803, 413.60 and 413.64(f)(1).

51.     USC and its affiliates were, at all relevant times, required to submit annually hospital cost reports to the fiscal intermediary or MAC.

52.     During the relevant time periods, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on government forms UB-92 and UB-04) during the course of the fiscal year.  On the hospital cost report, this Medicare Part A liability to the hospital for services is then combined with any Medicare Part A liabilities owed to Medicare from the hospital to determine whether Medicare or the hospital owes the other any funds related to treatment of Medicare Part A beneficiary patients during the course of a fiscal year.

53.     Under the rules applicable at all relevant times, Medicare, through its fiscal intermediaries, carriers and MACs, had the right to audit the hospital cost reports and to investigate representations made by USC or its affiliates in its claims for reimbursement and its cost reports to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustment to hospital cost reports previously submitted by a provider if any overpayments have been made, such as payments for services rendered by physicians and hospitals which are not in compliance with applicable laws and regulations, including the Stark and Anti-Kickback Statutes.  See 42 C.F.R. §413.64(f).

54.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

55.     For all relevant years, USC and its affiliates were required to expressly certify, and did certify, in relevant part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, and correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services

1
2
identified in this cost report were provided in compliance with such laws and regulations.

3   56.   For the entire relevant periods at issue, the hospital cost report

4   certification page also included the following notice:

5
6
7
8
9
Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative actions, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

10   57.   USC and its affiliates were required to certify that the filed hospital cost

11   report is (1) truthful, i.e., that the cost information contained in the report is true and

12   accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported

13   costs in accordance with applicable instructions; (3) complete, i.e., that the hospital

14   cost report is based upon all information known to the provider; and (4) that the

15   services provided in the cost report were billed in compliance with applicable laws and

16   regulations, including the Stark and Anti-Kickback Statutes as described in this

17   complaint.

18   58.   For the relevant time periods, USC and its affiliates submitted cost reports

19   to its fiscal intermediary attesting, among other things, to the certification quoted

20   above.

21   59.   A hospital is required to disclose all known error and omissions in its

22   claims for Medicare Part A reimbursement (including its cost reports) to its fiscal

23   intermediary or MAC.

24   60.   In addition to Part A claims, hospitals, doctors or other providers submit

25   Medicare Part B claims to the carrier or MAC for payment.

26   61.   Under Part B, Medicare will pay the reasonable charge for medically

27   necessary items and services provided to beneficiaries. See U.S.C.§§13951(a)(1),

28   1395y(a)(1).

62.     During the relevant time period, the USC and its affiliates electronically submitted claims to Medicare Part B for professional services in ANSI ASC X12N 837 Professional format.  USC and its affiliates were required to certify, and did certify, by electronically signing each claim submitted to Medicare in 837 Professional format:

> …this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback Statute and Physician Self-Referral law (commonly known as Stark Law).

63.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

64.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C.§§1396 et seq.

65.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C.§1396a(10)(A), 42 U.S.C.§1396d(a)(1)-(2).

66.     In the State of California, provider hospitals participating in the Medicaid program (known as "Medi-Cal") submits claims for hospital services rendered to beneficiaries to the California Department of Health Care Services (DHCS) for payment.

67.     In addition, DHCS requires hospitals participating in the Medi-Cal program to file a copy of their Medicare cost report with DHCS.

68.     DHCS uses Medi-Cal patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medi-Cal patients treated at the facility.

### 3.     The Physician Self-Referral Statute

69.     Enacted as amendments to the Social Security Act, 42 U.S.C.§1395nn (commonly known as the Physician Self-Referral Statute ("PSR Statute" or the "Stark

Statute" or "Stark Law") prohibits a hospital or other entity providing designated health services from submitting Medicare and Medicaid claims for designated health services (as defined in 42 U.S.C§1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the PSR Statute) with the hospital, and prohibits Medicare and Medicaid from paying any such claims.

70.    The PSR Statute establishes that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers.  The PSR Statute was designed specifically to prevent losses that might be suffered by the Medicare and Medicaid programs due to questionable or improper utilization of designated health services.

71.    The PSR Statute establishes that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers.  The PSR Statute was designed specifically to prevent losses that might be suffered by the Medicare and Medicaid programs due to questionable or improper utilization of designated health services.

72.    The PSR Statute explicitly states that Medicare and Medicaid may not pay for any designate health service provided in violation of the PSR Statute.  See 42 U.S.C.§1395nn(g)(1).  In addition, the regulations implementing the PSR Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R.§411.353 (2006).

73.    The PSR Statute prohibits a hospital from submitting a claim to Medicare and Medicaid for "designated health services" that were referred to by the hospital by a physician with whom the hospital has a financial relationship.  Designated health services include inpatient and outpatient hospital services reimbursable under Medicare Part A or Part B.  See 42 U.S.C.§1395nn(h)(6).

74.    In pertinent part, the PSR Statute provides:

(a)    Prohibition of certain referrals

(1) In general
Except as provided in subsection (b) of this section, if a physician…has a financial relationship with an entity specified in paragraph (2), then –

(A)   the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)   the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A). 42 U.S.C.§1395nn(a)(1).

75.   Moreover, the PSR Statute provides that Medicare and Medicaid will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). See 42 U.S.C.§1395nn(g)(1).  Numerous physician compensation arrangements orchestrated by USC and its affiliates violate the Stark Law in multiple ways as set forth in this Complaint.

76.   "Financial relationship" includes a "compensation arrangement," which includes any arrangement involving any remuneration paid directly or indirectly to a referring physician.  See 42 U.S.C.§§1395nn(h)(1)(A) and (h)(1)(B).

77.   The PSR Statute applies to claims for payment under Medicare and Medicaid.  See 42 U.S.C. § 1396b(s).

78.   The PSR Statute is a strict liability statute, with no scienter component.

79.   Providers who knowingly submit claims to the Medicare or Medicaid program in violation of the PSR Statute may be found liable for violation of the FCA.

80.    A knowing violation of the PSR Statute may also subject the billing entity to exclusion from participation in federal health care programs and civil monetary penalties.  42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

81.   Compliance with the PSR Statute is material to the payment decisions of Medicare and Medicaid because payment of PSR-tainted claims is statutorily

prohibited:  Congress decided that certain financial relationships between hospitals and referring physicians present a risk to federal healthcare programs and program beneficiaries due to questionable or improper utilization of designated health services.

82.     Medicare and Medicaid would not and could not legally pay for any designated health service provided in violation of the PSR Statute.  42 U.S.C. §§ 1395nn(g)(1), 1396b(s).

### 4.     The Anti-Kickback Statute (AKS)

83.     The Anti-Kickback Statute (AKS) makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or arrange for or recommend any good, facility service or item covered under a federal health care program.  This would include the receipt of payment for any services not rendered. 42. U.S.C.§1320a-7b(b)(1)-(2).

84.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C.§1320a-7b(b)(1).

85.     Any claim submitted to Medicare or Medicaid for items or services resulting from a violation of the AKS constitutes a "false or fraudulent claim" under the FCA.  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §6402(f)(1), 124 Stat. 119(2010), adding 42 U.S.C.§1320a-7b(g); *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1260 (11th Cir. 2005).

86.     The AKS covers any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985); United States v. McClatchey, 217 F.3d 823, 835 (10th Circ. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). The AKS is "violated, even if the payments were also intended to compensate for professional services." *United States v. Borrasi*, 639 F.3d774, 782(7th Cir. 2011) (quoting *United States v. Greber*, 760 F.2d 68, 72 (3rd Cir. 1985)).

87.     The Patient Protection and Affordable Care Act of 2010 clarified the intent requirement of the AKS by adding a provision stating that actual knowledge of an AKS violation or the specific intent to commit a violation of the AKS is not necessary for conviction under the statue.  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §6402(f)(2), 124 Stat. 119(2010).  The AKS now expressly provides: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C.§1320a-7b(h).

88.     The interplay between the AKS and the Stark Statute has been summarized as follows:

> Both the Anti-Kickback Statute and [Stark] address Congress' concern that health care decision-making can be duly influenced by a profit motive.  When physicians have a financial incentive to refer, this incentive can affect utilization, patient choice, and competition.  Physicians can overutilize by ordering items and services for patients that, absent a profit motive, they would not have ordered.  A patient's choice can be affected when physicians steer patients to less convenient, lower quality, or more expensive providers of health care, just because the physicians are sharing profits with, or receiving remuneration from, the providers.  And lastly, where referrals are controlled by those sharing profits or receiving remuneration, the medical marketplace suffers since new competitors can no longer win business with superior quality, service, or price.  Although the purposes behind the Anti-Kickback Statute and [Stark] are similar, it is important to analyze them separately.  In other words, to operate lawfully under Medicare and Medicaid, one must comply with both statutes.

*Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 63 Fed Reg. 1659, 1662 (Jan. 9, 1998).*

89.     Compliance with AKS is material to Medicare's and Medicaid's payment decisions because kickbacks are statutorily prohibited in order to protect the integrity of federal healthcare programs and AKS-tainted claims are statutorily designated as false claims under FCA.  See 42 U.S.C. § 1320a-7b; Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b)-(c), 86 Stat. 1329, 1419-20; Medicare-Medicaid

Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1175 (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101 Stat 680; Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), adding 42 U.S.C. § 1320a-7b(g).

### 5.    The California False Claims Act

90.    The California False Claims Act ("CFCA") provides in pertinent part that a person is liable to the State of California for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Cal. Gov. Code § 12651(a)(1).

91.    The California False Claims Act defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions: (A) is presented to an officer, employee, or agent of the state or of a political subdivision; (B) is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions (i) provides or has provided any portion of the money, property, or service requested or demanded; or (ii) reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service which is requested or demanded."  Cal. Gov. Code § 12651(b)(1).

92.    In addition, payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1 and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

93.    Relator alleges that since at least the year 2008, USC violated the California False Claims Act by knowingly submitting false claims for payment to Medi-Cal including but not limited to those tainted by illegal referrals and kickbacks.

In addition to submitting false claims directly to Los Angeles County, a political subdivision of the State of California, USC also knowingly caused submission of false claims to Medi-Cal by the County of Los Angeles including but not limited to those tainted by illegal referrals and kickbacks.

94.     USC knowingly violated the CFCA by submitting false claims to Los Angeles County—a political subdivision of California.  As described herein, USC submitted false claims to Los Angeles County pursuant to the MSOA and/or MSAA and/or PSA and/or other contracts in regards to the volume and time for which USC is supposed to provide physician services including but not limited to supervision of resident surgeons and unlicensed technologists at LAC+USC Medical Center.

95.     USC not only failed to provide those services in violation of various contractual agreements worth hundreds of millions of dollars, USC also knowingly caused LAC+USC to fraudulently submit thousands of false claims for surgical and IONM services to Medicare, Medi-Cal and private payers.

### 6.     California Insurance Frauds Prevention Act

96.     The California Insurance Frauds Prevention Act ("CIFPA") provides that any person or entity who knowingly submits, or causes the submission of, a false or fraudulent claim to a private insurer in California for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the insurer. Cal. Ins. Code § 1871.7(b). The Court may also grant equitable relief to protect the public.

97.     The CIFPA empowers and encourages any interested person to bring a civil action under Ins. Code § 1871.7 against those who submit, or cause to be submitted, false or fraudulent claims against insurers.

98.     A complaint brought pursuant to § 1871.7 is required to be filed in camera and under seal for sixty (60) days to allow the government to conduct its own investigation without the knowledge of the defendant, and to determine whether to join in the suit. Further, a copy of the complaint and written disclosure of substantially all

material evidence shall be served on the District Attorney of the county in which the matter is filed and Insurance Commissioner of the State of California.  Relator has provided written disclosure of substantially all material evidence regarding the allegations contained in the Complaint to the Los Angeles District Attorney's Office and to the Office of the Insurance Commissioner of the State of California.  Relator also offered complete cooperation in any potential investigation initiated by the above-referenced government entities.

99.    Relator is an original source for all the information contained in this Complaint as defined by California Insurance Code section 1871.7. Relator has direct and independent knowledge of the information on which the allegations contained herein are based and has voluntarily provided this information to the District Attorney and Commissioner before filing the present action.

100.   Relator alleges that since at least the year 2008, USC violated the CIFPA by "knowingly" submitting false claims to private insurers in California.  Additionally, USC "knowingly" caused false claims to be submitted to private insurers through the false claims it submitted to Los Angeles County, a political subdivision of California.

101.   Based on the foregoing laws, Relator seeks, though this action, to recover damages and civil penalties arising from the thousands of false or fraudulent records, statements and/or claims that USC knowingly made or caused to be made in connection with their fraudulent scheme.

**B.    Background for Defendants' Fraudulent Schemes**

**1.    Intraoperative Neurophysiologic Monitoring (IONM)**

102.   IONM is a sub-specialty of neurology utilized to potentially prevent life-threatening patient harm such as paralysis and death during neurosurgical, orthopedic, peripheral nerve, cardiothoracic, ENT, and vascular surgeries where the nervous system is at risk.  The goal of IONM is to immediately identify changes in brain, spinal cord, and peripheral nerve function during the surgery, prior to permanent patient injury.  IONM monitoring by the oversight physician can take place either in the

Operating Room (OR) or remotely.  Without continuous physician oversight necessary to interpret baseline data and determine any subsequent critical changes in real-time, IONM services are virtually worthless and reimbursement for all IONM services including both professional and technical components is not allowed.

103.   Los Angeles County, in its Master Agreement with contractors for IONM services at various hospitals within Los Angeles County, states that:

> The purpose of [IONM] is to reduce the risk to the patient of incidental damage to the nervous system during surgery, and or to provide functional guidance to the surgeon and anesthesiologist.  Intraoperative monitoring entails continuous observation…

(Exhibit 47).

104.   If monitoring occurs remotely, there must be a Chat Log containing the record of interpretations and communications by the remote physician.  If monitoring occurs in the Operating Room, the physician's presence must be documented in the hospital OR Record (OR Log) for the surgery.

105.   All remote monitoring from outside the operating room requires continuously open, real-time bilateral communication between the remote physician and the IONM technologist who is present in the operating room.  This essential communication is conducted through a typewritten real-time Chat Log which is automatically generated by the IONM software program.

106.   Chat Logs are always automatically created at the beginning of a remote connection to keep a record of real-time communications between a remote physician and technologist during a surgery. These Chat Logs thus document which physician monitored the surgery and contains the physician's real-time interpretation and communication of both baseline signals and subsequent data acquired throughout the entire course of the surgery.  After the physician conveys analysis of the data to the technologist in real-time via the Chat Log, the technologist relays the physician's interpretation of the data to the surgeon.  The technologist then documents in a separate Event Log that is created solely by the technologist.

107.   IONM technologists are not licensed or permitted to exercise independent clinical judgment and cannot independently analyze the IONM data without physician input.  Any reimbursement associated with fraudulent services provided by unsupervised IONM technologists is virtually worthless and not allowed unless there has been continuous real-time interpretation by a physician of the IONM data acquired by the technologist (Exhibits 1, 4).

108.   The IONM physician must be licensed in the state and privileged at the specific hospital where the surgery is being performed in order to provide IONM oversight.  As the Current Procedural Terminology (CPT) codes indicate per USC's training materials, the IONM physician is responsible for real-time interpretation of data and is responsible for continuously assessing the data and communicating the assessment to the technologist in the Chat Log or in the OR.  Both physician interpretation of the data and communication of that analysis between physician and technologist must be explicitly documented.  A lack of communication does not imply implicit communication.  As USC's own training materials state, "provisions" must be in place for "continuous and immediate communication" (Exhibit 2).  As described in this Complaint, if remote monitoring takes place outside the OR, Chat Logs are always automatically created at the beginning of a remote connection to keep a record of real-time communications between a remote physician and technologist during a surgery and as such, the Chat Logs between the technologist and IONM physician is the true and correct documentation of continuous, real-time remote monitoring.

109.   IONM fellowship training is available at some academic institutions.  IONM fellowships are non-accredited and are not governed by the Accreditation Council for Graduate Medical Education (ACGME).  These trainees are often neurologists who seek subspecialized training in the field of IONM.  During fellowship, trainees are taught by established IONM physicians who teach the fellows how to appropriately monitor IONM cases.  After completing an IONM fellowship, the graduate may be eligible to seek subspecialty board certification.  For patient safety

and billing reasons, a fellow cannot not monitor a surgery unless supervised by an attending physician and the proper attestation and modifier is present to indicate the teaching physician's presence in the patient's medical records.

110.   There can be no reimbursement for services related to IONM without documentation of real-time communication that a qualified physician continuously monitored the surgery at all times, even when no significant changes in the neurophysiological signals occurred.

### 2.   Supervision Requirement of Resident Surgeons by Teaching Surgeons under GME and Medicare Regulations

111.   Faculty of the USC Keck School of Medicine and residents in GME training programs from the Departments of Neurosurgery, Orthopedic Surgery, and Otolaryngology (ENT) perform surgeries at both USC Keck Hospital and LAC+USC Medical Center.

112.   The USC Office of Graduate Medical Education (GME) provides oversight and support for USC ACGME-accredited graduate medical education training programs.

113.   According to Graduate Medical Education Committee (GMEC) Policy and Procedure Manual between LAC+USC and USC Keck School of Medicine:

> …the Keck School of Medicine of the University of Southern California and the Los Angeles County Department of Health Services sponsors GME programs accredited by the Accreditation Council for Graduate Medical Education (ACGME)…The ACGME has designated the Sponsoring Institution at USC/LAC+USC, which conducts its major teaching efforts at LAC+USC Medical Center and Keck Hospital of USC. The LAC+USC Medical Center is a publicly hospital owned and operated by the County of Los Angeles to provide care for all patients including those that are medically indigent and those otherwise without access to health care…Keck Hospital of USC is a non-profit, private facility owned and operated by the University of Southern California.  The two institutions provide residents with the majority of their educational experience.

1
2
3
4
5
6
7

The Keck School of Medicine and LAC+USC Medical Center both recognize the importance of the Graduate Medical Education (GME) programs to their respective missions. Accordingly, LAC+USC Medical Center and the Keck School of Medicine have entered into a contractual partnership to provide the support and resources for GME. The contract, the Medical School Operating Agreement (MSOA) between the Department of Health Services and the University of Southern California establishes that the faculty of the Keck School of Medicine are responsible for the teaching and supervision of residents.

Oversight authority is delegated to the Designated Institutional Official (DIO) who also serves as the Associate Dean Graduate Medical Education (GME). The DIO reports to the Chief Medical Officer, LAC+USC Healthcare Network and to the Dean, Keck School of Medicine. The DIO is the Chair, Graduate Medical Education Committee (GMEC), which is a standing committee of the Attending Staff Association (ASA), which is the Organized Medical Staff structure. The DIO is a member of the ASA Executive Committee and as Associate Dean GME is a member of the Dean's Executive Council of the Keck School of Medicine.

8
9
10
11
12
13
14

(Exhibit 139)

15
16
17
18
19

114.   LAC+USC Medical Center and USC Keck Hospital are accredited by the Joint Commission, as are all the major affiliating institutions participating in the residency training programs. Los Angeles County specifically defines "Resident" as a physician trainee enrolled in an ACGME-accredited Training Program or subspeciality program." (Exhibit 49).

20
21
22

115.   The Graduate Medical Education Committee Policy and Procedure Manual between LAC+USC Medical Center and the Keck School of Medicine of the University of Southern California further states that:

23
24
25
26

For the resident, the essential learning activity is interaction with patients under the guidance and supervision of faculty members…Supervision in the setting of graduate medical education has the goals of assuring the provision of safe and effective care to the individual patient…

(Exhibit 139)

27
28

116.   The ACGME requires that each accredited program shall establish appropriate Letters of Agreement between the sponsoring institution and the

participating institution.  These Letters of Agreement are required for recurring exchanges of residents.  Even if the program meets the ACGME's requirements to be considered an integrated program wherein the faculty of a department supervise the residents at all the training sites, Letters of Agreement are still necessary because the participating institution must commit its resources to support the residents.

117.   A Letter of Agreement that fulfills the Institutional Requirements of the ACGME should:

> Identify the officials at the participating institution or facility who will assume administrative, educational, and supervisory responsibility for the residents;

> Outline the educational goals and objectives to be attained within the participating institutions;

> Specify the period of assignment of the residents to the participating institution, the financial arrangements, and the details for insurance and benefits;

> Determine the participating institution's responsibilities for teaching, supervision, and formal evaluation of the residents' performances;

> Establish with the participating institution the policies and procedures that govern the residents' education while rotating to the participating institution.

(Exhibit 139)

118.   Medicare pays for services furnished in teaching settings through the Medicare Physician Fee Schedule (MPFS) "if the services are furnished by a resident when a teaching physician is physically present during the critical or key portion of the service." (Exhibit 131)

119.   Medicare Claims Processing Manual, Chapter 12 defines the following terms: "resident," "teaching physician," "teaching hospital," "direct surgical services," "teaching setting." (Exhibit 132)

120. A "resident" is defined by Medicare as an individual who participates in an approved graduate medical education (GME) program.

121. A "teaching physician" is defined by Medicare as a physician (other than another resident) who involves residents in the care of his or her patients.

122. A" teaching hospital" is defined by Medicare as a hospital engaged in an approved GME residency program in medicine, osteopathy, dentistry, or podiatry.

123. "Direct Surgical Services" are defined by Medicare as services to individual beneficiaries that are either personally furnished by a physician or furnished by a resident under the supervision of a physician in a teaching hospital making the reasonable cost election for physician services furnished in teaching hospitals. All payments for such services are made by the A/B MAC (A) for the hospital.

124. "Teaching Setting" is defined by Medicare as any provider, hospital-based provider, or nonprovider setting in which Medicare payment for the services of residents is made by the A/B MAC (A) under the direct graduate medical education payment methodology.

125. Per Medicare rules, the teaching physician is responsible for the preoperative, operative, and postoperative care of the beneficiary.

126. In order to receive reimbursement for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical or key portions of the procedure and be immediately available to furnish services during the entire procedure.

127. During non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e. he/she cannot be performing another procedure.

128. Pursuant to 42 CFR §415.170, "services furnished in teaching settings are paid under the physician fee schedule if the services are a "personally furnished by a physician who is not a resident [or] furnished by a resident where a teaching physician was physically present during the critical or key portions of the service."

129.   In all situations, the services of the resident are payable through either the direct GME payment or reasonable cost payments made by the A/B MAC (A).

130.   Relator has disclosed to the United States, the State of California and Los Angeles County thousands of actual surgeries wherein USC violated ACGME, Medicare and patient safety regulations requiring the teaching surgeon be present during critical or key portions of the surgeries.

131.   Relator has also disclosed to the United States, the State of California and Los Angeles County hundreds of patient deaths and serious injuries which occurred as a result of USC's egregious fraud and negligent supervision.  This Complaint includes only a few of the examples that Relator has disclosed.

### 3.   IONM Current Procedural Terminology Codes and Reimbursement

132.   CPT codes for IONM services recognized by insurers are divided into two categories: the "time component" and "base codes" also known as the "modalities." These CPT codes are billed with modifiers which reflect either the Professional Component (PC) or Technical Component (TC) of IONM charges.

133.   Time component codes currently accepted by insurers include HCPCS G0453, CPT 95940, and CPT 95941.  These CPT codes allow the provider or facility to bill for time spent performing the appropriate IONM service.  Prior to January 1, 2013, the universal code for the time component was CPT 95920.

134.   CPT Code 95940 is specified for exclusive, continuous, personal one-on-one monitoring in the operating room.  Each unit of CPT code 95940 represents 15 minutes of monitoring time, rounded to the nearest 15-minute interval.  All insurers accept the "in-room" CPT code 95940 with the requirement that no other cases can be monitored at the same time.  CPT 95940 cannot be used unless there is OR Log documentation of the IONM physician's attendance in the OR.

135.   CPT Code 95941 is specified for continuous IONM from outside the operating room, remote or nearby, or for monitoring of more than one surgery while in

1  the operating room.  Each unit of CPT 95941 represents one hour of monitoring time,

2  rounded to the nearest hour.  Commercial insurers (other than United Healthcare)

3  accept CPT 95941.  CPT 95941 cannot be used unless there is documentation of real-

4  time, continuous interpretation by the IONM physician and communication by the

5  physician of that interpretation to the technologist (i.e. Chat Log).

6       136.   HCPCS G0453 is specified for continuous IONM monitoring from

7  outside the operating room, remote or nearby.  Each unit of G0453 represents 15

8  minutes of monitoring time, rounded to the nearest 15-minute interval.  Insurers that

9  require G0453 include Medicare, United Healthcare, Worker's Compensation, and

10 Senior HMOs.  G0453 cannot be used unless there is documentation of real-time,

11 continuous interpretation by the IONM physician and communication by the physician

12 of that interpretation to the technologist (i.e. Chat Log).

13      137.   Medicare developed HCPCS G0453 to be used in place of CPT 95941

14 because Medicare does not allow a physician to bill the professional time component

15 of multiple, concurrent surgeries for any singular point in time.  Per CMS, "G0453 can

16 be billed only for undivided attention by the monitoring physician to a single

17 beneficiary, not for the monitoring of multiple beneficiaries simultaneously."

18      138.   Prior to 2013, when all payers including Medicare accepted CPT 95920

19 for the time component for both in-room and remote monitoring, Medicare rules still

20 only allowed the use of CPT 95920 once per hour, even if multiple

21 electrophysiological studies were performed simultaneously. In other words, under

22 CPT 95920, Medicare still only allowed remote monitoring of one surgery at a time.

23 Since Medicare adopted HCPCS G0453, United Healthcare, Worker's Compensation

24 carriers, and Senior HMO's have also mandated the use of G0453 and have also

25 adopted Medicare's rules associated with this code.

26      139.   In addition to billing the time component, providers often bill insurers

27 using CPT codes for the IONM modalities performed during the surgery, often referred

28 to as the "base codes" or "modalities."  These codes include but are not limited to

---

somatosensory evoked potentials (SSEPs), motor evoked potentials (MEPs), electromyography (EMG), electroencephalography (EEG), and neuromuscular junction testing.  IONM base codes billed by USC include but are not limited to the following CPT codes: 92585, 95822, 95860-95870, 95907-5913, 95925, 95926, 95927, 95928, 95929, 95930-95937, 95938, and 95939.

140.   For both time-based and modality-based CPT codes described above, billing for IONM services is separated into two separate categories: the professional component (PC) and the technical component (TC).  The professional component is billed through the physicians whereas the technical component is billed by the hospitals who typically employ the technologists. This is an especially important distinction because the revenue streams generated by reimbursement from payers often flow to different entities.

141.   Reimbursement of the IONM PC and TC for IONM services at USC Keck Hospital is received by USC.  At LAC+USC, Los Angeles County receives reimbursement for both IONM professional and technical services provided at LAC+USC Medical Center.  LAC+USC Medical Center separately pays USC for the services the USC employed technologists and USC employed physicians perform at LAC+USC.

142.   Most non-Medicare payers typically reimburse the professional component and the technical component separately.  All the above-referenced CPT codes including the time component and base codes may be billed to payers with the appropriate modifier code. The modifier "-26" is used to delineate professional physician services whereas the hospital through the technologists' services use the modifier "TC" to delineate technical services.   For example, Anthem, one of the largest insurers in California, states the following regarding IONM reimbursement:

> Anthem allows reimbursement of the professional component and technical component of a global procedure or service when appended with Modifier 26 and Modifier TC unless provider, state, federal or CMS contracts and/or requirements indicate otherwise...

Professional Component (Modifier 26): The professional component is used to indicate when a physician or other qualified health care professional renders only the professional component of a global procedure or service. The professional component includes the supervision and interpretation portion of a procedure and the preparation of a written report. When reported separately, the professional component is denoted by adding Modifier 26 to the applicable procedure code.

Technical Component (Modifier TC): The technical component includes the technician, equipment, supplies and institutional charges associated with the performance of the service or procedure. When reported separately, the technical component is denoted by adding Modifier TC to the applicable procedure code. Services or procedures billed by a physician or other qualified health care professional that are performed in a facility…will not be reimbursed for the global procedure or the technical component (Modifier TC). Only the facility may be reimbursed for the technical component of the service or procedure.

143.   Unlike most commercial insurers, Medicare and the remaining insurers reimburse the hospital for the cost of providing IONM technical services in a bundled payment including but not limited to the Medicare Severity Diagnosis Related Group (DRG). Regarding the technical component for IONM services, CMS states:

It is [CMS'] understanding that these [technical component] services are nearly always furnished to beneficiaries in facility settings. Therefore, Medicare would not make [separate] payments through the PFS that account for the clinical labor, disposable supplies, or medical equipment involved in furnishing the service. Instead, these resource costs would be included in the payment Medicare makes to the facility through other payment mechanisms [i.e. DRG].

(Exhibit 3)

144.   Indeed, Medicare has established reimbursement standards for specific CPT codes. These values explicitly separate reimbursement of the technical component from reimbursement of the professional component.  The following chart from CMS' 2017 Proposed Physician Fee Schedule (CMS-1654-P) displays select payment rates for Medicare Physician Services.

145.   As shown in the chart below, in a typical 4-hour surgery utilizing IONM with common base codes, total reimbursement for IONM services averages $1,969 per case.  Of this average total, payers would reimburse the hospital $1,088 for the technical component and payers would reimburse the physician group $880 for the professional component.

| 2017 Proposed Physician Fee Schedule (CMS-1654-P) | | | | |
|---|---|---|---|---|
| **CPT** | **Base vs. Time Code** | **Descriptor** | **2017: $35.7751/RVU** | |
| | | | **Tech. (TC)** | **Prof. (PC)** |
| G03453 | Time Component | Per 15 minutes | | $33.27 |
| 95940 | | Per 1 hour | | $133.08 |
| 95938 | Base Code | Somatosensory (SSEP) | $296.58 | $46.87 |
| 95939 | Base Code | Motor Potentials (MEP) | $383.87 | $122.35 |
| 95861 | Base Code | Electromyography (EMG) | $90.51 | $84.79 |
| 95822 | Base Code | Electroencephalography (EEG) | $317.33 | $59.03 |
| 95937 | Base Code | Neuromuscular Junction Test | $47.22 | $35.42 |
| **Avg IONM Bill (PC+TC) 4 hour surgery = $1,969** | | | **$1,088.29** | **$880.79** |

146.   Some payers do not pay the TC separately, but instead are made through bundled payments to the hospital.  For example, Medicare follows the bundled payment model (i.e. DRG).   Therefore, for false claims involving Medicare patients and patients whose insurers made bundled payments, overcharges for fraudulently obtained TC monies can be extracted from the bundled payment using Medicare's valuation above.

147.   Notably, reimbursement of either the professional component or the technical component of these time-based CPT codes requires that a physician provided continuous, real-time monitoring of the IONM signals throughout the surgery. USC's own internal training materials emphasize this point, stating, in pertinent part:

> CPT introductory language and AMA coding guidance is clear that in
> order to bill these codes (+95940, +95941, or G0453) the service must be

performed by a monitoring professional who is **SOLELY DEDICATED** to performing the intraoperative neurophysiologic monitoring and is available to intervene at all times during the service as necessary.

(Exhibit 2)

148.   Through its elaborate scheme to defraud payers and LAC+USC, USC failed to provide appropriate supervision by USC's surgeons and neurologists, misrepresented the billing provider, and/or attested to services not provided. These false claims include but are not limited to false claims for reimbursement by USC Care Medical Group and false claims for reimbursement by USC Keck Hospital and LAC+USC Medical Center.

### 4.   USC's Policies Show Knowledge and Intent to Defraud

149.   Since at least the year 2008, USC has perpetrated a fraud on taxpayers, private payers, and the County of Los Angeles by falsifying records, causing hundreds of millions of dollars in false claims and receiving monies for surgeries and IONM services not provided, and intentionally falsifying documents to misrepresent patient care at both at USC Keck and LAC+USC.

150.   The fraudulent schemes and/or retaliation described in this complaint have occurred at the knowledge and/or direction of highest ranking officials at USC and USC Care Medical Group including:  CEO of Keck Medicine of USC and SVP Tom Jackiewicz; Interim CEO and Chief Operating Officer of Keck Medicine of USC and SVP Rodney Hanners; USC President Carol Folt; USC President Wanda Austin; USC Provost Michael Quick; USC Chief Legal Officer Carol Mauch Amir; USC Managing General Counsel Stacy Rummel Bratcher; VP of Ethics and Head of Office of Professionalism and Ethics (OPE) Michael Blanton; Members of the USC Board of Trustees; high-ranking officers of the USC Compliance Program; LAC+USC Chief Medical Officer (CMO) and USC Keck Associate Dean Brad Spellberg, M.D. (Dr. Spellberg); LAC+USC Chief Medical Officer (CMO) Dr. Stephanie Hall (Dr. Hall); USC Keck Senior Associate Dean of Clinical Administration, Glenn Ault, M.D. (Dr.

Ault); Associate Dean for GME and DIO, Dr. Lawrence Opas (Dr. Opas);  Dean of Keck School of Medicine, Dr. Laura Mosqueda (Dean Mosqueda); President of USC Care Medical Group, Inc and Chair of USC Orthopedic Surgery, Dr. Jay Lieberman (Dr. Lieberman); USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery Steven Giannotta, M.D. (Dr. Giannotta); USC Chair of Neurology and LAC+USC Chief of Neurology Helena Chui, M.D. (Dr. Chui); former IONM Division Chief Andres Gonzalez, M.D. ("Dr. Gonzalez"); and current IONM Division Chief Parastou Shilian, D.O. ("Dr. Shilian").

151.   At all relevant times, the IONM Division was led by Dr. Chui, USC Chair of Neurology and LAC+USC Chief of Neurology for which she was a direct Los Angeles County paid employee.  Dr. Chui heads the entire USC Department of Neurology, oversees the IONM physicians and IONM technologists at LAC+USC, manages the Department's budget, and negotiates the annual MSOA and/or MSAA and/or PSA and/or other contract funding from Los Angeles County at LAC+USC MC.  At all relevant times, the USC Neurosurgery Department which is also a part of USC's IONM Program was led by Dr. Steven Giannotta, USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery for which he was a direct Los Angeles County paid employee.  Dr. Giannotta heads the entire USC Department of Neurosurgery, oversees the USC teaching neurosurgeons and ACGME resident neurosurgeons, manages the Department's budget, and negotiates the annual MSOA and/or MSAA and/or PSA and/or other contract funding from Los Angeles County at LAC+USC.

152.   Dr. Gonzalez was an Assistant Professor of Neurology and former IONM Division Chief who directed the Surgical Neurophysiology Program at USC and LAC+USC Medical Centers.  Dr. Shilian is an Assistant Professor of Neurology and graduate of the LAC+USC Neurology Residency Program.  USC promoted Dr. Shilian to IONM Division Chief at USC's Keck School of Medicine under USC President Carol Folt after USC became aware of Dr. Shilian's role in perpetrating the fraud.  Drs. Gonzalez and Shilian provided IONM clinical services based on a schedule set by Dr.

Chui, under which only one attending physician was "in charge" of clinical decisions on any given day. (Exhibit 6).  USC submitted thousands of false claims or caused thousands of false claims to Medicare, Medi-Cal, and private payers at both USC Keck Hospital and LAC+USC Medical Center and also received fraudulent payments from LAC+USC via various contractual agreements.

153.   The USC Department Chairs include Dr. Chui, USC Chair of Neurology and LAC+USC Chief of Neurology and Dr. Giannotta, USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery.  Drs. Chui and Giannotta are direct Los Angeles paid employees who sign certifications attesting to volume of services to negotiate government funding based on volume of patient services provided by USC at LAC+USC as part of MSOA and/or MSAA and/or PSA and/or other contracts between USC and Los Angeles County.

154.   Per USC's own website, the USC IONM Program includes the USC Surgery Departments which are led by Chair of Neurosurgery, Dr. Steven Giannotta, Chair of Otolaryngology (ENT) Surgery, Dr. John Oghalai, and Chair of Orthopedic Surgery, Dr. Jay Lieberman.

155.   During the time periods wherein Dr. Cheongsiatmoy repeatedly reported the fraud to USC and Los Angeles County management internally prior to filing the qui tam action, Thomas Jackiewicz was CEO of Keck Medicine of USC and President of USC Care Medical Group, Inc., Dean Mosqueda was Chairman of USC Care Medical Group, Inc., Dr. Chui was Director of USC Care Medical Group, Inc., USC Chair of Neurology and LAC+USC Chief of Neurology as a direct Los Angeles County paid employee and Dr. Giannotta was Director of USC Care Medical Group, Inc., USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery as a direct Los Angeles County paid employee.  (Exhibit 141).

156.   USC's website specifically identifies surgeons from the Departments of Neurosurgery, Orthopedic Surgery and ENT Surgery as part of USC's IONM Program and specifically identifies the following surgeons by name: Dr. Steven Giannotta, Dr.

Jonathan Russin, Dr. Rick Friedman, Dr. Thomas Chen, Dr. Charles Liu, Dr. Frank Acosta, Dr. Patrick Hsieh, Dr. Gabriel Zada, Dr. Mark Liker, Dr. Arun Amar, Dr. William Mack, Dr. Dennis Maceri, Dr. Niels Kokot, Dr. John Niparko, Dr. Uttam Sinha, Dr. Mark Spoonamore, Dr. Jeffrey Wang, Dr. John Liu. (Exhibit 7).

157.   USC's website further states that the USC IONM team provides surgical services to patients at both USC Keck and LAC+USC.  Annually, USC provides surgeries with IONM services to 1,800 patients of which 1,200 are USC Keck patients and 600 are LAC+USC patients. "The Surgical Neurophysiology Program at Keck Medicine of USC in Los Angeles is unlike any surgical monitoring program in the country; it provides all aspects of surgical neurophysiology to greatly reduce the risk of damaging key nervous system areas during surgery.

> Intra-operative monitoring reduces risk and improves outcomes during brain, spine head and neck surgery or other surgeries where any part of the nervous system is at risk. By monitoring the electrical signals of nerve cells in the brain and spinal cord during surgery, the program at Keck Medicine of USC in Los Angeles can help prevent injuries like stroke or paralysis during any of these operations.
>
> Program physicians work with a wide variety of surgeons, including neurosurgeons, orthopaedic surgeons, otolaryngologists (ear, nose and throat specialists), movement disorder specialists, interventional neuroradiologists and vascular surgeons. The program monitors and assists surgeons at Los Angeles County+USC Medical Center as well as the hospitals at the Keck Medical Center of USC.
>
> Our Results
> Number of patients monitored per year
> Keck Medical Center of USC: 1,200
> LAC+USC Medical Center: 600

(Exhibit 7)

158.   As it relates the group billing fraud, USC's official IONM policy states that only "one attending physician (Primary Billing Physician) will be given the responsibility to monitor all the cases, and pair cases with other physicians (Pool

Physician) for billing purposes [only]." This policy, informally referred to at USC as "group billing," not only highlights USC's specific intent to defraud payers but also spotlights systemic failures in USC's Compliance Program. (Exhibit 8).

159. Through its fraudulent group billing policies, USC ordered the Primary Billing Physician (PBP) to be the only physician responsible for monitoring all cases at both USC Keck and LAC+USC on any given day. (Exhibit 6).

160. According to USC's own IONM policies, the Pool Physician (PP) is not responsible for monitoring any cases at USC Keck or LAC+USC on that given day. In USC's fraudulent group billing scheme designed to defraud payers, USC designated the PP's sole role on that given day for "billing purposes" enabling USC to "maximizing billing."

161. USC billed for IONM services not only for USC Keck surgeries purportedly monitored by the PBP, but USC also caused fraudulent billing through LAC+USC for all IONM services associated with the PBP at LAC+USC on that same day. Through LAC+USC, USC routinely billed CPT 95940 among other codes through LAC+USC under the PBP, knowing that the PBP was not present in the operating room providing one-on-one patient monitoring as required. (Exhibit 2).

162. The chart below demonstrates USC's group billing scheme which was intentionally designed to generate fraudulent charges associated with both the PBP and PP on any given day at both USC Keck Hospital and LAC+USC Medical Center including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. As it relates to the MSOA/MSAA/PSA contracts, USC's group billing and other fraudulent schemes also led to false claims submitted directly to Los Angeles County in violation of CFCA, in addition to causing false claims by misrepresentation medical services that were supposed to be provided by qualified physicians and false claims caused by illegal referrals in violation of Stark and/or AKS laws.

| | CONCURRENT SURGERIES AT BOTH LAC+USC AND USC KECK | | |
|---|---|---|---|
| **DAY** | **LAC+USC**<br>**(CPT 95940)** | **USC Keck**<br>**(CPT 95940, CPT 95941, G-0453)** | |
| Mon. | PBP Shilian (fraud) | PBP Shilian (fraud) | PP Gonzalez (misrepresentation) |
| Tues. | PBP Shilian (fraud) | PBP Shilian (fraud) | PP Gonzalez (misrepresentation) |
| Wed. | PBP Shilian (fraud) | PBP Shilian (fraud) | PP Gonzalez (misrepresentation) |
| Thurs. | PBP Gonzalez (fraud) | PBP Gonzalez (fraud) | PP Shilian (misrepresentation) |
| Fri. | PBP Gonzalez (fraud) | PBP Gonzalez (fraud) | PP Shilian (misrepresentation) |

163.   Further evidence of USC's actual knowledge in implementing IONM policies specifically designed to defraud payers is found in the two databases sorted by Referring Physician (Referring Surgeon) and referenced daily by the PBP, the PP, Dr. Chui's administrative team, and USC Keck technologists and LAC+USC technologists. The IONM daily billing database at USC Keck ("ORLOGSHEET") and the IONM daily billing database at LAC+USC ("LAC IOM Database") are updated several times a day by USC.  (Exhibits 144, 145).

164.   USC's actual knowledge of the systemic fraud cannot be denied since USC not only relied on both the USC Keck and LAC+USC databases containing indicating concurrent surgeries being billed under the same surgeon and/or same IONM physician at different hospitals  (Exhibits 144, 145), but the same databases were also regularly relied upon by Dr. Chui, USC Chair of Neurology and LAC+USC Chief of Neurology to make clinical assignments, procure, and allocate funding for IONM services at both USC Keck and LAC+USC.

165.   USC's Billing and Compliance team also analyzed provider activity on a regular basis to all Department Chairs which should have immediately flagged the fraudulent billing and illegal referrals.  (Exhibits 10, 11, 12 and 18).  As outlined above with respect to USC's actual knowledge of the fraud, the two databases referenced on a daily basis (Exhibits 144, 145) are applied below in order to illustrate that USC carried

out its group billing and other fraudulent schemes every day for over a decade at both USC Keck and LAC+USC.

166.   All USC healthcare providers completed USC's own mandatory training on Fraud and the False Claims Act which specifically highlights on Page 13 "Top Ten Fraud and Abuse Areas…billing for services not provided, misrepresenting the place of service, misrepresenting the provider of service, incorrect procedure code," Page 14 "misrepresent[ing] the provider of service as having rendered the service…not supported by the documentation" and Page 21-22 "Anti-Kickback illegal "remuneration to induce or reward referrals such as receipt of payment for services not performed (disguised as kickbacks)." (Exhibit 13).

167.   All Department Chairs and hospital administration also regularly reviewed the attestations and claims submitted when comparing the surgical services billed at both USC Keck and LAC+USC. (Exhibits 10, 11, 12, and 18). USC's Compliance team knew or should have known about the illegal referrals and submission of false claims for surgical services at both USC Keck and LAC+USC.

168.   All claims submitted for surgical services not appropriately rendered by USC surgeons and neurologists are false. For example, all claims submitted for surgeries in which there was no supervision or attendance by the USC teaching surgeon are false and in direct violation of all patient safety billing regulations.

169.   All claims submitted by USC for professional and technical components of IONM services are also false because all physicians, including the PBP, were not continuously monitoring the surgeries. A licensed physician's interpretation is a required component to separately bill any IONM services and therefore when there is no continuous monitoring, all charges related to IONM services including PC, TC, bundled payment for the surgery and Medicare DRG are false claims. (Exhibits 1, 4).

170.   As further evidence USC had knowledge that its physicians did not continuously supervise surgeries, as described in the Complaint, USC repeatedly instructed physicians and technologists to delete the IONM Chat Logs which are

automatically created at the beginning of a remote connection and which keep the record of all real-time communications between a remote physician and technologist during a surgery. (Exhibits 14, 15). USC intentionally acted with reckless disregard for patient safety and ordered the deletion of Chat Logs from the patients' medical records to hide evidence that lack of continuous monitoring by a physician posed a significant risk to patient safety and resulted in the submission of false claims.

171. The process by which USC billed for IONM PC and TC charges is described further below. At the conclusion of each surgery the technologists completed two separate billing sheets: one for the hospital to reference when billing the technical component and one for the physician to reference when billing the professional component.

172. The Hospital Billing Sheet template completed by the technologist, who, at USC Keck Hospital is an employee of USC, verified and signed by the Surgical RN employed by the hospital, and ultimately referenced by the hospital for billing of the technical component was titled "SURGICAL NEUROPHYSIOLOGY BILLING SLIP" and contained the following: name of the "Surgery RN" who confirmed the information on the sheet, the date of the surgery, procedure type, patient diagnoses, CPT base codes, the payer, reporting of critical values, time spent by the technologist in the case, patient name, patient date of birth, patient age, patient gender, date of service, patient MRN, and patient FIN. To ensure that this information was provided to the hospital, the sheet was labeled:

> Keck Hospital of USC
> 1500 San Pablo Street
> Los Angeles, CA 90033
> SURGICAL NEUROPHYSIOLOGY

(Exhibit 16)

173. The Physician Billing Sheet template completed by the technologist and referenced by USC contained the following: date of the surgery, patient name, patient date of birth, patient age, patient gender, date of service, patient MRN, patient FIN,

technologist, times of data acquisition, location of surgery, provider, referring physician, CPT time component codes, CPT base codes, and patient diagnoses.  To ensure that this information was given to USC Care Medical Group, the sheet was labeled:

> USC Care Medical Group Inc.
> 1510 San Pablo Street, 6th floor
> Los Angeles, CA 90033
> SURGICAL NEUROPHYSIOLOGY

(Exhibit 17)

174.   As it relates to the illegal referrals, the "REFERRING PHYSICIAN" is the USC surgeon identified at the top of each "Physician Billing Sheet" and specifically references the USC surgeon who initially ordered IONM services as a medical necessity and integral part of the surgery.  USC surgeons routinely referred IONM services despite actual knowledge that such services would never be rendered. (Exhibit 77).

175.   Both the Hospital Billing Sheets and Physician Billing Sheets were ultimately turned in to USC through Dr. Chui's administrative assistant, Angelique Matthews.  Ms. Matthews subsequently labeled each Physician Billing Sheet with the insurer of the patient and enter this into the OR surgical databases (Exhibit 145) so the billing physician would know the appropriate time component code to bill in addition to all other base codes.  Ms. Matthews then coalesced and distributed all billing sheets to the designated PBP "in charge" for that given day.  (Exhibit 6).  This step often took several days due to delays in collecting all the billing sheets.

176.   After receiving the stack of Physician Billing Sheets from Ms. Matthews, the PBP then selected a combination of bills which the PBP believed would maximize the PBP's overall reimbursement rate because the PBP's quarterly incentive bonus was directly tied to the PBP's billing.  (Exhibit 128).  The PBP then handed the remaining Physician Billing Sheets to the PP who was then instructed by USC to bill for services not rendered by the PP.  USC systemically submitted false claims for professional

services not rendered by the PBP and PP to maximize USC's financial gain, while violating payer requirements and jeopardizing patient safety.

177.   As a result of USC's group billing and other fraudulent schemes, none of the physicians knew which surgery each would later attest to have monitored until all the surgeries were completed.  After the billing was assigned to each physician days or weeks after the actual surgery date, that physician would retroactively review the IONM data file prior to falsely attesting in the medical record that the surgery was monitored in real-time when in fact there had been no continuous real-time monitoring by that physician at all.  Finally, USC Care Medical Group would submit false claims for IONM professional services per the process outlined above.

178.   USC carefully orchestrated multi-step fraudulent scheme outlined above explains why there were often systemically long delays of days and even weeks between surgeries and the completion of the IONM notes in the medical record. No one -- neither the PBP nor PP -- knew the billing assignments when the surgeries were taking place in real-time. The neurologists performing IONM services, i.e. Drs. Gonzalez and Shilian, were incentivized not to monitor any surgery in real-time since identification of a monitoring physician in real-time would prevent Drs. Gonzalez and Shilian from personally profiting from the false claims in the form of  faculty incentive bonuses.  (Exhibits 21, 22).  Defendants paid incentives to these physicians based on each physician's "Net Patient Services Revenues," which included revenues from false claims for services not rendered by the physician and tainted reimbursements made in violation of Stark and AKS statutes.

179.   USC's own mandatory training on Fraud and the False Claims Act specifically states on Page 15: "[USC should not receive] payment for services that [are] not documented by the physician." The provider of service must be accurately identified prior to billing for any services.  Page 39 from USC's Fraud and False Claims Act mandatory training on Authorship Integrity specifically states: "[The]

Healthcare Professional's signature is required in the medical records…when rendering services…complying with Medicare Signature Requirements, ICN 905364." (Exhibit 13)

180. The true extent of USC's group billing and other fraudulent schemes cannot be fully accounted for without including the false claims that USC caused to be submitted for surgical services at LAC+USC. USC's own mandatory training on Fraud and False Claims Act reiterates that an attestation by the physician of services provided is required to bill for any services.

181. As a result of USC false attestation that it performed the supervision required to bill for surgical services, LAC+USC submitted false claims that should not have been reimbursed because the services were actually performed by unsupervised resident surgeons and unsupervised technologists which tainted the DRG and global facility fees.

182. MSAA contracts between Los Angeles County and USC required USC physicians to perform supervision of physician services at LAC+USC.  USC's scheme to bill for surgeries at LAC+USC despite actual knowledge that the resident surgeons were not supervised by any teaching physician and IONM physicians were not supervising the IONM technologists from the LAC+USC operating room during those surgeries was not merely a misunderstanding of billing codes.

183. Despite actual knowledge that USC teaching surgeons and IONM physicians were nowhere near LAC+USC Medical Center during the surgeries, high-ranking officials within USC leadership including but not limited to LAC+USC Chief Medical Officer, Dr. Brad Spellberg; Associate Dean of GME and DIO, Dr. Lawrence Opas; USC Keck Senior Associate Dean of Clinical Administration, Dr. Glenn Ault; Dean of Keck School of Medicine Laura Mosqueda; USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery Steven Giannotta; USC Chair of Neurology and LAC+USC Chief of Neurology Helena Chui still conspired to have USC-employed referring surgeons fraudulently inflate the volume of referrals for surgical services in

order for USC to receive more government funding under the false pretenses that USC was supervising surgical services for LAC+USC patients.

184. USC further defrauded insurers and taxpayers by billing for IONM services in thousands of surgeries through the LAC+USC Electronic Medical Record (EMR) system using CPT 95940 and additional base codes despite USC's actual knowledge that the IONM physicians were not present in the LAC+USC operating room as explicitly required by the CPT 95940. CPT 95940 is the universal code for exclusive monitoring taking place within the operating room and accepted by every single insurer including Medicare, Medi-Cal, and private insurers.

185. Another reason why USC instructed its technologists to fraudulently bill for physician services using CPT 95940 instead of CPT 95941 is because Medi-Cal, the insurer for the majority of patients at LAC+USC, reimburses for CPT 95940 but does not reimburse for CPT 95941. See Medi-Cal reimbursement for IONM below.

**Table: MEDICARE reimburses CPT 95940**

| 2017 Proposed Physician Fee Schedule (CMS-1654-P) | | | | |
|---|---|---|---|---|
| CPT | Base vs. Time Code | Descriptor | 2017: $35.7751/RVU | |
| | | | Tech. (TC) | Prof. (PC) |
| G03453 | Time Component | Per 15 minutes | | $33.27 |
| 95940 | | Per 1 hour | | $133.08 |
| 95938 | Base Code | Somatosensory (SSEP) | $296.58 | $46.87 |
| 95939 | Base Code | Motor Potentials (MEP) | $383.87 | $122.35 |
| 95861 | Base Code | Electromyography (EMG) | $90.51 | $84.79 |
| 95822 | Base Code | Electroencephalography (EEG) | $317.33 | $59.03 |
| 95937 | Base Code | Neuromuscular Junction Test | $47.22 | $35.42 |
| **Avg IONM Bill (PC+TC) 4 hour surgery = $1,969** | | | **$1,088.29** | **$880.79** |

**Table: MEDI-CAL reimburses CPT 95940, but not CPT 95941**

| EXCERPT OF MEDI-CAL 2021 BILLING RATES | | | |
|---|---|---|---|
| Proc Code | Procedure Description | Unit Value | Basic Rate* |
| 95925 | SHORTLATENCY SOMATOSENSORY, UPPER LIMBS | $103.35 | $84.75 |
| 95926 | SHLATENCY SOMATOSENSORY EVOK STUDY LL | $123.15 | $123.15 |

| 95928 | C MOTOR EVOKED UPPR LIMBS | $186.77 | $153.15 |
|---|---|---|---|
| 95929 | C MOTOR EVOKED LWR LIMBS | $194.77 | 159.69 |
| 95937 | NEUROMUSCULAR JUNCTION TEST | $27.18 | $22.29 |
| 95938 | *12SOMATOSENSORY TESTING | $326.42 | $267.67 |
| 95939 | C MOTOR EVOKED UPR&LWR LIMBS | $506.75 | $415.54 |
| 95940 | IONM IN OPERATNG ROOM 15 MIN | $32.99 ($131.96 per 1 hour) | $27.05 |
| 95941 | IONM REMOTE/>1 PT OR PER HR | $0 | $0 |
| 95861 | MUSCLE TEST 2 LIMBS | $120 | $98.40 |
| 95822 | EEG COMA OR SLEEP ONLY | $79.28 | $65.01 |
| 95920 | INTRAOP NERVE TEST ADD-ON (PRIOR TO 2013) | $174.32 | $142.94 |

186.   In addition to USC's contracts with Los Angeles County requiring the IONM supervision of surgeries at LAC+USC, USC also determined that CPT 95940 would be accepted by insurers every single time without being flagged.  If the technologists at LAC+USC billed the remote time-based monitoring code under Drs. Gonzalez and Shilian instead of the universal, in-room CPT 95940, the technologists would need to reconcile the patient's insurance status with the appropriate CPT code each insurer accepted for remote monitoring: for example, G-0453 for Medicare and United Healthcare; CPT 95941 for private insurers.

187.   If the LAC+USC patient was insured by Medicare and CPT 95941 was incorrectly billed instead of the appropriate G-0453 code, Medicare would flag the incorrect billing at LAC+USC.  This would increase the likelihood that the billing of concurrent surgeries at Keck would be spotlighted and flagged.

188.   USC knew that for its fraudulent scheme to be profitable to LAC+USC where most of the underserved and indigent patients are insured through government payers such as Medicare and Medi-Cal (Exhibits 133, 134), it had to bill 95940 for the reasons stated above.  The contractual agreements with LAC+USC were then structured to reflect supervision requirements in alignment with the fraudulent schemes outlined in this Complaint.

189.   Notwithstanding the fact that USC had actual knowledge that the PBP and teaching surgeons were not continuously supervising surgeries in real-time, USC

also knew the PBP and teaching surgeons were not attesting to services provided at LAC+USC in direct violation of all billing regulations from all insurers and CMS's signature requirement, ICN 905364. (Exhibit 13).

### 5. USC's Submission of False Claims

#### i. False Claims related to Monitoring in the Operating Room

190.   The hospital OR Record (OR Log) documents important facts from the operation including patient name, date of birth, side and site of the surgery, name of the teaching surgeon and any resident surgeons, the specific entries and exits of every attendee to and from the operating room, the role these attendees performed, and surgical counts including medical instrumentation and sponges.

191.    Within the medical record of every USC Keck surgical patient is the "USC Main OR Record," a verified operating room record that contains a leger of all entries and exits to and from the USC Keck operating room during the surgery.

192.   Within the medical record of every LAC+USC surgical patient is the "USC Main OR Intraop Nursing Record," a verified operating room record which contains a leger of all entries and exits to and from the LAC+USC operating room during the surgery.  At the most basic level, any valid hospital compliance program requires an accurate OR Log for every surgery specifically referencing all entries, exits and the presence or absence of the attending surgeon, the teaching physician who all patient safety and billing regulations require to be physically present for critical or key portions of the surgery.

193.   On April 3, 2017, 54 year-old patient SA underwent surgery with IONM at USC Keck Hospital.  The referring physician is listed as USC neurosurgeon Dr. Patrick Hsieh and that the surgery took place from 8:52 to 20:55. Dr. Shilian's presence in the operating room during this case was documented in the USC Main OR Record where she was labeled as "Entry 17" and her exact "time in" and "time out" was logged.  (Exhibit 20).  In this surgery, Dr. Shilian was present in the operating

---

room and USC subsequently billed the insurer for 29 units of CPT 95940, the billing code used for exclusive and continuous monitoring by a physician inside the operating room. To be in compliance with all patient safety and billing rules, every unit of CPT 95940 billed must be supported by the presence of the IONM physician in the operating room record of entries and exits.

194.   On April 3, 2017, the same day that the above-referenced patient SA underwent surgery with IONM at USC Keck Hospital, 16 year-old patient BR also underwent ENT surgery with IONM at LAC+USC Medical Center. The referring physician is listed as USC ENT surgeon, Dr. Dennis Maceri who had actual knowledge, at the time the referral was made, that that no such IONM services would be rendered because the NIM machine was incapable of transmitting data remotely and no IONM physician would be present in the Operating Room.  This illegal referral therefore also tainted the global facility fee.  IONM records for the surgery involving patient BR at LAC+USC show that the case took place from 13:10 to 15:30, at the same time as USC Keck patient SA.  The verified "USC Main OR Intraop Nursing Record" in patient BR's medical records shows the entry and exit of the technologist to and from the LAC+USC operating room but does not show the presence of Dr. Shilian in the LAC+USC operating room at any time during this surgery.  Dr. Shilian was not present in the LAC+USC operating room during the surgery of patient BR; yet USC still knowingly billed the insurer 12 units of CPT 95940 in addition to the base code for electromyography, 95867-26. This should have been flagged by any valid compliance program since code CPT 95940 can only be used when monitoring is exclusive and continuous by a physician inside the operating room. (Exhibit 124).

195.   USC Keck patient SA and LAC+USC patient BR were undergoing surgeries at the same time at two different hospitals. Despite actual knowledge that the same physician cannot bill CPT 95940 attesting to being exclusively in-room at two different locations at the same time, USC knowingly billed both cases under CPT 95940 code which, by definition, prohibits the monitoring of other concurrent cases.

When the false claims at USC Keck and LAC+USC are compared for any given day (as was USC's practice to compare the billing associated with OR Start and End Times at USC Keck and LAC+USC on a monthly basis; See Exhibits 10, 18, 144 and 145), USC's fraud becomes clear as demonstrated in the table below as it is not physically possible for the same physician to be inside several different operating rooms at the exact same time.

| Date | Patient | Start | End | PC - Time/Base Codes Billed | TC - Time/Base Billed |
|------|---------|-------|-----|------------------------------|------------------------|
| 4/3/17 | SA | 8:52 | 20:55 | Dr. Shilian (in-OR); CPT 95940 | USC Keck Hospital |
| 4/3/17 | HG | 800 | 1130 | Dr. Shilian (in-OR); CPT 95940 | LAC+USC Medical Center (OR# 15) |
| 4/3/17 | AH | 1000 | 1245 | Dr. Shilian (in-OR); CPT 95940 | LAC+USC Medical Center (OR# 7) |
| 4/3/17 | MC | 1615 | 1915 | Dr. Shilian (in-OR); CPT 95940 | LAC+USC Medical Center (OR# 7) |
| 4/3/17 | BR | 1310 | 1530 | Dr. Shilian (in-OR); CPT 95940 | LAC+USC Medical Center (OR#15) |

196.   Again, it is not physically possible for the same physician to be in different operating rooms at two different hospitals at the same time.  Therefore, the USC Compliance Program should have flagged CPT 95940 being billed simultaneously under the same provider from two different locations.  The USC Compliance Program should have then taken further action to confirm the physician's purported presence in the operating room at either hospital against the official verified OR Record detailing the precise entry in and out of the operating room. (Exhibits 20, 124).

197.   Anytime CPT 95940 is billed, no other cases may be billed for the time component including 95940, 95941 and G-0453 and no other IONM codes can be billed including any billing of the PC and TC of the time component and various base modalities.

198.   The example above only illustrates one aspect of systemic compliance program failures wherein false claims under CPT 95940 at both USC Keck and LAC+USC are not supported by the official verified OR Record at each respective hospital.  However, this is only part of a much greater systemic fraud which highlights the complicity of the hospitals' compliance programs as described in this Complaint.

199.   Since many USC physicians also perform services at LAC+USC, the USC Compliance team routinely audits the billing at both locations and compares them against each other to flag any false claims and fraudulent referrals.  (Exhibit 10, 11 and 12).  Therefore, this example illustrates the failures of USC's Compliance Program leading to concerns of greater systemic patient safety and compliance issues that potentially extend beyond surgeons and IONM physicians who are performing work at two different hospitals simultaneously, unbeknownst to patients and payers, and subsequently receiving tainted government funding for these surgical services.

200.   In another example related to false claims in the OR at USC Keck, USC submitted false claims by billing for "in room" monitoring (CPT 95940) in combination with "remote" monitoring (CPT 95941) in the same surgery when no actual monitoring was performed inside the operating room.  USC repeatedly misrepresented location of service to fraudulently obtain higher reimbursements and knowingly took advantage of the significantly higher reimbursement rates that USC contracted with commercial insurers for performing in-room IONM monitoring, thereby rendering fraudulent all charges related to that false claim.

201.   Patient TV was a 63 year-old woman who underwent spine surgery at USC Keck on March 5, 2018. The referring physician is listed as USC neurosurgeon, Dr. Frank Acosta. The total duration of intraoperative monitoring was 9 hours.  USC billed the patient's insurance, Blue Shield PPO, for 9 units of CPT 95940 for in-room monitoring performed by Dr. Shilian in addition to 7 units of CPT 95941 for remote monitoring.  The detailed operating room log from the surgery recorded 26 different individuals who entered and exited the surgery including the 4 IONM technologists

who made 14 entries and exits.  Despite the fact that USC charged insurance for 9 units of in-room monitoring performed by Dr. Shilian for this surgery, there is no documentation of her presence in the operating room.

202.   There can be no reimbursement for the professional or technical components of any IONM services without documentation of real-time communication that the physician continuously monitored the surgery at all times, even when no significant changes in the neurophysiological signals occurred.

### ii.    False Claims related to Remote Monitoring

203.   As described above, typewritten real-time Chat Logs serve as the means for continuous, real-time bilateral communication between the operating room and the IONM physicians engaged in remote monitoring.  Chat Logs are always automatically created at the beginning of a remote connection to keep a record of real-time communications between a remote physician and technologist during a surgery. As described in this Complaint, the Chat Logs show USC's serious and systemic failure to provide IONM physician oversight which is the reason USC repeatedly and explicitly ordered the Chat Logs permanently deleted from the patients' medical records. (Exhibits 14, 15).

204.   There were several instances where insurers questioned USC on the physician's involvement in IONM services and specifically requested the Chat Log which USC had permanently deleted and were unable to retrieve as part of the patient's medical records.  Instead, USC's billing and compliance team attempted to submit the Event Log to falsify physician involvement; this proves USC had knowledge of the fraud several years ago yet continued to knowingly deceive insurers by using the Event Log to give the false impression that the physician interpreted the data and communicated the interpretation of that data in real-time to the surgeon, when in fact USC knew the physician was not overseeing the surgery.

205.   USC's systemic failure to provide the required physician oversight to bill for any IONM services is shown in the following examples.  On April 22, 2016, 77 year-old Medicare patient RD underwent surgery at USC Keck Hospital.  The referring physician is listed as USC neurosurgeon, Dr. John Liu. According to the Event Log which is solely created by the IONM technologist (separate from the Chat Log), the procedure commenced at approximately 3:00 p.m.  However, according to the Chat Log, there was no communication between the physician and technologist until 4:48 p.m. when Dr. Gonzalez wrote: "text me if any changes."  This is a blatant admission by Dr. Gonzalez that he was not continuously monitoring and had no intention of doing so.  Instead, he left the monitoring responsibility to the technologist who is not licensed to practice medicine and is not qualified to interpret the data. Worse still, one hour and twenty-two minutes later, the technologist attempted to communicate a problem to Dr. Gonzalez via the Chat Log: "Lt triceps & biceps 50% down from baseline."  This is precisely the type of issue for which the monitoring physician is responsible for interpreting.  There was no response from Dr. Gonzalez, however, and the surgery ended 45 minutes later.  Despite this utter failure to monitor the surgery, USC billed Medicare false claims for two and a half hours of monitoring (10 units of G0453) performed by Dr. Gonzalez and USC knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

206.   Similarly, patient BG, a 71 year-old Medicare patient, underwent surgery at USC Keck Hospital on August 4, 2015.  The referring physician is listed as USC neurosurgeon, Dr. William Mack. The only documented IONM communication between any physician and technologist is shown in the complete Chat Log for this case below:

> (16:57:55)ELITE1: dr Shilian
> (16:59:35)ELITE1: are you there
> (17:01:54)ELITE1: are you there?

In the complete Chat Log above, only the technologist (ELITE1) attempted to communicate three separate times with Dr. Shilian who was supposed to be monitoring the case. Dr. Shilian did not respond to the technologist after each of the three attempts.  There was good reason for technologist's multiple attempts to reach Dr. Shilian: neurological signals in the left arm were down significantly from baseline and it was Dr. Shilian's responsibility as the physician to interpret the IONM data.  The technologist never received a response from Dr. Shilian and the evidence shows that neither Dr. Shilian nor any other physician was monitoring the surgery.  Because USC knew it did not provide continuous professional interpretation of the IONM data by a physician as required, this example illustrates the fraudulent scheme by which USC knowingly billed Medicare both the professional and technical components for IONM services USC knew were not rendered.

207.   On June 12, 2014, 61 year-old patient KR underwent spine surgery at USC Keck Hospital. The referring physician is listed as USC neurosurgeon, Dr. Frank Acosta. During this surgery, the physician communicated only once with the technologist remotely through the only Chat Log for this case which appears in its entirety below:

> (12:24:48)D-104182: text me if changes. will be in a meeting
> (12:25:50)ELITE4: critical part, surgeon reported arteria is tear
> (12:26:08)D-104182: ok

In the only communication between the physician (D-104182) and the technologist (ELITE4) in this surgery, the physician informed the technologist the physician would not be monitoring the surgery because the physician "will be in a meeting." Otherwise, the physician would have continued communication through the Chat Log and there would be no need for the technologist to text the physician.  However, the Chat Log demonstrates there were no further communications.  Instead of complying with patient safety standards for patient KR through continuous IONM monitoring, after the physician was explicitly informed of the intraoperative tear of the patient's artery, the

physician still knowingly stepped away from the surgery to attend a meeting after being made aware of the bleeding from the patient's torn artery.  Further, by instructing the technologist to act in the capacity of the physician in interpreting the IONM data, USC not only placed the patient at risk, but USC also placed its technologist and surgeon at risk as well.  In this case, USC attested that Dr. Gonzalez monitored the surgery and USC knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC for patient TH. USC's failures show systemic patient safety and compliance issues.

208.   On May 26, 2016, 64 year-old patient SE underwent lumbar spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Mark Spoonamore.  During this surgery, the physician communicated only once with the technologist remotely through the only Chat Log for this case which appears in its entirety below:

> (10:08:49)ELITE4: right lower sep decrease in amp
> (10:10:24)ELITE4: will inform the surg if you agree
> (10:16:46)ELITE4: i informed surge of the right lower sep.
> (10:33:08)ELITE4: Sep on the right lower small improvement not back to baseline
> (10:34:07)D-103348: what were they doing?

At 10:08, the technologist attempted to communicate to the physician about a potential change in the IONM signals that the technologist had independently interpreted.  The reason the technologist reached out to the physician is because it was the physician's responsibility to interpret all data.  The Chat Log showed that the physician did not reply.  At 10:10, during a very critical portion of the surgery, the technologist once again attempted to communicate to the physician and explicitly asked for the physician's interpretation and confirmation: "will inform the surg if you agree."  The

Chat Log showed that the physician did not reply.  At 10:16, the technologist attempted to communicate to the physician that the technologist had informed the surgeon of the potential critical IONM change: "i informed surge of the right lower sep". The Chat Log showed that the physician did not respond.  At 10:33, the technologist attempted to communicate to the physician that the technologist believed the IONM signals were still significantly changed from baseline: "Sep on the right lower small improvement not back to baseline."  The Chat Log showed that the physician did not respond.  Finally, 26 minutes after the technologist first attempted to communicate with the physician, and after interpretations of the IONM data had been independently made by the technologist and communicated to the surgeon, the physician finally wrote: "what were they doing?"  There were no other real-time communications by the physician to the technologist during this surgery.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient SE's nervous system, consistent with intraoperative patient injury. Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented. USC attested that Dr. Gonzalez attested monitored the surgery and caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC for patient SK. USC's failures show systemic patient safety and compliance issues. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 96).

209.   On June 22, 2016, 69 year-old Medicare patient BW underwent brain surgery at USC Keck Hospital which took place from 20:00 in the evening of June 22, 2016 to 8:23 in the morning of June 23, 2016.  The referring physician is listed as USC surgeon, Dr. William Mack.  During the surgery, the physician communicated only

twice with the technologist remotely through the only Chat Log for this case which appears in its entirety below:

> ((23:12:56)KHV-CTXIMG01: what are they doing?
> (23:13:25)ELITE1: still exposing
> (02:56:01)KHV-CTXIMG01: are they almost done.
> (02:58:33)ELITE1: Suturing the left side closed.  I think they will still do bypass on the right side.

(Exhibit 95)

At 23:12, the physician (KHV-CTXIMG01) asked the technologist (ELITE1): "what are they doing?" and over 4 hours later, at 2:56 in the morning, the physician asked: "are they almost done."  Records show that the surgery would not be "done" for over 5 more hours.  These two questions are the only real-time communications from the physician to the technologist during the entire surgery which lasted more than 12 hours.  During the surgery, however, the technologist documented several critical changes in the IONM Event Log which is a part of the IONM data file and created solely by the technologist.  At 23:58 in the late evening of June 22, 2016, the technologist documented in the Event Log: "Informed surgeon Rt side MEPs not present now…" There is no communication in the real-time Chat Log from the physician to the technologist regarding this event.  At 00:43 in the early morning of June 23, 2016, the technologist documented in the Event Log: "Informed surgeon Rt side MEPs still absent, Surgeon acknowledged." There is no communication in the real-time Chat Log from the physician to the technologist regarding this event.  At 08:02 in the morning of June 23, 2016, the technologist documented in the Event Log: "right hand absent."  There is no communication in the real-time Chat Log from the physician to the technologist regarding this event.  At 08:23 in the morning of June 23, 2016, at the conclusion of the surgery, the technologist documented in the Event Log: "right hand absent."  There is no communication in the real-time Chat Log from the physician to the technologist regarding this event.  The discrepancies between the IONM Event Log and the real-time IONM Chat Log clearly demonstrate that the

IONM Event Log cannot be relied upon to demonstrate real-time physician communication or monitoring during surgery.  In other words, the Event Log alone gives the false impression that the physician interpreted the data and communicated the interpretation of that data when in fact the physician was not overseeing the surgery in accordance with USC Policy 9-107 instructing technologists to practice medicine in the capacity of the interpreting physician (Exhibits 34, 40). Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented.  USC attested that Dr. Shilian monitored surgery that started on June 22, 2016 and billed Medicare for IONM services.  USC knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at LAC+USC for patient GR. After the conclusion of the above-referenced case, later that same day, on June 23, 2016, patient BW was taken back to the operating room for a brain angiogram surgery. During this second surgery, initial IONM data signals from patient BP's nervous system involving movement of the right body were completely absent, consistent with the significant intraoperative injury which previously occurred during the June 22, 2016 surgery.  USC's failure directly violates patient safety practices and various payer requirements. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 95).

210.   On September 4, 2014, 51 year-old patient LW underwent brain tumor surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Jonathan Russin. During this surgery, the physician communicated with the technologist remotely through the only Chat Log for this case which appears below in its entirety:

(22:10:27)KHV-CTXAPP05: meps look good

(22:11:18)ELITE4: with cross over
(22:11:45)KHV-CTXAPP05: are they almost done with the resection?
(22:12:43)ELITE4: no
(22:12:22)KHV-CTXAPP05: ok
(22:45:52)KHV-CTXAPP05: text me if changes
(22:47:56)ELITE4: okay
(22:53:19)ELITE4: other case add on corpectomy

The final communication between physician and technologist occurred at 22:45 when the physician instructed the technologist to "text me if changes." The reason for this request is clear: the physician did not intend to monitor this late-night surgery. Otherwise, the physician could have simply continued communication through the Chat Log and there would be no need for the technologist to text the physician. However, the Chat Log demonstrates there were no further communications. Instead of complying with patient safety requirements for patient LW through continuous IONM monitoring, the physician placed the patient at significant risk at a critical time during the surgery. Further, by instructing the technologist to independently interpret the IONM data and act in the capacity of a physician USC not only placed the patient's safety at risk but both the surgeon and technologist were put at risk. Wrong interpretation of IONM data can lead to intraoperative injury, paralysis, and death. During the surgery, shortly after 1:00 in the morning and over 2 hours after the last communication between physician and technologist, there were severe changes in IONM data signals arising from patient LW's nervous system, consistent with intraoperative patient injury. The technologist documented in the IONM data that significant changes had occurred and these changes were "reported to surgeon." However, there is no documentation in the Chat Log that the physician was even monitoring the case and no documentation that the physician interpreted and communicated these changes to the technologist prior to the surgeon being informed. Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented. USC attested that Dr. Gonzalez monitored the surgery and knowingly

caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC for patient HF. USC's failures show systemic patient safety and compliance issues.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 103).

211.   On July 2, 2014, 57 year-old patient GL underwent brain surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Gabriel Zada. During this surgery, the physician communicated only once with the technologist remotely though the only Chat Log for this case which appears in its entirety below:

> (16:17:07)D-103349: there seems to be a cortical signal on the c4-c3 channel now in the left upper [sic]
> (16:18:11)D-103349: sorry meant for the other case

 In the only communication between the physician (D-103349) and the technologist in this surgery, at 16:17 and 16:18, the physician did not discuss patient GL who was undergoing surgery.  Instead, the physician asked the technologist about another case that was not related in any way to the surgery involving GL.  To be clear, the real-time Chat Log for patient GL demonstrated there were no communications from the physician to the technologist about patient GL during the entire case which the physician attested to have monitored. However, during this surgery involving patient GL, at 17:03, the technologist documented in the IONM Event Log which is a part of the IONM data file and maintained solely by the technologist: "significant reduction Left MEP's." The Chat Log showed there was no interpretation by the physician. Seven minutes later, at 17:10, the technologist documented in the IONM Event Log: "loss on left hand MEP."  The Chat Log showed there was no interpretation by the physician.  In fact, there is no evidence that the physician ever continuously interpreted

the IONM data in this case, including the time when significant changes were documented by the technologist in the Event Log.  The discrepancies between the IONM Event Log and the real-time IONM Chat Log clearly prove that the IONM Event Log cannot be relied upon to demonstrate real-time physician oversight during the surgery.  In other words, the Event Log alone gives the false impression that the physician interpreted the data and communicated the interpretation of that data when in fact the physician was not overseeing the surgery.  Because physicians did not continuously monitor surgeries and did not regularly communicate interpretation of the IONM data to the technologists, the technologists acted in the capacity of physicians. (Exhibit 34).  Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented.  USC attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at USC Keck including: USC Keck United Healthcare patient MM. USC's failures show systemic patient safety and compliance issues.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 107).

212.   Knowing that Chat Logs such as these lay bare the systemic fraud caused by USC's IONM policies, USC instructed IONM technologists and staff to simply delete the Chat Logs from the patients' medical records. Meeting Minutes created by Angelique Matthews from a June 27, 2018 Department meeting document that staff were reminded to "Stop saving chat logs." (Exhibit 14).  The instruction was reiterated repeatedly at several meetings including on July 18, 2018, as reflected in the Meeting Minutes. (Exhibit 15).  This bold destruction of evidence—orders to delete material portions of patients' medical records—is without excuse.

213.   Since Chat Logs are always automatically created upon any remote connection from technologist to physician, the absence of a Chat Log can only happen under two circumstances:  Either there was no communication between physician and technologist, or USC permanently deleted the Chat Logs from the patients' medical records to hide the lack of physician oversight – both explanations point to systemic patient safety and compliance issues.

214.   There can be no reimbursement for the professional or technical components of any IONM services without documentation of real-time communication that the physician continuously monitored the surgery at all times, even when no significant changes in the neurophysiological signals occurred.

### iii.        False Claims related to Misrepresentation of Provider

215.   As described above, certain insurers, including Medicare, United Healthcare, Worker's Compensation carriers, and Senior HMO do not pay for the time spent monitoring more than one surgery at a time like certain commercial carriers do. Accordingly, if a physician was faced with billing IONM services for two surgeries which took place at the same time, and one of those surgeries was for a patient covered by Medicare, United Healthcare, Worker's Compensation, or Senior HMO, then USC simply falsified the record of one of the surgeries, switching the Primary Billing Physician's name to another physician who was not responsible for monitoring surgeries on that particular day.  Under USC's IONM policies, this second physician was called the Pool Physician as described in the section detailing USC's specific intent in designing IONM policies to defraud payers.  (Exhibit 8).

216.   USC knowingly and intentionally falsified the names of the physicians in order to maximize insurance reimbursement.  This misrepresentation of physician names was not a mistake.  USC's IONM policies were designed to systemically defraud insurers every single day and indeed, payers were defrauded every single day for over a decade.

217.   The most straightforward evidence of how USC's IONM policies were designed to defraud on daily basis is applied below to an actual day which shows fraudulent billing by both the PBP and PP at both USC Keck and LAC+USC.

218.   On December 1, 2017, Dr. Gonzalez was the PBP and USC submitted false claims of PC and TC for IONM services in four surgeries.  USC submitted false claims of PC and TC with Dr. Gonzalez as the PBP for two surgeries at LAC+USC (patient SC) and patient WM.  (Exhibits 27, 28).

| LAC+USC MEDICAL CENTER: FRIDAY 12/1/2017 | | | | | |
|---|---|---|---|---|---|
| **MD** | **Case** | **Date** | **CPT Code** | **Start Time** | **End Time** |
| Gonzalez (PBP) | Patient SC | 12/1/2017 | 95940 (fraud) | 10:30 | 14:15 |
| Gonzalez (PBP) | Patient WM | 12/1/2017 | 95940 (fraud) | 11:00 | 16:15 |

| USC KECK MEDICAL CENTER: FRIDAY 12/1/2017 | | | | | |
|---|---|---|---|---|---|
| **MD** | **Case** | **Date** | **CPT Code** | **Start Time** | **End Time** |
| Gonzalez (PBP) | Patient KL | 12/1/2017 | 95941 (fraud) | 10:23 | 19:06 |
| Gonzalez (PBP) | Patient BT | 12/1/2017 | 95941 (fraud) | 14:46 | 2:27 (12/2/2017) |
| Shilian (PP) | Patient SY | 12/1/2017 | G-0453 (misrepresentation) | 10:00 | 14:00 |

USC also submitted false claims of PC and TC with Dr. Gonzalez as the PBP for two additional surgeries at USC Keck (patient KL and patient BT).  As the PP, Dr. Shilian was not responsible for monitoring any cases. Yet USC still submitted false claims of PC and TC to Medicare for IONM services performed by Dr. Shilian involving patient SY at USC Keck.  (Exhibit 29).

219.   The referring physician for patient WM is listed as USC Neurosurgery Resident Dr. Joshua Lucas who was resident surgeon in training as part of USC's

GME program.  The LAC+USC Operative Note is signed twice by Dr. Lucas, once as the Attending Surgeon and again as the Resident Surgeon in an attempt to coverup the fact that there was no actual teaching surgeon present during the surgery.  OR Records confirm there was no actual Teaching Surgeon in violation of Medicare billing and safety requirements that a Teaching Surgeon be physically present for key or critical portions of the surgery.  The only other surgeon present was any even more junior resident, Dr. Phillip Bonney.

220.    The referring physician for patient SC is listed as USC Orthopedic Surgeon, Dr. Mark Spoonamore.  Dr. Spoonamore was present in the Operating Room less than an hour but should have still actual knowledge that Dr. Gonzalez was not present in the Operating Room.

221.    December 1, 2017, the LAC+USC surgery for patient SC took place in Operating Room #23 and the LAC+USC surgery for patient WM took place in Operating Room #7.

222.    Both surgeries took place simultaneously and the OR records for both surgeries show the referring surgeons should have had actual knowledge that Dr. Gonzalez was not and would not be in the operating room for either surgery.   Despite USC's actual knowledge that CPT 95940 cannot be billed when the physician is not present in the operating room, USC still submitted false claims for CPT 95940 and knowingly caused false claim submissions of the PC and TC of the time component and various base code modalities for those two LAC+USC surgeries. (Exhibits 27, 28).

223.    Worst yet, USC not only caused fraudulent billing for those two LAC+USC surgeries under CPT 95940, but USC also caused fraudulent billing for IONM services associated with Dr. Gonzalez for two additional surgeries occurring simultaneously at USC Keck. Specifically, as the chart above shows, on December 1, 2017, while the surgeries for patient SC and patient WM were ongoing at LAC+USC, surgeries involving patient KL (referred by USC surgeon Dr. Patrick Hsieh), patient BT (referred by USC surgeon Dr. Thomas Chen), and Medicare patient SY (referred

by Dr. Steven Giannotta) were taking place concurrently at USC Keck.  At USC Keck, USC attested to Dr. Gonzalez monitoring the surgeries involving patient KL and patient BT; CPT 95941 and USC submitted false claims for PC and TC charges to both patients' insurers.  USC knowingly submitted false claims for CPT 95940 at LAC+USC on December 1, 2017; therefore, all claims for surgical services at USC Keck for the concurrent surgeries involving patient KL and patient BT are false due to CPT 95940's requirement that no other cases can be monitored at the same time. Thus, this example shows that on any given day, all surgical charges submitted by USC are false claims, including but not limited to the PC and TC of the time component and all base codes associated with the PBP.

224.   Per USC's group billing policies, the PP is supposed to serve USC's billing purposes only and not actually monitor any cases on that given day since it is the PBP's responsibility to "monitor all the cases" on that given day.  (Exhibit 8).

225.   On December 1, 2017, Dr. Shilian was the PP and despite not monitoring the surgery for Medicare patient SY, Dr. Shilian falsely attested to monitoring the surgery and billed Medicare 16 units of G-0453 causing additional false claims for other PC and TC charges.  (Exhibit 29).  Every IONM charge associated with the PP on that same day is presumptively false. Per USC's own IONM policies designed to misrepresent the purported provider of service, the PP was not responsible for monitoring any surgeries on that day.  (Exhibit 8).  Thus, this example shows that on any given day, all charges including the PC and TC of the time component and all base codes associated with the PP are false.

226.   A more specific example of how this scheme worked are the charges that USC submitted for services performed by Drs. Gonzalez and Shilian on days that they were not even available for IONM services. Per the IONM division policy established by Dr. Chui when Dr. Shilian joined USC around 2011, Dr. Gonzalez and Dr. Shilian did not perform any monitoring on their "academic days."  (Exhibit 8).  For example, in the 2017 academic year, Dr. Gonzalez did not perform any IONM monitoring

services on Mondays, which was considered his "academic day" and reserved only for administrative and academic duties.  Similarly, in the 2017 academic year, Dr. Shilian did not perform any IONM monitoring services on Thursdays, her "academic day."

227.   Nonetheless, USC's policies on Academic Days caused thousands of false claim submissions for IONM services including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  As described in this Complaint, the group billing fraud extended far beyond their academic days which varied beyond Mondays and Thursdays; these Academic Day examples are only provided for the purposes of illustrating how USC's group billing scheme was designed with the specific intent to defraud.

228.   The following example shows that USC's IONM policies which were designed with the specific intent to defraud caused actual and significant patient harm.  On Monday, October 16, 2017, 61 year-old Medicare patient DN underwent spine surgery at USC Keck Hospital.  The referring physician is listed as USC neurosurgeon, Dr. Frank Acosta but the Operative Note is signed only by USC orthopedic surgeon, Dr. Raymond Hah.  In the academic year 2017, Monday was the day of the week USC instructed Dr. Gonzalez not perform any IONM clinical duties, also known under USC's IONM policies as an "academic day."  During this surgery, patient DN suffered cardiac arrest.  The surgeon stated multiple times in the operative report that "all neuromonitoring remained stable" throughout the cardiac arrest event and "all neuromonitoring remained stable" throughout the entire case.  However, there were in fact severe and persistent changes in the IONM data consistent with intraoperative patient injury which were not reported to the surgeon during the case.  Patient DN ultimately suffered significant permanent injury during the surgery and woke up with difficulty moving the left side of the body, consistent with the multiple strokes seen on brain imaging obtained after surgery.  (Exhibit 30).  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC

1   deleted the Chat Log from the patient's medical records to hide the lack of physician

2   oversight.

3       229.   Because this surgery took place on a Monday which was Dr. Gonzalez'

4   Academic Day in 2017, Dr. Gonzalez was the PP and therefore instructed by USC to

5   bill Medicare in order to maximize billing since Medicare requires exclusive

6   monitoring.  Therefore, USC instructed Dr. Gonzalez to misrepresent that he

7   monitored this case so USC could receive maximum reimbursement for PC and TC

8   charges associated with patient DN's surgery.  After attesting to having monitored the

9   surgery, USC billed Medicare for 23 units of G-0453 in addition to multiple base

10   codes.  (Exhibit 30).  USC knowingly caused false claim submissions for IONM

11   services in this surgery including but not limited to fraudulent billing of the PC and TC

12   of the time component and various base code modalities. As the above example

13   illustrates, USC's IONM policies, which were specifically intended to defraud, harmed

14   not only the payers, but patients were significantly harmed as a result of USC's

15   reckless disregard for patient safety.

16       230.   In another example, patient EN underwent surgery at USC Keck Hospital

17   on February 12, 2018—a Monday.  The referring physician is listed as USC surgeon,

18   Dr. John Liu.  USC fraudulently billed the IONM monitoring services under Dr.

19   Gonzalez' name, when in fact he provided no monitoring.  USC fraudulently billed

20   Medicare for 12 units of CPT code G0453 and knowingly caused false claim

21   submissions for IONM services in this surgery including but not limited to fraudulent

22   billing of the PC and TC of the time component and various base code modalities.

23   USC also charged Medicare for CPT 95961 despite USC's actual knowledge that brain

24   mapping is never part of a spine surgery. (Exhibit 30).

25       231.   Patient LM, a 73 year-old Medicare patient, underwent surgery at USC

26   Keck Hospital on December 7, 2017—a Thursday.  The referring physician is listed as

27   USC orthopedic surgeon, Dr. Mark Spoonamore. Despite not providing clinical IONM

28   care, USC submitted false claims to the patient's Medicare Advantage plan for 24 units

of CPT code G0453 performed by Dr. Shilian and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

232.   USC even submitted false claims for IONM services under Dr. Shilian when she was out of the country, on vacation in Italy (and even if she actually provided remote monitoring services while on vacation, Medicare does not allow medical services to be provided from outside of the United States).  Specifically, patient DW underwent surgery at USC Keck Hospital on August 15, 2017.  The referring physician is listed as USC neurosurgeon, Dr. John Liu. Dr. Shilian was out of the country on that date.  USC nonetheless submitted false claims to Medicare for 33 units of CPT code G0453 under Dr. Shilian and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. Notably, the Event Log for the surgery indicates that there was a critical drop in IONM signals during the procedure which required Dr. Shilian's interpretation as the physician who attested to overseeing this surgery. (Exhibit 19).

233.   There can be no reimbursement for the professional or technical components of any IONM services without documentation of real-time communication that the physician continuously monitored the surgery at all times, even when no significant changes in the neurophysiological signals occurred.

### iv.      False Claims related to Monitoring of ENT Surgeries

234.   Ear, Nose and Throat ("ENT") surgeries require real-time continuous interpretation of electromyography (EMG) by the overseeing physician. (Exhibit 4).

235.    ENT surgeries at USC Keck and LAC+USC utilize a specific type of monitoring equipment called the NIM machine.   The manufacturer of the NIM machine, Medtronic, provides detailed specifications for its equipment confirming that it cannot send real-time streaming data through the internet to a remote location.

236.   Because the NIM machine does not have the capability of transmitting data remotely, electronic Chat Logs and Event Logs are not available with the NIM machine.  Nor does the NIM machine generate a data file for retrospective analysis.

237.   Surgeons had actual knowledge that any surgery monitored using the NIM machine requires the IONM physician to be physically present in the operating room throughout the entire duration of the surgery in order to provide appropriate patient care in real-time.  The physician's presence in the operating room during the surgery must be documented in the OR Log. Because physician oversight can only be performed in in the operating room, CPT codes specific to remote monitoring cannot be used.

238.   In nearly all Ear, Nose and Throat ("ENT") surgeries at both USC Keck and LAC+USC since the year 2008, IONM has been performed using the NIM machine which does not allow for remote monitoring.  Therefore, the monitoring physician must be present in the operating room; otherwise, monitoring did not occur. Despite the fact that physicians did not provide monitoring for these cases which are evidenced by the OR Logs showing the physician was not in the operating room for these cases, USC submitted and caused the submission of thousands of false claims for surgical services in ENT surgeries with tainted global fees at both USC Keck and LAC+USC.

239.   At LAC+USC, USC also caused thousands of false claim submissions for surgical services with tainted global fees.  Moreover, USC also submitted false claims to Los Angeles County with actual knowledge that USC did not provide physician services in thousands of ENT surgeries, in violation of patient safety standards, various payer requirements and the terms of its contracts with LAC+USC.

240.   Since at least the year 2008, USC-employed ENT surgeons who performed ENT procedures at both USC Keck Hospital and LAC+USC Medical Center referred IONM for their ENT surgeries on an almost daily basis despite their actual knowledge that the NIM machine could not transmit data to a remote location.

These ENT surgeons also knew that the neurologists were not present with them inside the operating room during the surgeries to perform IONM services.

241.   To be clear, this was not a one-time event; USC and USC-employed ENT surgeons had actual knowledge IONM physicians had not been monitoring ENT surgeries since at least the year 2008.  (Exhibits 32, 33).

242.   Yet for over a decade, the USC employed ENT surgeons referred thousands of IONM services at both USC Keck Hospital and LAC+USC Medical Center and this tainted the global facility fee because these referrals were made by ENT surgeons who had actual knowledge that the IONM services for ENT procedures were not and would never be rendered.

243.   For example, 40 year-old patient JQ underwent ENT surgery at USC Keck on September 18, 2017.The referring physician is listed as USC ENT surgeon, Dr. Niels Kokot who had actual knowledge, at the time the referral was made, that that no such IONM services would be rendered because the NIM machine was incapable of transmitting data remotely and no IONM physician would be present in the Operating Room.  This illegal referral therefore also tainted the global facility fee. The technologist was an outside vendor hired by USC to perform IONM technologist services during this ENT surgery.  During the surgery, the technologist provided interpretation of the NIM data to the surgical team without physician oversight which renders both the professional and technical component charges for IONM services fraudulent.  Thereafter, the vendor sent an email to Ms. Matthews citing concerns that the lead IONM technologist informed the vendor there is no professional oversight of ENT surgeries at the hospital.  Specifically, the vendor wrote:

> "I was told…there was no remote oversight, nor Medical Report for these cases, just the handwritten Event Log and Tech Billing Sheet.  Again, there was no neurologist oversight."

(Exhibit 31)

244.   On June 12, 2018, 40 year-old patient EH underwent ENT surgery at USC Keck.  The referring physician is listed as USC ENT surgeon, Dr. Dennis Maceri who had actual knowledge, at the time the referral was made, that that no such IONM services would be rendered because the NIM machine was incapable of transmitting data remotely and no IONM physician would be present in the Operating Room. This illegal referral therefore also tainted the global facility fee. USC fraudulently claimed Dr. Gonzalez monitored the surgery remotely for two hours. USC knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

245.   On July 17, 2018, 20 year-old patient AK underwent ENT surgery at USC Keck Hospital.  The referring physician, listed as USC ENT surgeon Dr. Dennis Maceri, had actual knowledge that there would be no in-person or remote IONM physician monitoring of the procedure.  This illegal referral therefore also tainted the global facility fee.  USC fraudulently claimed Dr. Gonzalez monitored the surgery remotely for three hours, and USC submitted false claims to the insurer—Aetna Student Health—for three units of CPT code 95941 and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. Moreover, the medical record indicates that Dr. Gonzalez did not sign the IONM note despite USC billing this case under Dr. Gonzalez.

246.   On June 12, 2018, 42 year-old patient RL underwent ENT surgery at USC Keck Hospital.  The referring physician, listed as USC ENT surgeon, Dr. Dennis Maceri who had actual knowledge, at the time the referral was made, that that no such IONM services would be rendered because the NIM machine was incapable of transmitting data remotely and no IONM physician would be present in the Operating Room.  This illegal referral therefore also tainted the global facility fee.  USC

fraudulently attested that Dr. Gonzalez monitored the surgery remotely for five hours, and USC submitted false claims to the insurer—Anthem Blue Cross—for five units of CPT code 95941 and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

247.   On April 27, 2018, 83 year-old Medicare patient GP underwent ENT surgery at USC Keck Hospital.  The referring physician is listed as USC ENT surgeon, Dr. Dennis Maceri who had actual knowledge, at the time the referral was made, that that no such IONM services would be rendered because the NIM machine was incapable of transmitting data remotely and no IONM physician would be present in the Operating Room.  This illegal referral therefore also tainted the global facility fee. USC fraudulently claimed Dr. Shilian monitored the surgery remotely for 1.75 hours, and USC submitted false claims to the insurer—Medicare—for seven units of G0453 and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

248.   There can be no reimbursement for the professional or technical components of any IONM services without documentation of real-time communication that the physician continuously monitored the surgery at all times, even when no significant changes in the neurophysiological signals occurred.

249.   To be clear, USC had full knowledge that its ENT surgeons routinely referred IONM services at both USC Keck and LAC+USC even though the referring ENT surgeons had actual knowledge the NIM machine could not transmit data remotely and that the IONM physician would not be monitoring the procedure from inside the Operating Room.  Yet, for over a decade, USC's ENT surgeons knowingly referred IONM services they knew would never be rendered.

       **v.**      **False Claims related to Both IONM Professional and Technical Components of the Time and Base Codes**

250.   As described in this Complaint, due to USC's fraudulent IONM policies, USC's IONM physicians ---- including attendings and fellows -- were not continuously supervising the IONM technologists.  Because the Chat Logs for these cases demonstrated lack of monitoring by any physician, USC maliciously ordered deletion of these Chat Logs which are material portions of the patients' medical records. IONM services were not rendered, thereby rendering the PC fraudulent and the TC virtually worthless and therefore fraudulent as well. (Exhibits 14, 15).

251.   The Technical Component can never be reimbursed if the Professional Component is not performed by a qualified interpreting physician.  Interpretation by a qualified physician is an integral part of any IONM procedure.  (Exhibit 1).  In other words, Technical Component charges are false claims if the IONM physician does not continuously interpret the data acquired by the technologist and communicate the interpretations in real-time either in the OR or remotely through the Chat Log. Therefore, any time false claims for PC are submitted, the associated TC charges are also false claims.

252.   Specifically, Medicare rules explicitly require intraoperative monitoring services to be overseen by a physician with specialty training:

> Noridian expects healthcare professionals who perform electrodiagnostic testing will be appropriately trained and/or credentialed, either by a formal residency/fellowship program, certification by a nationally recognized organization, or by an accredited post-graduate training course covering anatomy, neurophysiology, and forms of electrodiagnostics (including both NCS and EMG) acceptable to this Contractor, in order to provide the proper testing and assessment of the patient's condition, and appropriate safety measures. It would be highly unlikely that this training and/or credentialing is possessed by providers other than Neurologists, or Physical Medicine & Rehabilitation physicians.

> The electrodiagnostic evaluation is an extension of the neurologic portion of the physical examination.  Both require a detailed knowledge of a patient and his/her disease.  Training in the performance of electrodiagnostic procedures in isolation of knowledge about clinical

diagnostic and management aspects of neuromuscular diseases, may not be adequate for proper performance of an electrodiagnostic evaluation and correct interpretation of electrodiagnostic test results. Without awareness of the patterns of abnormality expected in different diseases and knowledge that the results of nerve conduction studies (NCS) and electromyography (EMG) may be similar in different diseases, diagnosis solely by EMG-NCS findings may be both inadequate and ultimately detrimental to the patient.

(Exhibit 4)

253.   USC technologists are not licensed to practice medicine and not qualified to perform any interpretation of IONM data.  The extant chat logs provided as examples in this complaint show the result of USC's IONM policies which knowingly instructed lack of physician oversight; USC systemically left technologists with no choice but to interpret IONM data and act in the capacity of physicians. (Exhibit 34).

254.   The reason USC ordered the deletion of Chat Logs was to destroy the evidence that the physician was not continuously monitoring the surgery as required, leaving the technologist with no choice but to act in the capacity of a physician even though the technologist was not qualified to do so.

255.   On Thursday, July 9, 2015, patient AB underwent surgery with IONM services from 8:20AM – 12:57PM (4 hours and 37 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh.  The USC IONM fellow for the July 2015- June 2016 academic year was Anh Thu Tran.  In this surgery, the IONM technologist followed USC Policy #9-107 to "contact the IOM supervisor [Chris Hansen]…when a significant change occurs." At 11:55, the technologist documents in the Event Log:

"call Chris reported mep changes in the left hand and left foot…Chris reported to Dr. Hsieh."

(Exhibit 35)

USC knowingly caused false claim submissions for services associated with this surgery. Moreover, USC endangered patient safety because technologists are not

licensed to practice medicine. Of note, in this case, the IONM data demonstrated a critical decrease in right MEPs but this was not identified by the technologists and the surgeon was not timely informed of these significant IONM changes.

256.   On Tuesday, April 20, 2010, patient GK underwent surgery with IONM services from 8:14AM – 1:31PM (5 hours and 17 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh.  In this surgery, the IONM technologist followed USC Policy #9-107 to "contact the IOM supervisor [Chris Hansen]…when a significant change occurs." At 10:23AM, the technologist documents in the Event Log: "reported Chris and surgeon changes on the lowers mep 50%." At 12:06PM, the technologist again writes: "reported to Chris and surgeon about significant changes on lowers mep…"   This is a violation of billing and patient safety requirements as technologists are not licensed to practice medicine.

257.   On Thursday, July 9, 2015, patient NA underwent surgery with IONM services from 10:41AM– 12:15PM (1 hour and 34 minutes) at USC Keck.  The USC IONM fellow for the July 2015- June 2016 academic year was Anh Thu Tran.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist.  No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and no answer to the technologist who reported potentially significant changes in the data requiring physician interpretation.  Even more alarming, the surgeon was so confused by the technologist's interpretation of the IONM data that surgeon repeatedly raised concerns that the in technologist's interpretation of the IONM data "doesn't make sense."

> (11:57:32)ELITE1: BUE sseps down about 50%.  Surgeon acknowledged and said it doesn't make sense.
> (11:59:42)ELITE1: BUE sseps down about 50%. Surgeon acknowledged and said it doesn't make sense. Onyx has been inserted.

258.   On Friday, March 9, 2018, Medicare patient SA underwent surgery with IONM services from 2:15P– 4:15PM (2 hours) at USC Keck.  The USC IONM fellow for the July 2017- June 2018 academic year was Jonathan Chen.  In the complete Chat Log for this case which appears in its entirety below, D-106283 is the technologist. There was no physician monitoring this surgery.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and no answer to the technologist who reported potentially significant changes in the data requiring physician interpretation.  After the technologist asked whether a potentially critical change in the IONM signals warranted communication with the surgeon, there was no response, indicating no physician was monitoring the case.

(15:28:17)D-106283: HOW MUCH OF A LATENCY SHIFT FOR ME TO REPORT?

259.   On Tuesday, February 17, 2015, patient TA underwent surgery with IONM services from 2:11PM– 5:11PM (3 hours) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist. No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and no response to the technologist who acted in the capacity of the physician per USC IONM policies and reported significant changes in IONM data without physician interpretation.

(14:22:10)ELITE4: informed surgeon baseline trains of firing in bilateral gastrocs.

260.   On Friday, July 25, 2014, patient GA underwent surgery with IONM services from 5:08PM– 9:32PM (4 hours and 24 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Jonathan Russin.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist and

KHV-CTXAPP05 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and instead of monitoring the surgery, the physician had one singular chat communication to the technologist in this 4 hour surgery, and that communication was intended to instruct the technologist to act in the capacity of the physician and interpret the data independently prior to texting the physician of any changes the technologist deemed present.  It is clear the physician was not monitoring the case because there would be no need for the technologist to text the physician if that physician were providing remote, real-time oversight of the surgery with continuous communication through the Chat Log.

> (18:27:59)KHV-CTXAPP05: text me if changes
> (18:29:45)ELITE4: okay

261.   On Thursday, February 1, 2018, patient CA underwent surgery with IONM services from 10:10AM– 2:46PM (4 hours and 36 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Brian Lee.  The USC IONM fellow for the July 2017- June 2018 academic year was Jonathan Chen. In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist and KHV-CTXIMG01 is  the fellow, Jonathan Chen.  In this surgery, there was no physician interpretation of baseline IONM data and no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  Instead, the fellow asked the technologist if there were any concerns, consistent with USC IONM policies instructing technologists to interpret the IONM data and act in the capacity of physicians.

> (14:19:25)ELITE4: who is this>
> (14:19:27)ELITE4: ?
> (14:20:04)KHV-CTXIMG01: jon
> (14:39:17)KHV-CTXIMG01: any concerns
> (14:39:49)ELITE4: no, he wants to run meps every 10 mins.

(14:39:41)KHV-CTXIMG01: ok
(14:39:45)KHV-CTXIMG01: d. rrussin?
(16:04:54)KHV-CTXIMG01: hi are they done with dura closing
(16:09:04)ELITE4: yes, just now.

262.   On Monday, November 3, 2014, patient DA underwent surgery with IONM services from 11:16AM– 4:22PM (5 hours and 6 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh.   In the complete Chat Log for this case which appears in its entirety below, ELITE 4: Technologist.  No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and no response to the technologist who attempted to communicate with the physician regarding the technologist's critical interpretation of the data.  There was no reply, indicating no physician was monitoring the case.

(11:02:57)ELITE4: no right lowers

263.   On Tuesday, February 17, 2015, patient MB underwent surgery with IONM services from 5:31PM– 8:12PM (2 hours and 41 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu.   In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist and D-104182 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and instead of monitoring the surgery, the physician had one singular chat communication to the technologist in this surgery which lasted nearly 3 hours, and that was to instruct the technologist to act in the capacity of the physician and interpret the data independently prior to texting the physician of any changes the technologist deemed present. It is clear the physician was not monitoring the case because there would be no need for the technologist to text the

physician if that physician were providing remote, real-time oversight of the surgery with an open chat log.

> (17:31:15)D-104182: text me if any isses [sic]
> (17:57:16)ELITE1: okay

264.   On Friday, March 18, 2016, patient RB underwent surgery with IONM services from 2:44PM– 5:44PM (3 hours) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu.  The USC IONM fellow for the July 2015-June 2016 academic year was Anh Thu Tran.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist. No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, and no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  The only communication between the remote physician and technologist was the singular comment by the technologist before the surgery even began.  There was no response, indicating no physician was monitoring the case.

> (14:25:23)ELITE4: pt has a pacemake [sic]

265.   On Wednesday, July 1, 2015, patient KB underwent surgery with IONM services from 5:24PM – 8:31PM (3 hours and 7 minutes) at USC Keck.  The referring physician is listed as USC orthopedic surgeon, Dr. Jeffrey Wang.  The USC IONM fellow for the July 2015- June 2016 academic year was Anh Thu Tran.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist and KHV-CTXAPP05 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the only communication between the technologist and physician, the technologist informed the physician that the surgeons were beginning to close the surgery.  There was no response by the physician until 35 minutes later, when the physician acknowledged

"ok."  No further communications were made for another hour until the technologist stated, "End monitoring."

> (18:58:41)ELITE1: plastics will close now
> (19:33:21)KHV-CTXAPP05: ok
> (20:31:42)ELITE1: End monitoring.
> (20:32:46)KHV-CTXAPP05: tks

266.   On Tuesday, August 25, 2015, patient JB underwent surgery with IONM services from 08:51AM – 12:33PM (3 hours and 42 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist. No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the singular communication between the technologist and remote physician in this surgery which lasted nearly 4 hours, the technologist informed the physician of the technologist's interpretation of the IONM signals.  There was no response, indicating no physician was monitoring the case.

> (10:45:04)ELITE1: the meps are very variables

267.   On Thursday, January 25, 2018, patient BC underwent surgery with IONM services from 8:51AM – 3:15PM (5 hours and 24 minutes) at USC Keck.  The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore. The USC IONM fellow for the July 2017- June 2018 academic year was Jonathan Chen.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the Technologist, KHV-CTXIMG01 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the only communication between the technologist and remote physician in this surgery, the physician asked the technologist to obtain an IONM data point.  After the technologist obtained this data, the technologist asked: "just did…stable?"  There was no physician

response and no further communication by the physician for the remainder of the

surgery.

>(14:39:40)KHV-CTXIMG01: can you check another TOF
>(14:40:33)ELITE4: just did
>(14:41:37)ELITE4: stable?

268.   On Sunday, December 24, 2017, patient MC underwent surgery with

IONM services from 9:49AM – 1:00PM (3 hours and 11 minutes) at USC Keck. The

referring physician is listed as USC surgeon, Dr. Steven Giannotta.   The USC IONM

fellow for the July 2017- June 2018 academic year was Jonathan Chen.   In the

complete Chat Log for this case which appears in its entirety below, D-106420 is the

technologist and KHV-CTXIMG01 is the physician.   In this surgery, there was no

physician interpretation of baseline IONM data, no physician interpretation of IONM

data throughout the surgery as required for continuous monitoring.   In the only

communications between the technologist and remote physician in this surgery, the

physician asked if the technologist was performing MEPs during the case 2.5 hours

after the surgery had already begun.   After the technologist confirmed that MEPs were

being performed, the only other communication between the physician and

technologist was the exchange of "feliz navidad" 30 minutes prior to the conclusion of

the surgery.

>(12:18:04)KHV-CTXIMG01: are we doing MEPs?
>(12:18:18)D-106420: yes
>(12:31:20)KHV-CTXIMG01: feliz navidad!!
>(12:32:01)D-106420: feliz navidad a ud and familia

269.   On Tuesday, July 26, 2016, patient JC underwent surgery with IONM

services from 9:22AM – 5:27PM (8 hours and 5 minutes) at USC Keck.  The referring

physician is listed as USC neurosurgeon, Dr. John Liu. The USC IONM fellow for the

July 2016- June 2017 academic year was Vahe Akopian.  The complete Chat Log for

this 8 hour surgery appears in its entirety below, ELITE 1: Technologist, D-103348:

Physician.  In this surgery, there was no physician interpretation of baseline IONM

data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, in this 8-hour surgery for patient JC, the physician did not discuss the IONM signals for patient JC with the technologist even once.  Instead, the physician asked the technologist for the IONM file for a different patient -- patient O -- who had undergone surgery the prior day:

> (13:42:33)D-103348: hi. do you have file for [patient O] for 7/25?
> (13:47:36)ELITE1: look in the s drive now

Indeed, it was common practice at USC for IONM physicians to spend their limited time in the office reviewing IONM files retroactively to generate false claims for real-time IONM services of instead of actually monitoring the current ongoing surgeries.

270.   On Wednesday, January 28, 2015, patient TC underwent surgery with IONM services from 1:55PM – 4:46PM (2 hours and 51 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Gabriel Zada.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist.  No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, in this nearly 3-hour surgery, the technologist attempted to communicate with Dr. Gonzalez four separate times throughout the entire duration of the case.  There was no response, indicating no physician was monitoring the case.

> (14:05:05)ELITE4: not able to gft [sic] MEP's without cross over; electrode placement is altered due to surg incision
> (15:12:43)ELITE4: hi dr gonzalez. this is joe. just sitting in for a few minutes while chris gets baselines in the other room
> (15:28:50)ELITE4: using 60hz filter
> (16:41:50)ELITE4: closing

271.   On Wednesday, July 18, 2018, patient FC underwent surgery with IONM services from 12:09PM–4:04PM (3 hours and 55 minutes) at USC Keck.  The referring

physician is listed as USC orthopedic surgeon, Dr. Jeffrey Wang. The USC IONM fellow for the July 2018- June 2019 academic year was John Parker.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist. No physician was present. In this surgery, there was no physician interpretation of baseline IONM data and no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  During a critical portion of this 4-hour case, the technologist urgently reached out to the physician to check the MEPs because there was a serious problem with the IONM data. There was no reply, indicating no physician was monitoring the case.

> (13:53:15)ELITE4: hello
> (13:53:28)ELITE4: pls check meps
> (13:53:46)ELITE4: discectomy, I increase stim and pulse

272.   On Friday, July 29, 2016, patient LD underwent surgery with IONM services from 12:54PM – 2:43PM (1 hours and 49 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu. The USC IONM fellow for the July 2016- June 2017 academic year was Vahe Akopian.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist.  No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the singular communication between the technologist and remote physician in this surgery which lasted nearly 2 hours, the technologist informed the physician of the technologist's interpretation of the IONM signals.  There was no response, indicating no physician was monitoring the case.

> (13:18:14)ELITE1: post flip baselines look good

273.   On Friday May 15, 2015, patient DE underwent surgery with IONM services from 9:41AM– 1:56PM (4 hours and 15 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. John Liu.  In the complete Chat Log for

this case which appears in its entirety below, ELITE 4 is the technologist. No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring. In the singular communication between the technologist and remote physician in this surgery which lasted over 4 hours, the technologist informed the physician of the technologist's interpretation of the IONM signals. There was no response, indicating no physician was monitoring the case.

> (13:56:29)ELITE4: Looks like the posterior portion will be canceled. So we're all finished

274.    On Tuesday June 9, 2015, patient RE underwent surgery with IONM services from 9:21AM – 4:03PM (6 hours and 42 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. John Liu. In the complete Chat Log for this case which appears in its entirety below, Physician is D-105660. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring. In fact, in this nearly 7-hour surgery for patient RE, the physician did not discuss the IONM signals for patient RE with the technologist even once. Instead, the physician asked the technologist for the IONM file for a former patient -- patient FK -- who had previously undergone surgery with IONM. It was common practice at USC for IONM physicians to spend their limited time in the office reviewing IONM files retroactively to bill for IONM services instead of monitoring the ongoing surgeries in real-time.

> (09:56:06)D-105660: do you have [patient FK] cascade file from 5/29 inj [sic] that computer?

275.    On Wednesday, October 19, 2016, patient RE underwent surgery with IONM services from 8:23AM– 12:43PM (4 hours and 20 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. Frank Acosta. The USC IONM fellow for the July 2016- June 2017 academic year was Vahe Akopian. In the

complete Chat Log for this case which appears in its entirety below, D-106283:
Technologist.  No physician was present. In this surgery, there was no physician
interpretation of baseline IONM data and no physician interpretation of IONM data
throughout the surgery as required for continuous monitoring.  During a critical portion
of this 4-hour case, the technologist urgently reached out to the physician to check the
IONM data because the technologist believed there was a significant problem. Despite
the technologist's multiple repeated attempts to reach the physician, there was no
response, indicating no physician was monitoring the case.

> (12:17:20)D-106283: can you check out my left gastroc
> (12:17:39)D-106283: can you check out my left gastroc
> (12:18:26)D-106283: its a right L4-L5 tlif
> (12:18:33)D-106283: its a right L4-L5 tlif
> (12:31:34)D-106283: there we go

276.   On Friday, July 27, 2018, patient EG underwent surgery with IONM
services from 10:35AM – 3:43PM (5 hours and 8 minutes) at USC Keck.  The
referring physician is listed as USC neurosurgeon, Dr. Thomas Chen. The USC IONM
fellow for the July 2018- June 2019 academic year was John Parker.  In the complete
Chat Log for this case which appears in its entirety below, D-106283 is the
technologist. No physician was present.  In this surgery, there was no physician
interpretation of baseline IONM data, no physician interpretation of IONM data
throughout the surgery as required for continuous monitoring.  In the singular
communication between the technologist and remote physician in this surgery which
lasted over 5 hours, the technologist informed the physician that monitoring was
concluding.  There was no response, indicating no physician was monitoring the case.

> (15:42:22)D-106283: i AM GOING TO BE END MONITORING.
> ANASTHESIA [sic] IS TURNING ON GAS

277.   On Thursday, May 21, 2015, patient MG underwent surgery with IONM
services from 8:39AM– 1:12PM (4 hours and 33 minutes) at USC Keck.  The referring
physician is listed as USC neurosurgeon, Dr. Jonathan Russin. In the complete Chat

Log for this case which appears in its entirety below, ELITE 1 is the technologist, D-106559 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and instead of monitoring the surgery, the physician had one singular chat communication to the technologist in this surgery which lasted over 4 hours, and that was to instruct the technologist to act in the capacity of the physician and interpret the data independently prior to texting the physician of any changes the technologist deemed present. It is clear the physician was not monitoring the case because there would be no need for the technologist to text the physician if that physician were providing remote, real-time oversight of the surgery with an open chat log.

> (10:53:34)D-106559: please text if any changes [sic]
> (12:26:13)D-106559: they are re opening?
> (12:58:35)ELITE1: okay and yes

278.   On Wednesday, July 2, 2014, patient GL underwent surgery with IONM services from 2:52PM – 6:26PM (3 hours and 34 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Gabriel Zada. In the complete Chat Log for this case which appears in its entirety below, D-103349 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the only communication from the remote physician in this surgery which lasted over 3 hours, the physician commented on an IONM signal, and then realized that the chat log was not for patient GL: "sorry meant for the other case." Instead of interpreting the data in the case of patient GL, the physician never returned. In fact, there was no physician interpretation of the IONM data acquired from patient GL throughout the surgery, indicating that no physician was monitoring the case.

> (16:17:07)D-103349: there seems to be a cortical signal on the c4-c3 channel now in the left uper
> (16:18:11)D-103349: sorry meant for the other case

279.   On Tuesday, April 28, 2015, patient HL underwent surgery with IONM services from 11:55AM – 2:57PM (3 hours and 2 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. John Liu.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist. No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data and no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  During a critical portion of this 3-hour case, the technologist believed there was a critical change in the signals and urgently reached out to the remote neurologist. Despite the technologist's interpretation that the right MEPs had become absent -- an alarming and significant change – there was no reply, indicating no physician was monitoring the case.

(14:32:33)ELITE1: right upper MEP's absent re-position  arm

280.   On Friday, May 1, 2015, patient HL underwent surgery with IONM services from 5:46PM – 6:34PM (0 hours and 48 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist.  No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the singular communication between the technologist and remote physician in this surgery, the technologist informed the physician that monitoring was concluding.  There was no response, indicating the no physician was monitoring the case.

(18:24:55)ELITE1: we're done

281.   On Friday, April 22, 2016, patient MM underwent surgery with IONM services from 12:57PM– 2:23PM (1 hour and 26 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Thomas Chen. The USC IONM fellow

for the July 2015- June 2016 academic year was Anh Thu Tran.  In the complete Chat Log for this case which appears in its entirety below, ELITE 4 is the technologist.  No physician was present.  In this surgery, the technologist attempted to discuss the baseline signals with the remote physician.  However, the physician never replied, indicating the remote physician was not monitoring the case.  Throughout the entire duration of the surgery, no physician provided any interpretation of IONM data.

> (13:11:55)ELITE4: MEP's baseline left side only small foot response right side only small hand and foot response

282.   On Thursday, June 19, 2014, patient JN underwent surgery with IONM services from 9:07AM – 12:49PM (3 hours and 42 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Gabriel Zada. In the complete Chat Log for this case which appears in its entirety below, D-103349 is the physician. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, in this nearly 4-hour surgery for patient JN, the physician did not discuss the IONM signals for patient JN with the technologist even once.  Instead, the physician asked the technologist for the IONM file for a former patient -- patient TN -- who had previously undergone surgery with IONM.  It was common practice at USC for IONM physicians to spend their limited time in the office reviewing IONM files retroactively to bill for IONM services instead of monitoring the ongoing surgeries in real-time.

> (11:32:12)D-103349: would you place [patient TN] report into the s drive
> (11:32:14)D-103349: thanks

283.   On Wednesday, October 22, 2014, patient LO underwent surgery with IONM services from 11:48AM – 1:56PM (2 hours and 8 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Frank Acosta. In the complete Chat Log for this case which appears in its entirety below, ELITE4 is the technologist and KHV-CTXAPP05 is the physician.  In this surgery, there was no physician

interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  Instead, in the only communication between the technologist and remote physician in this surgery, the physician asked the technologist whether there were any more IONM cases that afternoon.

> (14:00:27)KHV-CTXAPP05: any cases in the pm?
> (14:02:18)ELITE4: NO

284.   On Thursday, June 19, 2014, patient JO underwent surgery with IONM services from 5:10PM – 7:47PM (2 hours and 37 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Gabriel Zada. In the complete Chat Log for this case which appears in its entirety below, ELITE4 is the technologist, KHV-CTXAPP05 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and instead of monitoring the surgery, the physician had one singular chat communication to the technologist in this surgery, and that was to instruct the technologist to act in the capacity of the physician and interpret the data independently prior to texting the physician of any changes the technologist deemed present. It is clear the physician was not monitoring the case because there would be no need for the technologist to text the physician if that physician were providing remote, real-time oversight of the surgery with an open chat log.

> (19:27:45)KHV-CTXAPP05: txt me if changes
> (19:29:49)ELITE4: were gonna be closing shortly
> (19:30:03)ELITE4: ill text you!

285.   On Thursday, May 24, 2018, patient CP underwent surgery with IONM services from 1:18PM – 3:03PM (1 hours and 45 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. John Liu. The USC IONM fellow for the July 2017- June 2018 academic year was Jonathan Chen.  In the complete Chat Log for this case which appears in its entirety below, D-106283 is the technologist, RAD-

100129 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no continuous physician interpretation of IONM data throughout the surgery as required.  The technologist made multiple attempts to communicate with the physician, including a critical interpretation needed by the physician at 13:08. There was no response by the physician until 33 minutes later when the physician stated: "sorry this chat was hiding behind the other window."  The physician then attempted to answer the technologist's first question, 38 minutes after the question had been posed.  To be clear, when a technologist enters a communication into the chat log, the remote physician should see that communication immediately because the chat log automatically pops up on the front of the screen with an associated audible chime. The reason the physician was not aware of a chat log communication by the technologist is because the physician was not at the computer and therefore not monitoring the case.

> (13:08:32)D-106283: 1 + TWITCHES, YES?
> (13:08:52)D-106283: BUT I AM GETTING MEPS. PRETTY HIGH THOUGH ON STIMULATION
> (13:13:01)D-106283: REPORTED TO ANASTHESIA. SHE GAVE 30 MG OF ROCURONIUM EARLIER AND IS GOING TO REVERSE NOW
> (13:46:41)RAD-100129: sorry this chat was hiding behind the other window
> (13:47:33)RAD-100129: there were four twitches but not full
> (14:05:52)RAD-100129: hi could you also run some ssep on the left

286.  On Tuesday, April 7, 2015, patient JR underwent surgery with IONM services from 8:45AM – 5:16PM (8 hours and 31 minutes) at USC Keck.  The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore.  In the complete Chat Log for this case which appears in its entirety below, ELITE1 us the technologist.  No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the only

communication between the technologist and remote physician in this 8-hour surgery, the technologist informed the physician that monitoring was concluding. There was no response, indicating that no physician was monitoring the case.

> (17:16:02)ELITE1: end of monitoring /closing
> (17:16:22)ELITE1: end of monitoring/closing

287. On Tuesday, July 1, 2014, patient KS underwent surgery with IONM services from 5:17PM – 8:07PM (2 hours and 50 minutes) at USC Keck. The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore. In the complete Chat Log for this case which appears in its entirety below, D-103348 is the physician. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring, and instead of monitoring the surgery, the physician had one singular chat communication to the technologist in this surgery, and that was to instruct the technologist to act in the capacity of the physician and interpret the data independently prior to texting the physician of any changes the technologist deemed present. It is clear the physician was not monitoring the case because there would be no need for the technologist to text the physician if that physician were providing remote, real-time oversight of the surgery with an open chat log.

> (19:26:50)D-103348: text me if changes
> (19:27:07)D-103348: thanks

288. On Tuesday, September 1, 2015, patient JT underwent surgery with IONM services from 1:05PM – 2:46PM (1 hour and 41 minutes) at USC Keck. The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh. The USC IONM fellow for the July 2015 - June 2016 academic year was Anh Thu Tran. In the complete Chat Log for this case which appears in its entirety below, ELITE1 is the technologist. No physician was present. In this surgery, there was no physician interpretation of baseline IONM data and no physician interpretation of IONM data throughout the surgery as required for continuous monitoring. During a critical portion

of the case, the technologist urgently reached out to the remote neurologist to check the IONM data because the technologist believed there was a significant problem. The technologist attempted to reach the physician but never received a reply, indicating that no physician was even monitoring the case.

(14:13:19)ELITE1: Left sided EMG foot activity?

289.   On Monday, July 7, 2014, patient LT underwent surgery with IONM services from 8:33AM – 11:33AM (3 hours) at USC Keck.  The referring physician is listed as USC orthopedic surgeon, Dr. Jeffrey Wang. In the complete Chat Log for this case which appears in its entirety below, ELITE1 is the technologist and D-103349: is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, in this 3-hour surgery for patient LT, the physician did not discuss the IONM signals for patient LT with the technologist even once.  Instead, the physician asked the technologist for the IONM file for a former patient -- patient PV -- who had previously undergone surgery with IONM.  It was common practice at USC for IONM physicians to spend their limited time in the office reviewing IONM files retroactively to bill for IONM services instead of monitoring the ongoing surgeries in real-time.

(10:35:21)D-103349: do you have file for [patient PV] 6/27/14 on that computer?
(10:36:10)ELITE1: what is the name
(10:36:15)D-103349: [patient PV]
(10:36:35)ELITE1: yes
(10:36:34)D-103349: would you placeon [sic] s drive
(10:36:39)D-103349: thankyou !

290.   On Thursday, July 17, 2014, patient AV underwent surgery with IONM services from 9:25AM – 3:47PM (6 hours and 22 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. William Mack.  In the complete Chat Log for this case which appears in its entirety below, ELITE1 is the technologist

and D-103348 is the physician.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, in this 6-hour surgery for patient AV, the physician did not discuss the IONM signals for patient AV with the technologist even once.  Instead, the physician asked the technologist for the IONM file for a former patient -- patient GL -- who had previously undergone surgery with IONM.  It was common practice at USC for IONM physicians to spend their limited time in the office reviewing IONM files retroactively to bill for IONM services instead of monitoring the ongoing surgeries in real-time.

> (14:33:35)D-103348: could you place [patient GL] report in the S drive (is it in your computer)?
> (14:45:14)ELITE1: ok, I just did
> (14:45:29)D-103348: tks
> (14:48:43)D-103348: dont see it
> (14:51:04)ELITE1: sorry, it was the wrong file, [patient GL] report actually was not on here

291.   On Tuesday, August 23, 2016, patient KI underwent surgery with IONM services from 8:00PM – 12:40PM (4 hours and 40 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh. The USC IONM fellow for the July 2016- June 2017 academic year was Vahe Akopian.  In the complete Chat Log for this case which appears in its entirety below, ELITE1 is the technologist.  No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the singular communication between the technologist and remote physician in this surgery which lasted for over 4 hours, the technologist explicitly asked the physician for interpretation of the IONM signals.  There was no response, indicating no physician was monitoring the case.

> (11:43:38)ELITE1: are you okay with left triceps

292.   On Monday, May 18, 2015, patient CM underwent surgery with IONM services from 8:26AM – 10:38AM (2 hours and 12 minutes) at USC Keck.  The referring physician is listed as USC neurosurgeon, Dr. Patrick Hsieh.  In the complete Chat Log for this case which appears in its entirety below, ELITE1 is the technologist. No physician was present. No physician was present.  In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In the singular communication between the technologist and remote physician in this surgery, the technologist explicitly asked the physician to interpret the baseline IONM signals. "Do you agree" the technologist inquired.  There was no response, indicating no physician was monitoring the case.

(08:23:15)ELITE1: post position baseline look okay to me ,do you agree

293.   On Monday, November 30. 2015, patient JL underwent surgery with IONM services from 12:13PM – 5:22PM (5 hours and 9 minutes) at USC Keck.  The USC IONM fellow for the July 2015- June 2016 academic year was Anh Thu Tran.  In the complete Chat Log for this case which appears in its entirety below, ELITE 1 is the technologist.  No physician was present. In this surgery, there was no physician interpretation of baseline IONM data, no physician interpretation of IONM data throughout the surgery as required for continuous monitoring.  In fact, the only communication between the technologist and remote physician in this surgery occurred when the technologist explicitly asked the physician: "are you there" followed by "do you see the left hand MEP? What do you think?"  There was no response, indicating no physician was monitoring the case.

(14:21:44)ELITE1: are you there? do you see left hand mep? what do you think? Julie change the tcm box and cable?

(14:22:23)ELITE1: ssep stable

294.   On April 22, 2016, 77 year-old Medicare Patient RD underwent spine surgery with IONM at USC Keck Hospital.  The referring physician is listed as USC neurosurgeon, Dr. John Liu.  The USC IONM fellow for the July 2015- June 2016 academic year was Anh Thu Tran.  The only documented IONM communication between any physician and technologist occurred in the complete Chat Log for this case which consisted only of the following communications below:

> (16:48:11)D-106559: text me if any changes
> (16:48:19)D-106559: this is Dr G
> (16:48:34)ELITE1: sure
> (18:10:36)ELITE1: Lt triceps & biceps 50% down from baseline.
> (18:53:23)ELITE1: closing

As the complete Chat Log for the entire case above demonstrates, at 16:48, Dr. Gonzalez (D-106559) instructed the technologist (ELITE1) to interpret the IONM data independently and text Dr. Gonzalez if the technologist determined there were changes.  There was no reason for the technologist to text Dr. Gonzalez if Dr. Gonzalez or any other physician was monitoring continuously with communications via documented chat. Over one hour and 20 minutes passed without any communication between physician and technologist, until 18:10 when the technologist attempted to communicate a severe change in the IONM data: "Lt triceps & biceps 50% down from baseline.  Dr. Gonzalez did not reply; in fact, Dr. Gonzalez did not provide any interpretation of any IONM data throughout the entire case.  USC nonetheless knowingly billed Medicare for IONM services including 10 units of G-0453, 95938-26, 95939-26, 95861-26, 95822-26 and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.

295.   On February 25, 2015, patient JM underwent brain surgery with IONM at USC Keck Hospital. The referring physician is listed as USC neurosurgeon, Dr. William Mack who knew that USC physicians did not provide continuous IONM monitoring as required by both patient safety and payer requirements.  This is further

evidenced by the explicit communication documented in the Chat Log for this case between the physician (KHV-CTXAPP05) and technologist (ELITE1):

> (18:37:54)ELITE1: they're embolizing so that tomorrow they can remove the avm
> (18:49:05)KHV-CTXAPP05: ok
> (18:49:27)KHV-CTXAPP05: I will be watching intermitently [sic]. Text me if issues
> (19:02:47)ELITE1: ok
> (21:21:18)ELITE1: we're closing, signals remained unchanged

As the Chat Log above shows, at 18:49, the physician unequivocally documented in the Chat Log to the technologist that the physician would only be "watching intermitently [sic]" thereby admitting in writing that the physician would not be continuously monitoring the case. After the technologist acknowledged that the physician would only be "watching intermittently [sic]," there is no evidence that the physician ever came back to the computer to monitor the case. The only other subsequent communication documented in this case occurred at 21:21 when the technologist attempted to communicate with the physician in chat that the case was nearly done: "we're closing, signals remained unchanged." There was no response from the physician. Because USC knew it did not provide continuous professional interpretation of the IONM data by a physician as required and the technologist was left with no choice but to act in the capacity of an interpreting physician, this example illustrates the fraudulent scheme by which USC knowingly billed both the professional and technical components for IONM services USC knew were not rendered.

296.   On March 4, 2015, patient DS underwent spine surgery with IONM at USC Keck Hospital. The referring physician is listed as USC neurosurgeon, Dr. John Liu. The following complete Chat Log for this entire case again demonstrated the physician (KHV-CTXAPP05) did not continuously monitor the surgery, ultimately leaving the technologist (ELITE4) who is unlicensed to practice medicine no choice but to interpret the IONM data in the capacity of a physician:

(09:36:20)KHV-CTXAPP05: what case is this?
(10:01:26)KHV-CTXAPP05: what surgery? surgeon?
(10:16:47)ELITE4: Dr.Liu, cervical/thoracic spine cord untethering
(11:45:01)ELITE4: are u there
(11:47:01)ELITE4: left biceps response dropped in amplitude
(13:07:04)ELITE4: Emg activity on right and MEP's decrease in amp right hand and tricep,surg informed.

At 10:01, the physician (KHV-CTXAPP05) asked the technologist (ELITE4) a question indicating the physician was not continuously monitoring the surgery since the physician did not even know the case, the surgeon, or the type of surgery for this patient.  The only other subsequent communications in this case were by the technologist in attempts to try to communicate with the physician who did not respond. At 11:47, the technologist asked in the Chat Log: "are u there?" Because no physician was continuously monitoring the case, the technologist received no response.  At 13:07, over 3 hours after the last communication by the physician in the Chat Log, the technologist again attempted to reach the physician one more time in the Chat Log to ask the physician to interpret a change in the IONM data.  Again, there was no response by the physician.  Because USC knew it did not provide continuous professional interpretation of the IONM data by a physician as required and the technologist was left with no choice but to act in the capacity of an interpreting physician, this example illustrates the fraudulent scheme by which USC knowingly billed both the professional and technical components for IONM services USC knew were not rendered.

297.   Damages associated with illegal referrals and orders and damages associated with surgeries performed by surgery residents without supervision by a qualified teaching surgeon who was absent for the entire surgery include but are not limited to the entire Medicare Part A, facility fees and Diagnosis-Related Group (DRG) reimbursements to Medicare, Medi-Cal and other payers. Without accounting for the damages associated with the illegal referrals or DRG and other tainted damages

associated with surgeries performed by surgery residents without supervision by the teaching surgeon who was absent during the entire surgery, total damages from just the fraudulent IONM services associated with only neurologists alone are estimated to be $31.1M in single damages, $62.5M in double damages, $93.8M in treble damages and $266.7M with the minimum statutory penalties of $11,665 per false claim.

### 2008-2018 Grand Total Estimated IONM Damages related to Neurologists Only

| | Single Damages: | Double Damages: | Treble Damages: | Statutory Penalties: | Grand Total: |
|---|---|---|---|---|---|
| **Medicare:** | $  8,090,369 | $  16,180,739 | $  24,271,108 | $  61,596,730 | $  85,867,838 |
| **Medi-Cal/State:** | $  5,912,193 | $  11,824,386 | $  17,736,579 | $  45,012,995 | $  62,749,574 |
| **Private:** | $  8,712,706 | $  17,425,411 | $  26,138,117 | $  66,334,940 | $  92,473,057 |
| **LAC Contracts** | $  8,541,540 | $  17,083,080 | $  25,624,620 | | $  25,624,620 |
| **TOTAL:** | $ 31,256,808 | $  62,513,616 | $  93,770,424 | $ 172,944,665 | $ 266,715,089 |

### USC Keck Estimated IONM Damages related to Neurologists Only

| **Keck Professional Component Net Collections** | |
|---|---|
| CY Net Collection Projections (Exhibit 24): | $      1,052,026 |
| July-Feb 2016-2017 Net Collections (Exhibit 23): | $      564,670 |
| **ANNUAL PC ESTIMATE:** | **$      1,052,026** |

| **Keck Technical Component Net Collections (Exhibit 23):** | | | | |
|---|---|---|---|---|
| **Total Keck Cases 2017:** | **1,413** | | | |
| **Most Common Modalities:** | **Units:** | **Units Annualized:** | **TC Reimbursement Rates (CA, Area 18, Noridian Fee Schedule)** | **Annualized Total:** |
| 92585 | 58 | 99 | $      129.03 | $      12,829 |
| 95822 | 46 | 79 | $      391.42 | $      30,866 |
| 95861 | 496 | 850 | $      107.57 | $      91,465 |
| 95867 | 164 | 281 | $      75.75 | $      21,297 |
| 95868 | 91 | 156 | $      89.75 | $      14,001 |
| 95937 | 172 | 295 | $      63.45 | $      18,709 |
| 95938 | 657 | 1126 | $      358.76 | $      404,066 |
| 95939 | 643 | 1102 | $      471.42 | $      519,640 |
| **Annual TC Estimate:** | | | | **$      1,112,873** |

| ANNUAL TC ESTIMATE | $ | 1,112,873 |
|---|---|---|

| SUB-TOTAL ANNUAL KECK PC + TC: | $ | 2,164,899 |
|---|---|---|

| 2008-2018 Totals | | Single Damages | | False Claims Stat. Penalties: |
|---|---|---|---|---|
| Assuming 5% growth of revenues per year: | 2018 | $ | 2,164,899 | 1,413 |
| | 2017 | $ | 2,056,654 | 1,342 |
| | 2016 | $ | 1,953,821 | 1,275 |
| | 2015 | $ | 1,856,130 | 1,211 |
| | 2014 | $ | 1,763,324 | 1,151 |
| | 2013 | $ | 1,675,157 | 1,093 |
| | 2012 | $ | 1,591,400 | 1,039 |
| | 2011 | $ | 1,511,830 | 987 |
| | 2010 | $ | 1,436,238 | 937 |
| | 2009 | $ | 1,364,426 | 891 |
| | 2008 | $ | 1,296,205 | 846 |
| SINGLE DAMAGES TOTAL (KECK): | | $ | 18,670,083 | 12,186 |
| STAT. PENALTIES (Min. $11,665/violation) | | | | $   142,146,300 |

| Est. payer mix (Keck): | | | Single Damages by payer: | Treble Damages by payer: | Statutory Damages by payer: |
|---|---|---|---|---|---|
| | Medicare: | 40% | $   7,468,033 | $ 22,404,100 | $   56,858,520 |
| | Private 3rd Party: | 45% | $   8,401,538 | $ 25,204,613 | $   63,965,835 |
| | Medi-Cal: | 5% | $   933,504 | $ 2,800,513 | $   7,107,315 |
| | Other: | 10% | $   1,867,008 | $ 5,601,025 | $   14,214,630 |

## LAC+USC Estimated IONM Damages related to Neurologists Only

| 2008-2018 SINGLE DAMAGES TOTAL (LAC+USC): | $ | 6,223,361 |
|---|---|---|
| STATUTORY PENALTIES (Minimum $11,665 per violation) | $ | 47,382,100 |

| Est. payer mix (LAC+USC) | | | Single Damages by payer: | Double Damages by payer: | Treble Damages by payer: | Statutory Damages by payer: |
|---|---|---|---|---|---|---|
| | Medicare: | 10% | $   622,336 | $ 1,244,672 | $ 1,867,008 | $   4,738,210 |
| | Medi-Cal: | 80% | $ 4,978,689 | $ 9,957,378 | $ 14,936,067 | $ 37,905,680 |
| | Private: | 5% | $   311,168 | $ 622,336 | $ 933,504 | $ 2,369,105 |
| | Other: | 5% | $   311,168 | $ 622,336 | $ 933,504 | $ 2,369,105 |

**Los Angeles County Estimated Contract Damages related to Neurologists Only**

| | |
|---|---|
| FY2017 IONM Funding from Los Angeles County (MSOA/MSAA/PSA); Exhibit 52 | $854,154 |
| Single Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $8,541,540 |
| Double Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $17,083,080 |
| Triple Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $25,264,620 |

**Los Angeles County Estimated Contract Damages related to Neurosurgeons Only**

| | |
|---|---|
| FY2017 IONM Funding from Los Angeles County (MSOA/MSAA/PSA); Exhibit 45 | $418,981 |
| Single Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $4,189,808 |
| Double Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $8,379,617 |
| Triple Damages Estimate: Los Angeles County IONM Funding to USC 2008-2018 | $12,569,425 |

> ### vi.  False Claims and Patient Injuries associated with USC Surgeons and Neurologists at LAC+USC; Fraudulent Contracts

298.   In addition to false claims submitted to Los Angeles County as part of the LAC+USC fraudulent contracts, USC also knowingly caused Los Angeles County to submit thousands of false claims to various payers.

299.   Because contracts between Los Angeles County and USC required USC physicians to supervise surgeries LAC+USC, Defendants conspired with themselves and others to falsely attest such supervision was occurring at LAC+USC despite USC's referring physicians' actual knowledge that the services for which they referred were never going to be provided under the supervision of a qualified physician. Retention of records under the LAC+USC affiliation agreements include are but are not limited to attending physician [Teaching Surgeon] schedules, Individual Physician Time Studies (PTS) in the form required by the Medicare fiscal intermediatory (electronic pdf format), any executed contracts for University Personnel providing services under this Agreement and University's Internal Indirect Cost Allocation. Most notably when the USC attending/teaching surgeon schedules at LAC+USC MC are compared to the LAC+USC MC OR Log for the thousands of unsupervised

surgeries which took place of the last decade at LAC+USC MC, the scienter underpinning the false claims becomes clear and evident.  These records have always been retained for the purposes of such an investigation per the contracts between USC and Los Angeles County stating that "if this Agreement is audited by Federal or County auditors, copies of all documents provided to such auditors" are also subject to the records retention.  (Exhibit 49).

300.   USC specifically intended to defraud Los Angeles County by falsely increasing "county volume" from fraudulent self-referrals by its surgeons despite USC's actual knowledge that USC physicians were nowhere near LAC+USC Medical Center at the time the surgery was being performed as required by all patient safety and billing requirements. (Exhibit 125).

301.   USC's surgical policies were designed with the specific intent to defraud and, as a result, the fraud occurred every day for over a decade at both USC Keck and LAC+USC.  (Exhibits 6, 8 and 34). Despite actual knowledge that there was no supervision of resident surgeons and unlicensed technologists, USC continued to self-refer such fraudulent services for over a decade. In addition, USC continued to submit false claims attesting to supervision of physician services in order to receive indirect or direct payments from Los Angeles County based on volume of surgical services and referrals.  At both USC Keck Hospital and LAC+USC Medical Center, USC's fraudulent schemes resulted in thousands of false claims and hundreds of millions of dollars of fraudulent reimbursements for surgeries not appropriately performed.

302.   In accordance with ACGME rules, the Medical School Operating Agreement (MSOA) between the Department of Health Services and the University of Southern California establishes that the faculty of the Keck School of Medicine are responsible for the teaching and supervision of residents. Moreover, all patient safety and billing regulations require the teaching physician to be responsible for the preoperative, operative, and postoperative care of the beneficiary. (Exhibit 139).

303.   Per Medicare Claims Processing Manual, Publication 100-04, in order to

bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure.  During non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e., he/she cannot be performing another procedure. (Exhibit 132).

304.   The USC Office of Culture, Ethics and Compliance states:

> Physician services are provided to patients by faculty members of the USC Care Medical Group, as well as by physicians enrolled in accredited internship, residency, and fellowship programs with the USC system, and appropriate non-physician providers.  Only those professional services provided by billable providers or resident physicians adequately supervised by faculty physicians, and documented in the medical record, are billable to third party payers and/or patients.  USC is committed to full compliance with the laws and regulations that apply to our institution, including all federal health care programs (such as Medicare and Medi-Cal) requirements, and is committed to prepare and submit accurate claims consistent with such requirements.

> USC has adopted the principles of billing for teaching physician services as established by the Medicare program, except when specific payers require a higher standard.  For example, a payer may require personal involvement of the teaching physician for all services (as opposed to the primary care exception) in order to bill for professional component services.

(Exhibit 138)

305.   However, USC violated ACGME, Medicare, Medi-Cal and all billing and patient safety regulations in thousands of surgeries at LAC+USC Medical Center because its non-board certified GME resident surgeons performed surgeries without any attendance by the USC teaching surgeon for the entire case, let alone the critical portions of the surgery which required the teaching surgeon's presence.  Medicare and patient safety and billing regulations state that "in order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical

and key portions of the procedure and be immediately available to furnish services during the entire procedure."  Moreover, the USC teaching physician responsible for overseeing the resident surgeon at LAC+USC was regularly scheduled to perform multiple surgeries occurring simultaneously at two different hospitals (USC Keck Hospital and LAC+USC Medical Center).  To be clear, USC and its affiliates had specific intent to leave resident surgeons unsupervised which routinely resulted in the teaching surgeon failing to be present or failing to return to the procedure even when known intraoperative injury had occurred.  USC and its affiliates had full knowledge that its actions risked patient safety and caused significant patient injuries and deaths as a result of this negligent supervision wherein USC and its affiliates routinely perpetrated fraud for financial gain at the expense of patient safety.  Notably, after Dr. Cheongsiatmoy the fraud and patient harm caused by lack of GME resident surgeon supervision by teaching surgeons at LAC+USC to the highest levels of USC and LAC+USC management, USC and Los Angeles County changed their local ACGME rules through their own Letters of Agreement.  On July 23, 2019, Christina Ghaly, M.D, Director for the Los Angeles County Department of Health Services, recommended the "Approval of a Successor Medical School Affiliation Agreement with the University of Southern California," addressing "critical needed inpatient areas… critical new services…[to add] new neurosurgical attending coverage [at LAC+USC MC] due to changes in ACGME requirements." (Exhibit 49 at 3). This recommendation was made by Christina Ghaly, M.D, Director for the Los Angeles County Department of Health Services, in her role as Chief Operations Officer overseeing operations of DHS' directly operated delivery system including at LAC+USC Medical Center. (Exhibit 49 at 6).  Dr. Christina Ghaly's recommendation was approved by the Los Angeles County Board of Supervisors that same day and signed by the Chair of the Los Angeles County Board of Supervisors, Janice Hahn. The joint actions taken by USC and Los Angeles County via Dr. Ghaly and Supervisor Hahn following Dr. Cheongsiatmoy's reporting are in direct contradiction to USC's

March 27, 2020 Voluntary Self Disclosure which not only omits any reference to the fraud at LAC+USC MC but also specifically states "Dr. Cheongsiatmoy's other allegations about inadequate documentation by the IONM Program [including lack of supervision by USC attending surgeons and neurologists which led to significant fraud and patient harm at USC and LAC+USC] were not substantiated." (Exhibit 89 at 15).

306.   On August 7, 2017, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient RL and USC Keck patient RN whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

307.   On December 11, 2017, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient TE and USC Keck patient GO whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations ACGME, Medicare and all billing and patient safety regulations.

308.   On December 19, 2017, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient HL and USC Keck patient TM whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

309.   On October 20, 2014, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient RE and USC Keck patient VS whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

310.   On January 14, 2016, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient YW and USC Keck patient KA whose surgeries occurred simultaneously at these two different hospitals.  This example

illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

311.   On February 25, 2016, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient CV whose surgery occurred simultaneously with the surgeries of USC Keck patient CM and USC Keck patient DD at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

312.   On April 26, 2016, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient BI and USC Keck patient RS whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

313.   On February 9, 2018, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient CS and USC Keck patient PB whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

314.   On April 27, 2018, USC neurosurgeon Dr. Jonathan Russin was the teaching surgeon for both LAC+USC patient TC and USC Keck patient MM whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

315.   On April 6, 2016, USC neurosurgeon Dr. Gabriel Zada was the teaching surgeon for LAC+USC patient GR, USC Keck patient KC and USC Keck patient LA whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

316.   On April 28, 2016, USC neurosurgeon Dr. Gabriel Zada was the teaching surgeon for both LAC+USC patient MM and USC Keck patient DD whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

317.   On May 26, 2016, USC neurosurgeon Dr. Gabriel Zada was the teaching surgeon for both LAC+USC patient SK and USC Keck patient LO whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations ACGME, Medicare and all billing and patient safety regulations.

318.   On April 12, 2017, USC neurosurgeon Dr. Gabriel Zada was the teaching surgeon for both LAC+USC patient RN and USC Keck patient IM whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

319.   On May 14, 2018, USC neurosurgeon Dr. Gabriel Zada was the teaching surgeon for both LAC+USC patient LT and USC Keck patient ES whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

320.   On April 7, 2014, USC orthopedic surgeon Dr. Mark Spoonamore was the teaching surgeon for both LAC+USC patient EE and USC Keck patient YB whose surgeries occurred simultaneously at these two different hospitals.  This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

321.   On August 12, 2016, USC orthopedic surgeon Dr. Mark Spoonamore was the teaching surgeon for both LAC+USC patient RG and USC Keck patient AB whose surgeries occurred simultaneously at these two different hospitals.  This example

illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

322. On May 3, 2016, USC and Los Angeles County employed surgeon, Dr. Steven Giannotta was the teaching surgeon for both LAC+USC patient GH and USC Keck patient FC whose surgeries occurred simultaneously at these two different hospitals. This example illustrates how USC's fraudulent scheme led to serious violations of ACGME, Medicare and all billing and patient safety regulations.

323. On January 8, 2018, 66 year-old patient RS underwent brain surgery at LAC+USC Medical Center and died the following day. The referring physician is listed as USC surgery resident, Dr. Vivek Mehta. Records show there was no teaching surgeon present to supervise the resident in this surgery which led to this patient death. During a critical portion of the surgery, there was significant bleeding from the brain and severe and persistent changes in IONM motor evoked potentials arising from the nervous system of patient RS, consistent with serious intraoperative patient injury. Despite the actual IONM data from patient RS's surgery showing significant changes in the IONM signals, on January 17, 2018, the USC technologist involved in this case, Pooja Parikh, emailed a written admission to all the IONM physicians that she had independently interpreted "no significant changes" during this surgery. She further stated:

> "The patient passed away next day due to ICH [intracerebral hemorrhage]. During surgery aneurysm ruptured but bleeding was controlled. No significant IOM changes."

(Exhibit 76)

The email referenced above is USC's written admission that USC's technologist, Ms. Parikh, failed to identify significant changes in the IONM data and the technologist was independently in interpreting the IONM data, as instructed by USC's IONM policies directing technologists to act in the capacity of physicians. Even worse, there was no teaching surgeon during critical portions of the case in which the aneurysm ruptured causing significant bleeding in the brain. ACGME, Medicare and all patient

1   safety and billing regulations specifically state that "in order to bill for surgical, high-

2   risk, or other complex procedures, the teaching physician must be present during all

3   critical and key portions of the procedure and be immediately available to furnish

4   services during the entire procedure."  Despite USC's actual knowledge of no

5   supervision of the resident surgeon and IONM technologist, USC still knowingly

6   submitted false claims to insurance for surgical services not rendered.  USC also billed

7   for IONM services using CPT 95940 among other base codes through LAC+USC

8   Medical Center attesting that Dr. Shilian was monitoring patient RS' surgery from

9   inside the operating room at LAC+USC despite actual knowledge that no IONM

10   physician was ever present during the surgery.  These false claims also led to

11   overpayment of funds associated with the TC as well.  USC also knowingly billed for

12   IONM services under Dr. Shilian in other surgeries occurring simultaneously at both

13   LAC+USC and USC Keck including: LAC+USC patient ER, USC Keck patient YC,

14   USC Keck patient BS, and USC Keck patient BC.  The example is provided to

15   highlight the significant patient harm that resulted from USC's consistent pattern and

16   practice of prioritizing financial gain over patient safety and compliance.  Had USC

17   appropriately supervised its employees, resident surgeons and technologists involved

18   in this surgery, the death of patient RS could have been avoided.

19       324.   On December 19, 2017, 53 year-old Medi-Cal patient HL underwent brain

20   surgery at LAC+USC Medical Center between 08:52 and 16:18.  USC neurosurgeon

21   Dr. Jonathan Russin was both the referring and teaching surgeon. Operating room

22   records show that Dr. Russin was present in the LAC+USC Medical Center operating

23   room between 11:47 and 12:43 (Exhibit 41).  After Dr. Russin left the LAC+USC

24   operating room at 12:43, he went to USC Keck Hospital -- a completely different

25   hospital -- in order to perform brain surgery on USC Keck patient TM for whom he

26   was also the teaching surgeon.  Patient TM was undergoing surgery at the same time as

27   LAC+USC patient HL.  Dr. Russin's departure from LAC+USC Medical Center

28   caused the LAC+USC neurosurgery resident to be unsupervised while performing

brain surgery on patient HL in violation of ACGME and all patient and billing requirements that "in order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure…if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, i.e., he/she cannot be performing another procedure." (Exhibit 132).  Dr. Russin entered the USC Keck operating room for patient TM at 13:08 as documented in the IONM data file. (Exhibit 130).  At 13:30, while Dr. Russin was performing surgery on USC patient TM and while the LAC+USC surgical resident was unsupervised during a critical key portion of LAC+USC patient HL's surgery, there were severe and persistent changes in IONM data signals arising from patient HL's nervous system indicating serious intraoperative patient injury.  At the time of the patient HL's intraoperative injury at LAC+USC Medical Center, Dr. Russin was actively performing another surgery and clearly not able to provide the required supervision as teaching surgeon overseeing the LAC+USC ACGME neurosurgery resident.  Instead, Dr. Russin continued to perform surgery at USC Keck Hospital and then traveled back to LAC+USC Medical Center, arriving in the LAC+USC operating room at 14:00.  The IONM signals for patient HL remained permanently decreased and never recovered.  Dr. Russin did not sign the surgeon's Operative Report.  Instead, the Operative Report was signed only by the neurosurgery resident, Dr. Daniel Kramer, who attested in the medical record that Dr. Russin personally "spoke with the family to let them know the motor evoked potentials had dropped…and following the patient waking up, the family was informed that this deficit could be permanent…and it was stated that this was a complication of surgery." Most billing regulations follow 42 CFR §415.172 (b) which "requires documentation in the medical records must identify, at a minimum, the service furnished, the participation of the teaching physician in providing the service, and whether the teaching physician was physically present."  Teaching surgeon Dr. Jonathan Russin

was absent from the LAC+USC operating room and not even present at LAC+USC Medical Center when the IONM signals for patient HL became critically changed, yet the Operative Report for LAC+USC patient HL did not reflect this important information.  The Operative Report also failed to state that Dr. Russin was actively performing surgery on another patient at USC Keck Hospital at the time of HL's intraoperative injury.  The day after surgery, post-operative reports showed that patient



**TWO SIMULTANEOUS SURGERIES, TWO DIFFERENT HOSPITALS, ONE USC TEACHING SURGEON → PATIENT INJURY**

Medicare Claims Processing Manual, Chapter 12: "In order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure…The teaching surgeon is responsible for the preoperative, operative, and postoperative care of the beneficiary…if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure, **i.e., he/she cannot be performing another procedure**."

See Exhibits 41, 130, 132

HL was paralyzed and unable to move the right arm and right leg.  MRI imaging of the brain confirmed that patient HL had suffered a severe stroke.  Because there was significant patient injury in this surgery, the case was reported to the "central reporting agency" of LAC+USC Medical Center.  The above timeline is just one exemplar of the fraud Dr. Cheongsiatmoy reported and shows serious billing and safety violations by USC which resulted in false claims and significant patient harm.  Despite actual knowledge that there was no supervision of the resident surgeon by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not appropriated provided. In addition, also absent from the LAC+USC operating room

was Dr. Gonzalez, the USC IONM physician who USC falsely attested was physical monitoring the surgery within the operating room for the entire duration of the procedure by billing eight units of in-room "Continuous IONM" under CPT code 95940.  The operating room records show that no IONM physician was ever present during the surgery for LAC+USC patient HL.  Despite USC's actual knowledge that no IONM physician was monitoring the case in the operating room, USC caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false claims also led to overpayment of funds associated with the TC as well. USC's compliance teams should have been aware that while patient HL was undergoing surgery at LAC+USC under the purported care of Dr. Russin and Dr. Gonzalez, medical services for simultaneous surgeries at USC Keck were also billed by USC for patient TM who was supervised by Dr. Russin as described above, and IONM services for simultaneous surgeries at USC Keck were also billed by USC under Dr. Gonzalez for USC Keck patient AW, USC Keck patient HS, and USC Keck patient CH.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented. (Exhibit 41).

325.   In FY 2017, USC neurosurgeon Dr. Jonathan Russin received over $250,000 of MSAA money annually from Los Angeles County to supervise resident ACGME neurosurgery residents at LAC+USC Medical Center.  USC neurosurgeon Dr. Gabriel Zada received over $160,000 of PSA money annually from Los Angeles County to supervise resident ACGME neurosurgery residents at LAC+USC Medical Center (Exhibit 45). USC neurologist Dr. Gonzalez received $185,000 of MSOA/PSA money annually from Los Angeles County and USC neurologist Dr. Shilian received over $150,000 of MSOA money annually from Los Angeles County to provide IONM physician oversight at LAC+USC Medical Center (Exhibits 45 and 52) – these USC

physicians received such monies as a result of USC's explicit attestations that these physicians would be supervising the surgeries for patients receiving care at LAC+USC.

326.   On August 15, 2017, 64 year-old patient DF underwent spine surgery at LAC+USC Medical Center and the referring physician is listed as USC neurosurgery resident Dr. Vivek Mehta.  The OR records show that only Dr. Mehta and an even more junior resident were present during this case.  Records show the teaching surgeon was not present to supervise the residents in this surgery which led to this serious patient injury.  During a critical portion of the surgery, significant IONM changes involving the somatosensory evoked potentials and motor evoked potentials occurred, consistent with catastrophic intraoperative patient injury leading to sensory deficits and paralysis.  The surgical resident was concerned about risk for further patient injury if the surgical procedure was not extended to other areas of the spine.  However, because the family could not be reached for consent of this additional surgical procedure, a two-physician consent was performed to allow the emergency surgery to continue.  There is no documentation that any teaching surgeon was present for this two-physician emergency consent.  Medicare and patient safety and billing regulations state that "in order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure."  In violation of ACGME and all patient safety and billing regulations, no teaching surgeon ever entered the operating room to provide resident supervision at any time during the entire surgery for patient DF, including the additional emergency procedure.  Pursuant to 42 CFR §415.172 (b), "documentation in the medical records must identify, at a minimum, the service furnished, the participation of the teaching physician in providing the service, and whether the teaching physician was physical present."  Only the neurosurgery resident signed the Operative Report.  Despite actual knowledge that there was no supervision by a teaching surgeon, USC still submitted false claims to

insurance for surgical services not rendered.  Patient DF was insured by Los Angeles County's In-Home Support Services program, which is funded through a mix of local, state, and federal taxpayer dollars.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient DF's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  The operating room records show that no IONM physician was ever present during the surgery. (Exhibit 37). These false claims also led to overpayment of funds associated with the TC as well.  USC not only knowingly billed for IONM services under Dr. Gonzalez in this case, but also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient NR, USC Keck patient SH, and USC Keck patient MM.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented.  (Exhibit 37).

327.   On January 6, 2017, 59 year-old Medi-Cal patient MM underwent brain surgery for removal of ovarian metastases at LAC+USC Medical Center. The referring physician is listed as USC neurosurgery resident Dr. Martin Pham. The LAC+USC OR Log show that only Dr. Martin Pham, a USC neurosurgery resident, and another even more junior surgery resident, Dr. Ki-Eun Chang, were present in the operating room. Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, significant IONM changes involving the motor evoked potentials occurred, consistent with significant intraoperative injury and paralysis.  As indicated in the surgical notes, there were serious neurological complications during the surgery, and patient MM awoke the day after surgery with paralysis and loss of motor function on her left side. All patient safety and safety regulations require that "in order to bill for

surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure."   During the key portion of the surgery where there were significant changes in IONM signals, no teaching surgeon ever entered the operating room to provide supervision as required by ACGME and all patient safety and billing regulations.  Even though this surgery took place on January 6, 2017, attestation of the Operative Report was delayed for over a month until February 7, 2017, when Dr. Gene Sung signed the Surgeon's Operative Report.  This is a false attestation because Dr. Sung is not even a surgeon, but rather, like many other USC physicians, he had dual responsibilities at both USC Keck and LAC+USC.  In this case, Dr. Sung was both a USC neurologist and served as LAC+USC Director of Neuro Critical Care and LAC+USC Medical Center Inpatient Chief.  According to the official LAC+USC Medical Center operating room records, Dr. Sung was never present during this surgery and there is no documentation in the Operative Report of Dr. Sung's involvement in this surgery at all.  More than 3 months after this surgery occurred, on April 13, 2017, neurosurgery resident, Dr. Martin Pham, finally signed the Report.  The Operative Report did not describe the involvement of any supervising teaching surgeon during the surgery, and no teaching surgeon ever appeared in the OR attendance records during the surgery which ultimately led to serious patient injury.  Despite actual knowledge of no supervision by any teaching surgeon, USC still caused submissions of false claims to insurance for surgical services not rendered.  In addition, absent from the LAC+USC operating room was Dr. Gonzalez, the USC IONM physician who USC attested was physically monitoring the surgery within the operating room for the entire duration of the procedure.  Despite USC's actual knowledge that no IONM physician was monitoring the case in the operating room, USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient KP's surgery from inside the operating room at LAC+USC despite actual

knowledge these claims were clearly false.  The operating room records show that no IONM physician was ever present during the surgery for LAC+USC Medi-Cal patient MM. These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented. (Exhibit 42).

328.    On July 17, 2015, 27 year-old Medi-Cal patient KP underwent spine surgery at LAC+USC Medical Center and the referring physician is listed as Dr. Alexander Tuchman, a USC neurosurgery resident.  The OR records show that Dr. Tuchman and only two more junior residents were present during the case.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, significant IONM changes occurred, consistent with intraoperative patient injury.  All patient safety and billing regulations require that "in order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure."  However, no teaching surgeon ever entered the operating room to provide the resident supervision during this critical portion of the procedure as required by ACGME and patient safety and billing regulations.  (Exhibit 147).  Pursuant to 42 CFR §415.172 (b), "documentation in the medical records must identify, at a minimum, the service furnished, the participation of the teaching physician in providing the service, and whether the teaching physician was physically present."  Only the neurosurgery resident, Dr. Tuchman, signed the Operative Report.  No teaching physician attested to being present or to providing resident supervision of the ACGME surgical resident in this surgery which led to patient injury.  Despite actual knowledge of no supervision of the resident surgeon by a teaching surgeon, USC still submitted false claims to insurance for surgical services not rendered.

(Exhibit 147). In addition, absent from the LAC+USC operating room was Dr. Gonzalez, the USC IONM physician who USC attested was physically monitoring the surgery within the operating room for the entire duration of the procedure.  Despite USC's actual knowledge that no IONM physician was monitoring the case in the operating room, USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient KP's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented. (Exhibit 147).

329.   On January 19, 2018, 67 year-old Medicare patient ES underwent spine surgery at LAC+USC Medical Center from 11:14 to 16:25 and the referring physician and teaching surgeon is listed as USC Orthopedic Surgeon, Dr. Mark Spoonamore. Operating room records show that Dr. Spoonamore was present in the OR for exactly 8 minutes at the very beginning of the surgery, from 11:30 to 11:38, leaving the rest of the 4-hour surgery in the sole hands of the ACGME neurosurgery resident.  Later in the case, during a critical portion of the surgery, significant IONM changes occurred, consistent with intraoperative patient injury. (Exhibit 44). Medicare regulations state that "in order to bill for surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure.  Even during non-critical or non-key portions of the surgery, if the teaching surgeon is not physically present, he/she must be immediately available to return to the procedure." Operating room records show that Dr. Spoonamore never returned to the operating room to provide resident supervision during this critical portion of the procedure as

required by ACGME and Medicare rules. (Exhibit 44). Pursuant to 42 CFR §415.172 (b), "documentation in the medical records must identify, at a minimum, the service furnished, the participation of the teaching physician in providing the service, and whether the teaching physician was physically present." The Operative Report fails to acknowledge that Dr. Spoonamore was absent from the operating room at the time of injury, and in fact, never returned to the operating room to provide supervision of the ACGME surgical resident even after the surgery team was aware there were critical changes in the IONM signals consistent with intraoperative patient injury. (Exhibit 44). Despite actual knowledge that the resident supervision was not supervised by the teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered. In addition, absent from the LAC+USC operating room was Dr. Gonzalez, the USC IONM physician USC attested provided twenty-four units of in-room "Continuous IONM" under CPT code 95940 and who was physically monitoring the surgery within the operating room for the entire duration of the procedure. However, the operating room records show that no IONM physician was ever present during the surgery for LAC+USC Medicare patient ES. Despite USC's actual knowledge that no IONM physician was monitoring the case in the operating room, USC caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient MA, LAC+USC patient AR, USC Keck patient KO, USC Keck patient YR and USC Keck patient AD. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented.

(Exhibit 44).

330. On May 23, 2017, 63 year-old patient LB underwent spine surgery at LAC+USC Medical Center. The referring surgeon is listed as USC surgery resident, Dr. Martin Pham. Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury. During a critical portion of the surgery, there were severe and persistent changes in IONM motor evoked potentials arising from the nervous system of patient LB, consistent with intraoperative patient injury and paralysis. Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered. USC also billed CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring this case inside the operating room despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for fraudulent IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously such as USC Keck patient RC referred by USC surgeon, Dr. Hsieh. There was no evidence that any IONM physician continuously monitored the case. As a result of USC's negligent supervision of both the resident surgeon and IONM technologists, patient LB woke up in the operating room after the surgery completely paralyzed in both of his legs. The IONM event log created by the technologist documented:

> 15:56:09    pt extubated, not moving ble [bilateral lower extremity legs]
> 16:36:37    pt reintubated, all monitoring needles inserted again

(Exhibit 38)

After the resident surgeon realized the patient was severely paralyzed in both legs, the patient was re-intubated and taken back to the operating room table for an emergency surgery to re-open the patient's wound. Had USC appropriately supervised the resident surgeon and IONM technologist, patient injury could have been prevented. In

fact, during the emergency surgery, the resident surgeon then realized that patient LB had suffered a life-threatening blood clot in the spine which occurred in the critical portion of the case which was not supervised by the teaching surgeon.

331.   On January 31, 2018, 54 year-old patient AA underwent thoracic spine surgery at LAC+USC Medical Center.  The referring physician is listed as USC neurosurgery resident, Dr. Joshua Lucas.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM motor evoked potentials arising from the nervous system of patient AA, consistent with intraoperative patient injury and significant paralysis.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AA's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only for this case, but also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC including: LAC+USC patient VR, LAC+USC patient AT and USC Verdugo Hills patient TH.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented.

332.   On November 10, 2017, 80 year-old patient JR underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Vivek Mehta.  Records show the teaching surgeon was not present to

supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM motor evoked potential data signals arising from the nervous system of patient JR, consistent with intraoperative patient injury and right-sided paralysis.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered. USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient JR's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck patient TS, USC Keck patient EL, and USC Keck patient SK. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and IONM technologists involved in this surgery, significant patient injury could have been prevented.

333.   On September 11, 2017, 37 year-old patient AH underwent spine surgery at LAC+USC Medical Center.  The referring surgeon is listed as USC surgery resident, Dr. Vivek Mehta.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM motor evoked potentials arising from the nervous system of patient AH, consistent with intraoperative patient injury and paralysis. There was no evidence that any IONM physician continuously monitored the case or teaching surgeon supervising the resident surgeon.  Despite actual knowledge that the resident surgeon was not supervised by the teaching surgeon, USC still knowingly submitted false claims to insurance for surgical

services not rendered.  USC also billed CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AH's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  USC not only fraudulently billed Dr. Shilian in this case but USC also fraudulent billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously including submission of false claims under CPT 95940 attesting that Dr. Shilian was exclusively monitoring patient SC (referred by USC surgeon, Dr. Wang) from inside the Operating Room of a completely different hospital - also false claims for exclusive one-on-one monitoring of Medicare patient SC (referred by USC and Los Angeles County employed surgeon, Dr. Steven Giannotta). USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented. (Exhibit 39).

334.   On August 28, 2017, 58 year-old patient SC underwent lumbar spine surgery at LAC+USC Medical Center.  The referring surgeon is listed as USC surgery resident, Dr. Vivek Mehta.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in the IONM signals including the motor evoked potentials and somatosensory evoked potentials arising from the nervous system of patient SC, consistent with intraoperative patient injury and permanent sensory deficits and paralysis.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered. USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient SC's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the

TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only for this case, but also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient GV, and USC Keck patient DS.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

335.   On August 17, 2017, 54 year-old patient TO underwent carotid endarterectomy at LAC+USC.  The referring physician is listed as USC surgery resident Dr. Vivek Mehta.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury. The Operative Report is signed by the resident surgeon only with no reference to the presence of a teaching surgeon in direct violation of AGME and patient safety billing regulations intended to protect patients.  During the most critical portion of the surgery -- the clamping of the internal carotid artery -- IONM data showed there was a significant decline in SSEPs consistent with a devastating stroke.  After the clamp, the USC employed technologist, Nancy Nguyen documented in the Event Log: "informed physicians right lower SSEP is down. Surgeons acknowledge." Twenty-two minutes later, the technologist documented again: "Informed physicians right SSEP is absent, surgeons acknowledge."  Most troubling, the Event Log written by the technologists shows there was never any communication regarding any MEPs which monitor the nerve pathways involved in patient movement.  Immediately after the surgery was completed, the patient was completed paralyzed in her right arm and MRI imaging of the brain demonstrated she had suffered multiple severe strokes throughout her brain. The Operative Report was only attested to by the USC resident surgeon and stated: "At baseline, the MEPs and SSEPs were extremely low, likely due to his significant nerve root compression." The resident surgeon's characterization of the communication he

received regarding the signals directly contradicts the technologist's interpretation documented in the technologist's Event Log.  Either the technologist did not report these significant findings to the resident surgeon or the communications from the technologist were misinterpreted by the resident surgeon.  In the resident surgeon's only other reference to IONM in the operative report, the resident surgeon stated: "All sponge and needle counts were correct at the end of the procedure, and the baseline MEPs and SSEPs, which were significantly down prior to surgery, remained stable." In this statement, the surgeon documented that both MEPs and SSEPs "remained stable" throughout the procedure, which is also direct contradiction to the technologist's interpretation in the Event Log.  Patient TO awoke from surgery the next day with complete paralysis in the right arm after having suffered multiple strokes and paralysis.  The documentation of the technologist and resident surgeon in their respective attestations in the patient's medical record highlight the negligent supervision of both which directly led to significant patient injury. Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered. USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient TO's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented. (Exhibit 121).

336.   On May 22, 2017, 68 year-old patient AC underwent thoracic spine surgery at LAC+USC Medical Center. The referring surgeon is listed as USC surgery resident, Dr. Martin Pham.  Records show the teaching surgeon was not present to

supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM signals including the right lower extremity motor evoked potentials arising from the nervous system of patient AC, consistent with intraoperative patient injury and paralysis.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AC's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient FC, USC Keck patient MS, USC Keck patient ND, and USC Keck patient AF.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

337.   On October 28, 2016, 42 year-old patient MG underwent spine surgery at LAC+USC Medical Center. The referring surgeon is listed as USC surgery resident, Dr. Martin Pham.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient MG, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among

other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient MG's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient JR, USC Keck patient DF, and USC Keck patient JS.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

338.   On October 4, 2016, 49 year-old patient MA underwent spine surgery at LAC+USC Medical Center. The referring surgeon is listed as USC surgery resident, Dr. Martin Pham.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient MA, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient MA's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: 48 year-old LAC+USC patient MA and

USC Keck patient DL.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

339.   On September 14, 2016, 57 year-old patient AM underwent cervical spine surgery at LAC+USC Medical Center at 2:10AM.  The referring physician is listed as USC surgery resident, Dr. Patrick Reid.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AM, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AM's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

340.   On November 24, 2015, 39 year-old patient AH underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgery resident, Dr. Alexander Tuchman.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AH, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was

not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AH's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at LAC+USC for patient AR.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

341.   On November 23, 2015, 61 year-old patient KR underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgery resident, Dr. Eisha Anne Christian.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient KR, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient KR's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery

occurring simultaneously at LAC+USC for patient DG.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

342.   On April 6, 2015, 66 year-old patient ZA underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Yvette Marquez.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient ZA, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient ZA's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at LAC+USC including: LAC+USC patient RW and LAC+USC patient MB.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

343.   On September 25, 2014, 64 year-old patient AB underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Lee.  Records show the teaching surgeon was not present to supervise the

resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AB, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient AB's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient MH, USC Keck patient BT, USC Keck patient JF, and USC Keck patient EG.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

344.   On March 11, 2015, 61 year-old patient AL underwent brain surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Lee.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AL, consistent with intraoperative patient injury. Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring

patient AL's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

345.   On December 29, 2014, 55 year-old patient OL underwent spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Lee.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient OL, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient OL's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck patient LM and USC Keck patient WW.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

346.   On December 4, 2014, 71 year-old patient ES underwent spine surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgery resident,

Dr. Lee.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient ES, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient ES' surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck Medicare patient BJ and USC Keck patient MH.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

347.  On September 17, 2014, 40 year-old patient DE underwent thoracic spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Lee.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient DE, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was

monitoring patient DE's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck Medicare patient RS, USC Keck Medicare patient EO, USC Keck patient YR, and USC Keck patient AH.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

348.   On June 27, 2014, 51 year-old patient BM underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Lee.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient BM, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient BM's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at LAC+USC including: LAC+USC patient SI and LAC+USC patient LB.  USC's failures show a consistent pattern and practice of prioritizing financial gain

over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

349.   On March 31, 2014, 23 year-old patient JZ underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Richard Robison.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient JZ, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient JZ's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient JM, USC Keck Medicare patient ST, and USC Keck Medicare patient WD.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

350.   On March 13, 2014, 55 year-old patient NR underwent thoracic spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Richard Robison.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a

critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient NR, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient NR's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC including: LAC+USC patient TL.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

351.   On March 3, 2014, 55 year-old patient SF underwent spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Richard Robison.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient SF, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient SF's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to

overpayment of funds associated with the TC as well.  USC's failures show a
consistent pattern and practice of prioritizing financial gain over patient safety and
compliance.  Had USC appropriately supervised its employees, resident surgeons and
technologists involved in this surgery, significant patient injury and false claims could
have been prevented.

352.   On February 28, 2014, 47 year-old patient ER underwent cervical spine
surgery at LAC+USC Medical Center.  The referring physician is listed as USC
surgery resident, Dr. Richard Robison.  Records show the teaching surgeon was not
present to supervise the resident in this surgery which led to this serious patient injury.
During a critical portion of the surgery, there were severe and persistent changes in
IONM data signals arising from the nervous system of patient ER, consistent with
intraoperative patient injury.  Despite actual knowledge that the resident surgeon was
not supervised by a teaching surgeon, USC still knowingly submitted false claims to
insurance for surgical services not rendered.  USC also billed for IONM services using
CPT 95940 among other base codes through LAC+USC Medical Center attesting that
Dr. Gonzalez was monitoring patient ER's surgery from inside the operating room at
LAC+USC despite actual knowledge these claims were clearly false.  These false
claims also led to overpayment of funds associated with the TC as well.  USC
knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC
also knowingly billed for IONM services under Dr. Gonzalez in other surgeries
occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC
patient DM and USC Keck Medicare patient SA.  USC's failures show a consistent
pattern and practice of prioritizing financial gain over patient safety and compliance.
Had USC appropriately supervised its employees, resident surgeons and technologists
involved in this surgery, significant patient injury and false claims could have been
prevented.

353.   On January 16, 2014, 52 year-old patient SH underwent spine surgery at
LAC+USC Medical Center.  The referring physician is listed as USC surgery resident,

Dr. Richard Robison.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient SH, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient SH's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

354.   On October 7, 2013, 50 year-old patient LQ underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Jesse Winer.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient LQ, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient LQ's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for

IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC ENT patient SS, LAC+USC patient MS, LAC+USC patient JF, USC Keck ENT patient TS, and USC Keck ENT patient JC.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

355.   On July 23, 2013, 57 year-old patient HH underwent brain tumor surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Richard Robison.  Records show the teaching surgeon was not present to supervise the resident in this surgery which led to this serious patient injury.  During a critical portion of the surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient HH, consistent with intraoperative patient injury.  Despite actual knowledge that the resident surgeon was not supervised by a teaching surgeon, USC still knowingly submitted false claims to insurance for surgical services not rendered.  USC also billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient HH's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient ML and USC Keck ENT patient VL.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

356.   USC's extensive fraud involving Los Angeles County involved not just LAC+USC, but multiple government institutions at both the state and federal levels. (Exhibit 5).

357.   Department of Health Services (DHS) of Los Angeles County entered into contract with USC to provide physician services at LAC+USC. This contract, also known as the MSAA Agreement, was originally made between Los Angeles County and USC effective August 1, 2006, through June 30, 2007, with a one-year automatic extension at the end of each contract year.  The term of the MSAA agreement is for rolling five-year terms. (Exhibits 48, 49).

358.   In November 2008, DHS processed Amendment No. 1 to the MSAA Agreement to increase the volume of physician services.  The MSAA Agreement was subsequently amended to memorialize LAC+USC MC's and USC's responsibilities relative to undergraduate and medical school education for USC's accrediting agency, add purchased services and funding to ensure full compliance with accreditation standards.

359.   Through the MSAA contract, USC submitted false claims to Los Angeles County, a political subdivision of the State of California, for purchased services.  For example, in the Contract year 2012, the maximum contract amount was $126.6M.  In the Contract year 2012, the maximum contract amount was $126.7M. The USC IONM Program received significant funding for IONM services from these contracts, including but not limited to Addendum A-3 which supported the salaries of physicians, Addendum A-5 which supported the salaries of IONM technologists and Addendum A-6 which supports the salaries of USC teaching surgeons to oversee resident surgeons (Exhibit 45 and 129).  Addendum A-4 provided funding for under the purchase of physician services and was directly based on volume.

360.   Addendum A-5 Purchased Services states "the Agreement with USC provides funding for an IOM technician (1.0 FTE) to monitor the functional integrity of certain neural functions of a patient during surgery.  DHS is proposing to add two

additional IOM technicians (2.0 FTE) at a total annual cost of $267,000 to meet the growing demands for such technicians by LAC+USC MC.  Such technicians are needed because the current County class specifications for an Electroencephalography (EEG) Technician do not meet the industry standards and certification requirements to perform the full array of IOM services required in the surgical room.  Meanwhile, DHS is developing an appropriate class specification to replace USC's IOM Technicians, and will start negotiations with USC no later than 9 months after the approval of this Amendment to determine the feasibility and appropriateness of continuing such services by USC." (Exhibit 48).

361.   Addendum A-5 further states "Payment for Purchased Services will be made by County to University…in quarterly installments, each payable on the first business day of each Contract Year quarter.  University shall provide the following Purchased Services during the Contract Year…University shall provide those clinical services…The FTEs include Intra-Operative Monitoring (IONM) Technicians. University shall continue to provide IOM Technicians effective July 1, 2013 at the same rates set forth in Amendment No. 5 of this Agreement, and annually thereafter…"  (Exhibit 50).

362.   Addendum A-6 provides Los Angeles County funding to USC for teaching surgeons to supervise resident surgeons at LAC+USC Medical Center.  For example, in FY2017, USC surgeon Dr. Jonathan Russin received over $250,000 annually and Dr. Gabriel Zada received over $160,000 annually to provide such supervision services. (Exhibit 45).

363.   The PSA agreements between Los Angeles County and USC provide funding to surgeons based on volume of referrals and surgical services at LAC+USC Medical Center.

364.   USC has submitted millions of dollars in false claims to Los Angeles County to perform surgical services at LAC+USC since 2001.  (Exhibits 26, 51).  In turn, USC Departments of Neurology, Neurosurgery, Orthopedic surgery, and

Otolaryngology used these funds from Los Angeles County, a political subdivision of the State of California, to pay the salaries of USC's referring surgeons, neurologists, and USC IONM technologists working at LAC+USC through the PSA/MSAA/MSOA accounts.  For example, the Department of Neurology received over $850,000 in IONM funding in FY2017 alone from these false claim submissions. (Exhibit 52).

365.   USC submitted false claims to Los Angeles County by falsely attesting to providing surgical services including but not limited to fraudulent PTS submitted as part of the MSOA and/or MSAA and/or PSA contracts with Los Angeles County, a political subdivision of the State of California.

366.   "Unless otherwise authorized in writing by DHS and [the LAC+USC] CMO, only County may bill for services rendered to patients in [LAC+USC] Hospital."  In the event that University [USC] is permitted to bill for professional services, County and University shall mutually agree to written procedures and guidelines for such billing." (Exhibit 49).

367.   The MSAA Contract between Los Angeles County and USC stipulated that USC physicians submit CMS-approved and mandated Provider Time Studies (PTS) to document provider activity dedicated to LAC+USC which is a designated public hospital.  (Exhibit 49).

368.   Certified Public Expenditures are statutorily recognized Medicaid financing programs by which a governmental entity, including a governmental provider such as a county hospital like LAC+USC, incurs an expenditure eligible for Federal Financial Participation (FFP) under the state's approved Medicaid state plan (§1903(w)(6) of the Social Security Act; 42 CFR 433.51). FFP is an after-the-fact reimbursement by the Federal Government for State expenditures under Medicaid.

369.   In CPEs, the governmental entity certifies that the funds expended are public funds used to support the full cost of providing the Medicaid-covered service or the Medicaid program administrative activity. Based on this certification, the state then claims FFP.

---

FOURTH AMENDED COMPLAINT                    CASE NO. CV 18-08311-ODW(AS)         137

370.   CA State Planned Amendment (SPA) 05-023 was approved by CMS December 21, 2007 (and retroactive to July 1, 2005) and allows for interim, supplemental payments to DPHs to reimburse them for the uncompensated cost of providing physician and non-physician practitioner professional services to Medicaid inpatient beneficiaries. (Exhibit 53, 54). With the backing of SPA 05-023, the Physician Non-Physician Practitioner Supplemental Reimbursement Program (PNPP), a Certified Public Expenditure, allows DPHs including LAC+USC to be ultimately reimbursed by the Federal Government for uncompensated costs of providing physician and non-physician practitioner professional services to Medicaid beneficiaries.  (Exhibit 55).  For LAC+USC, the uncompensated costs are the payments the Los Angeles County pays to USC's physicians through the MSAA contracts that are not fully reimbursed through the billing and other collections related to the services performed by USC physicians at LAC+USC.

371.   CA SPA 05-023 requires time studies to be conducted to account for clinical time for physician and non-physician practitioners utilizing the Medicare approved time study.  The reason for this is because OIG-HHS determines State compliance with CPE.  (Exhibit 56).  After the State of CA files claims for Federal Financial Participation (FFP) with CMS, if the CPE is ultimately approved by OIG-HHS, the State of CA receives FFP funding from Federal Government, which ultimately flows back to the government institutions and ultimately to the DPHs, including LAC+USC.

372.   USC and its affiliates falsified the CMS-approved Provider Time Studies and these false claims were ultimately signed and submitted by all Department Chairs (i.e. Drs. Chui and Giannotta) to Los Angeles County, a political subdivision of the State of California.  These false attestations were then submitted through the aforementioned government programs including the PNPP and this fraudulent information was used to justify reimbursement by the Federal government.

373.   USC defrauded Los Angeles County, a political subdivision of the State of California, by submitting false claims as part of the MSAA/MSOA/PSA contracts and receiving millions of taxpayer dollars for surgical services USC knew it was not planning on performing.  USC further defrauded Los Angeles County, a political subdivision of the State of California, by submitting to Los Angeles County false claims through fraudulent CMS-approved PTS attestations which were ultimately used to procure Federal government funding.

374.   In connection with the MSOA and/or MSAA and/or PSA and other contracts with USC, Los Angeles County – a political subdivision of the State of California -- requires USC, twice yearly, to certify actual time spent by all USC providers who work at LAC+USC.  (Exhibit 49).  These certifications are referred to as "Provider Time Studies." (Exhibit 57). In an internal e-mail, USC described the purposes of PTS as follows:

> "All providers of these services are required to complete a Provider Time Study (PTS) survey twice a year in order to be in compliance with the county, state and federal government's cost reporting mandates; and to supply verification that the Keck School of Medicine is meeting its MSOA contractual service obligations."

(Exhibit 58)

Over the course of several years, for example, USC falsified the PTS for its IONM physicians (Exhibit 59), fraudulently reporting that 100% of multiple physicians' time as dedicated to providing IONM monitoring services—both "on-site" and "on call"— for 24 hours a day for every day of the work week at LAC+USC.  (Exhibit 60).

375.   Using falsifying PTS, USC submitted false claims to Los Angeles County in order to receive government funding for physician services. (Exhibits 61, 25). For example, in the Spring of 2012, from May 7, 2012 to May 20, 2012, Dr. Chui submitted false claims on the PTS submitted to Los Angeles County attesting that Dr. Shilian dedicated 24 hours a day, Monday through Friday for two straight weeks to patient care at LAC+USC for a total of 240 hours.  (Exhibit 62).

376.   However, during the exact time periods Dr. Chui attested to Dr. Shilian performing exclusive patient care to LAC+USC patients at LAC hospital, USC was also submitting false claims for IONM services under Dr. Shilian for numerous surgeries at USC Keck Hospital in direct contradiction to the CMS-required PTS forms.   (Exhibits 63, 64, 65, 66, 67, 68 and 69).

377.   In fact, for the past several years, the IONM division policy set by Dr. Chui and memorialized in a schedule Dr. Chui distributed to USC's IONM physicians on June 29, 2018, strictly limited one designated IONM physician to certain days of the week for which only that physician could make clinical decisions at both USC Keck and LAC+USC. (Exhibits 6, 8).  Despite USC's IONM policies that only one physician was responsible for monitoring surgeries at LAC+USC on any given day, Dr. Chui also knowingly submitted false claims to Los Angeles County through fraudulent PTS in order to receive funding for multiple physicians providing IONM services for LAC+USC on any given day despite Dr. Chui's orders that only one physician could be the billing physician on any given day. (Exhibits 70, 59 and 25).

378.   Because the IONM schedule was structured such that only one IONM physician was on-call on any given day, USC submitted false claims for services performed by that physician at both USC Keck and LAC+USC for the same period of time -- in direct violation of the rules governing these funds.  (Exhibits 71, 72, 73, 74 and 75).

379.   As indicated in USC's own internal documents, these PTS reports were material not only to USC's cost reporting mandates for all services performed by USC at LAC+USC, but also verification of USC's compliance—or lack thereof—with its MSOA and/or MSAA and/or PSA and other contracts with Los Angeles County.

380.   As early as 2006, USC self-referred IONM services in surgeries of LAC+USC patients to USC neurologists and USC technologists who received work direction from Dr. Chui, the USC Chair of Neurology.

381.   At both LAC+USC and USC Keck, Defendants referred these IONM services -- designated health services – with actual knowledge that the IONM services would not be performed by qualified neurologists as required by all patient safety and billing requirements. (Exhibits 77, 146).

382.   As a result of the increased volume of IONM services at LAC+USC generated by USC's referrals and despite USC's actual knowledge those IONM services were not and would not be performed, USC submitted false claims and received direct or indirect payments from Medi-Cal, Medicare, and other payers for IONM services they knew were not rendered. (Exhibit 146).

383.   USC-employed technologists who directly reported to USC's Department of Neurology under Dr. Chui were the ones who entered thousands of false claims through the LAC+USC electronic medical record system.  (Exhibits 37, 38, 39, 40, 41, 42, 43, 44, 45, 46 and 47).

384.   As a result of the increased volume of IONM services at LAC+USC generated by USC's referrals despite USC's actual knowledge those IONM services were not and would not be performed, LAC+USC submitted false claims and received payments from Medi-Cal, Medicare, and other payers for the technical component of IONM services via fee for service charges and payments through the diagnosis-related group (DRG).

385.   As a result of the surgical services at LAC+USC by USC's IONM technologists despite actual knowledge that the USC's IONM technologists would not be supervised by a IONM physician, LAC+USC submitted false claims and received payments from Medi-Cal, Medicare, and other payers for separate payments or payments through the diagnosis-related group (DRG).

386.   As a result of surgical services at LAC+USC which were performed despite actual knowledge that the resident surgeon would not be supervised by a teaching surgeon, USC caused the submission of false claims and received payments for surgical services from Medi-Cal, Medicare, and other payers.

387.   As a result of the increased volume of IONM services at LAC+USC generated by USC's referrals for services USC had actual knowledge its physicians would not be performing, LAC+USC received payments from insurers for the surgeries and associated facility fees, even though the integral intraoperative surgical service of IONM was explicitly referred by USC surgeons who had actual knowledge that such services were not performed and USC had actual knowledge that the surgeries performed at LAC+USC hospital were not performed by qualified surgeons.

388.   Historically, the LAC+USC Chief Medical Officer (CMO) is also paid directly by USC and holds the title Associate Dean of Clinical Affairs.

389.   In the February 10, 2009 meeting with USC and LAC+USC management, then LAC+USC Chief Medical Officer, Dr. Stephanie Hall who had her salary funded directly by USC, advocated for more MSOA funds from Los Angeles County based on increased volume of self-referrals:

> "IOM considered standard of care...The service is provided by a trained technologists under the supervision of a physician (neurologist, neurophysiologist)."

> "Volume of IOM cases double each year [based on referrals by USC surgeons]."

> "Cost for outside technician and supervising physician greatly exceeding original budget...9/2/08 [meeting]with Neurology [Dr. Chui] and Neurosurgery [Dr. Giannotta] of increase demand [volume of referrals from USC surgeons] for IOM."

(Exhibit 127)

390.   The agenda for that meeting is attached hereto as Exhibit 127 and references Addendum A regarding the volume of Purchased Services.

391.   Dr. Brad Spellberg, who took over the LAC+USC Chief Medical Officer position from Dr. Stephanie Hall, also had the same historical salary structure funded by USC with the title of USC Keck Associate Dean of Clinical Affairs.  (Exhibit 120).

392.   After Dr. Cheongsiatmoy reported the fraud to the highest levels of USC and Los Angeles County management, on December 12, 2018, Los Angeles County made a public announcement of a change to Dr. Spellberg's LAC+USC Chief Medical Officer salary which was historically funded by USC:

> "Historically, the Chief Medical Officer for LAC+USC has negotiated [his own] salary with the USC Keck School of Medicine as part of an Associate Dean faculty appointment.  The duties of this appointment are related to the Chief Medical Officer position at LAC+USC Medical Center.  Due to the fact that these duties are consistent with Dr. Spellberg's County position as [Los Angeles County] Hospital Chief Medical Officer, the Health Agency and [Los Angeles] County Counsel recommend that [Dr. Spellberg's] salary [now] be paid by the [Los Angeles] County [instead of paid by USC]."

(Exhibit 83)

Further, as part of the July 1, 2019 Affiliation Agreement By and Between the University (University) and County of Los Angeles (County), the compensation structure for the LAC+USC CMO who is "responsible for monitoring and overseeing clinical services provided under this Agreement…[with] overall responsibility for delivery of clinical care at the [LAC+USC MC] Hospital" was changed to state:

> "the LAC+USC CMO shall be a full time County employee and shall receive no compensation from the University…LAC+USC CMO's responsibilities shall include monitor and facilitate institutional compliance with ACGME standards and requirements with respect to Training Programs in partnership with the DIO and GMEC."

(Exhibit 49)

393.   USC Keck Senior Associate Dean of Clinical Administration, Dr. Glenn Ault, and Dr. Brad Spellberg, LAC+USC Chief Medical Officer both reported directly to the Dean of USC Keck, Dr. Laura Mosqueda.  The Dean of USC Keck reports USC Provost, Elizabeth Graddy and USC President, Carol Folt. (Exhibit 120).

394.   In February 2018, Dr. Chui had explained to Dr. Cheongsiatmoy that she works directly with Dr. Spellberg and Dr. Ault who approved the volume of IONM cases for USC at LAC+USC Medical Center from the referrals by USC's surgeons

including Dr. Giannotta's team of neurosurgeons.  This increased volume from the referrals allowed USC to pay additional compensation to the technologists and referring surgeons, neurologists.

395.   Dr. Chui also explained to Dr. Cheongsiatmoy that Dr. Spellberg and Dr. Glenn Ault work closely with USC Department Chairs to verify and approve volume of services projected to be performed by USC's physicians at LAC+USC.  These verifications by Dr. Spellberg and Dr. Ault form the basis of MSOA/MSAA/PSA negotiations which ultimately determine the amount of funding to USC from Los Angeles County (Exhibit 122). Indeed, the majority of patients who receive care at LAC+USC are funded by taxpayer dollars through the Medicare and Medicaid (Medi-Cal) program.  (Exhibits 133, 134).

396.   USC receives $179,000,000 annually from Los Angeles County per the MSOA/MSAA/PSA contract.  (Exhibit 123).

397.   Funds from Los Angeles County comprise a significant portion of the compensation paid to USC physicians including salaries for the USC surgeons who referred IONM services at LAC+USC these surgeons knew were not and would not be performed by qualified USC physicians.

398.   Over a year after Dr. Cheongsiatmoy reported the significant fraud and patient injuries from unsupervised surgeries at LAC+USC Medical Center, USC announced:

> "Los Angeles Board of Supervisors approved a five-year, $170 million annual funding agreement for the Keck School of Medicine of USC to provide patient care services and physician medical education at Los Angeles County + USC Medical Center.  LAC+USC is the largest academic teaching hospital on the West Coast and one of the largest public hospitals in the nation. [USC's] partnership with Los Angeles County began in 1885…we are pleased to continue this historic partnership to provide superb medical care to the Los Angeles County community, including those who are most vulnerable."

(Exhibit 123)

**C.**     **Reporting and Retaliation Timeline**

**1.**     **Dr. Cheongsiatmoy's Career Prior to Joining USC**

399.   Dr. Cheongsiatmoy's education and background is impressive and reflects a lifetime spent dedicated to excellence and service.  In 1999, Dr. Cheongsiatmoy enrolled at Harvard University with the support of a Frank H. Buck Scholarship, a full-tuition award given to a handful of exceptional young Californians who demonstrate leadership potential, a commitment to their community, and financial need.  After graduating cum laude with a degree in economics, Dr. Cheongsiatmoy worked as a Research Associate at Massachusetts General Hospital and as a Head Teaching Fellow at Harvard University while applying to joint MD/MBA programs.

400.   In 2005, Dr. Cheongsiatmoy enrolled in UCLA's David Geffen School of Medicine and UCLA's Anderson School of Management, where he continued to nurture his passion for learning, teaching, research, and public service.

401.   At UCLA, Dr. Cheongsiatmoy was elected by his peers to serve as a Medical Education Committee Representative.  In this role, Dr. Cheongsiatmoy worked closely with two dozen faculty members from the school of medicine, reviewing the school's curricula, evaluating courses, and developing and recommending educational policies to the Faculty Executive Committee.  Dr. Cheongsiatmoy also took on leadership roles in the business school, serving as Vice President of Academics during the 2008 to 2009 academic year.  At both institutions, Dr. Cheongsiatmoy earned the respect and admiration of his instructors and peers alike.

402.   After graduating with his dual MD/MBA degree in 2010, Dr. Cheongsiatmoy was awarded the Richard D. Walter Award in Neurology by UCLA's Department of Neurology.  Over the following six years, he earned numerous other honors and accolades while completing his Internal Medicine Internship at St. Mary's Medical Center, an Adult Neurology Residency at UCLA, and a two-year Clinical

Neurophysiology and Intraoperative Neurophysiologic Monitoring Fellowship, also at UCLA.  These awards included the Core Values Award from St. Mary Medical Center, which is presented annually by faculty to one resident who demonstrates values of leadership, ethics, and excellence.  St. Mary's Medical Center also gave Dr. Cheongsiatmoy its annual award for Leadership in Medical Student Teaching. UCLA's David Geffen School of Medicine awarded him the CICARE Award, which is presented to individuals who show a commitment to dedicated patient care, and UCLA's medical students selected him from hundreds of candidates for the Excellence in Teaching with Humanism Residents and Fellows Award.

403.   During his residency and fellowship, Dr. Cheongsiatmoy served as a Resident Representative on the Residency Training Committee, a Resident Representative on the Neurology Quality Assurance/Performance Improvement Committee, and a Staff Representative in UCLA's Clinical Neurophysiology department.  In these roles, he was able to improve the medical services UCLA provided to patients and support new residents training in UCLA-affiliated hospitals. From 2015 to 2016, Dr. Cheongsiatmoy was a fellow in UCLA's prestigious intraoperative neurophysiological monitoring ("IONM") program under the mentorship of Dr. Marc Nuwer, IONM expert and Centers for Medicare and Medicaid Services ("CMS") consultant.  As an IONM fellow and Clinical Instructor in UCLA's Department of Neurology, Dr. Cheongsiatmoy honed his expertise in the subspecialized field of IONM.

## 2.   Dr. Cheongsiatmoy's Employment with USC

404.   In early 2016, Dr. Cheongsiatmoy applied for the position of Assistant Professor of Neurology within the Division of Intraoperative Neurophysiology at the USC Keck School of Medicine.  As a condition of his employment with USC, the University required Dr. Cheongsiatmoy to be privileged and credentialed as a Los Angeles County contractor (Contractor # c078853) and take work direction from Dr. Chui, USC Chair of Neurology and the LAC+USC Chief of Neurology for which she

was a direct Los Angeles County paid employee. Respected faculty from UCLA submitted glowing letters of recommendation in support, praising his professional skills, moral character, compassion, collaborative style, and superb interpersonal skills.

405.   For example, in addition to detailing and lauding Dr. Cheongsiatmoy's academic credentials and professional achievements, Dr. Barbara S. Giesser, Professor of Clinical Neurology at UCLA, praised his "outstanding critical thinking skills … flawless communication skills … impeccable worth ethic, and his ethical, moral and personal standards," which she called "above reproach."  She also wrote that, "[o]n a personal note, Justin is a delight!  He is consistently cheerful and enthusiastic, and incredibly hard working.  He is always 'part of the solution' to any problem."  She concluded that Dr. Cheongsiatmoy is "one of the most multi-talented, energetic, responsible, creative professional and dedicated people it has ever been my privilege to meet.  He clearly is in the top 1% of all the trainees I have encountered during my 30 years in academia.  I would refer [anyone] to his care … You will find him to be a brilliant neurologist … and a valued and trusted colleague."

406.   Another letter of recommendation from Dr. Lara M. Schrader, Associate Professor in the Department of Neurology at UCLA, was equally enthusiastic.  Dr. Schrader worked closely alongside Dr. Cheongsiatmoy and noted that he was "highly regarded" and a "respected team member."  She wrote, "Dr. Cheongsiatmoy has outstanding moral character.  He is genuinely kind and may be the most thoughtful person I have ever worked with.  He relates to people extremely well and is respected by everyone he works with.  He is a true team player."

407.   Dr. Nuwer, Professor and Vice Chair of the Department of Neurology, wrote a third letter of recommendation for Dr. Cheongsiatmoy.  Dr. Nuwer had worked with Dr. Cheongsiatmoy for five years, including while serving as his mentor and advisor during his time at UCLA.  Dr. Nuwer endorsed Dr. Cheongsiatmoy's qualifications, abilities, and skillset.  He further stated, "Dr. Cheongsiatmoy has been a fantastic fellow.  He is … professional in his demeanor, well prepared … very

personable and easy to get along with."  Furthermore, he "works well with all members of the medical team and is highly respected by his peers."  Dr. Cheongsiatmoy's impeccable interpersonal skills extended to everyone, not just his supervisors:  "He is a professional with an excellent bedside manner, great rapport, and positive attitude.  He is a compassionate young physician with excellent interpersonal skills evident in his interactions with peers, faculty, patients, familiars, and hospital and clinic staff."

### 3.    Dr. Cheongsiatmoy's Background and Performance at USC

408.    USC extended an offer to Dr. Cheongsiatmoy to join as Assistant Professor of Clinical Neurology, beginning July 1, 2016.

409.    Around the commencement of his employment with USC, in one of Dr. Cheongsiatmoy's earliest interactions with Dr. Helena Chui, USC Chair of Neurology and LAC+USC Chief of Neurology, Dr. Chui asked Dr. Cheongsiatmoy about his ancestry and name.  Dr. Cheongsiatmoy shared with Dr. Chui that his parents were from Mauritius and Malaysia, respectively.  In response, Dr. Chui coined a moniker for Dr. Cheongsiatmoy: "Martian".  The name stuck, and Dr. Chui and other USC colleagues, including Dr. Andres Gonzalez, the IONM Program Chief and senior faculty member, and Dr. Parastou Shilian, a fellow Assistant Professor of Neurology, began calling him "Martian" from time to time, instead of his name.  Initially, they used the nickname in a joking manner.  They would say things like "you're Asian - how can you be from Mauritius?" (or words of similar import).

410.    Dr. Cheongsiatmoy initially worked well with his USC colleagues, including Drs. Gonzalez and Shilian.  Dr. Chui also gave him high marks on his January 2017 performance review, noting that he was a "great addition to the team," "performs well in service, teaching, research," and would "work on expanding the service in IOM program."

411.    As part of that review, Dr. Cheongsiatmoy detailed his accomplishments over the previous six months as well as his ambitious long-term goals for expanding

the department's work into other medical centers in the coming years.  USC notified him in June 2017 that he would be reappointed for the 2017 to 2018 fiscal year.

412.   Dr. Cheongsiatmoy's next review, which covered all of 2017, was even better.  Dr. Chui assigned him a score of 3.75, indicating that Dr. Cheongsiatmoy performed "beyond expectations."  She also recognized his work expanding the IONM program to a nearby hospital.

413.   For the first time, Dr. Chui was also asked to evaluate Dr. Cheongsiatmoy's "Professionalism and Citizenship," which included the following factors:  integrity/ethics, self-development, interpersonal skills, dependability, judgment, adaptability, initiative, and productivity.  Dr. Cheongsiatmoy assigned himself a score of 100 percent and Dr. Chui did not provide a score, suggesting she saw nothing wrong with his self-evaluation.  She also left blank a box on the "summary of performance and merit" evaluation which read, "*If the merit score has been modified because of professionalism concerns, please check this box."  This performance review was completed by Dr. Chui on January 18, 2018.

### 4.   Dr. Cheongsiatmoy Reports Fraud and USC Retaliates

414.   In or around the Fall/Winter of 2017, Dr. Cheongsiatmoy began to question USC's practices at USC Keck Hospital and LAC+USC Medical Center.  The more Dr. Cheongsiatmoy learned, the more concerned he grew that USC's fraudulent practices posed serious patient safety issues.

415.   On February 13, 2018, Dr. Cheongsiatmoy met with Dr. Chui in her office to report his concerns about fraud and patient safety at USC Keck and LAC+USC Medical Center.  He described significant patient safety issues due to USC's failure to supervise the IONM technologists and failure to supervise resident surgeons which is a serious violation of ACGME and all billing and patient safety regulations.

416.   Dr. Cheongsiatmoy explained that the IONM data files show what was happening when an intraoperative injury occurred, and when this IONM data file is compared to OR Logs from the surgery, it was clear that the IONM technologist was

not being supervised by an IONM physician and the resident surgeon was not being supervised by a teaching surgeon, especially during critical portions of the surgeries.

417.   Dr. Chui responded that the Departments of Neurology and Neurosurgery often struggle with lack of resources, and she has been working with Dr. Giannotta to get more funding by continuing to increase the volume of surgeries and IONM services.  By doing so, she explained, both departments (of Neurosurgery and Neurology) would "receive more money from the hospitals which we need to fund physician salaries and ensure we don't go into the red so we can pay incentives.  But even if we do go into the red, I often request a special exception to pay out the incentives for the IONM Division."

418.   Dr. Chui explained "the key is to keep the hospitals happy by increasing their margins through more surgeries and IONM services which allow Dr. Giannotta and me to get more hospital funding for things like call pay, bonuses and hospital guarantee plans which, by the way, is paying your salary -- so it's in your best interest to put your head down, do the group billing, and keep things going."

419.   Regarding the resident surgeons, Dr. Chui explained that the teaching physicians who are supposed to supervise residents at LAC+USC are governed by ACGME rules.  Dr. Chui further explained that these arrangements are detailed in the Letters of Agreement between USC and LAC+USC which are signed by officials from both hospitals including the Designated Institutional Individual (DIO) Dr. Lawrence Opas and Chief Medical Officer (CMO), Dr. Brad Spellberg who represent LAC+USC Medical Center, as well as USC Keck CEO Tom Jackiewicz who represents USC Keck Hospital.

420.   Dr. Cheongsiatmoy reiterated his concern that his review of numerous patient injuries and deaths showed the pervasive practice of unsupervised ACGME resident surgeons -- especially at LAC+USC Medical Center -- where the USC teaching surgeon was usually not present in the operating room for the entire duration of the surgery, or even after an intraoperative injury had occurred.  As a result, these

surgical residents were practicing in an unsupervised environment which was causing multiple patient injuries and deaths.

421.   Dr. Cheongsiatmoy then cited LAC+USC's own written admission that the surgical division at LAC+USC had an "embarrassingly high" Mortality Index of 2.53 which means that patients were 135% more likely to get injured from surgeries at LAC+USC.

422.   Dr. Chui shrugged her shoulders and then said, "Well, that's where the residents go to practice on the poor folks."

423.    Dr. Cheongsiatmoy then explained to Dr. Chui that his review of the financials in USC's Shared Drive (S-Drive) which were regularly referenced by the entire USC Neurology team showed that IONM technologists at LAC+USC were USC employees who reported to Dr. Chui and whose salaries were fully funded by Los Angeles County. Dr. Cheongsiatmoy further told Dr. Chui that the S-Drive financials showed that Los Angeles County was paying USC for teaching surgeons to oversee resident surgeons at LAC+USC (Exhibit 45) which it appears USC had not been doing.

424.   Dr. Cheongsiatmoy explained his concerns regarding USC's IONM policies whereby technologists were being instructed to act in the capacity of physicians. (Exhibits 34, 40).  Because of these policies, the IONM physicians were not even aware of patient injuries and deaths until they were later brought to their attention by the surgeon or the technologist.

425.   Dr. Cheongsiatmoy described a recent case of patient RS who underwent brain surgery by the neurosurgery resident at LAC+USC on January 8, 2018.  During the surgery, the patient's brain aneurysm ruptured.  Although the technologist reported that there were "No significant IOM changes," critical IONM changes did occur during the surgery, as evidenced by the IONM data acquired during the surgery (Exhibit 46).

426.   Worse yet, there was no teaching surgeon during critical portions of the case in which the aneurysm ruptured, causing significant bleeding in the brain.  Patient RS died the next day from uncontrolled bleeding in the brain.  (Exhibit 76).

427.   Dr. Cheongsiatmoy further stated to Dr. Chui that USC surgeons, including Dr. Steven Giannotta, the USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery for which he was a direct Los Angeles County paid employee, were well aware of the causal link between the lack of supervision and numerous patient injuries.  Dr. Cheongsiatmoy cited a recent and troubling email from Dr. Giannotta that Dr. Gonzalez had forwarded to all the IONM physicians including Dr. Cheongsiatmoy. In that email, dated January 24, 2018, Dr. Giannotta admitted that he was not sure of Dr. Gonzalez's involvement with Los Angeles County's IONM services, despite the fact that Dr. Gonzalez was the Chief of the USC IONM Division.  Dr. Giannotta noted quality control problems because the technologist's interpretation was unreliable and, as a result, Dr. Giannotta severed the nerve.  Dr. Giannotta concluded that they needed to have better quality control for this type of case or they would not be able to continue handling acoustic tumors at LAC+USC.

> "[Dr.] Andres [Gonzalez]: Not sure of your involvement with overseeing county services. We had a large acoustic in an 18 yr old yesterday. I don't feel comfortable unless I can hear the facial nerve irritability trains while I am working. It was very unreliable and I was told the nerve was ""quiet". At the end of the case, another tech came in the room and we were taking the last bit of tumor out with absolutely no evidence of injury, verbally from the tech, or aurally. We lost the nerve and had to repair it. When I went to stimulate the proximal stump, nothing happened. The tech said "oh, wait a minute....OK now" and the nerve stimulated. We must have better QC [quality control] over there for this type of case or we can't do acoustic tumors there [at LAC+USC MC]. What can we do?"

(Exhibit 77)

428.   Dr. Giannotta's written admission of serious patient harm at LAC+USC caused by technologists acting as physicians highlights USC's fraud and directly contradicts USC's attestation that a physician was physically present and performing the IONM oversight in the Operating Room at LAC+USC where Dr. Giannotta would have certainly been aware of the physician's physical presence.

429.   Even more troubling, the OR records show Dr. Giannotta, the USC and Los Angeles County employed surgeon, who referred the IONM services.

430.   Indeed, since at least the year 2008, the USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery, Dr. Giannotta, and his team of surgeons referred thousands of IONM services at LAC+USC billed by USC under CPT 95940 attesting to IONM physicians directly supervising the technologists and monitoring the IONM data from inside the operating room.

431.   There is no Chat Log for patient CA's surgery; instead, the Event Log written solely by the USC-employed technologist, Pooja Parikh, confirmed the serious patient injury referenced above whereby Ms. Parikh documented that Dr. Giannotta severed the nerve:

> 12:59:37 Dr. Giannotta reports he accidentally transected the facial nerve
> 13:05:27 ENT surgeons take over [to take repair the nerve]

(Exhibit 82)

432.   Dr. Cheongsiatmoy informed Dr. Chui that he was very concerned that USC's policies – which instructed resident surgeons to "practice on the poor folks" at LAC+USC without supervision from any teaching surgeon and which instructed IONM technologists to order patient care through impersonation of physicians – had placed the welfare and safety of thousands of patients at USC Keck Hospital and LAC+USC Medical Center at risk and directly led to hundreds of serious injuries and deaths including the intraoperative nerve injury suffered by Dr. Giannotta's surgical patient as Dr. Giannotta admitted in his own written words.

433.   In addition to the patient harm, Dr. Cheongsiatmoy told Dr. Chui that he feared USC's fraudulent IONM policies posed a substantial risk to USC through individual and class action lawsuits from thousands of patients who underwent surgeries with fraudulent IONM services at both hospitals over the past decade where USC's policies resulted in USC technologists engaging in the unauthorized practice of medicine and impersonating physicians to order patient care.  In warning Dr. Chui

about the seriousness of the fraud, he described how just one patient injury alone could lead to damages in the tens of millions.

434. Dr. Cheongsiatmoy provided Dr. Chui with the example of the California lawsuit *Charlene McKnight v. Catholic Healthcare West* in which IONM was performed on the plaintiff who had undergone spine surgery and ultimately suffered intraoperative injury leading to paraplegia because there was no IONM physician oversight. Dr. Cheongsiatmoy explained that the situation at USC Keck and LAC+USC is even worse since USC's own IONM policies instruct technologists to act in the capacity of physicians, whereas in the Catholic Healthcare West case, the physician made several good faith attempts to log in to monitor the surgery but was unable to do so which left the technologist with no choice but to interpret IONM signals independently without physician oversight. The court ruled that a physician providing interpretation on the phone without monitoring the IONM data in real-time is not sufficient to absolve the technologists of the unauthorized practice of medicine. California's medical malpractice tort reform statute (MICRA) did not apply in this case because IONM technologists are not licensed health care providers and do not have the protection of damage caps. In this case, Dr. Cheongsiatmoy told Dr. Chui, the plaintiff who had unfortunately become paraplegic, was awarded $26,800,000.00 because there was strong precedent for punitive damages in IONM malpractice cases.

435. Dr. Cheongsiatmoy also told Dr. Chui that the documents in USC's Shared S: Drive (accessible to the entire IONM team including technologists) showed that Los Angeles County had paid USC millions of dollars over the past decade for USC's supervision of resident surgeons and supervision of IONM technologists at LAC+USC Medical Center, which it appeared USC had not in fact been doing. He stated that USC technologists at LAC+USC were also impersonating physicians to submit false claims on behalf of physicians using an IONM code ("CPT 95940") which requires a physician to (1) be present in the operating room and (2) not monitoring any other procedure at the same time. The USC technologists submitted

these charges even though both the USC technologists and USC surgeons who referred the IONM services knew no IONM physician was with them in the operating room. Dr. Cheongsiatmoy informed Dr. Chui that he would only accept his faculty appointment on the condition that USC not submit false claims under his name, since this could subject him to liability for USC's illegal activities.

436.   Dr. Chui abruptly ended the meeting and thanked him for his time.  As Dr. Cheongsiatmoy was leaving, she warned him to have "only oral conversations" and "not put in writing things you don't need to know" or else she would be "forced to open the books" which could lead to "very bad things for the entire team which includes you" so "be careful what you say so we can all stay above board."  Shortly after their meeting, Dr. Chui emailed Dr. Cheongsiatmoy the following message:

> "We feel very fortunate to have you on our team in the Department of Neurology.  I have only heard and experienced positive feedback about your collegiality and skills.  Rick and I will submit the Department of Neurology budget to KSOM administration for you with 75K MSAA (as you stated).
>
> I should let you know, however, that KSOM plans to put department requests for increased MSAA support in a conditional category, pending approval of the Board of Supervisors for the new LAC+USC contract to become effective July 1, 2018.  LAC and USC have been worked very hard on this budget negotiation, and many of us expect it to pass."

(Exhibit 80)

437.   Unfortunately, the unlawful practices Dr. Cheongsiatmoy first brought to Dr. Chui in her role as USC Chair of Neurology and LAC+USC Chief of Neurology for which she was a direct Los Angeles County paid employee continued after his initial report to her in February 2018.  Shortly thereafter, Dr. Cheongsiatmoy began to experience serious harassment based on his national origin and ancestry perpetrated by Drs. Chui, Gonzalez and Shilian.  While the moniker "Martian" had started as a joke, once Dr. Cheongsiatmoy reported the fraud and patient safety to Dr. Chui in her role as her role as USC Chair of Neurology and LAC+USC Chief of Neurology, the name

calling turned into a vehicle of hate and retaliation.  Drs. Chui, Gonzalez and Shilian thereafter branded him as the "Martian Narc" and it was clear to Dr. Cheongsiatmoy that his national origin and ancestry had become an integral part of Drs. Chui, Gonzalez and Shilian's targeting of him.  The name calling by Drs. Chui, Gonzalez and Shilian occurred starting in February 2018 and continued thereafter.  Meanwhile, Dr. Chui would similarly name call Dr. Cheongsiatmoy with the nickname "Martian" – she would regularly use the term when addressing him in passing during the weekly neurology grand rounds meetings, telling him on one or more occasions that he needed to "keep his Martian mouth shut."

438.   On June 17 and June 18, Dr. Cheongsiatmoy communicated his concerns about billing fraud to Dr. Chui again.  Shortly thereafter, Dr. Gonzalez admitted in an email that the billing system was "not a perfect system" and was "a byproduct of the history of the program itself."

439.   In June 2018, the university again reappointed Dr. Cheongsiatmoy for the following fiscal year.

440.   On June 29, 2018, Dr. Cheongsiatmoy told Dr. Chui and Department of Neurology Chief Administrative Officer, Rick Hagy, that he would only accept his faculty appointment starting July 1 provided USC did not further involve him in its illegal activities.  He was concerned that no one had reached out to him to investigate, and the illegal practices would continue to cause significant patient harm.  That same day, Dr. Cheongsiatmoy emailed Dr. Chui's assistant, Angelique Matthews, that he would not be billing ENT procedures.  (Exhibit 81).

441.   Dr. Cheongsiatmoy noticed that Drs. Chui, Gonzalez and Shilian's retaliation against him continued to escalate after he reported the fraud causing patient harm and explicitly objected to USC using his Provider ID to submit false claims.  He was also concerned after noticing someone was interfering with his work and impersonating him as the interpreting physician which he promptly reported to hospital administration.

1
2
3
4

442.    Drs. Chui, Gonzalez and Shilian's retaliatory and harassing treatment of Dr. Cheongsiatmoy was apparent to everyone in the IONM Program, including Ms. Matthews and IONM Fellow John Arlen Parker.  On July 11, Ms. Matthews texted Dr. Cheongsiatmoy:

5
6

> "Oh, I think [Drs. Chui, Gonzalez and Shilian] are after you.  But I also don't trust them to any extent, so I wouldn't be surprised if they threw us under the bus and ran us over."

7
8

443.    Several weeks later, on July 23, she again texted:
> "[Dr. Gonzalez] wants to destroy you."

9
10
11
12
13
14
15
16
17
18
19
20

444.    Concerned by USC and LAC+USC's inaction, Dr. Cheongsiatmoy met with Dr. Chui and Vice Dean of Academic Affairs Judy Garner on July 18.  Dr. Cheongsiatmoy believed that if he complained to Dean Mosqueda's office—the highest level of authority at Keck Medicine—and reported the risks IONM's unlawful practices posed, patients' lives could be saved.  Dr. Cheongsiatmoy reported that the unlawful practices he first raised with Dr. Chui in February had continued unabated.  In fact, Dr. Chui appeared to have doubled down, continuing to commit fraud and submit false claims on the provider time studies ("PTS").  In these PTS, Dr. Chui fraudulently attested that all three IONM physicians dedicated exclusive, 24/7 care to LAC+USC patients.  (Exhibits 10, 18).  Dr. Cheongsiatmoy told Vice Dean Garner that he was concerned that he would be subject to liability because Dr. Chui continued to submitted these fraudulent attestations to CMS under his name.

21
22
23
24
25
26
27
28

445.    Shortly after Dr. Cheongsiatmoy left that meeting, USC's billing department started to refund the fraudulent charges on academic days, indicating that his concerns were justified.  That same evening, Vice Dean Garner emailed Dr. Cheongsiatmoy and acknowledging problems with IONM division policy, describing it as a "complicated situation, with a lot of moving parts."  Vice Dean Garner acknowledged "[Dr. Cheongsiatmoy's] dedication to the patient's welfare" and explained that it was the "Chair's responsibility to make clinical assignments and allow Academic Days."  Vice Dean Garner even reassured Dr. Cheongsiatmoy in

writing that the Dean's office and Dr. Chui would "look into the issues [Dr. Cheongsiatmoy had] … raised." (Exhibit 9). However, Vice Dean Garner and Dr. Chui never followed up to discuss any investigation.

446. No one at USC or Los Angeles County ever contacted Dr. Cheongsiatmoy about the fraud he had reported. Ironically, on July 18, 2018, at the exact time that Dr. Cheongsiatmoy was reporting his concerns to Vice Dean Garner and Dr. Chui, USC fraudulently billed charges in a 12-hour surgery for LAC+USC patient MO, attesting that Dr. Cheongsiatmoy was in the operating room of LAC+USC during the surgery. In fact, in the month following the July 2018 meeting with Vice Dean Garner, USC submitted fraudulent charges under Dr. Cheongsiatmoy's name for IONM services in nearly 50 surgeries at LAC+USC. Specifically, USC submitted these false claims under CPT 95940 when USC knew that Dr. Cheongsiatmoy was not present in the operating room during the surgeries and after USC knew that Dr. Cheongsiatmoy objected to USC's technologists impersonating him to order patient care and submit false claims using his Provider ID. (Exhibit 150).

447. Because USC continued to place patients at risk and escalated the harassment and retaliation against him, Dr. Cheongsiatmoy formed IONM LLC for the purposes of filing the original qui tam action which was filed on September 26, 2018.

448. In early October 2018, Dr. Cheongsiatmoy told Dr. Chui's staff that he did not want Dr. Chui to submit fraudulent PTS under his name. He also reiterated that he objected to USC technologists impersonating him to order patient care and submit false claims associated with CPT 95940 at LAC+USC under Dr. Cheongsiatmoy's name since USC had actual knowledge that he was not in the operating room at LAC+USC, as required to bill under that code. He also asked Dr. Chui's special assistant, Ms. Matthews to send him copies of all the PTS Dr. Chui had submitted under his name.

449. On October 23, 2018, Pooja Parikh, a USC Technologist working at LAC+USC Medical Center, texted Dr. Cheongsiatmoy, Dr. Parker (the IONM

Fellow), and Dr. Gonzalez, asking "Whom to bill for this [LAC+USC] case?"  Dr. Parker replied, "Gonzalez."  It is readily apparent from this text message that Dr. Gonzalez was not involved in this case at all, yet USC knowingly submitted false claims including CPT 95940, which required Dr. Gonzalez to be in the operating room with Ms. Parikh at LAC+USC.  Dr. Cheongsiatmoy was alarmed that the fraud was continuing despite his detailed reporting to Dr. Chui on February 13, 2018 and to the Dean's Office on July 18, 2018.  Dr. Cheongsiatmoy then texted: "Who authorized Pooja to bill the County case under Dr. Gonzalez?  I do not authorize the techs to bill under my name at [Los Angeles] County and need to understand who is authorizing the billing given your text instructing Pooja on billing." Dr. Parker texted back "It's 'his day'" confirming the group billing fraud and LAC+USC fraud was still ongoing after Dr. Cheongsiatmoy had blown the whistle to USC and Los Angeles County.

450.   On November 1, 2018, USC received a California Department of Insurance ("CDI") Investigative Subpoena which explicitly ordered the preservation and production of "all CHAT LOGS created by a HEALTHCARE PROVIDER RELATED TO IONM SERVICES" through Keck Medicine of USC and its affiliates including but not limited to USC Care Medical Group (physician group), Keck Medical Center (USC hospital), LAC+USC Medical Center (LAC hospital) for the relevant period of January 1, 2008 through the final response date. "CHAT LOGS" means all communications between "HEALTHCARE PROVIDERS RELATED TO the interpretation and communication of IONM SERVICES." "HEALTHCARE PROVIDERS" explicitly included "hospital, technologist, doctor, fellow, resident and physician [including surgeon]."  "RELATED TO means constituting, containing, concerning, discussing, describing, analyzing, identifying, referring to, relating to, referencing, documenting, governing, regulating, directing, evidencing OR stating." All communications between the hospitals (both USC Keck Hospital and LAC+USC Medical Center), technologists (USC employed technologists working at both USC Keck Hospital and LAC+USC Medical Center), and physicians (both neurologists and

surgeons) related to IONM SERVICES were squarely within the scope of the subpoena and this included but was not limited to all Surgeons' Operative Reports from the surgeons who referred or relied upon IONM during the surgery since the Surgeons' Operative Reports almost always document the "interpretation and communication of IONM SERVICES" performed as an integral part of the surgery. The CDI subpoena is incorporated by reference as Exhibit A of USC's Voluntary Self-Disclosure dated March 27, 2020. (Exhibit 89).

451.   Dr. Cheongsiatmoy was concerned that Drs. Chui, Gonzalez, and Shilian had concluded that he had reported the fraud to the CDI and would harass and retaliate against him further.  USC has since acknowledged Dr. Cheongsiatmoy as the one who formed IONM LLC for the purposes of reporting USC's fraud to the United States of America, the State of California and Los Angeles County through their respective representatives in the Department of Justice, California Attorney General's Office, California Department of Insurance, and the Los Angeles District Attorney's Office.

452.   By the fall of 2018, it was clear that USC would not intervene to prevent the increasing retaliation Dr. Cheongsiatmoy had been experiencing as a result of reporting the fraud and patient injuries.  In addition, the harassment by Drs. Chui, Gonzalez and Shilian had continued unabated.  Accordingly, he began to explore positions at other IONM programs, including at the Mayo Clinic College's Department of Neurology.  On November 6, Dr. Cheongsiatmoy asked Dr. Chui to release a letter reflecting his performance and standing at USC per Mayo's request.

### 5.   USC Blocks Dr. Cheongsiatmoy's Access to Surgical Database

453.   Dr. Cheongsiatmoy was also inexplicably excluded from the surgical database which was normally stored on the Neurology shared drive.  That file had been accessible to everyone on the team, including Dr. Cheongsiatmoy.  Just four days after the CDI subpoena, on the morning of Monday, November 5, 2018, Dr. Cheongsiatmoy found that he could not access the file, which included important information he needed for the day's operations and other work.  (Exhibits 144, 145).  The file also

contained records showing the USC referring surgeons and neurologists under which USC billed the simultaneous surgeries occurring at two different hospitals (USC Keck Hospital and LAC+USC Medical Center). Since USC had ordered both Drs. Gonzalez and Shilian to take an "academic day" off on this particular day, Dr. Cheongsiatmoy was the PBP "in charge" of the IONM service on that day.  USC must have realized the absurdity of excluding the only attending physician from a document that the IONM team relied upon daily for work activities.  Attending physicians are responsible for everything that transpires under their watch and, therefore, must have unhindered access to all relevant information.  Anything less is malpractice.

### 6.    USC Directs Dr. Cheongsiatmoy's Colleagues to Avoid Him

454.   On Friday, November 9, 2018 Dr. Cheongsiatmoy went to the team office around 10:00 AM.  Oddly, Ms. Matthews and Dr. Parker were not in the work room on the third floor.  Concerned, he texted them: "Hi! Been looking around the hospital this morning but can't find anyone including at our office.  Where are you?  Everything ok?"  No one responded.  Dr. Cheongsiatmoy was concerned, as the main IONM workroom on the third floor was dark and the computers were off.

455.   Around 11:00 AM, still unsure where his colleagues were, Dr. Cheongsiatmoy went to the fourth floor to check if anyone was in the second IONM office located on the fourth floor.  Dr. Cheongsiatmoy saw Dr. Shilian, Dr. Parker, and Ms. Matthews through the window and heard their voices inside, but when he knocked on the door, everyone became quiet.  When no one responded to his knock, he used his key to unlock the door to investigate further.  He opened the door and saw Dr. Shilian, Dr. Parker, and Ms. Matthews all present.  The small office was crowded and Ms. Matthews was sitting on the floor.  Wary of further crowding the space, he stood halfway in the office and halfway out and asked in an inquisitive, friendly tone, "Hey guys!  I just unlocked the door.  You guys are all here—you didn't want to open the door for me?"  Dr. Parker responded, quietly, "No excuse, but Dr. Gonzalez was heading downstairs to talk to you about the day and had us stay here."

456.   Dr. Cheongsiatmoy moved a bit further into the room so he could hear Dr. Parker.  He then tried to get additional clarification about what was happening.  Ms. Matthews responded, "I didn't know who it was [at the door]."  Dr. Cheongsiatmoy asked again, "What's going on?"  Dr. Parker responded, "Um, other than an extremely awkward situation, we are just following instructions and Dr. Gonzalez is looking for you."  Dr. Cheongsiatmoy confirmed that they were all just following Dr. Gonzalez's instructions and reiterated that he just wanted to know what was happening because the entire situation was so out of character.  Dr. Cheongsiatmoy concluded, "Okay, I hope you guys have a good day.  Good to see you Dr. Shilian."

457.   This exchange lasted less than two minutes.  Dr. Cheongsiatmoy felt betrayed that his colleagues would ignore him and disturbed that Dr. Gonzalez had directed them to do so.  As Dr. Cheongsiatmoy was walking away from the office, he heard a female voice say they should call the police.  Dr. Cheongsiatmoy concluded that he would be safest if he left campus immediately, so he hurried to the train station and went home.

458.   That afternoon, Dr. Cheongsiatmoy received a voicemail from Dr. Chui who stated:

> "Hi Justin, this is Helena Chui on with Judy Garner, calling from her office … [we heard you caused] some stress this morning …it might be good to chill out and maybe you don't come in next week…."

### 7.   USC Places Dr. Cheongsiatmoy on Involuntary Leave

459.   That day, Dr. Chui placed Dr. Cheongsiatmoy on involuntary leave from November 12 to 16.  On November 16, she further attempted to ostracize and harass Dr. Cheongsiatmoy by directing him to conduct his work from an office isolated from the rest of the team.  USC never told Dr. Cheongsiatmoy of any accusations against him that would justify placing him on leave or requiring him to work from a different office.

460.   USC's treatment of Dr. Cheongsiatmoy in stripping him of his duties violated USC's own internal policies, set forth in the Faculty Handbook.  Dr. Chui's unilateral reassignment of Dr. Cheongsiatmoy to "no duties," along with his ban from USC, violated inter alia, Section 6-A(9) (requiring fundamental fairness procedures for disciplinary action), Section 6-B(8) (requiring no adverse action including spreading negative information, shunning or ostracizing), Section 8-D(1) (requiring personal conference with supervising dean or academic director before termination for cause), and Section 8-D(3) (requiring finding of threat of immediate harm before imposition of suspension, as well as appointment of committee for evaluation).

461.   USC's failure to follow its own policies is further evidence of harassment, retaliation, and pretext in Dr. Cheongsiatmoy's abrupt suspension.  For example, USC did not perform equitable information gathering and Dr. Cheongsiatmoy was never informed of any specific allegations against him.  USC's legal counsel indicated that Dr. Cheongsiatmoy was informed of his alleged problematic behavior, but they provided no reference to any warnings—written or otherwise—given to him by anyone.  Rather, all communications between Dr. Cheongsiatmoy and his superiors before he reported the fraud indicated that he was an outstanding contributor and team member.

462.   On November 16, 2018, USC Chief Legal Officer Carol Mauch Amir and USC Managing General Counsel Stacy Rummel Bratcher were both notified in writing of "systemic fraud, waste and abuse occurring within the Department of Neurology…at Keck, and at Los Angeles County Medical Center, pursuant to the County's contract with USC.  Keck personnel are knowingly engaged in fraud and overbilling, in several respects."

463.   On November 21, 2018, USC directed Dr. Cheongsiatmoy to remain on leave through December 16, 2018, stripping him of his work assignments and ability to work remotely.  On December 4, 2018, USC Counsel was specifically requested in writing to immediately provide copies of all records related to the [fraud]

"raised…with Vice Dean Judy Garner on July 18, 2018, issues which the Dean promised to 'look into.'"

464.   On December 14, 2018, USC's counsel claimed that Dr. Cheongsiatmoy's reassignment of no duties was due to his "threatening and unprofessional conduct towards his colleagues and others at USC, [which was] extremely concerning and unacceptable.  Further, it puts patient care and safety at risk, as the work performed by Dr. Cheongsiatmoy and his colleagues requires carefully coordinated care.  Thus, Dr. Cheongsiatmoy has been reassigned to no duties until further notice, and will not have any teaching, research, or patient care duties during this time, and specifically told "he is not permitted to come on to USC's campus."  While the allegation that Dr. Cheongsiatmoy's behavior was "threatening and unprofessional" is false for the reasons described above, USC's decision to cite the need for "carefully coordinated care" is especially rich, given USC's instructions to block Dr. Cheongsiatmoy from accessing important patient information and even communicating with his colleagues during the time period before he was put on involuntary leave.

## 8.    Dr. Cheongsiatmoy Faces Continued Harassment and Retaliation

465.   On January 31, 2019, Dr. Cheongsiatmoy received a conditional offer to join the Mayo Clinic College of Medicine's Department of Neurology, the top-ranked neurology program in the United States.  This offer was "contingent upon an opportunity to speak with your current department chair, Dr. Chang Chui, regarding your employment in the Department of Neurology, at the Keck School of Medicine."  On May 1, 2019, Dr. Cheongsiatmoy received an email from the Mayo Clinic notifying him that despite contacting USC "on multiple occasions to obtain information regarding your clinical skills and practice," it has "not been provided by Keck/USC and we have been advised by Dr. Chui that Keck/USC will be unable to provide any information other than confirmation of your position and dates of employment."  The letter continued:

> "[B]ased on our inability to obtain this information [from Dr. Chui/USC], we are withdrawing the conditional offer made to you in my letter of January 31, 2019."

(Exhibit 84)

466.   During this period, Dr. Cheongsiatmoy continued to seek assistance from Dr. Chui, to no avail.  On February 5, 2019, Dr. Cheongsiatmoy emailed Dr. Michael W. Quick, USC's Provost and Senior Vice President for Academic Affairs, detailing the retaliation he was experiencing after reporting fraud.  Dr. Quick responded in writing that he would send the letter to the office of Professionalism and Ethics ("OPE"), a newly created office that reports directly to the President and to USC's Board of Trustees. (Exhibits 85, 86).  Dr. Cheongsiatmoy also emailed Wanda Austin, then USC President and USC Board of Trustee member, to alert her to both the fraud and retaliation he was experiencing.  Despite multiple requests, Dr. Cheongsiatmoy never received any information regarding the status of the investigation, nor did he receive any response from President Austin or the OPE.  Despite basic requirements that any valid compliance program begin by interviewing the whistleblower, USC and its outside counsel never even attempted to interview Dr. Cheongsiatmoy.

467.   On June 24, 2019, in a final attempt to persuade USC to stop retaliating against him, Dr. Cheongsiatmoy emailed Carol Folt (President-elect of USC), Ms. Austin, Mr. Quick, Elizabeth Graddy (Interim Provost of USC), the Office of Professionalism and Ethics, Dean Mosqueda, and Dr. Chui, explaining the situation and asking for their help.  (Exhibit 87).  Dr. Cheongsiatmoy also informed them that he had secured another offer to join the faculty at another university.  At that point, over sixteen months has passed since he first reported the fraud, and he had been on involuntary leave for nearly eight months.

468.   On June 27, 2019, just three days after his reporting to USC President Carol Folt and USC Keck Dean Mosqueda, Dr. Cheongsiatmoy received a letter from Dean Mosqueda informing him that Dr. Chui and a faculty committee had recommended that he not be reappointed.  (Exhibit 88).

---

FOURTH AMENDED COMPLAINT                    CASE NO. CV 18-08311-ODW(AS)                    165

469.   That same day, USC Counsel acknowledged receipt of the June 24, 2019 memorandum addressed to key members of USC management including USC President Carol Folt, USC Provost Elizabeth Graddy, Dean Laura Mosqueda, and the OPE, following up on the "reporting [of] significant fraud, waste and abuse by the Department of Neurology."

470.   Following the reporting of the IONM fraud, over a dozen high-ranking USC leaders stepped down from their positions of power at USC including but not limited to: CEO of Keck Medicine of USC and SVP Tom Jackiewicz, President Wanda Austin, Provost Michael Quick, USC Chief Legal Officer Carol Mauch Amir, USC Managing General Counsel Stacy Rummel Bratcher, VP of Ethics and Head of OPE Michael Blanton, Chief Compliance Officer Laura LaCorte, SVP of Audit Services Andrew Tinseth, Chief of IONM Services Andres Gonzalez, Vice Dean Judy Garner and Dean Laura Mosqueda.

471.   USC did not send Dr. Cheongsiatmoy any information about unemployment compensation.  When Dr. Cheongsiatmoy applied for unemployment benefits with the California Employment Development Department, he was informed that USC had communicated that Dr. Cheongsiatmoy had been fired for cause.  Unable to pay the mortgage on his home and support his two young children, Dr. Cheongsiatmoy suffered substantial damages in the forced sale of his home.

### 9.     Dr. Cheongsiatmoy Learns of USC's Past and Ongoing Defamation

472.   In late June 2019, the University of California San Francisco ("UCSF") created a new Chief of IONM Division position for Dr. Cheongsiatmoy.  This joint appointment as an Associate Professor within UCSF's departments of Neurosurgery and Neurology would have been a significant promotion.  USCF made clear that it only needed a recommendation from USC in order to finalize Dr. Cheongsiatmoy's appointment.  Dr. John Mazziotta, Vice Chancellor of UCLA Health Sciences, CEO of UCLA Health, and Dr. Cheongsiatmoy's former Chair of Neurology at UCLA, wrote

UCSF in support of Dr. Cheongsiatmoy's impending promotion.  Dr. Cheongsiatmoy also received a stellar recommendation from USC's own expert witness in this case, Dr. Nuwer, who reiterated Dr. Cheongsiatmoy's "expertise in all aspects of neuromonitoring billing, code, compliance and reimbursement."

473.   On July 24, 2019, Dr. Cheongsiatmoy met with UCSF Chair of Neurosurgery Mitchel Berger at his office at UCSF.  Dr. Berger told Dr. Cheongsiatmoy that Dr. Giannotta, the USC Chair of Neurosurgery and LAC+USC Chief of Neurosurgery for which he was a direct Los Angeles County paid employee, claimed Dr. Cheongsiatmoy had "assaulted staff and colleagues in the workroom" and Dr. Chui subsequently reported Dr. Cheongsiatmoy to the police and banned him from USC's campus.  Based on this false information from Dr. Giannotta, UCSF withdrew its conditional offer of employment.

474.   In October 2019, Dr. Cheongsiatmoy contacted Real Time Neuromonitoring Associates ("RTNA"), a private IONM practice that had previously offered him employment.  While Dr. Cheongsiatmoy had always aspired to work in academia, he was in dire need of income and employment.  On a call with an RTNA physician, Dr. Cheongsiatmoy learned that USC had engaged in a smear campaign against him.  Specifically, the physician told him that despite two open positions at the company for an IONM physician, it would be difficult for RTNA to hire him because USC was telling people that he had been fired for assaulting staff.

### 10.   USC Discloses Non-Confidential, Voluntary Self-Disclosure to the Office Inspector General Health and Human Services (OIG)

475.   On March 27, 2020, USC self-reported itself in a non-confidential Voluntary Self-Disclosure to the Office Inspector General Health and Human Services (OIG HHS) which incorporates the CDI subpoena as Exhibit A. (Exhibit 89). Per USC's contract with Los Angeles County, USC was required to file the final audit reports prepared as a result of any Federal or State audit as it relates to the Purchased Services (Exhibit 49) included in the scope of the CDI subpoena. This disclosure was

made under the leadership of USC President Carol Folt, Provost Graddy, Dean Mosqueda, and USC Associate Dean and LAC+USC Chief Medical Officer, Brad Spellberg, M.D. (Exhibit 120).

476.  Thomas Jackiewicz, the former CEO of Keck Medicine of USC and Senior Vice President of USC certified USC's March 27, 2020, Voluntary Self-Disclosure as "truthful information…based on a good faith effort to bring this matter to the government's attention." Mr. Jackiewicz was in the ultimate position of power at Keck Medicine of USC which operates <u>both</u> USC Care Medical Group and USC Keck Hospital.  Keck Medicine of USC was also responsible for managing the Los Angeles County Professional Services Agreement (PSA/MSOA/MSAA), one of the many vehicles by which LAC+USC Medical Center pays for medical services by USC physicians.  In 2017, Thomas Jackiewicz received $2,322,895 for his role as the Vice Chairman/President of USC Care Group. (Exhibit 141).

477.  The instructions on OIG HHS's Provider Self-Disclosure Protocol (SDP) clearly state "During [the] review and resolution of these matters, OIG HHS will comply with the Freedom of Information Act (FOIA).  Disclosing parties should clearly identify any portion of their submissions they believe are trade secrets or are commercial, financial, privileged or confidential and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. §552."  See OIG HHS's Provider Self-Disclosure Protocol at Paragraph H.  Notably, USC did not mark its disclosure or any of the contents contained its March 27, 2020 Voluntary Self-Disclosure as confidential.  Therefore, further information related to USC's non-confidential should be freely available to the public through the Freedom of Information Act.

**D. Additional Patient Harm and Deaths at USC Keck and LAC+USC**

478.  In litigation involving surgeries with IONM, discovery always includes investigation of all communications to the surgeon, the presence of the teaching surgeon, the IONM interpreting physician's communications to the operating room (in

the form of chat log if monitoring occurred remotely), the concurrent cases where the teaching/attending surgeon and IONM physician were supervising at the time of the patient injury, and all hospital rules, regulations and policies related to supervision models for all individuals involved in patient care during the surgery.  When these data points are compared, USC's intent to defraud and resulting patient harm becomes is glaringly obvious.  The patient injuries and deaths described in this complaint clearly demonstrate pervasive patient harm caused by USC's systemic failure to supervise resident surgeons and technologists,

479.   Relator has disclosed to the United States, the State of California and Los Angeles County thousands of examples of false claim submissions by USC and hundreds of examples of patient deaths and life-altering injuries resulting from surgeries without appropriate supervision by the USC neurologist or USC teaching surgeon at USC Keck Hospital and LAC+USC Medical Center spanning the period from 2008 through 2018. This Complaint contains only a select sample of the false claims and patient injuries that Relator has disclosed to the government.

480.   On Sunday, October 15, 2016, 46 year-old Medi-Cal patient RS walked into USC Keck Hospital for an elective brain aneurysm surgery procedure. Patient RS never left USC Keck Hospital alive. The referring physician is listed as USC surgeon, Dr. William Mack. During the surgery, the patient began bleeding excessively and IONM data signals became completely absent.  Within minutes of the onset of bleeding, IONM records also demonstrate that the surgeon began to perform emergency closure. Dr. Shilian later told Dr. Cheongsiatmoy that patient deaths which occur during a surgery in the operating room could lead to investigations of malpractice and penalties and therefore negatively impact the surgeon's records and the hospital's safety grades.  USC falsely claimed that Dr. Shilian monitored the surgery and knowingly caused false claim submissions to Medi-Cal for IONM services in this surgery including but not limited to fraudulent billing of the PC component and various base code modalities. These false claims also led to overpayment of funds

associated with the TC as well.  Patient RS was pronounced dead on October 18, 2016, just three days after he walked into USC Keck for this elective surgery.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, patient death could have been prevented. (Exhibit 43).

481.   On Wednesday, September 21, 2016, 43 year-old patient BV walked into USC Keck Hospital for an elective brain surgery procedure which began around 4:30PM.  Patient BV never left USC Keck Hospital alive.  USC surgeon, Dr. Thomas Chen was the referring surgeon.  Dr. Shilian, who Dr. Chui assigned as the PBP but not monitoring the case was instead feeding her baby when she received a message from USC technologist, Julie Blue, about significant changes the technologist had interpreted in the IONM data.  During this case, multiple critical changes in the IONM data occurred, many of which were not documented by the technologist.  In addition, the IONM documentation does not clearly reflect what communication was made to the surgeon regarding any IONM changes or what acknowledgement the surgeon had provided the IONM team.  The surgeon's operative report specifically cites failures by the IONM physician as the reason for why the surgeon continued the surgery, despite further risk for injury and death.  "At this time also, we were reported by neuromonitoring that there was a change in the patient's SSEP and then motor evoked potentials. At that time, [the surgical team] really did not understand why these changes occurred because we were just debulking the tumor in the left frontal lobe," the surgeon wrote.  To be clear, in the surgeon's operative report, the surgeon unequivocally stated that he did not understand why the changes were occurring.  To ensure compliance with patient safety standards, it is the IONM physician's duty to continuously interpret and communicate with the surgeon the critical importance of the

change in IONM signals as they occur in real-time to prevent injury, or in this case, death.  Dr. Shilian was not on-site at USC during this case; rather, she was at home taking care of her baby when the patient began dying on the operating room table. Patient BV left the operating room in a coma after the surgery and never regained consciousness. On October 13, 2016, patient BV was pronounced dead after the artificial breathing machine was disconnected.  After attesting to having monitored the surgery, USC billed the insurer under Dr. Shilian and caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, a patient death could have been prevented. (Exhibit 94).

482.  On Sunday, March 4, 2018, 47 year-old patient JN underwent spine surgery at USC Keck Hospital. The referring physician is listed as USC neurosurgeon Dr. Patrick Hsieh. At the beginning of this surgery, the IONM technologist documented that "bilateral lowers [motor evoked potentials] absent." Hsieh also unequivocally stated in the operative report that "neurophysiology monitoring…demonstrated absent [motor evoked potentials] at baseline." Baseline interpretation of IONM data is important because all potentially critical changes during the surgery are determined by comparing subsequent data to initial baseline data. In this case, the baseline IONM data from patient JN clearly demonstrated large motor evoked potentials from the right leg.  Therefore, the communication by the IONM team to Dr. Hsieh of absent baseline motor evoked potentials in the legs was dangerously misleading.  False interpretation of IONM data is not merely a mistake or misunderstanding; when surgeons rely on incorrect interpretation of the IONM data,

surgeons unknowingly make decisions during surgeries which can lead to significant patient injury and death. In this case, Dr. Hsieh was initially misinformed by the IONM team that the right leg motor evoked potentials were absent at baseline when they were indeed present.  Therefore, when Dr. Hsieh was subsequently informed by the IONM team at a later period in the case that right leg motor evoked potentials were absent, Dr. Hsieh continued onward in the surgery, apparently unaware that the absence of right leg motor evoked potentials was in fact a critical change from baseline.  Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to Dr. Hsieh appropriately, patient injury may have been prevented.  Instead, patient JN awoke from surgery the next day with complete paralysis in the right leg.  Records demonstrate that the IONM report for this surgery was signed by both Dr. Gonzalez and the IONM fellow, Dr. Jonathan Chen.  After attesting to having monitored the surgery, USC submitted false claims to the patient's insurer for IONM services and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury may have been prevented. (Exhibit 90).

483.   On January 16, 2018, 64 year-old patient JS underwent brain surgery at USC Keck Hospital. The referring physician is listed as USC neurosurgeon, Dr. Jonathan Russin. During this surgery, there was severe and persistent reduction in the motor evoked potentials arising from patient JS's nervous system, consistent with intraoperative patient injury.  However, IONM documentation created by the USC technologist throughout the entire case repeatedly stated at least 15 times, "[Motor

evoked potentials] per [surgeon], no change from baseline."  In the surgeon's operative
report, the surgeon explained that the decision to proceed forward throughout the case
was made upon repeated reliance of interpretation of the data by USC's IONM team:
"Since motor…evoked potentials were stable, this was felt to be a salvable
reconstruction of the intracranial circulation.  At the end of the case, all
motor…evoked potentials were stable."  In actuality, the motor evoked potentials
became critically decreased early in the case and remained critically decreased through
the conclusion of the surgery, but USC's IONM team repeatedly failed to warn the
surgeon of these critical changes -- warnings which should have prevented injury. Had
IONM physicians monitored this case, interpreted the data correctly, and conveyed this
data to the surgeon appropriately, patient injury may have been prevented.  Instead, the
surgeon proceeded to complete the surgery and patient JS woke up paralyzed,
consistent with the strokes seen throughout the patient's brain on subsequent imaging
after the surgery.  The IONM report for this surgery was ultimately modified by both
Dr. Gonzalez and the fellow, Dr. Jonathan Chen.  Dr. Gonzalez attested to having
monitored the surgery and billed the insurer for IONM services.  USC knowingly
caused false claim submissions for IONM services in this surgery including but not
limited to fraudulent billing of the PC and TC of the time component and various base
code modalities.  USC knowingly billed for IONM services not only in this case, but
USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries
occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC
patient CD and USC Keck patient KG.  Because USC billed CPT 95940 in the surgery
for LAC+USC patient CD, all charges for IONM services by USC in other current
surgeries are in violation of CPT 95940 billing rules and are therefore fraudulent.
There is no Chat Log for this case; either there was no communication between
physician and technologist, or USC deleted the Chat Log from the patient's medical
records to hide the lack of physician oversight.  USC's failures show a consistent
pattern and practice of prioritizing financial gain over patient safety and compliance.

Had USC appropriately supervised its employees involved in this surgery, significant patient injury may have been prevented. (Exhibit 91).

484. On October 16, 2017, 61 year-old Medicare patient DN underwent spine surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Frank Acosta. During this surgery, patient DN suffered cardiac arrest. The Event Log created by the technologist throughout the entire case indicated the surgeon was informed there were no changes in motor evoked potentials. The surgeon also stated multiple times in the operative report that "all neuromonitoring remained stable" throughout the cardiac arrest event, and "all neuromonitoring remained stable" throughout the entire case. In direct contradiction to the IONM documentation in this case, there were severe and persistent changes in the motor evoked potentials arising from patient DN's nervous system involving the left leg, consistent with intraoperative patient injury. Patient DN suffered significant permanent injury during the surgery and woke up with difficulty moving the left side of the body, consistent with the multiple strokes seen on brain imaging obtained after surgery. The communication by the IONM team to the surgeon of no changes in the motor evoked potentials throughout the case was false and misleading. False interpretation of IONM data is not merely a mistake or misunderstanding; when surgeons rely on incorrect interpretation of the IONM data, surgeons unknowingly make decisions during surgeries which can lead to significant patient injury and death. This surgery took place on a Monday which is also the day of the week that USC knew Dr. Gonzalez was not performing any IONM clinical duties, also known as his "academic day." Yet, Dr. Gonzalez falsely attested in the IONM report to monitoring this case and stated "During the procedure, potentials remained stable…" The IONM report for this surgery was ultimately signed by both Dr. Gonzalez and the fellow, Dr. Jonathan Chen. USC attested that Dr. Gonzalez monitored the surgery and billed Medicare for 23 units of G-0453 in addition to multiple base codes. USC caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time

component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC including LAC+USC patient VC which is in direct violation of USC's G-0453 billing for USC Keck Patient DN. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show systemic patient safety and compliance issues. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 30).

485.   On October 3, 2016, 28 year-old patient JM underwent brain surgery at LAC+USC Medical Center. The referring physician is listed as USC surgeon, Dr. Frank Attenello. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient JM, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient JM's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient YI, USC Keck patient EW, USC Keck patient SN, and USC Keck patient AA.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient JM are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

486.   On August 18, 2017, 57 year-old patient GW underwent brain surgery at USC Keck Hospital. The referring physician is listed as USC neurologist, Dr. Sabina Bulic. During this surgery, there were severe and persistent changes in the patient's somatosensory evoked potentials involving the left leg, consistent with intraoperative patient injury.  In the surgeon's operative report, the surgeon explained "sensory evoked potentials did decline…[and] did not return completely to baseline."  In fact, patient GW awoke from surgery paralyzed on the left side of the body, consistent with the strokes seen throughout patient GW's brain on subsequent imaging after the surgery.  However, USC's IONM report in the medical record falsely states "at the end of the case, left lower SEP returned to…baseline."  This attestation is factually incorrect and in direct contradiction to the IONM data and surgeon's own attestation of the information the IONM team had relayed during the surgery.  Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented. Records demonstrate that the IONM report for this surgery was signed by both Dr. Gonzalez and the fellow, Dr. Jonathan Chen.  After attesting to having monitored the surgery, Dr. Gonzalez billed the insurer and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: USC Keck patient LR, USC Keck patient SS, LAC+USC patient AL, and LAC+USC patient JM. Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient AL and LAC+USC patient JM are in violation of CPT 95940 billing rules and are therefore fraudulent.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the

Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 92).

487.   On March 22, 2016, 31 year-old patient CS underwent vascular surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgeon, Dr. Arun Amar.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient CS, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient CS' surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient SR, USC Keck patient ER, and USC Keck patient BK.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient CS are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

488.   On January 20, 2016, 50 year-old Medi-Cal patient TC underwent thoracic spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Frank Acosta.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient TC's nervous system, consistent

with intraoperative patient injury.  Had IONM physicians monitored this case, interpreted the data correctly, and conveyed this data to the surgeon appropriately, patient injury may have been prevented.  USC falsely attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at LAC+USC including: LAC+USC patient AM and LAC+USC patient JC.  Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC patient AM and LAC+USC patient JC are in violation of CPT 95940 billing rules and are therefore fraudulent.  (Exhibits 144, 145).  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 148).

489.   On December 21, 2015, 39 year-old patient MM underwent spine surgery at LAC+USC Medical Center.  The referring physician is listed as USC and Los Angeles County employed surgeon, Dr. Steven Giannotta. During this surgery, there were catastrophic decreases in IONM data signals arising from the nervous system of patient MM involving the somatosensory evoked potentials (SSEPs) and motor evoked potentials (MEPs), consistent with intraoperative patient injury, sensory deficits, and paralysis.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient MM's surgery from inside the operating room at LAC+USC despite actual knowledge

these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at LAC+USC for patient RG. All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient MM are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

490.   On December 16, 2015, 20 year-old patient OI underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgeon William Mack.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient OI, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient OI's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at LAC+USC for patient IV.  All charges for IONM services by USC in other surgeries concurrent to that of patient OI are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

491.   On November 11, 2015, 59 year-old patient MY underwent brain surgery

1    at LAC+USC Medical Center.  The referring physician is listed as USC surgeon, Dr.

2    Jonathan Russin.  During this surgery, there were severe and persistent changes in

3    IONM data signals arising from the nervous system of patient MY, consistent with

4    intraoperative patient injury.  USC also billed for IONM services using CPT 95940

5    among other base codes through LAC+USC Medical Center attesting that Dr. Shilian

6    was monitoring patient MY's surgery from inside the operating room at LAC+USC

7    despite actual knowledge these claims were clearly false.  These false claims also led

8    to overpayment of funds associated with the TC as well.  USC's failures show a

9    consistent pattern and practice of prioritizing financial gain over patient safety and

10   compliance.  Had USC appropriately supervised its employees, resident surgeons and

11   technologists involved in this surgery, significant patient injury and false claims could

12   have been prevented.

13           492.  On October 16, 2015, 64 year-old patient AA underwent brain surgery at

14   USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Steven

15   Giannotta.  During this surgery, there were severe and persistent changes in IONM

16   data signals arising from patient AA's nervous system, consistent with intraoperative

17   patient injury.  USC attested that Dr. Gonzalez monitored the surgery and caused false

18   claim submissions for IONM services in this surgery including but not limited to

19   fraudulent billing of the PC and TC of the time component and various base code

20   modalities.  USC knowingly billed for IONM services under Dr. Gonzalez not only in

21   this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in

22   other surgeries occurring simultaneously including LAC+USC patient RG, LAC+USC

23   patient VP, LAC+USC patient TT, and LAC+USC patient IL.  Because USC billed

24   CPT 95940 through LAC+USC Medical Center in all these aforementioned

25   LAC+USC surgeries, all charges for IONM services by USC in other surgeries

26   concurrent to that of LAC patient RG, LAC+USC patient VP, LAC+USC patient TT,

27   and LAC+USC patient IL are in violation of CPT 95940 billing rules and are therefore

28   fraudulent.  There is no Chat Log for this case; either there was no communication

between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show systemic patient safety and compliance issues. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

493.   On March 24, 2015, 49 year-old patient LC underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgeon, Dr. Jonathan Russin. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient LC, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient LC's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

494.   On December 16, 2014, 46 year-old patient JN underwent surgery at USC Keck Hospital. The referring physician is listed as USC ENT surgeon, Dr. Rick Friedman. During this surgery, there were severe and persistent changes in the auditory evoked potentials and electromyography IONM data signals involving the arising from patient JN's nervous system, consistent with intraoperative patient injury, severe hearing loss and facial paralysis.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Gonzalez not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at USC Keck

including: USC Keck patient RP. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show systemic patient safety and compliance issues.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 99).

495.   On December 15, 2014, 7 year-old child, patient AB underwent brain surgery at LAC+USC Medical Center. The referring physician is listed as USC surgeon, Dr. Jonathan Russin.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AB, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AB's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: USC+LAC patient LM and USC Keck patient TM.  All charges for IONM services by USC in other surgeries concurrent to that of patient AB are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

496.   On November 25, 2014, 59 year-old patient TN underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC and Los Angeles County employed surgeon, Dr. Steven Giannotta.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous

system of patient TN, consistent with intraoperative patient injury. USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient JM's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services under Dr. Shilian not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck Caremore patient DF and USC Keck patient OY. All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient TN are in violation of CPT 95940 billing rules and are therefore fraudulent. Caremore is an integrated health plan and care delivery system for Medicare and Medicaid patients. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

497. On October 10, 2014, 59 year-old patient CQ underwent spine surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Patrick Hsieh. During this surgery, there were severe and persistent changes in IONM data signals arising from patient CQ's nervous system involving the legs, consistent with significant intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services under Dr. Gonzalez not only for this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both USC Keck and LAC+USC including: USC Keck patient JN, LAC+USC patient AQ, and LAC+USC patient BM. Because USC billed CPT 95940 through LAC+USC Medical Center in

all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC patient AQ and LAC+USC patient BM are in violation of CPT 95940 billing rules and are therefore fraudulent.  Three days later, on October 13, 2014, the patient was rushed back to the operating room after studies revealed that the patient had a blood clot in the spine threatening permanent, life-altering paralysis. During this emergency surgery to remove the blood clot in the spine, initial IONM data signals from patient BP's nervous system involving the legs were completely absent, consistent with the significant intraoperative injury which previously occurred during the October 10, 2014 surgery.  USC falsely attested that Dr. Shilian monitored the October 13, 2014 surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in another surgery occurring simultaneously at USC Keck on October 13, 2014 for USC Keck patient DA. There is no Chat Log for either of these cases; either there were no communications between physician and technologist, or USC deleted the Chat Logs from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 100).

498.   On September 26, 2014, 68 year-old Medicare patient AB underwent thoracic spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Jeffrey Wang. During this surgery, there were severe changes in IONM data signals arising from patient AB's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not

limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed Medicare for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both USC Keck and LAC+USC including: USC Keck patient SG, USC Keck patient KR, USC Keck patient JL, LAC+USC patient ER, and LAC+USC patient TM.  Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC patient ER and LAC+USC patient TM are in violation of CPT 95940 billing rules and are therefore fraudulent.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 101).

499.   On September 22, 2014, 65 year-old Medicare patient DB underwent cervical spine surgery performed by referring physician, USC surgeon Dr. Patrick Hsieh at USC Keck Hospital. During this surgery, there were severe and persistent changes in IONM data signals arising from patient DB's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities to Medicare.  These false claims also led to overpayment of funds by Medicare associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both USC Keck and LAC+USC including: USC Keck patient SM, USC Keck Caremore patient

GE, LAC+USC patient PA, and LAC+USC patient ER.  Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC patient PA and LAC+USC patient ER are in violation of CPT 95940 billing rules and are therefore fraudulent.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 102).

500.   On August 14, 2014, 63 year-old patient IH underwent lumbar spine surgery at USC Keck Hospital. The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore. During this surgery, there were severe and persistent changes in IONM data signals arising from patient IH's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 104).

501.   On August 12, 2014, 40 year-old patient SC underwent brain surgery at LAC+USC Medical Center. The referring physician is listed as USC surgeon, Dr.

Jonathan Russin.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient SC, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient SC's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck Medicare patient EA, USC Keck Medicare patient PC, USC Keck Medicare patient DN, USC Keck Medicare patient KC, USC Keck patient JK, USC Keck patient JG, USC Keck patient AZ, and USC Keck patient FP.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient SC are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

502.   On July 24, 2014, 47 year-old patient LS underwent lumbar spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Thomas Chen.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient LS's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false claims also led to overpayment of funds associated with the TC as well. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical

records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 105).

503.   On July 10, 2014, 61 year-old patient MR underwent brain surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Jonathan Russin.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient MR's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck and LAC+USC including: USC Keck patient JN and LAC+USC patient HC.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 106).

504.   On June 11, 2014, 50 year-old patient GR underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgeon Dr. Michael Apuzzo.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient GR, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was

monitoring patient GR's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient CG, USC Keck Medicare patient JK, USC Keck patient EH, USC Keck patient PB, USC Keck patient MO, USC Keck patient GD, and USC Keck patient MP.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient GR are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees, resident surgeons and technologists involved in this surgery, significant patient injury and false claims could have been prevented.

505.   On June 3, 2014, 57 year-old patient AP underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC surgeon, Dr. John Liu.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient AP, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient AP's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient AG, USC Keck Medicare patient SH, USC Keck patient JD, USC Keck patient MB, and USC Keck patient HA.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient AP are in

violation of CPT 95940 billing rules and are therefore fraudulent. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

506. On May 2, 2014, 48 year-old patient DP underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient DP, consistent with intraoperative patient injury. USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient DP's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at LAC+USC for patient FZ. All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient DP are in violation of CPT 95940 billing rules and are therefore fraudulent. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

507. On April 7, 2014, 76 year-old patient FM underwent cervical spine surgery performed by referring surgeon Dr. Frank Acosta at USC Keck Hospital. During this surgery, there were severe and persistent changes in IONM data signals arising from patient FM's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false

claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both USC Keck and LAC+USC including: USC Keck Medicare patient RG, USC Keck patient AL, USC Keck patient YB, USC Keck patient DA, LAC+USC patient EE, LAC+USC patient ER, and LAC+USC patient RH. Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient EE, LAC+USC patient ER, and LAC+USC patient RH are in violation of CPT 95940 billing rules and are therefore fraudulent. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 108).

508.   On March 28, 2014, 53 year-old patient LC underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC orthopedic surgeon, Dr. Mark Spoonamore. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient LC, consistent with intraoperative patient injury. USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient LC's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

509.   On March 26, 2014, 47 year-old patient VH underwent brain surgery at LAC+USC Medical Center. The referring physician is listed as USC and Los Angeles County employed surgeon, Dr.  Steven Giannotta. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient VH, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient VH's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient LO and USC Keck Medicare patient JA.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient VH are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

510.   On March 12, 2014, 75 year-old patient JT underwent brain aneurysm surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. William Mack.  During this surgery, there was significant bleeding in the brain from surgical complications, and IONM signals arising from the right side of patient JT's nervous system became completely absent, consistent with severe intraoperative patient injury and paralysis.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  There is no Chat Log for this case; either there was no communication

between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 109).

511.   On March 10, 2014, 47 year-old patient ON underwent brain surgery at LAC+USC Medical Center.  The referring physician is listed as USC and Los Angeles County employed surgeon, Dr. Steven Giannotta. During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient ON, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Shilian was monitoring patient ON's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at both LAC+USC and USC Keck including: LAC+USC patient OA, USC Keck Medicare patient JM, USC Keck Tricare patient NR, USC Keck patient JW, and USC Keck patient NA.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient ON are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

512.   On October 24, 2013, 33 year-old patient PH underwent brain surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Thomas Chen. During this surgery, there were severe and persistent changes in IONM data signals arising from patient PH's nervous system, consistent with intraoperative patient

injury.  USC attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck Medicare patient RW and USC Keck patient FV.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 110).

513.   On October 23, 2013, 45 year-old patient VL underwent cervical spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Steven Giannotta. During this surgery, there were severe and persistent changes in IONM data signals arising from patient VL's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at USC Keck for patient LR. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice

of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 111).

514.   On September 12, 2013, 59 year-old patient SV underwent spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgeon, Dr. Patrick Hsieh.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient SV, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient SV's surgery from inside the operating room at LAC+USC despite actual knowledge these claims were clearly false.  These false claims also led to overpayment of funds associated with the TC as well.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient SV are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at USC Keck for patient GV.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

515.   On August 29, 2013, 58 year-old patient LC underwent cervical spine surgery at LAC+USC Medical Center. The referring physician is listed as USC surgery resident, Dr. Jesse Winer.  Records show there was no teaching surgeon present in this surgery that led to significant patient injury.  During this surgery, there were severe and persistent changes in IONM data signals arising from the nervous system of patient LC, consistent with intraoperative patient injury.  USC billed for IONM services using CPT 95940 among other base codes through LAC+USC Medical Center attesting that Dr. Gonzalez was monitoring patient LC's surgery from inside the

operating room at LAC+USC despite actual knowledge these claims were clearly false. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck patient HS, USC Keck patient DE, USC Keck patient AS, and USC Keck patient MW.  All charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient LC are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees including the resident surgeon and technologists involved in this surgery, significant patient injury could have been prevented.

516.   On August 8, 2013, 65 year-old patient SB underwent spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon Dr. Frank Acosta. During this surgery, there were severe and persistent changes in IONM data signals arising from patient SB's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities. These false claims also led to overpayment of funds associated with the TC as well. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at both USC Keck and LAC+USC including: USC Keck patient PN, LAC+USC patient AK, and LAC+USC patient HM.  Because USC billed CPT 95940 through LAC+USC Medical Center in all these aforementioned LAC+USC surgeries, all charges for IONM services by USC in other surgeries concurrent to that of LAC+USC patient AK and LAC+USC patient HM are in violation of CPT 95940 billing rules and are therefore fraudulent.  USC's failures show a consistent pattern and

practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 112).

517.   On May 30, 2013, 62 year-old patient AB underwent spine tumor surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Thomas Chen. During this surgery, there were severe and persistent changes in IONM data signals arising from patient AB's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC of the time component and various base code modalities.  These false claims also led to overpayment of funds associated with the TC as well.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck patient CA and USC Keck patient AS. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 113).

518.   On May 2, 2013, 49 year-old patient CR underwent cervical spine surgery at USC Keck Hospital. The referring physician is listed as USC orthopedic surgeon, Dr. Jeremy Smith. During this surgery, there were severe and persistent changes in IONM data signals arising from patient CR's nervous system, consistent with intraoperative patient injury.  IONM data files from this surgery appear to be deleted and would therefore need to be retrieved to reconcile records.  Nonetheless, USC

attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in another surgery occurring simultaneously at USC Keck including for patient VG. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 114).

519.   On March 8, 2013, 69 year-old patient YA underwent brain aneurysm surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Steven Giannotta.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient YA's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 115).

520.   On December 15, 2012, 78 year-old patient MO underwent brain tumor surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Gabriel Zada.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient MO's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 116).

521.   On February 23, 2012, 41 year-old patient MM underwent thoracic spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Thomas Chen. During this surgery, there were severe and persistent changes in IONM data signals arising from patient MM's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck patient MH, USC Keck patient CP, and USC Keck patient TB. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and

technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 117).

522.   On January 10, 2012, 72 year-old patient AR underwent cervical spine tumor surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Patrick Hsieh.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient AR's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient MA and USC Keck ENT patient JV. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 118).

523.   On November 15, 2011, 73 year-old patient MF underwent cervical spine surgery at USC Keck Hospital. The referring physicians were USC surgeons, Drs. Jeremy Smith and Mark Spoonamore.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient MF's nervous system, consistent with intraoperative patient injury.  USC falsely attested that Dr. Shilian

attested monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck patient NP, USC Keck patient LS, and USC Keck ENT patient KL. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 119).

524.    On October 10, 2011, 65 year-old patient BP underwent spine surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Patrick Hsieh.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient BP's nervous system involving the patient's legs, consistent with intraoperative patient injury.  USC falsely attested that Dr. Shilian monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this October 10, 2011 case, but USC also knowingly billed for IONM services under Dr. Shilian in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient RH and USC Keck ENT patient CF. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was

no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 98).

525.  The next day, on October 11, 2011, the same USC Keck patient BP was rushed back to the operating room for a revision spine surgery. The referring physician is listed as USC surgeon, Dr. Patrick Hsieh. During this emergency surgery, initial IONM data signals from patient BP's nervous system involving the legs were completely absent, consistent with the significant intraoperative injury which previously occurred during the October 10, 2011 surgery. USC attested that Dr. Gonzalez monitored the October 11, 2011 surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. USC knowingly billed for IONM services not only in this October 11, 2011 case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient AR, USC Keck ENT patient MD, USC Keck patient KD, USC Keck patient CS, and USC Keck patient MF. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 84).

526.  On September 22, 2011, 57 year-old patient GL underwent brain tumor

surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Gabriel Zada.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient GL's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck patient JR and USC Keck patient DK. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 97).

527.   On April 20, 2010, 50 year-old patient GK underwent spine surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Patrick Hsieh.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient GK's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient RI, USC Keck ENT patient JV, USC Keck ENT patient GU, and USC Keck patient JB. Records

from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 36).

528.   On October 20, 2009, 52 year-old patient CK underwent spinal cord tumor surgery at USC Keck Hospital.  The referring physician is listed as USC surgeon, Dr. Steven Giannotta.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient CK's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient JM, USC Keck ENT patient HM, and USC Keck patient RL. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 93).

529.   On January 27, 2009, 41 year-old patient AB underwent cervical spine

surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Patrick Hsieh.  During this surgery, there were severe and persistent changes in IONM data signals arising from patient AB's nervous system, consistent with intraoperative patient injury.  USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  However, the event log created by the technologist documents that only the lead IONM technologist, Chris Hansen, was called: "Call Chris reported mep changes in the left hand and left foot…Chris reported to Dr. Hsieh." (Exhibit 35). USC knowingly billed for IONM services not only in this case, but USC also knowingly billed for IONM services under Dr. Gonzalez in other surgeries occurring simultaneously at USC Keck including: USC Keck ENT patient VS, USC Keck ENT patient KM, USC Keck ENT patient ED, USC Keck patient SB, USC Keck patient SC, USC Keck patient MB. Records from LAC+USC for this date appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 35).

530.   On October 14, 2008, LAC+USC Medical Center patient referenced as Study #LAC 08-154 underwent spine surgery for tumor removal.  The referring surgeon is listed as Dr. Daniel Hoh.  Records show there was no teaching surgeon present in this surgery which led to this serious patient injury.  During a critical portion of the surgery, IONM data involving the somatosensory evoked potentials (SSEPs) from the patient's right leg became significantly decreased, consistent with significant intraoperative patient injury.  These IONM changes were permanent and persisted

through the conclusion of the surgery.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC attested and submitted false claims for this surgery under Dr. Gonzalez.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

531.   On August 4, 2008, LAC+USC Medical Center patient referenced as Study #LAC 08-099 underwent brain aneurysm surgery.  The referring surgeon is listed as Dr. Steven Giannotta.  During a critical portion of the surgery, multiple IONM data signals including somatosensory evoked potentials (SSEPs) and motor evoked potentials (MEPs) became absent, consistent with catastrophic intraoperative patient injury.  These IONM changes were permanent and persisted through the conclusion of the surgery.  There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC attested and submitted false claims for this surgery under Dr. Gonzalez.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

532.   On October 14, 2008, LAC+USC Medical Center patient referenced as Study #LAC 08-154 underwent spine surgery for tumor removal.  The referring surgeon is listed as Dr. Daniel Hoh. Records show there was no teaching surgeon present in this surgery which led to this serious patient injury.  During a critical portion of the surgery, IONM data involving the somatosensory evoked potentials (SSEPs) from the patient's right leg became significantly decreased, consistent with significant intraoperative patient injury.  These IONM changes were permanent and persisted through the conclusion of the surgery.  There is no Chat Log for this case; either there

was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC attested and submitted false claims for this surgery under Dr. Gonzalez. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.

533.   On April 2, 2008, 71 year-old patient RK underwent thoracic spine surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Thomas Chen. During this surgery, there were severe and persistent changes in IONM data signals arising from patient RK's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities. Records from this surgery and other surgeries occurring simultaneously that day at USC Keck and LAC+USC appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight. USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance. Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented. (Exhibit 79).

534.   On February 7, 2008, 62 year-old patient HL underwent posterior cervical spine surgery at USC Keck Hospital. The referring physician is listed as USC surgeon, Dr. Thomas Chen. During this surgery, there were severe and persistent changes in IONM data signals arising from patient HL's nervous system, consistent with intraoperative patient injury. USC attested that Dr. Gonzalez monitored the surgery and knowingly caused false claim submissions for IONM services in this surgery

including but not limited to fraudulent billing of the PC and TC of the time component and various base code modalities.  Records from this surgery and other surgeries occurring simultaneously that day at USC Keck and LAC+USC appear to be deleted and would therefore need to be retrieved to reconcile records. There is no Chat Log for this case; either there was no communication between physician and technologist, or USC deleted the Chat Log from the patient's medical records to hide the lack of physician oversight.  USC's failures show a consistent pattern and practice of prioritizing financial gain over patient safety and compliance.  Had USC appropriately supervised its employees involved in this surgery, significant patient injury could have been prevented.  (Exhibit 78).

### E.  False Claims Resulting from Referrals Tainted by Violations of Physician Self-Referral and Kickback Statutes

535.   Beginning as early as 2008 and continuing to the present, Defendants devised and implemented a scheme by which they:

a.  knowingly entered into compensation arrangements with physicians in violation of the PSR Statute, AKS and California laws, specifically by paying or providing unlawful kickbacks, compensation that varied with the volume or value of referrals, commercially unreasonable compensation for services not rendered, commercially unreasonable long term physician practice income guaranties, compensation exceeding fair market value ("FMV"), and other illegal incentives to physicians who refer patients to Defendants in violation of federal and state law; and

b.  knowingly submitted and/or caused others to submit false and fraudulent claims for payment to Government Payers in violation of FCA and CFCA, which included claims relating to inpatient and outpatient designated health services rendered to patients referred to Defendants by physicians who had improper financial relationships with Defendants violating the PSL Statute, AKS and California laws.

### 1.   **Neurologists**

536.   Defendants paid Dr. Gonzalez and Dr. Shilian (collectively, the "Neurologists") kickbacks and other illegal compensation and incentives to induce referrals of the PC and TC components of IONM services to Defendants and participate in the scheme in which Defendants submitted false claims for IONM services that were not personally performed by the Neurologists at both USC Keck Hospital and LAC+USC Medical Center.

537.   USC Department of Neurology established a Faculty Compensation Plan and Incentive Formula effective July 1, 2010 (the "Plan") that describes some of the ways Defendants compensated the Neurologists.  (Exhibit 135).  The Plan provides a fixed salary, guaranteed for one year, for academic and clinical components (X). In addition to the fixed salary, the Plan provides administrative stipends for medical directorships and other administrative duties (Y). In addition to the fixed salary and administrative components (X+Y), the Plan provides a variable incentive encompassing the strategic goals of the Department (Z). The variable incentive (Z) is calculated quarterly based on "[n]et collections of each faculty member for services personally performed. *Id.,* at p. 4. In addition to the X+Y+Z components of the Plan, Defendants paid the Neurologists a "Clinical Services Overload" component for call coverage beginning in 2014.

538.   In fact, MSOA/MSAA/PSA payments for services not rendered at LAC+USC Medical Center and the variable incentive (Z) for services not rendered at USC Keck Hospital as calculated for the Neurologists and the Clinical Service Overload component were not based on each physician's personally performed services; Defendants had full knowledge Neurologists were not personally performing the PC of IONM services at both USC Keck Hospital and LAC+USC Medical Center. Instead, Defendants had actual knowledge that professional services were being performed by technologists illegally acting in the capacity of physicians at both USC

Keck Hospital and LAC+USC Medical Center because Defendants' are the ones who created policies instructing the technologists to do so.

539.   For example, Defendants paid Dr. Gonzalez the following amounts for the variable incentive (Z) and Clinical Services Overload during the years 2013-2015 for services that were not personally performed by the respective physician:

| **Dr. Gonzalez** | **2013** | **2014** | **2015** | **Totals 2013-2015** |
|---|---|---|---|---|
| Incentive (Z) | $19,152 | $36,165 | $66,794 | $122,111 |
| Clinical Services Overload | -0- | $63,216 | $114,648 | $177,864 |
| Totals | $19,152 | $99,381 | $181,442 | $299,975 |

Source: Exhibit 21.

540.   Defendants paid Dr. Shilian the following amounts for the variable incentive (Z) and Clinical Services Overload during the years 2013-2015 for services that were not personally performed by the respective physician:

| **Dr. Shilian** | **2013** | **2014** | **2015** | **Totals 2013-2015** |
|---|---|---|---|---|
| Incentive (Z) | $136,302 | $162,371 | $87,572 | $386,245 |
| Clinical Services Overload | -0- | $51,000 | $81,600 | $132,600 |
| Totals | $136,302 | $213,371 | $169,172 | $518,845 |

Source: Exhibit 22.

541.   When Relator joined USC in 2016, USC paid Relator hospital guaranteed salary where USC Hospital guaranteed the shortfall of his base salary so the physician practice would not lose money. Defendants told Relator that his billing did not matter because USC would pay him his salary no matter what, and Defendants ordered Relator to artificially create a shortfall and credit the billing from "his day" to Drs. Gonzalez and Shilian thereby enabling Dr. Chui's Department of Neurology to receive

fraudulent funding from USC Hospital in the form of hospital guarantee salary for Dr. Cheongsiatmoy.  USC orchestrated a similar scheme to procure fraudulent government funding (i.e. MSOA/MSAA/PSA) from LAC+USC through the false claims Dr. Chui submitted under Dr. Cheongsiatmoy's name from 2016 to 2018.  During 2016-2018, Defendants continued to pay Dr. Gonzalez and Dr. Shilian the variable incentive (Z), additional amounts for Clinical Services Overload and in addition to fraudulent funding Los Angeles County received from the false claims submitted by Dr. Chui submitted as part of the PTS.

542.   Defendants knew that they were paying Dr. Gonzalez and Dr. Shilian for services that they did not personally perform, contrary to the Plan and contracts with Los Angeles County. Defendants' payments to Dr. Gonzalez and Dr. Shilian were commercially unreasonable and exceeded FMV because Defendants knew Neurologists did not in fact perform the services.  The payments also varied with the volume or value of referrals of designated health services by the referring physician because the PC and TC components of IONM services were actually performed by non-physician technologists as an inpatient hospital service.

543.   By stacking payments for the variable incentive (Z) and the Clinical Service Overload, base academic salary (X) and administrative stipends (Y), Defendants knowingly created direct compensation relationships with the Neurologists that were commercially unreasonable, exceeded FMV, varied with the volume or value of referrals of designated health services, and violated the PSR Statute because no exception applied. Defendants knew or should have known they were in violation of the PSR Statute and still knowingly continued to submit tainted claims for reimbursement related to the aforementioned services in violation of FCA and CFCA.

544.   One purpose of Defendants' payments to the Neurologists for the variable incentive (Z) and the Clinical Service Overload was to induce referrals of IONM services to Defendants. As such, those payments are kickbacks and Defendants could not have reasonably concluded that the payments did not violate AKS and California

1   laws. Even if Defendants believed that the Neurologists were bona fide employees, the

2   Neurologists were not providing "covered items or services" as required by the AKS

3   safe harbor.  42 U.S.C. § 1320a-7b(b)(3)(B). Rather, Defendants paid the variable

4   incentive (Z) and the Clinical Services Overload for referrals and not for any legitimate

5   service personally performed by the Neurologists for which Defendants could receive

6   any reimbursement from Medicare and other insurers. *See United States v. Starks*, 157

7   F.3d 833, 839 (11th Cir. 1998). Defendants knew or should have known they were in

8   violation of AKS and California laws and still knowingly continued to submit tainted

9   claims for reimbursement in violation of FCA and CFCA.

10   545.   Defendants self-reported only a small portion of the false claims in its

11   March 27, 2020 Voluntary Self-Disclosure. (Exhibit 89). Defendants self-reported 307

12   claims for IONM physician services relating to ENT surgeries that were fraudulently

13   billed and paid because no remote continuous monitoring was performed, and 1,575

14   fraudulent claims billed by USC under Neurologists on their "academic research" day

15   (Mondays for Dr. Gonzalez and Thursdays for Dr. Shilian).  Notably absent are any

16   disclosures of the false claims billed through both USC Keck and LAC+USC hospitals

17   and the fraud which Defendants perpetrated at LAC+USC Medical Center including

18   services from unsupervised resident surgeons and unlicensed technologists.

19   546.   Moreover, Defendants failed to self-report all other false claims for the

20   PC and TC components of IONM services associated with the illegal referrals during

21   the entire period of the financial relationship for which no exception to the PSR Statute

22   applied.

23   547.   The PSR Statute prohibits the Neurologists from referring designated

24   health services to Defendants, and Defendants from presenting or causing to be

25   presented a claim for designated health services furnished pursuant to a prohibited

26   referral.  Defendants failed to refund "all collected amounts on a timely basis" as

27   required by the PSR regulations. 42 C.F.R.§411.353 (2006).

28

548.   Defendants knew or should have known they an obligation to refund all collected amounts on prohibited referrals by the Neurologists during the entire period of the financial relationship for which no exception to the PSR Statute.  In addition, Defendants knowingly avoided their obligation to refund to the United States and the State of California overpayments received from false claims on PSR and AKS-prohibited referrals.  This type of deceptive conduct subjects Defendants to liability under the FCA and CFCA.

### 2.   Surgeons

549.   Defendants paid Surgeons including but not limited to ENT surgeons, orthopedic surgeons and neurosurgeons (collectively, "Surgeons") kickbacks and other illegal compensation and incentives to induce them to refer high-margin surgery procedures at USC Keck Hospital and LAC+USC Medical Center for the financial benefit of Keck Medical Center of USC.

550.   The PSR Statute prohibits the Surgeons from referring designated health services to Defendants, and Defendants from presenting or causing to be presented a claim for designated health services furnished pursuant to a prohibited referral. Defendants failed to refund "all collected amounts on a timely basis" as required by the PSR regulations. 42 C.F.R.§411.353 (2006).

551.   Defendants knew or should have known they an obligation to refund all collected amounts on prohibited referrals by the Surgeons during the entire period of the financial relationship for which no exception to the PSR Statute.  In addition, Defendants knowingly avoided their obligation to refund to the United States and the State of California overpayments received from false claims on PSR and AKS-prohibited referrals.

552.   The Surgeons jeopardized the medical care of their patient because they knew that IONM services during surgery procedures were not personally performed by the Neurologists and supervised resident surgeons at USC Keck Hospital and LAC+USC Medical Center.

553.   For example, USC Chair of Neurosurgery, Dr. Giannotta, wrote a December 15, 2011 memorandum to Scott Evans, Chief Operating Officer of USC Keck Hospital and Jon Spees, Chief Financial Officer of USC Keck Hospital stating:

> "Attracting [more surgical] volume into Keck Medical Center will generate significant margin to Keck Hospital.  Neurosurgery already provides significant margin business to the hospital.  However, my hope is to significantly grow that margin.  In return, the department requests support to achieve our projected growth targets through clinical financial support…We have not been able to afford any incentive pay to the faculty since last December…Providing ongoing physician support will enable us to generate enough physician service income to pay our incentive…"

(Exhibit 136).

554.   USC Chair of Neurosurgery, Dr. Giannotta, wrote another memorandum on October 30, 2012 to Scott Evans, Chief Executive Officer of USC Keck Hospital requesting $2,613,000 per year for five years to guarantee fixed minimum base salaries for three full time faculty physicians who were being recruited to the USC Spine Institute. In addition to the salary guarantee, USC Keck Hospital would provide $150,000 per year as a stipend for the Institute Director.  In this same memorandum, Dr. Giannotta stated: "Neurophysiological monitoring (IONM) services will be provided, as needed, for neurosurgical cases." (Exhibit 126).

555.   In another example contained in a more detailed Proposal for Spine Institute at USC dated September 21, 2012 (the "Proposal") (Exhibit 137), USC planned to recruit one professor (Dr. John Liu) and one associate professor (Dr. Frank Acosta) from Cedars-Sinai Spine Center in Los Angeles. USC planned to significantly increase the compensation of Dr. Patrick Hsieh, who had joined USC as an associate professor in 2008. USC guaranteed the compensation for Drs. Patrick Hsieh, John Liu and Frank Acosta for five years. The base compensation was based on a multiple of the FY 2012 MGMA 75th Percentile Neurosurgery wRVU physicians earnings per wRVU and a pre-negotiated WRVU base between 8,000 and 10,000 wRVUs. In addition,

USC paid Dr. John Liu additional compensation for a medical directorship in the amount of $150,000 per year.

556.   The five year guarantee period commenced on January 1, 2013 for Dr. Patrick Hsieh, and on February 1, 2013 for Dr. John Liu and Dr. Frank Acosta.  During this five year period, Defendants paid Drs. Liu, Hsieh, and Acosta the following fixed, guaranteed amounts annually:

| Physician | Guaranteed Annual Salary | Annual Medical Directorship | Total Annual Compensation | Assumed Base Annual wRVUs ($93/wRVU) |
|---|---|---|---|---|
| Dr. John Liu | $930,000 | $150,000 | $1,080,000 | 10,000 wRVUs |
| Dr. Patrick Hsieh | $930,000 | -0- | $930,000 | 10,000 wRVUs |
| Dr. Frank Acosta | $753,000 | $-0- | $753,000 | 8,097 wRVUs |

557.   Beginning in 2018, Defendants began paying a $75,000 annual administrative stipend to Dr. Hsieh, increasing his total annual compensation from USC to $1,005,000. (Exhibit 140). In addition, Dr Hsieh received outside payments from spinal products vendors, including Medtronic and Nuvasive, totaling over $426,000 during the period 2014-2019, as reported on OpenPaymentsData.CMS.gov. (Exhibit 142).

558.   The five year guaranteed fixed compensation for each surgeon described above was commercially unreasonable. Defendants cannot satisfy the AKS safe harbor for practitioner recruitment because the remuneration was paid to these established surgeons who each had been practicing more than one year, were not relocating into a HPSA for their specialty, and the benefits lasted longer than 3 years. 42 C.F.R. §

1001.952(n) (2017).  Additionally, Defendants cannot satisfy the PSR exception for physician recruitment because each of these neurosurgeons had an established practice in Los Angeles and was not relocating from outside the geographic area served by Keck Medical Center. 42 C.F.R § 411.357(e) (2017). Dr. Hsieh was not recruited to USC by the five year guaranteed fixed compensation because he was already an Associate Professor at USC when he received the five year guaranteed fixed compensation benefit. Defendants paid the fixed compensation for the entire five-year period regardless of whether each surgeon work the actual base wRVUs that was used to specifically compute his fixed compensation at $93 per wRVUs.

559.   The medical directorships paid to Dr. John Liu of $150,000 per year and to Dr. Patrick Hsieh of $75,000 per year are commercially unreasonable and exceed FMV of the administrative services actually rendered. FY 2012 MGMA benchmarks for Medical Director Compensation for Neurosurgery was less than $300 per hour. At $300 per hour, Dr. John Liu would have to perform administrative duties for 500 hours per year to earn his stipend, and Dr. Hsieh would have to perform administrative duties for 250 hours per year to earn his stipend. Neither Dr. John Liu nor Dr. Hsieh performed administrative duties for the number of hours necessary to justify these large stipends.

560.   In the case of Dr. Patrick Hsieh, his outside income from spinal products vendors, when combined with his five year guaranteed fixed salary and his medical directorship, resulted in total compensation that exceeded FMV based on MGMA benchmarks for neurosurgery.

561.   Most troubling is the fact that the Surgeons knew of the patient danger resulting from the deficient surgical services, yet did could not walk away from the guaranteed compensation and continued to increase the volume of referrals for surgeries with IONM services they knew would not be provided by Defendants.

562.   By paying five year guaranteed fixed salaries assuming but not accounting for a high base level of wRVUs, plus excessive medical directorships and

1  administrative stipends, plus allowing the Surgeons to earn significant outside income

2  from consulting and other services for spinal products vendors, Defendants knowingly

3  created direct compensation relationships with the Surgeons that were commercially

4  unreasonable, exceeded FMV, and violated the PSR Statute because no exception

5  applied. Defendants knew or should have known they were in violation of the PSR

6  Statute and still knowingly continued to submit tainted claims for reimbursement in

7  violation of FCA and CFCA.

8      563.   One purpose of Defendants' payments to Drs. Patrick Hsieh, John Liu and

9  Frank Acosta for the five year guaranteed fixed salaries (assuming but not accounting

10  for a high base level of wRVUs, plus excessive medical directorships and

11  administrative stipends, plus allowing the surgeons to earn significant outside income

12  from consulting and other services for spinal products vendors) was to induce referrals

13  of inpatient and outpatient neurosurgery procedures to Defendants. As such, those

14  payments are kickbacks and Defendants could not have reasonably concluded that the

15  payments did not violate AKS and California laws. Even if Defendants believed that

16  the Surgeons were bona fide employees, the Surgeons were not providing "covered

17  items or services" as required by the AKS safe harbor to the extent that the Surgeons

18  did not meet the assumed base level of wRVUs and received payment at the rate of

19  $93 per unworked RVU anyway. 42 U.S.C. § 1320a-7b(b)(3)(B). Rather, Defendants

20  paid the variable incentive (Z) and the Clinical Services Overload for referrals and not

21  for any legitimate service personally performed by the Neurologists for which

22  Defendants could receive any Medicare reimbursement. *See United States v. Starks*,

23  157 F.3d 833, 839 (11th Cir. 1998). Defendants knew or should have known they were

24  in violation of AKS and California laws and still knowingly continued to submit

25  tainted claims for reimbursement in violation of FCA and CFCA.

26      **3.    False Claims and Statements.**

27      564.   The Neurologists and Surgeons with whom Defendants entered into

28  financial relationships specified above referred patients, including Medicare and Medi-

Cal beneficiaries, to Defendants for designated health services in violation of the PSR Statute.

565.   Defendants presented, or caused to be presented, claims for payment to payers for designated health services provided to patients of the Neurologists and Surgeons.  Defendants thereby obtained payments from the United States and the State of California in violation of the PSR Statute.

566.   Under the FCA (31 U.S.C. §3729(a)(1)(A)) and the CFCA (Cal. Gov't Code §12651(a)(1)), the claims submitted by Defendants as set forth above were false and/or fraudulent because Defendants were prohibited from obtaining payment from the United States and the State of California for designated health services provided to referrals from the Neurologists and Surgeons with whom Defendants had PSR-violative financial relationships.

567.   Under the AKS (42 U.S.C. § 1320a-7b(g)), the FCA (31 U.S.C. § 3729 (a)(1)(A)), and the CFCA (Cal. Gov't Code § 12651(a)(1)), the claims submitted by Defendants as set forth above were false and/or fraudulent because Defendants knowingly and willfully paid (and the Neurologists and Surgeons knowingly received) remuneration to induce referrals to Defendants in violation of the AKS, Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2.

568.   Defendants, the Neurologists and the Surgeons also violated the FCA (3729(a)(1)(B)), and the CFCA (Cal. Gov't Code § 12651(a)(2)), by making false statements, or causing false statements to be made by the fiscal intermediary and MAC, and by DHCS, to get claims paid by payers for designated health services based on prohibited financial relationships as set forth above.  Defendants certifications on cost reports and the Neurologists' and Surgeons' certifications on their form 837 claims that their statements were "true" and/or "correct" and/or "complie[d] with all applicable Medicare and/or Medicaid laws, regulations, and program instructions" (for example) such that they were entitled to payment of their claims for such services were

---

false or fraudulent because the PSR Statute prohibited Defendants from receiving payments from the United States and the State of California for those claims.

569.   Defendants knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States and the State of California (i.e., to avoid refunding payments made in violation of the PSR Statute) by certifying on their annual cost reports and Form 837 claims that the services were provided in compliance with federal law, all in violation of the FCA (§ 3729(a)(1)(G)) and the CFCA (Cal. Gov't Code § 12651(a)(7)).   The false certifications, made with each annual cost report and Form 837 claim submitted to the government, were part of Defendants' unlawful and orchestrated scheme to defraud payers.

570.   Even if Defendants could be considered not to have initially known that the scheme in which they conspired was fraudulent, and as such were each beneficiaries of inadvertent submissions of false claims, they each subsequently discovered the falsity of the claims and failed to disclose the false claims to the State of California within a reasonable time after discovery in violation of the CFCA (Cal. Gov't Code § 12651(a)(8)).   The conduct was part of Defendants' orchestrated scheme to defraud payers that has caused damage to taxpayers for over a decade.

571.   All claims submitted to payers by Defendants for designated health services, as set forth above, were false claims that were knowingly submitted to the United States or the State of California.   Defendants submitted or caused others to submit false and fraudulent claims for payment to payers, which included claims relating to inpatient and outpatient designated health services that resulted from violations of the PSR Statute, AKS and California law.

572.   Defendants presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.   The illegal scheme implemented by

Defendants involved thousands of false claims based on prohibited conduct, as discussed in this Complaint.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**ON BEHALF OF THE UNITED STATES AGAINST ALL DEFENDANTS**

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**PRESENTING FALSE CLAIMS**

**(31 U.S.C. § 3729(a)(1)(A))**

573.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

574.   Defendants knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

575.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or approval of charges by the Medicare or Medicaid program that were higher than they were permitted to claim or charge by applicable law for surgical services, among other things.

576.   Defendants knowingly made false claims for payment to Medicare or Medicaid programs in order to receive government funding from LAC+USC through various contracts funded by a mix of Medicare and Medicaid programs.

577.   Defendants knowingly made false claims for payment to Medicare or Medicaid programs associated with misrepresentation of the provider of service and/or services not provided.

578.   Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement for designated health services rendered to patients who were

---

FOURTH AMENDED COMPLAINT                    CASE NO. CV 18-08311-ODW(AS)          220

referred by physicians with whom Defendants had entered into prohibited financial relationships in violation of the Stark and AKS statutes.

579.   Such claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

580.   Defendants acted in a concerted fashion to defraud the United States of America and acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States of America.

581.   Defendants knowingly made, used, and caused to be made false claims for payment on the basis of false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

582.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## SECOND CAUSE OF ACTION

### ON BEHALF OF THE UNITED STATES AGAINST ALL DEFENDANTS

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**MAKING OR USING FALSE RECORDS OR STATEMENTS**
**MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS**

**(31 U.S.C. § 3729(a)(1)(B))**

583.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

584.   Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

585.   Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, in order to obtain payment or

1   approval of charges by the Medicare program.  Among other things, Defendants

2   knowingly submitted false claims for Medicare and Medicaid business.

3       586.   Defendants made, used, or caused to be made or used, false claims or

4   statements – i.e. false certifications and representations made and caused to be made

5   by Defendants when submitting the false claims for payments and the false

6   certification made by Defendants in submitting the cost reports – to get false or

7   fraudulent claims paid and approved by the United States.

8       587.   Defendants false certifications and representations were made for the

9   purpose of getting false or fraudulent claims paid and the payment of the false or

10  fraudulent claim was a reasonable and foreseeable consequence of Defendants'

11  statement and actions.

12      588.   Said false statement were made with actual knowledge of their falsity, or

13  with reckless disregard or deliberate ignorance of whether or not they were false.

14      589.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a

15  substantial factor in causing the United States to sustain damages in an amount

16  according to proof.

17

18                 **THIRD CAUSE OF ACTION**

19  **ON BEHALF OF THE UNITED STATES AGAINST ALL DEFENDANTS**

20  **VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
    **RETENTION OF PROCEEDS TO WHICH NOT ENTITLED**

21  **(31 U.S.C. 3729(a)(1)(G))**

22      590.   Relator re-alleges and incorporates herein by reference each and every

23  allegation of the preceding paragraphs as though fully set forth herein.

24      591.   Defendants knowingly made, used, or caused to be made or used a false

25  record or statement material to an obligation to pay or transmit money property to the

26  United States, or knowingly concealed or knowingly improperly avoided or decreased

27  an obligation to pay or transmit money or property to the United States.

28

---

FOURTH AMENDED COMPLAINT        CASE NO. CV 18-08311-ODW(AS)   222

592.   Defendants received far more money from the Medicaid and Medicare programs than they were entitled.  Defendants knew that they had received more money than they were entitled to and avoided their obligation to return the excess money to the United States.

593.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

594.   The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA AND LOS ANGELES COUNTY AGAINST ALL DEFENDANTS

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT PRESENTING FALSE CLAIMS

### (Cal. Gov. Code § 12651(a)(1)); Cal. Bus. & Prof. Code §§ 650 and 650.1; Cal. Welf. & Inst. Code § 14107.2)

595.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

596.   Defendants knowingly submitted false claims for payment Los Angeles County, the State of California and to Medi-Cal programs associated with misrepresentation of the provider of service and/or services not provided.

597.   Cal. Gov't Code § 12651 (a)(1) provides liability for any person or entity who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" to the State of California or one of its political subdivisions.

598.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1 and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

599.   Defendants violated Cal. Bus. & Prof. Code §§ 650 and 650.1 and to Cal. Welf. & Inst. Code § 14107.2 from at least January 1, 2008 to the present by engaging in the fraudulent and illegal practices described herein.

600.   Defendants violated Cal. Gov't Code § 12651 (a)(1)) and knowingly caused thousands of false claims to be made, used and presented to the State of California and Los Angeles County from at least January 1, 2008 to the present by its violation of federal and state laws including Cal. Bus. & Prof. Code §§ 650 and 650.1 and to Cal. Welf. & Inst. Code § 14107.2 as described in this Complaint.

601.   The State of California, by and through the Medi-Cal program, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by Defendants.

602.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied and also was an express condition of payment of claims submitted to the State of California.

603.   Had the State of California and/or Los Angeles County known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by Defendants and third party payers in connection with Defendants' fraudulent and illegal practices.

604.   Defendants acted in a concerted fashion to defraud the State of California, and acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the State of California.

605.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer or employee of the State of California.

606.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to an officer, employee or agent of Los Angeles County, a political subdivision of the State of California.

607.   Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

608.   The State of California and Los Angeles County, a political subdivision of California, sustained damages because of Defendants' acts in an amount according to proof.

## FIFTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA AND LOS ANGELES COUNTY AGAINST ALL DEFENDANTS

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT MAKING OR USING FALSE RECORDS OR STATEMENTS TO OBTAIN PAYMENT OR APPROVAL OF FALSE CLAIMS

### (Cal. Gov. Code § 12651(a)(2))

609.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

610.   Defendants knowingly made, used, or caused to be made or used false records or statements and false certifications made by Defendants in submitting cost reports to get false or fraudulent claims approved by the State of California and Los Angeles County, a political subdivision, in violation of the California False Claims Act.

611.   Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims involving State and Los Angeles County political division funds, in violation of the California False Claims Act.

612.   'Defendants' false records or statements had the natural tendency to influence, or capable of influencing, the payment or receipt of money, property, or services.

613.   The State of California and Los Angeles County, a political subdivision of California, sustained damages because of 'Defendants' acts in an amount according to proof.

## SIXTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA AND LOS ANGELES COUNTY AGAINST ALL DEFENDANTS

### FALSE RECORD MATERIAL TO OBLIGATION TO PAY

### (Cal. Gov. Code § 12651(a)(7))

614.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

615.   Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the State of California and/or Los Angeles County, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the State of California and/or Los Angeles County.

616.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## SEVENTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA AND LOS ANGELES COUNTY AGAINST ALL DEFENDANTS

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT INADVERTENT SUBMISSION OF FALSE CLAIMS

### (Cal. Gov. Code § 12651(a)(8))

617.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

618.   Defendants were the beneficiary of inadvertent submissions of false claims, subsequently discovered the falsity of the claims, and failed to disclose the false claims to the State of California and Los Angeles County within a reasonable time after discovery of the false claims.

619.   To the extent any of Defendants' complained of acts were inadvertent at the time committed, Defendants subsequently discovered they had engaged in fraudulent billing practices and failed to disclose the facts to the State of California and Los Angeles County within a reasonable time of such discovery.

620.   'Defendants' false or fraudulent claims had the natural tendency to influence agency action or were capable of influencing agency action.

621.   The State of California and Los Angeles County, a political subdivision of California, sustained damages because of 'Defendants' acts in an amount according to proof.

## EIGHTH CAUSE OF ACTION

### ON BEHALF OF THE STATE OF CALIFORNIA AGAINST ALL DEFENDANTS

### CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

#### (Cal. Ins. Code § 1871.7 and Cal. Pen. Code § 550))

622.   Relator re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein

623.   This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 et seq., as amended ("the Act").  The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim.  Cal. Ins. Code § 1871.7(b).

624.   Subsection (e) of Cal. Ins. Code § 1871.7 provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.  Cal. Ins. Code § 1871.1(e).

625.   Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550.  Section 550 of the Penal Code prohibits the following activities, among others:

(a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

******

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

*****

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

Cal. Penal Code § 550.

626.   By virtue of the acts described in this Complaint, Defendants knowingly presented, or caused to be presented, false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, in order to obtain payment from insurers, in violation of Penal Code § 550(a) and Cal. Ins. Code § 1871.7(b).  The claims were false or fraudulent because, among other things:

- Defendants knowingly sought, and falsely represented that it was entitled to reimbursement in excess of amounts it was owed;
- Defendants knowingly sought and falsely represented that it was entitled to reimbursement for services not actually performed;
- Defendants knowingly sought, and falsely represented that it was entitled to, reimbursement for treatment that did not meet the required conditions set out by insurers for reimbursement.

627.   Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

628.   The California State Government is entitled to receive three times the amount of each claim for compensation submitted in violation of Cal. Ins. Code § 1871.7.  Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

629.   This conduct was a substantial factor in causing damages as detailed herein and in an amount according to proof.

# NINTH CAUSE OF ACTION

## ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D.
## AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Retaliation in Violation of Cal. Lab. Code § 1102.5)

630.   Justin Cheongsiatmoy, M.D re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

631.   At all times relevant to this Complaint, USC has been subject to the requirements of California Labor Code section 1102.5, which applied to Justin Cheongsiatmoy, M.D. as an employee of USC.  Section 1102.5 prohibits employers from discharging, retaliating, or in any manner discriminating against any employee for making any complaint to their employer in which the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a local, state, or federal rule or regulation.  *See* Cal. Labor Code § 1102.5(b).  Section 1102.5 also prohibits employers from retaliating "against an employee for refusing to participate in an activity that would result in a violation of [a local, state, or federal rule or regulation]."  *See* Cal. Labor Code § 1102.5(c).

632.   USC violated sections 1102.5(b) and (c) by subjecting Justin Cheongsiatmoy, M.D. to adverse employment actions, including termination, in retaliation for both his complaints about patient safety and refusal to participate in USC's fraudulent billing practices.  Justin Cheongsiatmoy, M.D. had reasonable cause to believe USC's billing practices constituted violations of state and local laws and/or regulations, including but not limited to the Federal False Claims Act (§§ 3729(a)(1)(a), (a)(1)(b), and (a)(1)(g)), the California False Claims Act (Cal. Gov. Code §12652), and the California Insurance Frauds Prevention Act (Cal. Ins. Code §1871, *et seq*.).  Justin Cheongsiatmoy, M.D.'s disclosures were made to senior employees of USC with the authority to investigate, including, but not limited to, the

USC Chair of the Department of Neurology.  Justin Cheongsiatmoy, M.D.'s complaints about patient safety and refusal to participate in USC's fraudulent billing practice was a contributing reason for USC's decision to terminate Justin Cheongsiatmoy, M.D. (Cal. Labor Code § 1102.6).

633.   As a direct and proximate result of USC's actions, Justin Cheongsiatmoy, M.D. has suffered and will continue to suffer from loss of earnings, other employment benefits, and other economic damages related to his termination.  Justin Cheongsiatmoy, M.D. has also incurred and continues to incur attorney's fees and legal expenses.

634.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, anxiety, and embarrassment in an amount to be proven at the time of trial.

635.   The conduct of USC described above was outrageous and was executed with malice, fraud, and oppression, and with conscious disregard for Justin Cheongsiatmoy, M.D.'s rights.  USC acted with the intent and purpose of injuring Justin Cheongsiatmoy, M.D. and deterring other employees from undertaking protected activities in furtherance of the rights afforded under law.  Justin Cheongsiatmoy, M.D. is therefore entitled to recover punitive damages in an amount according to proof.

## **TENTH CAUSE OF ACTION**

### **ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D.
AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA**

**(Retaliation in Violation of the False Claims Act 31 U.S.C. § 3730(h); Cal. False Claims Act Gov't. Code §12653; Cal. Insurance Fraud Prevention Act § 1871, *et seq*.)**

636.   Justin Cheongsiatmoy, M.D re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

637.   At all times relevant to this Complaint, USC and its affiliates have been subject to the requirements of the False Claims Act ("FCA"), which "prohibits submitting false or fraudulent claims for payment to the United States" and authorizes *qui tam* suits.  *See* 31 U.S.C. §§ 3729(a), 3730(b)(1).  The "California analogue" to the FCA, the California False Claims Act ("CFCA"), "is nearly identical."  *United States ex rel. Mosler v. City of Los Angeles*, 414 F. App'x 10, 11 (9th Cir. 2010) (citing Cal. Gov't Code § 12652(d)(3)).  Both the FCA and CFCA prohibit retaliation against whistleblowers, making it illegal to discriminate against an employee or contractor because of lawful acts done by the employee or contractor in furtherance of any action under the FCA or CFCA. *See* 31 U.S.C. § 3730(h); Gov't. Code §12653.  The California Insurance Fraud Prevention Act ("IFPA") allows "[a]ny interested person" to bring a civil action against anyone who submits a fraudulent claim to an insurance company.  *See* Cal. Ins. Code §§ 1871.7(e)(1).  The IFPA prohibits employers from retaliating against an employee "because of lawful acts done by the employee … in furtherance of an action under this section" and provides for relief in the form of reinstatement, double backpay, interest, special damages, and attorney's fees. *See* Cal. Ins. Code § 1871.7(k).

638.   USC and its affiliates violated 31 U.S.C. section 3730(h) and Government Code section 12653 by discriminating against Justin Cheongsiatmoy, M.D. after Justin

1   Cheongsiatmoy, M.D. reported his reasonable belief that USC and its affiliates were

2   submitting false claims in violation of the FCA, CFCA, and IFPA.  Justin

3   Cheongsiatmoy, M.D. reported his concerns to all the government agencies responsible

4   for investigating false claims and internally to senior employees of USC and Los

5   Angeles County.  Justin Cheongsiatmoy, M.D.'s beliefs were reasonably held, as

6   evidenced by actions by the U.S. Department of Justice, the State of California and the

7   County of Los Angeles.  USC is liable for violating California Insurance Code

8   § 1871.1(k) for the same reasons it is liable under the FCA and CFCA.

9        639.   As a direct and proximate result of USC and its affiliates' actions, Justin

10   Cheongsiatmoy, M.D. has suffered and will continue to suffer from loss of earnings,

11   other employment benefits, and other economic damages related to his termination.

12   Justin Cheongsiatmoy, M.D. has also incurred and continues to incur attorney's fees

13   and legal expenses.

14        640.   As a direct, foreseeable, and proximate result of USC and its affiliates'

15   unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress

16   damages, including, without limitation, humiliation, shame, anxiety, and

17   embarrassment in an amount to be proven at the time of trial.  The conduct of USC and

18   its affiliates described above was outrageous and was executed with malice, fraud, and

19   oppression, and with conscious disregard for Justin Cheongsiatmoy, M.D.'s rights.

20   USC and its affiliates acted with the intent and purpose of injuring Justin

21   Cheongsiatmoy, M.D. and deterring other employees and contractors from undertaking

22   protected activities in furtherance of the rights afforded under law.  Justin

23   Cheongsiatmoy, M.D. is therefore entitled to recover punitive damages in an amount

24   according to proof.

25

26

27

28

## ELEVENTH CAUSE OF ACTION

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Violations of Cal. Labor Code § 6310; Cal. Health and Safety Code § 1278.5, *et seq.*)

641.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein

642.   California Labor Code section 6310 makes it unlawful for an employer to discharge or in any manner discriminate against an employee for making a bona fide oral or written complaint to his or her employer or the relevant division or government entity of unsafe work practices in his employment or place of employment. *See* Cal. Lab. Code § 6310(b).  California Health and Safety Code section 1278.5 similarly makes it unlawful for an employer to in any manner discriminate or retaliate against an employee or member of the medical staff for presenting a grievance, complaint or report to medical staff, the medical facility or to a government entity.

643.   USC violated sections 6310 and 1278.5 by retaliating against Justin Cheongsiatmoy, M.D. for reporting his concerns about the unauthorized practice of medicine by USC's technologists and resident surgeons who were practicing on patients without appropriate supervision.  Justin Cheongsiatmoy, M.D. made bona fide complaints to USC that its practices had caused multiple patient injuries and deaths. USC retaliated against Justin Cheongsiatmoy, M.D. in ways described in detail in this Complaint, including by terminating his employment.  Justin Cheongsiatmoy, M.D.'s activities were substantial motivating reasons for USC's decision to fire Justin Cheongsiatmoy, M.D.

644.   As a direct and proximate result of USC's actions, Justin Cheongsiatmoy, M.D. has suffered and will continue to suffer from loss of earnings, other employment benefits, and other economic damages related to his termination.  Justin

Cheongsiatmoy, M.D. has also incurred and continues to incur attorney's fees and legal expenses.

645.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, anxiety, and embarrassment in an amount to be proven at the time of trial.

646.   The conduct of USC described above was outrageous and was executed with malice, fraud, and oppression, and with conscious disregard for Justin Cheongsiatmoy, M.D.'s rights.  USC acted with the intent and purpose of injuring Justin Cheongsiatmoy, M.D. and deterring other employees from undertaking protected activities in furtherance of the rights afforded under law.  Justin Cheongsiatmoy, M.D. is therefore entitled to recover punitive damages in an amount according to proof.

647.   A "person who willfully violates this section is guilty of a misdemeanor," in addition to a civil penalty.  *See* Health and Safety Code  § 1278.5(f), (b)(3).

## TWELFTH CAUSE OF ACTION

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Violation of Cal. Bus. and Prof. Code § 510)

648.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

649.   California Business and Professions Code section 510 protects health care providers "who advocate for appropriate health care for their patients" and bars employers from terminating "an employment or other contractual relationship" with a health care practitioner "principally for advocating for appropriate health care …"  *See* Cal. Bus. and Prof. Code § 510 (a), (c).

650. USC and its affiliates violated section 510 by retaliating against Justin Cheongsiatmoy, M.D. for reporting unauthorized practice of medicine by USC's technologists and resident surgeons who were practicing on patients without appropriate supervision. When Justin Cheongsiatmoy, M.D. made bona fide complaints to USC and its affiliates that their fraudulent and unsafe medical practices had caused multiple patient injuries and deaths, USC and its affiliates retaliated against Justin Cheongsiatmoy, M.D. in ways described in detail in this Complaint, including by terminating his employment. Justin Cheongsiatmoy, M.D.'s activities were substantial motivating reasons in the decision to terminate Justin Cheongsiatmoy, M.D.

651. As a direct and proximate result of USC's actions, Justin Cheongsiatmoy, M.D. has suffered and will continue to suffer from loss of earnings, other employment benefits, and other economic damages related to his termination. Justin Cheongsiatmoy, M.D. has also incurred and continues to incur attorney's fees and legal expenses.

652. As a direct, foreseeable, and proximate result of USC and its affiliates' unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, anxiety, and embarrassment in an amount to be proven at the time of trial. The conduct of USC and its affiliates described above was outrageous and was executed with malice, fraud, and oppression, and with conscious disregard for Justin Cheongsiatmoy, M.D.'s rights. USC and its affiliates acted with the intent and purpose of injuring Justin Cheongsiatmoy, M.D. and deterring other employees from undertaking protected activities in furtherance of the rights afforded under law. Justin Cheongsiatmoy, M.D. is therefore entitled to recover punitive damages in an amount according to proof.

## THIRTEENTH CAUSE OF ACTION

## ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

**(Unfair Competition, Cal. Bus. and Prof. Code § 17200)**

653.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

654.   As a result of USC's unlawful retaliation against Justin Cheongsiatmoy, M.D., USC is liable for unfair competition in violation of the California Business and Professions Code.  *See* Cal. Bus. & Prof. Code § 17200.

655.   USC, by engaging in the unlawful, unfair, deceptive, and fraudulent practices alleged herein, has enriched itself at the expense of Justin Cheongsiatmoy, M.D., and has gained an unfair competitive advantage over law-abiding employers who complied with applicable laws.

656.   As a remedy for USC's actions constituting unfair competition, USC is liable to pay restitution to Justin Cheongsiatmoy, M.D. in the amount of due in unpaid wages, plus interest, costs, expenses, and attorney's fees, in amounts to be proven at trial.  *See id.*, § 17203; Cal. Civ. Code § 3287; *id.*, § 3288.

## FOURTEENTH CAUSE OF ACTION

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Wrongful Termination in Violation of Public Policy)

657.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

658.   California Labor Code section 1102.5 reflects a broad public policy interest in encouraging workplace whistleblowers to report perceived unlawful conduct without fear of retaliation.  *See e.g.*, *Collier v. Superior Court*, 228 Cal.App.3d 1117 (1991). Similarly, important public policy is embodied in Government Code 12653;

California Insurance Code section 1871.7(k)); California Labor Code sections 232.5 and 6310; Health and Safety Code section 1278.5; and Business and Professions Code sections 510 and 17200.  A termination for reporting violations of any of these laws thus constitutes wrongful termination in violation of public policy.

659.   Because USC is liable for unlawful retaliation in violation of the Labor Code, USC is also liable for wrongful termination in violation of public policy.

660.   USC's termination of Justin Cheongsiatmoy, M.D.'s employment violated the fundamental public policy of the State of California that employers shall not discharge, retaliate against, or discriminate against any employee for making a complaint to their employer in which the employee has reasonable cause to believe that the information discloses a violation of a law or regulation.  *See* Cal. Lab. Code § 1102.5.

661.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

662.   As a further direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, and embarrassment, in an amount to be proven at time of trial.

663.   USC committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D., with an improper and evil motive amounting to malice, and in conscious disregard of Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D.  is thus entitled to recover punitive damages from USC in an amount according to proof.

664.   USC is also liable to pay Justin Cheongsiatmoy, M.D.'s attorney's fees and costs, as Justin Cheongsiatmoy, M.D.'s claims implicate an important right affecting the public interest.  *See* Cal. Code Civ. Pro. § 1021.5.

# FIFTEENTH CAUSE OF ACTION

## ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Violation of Cal. Lab. Code § 1050)

665.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

666.   California Labor Code section 1050 states that "Any person, or agent or officer thereof, who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor." *See* Cal. Lab. Code § 1050.

667.   Justin Cheongsiatmoy, M.D. can state a claim under section 1050.  After terminating Justin Cheongsiatmoy, M.D., USC's employees made false statements to another potential employer of Justin Cheongsiatmoy, M.D. that prevented Justin Cheongsiatmoy, M.D. from obtaining employment.  Specifically, USC's employees misrepresented the basis of Justin Cheongsiatmoy, M.D.'s termination, telling the potential employer that Justin Cheongsiatmoy, M.D. assaulted his colleagues, which is false.  "Under principles of *respondeat superior*, an employer may be held liable for a defamatory statement made by its employee."  *Kelly v. Gen. Tel. Co.*, 136 Cal. App. 3d 278, 284 (1982).

668.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

669.   As a further direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages,

1   including, without limitation, humiliation, shame, and embarrassment, in an amount to
2   be proven at time of trial.

3       670.   USC committed the acts herein despicably, maliciously, fraudulently, and
4   oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D.,
5   from an improper and evil motive amounting to malice, and in conscious disregard of
6   Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D. is thus entitled to
7   recover punitive damages from USC in an amount according to proof.

8       671.   USC will also be liable to Justin Cheongsiatmoy, M.D. for treble
9   damages. *See* Cal. Lab. Code § 1054.

10
11                        **SIXTEENTH CAUSE OF ACTION**
12
13       **ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE
       UNIVERSITY OF SOUTHERN CALIFORNIA**
14                              **(Defamation)**

15      672.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by
16   reference each and every allegation of the preceding paragraphs as though fully set
17   forth herein.

18      673.   Slander is a form of defamation, consisting of a false and unprivileged
19   oral publication.  *See* Cal. Civ. Code §§ 44, 46.  To establish a prima facie case for
20   slander, a plaintiff. must demonstrate an (1) oral publication (2) to third persons (3) of
21   specified false matter (4) that has a natural tendency to injure or that causes special
22   damage." *Mann v. Quality Old Time Service, Inc.* 120 Cal.App.4th 90, 106 (2004);
23   *City of Costa Mesa v. D'Alessio Invs., LLC*, 214 Cal. App. 4th 358, 375–76 (2013).
24   The defamatory statement must specifically refer to, or be "of and concerning," the
25   Justin Cheongsiatmoy, M.D. *Blatty v. New York Times Co.* 42 Cal.3d 1033, 1042
26   (1986).  In cases involving matters of purely private concern, the burden of proving
27   truth is on the defendant.  *Smith v. Maldonado*, 72 Cal.App.4th 637, 646 & n.5 (1999).

28

---

Where, as here, the defamatory statements related to a plaintiff's ability to perform in his profession, they constitute defamation *per se*, and injury is presumed.

674.   Justin Cheongsiatmoy, M.D. can state a defamation claim arising from his employment with USC.  First, USC published to Justin Cheongsiatmoy, M.D. and others false and defamatory reasons for the termination of his employment, including that he engaged in unprofessional and threatening behavior.  Moreover, USC stated to a third party that Justin Cheongsiatmoy, M.D. was fired because he assaulted his colleagues.  These statements are patently false and caused Justin Cheongsiatmoy, M.D. great injury, including lost employment opportunities and reputational harm. USC's employees made additional publications of the defamatory statements to other potential employers of Justin Cheongsiatmoy, M.D.  "Under principles of *respondeat superior*, an employer may be held liable for a defamatory statement made by its employee." *Kelly v. Gen. Tel. Co.*, 136 Cal. App. 3d 278, 284 (1982).  Moreover, USC will be responsible under a "self-publication" theory because it is reasonably foreseeable that Justin Cheongsiatmoy, M.D. will be compelled to repeat the false and defamatory statements in explaining why he was terminated.

675.   The defamatory statements made were understood as assertions of fact, and not as opinion.  Dr. Cheongsiatmoy believes this defamation will continue to be negligently, recklessly, and intentionally published and foreseeably republished by USC and its employees, and foreseeably republished by recipients of USC's publications, thereby causing additional injury and damages for which Plaintiff seeks redress by this action.

676.   The defamatory statements were made with hatred and ill will towards Dr. Cheongsiatmoy and the design and intent to injure him, his good name, his reputation, employment and employability. USC and its employees published these statements not with an intent to protect any interest intended to be protected by any privilege, but with negligence, recklessness and/or an intent to injure Dr. Cheongsiatmoy and destroy his

1  reputation.  Therefore, no privilege existed to protect USC from liability for any of

2  these aforementioned publications or republications.

3      677.   As a direct, foreseeable, and proximate result of USC's unlawful actions,

4  Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other

5  employment benefits and has incurred other economic losses.

6      678.   As a further direct, foreseeable, and proximate result of USC's unlawful

7  actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages,

8  including, without limitation, humiliation, shame, and embarrassment, in an amount to

9  be proven at time of trial.

10     679.   USC committed the acts herein despicably, maliciously, fraudulently, and

11 oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D.,

12 with an improper and evil motive amounting to malice, and in conscious disregard of

13 Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D. is thus entitled to

14 recover punitive damages from USC in an amount according to proof.

15

16              **SEVENTEENTH CAUSE OF ACTION**

17 **ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE**
**UNIVERSITY OF SOUTHERN CALIFORNIA**

18

19        **(Private Attorney General Act, Cal. Lab. Code § 2699.5)**

20     680.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by

21 reference each and every allegation of the preceding paragraphs as though fully set

22 forth herein.

23     681.   Claims for violations of the California Labor Code, including, without

24 limitation, California Labor Code §§ 98.6, 232.5, 1102.5 and 6310, may be enforced

25 through a claim pursuant to the Private Attorney General Act ("PAGA"). *See* Cal. Lab.

26 Code § 2699.5.

27     682.   The requirements of §2699 have been met; Justin Cheongsiatmoy, M.D.

28 filed with the Cal. Labor Workforce Development Agency (the "LWDA"), and served

USC with, notice of his intent to sue under PAGA.  Plaintiff did not receive a response from the LWDA notifying Plaintiff that the LWDA would investigate Plaintiff's alleged violations within 65 calendar days of the postmark date of Plaintiff's notice thereof; as such, Plaintiff is entitled to pursue a civil action at this time.  Cal. Lab. Code § 2699.3(a)(2)(A).  A true and correct copy of Plaintiff's initial notice to the LWDA and Defendant are attached hereto collectively. (Exhibit 149).  All conditions precedent to the addition of PAGA claims to this lawsuit have been fulfilled.

683.   Plaintiff brings this action on behalf of himself and all other aggrieved employees of Defendant who were subjected to any of the Labor Code violations alleged in the Complaint and Plaintiff's LWDA Notice, including, without limitation, violations of California Labor Code §§ 98.6, 232.5, 1102.5 and 6310.

684.   The failure to comply with each California Labor Code section herein mentioned entitles Plaintiff and other aggrieved employees to distinct and cumulative penalties under the PAGA, including, without limitation, under Labor Code section 2699.

685.   Pursuant to Labor Code section 2699(g)(1), Plaintiff is also entitled to an award of reasonable costs and attorneys' fees incurred in conjunction with claims brought pursuant to Labor Code section 2698 et seq. should he prevail on any of those claims.

## EIGHTEENTH CAUSE OF ACTION

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Harassment in Violation of Cal. Gov. Code section 12940(j)(1))

686.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

687.   At all times relevant to this Complaint, USC has been subject to the requirements of California Government Code section 12940, which applied to Justin Cheongsiatmoy, M.D. as an employee of USC.  Section 12940(j)(1) makes it unlawful for an employer or any person to harass an employee because of his or her national origin or ancestry. Harassment of an employee by someone other than an agent or supervisor is unlawful if the employer knows or should have known of this conduct and fails to take immediate and appropriate corrective action.

688.   During the course of Justin Cheongsiatmoy, M.D.'s employment, high ranking members of the USC Keck Division of Neurology, including, without limitation, Drs. Chui, Shilian, and Gonzalez, engaged in a campaign of severe and/or pervasive harassment against Justin Cheongsiatmoy, M.D. based on his national origin and ancestry.  The conduct ranged from name calling and threatening statements to personnel management actions carried out by the harassers and designed to communicate a hostile message.  *See Roby v. McKesson*, 47 Cal. 4th 686, 708 (2009); *see also Landucci v. State Farm Insurance Co.*, 65 F. Supp. 3d 694, 707 (N.D. Cal. 2014).

689.   At all times relevant to this Complaint, Drs. Chui and Gonzalez were "supervisors" within the meaning of California Government Code section 12926(t) because they had the authority, in the interest of USC, "to hire, transfer, suspend, lay-off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or to effectively recommend that action," and in connection with the foregoing were required to use independent judgment.  Because Drs. Chui and Gonzalez were supervisors as defined by the FEHA, USC is strictly liable for their acts of harassment.

690.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

691.   As a further direct, foreseeable, and proximate result of USC's unlawful

1   actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages,

2   including, without limitation, humiliation, shame, and embarrassment, in an amount to

3   be proven at time of trial.

4       692.   USC committed the acts herein despicably, maliciously, fraudulently, and

5   oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D.,

6   with an improper and evil motive amounting to malice, and in conscious disregard of

7   Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D. is thus entitled to

8   recover punitive damages from USC in an amount according to proof.

9       693.   USC is also liable to pay Justin Cheongsiatmoy, M.D.'s attorney's fees,

10   costs and interest pursuant to the FEHA.

11       694.   Prior to the filing of this Fourth Amended Complaint Justin

12   Cheongsiatmoy, M.D. filed a charge against USC with the California Department of

13   Fair Employment and Housing pursuant to section 12900 *et seq.* of the California

14   Government Code alleging the applicable claims described in this Fourth Amended

15   Complaint.  On June 21, 2021, the DFEH issued a "right to sue" letter.  True and

16   correct copies of the administrative complaint and the "right to sue" letter are attached

17   hereto collectively. (Exhibit 143).  All conditions precedent to the institution of this

18   lawsuit have been fulfilled.  The relevant causes of action are being asserted within one

19   year of the date that the DFEH issued its right to sue letter.

## NINETEENTH CAUSE OF ACTION

**ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE
UNIVERSITY OF SOUTHERN CALIFORNIA**

**(Failure to Prevent Harassment in Violation of Cal. Gov. Code section 12940(k))**

    695.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by
reference each and every allegation of the preceding paragraphs as though fully set
forth herein.

696.   California Government Code section 12940(k) makes it an unlawful employment practice for an employer to "fail to take all reasonable steps to prevent... harassment from occurring."  USC violated this provision by failing to prevent harassment against Justin Cheongsiatmoy, M.D., including, without limitation, the harassment described above.

697.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

698.   As a further direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, and embarrassment, in an amount to be proven at time of trial.

699.   USC committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D., with an improper and evil motive amounting to malice, and in conscious disregard of Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D. is thus entitled to recover punitive damages from USC in an amount according to proof.

700.   USC is also liable to pay Justin Cheongsiatmoy, M.D.'s attorney's fees, costs and interest pursuant to the FEHA.

## TWENTIETH CAUSE OF ACTION

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Negligent Hiring, Supervision and/or Retention)

701.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

702.   The harassing conduct of USC's employees, including, without limitation, Chui, Shilian, and Gonzalez, constitutes conduct rendering such employees unfit to perform the work for which they were hired.

703.   USC knew or should have known that such employees were unfit, and this unfitness created a particular risk of harassment to other employees, including Justin Cheongsiatmoy, M.D.

704.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

705.   As a further direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, and embarrassment, in an amount to be proven at time of trial.

706.   USC's negligence in hiring, supervising and/or retaining each such employee was a substantial factor in causing serious harassment of Justin Cheongsiatmoy, M.D. and harm resulting therefrom.

## <u>TWENTY-FIRST CAUSE OF ACTION</u>

### ON BEHALF OF JUSTIN CHEONGSIATMOY, M.D. AGAINST THE UNIVERSITY OF SOUTHERN CALIFORNIA

### (Intentional Infliction of Emotional Distress)

707.   Justin Cheongsiatmoy, M.D. re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

708.   The conduct of USC as described above, was extreme and outrageous. USC employees engaged in this conduct, consisting of serious harassment combined with other wrongful acts, with the intention of causing, or reckless disregard of the

probability of causing, severe emotional distress to Justin Cheongsiatmoy, M.D, both during the time of his employment with USC and thereafter.  USC knew or should have known about such harassing and wrongful conduct but authorized, ratified and/or failed to take appropriate corrective action with respect thereto.

709.   As a direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered substantial losses in earnings and other employment benefits and has incurred other economic losses.

710.   As a further direct, foreseeable, and proximate result of USC's unlawful actions, Justin Cheongsiatmoy, M.D. has suffered emotional distress damages, including, without limitation, humiliation, shame, and embarrassment, in an amount to be proven at time of trial.

711.   USC committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Justin Cheongsiatmoy, M.D., with an improper and evil motive amounting to malice, and in conscious disregard of Justin Cheongsiatmoy, M.D.'s rights.  Justin Cheongsiatmoy, M.D. is thus entitled to recover punitive damages from USC in an amount according to proof.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States of America, by and through Relator, prays for relief against Defendants as follows:

**Pursuant to the Federal False Claims Act:**

**TO THE UNITED STATES OF AMERICA AND TO QUI TAM PLAINTIFF:**

1.   For civil penalties of up to the maximum statutory amount to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to be presented to Medicare or Medicaid for payment;

2.   For treble damages resulting to the Medicare or Medicaid system from the conduct of Defendants;

3.   For pre- and post-judgment interest;

4.   For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

5.   That Qui Tam Plaintiff be awarded the maximum percentage of recovery allowed to it pursuant to the False Claims Act;;

6.   Together with all such further relief as may be just and proper.

**Pursuant to the California False Claims Act:**

**TO THE PEOPLE OF CALIFORNIA AND TO THE PEOPLE OF LOS ANGELES COUNTY AND TO QUI TAM PLAINTIFF:**

7.   For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted to presented to the State of California and/or Los Angeles County

8.   For treble damages resulting to the State of California and/or Los Angeles County and/or the Medi-Cal system from the conduct of Defendants, and each of them;

9.   For pre- and post-judgment interest;

10.  For reasonable attorneys' fees, costs, and expenses incurred in bringing this case;

11.  That Qui Tam Plaintiff be awarded the maximum percentage of any recovery allowed to it pursuant to the California False Claims Act;; and

12.  Together with all such further relief as may be just and proper.

**Pursuant to the California Insurance Frauds Prevention Act:**

**TO THE PEOPLE OF CALIFORNIA AND TO QUI TAM PLAINTIFF:**

13.  For the maximum allowable civil penalties to be imposed for each and every false and fraudulent claim for payment submitted, presented, or caused to be submitted or presented to an insurance company;

FOURTH AMENDED COMPLAINT                    CASE NO. CV 18-08311-ODW(AS)        249

14. For an assessment of three times the amount of each claim for compensation made by Defendants;

15. For pre- and post-judgment interest;

16. For reasonable attorneys' fees, costs, and expenses incurred in bringing this case;

17. For an award of such other and further relief as this Court deems just and proper; and

18. That the Qui Tam Plaintiff be awarded the maximum percentage of any recovery allowed to it pursuant to Cal. Ins. Code § 1871.7.

**TO PLAINTIFF, JUSTIN CHEONGSIATMOY M.D., FOR HARASSMENT, RETALIATION, WRONGFUL TERMINATION AND OTHER EMPLOYMENT VIOLATIONS:**

19. For relief necessary to make him whole including loss of career earning in the form of front and double backpay with interest, restitution, damage to reputation, consequential damages, special damage such as emotional distress, civil penalties, double damages, attorney's fees and costs as allowed by law;

20. That, as a result of USC's wrongful violation of public policy, he receives all necessary to make him whole pursuant to all applicable federal and state laws including punitive damages and such other and further relief as the Court deems just and proper;

21. For reinstatement with the same seniority status that Plaintiff would have had, pursuant to Labor Code § 6310(b), Labor Code § 1102.62, California Health and Safety Code § 1278.5 and California Government Code § 12653;

22. For penalties in accordance with PAGA, including, without limitation, under Labor Code sections 2699.

23. For pre- and post-judgment interest;

24. For other declaratory and injunctive relief, as appropriate; and

25. Together with all such further relief as may be just and proper.


Dated: September 1, 2021                    Respectfully Submitted,

By: _____/s/ Alice Chang_____
ALICE CHANG

_/s/ Marlan B. Wilbanks_____
MARLAN B. WILBANKS
(Admitted Pro Hac Vice)

*Attorneys for Relators and Plaintiff-Relator Justin Cheongsiatmoy, M.D. in his individual capacity*

## VII.  **JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.


Dated: September 1, 2021                    Respectfully Submitted,

By: _____/s/ Alice Chang_____
ALICE CHANG

_/s/ Marlan B. Wilbanks_____
MARLAN B. WILBANKS
(Admitted Pro Hac Vice)

*Attorneys for Relators and Plaintiff-Relator Justin Cheongsiatmoy, M.D. in his individual capacity*