1  MARLAN B. WILBANKS (SBN 758223 - Admitted Pro Hac Vice)
2  mbw@wilbanksgouinlock.com
   SUSAN S. GOUINLOCK (SBN 303217 - Admitted Pro Hac Vice)
3  ssg@wilbanksgouinlock.com
4  WILBANKS & GOUINLOCK, LLP
   3490 Piedmont Road, NE, Suite 1010
5  Atlanta, Georgia  30305
6  Telephone:  (404) 842-1075

7  ALICE CHANG (SBN 239761)
8  alicechangjdmba@gmail.com
   1301 Kenwood Road, Unit 159B
9  Seal Beach, CA 90740
10 Telephone: (714) 507-6161

11 ELIOT J. RUSHOVICH (SBN 252343)
12 eliot@riselawfirm.com
   LISA M. WATANABE-PEAGLER (SBN 258182)
13 lisa@riselawfirm.com
14 ELISSA A. WAIZMAN (SBN 329959)
   elissa@riselawfirm.com
15 RISE LAW FIRM, PC
16 8383 Wilshire Boulevard, Suite 315
   Beverly Hills, CA 90211
17 Telephone: (310) 728-6588

18

19  *Attorneys for Relators and Plaintiff-Relator*

20          **IN THE UNITED STATES DISTRICT COURT**

21        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

22

23  **[UNDER SEAL],**              **CASE NO. CV 18-08311-ODW(AS)**
                Plaintiffs,
24        v.                       **PART 5 OF 13**
                                   **(EXHIBITS 43 – 48)**
25  **[UNDER SEAL],**
26          Defendants.            **FOURTH AMENDED COMPLAINT**

27

28          **[FILED IN CAMERA AND UNDER SEAL**
            **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

FILED
CLERK, U.S. DISTRICT COURT
9/20/21
CENTRAL DISTRICT OF CALIFORNIA
BY:      SE      DEPUTY

MARLAN B. WILBANKS (SBN 758223 – Admitted Pro Hac Vice)
mbw@wilbanksgouinlock.com
SUSAN S. GOUINLOCK (SBN 303217 -Admitted Pro Hac Vice)
ssg@wilbanksgouinlock.com
WILBANKS & GOUINLOCK, LLP
3490 Piedmont Road, NE, Suite 1010
Atlanta, Georgia  30305
Telephone:  (404) 842-1075

ALICE CHANG (SBN 239761)
alicechangjdmba@gmail.com
1301 Kenwood Road, Unit 159B
Seal Beach, CA 90740
Telephone: (714) 507-6161

ELIOT J. RUSHOVICH (SBN 252343)
eliot@riselawfirm.com
LISA M. WATANABE-PEAGLER (SBN 258182)
lisa@riselawfirm.com
ELISSA A. WAIZMAN(SBN 329959)
elissa@riselawfirm.com
RISE LAW FIRM, PC
8383 Wilshire Boulevard, Suite 315
Beverly Hills, CA 90211
Telephone: (310) 728-6588

*Attorneys for Relators and Plaintiff-Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**.; **STATE OF CALIFORNIA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY,** | **CASE NO. CV 18-08311-ODW(AS)** <br><br> **PART 5 OF 13** <br> **(EXHIBITS 43 – 48)** <br><br> **FOURTH AMENDED COMPLAINT** |

1  **M.D**; and **LOS ANGELES COUNTY** *ex*
2  *rel.* **IONM LLC**, a Delaware corporation;
   and *ex rel.* **JUSTIN**
3  **CHEONGSIATMOY, M.D.**, and
4  **JUSTIN CHEONGSIATMOY, M.D.**, in
   his individual capacity
5
6              Plaintiffs,
7        v.
8
9  **UNIVERSITY OF SOUTHERN**
10 **CALIFORNIA**, a California corporation;
   and
11
12 **USC CARE MEDICAL GROUP, INC.**,
   a California corporation,
13
14             Defendants.
15
16
17
18
19        **[FILED IN CAMERA AND UNDER SEAL**
20        **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
21
22
23
24
25
26
27
28

FOURTH AMENDED COMPLAINT EXHIBITS PART 5 OF 13 (43-48)
CASE NO. CV 18-08311-ODW(AS)

# Exhibit 43







| Time | Priority | Text |
|------|----------|------|
| 8:50:37 AM | Medium | pt in the room |
| 9:58:28 AM | | Stored Impedance |
| 9:59:06 AM | Medium | hr 91 bp 89/54 map 63 temp core 37.5 |
| 9:59:24 AM | Medium | Soft bite block in before MEP testing |
| 10:00:03 AM | Medium | begin monitoring |
| 10:04:01 AM | Medium | baseline bilateral upper and lower ssep's and MEP's are adequate for monitoring |
| 10:24:49 AM | Medium | time out |
| 10:27:52 AM | Medium High | Begin Incision |
| 10:31:09 AM | Medium | exposing |
| 11:25:20 AM | Medium | scope in |
| 11:25:41 AM | Medium | MEP's stable |
| 11:35:03 AM | Medium | open dura |
| 11:38:36 AM | Medium | pt in burst |
| 11:42:37 AM | Medium | exposing aneurysm |
| 12:18:02 PM | Medium | cont exposing tumor |
| 13:23:25 PM | Medium | exposing tumor |
| 13:42:40 PM | Medium | aneurysm bleeding |
| 13:45:36 PM | Medium | ssep's on the right decrease in amp.surgeon informed |
| 13:47:20 PM | Medium | bilateral ssep's are decrease.surgeon informed |
| 13:49:08 PM | Medium | right side upper and lower ssep's are absent surgeon informed cortical |
| 13:50:39 PM | Medium | bilateral cort upper and lower are now absent informed surgeon |
| 13:53:43 PM | Medium | 76 bp 99/64 map 78 temp core 36.8 |
| 13:54:22 PM | Medium | closinfg |
| 14:00:35 PM | Medium | close |
| 14:06:08 PM | Medium | unable to do final MEP's due to emergency closing |
| 14:06:08 PM | | R LOWER Baseline |



# Exhibit 44

**LAC MEDICARE - Intraoperative Injury**



Intraoperative Note
* Final Report *

## * Final Report *

**Procedure Date:** 1/19/2018          **Study #:** LAC 18-019
**Referring Physician:** Spoonamore, MD     **Technician:** PP
**OR#:** 23
**Patient History:** 67F w/ hx of right total knee arthroplasty in Oct 2015, R foot surgery presenting with neck pain radiating to RUE, as well as LBP radiating to RLE, with RUE weakness. MRI done demonstrated severe cervical stenosis.
**Surgical Procedure:** anterior C4 corpectomy

**MONITORING MODALITIES:**
SSEPs (somatosensory evoked potentials) TcMEPs (transcranial motor evoked potentials) and free run EMG.

**RESULTS:**
During the procedure the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's motor evoked potentials were smaller and nonreliable in bilateral deltoid and arms, all other potentials amplitudes were adequate for monitoring bilaterally. These waveforms remained stable throughout the procedure. No adverse electrodiagnostic events were encountered during monitoring. 6.0 hours were spent monitoring, and the surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:**
Somatosensory evoked potentials and Transcranial Motor evoked potentials were continuously monitored during surgery. The following changes were observed. Transient Train of EMG observed in bilateral arms and left deltoid. Motor evoked potentials were lost in right hand during cage trial, small variable motor evoked potential were present in right hand during closing.

Please see comment.

**COMMENT:** The changes seen in the right hand motor evoked potentials during corpectomy suggest that an interruption of this pathway occurred. Clinical correlation is strongly advised.

Further monitoring data is available by contacting the Intraoperative Neurophysiological Monitoring department.

**Signature Line**
Electronically Signed on 01/19/18 16:40 PST

Parikh, Pooja, Department

Neurosurgery Inpatient Progress Note
' Final Report *

**acetaminophen 325 mg Tab**  650 mg 2 tabs, Oral, Q6H-INT
**acetaminophen-HYDROcodone 325 mg-10 mg Tab**  2 tabs, Oral, Q6H-INT
**acetaminophen-HYDROcodone 325 mg-5 mg Tab**  2 tabs, Oral, Q6H-INT
**albuterol 90 mcg/inh INH 8 gm**  2 puffs, Inh-Oral, Q4H
**dextrose 50% INJ Syringe 50 mL**  25 mL, IV Push, Q15MIN-INT
**dextrose 50% INJ Syringe 50 mL**  50 mL, IV Push, Q15MIN-INT
**glucagon 1 mg INJ PWVL**  1 mg 1 mL, Intramuscular, Q15MIN-INT
**hydrALAZINE 20 mg/mL INJ 1 mL**  10 mg 0.5 mL, IV Push, Q6H-INT
**HYDROmorphone 2 mg/mL INJ 1 mL**  0.2 mg 0.1 mL, IV Push, Q2H
**labetalol 5 mg/mL INJ Syringe 4 mL**  10 mg 2 mL, IV Push, Q6H-INT
**magnesium hydroxide 400 mg/5 mL Susp 30 mL UD**  30 mL, Oral, Q12H-INT
**ondansetron 2 mg/mL INJ 2 mL**  4 mg 2 mL, IV Push, Q6H-INT
**senna 8.6 mg Tab**  17.2 mg 2 tabs, Oral, ONCE

**Physical Exam:**
A&OX3
PERRLA
FS TML EOMI

|   | D | B | WE | T | HG | IO |
|---|---|---|----|---|----|----|
| R | 3 | 4- | 4 | 4 | 4 | 4 |
| L | 5 | 5 | 5 | 5 | 5 | 5 |

|   | HF | KE | DF | EHL | PF |
|---|----|----|----|-----|----|
| R | 5 | 5 | 5 | 5 | 5 |
| L | 5 | 5 | 5 | 5 | 5 |

no clonus
DTR's 2+
SILTx4
inc CDI
JP 40 SS
in cervical collar

**Assessment and Plan**
67F w/ cervical stenosis s/p C4 corpectomy 1/19/18.

Neuro:
- pt with RUE weakness postop
- MRI c-spine and Rt brachial plexus
- decadron 6q6
- continue JP to gravity
- Post-op CT 1/19/18 - hardware in place

Operative Report
* Final Report *

using awake fiberoptic with induction of general anesthesia without any complication. MAPs were kept above 85 during induction. Appropriate IVs and arterial line were then placed. The patient's head was then placed on a donut, and care was taken not to extend the neck too much. Fluoroscopy was then used to localize the correct level for the incision. The incision was then marked, prepped, and draped in usual sterile fashion. A surgical time-out was then performed to confirm the patient and correct surgical procedure. The incision was then infiltrated with 0.5% lidocaine with epinephrine. An incision was made using a 10 blade. Monopolar electrocautery was then used to dissect down to the level of the platysma. Supraplatysmal and subplatysmal dissections were then performed using Metzenbaum scissors. The medial aspect of the sternocleidomastoid muscle was localized. We then palpated the carotid sheath laterally. Dissection was then carried out using a combination of Metzenbaum scissors and Kittners down to the level of the spine. Kittners were then used to dissect off the prevertebral fascia. Once the spine was exposed, a bent spinal needle was then introduced into the disk and intraoperative fluoroscopy was then obtained to confirm that we were indeed at the C3-4 level. The longus colli muscle and rest of the prevertebral fascia were then dissected off the bottom of C3 to the top of C5 using monopolar cautery. Trimline retractors were then placed into the surgical site, and Caspar pins were then placed into C3 and C5 to provide distraction. Diskectomy was then performed at C3-4, starting with a 15 blade to make incision and then pituitary rongeurs were used to remove disk material. A combination of curettes was then used to remove the rest of the disk as well as a high-speed drill was used to drill down to the posterior aspect of the disk. Curettes were then used to expose the PLL. The PLL was noted to be extremely calcified and stuck to the dura. During the process of dissecting the PLL off the dura, CSF leak was noted. After adequate diskectomy at C3-4, diskectomy was performed at C4-5, as previously described, down to the level of the dura. Once diskectomy was performed here, the C4 corpectomy was performed using a combination of high-speed drill and Leksell rongeur. The drill was used to drill all the way down to the posterior aspect of the C4 vertebral body, and Kerrison rongeurs were then used to remove the rest of the body. The PLL was then dissected off the dura using a combination of nerve hooks and Kerrison rongeurs. Once the PLL was completely dissected, attention was turned to the neural foramen, especially on the right side. This was decompressed using nerve hook and Kerrison rongeurs. During this time, motors were noted to be stable. At this point, hemostasis was achieved and attention was turned to the durotomy. A 2 x 2 DuraGen was cut and placed onto the dura, and a layer of DuraSeal was then sprayed over the DuraGen with no further egress of CSF noted. At this time, the high-speed drill was then used to shape the C3 inferior endplate and the C5 inferior endplate to receive the expandable cage. A 14 mm expandable cage was then filled with a combination of Fibergraft and autograft and then introduced into the corpectomy site. During expansion of the cage, neuromonitoring noted a decrease in the right upper extremity motors. The cage was removed, and the corpectomy site was examined without any evidence of compression. Then 10 mg of Decadron was given and MAPs were maintained above 85 at that time. The expandable cage was then reintroduced and expanded. Fluoroscopy shot was then taken to confirm appropriate positioning of the cage. A 34 mm plate was then introduced into the surgical site, and 14 mm variable screws were then used to secure the top of the plate to C3 and then 16 mm fixed screws were used to secure the bottom of the plate to C5. Fluoroscopy was then taken to confirm final position of all hardware, and the plate screws were then final tightened. Then 1 L of antibiotic irrigation was used to irrigate out the wound. Hemostasis was then achieved using a combination of bipolar cautery and Surgicel. A 7 flat JP was introduced into the surgical site. The platysma was closed using 2-0 Vicryl sutures, the deep dermal layer was closed using 3-0 Vicryl sutures, and the skin was closed using a 4-0 Monocryl subcuticular stitch. Dermabond was then used to cover the surgical incision. The patient was then placed in a cervical collar at that time. The patient was then extubated and taken to the intensive care unit in stable condition. All sponge and needle counts were correct at the end of the procedure. Neuromonitoring at the end of the case showed that we had a decrease in the right upper extremity motors that did not return at the end of the case. The patient's condition at the end of the operation was stable.

Dictated By: Elliot Thomas Min, MD

Mark J. Spoonamore, MD

ETM/MODL
JOB #:

































Intraoperative Note
* Final Report *



## * Final Report *

**Procedure Date:** 1/19/2018          **Study #:** LAC 18-019
**Referring Physician:** Spoonamore, MD   **Technician:** PP
**OR#:** 23
**Patient History:** 67F w/ hx of right total knee arthroplasty in Oct 2015, R foot surgery presenting with neck pain radiating to RUE, as well as LBP radiating to RLE, with RUE weakness. MRI done demonstrated severe cervical stenosis.
**Surgical Procedure:** anterior C4 corpectomy

### MONITORING MODALITIES:
SSEPs (somatosensory evoked potentials) TcMEPs (transcranial motor evoked potentials) and free run EMG.

### RESULTS:
During the procedure the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's motor evoked potentials were smaller and nonreliable in bilateral deltoid and arms, all other potentials amplitudes were adequate for monitoring bilaterally. These waveforms remained stable throughout the procedure. No adverse electrodiagnostic events were encountered during monitoring. 6.0 hours were spent monitoring, and the surgeons were kept informed of the monitoring status and any significant changes.

### IMPRESSION:
Somatosensory evoked potentials and Transcranial Motor evoked potentials were continuously monitored during surgery. The following changes were observed. Transient Train of EMG observed in bilateral arms and left deltoid. Motor evoked potentials were lost in right hand during cage trial, small variable motor evoked potential were present in right hand during closing.

Please see comment.

COMMENT: The changes seen in the right hand motor evoked potentials during corpectomy suggest that an interruption of this pathway occurred. Clinical correlation is strongly advised.

Further monitoring data is available by contacting the Intraoperative Neurophysiological Monitoring department.

**Signature Line**
Electronically Signed on 01/19/18 16:40 PST

Parikh, Pooja, Department

 

Intraoperative Note
* Final Report *





Operative Report
* Final Report *



# * Final Report *

**Operative Report**
REPORT OF OPERATION

DEPARTMENT: ORTHOPAEDIC SURGERY-OS   DATE OF OPERATION: January 19, 2018

ATTENDING SURGEON: Mark J. Spoonamore, MD

DICTATED BY: Elliot Thomas Min, MD

OPERATING SURGEON: Elliot Thomas Min, MD

ASSISTANT(S): 1. Elliot Thomas Min, MD.
2. Marie Nicole Dusch, MD.

PREOPERATIVE DIAGNOSIS: Cervical stenosis.

POSTOPERATIVE DIAGNOSIS: Cervical stenosis.

PROCEDURE PERFORMED: C4 corpectomy.

ANESTHESIA: General anesthesia was used.

FINDINGS: Acute herniated disk at C3-4 and C4-5.

COMPLICATIONS: There was a CSF leak that was closed with DuraGen and DuraSeal. Loss of right upper extremity motors during the case.

NEUROMONITORING: Performed using MEPS and SSEPs.

IMPLANTS: The vendor was Zimmer Biomet. We used an expandable 14 mm titanium cage that was filled with Fibergraft mixed with autograft. A 34 mm plate was used with 14 mm variable top screws and 16 mm fixed bottom screws.

HISTORY: Patient was a 67-year-old female with history of right total knee arthroplasty and right foot surgery who presented with neck pain radiating into the right upper extremity as well as low back pain radiating into the right lower extremity and right upper extremity weakness. MRI was done demonstrating severe cervical stenosis. On exam, the patient was noted to be weak in the right arm with 4- to 4 from the biceps down to the interossei, with 5 in the deltoid and a positive right Hoffmann sign. In the right lower extremity, she was noted to be 4's throughout. Given the severe cervical stenosis as well as the patient's weakness and neck pain, it was decided to offer the patient a C4 corpectomy for decompression and fusion. The risks, benefits, and alternatives associated with the surgery were discussed in detail with the patient. Risks included but were not limited to infection, bleeding, nerve root or spinal cord injury, paralysis or loss of bowel or bladder function, CSF leak, postoperative back pain, instability, or reoperation. Medical complications included heart attack, stroke, DVT, PE, pneumonia, and possibly death. Despite the risks of the surgery, she wished to continue and consented to procedure.

DESCRIPTION OF PROCEDURE: The patient was brought back to the operating room. She underwent endotracheal intubation




Operative Report
* Final Report *

using awake fiberoptic with induction of general anesthesia without any complication. MAPs were kept above 85 during induction. Appropriate IVs and arterial line were then placed. The patient's head was then placed on a donut, and care was taken not to extend the neck too much. Fluoroscopy was then used to localize the correct level for the incision. The incision was then marked, prepped, and draped in usual sterile fashion. A surgical time-out was then performed to confirm the patient and correct surgical procedure. The incision was then infiltrated with 0.5% lidocaine with epinephrine. An incision was made using a 10 blade. Monopolar electrocautery was then used to dissect down to the level of the platysma. Supraplatysmal and subplatysmal dissections were then performed using Metzenbaum scissors. The medial aspect of the sternocleidomastoid muscle was localized. We then palpated the carotid sheath laterally. Dissection was then carried out using a combination of Metzenbaum scissors and Kittners down to the level of the spine. Kittners were then used to dissect off the prevertebral fascia. Once the spine was exposed, a bent spinal needle was then introduced into the disk and intraoperative fluoroscopy was then obtained to confirm that we were indeed at the C3-4 level. The longus colli muscle and rest of the prevertebral fascia were then dissected off the bottom of C3 to the top of C5 using monopolar cautery. Trimline retractors were then placed into the surgical site, and Caspar pins were then placed into C3 and C5 to provide distraction. Diskectomy was then performed at C3-4, starting with a 15 blade to make incision and then pituitary rongeurs were used to remove disk material. A combination of curettes was then used to remove the rest of the disk as well as a high-speed drill was used to drill down to the posterior aspect of the disk. Curettes were then used to expose the PLL. The PLL was noted to be extremely calcified and stuck to the dura. During the process of dissecting the PLL off the dura, CSF leak was noted. After adequate diskectomy at C3-4, diskectomy was performed at C4-5, as previously described, down to the level of the dura. Once diskectomy was performed here, the C4 corpectomy was performed using a combination of high-speed drill and Leksell rongeur. The drill was used to drill all the way down to the posterior aspect of the C4 vertebral body, and Kerrison rongeurs were then used to remove the rest of the body. The PLL was then dissected off the dura using a combination of nerve hooks and Kerrison rongeurs. Once the PLL was completely dissected, attention was turned to the neural foramen, especially on the right side. This was decompressed using nerve hook and Kerrison rongeurs. During this time, motors were noted to be stable. At this point, hemostasis was achieved and attention was turned to the durotomy. A 2 x 2 DuraGen was cut and placed onto the dura, and a layer of DuraSeal was then sprayed over the DuraGen with no further egress of CSF noted. At this time, the high-speed drill was then used to shape the C3 inferior endplate and the C5 inferior endplate to receive the expandable cage. A 14 mm expandable cage was then filled with a combination of Fibergraft and autograft and then introduced into the corpectomy site. During expansion of the cage, neuromonitoring noted a decrease in the right upper extremity motors. The cage was removed, and the corpectomy site was examined without any evidence of compression. Then 10 mg of Decadron was given and MAPs were maintained above 85 at that time. The expandable cage was then reintroduced and expanded. Fluoroscopy shot was then taken to confirm appropriate positioning of the cage. A 34 mm plate was then introduced into the surgical site, and 14 mm variable screws were then used to secure the top of the plate to C3 and then 16 mm fixed screws were used to secure the bottom of the plate to C5. Fluoroscopy was then taken to confirm final position of all hardware, and the plate screws were then final tightened. Then 1 L of antibiotic irrigation was used to irrigate out the wound. Hemostasis was then achieved using a combination of bipolar cautery and Surgicel. A 7 flat JP was introduced into the surgical site. The platysma was closed using 2-0 Vicryl sutures, the deep dermal layer was closed using 3-0 Vicryl sutures, and the skin was closed using a 4-0 Monocryl subcuticular stitch. Dermabond was then used to cover the surgical incision. The patient was then placed in a cervical collar at that time. The patient was then extubated and taken to the intensive care unit in stable condition. All sponge and needle counts were correct at the end of the procedure. Neuromonitoring at the end of the case showed that we had a decrease in the right upper extremity motors that did not return at the end of the case. The patient's condition at the end of the operation was stable.

Dictated By: Elliot Thomas Min, MD

Mark J. Spoonamore, MD

ETM/MODL
JOB #: ▨▨▨▨▨▨

**Signature Line**

Operative Report
* Final Report *

Electronically Signed on 01/24/18 22:56 PST
_____
Min, Elliot Thomas, MD

Electronically Signed on 02/14/18 09:01 PST
_____
Spoonamore, Mark J., MD

Neurosurgery Inpatient Progress Note
* Final Report *

# * Final Report *

**Neurosurgery ICU Progress Note**
**Subjective**
NAEON. s/p C4 corpectomy and laminectomy. CT C-spine done - hardware in place.

**Objective**
**Vital Signs (last 24 hrs)**

| | Last Charted | Minimum | Maximum |
|---|---|---|---|
| Temp | L 35.7 DegC (Axillary) (01/20 00:00) | L 35.7 DegC (Axillary) (01/20 00:00) | 37.1 DegC (Axillary) (01/19 17:15) |
| HRMon | 53 (01/20 04:00) | L 45 (01/20 00:30) | 94 (01/19 17:22) |
| RR | 24 (01/20 04:00) | 10 (01/19 20:30) | H 28 (01/19 17:22) |
| SBP | H 164 (01/20 04:00) | 116 (01/20 00:00) | H 164 (01/20 04:00) |
| DBP | 72 (01/20 04:00) | 59 (01/19 17:30) | 84 (01/20 00:00) |
| SpO2 | 100 (01/20 04:00) | 90 (01/19 10:05) | 100 (01/19 06:10) |

**Labs** (Last four charted values)
| | | | | |
|---|---|---|---|---|
| WBC | 7.2 (JAN 19) | 6.9 (JAN 19) | | |
| Hgb | L 10.7 (JAN 19) | L 11.1 (JAN 19) | | |
| Hct | L 33.7 (JAN 19) | L 33.6 (JAN 19) | | |
| Plt | 165 (JAN 19) | 201 (JAN 19) | | |
| Na | H 146 (JAN 19) | H 148 (JAN 19) | | |
| K | 4.3 (JAN 19) | 3.9 (JAN 19) | | |
| CO2 | 22 (JAN 19) | 25 (JAN 19) | | |
| Cl | 108 (JAN 19) | 109 (JAN 19) | | |
| Cr | 0.59 (JAN 19) | 0.67 (JAN 19) | | |
| BUN | 9 (JAN 19) | 8 (JAN 19) | | |
| Glucose Random | H 143 (JAN 19) | H 157 (JAN 19) | | |
| Ca | L 8.4 (JAN 19) | L 8.2 (JAN 19) | | |
| PT | H 14.7 (JAN 19) | H 15.4 (JAN 19) | | |
| INR | H 1.17 (JAN 19) | H 1.24 (JAN 19) | | |

| | Recorded | Input | Output | Balance |
|---|---|---|---|---|
| 01/20 | 07:00-05:38 | 0 | 0 | 0 |
| | | | | |
| 01/19 | 7a - 3p | 2049.75 | 1950 | 99.75 |
| | 3p - 11p | 2822.843 | 1375 | 1447.843 |
| | 11p - 7a | 497.12 | 300 | 197.12 |
| | 24hr total | 5369.713 | 3625 | 1744.713 |

**Medications (20) Active**
Scheduled: (5)
**ceFAZolin 100 mg/mL in SWI INJ CMPD** 1 gm 10 mL, IVPB, PRE-OP
**dexamethasone 4 mg/mL INJ 1 mL** 6 mg 1.5 mL, IV Push, Q6H
**docusate sodium 100 mg Cap** 100 mg 1 caps, Oral, BID
**famotidine 10 mg/mL INJ 2 mL** 20 mg 2 mL, IV Push, Q12H
**insulin regular 100 units/mL INJ 3 mL** MODERATE CORRECTIONAL DOSE, Subcutaneous, ACHS
Continuous: (2)
**phenylephrine CAPS Premix in NS 40 mg [100 mcg/min] + Premix NS 250 mL** 250 mL, IV Continuous, 37.5 mL/hr
**Sodium Chloride 0.9% with KCl 20 mEq/L 1,000 mL** 1,000 mL, IV Continuous, 100 mL/hr
PRN: (13)



Neurosurgery Inpatient Progress Note
\* Final Report \*

**acetaminophen 325 mg Tab**  650 mg 2 tabs, Oral, Q6H-INT
**acetaminophen-HYDROcodone 325 mg-10 mg Tab**  2 tabs, Oral, Q6H-INT
**acetaminophen-HYDROcodone 325 mg-5 mg Tab**  2 tabs, Oral, Q6H-INT
**albuterol 90 mcg/inh INH 8 gm**  2 puffs, Inh-Oral, Q4H
**dextrose 50% INJ Syringe 50 mL**  25 mL, IV Push, Q15MIN-INT
**dextrose 50% INJ Syringe 50 mL**  50 mL, IV Push, Q15MIN-INT
**glucagon 1 mg INJ PWVL**  1 mg 1 mL, Intramuscular, Q15MIN-INT
**hydrALAZINE 20 mg/mL INJ 1 mL**  10 mg 0.5 mL, IV Push, Q6H-INT
**HYDROmorphone 2 mg/mL INJ 1 mL**  0.2 mg 0.1 mL, IV Push, Q2H
**labetalol 5 mg/mL INJ Syringe 4 mL**  10 mg 2 mL, IV Push, Q6H-INT
**magnesium hydroxide 400 mg/5 mL Susp 30 mL UD**  30 mL, Oral, Q12H-INT
**ondansetron 2 mg/mL INJ 2 mL**  4 mg 2 mL, IV Push, Q6H-INT
**senna 8.6 mg Tab**  17.2 mg 2 tabs, Oral, ONCE


**Physical Exam:**
A&OX3
PERRLA
FS TML EOMI

|    | D | B | WE | T | HG | IO |
|----|---|---|----|---|----|----|
| R  | 3 | 4- | 4 | 4 | 4  | 4  |
| L  | 5 | 5 | 5 | 5 | 5  | 5  |

|    | HF | KE | DF | EHL | PF |
|----|----|----|----|----|----|
| R  | 5  | 5  | 5  | 5  | 5  |
| L  | 5  | 5  | 5  | 5  | 5  |

no clonus
DTR's 2+
SILTx4
inc CDI
JP 40 SS
in cervical collar

**Assessment and Plan**
67F w/ cervical stenosis s/p C4 corpectomy 1/19/18.

Neuro:
- pt with RUE weakness postop
- MRI c-spine and Rt brachial plexus
- decadron 6q6
- continue JP to gravity
- Post-op CT 1/19/18 - hardware in place

CV:
- HDS
- cont a-line
- MAP > 85, phenylephrine PRN

Pulm:
- Tolerating RA

FEN/GI:
- CLD
- d/c IVF 100cc/hr NS when tolerating PO

GU:
- d/c foley
- Adequate UOP

Neurosurgery Inpatient Progress Note
* Final Report *

Heme/ID:
- Afebrile, WBC wnl
- hold SQH

Endo:
- Replete lytes PRN

Activity: Bedrest w/ bathroom privileges
Lines: piv, Foley
PPx: scds
Code: Full
Dispo: ICU for post-operative monitoring

**NSG Red**
Tang
Bonney
Min
Attn Spoonamore

**Signature Line**
Electronically Signed on 01/20/18 20:04 PST
_____

Tang, Liyang, MD.

Electronically Signed on 01/20/18 10:29 PST
_____

Min, Elliot Thomas, MD

Electronically Signed on 01/26/18 09:39 PST
_____

Bonney, Phillip Alan, MD

Electronically Signed on 02/14/18 09:01 PST
_____

Spoonamore, Mark J., MD

in OR Intraoperative Record
nal Report *

## * Final Report *

### Main OR Intraop Nursing Record (Verified)

#### SC Main OR Intraop Nursing Record Summary

| | |
|---|---|
| imary Physician: | Spoonamore, Mark J. |
| ase Number: | USCOR-2018-326 |
| nalized Date/Time: | 01/19/18 17:20:21 |
| :. Name: | |
| O.B./Sex: | |
| ed Rec #: | |
| ysician: | Spoonamore, Mark J. |
| nancial #: | |
| :. Type: | I |
| om/Bed: | OR/03 |
| lmit/Disch: | 01/19/18 05:31:35 - |
| stitution: | |

#### afety Checklist 2) Time Out - USC MOR

e-Care Text:
    A.10 Confirms patient identity A.20 Verifies operative procedure, surgical site, and laterality A.20.1 Verifies
    consent for planned procedure A.30 Verifies allergies
                    **Entry 1**

| | | | |
|---|---|---|---|
| nal Time Out was onducted based on e DHS Final Time t ecklist/Standards: | Yes | **Comments** | N/A |
| l Time Out rticipants ceased ctivity, confirmed tient, site, ocedure, and nsents | Yes | **Comments** | N/A |
| me Out Members | Min, Elliot Thomas, Jarvina, Ronald | **Time Out Time** | 01/19/18 11:11:00 |

st-Care Text:
    E.30 Evaluates verification process for correct patient, site, side, and level surgery

#### urgical Procedures - USC MOR

e-Care Text:
    A.20 Verifies operative procedure, sugical site, and laterality A.20.2 Assesses the risk for unintended
    retained foreign body Im.20 Performs required counts
                    **Entry 1**

| | | | |
|---|---|---|---|
| ocedure scription rocedure | Fusion Spine Cervical Anterior and Discectomy | **Procedure Code** | ARTHRD ANT MIN DISCECT INTERBODY CERV BELOW C2 |
| odifiers | Cervical | **Additional Procedure Detail** | C4 anterior corpectomy and fusion |
| imary Procedure | Yes | **Attending Surgeon of Record** | Spoonamore, Mark J. |
| :art | 01/19/18 11:14:00 | **Stop** | 01/19/18 16:25:00 |
| esthesia Type | General | **Surgical Service** | Orthopedic (SN) |
| und Class | 1-Clean | | |




in OR Intraoperative Record

nal Report *

ost-Care Text:
    O.730 The patinet's care is consistent with the individualized perioperative plan of care

ase Times - USC MOR

### Entry 1

| | | | |
|---|---|---|---|
| atient | | | |
| atient In Room Time | 01/19/18 09:50:00 | Patient Out Room Time | 01/19/18 17:13:00 |
| ase | | | |
| rocedure Start Time | 01/19/18 11:14:00 | Procedure Stop Time | 01/19/18 16:25:00 |

ase Attendance - USC MOR

| Entry 1 | | Entry 2 | | Entry 3 | |
|---|---|---|---|---|---|
| se Attendee | Yu RN, Kyong | Spoonamore, Mark J. | | Park, Ellen Jiwon | |
| le Performed | Scrub - Relief | Surgeon - Attending | | Anesthesiologist - Attending | |
| me In | 01/19/18 13:40:00 | 01/19/18 11:30:00 | | 01/19/18 09:30:00 | |
| me Out | 01/19/18 14:10:00 | 01/19/18 11:38:00 | | 01/19/18 17:13:00 | |
| ocedure(s) | Fusion Spine Cervical Anterior and Disce(Cervical) | Fusion Spine Cervical Anterior and Disce(Cervical) | | Fusion Spine Cervical Anterior and Disce(Cervical) | |

| Entry 4 | | Entry 5 | | Entry 6 | |
|---|---|---|---|---|---|
| se Attendee | Ortiz RN, Vanessa | Min, Elliot Thomas | | Kin, Natalie | |
| le Performed | Scrub - Primary | Surgical Resident | | Circulator - Relief | |
| me In | 01/19/18 09:50:00 | 01/19/18 09:50:00 | | 01/19/18 12:30:00 | |
| me Out | 01/19/18 17:13:00 | 01/19/18 17:13:00 | | 01/19/18 13:12:00 | |
| ocedure(s) | Fusion Spine Cervical Anterior and Disce(Cervical) | Fusion Spine Cervical Anterior and Disce(Cervical) | | Fusion Spine Cervical Anterior and Disce(Cervical) | |

| Entry 7 | | Entry 8 | | Entry 9 | |
|---|---|---|---|---|---|
| se Attendee | Jarvina, Ronald | Estrella RN, Segundo | | Dusch, Marie Nicole | |
| le Performed | CRNA | Scrub - Relief | | Surgical Resident | |
| me In | 01/19/18 09:30:00 | 01/19/18 10:45:00 | | 01/19/18 09:50:00 | |
| me Out | 01/19/18 17:13:00 | 01/19/18 11:01:00 | | 01/19/18 17:13:00 | |
| ocedure(s) | Fusion Spine Cervical Anterior and Disce(Cervical) | Fusion Spine Cervical Anterior and Disce(Cervical) | | Fusion Spine Cervical Anterior and Disce(Cervical) | |

| Entry 10 | | Entry 11 | | Entry 12 | |
|---|---|---|---|---|---|
| se Attendee | Chu RN, Jannie | Baek, Man | | Andal RN, Ryan | |
| le Performed | Circulator - Primary | Radiology Tech | | Circulator - Relief | |
| me In | 01/19/18 09:50:00 | 01/19/18 11:32:00 | | 01/19/18 16:10:00 | |
| me Out | 01/19/18 17:13:00 | 01/19/18 16:05:00 | | 01/19/18 16:26:00 | |
| ocedure(s) | Fusion Spine Cervical Anterior and Disce(Cervical) | Fusion Spine Cervical Anterior and Disce(Cervical) | | Fusion Spine Cervical Anterior and Disce(Cervical) | |

eneral Comments:
    STAN REP, MS in 1440 and out 1502

atheter, Drains, Tub - USC MOR

re-Care Text:
    A.310 Identifies factors associated with an increased risk for hemorrhage or fluid and electrolyte imbalance
    Im.250 Administers care to invasive device sites







in OR Intraoperative Record
..nal Report *

| | Entry 1 | Entry 2 |
|---|---|---|
| ..vice Description | TRAY CATHETERIZATION SURESTEP BARDEX COMPLETE CARE STATLOCK 16FR URINE METER | DRAIN INCISION 20CMX7MM SILICONE FULL PERFORATION HUBLESS RADIOPAQUE STERILE |
| ..vice Type | Indwelling | Bulb Reservoir |
| ..cation | Bladder, Urethra | Neck |
| ..lloon Inflation | 10 ml | |
| ..ount | | |
| ..cation Detail | | |
| ..esent on Arrival? | No | No |
| ..serted By | Chu RN, Jannie | Min, Elliot Thomas |
| ..'d at End of Case? | No | No |
| ..'d By | | |
| ..ainage Details | | |
| ..rainage? | Yes | Yes |
| ..mount | Measured in Milliliters (mL) | Measured in Milliliters (mL) |
| ..olor | Yellow | Red |
| ..onsistency | Watery | Thick |
| ..rainage System | Dependent drainage bag | Suction Reservoir |
| ..rainage Type | | Serosanguineous |
| ..dor | | |
| ..tcome Met (O.60) | Yes | Yes |

**..st-Care Text:**

    E.340 Evaluates tubes and drains are intact and functioning as planned O.60 Patient is free from signs and symptoms of injury caused by extraneous objects

**..ounts Verification - USC MOR**

**..e-Care Text:**

    A.20 Verifies operative procedure, sugical site, and laterality A.20.2 Assesses the risk for unintended retained foreign body Im.20 Performs required counts

| | Entry 1 | | |
|---|---|---|---|
| ..ocedure | Fusion Spine Cervical Anterior and Disce(Cervical) | | |
| ..itial Counts | | | |
| ..nitial Counts Performed By | Chu RN, Jannie, Ortiz RN, Vanessa | Items included in the Initial Count | Sponges, Sharps |
| ..vity Count | | | |
| ..osing Counts | | | |
| ..losing Counts Performed By | Andal RN, Ryan, Ortiz RN, Vanessa | Items included in the Closing Count | Sponges, Sharps |
| ..nal Counts | | | |
| ..inal Count Status | Correct | Did you use Radio Frequency Wanding for this case? | No |
| ..inal Counts Performed By | Chu RN, Jannie, Ortiz RN, Vanessa | Items Included in Final Count | Sponges, Sharps |
| ..tcome Met (O.20) | Yes | | |

**..st-Care Text:**

    E.50 Evaluates results of the surgical count O.20 Patient is free from unintended retained foreign objects

**..atient Positioning - USC MOR**

**..e-Care Text:**

    A.240 Assesses baseline skin condition A.280 Identifies baseline musculoskeletal status A.280.1 Identifies physical alterations that require additional precautions for procedure-specific positioning A.510.8 Maintains patient's dignity and privacy Im.120 Implements protective measures to prevent skin/tissue injury due to mechanical sources Im.40 Positions the patient Im.80 Applies safety devices

| | Entry 1 | | |
|---|---|---|---|
| ..ocedure | Fusion Spine Cervical | Body Position | Supine |

..ted by: 

..ted on:



...in OR Intraoperative Record
...nal Report *

| | | | |
|---|---|---|---|
| ...ft Arm Position | Anterior and Disce(Cervical) Tucked and padded at side | Right Arm Position | Tucked and padded at side |
| ...ft Leg Position | Elevated | Right Leg Position | Elevated |
| ...et Uncrossed? | Yes | Pressure Points Checked | Yes |
| ...dditional ...nformation | Pillow underneath BLE. Soft restraints to hands per surgeon. | Positioning Device | Elbow Protector, Head Protector, Positioner - Pillow, Strap - Stafety, Table - Standard |
| ...sitioned By | Min, Elliot Thomas, Chu RN, Jannie, Jarvina, Ronald | Safety Strap Applied? | Yes |
| ...cation | Abdomen, Above Knees | Outcome Met (0.80) | Yes |

...st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue E.290 Evaluates musculoskeletal
        status 0.80 Patient is free from signs and symptoms of injury related to positioning

*eassessment of Body - USC MOR*
                        **Entry 1**

| | | | |
|---|---|---|---|
| ...te/Time Checked | 01/19/18 14:05:00 | Site | Arm, left, Arm, right, Leg, left, Leg, right |

...neral Comments:
    Position of head, BUE, BLE checked including pulses & skin temperature by touch.

*...kin Prep - USC MOR*
...e-Care Text:
    A.30 Verifies allergies A.20 Verifies procedure, surgical site, and laterality A.510.8 Maintains paritnet's
        dignity and privacy Im.270 Performs Skin Preparation Im.270.1 Implements protective measures to prevent skin
        and tissue injury due to chemical sources  A.300.1 Protects from cross-contamination
                        **Entry 1**

...in Prep

| | | | |
|---|---|---|---|
| ...rep Agents (Im.270) | Iodine Povacrylex and Isopropyl Alcohol | Prep By | Chu RN, Jannie |
| ...rep Area (Im.270) | Neck | Prep Area Details | Anterior |
| ...kin Prep Agent Dry ...ithout Pooling | Yes | | |
| ...air Removal | | | |
| ...air Removal Methods | No hair removal performed | | |
| ...utcome Met (O.100) | Yes | | |

...st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.100 Patient is free from signs
        and symptoms of chemical injury

*...eneral Case Data - USC MOR*
...e-Care Text:
    A.350.1 Classifies surgical wound
                        **Entry 1**

...se Information

| | | | |
|---|---|---|---|
| ...R | USC OR 23 | Case Level | 5 |
| ...ound Class | 1-Clean | Specialty | Orthopedic (SN) |
| ...SA Class | 2 | | |
| ...eop Diagnosis | Cervical disc disorder with myelopathy | | |

...st-Care Text:
    O.760 Patient receives consistent and comparable care regardless of the setting





in OR Intraoperative Record
nal Report *

*mplant Log - USC MOR*

e-Care Text:
A.20 Verifies operative procedure, surgical site, and laterality A.20.1 Verifies consent for planned procedure
Im.350 Records implants inserted during the operative or invasive procedure

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| plant/Explant plant lentification | Implant | Implant | Implant |
| escription | SUBSTITUTE BONE GRAFT FIBERGRAFT OSSIGLIDE POROUS LARGE 11 CC PUTTY BIOACTIVE MORSEL MOLDABLE | GRAFT SOFT TISSUE DURAGEN PLUS BOVINE COLLAGEN MATRIX L2 IN X W2 IN CRANIAL DURA PATCH RESORBABLE SUTURABLE STERILE DURAPLASTY | SCREW BONE MAXAN L14 MM OD4.5 MM SPINE VARIABLE ANGLE |
| ize | 11cc syringe | 2inx2in | 4.5x14mm |
| erial Number | | | |
| ot Number | 1708101 | 1171579 | 1171579 |
| anufacturer | PROSIDYAN | INTEGRA LIFE SCIENCES | BIOMET ORTHOPEDICS |
| atalog # | 4700-0110 | DP1022 | 14-521644 |
| xpiration Date age Data | 08/10/20 | 05/31/20 | 05/31/20 |
| mplant Site elect Left or tight when pplicable: | Spine-cervical | Spine-cervical | Spine-cervical |
| uantity | 1 | 1 | 2 |
| tcome Met (O.30) | Yes | Yes | Yes |

| | Entry 4 | Entry 5 | Entry 6 |
|---|---|---|---|
| plant/Explant plant lentification | Implant | Implant | Implant |
| escription | SCREW BONE L16 MM OD4.5 MM FIX | CAGE SPINAL VBR ADD TITANIUM 0 D SMALL LORDOTIC H24-40 MM OD14 MM CONTINUOUS EXPANDABLE ADJUSTABLE LUMBAR INTERBODY FUSION | SCREW SET TITANIUM SPINE THORACOLUMBAR ANTERIOR VERTEBRAL BODY REPLACEMENT |
| ize | 4.5x16mm | 14x24-40 | set screw |
| erial Number | | | |
| ot Number | 1171579 | 1171579 | 1171579 |
| anufacturer | BIOMET ORTHOPEDICS | Ulrich Medical Usa | Ulrich Medical Usa |
| atalog # | 14-521546 | CS 2250-14-24 | CS 2259 |
| xpiration Date age Data | 05/31/20 | 05/31/20 | 05/31/20 |
| mplant Site elect Left or tight when pplicable: | Spine-cervical | Spine-cervical | Spine-cervical |
| uantity | 2 | 1 | 1 |
| tcome Met (O.30) | Yes | Yes | Yes |

st-Care Text:
E.30 Evaluates verification process for correct patient, site, side and level surgery O.30 Patient's procedure
is performed on the correct site, side, and level

*edication Administration - USC MOR*
e-Care Text:
E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.10 Patient is free from

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| me Administered | 01/19/18 11:12:00 | 01/19/18 13:05:00 | 01/19/18 13:05:00 |





in OR Intraoperative Record
nal Report *

| dication | LIDOCAINE 0.5% with EPINEPHRINE 1:200,000 INJ, 50 ML INJ | SEALANT TISSUE DURASEAL 5 ML SPINE EXACT | BACITRACIN 50,000 UNITS IN 1 LITER LACTATED RINGERS (LR) |
|---|---|---|---|
| ute of Admin | Topical | Topical | Topical |
| se | 1 | 2 | 1 |
| lume | 5 mL | 5 mL | 1000 mL |
| ministered By | Min, Elliot Thomas | Min, Elliot Thomas | Min, Elliot Thomas |
| tcome Met (O.130) | Yes | Yes | Yes |

**Entry 4**

| | |
|---|---|
| me Administered | 01/19/18 13:05:00 |
| dication | THROMBIN TOPICAL 20,000 UNITS |
| ute of Admin | Topical |
| se | 3 |
| lume | 20 mL |
| ministered By | Min, Elliot Thomas |
| tcome Met (O.130) | Yes |

st-Care Text:
    E.20 Evaluates response to medications O.130 Patient receives appropriately administerd medication(s)

### -Ray and Images – USC MOR
e-Care Text:
    A.240 Assesses baseline skin condition A.240.1 Assesses history of previous radiation exposure Im.110 Implements protective measures to prevent injury due to radiation sources

**Entry 1**

| te | Neck | X-Ray Type | C-Arm |
|---|---|---|---|
| tcome Met (O.110) | Yes | | |

st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.110 Patient is free from signs and symptoms of radiation injury

### atient Care Devices – USC MOR
e-Care Text:
    A.200 Assesses risk for normothermia regulation A.40 Verifies presence of prosthetics or corrective devices Im.280 Implements thermoregulation measures Im.60 Uses supplies and equipment within safe parameters

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| quipment Type | TABLE CMAX  *USC | WARMER BAIR HUGGER  *USC | PUMP, ALP 501 COMPRESSION  *USC |
| rial Number | C428207068 | 08757 | 22502 |
| ttings (if plicable) | | at 43 C per surgeon | |
| ad Number (if plicable) | | | |
| te Sterilized | | | |
| mments | | | |
| tcome Met (O.700) | Yes | Yes | Yes |

st-Care Text:
    E.10 Evaluates signs and symptoms of physical injury to skin and tissue O.700 Patient is free from signs and symptoms of injury caused by extraneous objects

### urgical Irrigation – USC MOR
e-Care Text:
    A.280 Verifies allergies A.310 Identifies factors associated with an increased risk for hemorrhage or fluid and electrolyte imbalance Im.210 Administers prescribed solutions A.280.1 Implements protective measures to prevent skin or tissue injury due to thermal sources

| | Entry 1 | Entry 2 |
|---|---|---|
| rigant | Yes | Yes |





in OR Intraoperative Record
nal Report *

| rigant Used: | SOLUTION IRRIGATION WATER 1 L PLASTIC POUR BOTTLE STERILE | BACITRACIN 50,000 UNITS IN 1 LITER LACTATED RINGERS (LR) |
|---|---|---|
| rigant Volume In | | |
| rigant Volume Out | | |
| l irrigation | | |
| lditives must be | | |
| ttered in the Med | | |
| lministration | | |
| gment. | | |
| tcome Met (O.300) | Yes | Yes |

st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.300 Patient is free from signs
    and symptoms of injury due to thermal sources
neral Comments:
    Water used to clean instruments.

autery - USC MOR
e-Care Text:
    A.240 Assesses baseline skin condition A280.1 Identifies baseline musculoskeletal status Im.50 Implements
    protective measures to prevent injury due to electrical sources  Im.60 Uses supplies and equipment within safe
    parameters Im.80 Applies safety devices

| | Entry 1 | Entry 2 |
|---|---|---|
| U Type | Electrosurgical Unit | Bipolar Unit |
| lentification | F8C59715A | F8C59715A |
| mber | | |
| ccessories Used | | |
| U Settings | | |
| ipolar Setting | | 25 |
| lend Setting | | |
| oag Setting | 35 | |
| ut Setting | 35 | |
| nstrument/Model | | |
| ype | | |
| ther Settings | | |
| ercentage | | |
| ower Level | | |
| emperature | | |
| Celsius) | | |
| otal Time Used | | |
| ounding Pad | | |
| tails | | |
| rounding Pad | Yes | No |
| eeded? | | |
| rounding Pad Lot | 72210153X | |
| umber | | |
| ithin Expiration | Yes | |
| ate? | | |
| rounding Pad Site | Thigh | |
| rounding Pad Site | Left | |
| etail | | |
| air Removed Under | No | |
| rounding Pad | | |
| air Removed Using: | | |
| kin Condition | Intact | |
| nder Grounding Pad | | |
| erified By | | |
| oke Evacuation | No | No |
| rvice Used | | |
| oke Evacuation | | |
| it: | | |
| tcome Met (O.10) | Yes | Yes |

st-Care Text:





in OR Intraoperative Record
nal Report *

E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.10 Patient is free from signs and symptoms of injury related to thermal sources

## ıltures and Specimen - USC MOR
e-Care Text:
A.20 Verifies operative procedure, surgical site, and laterality Im.320 Manages culture specimen collection Im.330 Manages specimen handling and disposition
**Entry 1**

| ıltures Ordered | No | Specimens Ordered | Yes |
|---|---|---|---|
| ıtcome Met (O.40) | Yes | | |

ıst-Care Text:
E.40 Evaluates correct processes have been performed for specimen handling and disposition O.40 Patient's specimen(s) is managed in the appropriate manner
ıneral Comments:
1. Disc for permanent specimen

## ressing/Packing - USC MOR
e-Care Text:
A.350 Assesses susceptibility for infection Im.250 Administers care to invasive devices Im.290 Administer care to wound sites  Im.300 Implements aseptic technique
**Entry 1**

| ɪn Prep Agent ımoved Prior to ɪessing? | NA | | |
|---|---|---|---|
| ɪessing Item ıtails | | | |
| ıressing Item (Im.290) | Other: See comments | **Tape (Im.290)** | Liquid Bandage |
| .te | Neck | **Outcome Met (O.200)** | Yes |

ıst-Care Text:
E.320 Evaluate factors associted with increased risk for postoperative infection at the completion of the procedure O.200 Patient's wound perfusion is consistent with or improved from baseline levels
ıneral Comments:
Dermabond to neck with bio patch for jp drain.

## ɔmmunication - USC MOR
**Entry 1**

| ımmunication | RN Report to Unit/Floor |
|---|---|

ıneral Comments:
4C144

## kin Assessment - USC MOR
e-Care Text:
A.240 Assesses baseline skin condition Im.120 Implements protective measures to prevent skin or tissue injury due to mechanical sources  Im.280.1 Implements progective measures to prevent skin or tissue injury due to thermal sources Im.360 Monitors for signs and symptons of infection
**Entry 1**

| ɪn Integrity | Intact | Outcome Met (O.60) | Yes |
|---|---|---|---|

ıst-Care Text:
E.10 Evaluates for signs and symptoms of physical injury to skin and tissue E.270 Evaluate tissue perfusion O.60 Patient is free from signs and symptoms of injury caused by extraneous objects
ıneral Comments:
Bruising to BUE from IV/A-line start.

## ɪfety Checklist 3) Sign Out - USC MOR
e-Care Text:
Im.330 Manages specimen handling and disposition
**Entry 1**





in OR Intraoperative Record
nal Report *

| | | | |
|---|---|---|---|
| rse verbally onfirms with team e name of the erative ocedure(s) and rrect CPT code | Yes | Nurse verbally confirms with team specimen identity and label | Yes |
| rse verbally onfirms with team y equipment oblems to be ddressed | NA | The nurse confirmed with the surgeon and the incision is: | Closed |
| re the strument, sponge, d needle counts rrect? | Yes | All team members review key concerns for recovery and management of patient | Yes |
| s this case a auma case? | No | Was this an endoscopic case? | No |
| an implant used r this case? | Yes | | |

st-Care Text:
    E.800 Ensures continuity of care E.50 Evaluates results of the surgical count

## eparture from OR – USC MOR
### Entry 1

| | | | |
|---|---|---|---|
| ansport Time | 01/19/18 17:13:00 | Patient Handoff Status | Sedated |
| ansfer Evaluation eassessment | ESU Pad Site Checked, Tubes Drains Chains Secured, Warm Blanket Applied, Pressure Areas Checked, Sterile Dressing Intact | Skin Condition | Warm, Dry |
| tient Handoff atus | Extubated | Oxygen in Use? | Yes |
| ow Rate | 8 L/min | Airway Device | Nasal Cannuale or Mask |
| tient IV Access tent | Yes | Post-op Destination | Other, see comments |
| a | Bed | | |
| scharge | | | |
| eport Given By | Chu RN, Jannie | Time Discharged/Transferr ed | 01/19/18 17:18:00 |

neral Comments:
    Any ICU RN

## elays – USC MOR
e-Care Text:
    Im.760 Minimizes the length of invasive procedure by planning care
### Entry 1

| | | | |
|---|---|---|---|
| lay Reason | E-Vendor Delay | Description | Had to check vendor trays. |

## ase Comments
    <None>

        Finalized By: Chu RN, Jannie

## ocument Signatures



in OR Intraoperative Record
nal Report *

.gned By:
    Chu RN, Jannie 01/19/18 17:20




# Exhibit 45

**LABOR DISTRIBUTION REPORT – FACULTY**

**PARTIAL FISCAL YEAR 2017 (JULY 2016 – DECEMER 2016)**

| Employee Name | Earning Name | Account | Account Name | Jul 16 | Aug16 | Sep16 | Oct16 | Nov16 | Dec16 |
|---|---|---|---|---|---|---|---|---|---|
| Gonzalez, Andres A. | Core Earnings | 8421220101 | PSA NEUROLOGY | 12,500.48 | 12,500.48 | 12,500.48 | 12,500.48 | 12,500.48 | 12,500.48 |
| | | 8821223000 | NEUROLOGY-CLINICAL | 13,199.52 | 13,199.52 | 13,199.52 | 13,199.52 | 13,199.52 | 13,199.52 |
| | Stipend Pay | 8421220101 | PSA NEUROLOGY | 416.79 | 416.79 | 416.79 | 416.79 | 416.79 | 416.79 |
| | | 8421220903 | MSOA-NEUROLOGY IOM ADDEN A-3 | 2,499.88 | 2,499.88 | 2,499.88 | 2,499.88 | 2,499.88 | 2,499.88 |
| Russin, Jonathan | Core Earnings | 8421540902 | MSAA NEUROSURGERY 2 ADDEN A-6.A.3 | 20,938.34 | 20,938.34 | 20,938.34 | 20,938.34 | 20,938.34 | 20,938.34 |
| | | 8821543000 | NEUROSURGERY-CLINICAL | 14,478.33 | 14,478.33 | 14,478.33 | 14,478.33 | 14,478.33 | 14,478.33 |
| | Stipend Pay | 8821543000 | NEUROSURGERY-CLINICAL | 2,083.32 | 2,083.32 | 2,083.32 | 2,083.32 | 2,083.32 | 2,083.32 |
| Shilian, Parastou | Core Earnings | 8421220903 | MSOA-NEUROLOGY IOM ADDEN A-3 | 12,640.00 | 12,640.00 | 12,640.00 | 12,640.00 | 12,640.00 | 12,640.00 |
| | | 8821223000 | NEUROLOGY-CLINICAL | 4,026.67 | 4,026.67 | 4,026.67 | 4,026.67 | 4,026.67 | 4,026.67 |
| Zada, Gabriel | Core Earnings | 8421540101 | PSA NEUROSURGERY | 13,976.67 | 13,976.67 | 13,976.67 | 13,976.67 | 13,976.67 | |
| | | 8821543000 | NEUROSURGERY-CLINICAL | 19,356.66 | 19,356.66 | 19,356.66 | 19,356.66 | 19,356.66 | |
| | Stipend Pay | 8821543000 | NEUROSURGERY-CLINICAL | 2,083.33 | 2,083.33 | 2,083.33 | 2,083.33 | 2,083.33 | |
| | Core Earnings | 8421540101 | PSA NEUROSURGERY | | | | | | 13,976.67 |
| | | 8821543000 | NEUROSURGERY-CLINICAL | | | | | | 19,356.66 |
| | Stipend Pay | 8821543000 | NEUROSURGERY-CLINICAL | | | | | | 2,083.33 |

# Exhibit 46



# Exhibit 47

APPENDIX F

# HASMA STATEMENT OF WORK
# FOR
# INTRAOPERATIVE MONITORING SERVICES

This Appendix F (hereinafter referred to as "SOW" or "Statement of Work") sets forth the scope and requirements for provision by Contractor of Intraoperative Monitoring Services pursuant to the Healthcare Ancillary Services Master Agreement (hereinafter "HASMA" or "Master Agreement").

## 1. CONTRACTOR PERSONNEL

1.1     Contractor shall designate an administrator to lead and coordinate Contractor's day-to-day provision of surgical intraoperative monitoring services under the Master Agreement. Upon request by Facility, Contractor's administrator shall be available at all reasonable times (Monday through Saturday, 8:00 a.m. to 5:00 p.m.) to explain the services being provided to the County hereunder; such explanations shall include, but not be limited to, providing oral presentations on behalf of the Facility and, upon Facility's request, providing written reports to each appropriate County Facility receiving services under the Agreement.

Contractor shall notify County, in writing, of the name, telephone (e.g., land line, cellular/mobile phone), and facsimile/FAX number(s) of Contractor's designated day-to-day administrator within ten (10) calendar days prior to the effective date of the Master Agreement.

1.2     Contractor's administrator shall be responsible for determining daily work duties, staffing levels, scheduling, and staffing hours needed to properly provide surgical intraoperative monitoring services under the Master Agreement, which shall be prepared in writing and submitted to the Facility for approval before any such services are provided. During the term of the Master Agreement, Contractor shall have available, and shall provide upon request to authorized representatives of the Facility, the names of Contractor's staff (including any subcontractor staff), their titles, professional degrees (if any), salary history, and experience in providing services under the Master Agreement.

1.3     Contractor's administrator shall institute and maintain appropriate supervision of all persons providing services pursuant to the Master Agreement. Further, unless directed pursuant to the Master Agreement by Director to do otherwise, Contractor shall work independently on designated assignments in accordance with the Statement of Work duties contained herein.

1.4     Contractor assumes the sole responsibility for the timely completion of all activities assigned or to be performed hereunder.

1.5     Contractor staff shall have certifications or credentials from either the American Board of Neurophysiologic Monitoring (ABNM) or American Board of Registration of Electroencephalographic and Evoked Potential Technologists (ABRET).

## 2.  COUNTY PERSONNEL

County does not anticipate needing to assign County personnel, employees or other staff to assist Contractor on a full-time or a part-time basis for provision of services by Contractor pursuant to the Master Agreement. However, County personnel will be made available to Contractor at the discretion of the Facility to provide necessary input to answer questions and provide necessary liaisons between Contractor and County. In any event, County further will provide Contractor with an appropriate contact person at each work site location to be served under the Master Agreement.

## 3.  DEFINITIONS

As used in this Appendix F and elsewhere in the Master Agreement, the terms and phrases in this Paragraph 3 shall have the particular meanings as specified below:

3.1     **Surgical Intraoperative Monitoring** (also known as "intraoperative neurophysiological monitoring or intraoperative neuromonitoring"):  The use of electrophysiological methods such as electroencephalography (EEG), electromyography (EMG), and Evoked Potentials (EP) to monitor the functional integrity of certain neural structures (e.g., nerves, spinal cord, and parts of the brain) during surgery. The purpose is to reduce the risk to the patient of incidental damage to the nervous system during surgery, and or to provide functional guidance to the surgeon and anesthesiologist. Intraoperative monitoring entails continuous observation, and monitoring of vital signs and general health status during surgery.

3.2     **Auditory Evoked Response (Auditory Evoked Potential)**:  An electrical signal elicited from the brain while an auditory stimulus is presented. The EEG is used to record a physiological response to sound.

3.3     **Somatosensory Evoked Response/Somatosensory Evoked Potential (SSEP)**:  A response produced by small, painless electrical stimuli administered to large sensory fibers in mixed nerves of the hand or leg.  The EEG record of the subsequent waves produced helps determine the functional state of the nerves involved.

3.4     **Visual Evoked Response (Visual Evoked Potential)**:  An electrical signal elicited from the brain while a visual stimulus is presented. While the patient is watching a pattern projected on a screen, the EEG is recorded. The

**APPENDIX F**

characteristics of the resulting waves can then be compared with normal (no stimulus).

3.5   **Motor Strip Grid (Subdural Grid)**: A grid of electrodes implanted beneath the cranium utilized for functional cortical mapping to identify a seizure focus.

## 4. SERVICES TO BE PROVIDED BY CONTRACTOR

4.1   Contractor will provide neurodiagnostic equipment and staff that are trained in the equipment's operation. Services include, but are not limited to, those listed in Section 4.1.1 below.

4.1.1. a.  Surgical Intraoperative Monitoring
   b.  SSEP Spinal Cord Monitoring
   c.  EMG, Facial Nerve, Pedicle Screw Stim
   d.  Intraoperative EEG Monitoring (Including Endarterectomy, Aneurysm Clipping)
   e.  Pre-op routine EEG for Endarterectomy,
   f.  Electrocoticography, Motor Strip Mapping
   g.  Motor Strip Grid (subdural grid)

4.2   Contractor shall meet and confer with Facility staff to establish mutually agreeable schedules, which may be adjusted by the Contractor based upon actual demands of the scheduled surgical appointments.

4.3   Facility shall advise the Contractor of required services not less than 24 hours before the services are scheduled to be performed. Contractor shall provide the necessary staff for services requested by County at least 24 hours in advance and will make its best efforts to provide staff with less than 24 hours' notice.

4.4   Contractor shall maintain all of its equipment in good condition and shall provide, upon Facility's request, maintenance records for each piece of equipment requiring preventive maintenance.

4.5   Contractor shall not be responsible to the Facility, its patients, or physicians for rescheduling due to unforeseen equipment failure or other events beyond the control of the Contractor.

4.6   The Facility is not obligated to have direct control over the methods by which the Contractor performs technical services. The Contractor shall perform all services under the Master Agreement in a competent, efficient and manner satisfactory to the County, consistent with the industry and the Facility standards.

APPENDIX F

## 5. APPROVED SERVICE SITES

The following sites have been approved for provision of services under the Master Agreement:

> (1) Harbor-UCLA Medical Center
>     1000 West Carson Street
>     Torrance, California  90509
>
> (2) Rancho Los Amigos National Rehabilitation Center
>     7601 East Imperial Highway
>     Downey, California  90242

Further, the Director of Health Services, or designee, may, upon agreement of Contractor, add additional service sites, which may include any or all DHS or Health Agency Medical Centers, Comprehensive Health Centers, Health Clinics or any combination thereof.  The addition of such sites shall be memorialized in a written amendment to the Master Agreement, which executed by Contractor and the Director of DHS, or authorized designee, pursuant to the delegated authority granted to the Director under the Master Agreement.

## 6. INFECTION CONTROL

If any of Contractor's staff diagnosed with an infectious disease has had contact with a County patient during the usual incubation period for such infectious disease, then Contractor, if aware of such diagnosis, shall, within twenty-four (24) hours of becoming aware of the diagnosis, report such occurrences to the Infection Control Department at each County facility where the staff member is assigned.

If a County patient diagnosed with an infectious disease has had contact with Contractor staff during the usual incubation period for such infectious disease, then the County Facility treating the patient shall report such occurrence to Contractor, to the extent permitted by law.

## 7. DHS RISK MANAGEMENT HANDBOOK

Contractor's staff, prior to providing services at County Facilities under the Master Agreement, must read and sign a statement acknowledging that she/he has read and consents to the DHS Risk Management Information Handbook regarding DHS' malpractice policies and medical protocols.

# Exhibit 48



**Health Services**
LOS ANGELES COUNTY

**ADOPTED**

BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

18      November 13, 2012

*Sachi A. Hamai*
SACHI A. HAMAI
EXECUTIVE OFFICER

Los Angeles County
Board of Supervisors

Gloria Molina
First District

Mark Ridley-Thomas
Second District

Zev Yaroslavsky
Third District

Don Knabe
Fourth District

Michael D. Antonovich
Fifth District

Mitchell H. Katz, M.D.
Director

Hal F. Yee, Jr., M.D., Ph.D.
Chief Medical Officer

Christina Ghaly, M.D.
Deputy Director, Strategic Planning

313 N. Figueroa Street, Suite 912
Los Angeles, CA 90012

Tel: (213) 240-8101
Fax: (213) 481-0503

www.dhs.lacounty.gov

To ensure access to high-quality,
patient-centered, cost-effective health
care to Los Angeles County residents
through direct services at DHS facilities
and through collaboration with
community and university partners.

November 13, 2012

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

**AMENDMENT TO MEDICAL SCHOOL AFFILIATION AGREEMENT AND
ONSITE CUSTODIAL INMATE SPECIALTY CARE AGREEMENT BETWEEN
THE COUNTY OF LOS ANGELES AND THE UNIVERSITY OF SOUTHERN
CALIFORNIA
(1st SUPERVISORIAL DISTRICT)
(3 VOTES)**

## SUBJECT

Request approval to adjust staffing levels and increase the maximum cost
through an amendment to the Medical School Affiliation Agreement with the
University of Southern California, and request delegated authority to execute a
new agreement, to provide onsite specialty care for inmates at certain Sheriff's
Department facilities.

## IT IS RECOMMENDED THAT THE BOARD:

1.  Approve and instruct the Chairman to sign the attached Amendment No. 5
(Amendment) to the Medical School Affiliation Agreement No. 75853 (MSAA
Agreement) with the University of Southern California (USC), effective upon
Board approval, to: a) add staff for the clinical oversight of Health Information
Technology (HIT) projects, b) add staff resulting from the implementation of
the State's Public Safety Realignment Act, c) delete discontinued staff items
and a one-time payment provision for a prior fiscal year,, and d) provide
additional Intra-Operative Monitoring (IOM) technician services at LAC+USC
Medical Center (LAC+USC MC) through June 30, 2013 resulting in a net
increase to the annual maximum obligation from $126,583,896 to  $
126,703,786.



The Honorable Board of Supervisors
11/13/2012
Page 2

2. Delegate authority to the Director, or his designee, to amend the MSAA Agreement to further extend IOM technician services beyond June 30, 2013, and annually thereafter upon agreement by both parties subject to review and approval of County Counsel, and notification to the Board and the Chief Executive Office (CEO).

3. Delegate authority to the Director, or his designee, to execute a new Onsite Custodial Inmate Specialty Care Agreement (Inmate Care Agreement) for USC to provide onsite specialty care to inmates at certain Sheriff's Department facilities under the terms set forth below for a period of one year effective upon execution with a one year automatic renewal for full services, or partial services upon agreement by the parties, and to execute amendments to adjust staffing levels and cost based on the Sheriff's Department's budget and future need for specialty care within the Sheriff's Department's approved budget as described below, subject to review and approval by County Counsel, with notice to the Board and the CEO.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

Approval of first recommendation will adjust the staffing levels and costs based on service needs, as described below:

Additional Staffing

Chief Medical Information Officer.  DHS facilities are implementing HIT projects that are critical to the successful transformation of DHS' health care delivery system, which includes a new disease management registry to improve the quality of care provided to patients with chronic diseases, an e-consult system to improve continuity of care through electronic consultations between primary and specialty care physicians, and an Electronic Health Record system to be implemented enterprise-wide.  Each facility will have a Chief Medical Information Officer (CMIO) to serve as the clinical leader to assist in implementing the above projects at their respective facilities.  DHS is proposing to add a physician (0.5 Full Time Equivalent or "FTE") to perform this function at an annual cost of $123,524.

Public Safety Realignment Act (Assembly Bill 109).  Effective October 1, 2011, State law transferred responsibility from the California Department of Corrections and Rehabilitation to the County for the incarceration of individuals convicted of non-violent, non-serious, and non-sex offender, otherwise known as "N3," crimes, and the supervision of such individuals from State prisons.  As a result, DHS anticipates an increase in health care utilization at LAC+USC MC, and is requesting approval to add an Emergency Room Physician (1.0 FTE) at an annual cost of $258,720, and various specialists (1.0 FTE total) at an annual cost of $242,550.

Intra-Operative Monitoring.  The current Agreement with USC provides funding for an IOM technician (1.0 FTE) to monitor the functional integrity of certain neural functions of a patient during surgery. DHS is proposing to add two additional IOM technicians (2.0 FTE) at a total annual cost of $267,000  to meet the growing demands for such technicians by LAC+USC MC.  Such technicians are needed because the current County class specifications for an Electroencephalography (EEG) Technician do not meet the industry standards and certification requirements to perform the full array of IOM services required in the surgical room.  Meanwhile, DHS is developing an appropriate class specification to replace USC's IOM Technicians, and will start negotiations with USC no later than 9 months after the approval of this Amendment to determine the feasibility and appropriateness of continuing such services by USC.

The Honorable Board of Supervisors
11/13/2012
Page 3


Discontinued Staffing and Costs

Senior Pathologist:  The initial Agreement provided funding for a Senior Pathologist (1.0 FTE) at an annual cost of $270,260, which now needs to be removed from the Agreement since this position has been transferred to the County as authorized by your Board on June 12, 2012.

Psychiatric Outpatient Department Coverage and One-Time Funding.  Amendment No. 1 added psychiatrists (1.5 FTEs) to cover LAC+USC MC's outpatient department at a total annual cost of $371,700 until such time that the County Department of Mental Health (DMH) negotiated a separate agreement with USC to pay for such services. These psychiatric outpatient services were transferred to DMH in 2009.  This same amendment also provided one-time, non-recurring funding of $436,204 to replace County-employed physicians leaving County service.  Based on the above, the psychiatric outpatient services and the one-time attrition funding is no longer required and should be removed from the Agreement.

Approval of the second recommendation will enable DHS to administratively amend the Agreement to delete IOM technicians in the event that DHS is able to hire its own technicians.

Approval of the third recommendation will enable DHS to provide cost-effective, onsite specialty care to inmates at certain Sheriff's Department facilities rather than the costlier and more cumbersome process of transporting inmates to LAC+USC MC.


**Implementation of Strategic Plan Goals**

The recommended actions support Goal 1, Operational Effectiveness, of the County's Strategic Plan.


**FISCAL IMPACT/FINANCING**

MSAA Agreement

The maximum annual County obligation for LAC+USC MC under the MSAA Amendment in Fiscal Year (FY) 2012-13 will be $126,703,786, an increase of $119,890 from the previous fiscal year's maximum obligation of $126,583,896.  Funding is included in the DHS' FY 2012-13 Final Budget. Funding for future years will be requested as necessary.

Inmate Care Agreement

DHS will be fully reimbursed by the Sheriff's Department for the cost of the inmate care agreement.


**FACTS AND PROVISIONS/LEGAL REQUIREMENTS**

MSAA Agreement

DHS entered into the current MSAA Agreement with USC effective August 1, 2006 through June 30, 2007, with a one-year automatic extension at the end of each contract year.  The term of the current MSAA Agreement is for a rolling five-year term unless either party serves notice of non-renewal to the other party, in which case the MSAA Agreement would expire in four years.

The Honorable Board of Supervisors
11/13/2012
Page 4


In November 2008, DHS processed Amendment No. 1 to the MSAA Agreement to increase the volume of physician services to accommodate the Replacement Facility for the LAC+USC MC and to provide additional compensation to retain current physician staffing.  The MSAA Agreement was subsequently amended to memorialize LAC+USC MC's and USC's responsibilities relative to undergraduate and medical school education for USC's accrediting agency, add additional services for radiology and emergency room services, and add purchased services and funding to ensure full compliance with accreditation standards.

The recommended Amendment No. 5 identifies the changes in staffing and costs for FY 2012-13 as previously described hereinabove.

Inmate Care Agreement

On June 28, 2012, DHS informed the Board about its work with the County Sheriff's Department's Medical Services Bureau (MSB) to assess options for improving specialty care for individuals incarcerated in Los Angeles County jails.  This report also included a proposed plan for how DHS could further collaborate with MSB to improve services by providing on-site specialty care to jailed patients.  The Board subsequently passed a motion that the funds will be annually identified within the Sheriff's Department's budget not to exceed $5.2 million annually.  The motion also directed the Chief Executive Officer and the Sheriff's Department to ensure that all cost-savings will be used to expand the scope of specialty care

The Inmate Care Agreement will include provisions substantially similar to those in the MSAA Agreement with respect to indemnification, insurance and the County's standard terms and conditions.  Additional provisions include an automatic one year renewal unless either party serves upon the other a notice of non-renewal.  Unless the parties agree to the contrary, such renewal shall continue for the full services provided during the previous one year period.  Either party may terminate this Agreement for convenience upon one hundred twenty days written notice.

DHS is seeking delegated authority to enter into an Inmate care Agreement with USC to provide these on-site custodial specialty care services.

County Counsel has advised that the portion of the MSAA Agreement related to academic and patient care services and the Inmate Care Agreement, which is for a one-year period, are not subject to the provisions of County Code Chapter 2.121, Contracting with Private Business (Proposition A).

County Counsel has reviewed and approved Exhibit I as to form.


**CONTRACTING PROCESS**


Not applicable.


**IMPACT ON CURRENT SERVICES (OR PROJECTS)**

The MSAA Agreement will continue the provision of certain clinical and academic services at the LAC+USC MC.

The Honorable Board of Supervisors
11/13/2012
Page 5

It is anticipated that the Inmate Care Agreement will improve inmate care by reducing the number and volume of inmates who have to be transported to LAC+USC MC to receive specialty care.


Respectfully submitted,


Mitchell H. Katz, M.D.
Director

MHK:ck

Enclosures

c:   Chief Executive Office
     County Counsel
     Executive Office, Board of Supervisors
     Sheriff's Department

Contract No. <u>75853</u>

**AFFILIATION AGREEMENT**

Amendment No. 5

THIS AMENDMENT is made and entered into this ⟨13th⟩ day

of ⟨November⟩ , 2012,

by and between          COUNTY OF LOS ANGELES
(hereafter "County")

and                  THE UNIVERSITY OF SOUTHERN
CALIFORNIA (hereafter "University").

WHEREAS, reference is made to that certain document entitled "AFFILIATION

AGREEMENT", dated August 29, 2006, as amended by Amendment to the Affiliation

Agreement dated November 14, 2008, Amendment No. 1 dated November 25,

2008, Amendment to Affiliation Agreement dated November 14, 2008, Amendment

No. 3 dated April 19, 2011, and Amendment No. 4 dated June 28, 2011, further

identified as County Agreement No. 75853 (collectively, hereafter "Agreement");

WHEREAS, it is the desire of the parties hereto to amend the Agreement and

add Addendum A-5 as described hereafter;

WHEREAS, said Agreement provides that changes may be made in the form of a

written amendment, which is formally approved and executed by both parties; and

NOW, THEREFORE, the parties hereby agree as follows:

1.     This Amendment shall become effective November 7, 2012.

2.     Any reference in the Agreement to Addendum A, A-1, A-2, or A-3
shall also refer to Addendum A-4, as appropriate.

3.     Addendum A-4 shall be added to the Agreement, attached hereto and
incorporated by reference.

4.     Except for the changes set forth herein, the remaining terms and
conditions of the Agreement shall remain in full effect.

-1-

75853 SUPPLEMENT 4

IN WITNESS WHEREOF, the Board of Supervisors of the County of Los Angeles has caused this Amendment to be subscribed by its Chair and seal of said Board to be hereto affixed, and attested by the Executive Officer thereof, and Contractor has caused this Amendment to be subscribed in its behalf by its duly authorized officers, the day, month and year first above written.

COUNTY OF LOS ANGELES

By _____
Chairman, Board of Supervisors

SACHI A. HAMAI,
Executive Officer Board
of Supervisors of the
County of Los Angeles

By _____
Deputy

UNIVERSITY OF SOUTHERN CALIFORNIA
Contractor

By _____
Signature R. Dickey
Senior Vice President,
Title          Administration
(AFFIX CORPORATE SEAL HERE)

APPROVED AS TO FORM
John Krattli
County Counsel

By _____
Principal Deputy County Counsel



I hereby certify that pursuant to
Section 25103 of the Government Code,
delivery of this document has been made.

SACHI A. HAMAI
Executive Officer
Clerk of the Board of Supervisors

By _____
Deputy

ADOPTED
BOARD OF SUPERVISORS

-2-          1 8          NOV 1 3 2012

SACHI A. HAMAI
EXECUTIVE OFFICER

75853 SUPPLEMENT 4

**USC ADDENDUM A-4**
**Purchased Services**

**Contract Year Ending June 30, 2013**

A.1      **General.**  Payment for Purchased Services will be made by County to University in the amounts set forth in Section A.3 below.  Payment for Purchased Services shall be made in quarterly installments, each payable on the first business day of each Contract Year quarter.  In addition, if County requests increases in the volume of any Purchased Services identified in this Addendum A, County will pay for such services in advance on a quarterly basis.  University is not obligated to provide such supplemental services until University receives payment from County for those services.  Except with regard to additional Purchased Services provided by University pursuant to Section A.2.4.3 *Attrition of County-Employed Physicians*, any new services which the Parties agree to commence during the Contract Year, of a nature not set forth in this Addendum A, will be provided pursuant to an amendment or separate agreement between the Parties, subject to the approval of the Governing Board; such new services will be taken into account in revising Addendum A for the next Contract Year.  Any such revisions to this Addendum A shall not take effect without a properly executed amendment.

A.2      **Purchased Services.**  University shall provide the following Purchased Services during the Contract Year beginning July 1, 2012 and ending June 30, 2013 . The type and volume of Purchased Services provided during the Contract Year shall continue at the same overall level, on an annualized University Personnel FTE basis, as provided by University Personnel during the prior Contract Year.

     A.2.1   <u>Clinical Services.</u>  Except for those services which may be provided by persons other than University Personnel, University shall provide those clinical services sufficient to address the goals and responsibilities set forth in §5.4.

     A.2.2   <u>Non-Clinical Academic and Administrative Services.</u>  Except as provided by persons other than University Personnel, University shall provide academic and management services sufficient to address the goals and responsibilities set forth in §§ 5.3 and 5.5, respectively.

     A.2.3   <u>Research.</u>  The Parties understand and agree that no funds paid under this Agreement shall be used to pay for non-clinical research. If it is determined that any funds are used to pay for non-clinical research, University shall reimburse County such amount.

     A.2.4   <u>Volume of Purchased Services.</u>  Until measures are developed to more accurately define the volume of Purchased Services, the Parties agree that the volume of all services will be measured on the basis of full time equivalents (FTEs) for physicians and other University Personnel.

          A.2.4.1   Intentionally omitted.

-1-

| | FTE COUNT | | |
|---|---|---|---|
| | Physician and Dentist FTEs** | Non-Physician FTEs | Total FTEs |
| Base Contract as of Contract Year 2012 | 594.75 | 79.75 | 674.50 |
| New Contract Year 2013 | 1.0 | 2.0 | 3.0 |
| Total | 595.75 | 81.75 | 677.50 |

** The number of FTEs includes a fraction of the effort of 73 direct County-paid physicians who receive a stipend from University (to be verified by the Hospital).

A.2.4.2   *Allocation of FTEs.*  The allocation of University Personnel FTEs among Departments may be changed upon written agreement of the Chief Medical Officer, CEO and University Representative that such reallocation optimizes the use of personnel in the performance of this Agreement.

A.2.4.3   *Attrition of County-Employed Physicians.*  Upon attrition of a County-employed physician in Primary County Facilities, Director may (1) hire a replacement or (2) direct University, for the remainder of the Contract Year to provide the services previously provided by such County physician through University-employed physicians, which shall constitute additional Purchased Services under this Agreement for which University shall be compensated during the Contract Year in addition to the contract maximum amount set forth in this Addendum A.

A.2.4.4   Intentionally omitted.

A.3   **Payment for Purchased Services.** County shall compensate University as set forth below.

|  | Contract Year 2012 (annualized) |
|---|---|
| **Contract Maximum Amount (from MSOA Addendum A-3)** | 126,583,896* |
| / | |
| / | |
| / | |
| / | |

-2-

**Additional Funding Needed for Current Services:**

**ADDITIONAL FTEs**

| | | |
|---|---|---|
| 1. | Chief Medical Information Officer (0.5 FTE) | 123,524 |
| 2. | Emergency Medicine Physician (1.0 FTE) | 258,720 |
| 3. | Various Specialists (1.0 FTE total) | 242,550 |
| 4. | Intra-Operative Monitoring Technician (2.0 FTE) | 303,000* |
| | **Subtotal (4.5 FTE)** | **927,794** |

**DELETED FTEs and ONE-TIME COSTS****

| | | |
|---|---|---|
| 1. | Psychiatric Outpatient Department Coverage (1.5 FTEs) | (371,700) |
| 2. | One-Time Costs (Attrition for County Employees - CY 2008) | (436,204) |
| | **Subtotal (1.5 FTEs)** | **(807,904)** |
| | **Contract Maximum Amount** | **126,703,786*** |

*  Notwithstanding the provisions of Section 4.2 of this Agreement, Intra-Operative Monitoring Technician services shall expire after June 30, 2013, unless otherwise mutually agreed to by the parties, and ratified via an administrative amendment to the Agreement.

**  The Senior Pathologist (1.0 FTE) and its funding shall be deleted from this Agreement contingent upon the transfer of this position to the County.

***Contract Amount does not include revision necessary to reflect implementation of the County's Physician Pay Plan in accordance with Section A.10 below.

**A.4     Volume of Purchased Services.**

A.4.1.   <u>Academic Purchased Services.</u>  During the term of this Agreement, Academic Purchased Services will be performed by Faculty in accordance with the requirements of this Agreement.  The parties agree during the Contract Year to work together to develop a new methodology for determining payments for the provision of Academic Purchased Services under this Agreement.

A.4.2.   <u>Academic and Clinical Administrative Purchased Services.</u>  During the term of this Agreement, University shall provide Academic and Clinical Administrative Purchased Services as needed to support the Training Programs in accordance with the requirements of this Agreement.  The Parties agree during the Contract Year to work together to develop a new methodology for determining payments for the provision of University Academic and Clinical Administrative Purchased Services under this Agreement.

A.4.3.   <u>Mission Support.</u>  County is committed to promoting medical education in its community, as reflected through County's affiliation with University and County's participation in graduate medical education training programs accredited by the Accreditation Council for Graduate Medical Education.  The

-3-

Parties agree during Contract Year 2009 to work together to develop a methodology for providing mission support to University.

A.5 **Community-Based Health Services Planning.** University agrees to participate in the County's community based planning efforts. These planning efforts include but are not limited to: resizing the breadth and depth of primary and specialty care programs to meet local community needs, disease burden and public health initiatives; resizing the breadth and depth of tertiary and quaternary services to fit effectively within system-wide DHS clinical programs; expansion of outpatient diagnostic and therapeutic programs at Hospital and other community–based sites; sizing ACGME, ADA and other allied health programs in concert with service delivery planning; and developing, implementing and reporting evaluation metrics for the quality and efficiency of the service delivery program.

A.6 **Replacement Hospital Transition Planning.** County agrees to participate with the University to maximize collaborative planning for the transition to the Hospital replacement facility during the term of this Addendum. Through such planning, County agrees to provide adequate office space, on-call rooms, and other support space for University administration, clinical service, and teaching in the Hospital replacement facility.

County also agrees to make best efforts to ensure the continuing viability of University Training Programs in the Hospital replacement facility. Pursuant to section 2.6.1 of this Agreement, University will notify County of any matters within the control of County in transitioning to the Hospital replacement facility that to the University's knowledge may compromise accreditation of any University Training Program. In the event County receives such notice, County will cooperate with University to make all reasonable efforts to retain accreditation. The parties understand and acknowledge that County has a continuing obligation to provide adequate non-physician staffing support pursuant to section. 3.3.4 of the Agreement.

A.7 **Faculty Teaching Incentive Fund**. Facility JPO Committee will establish annual awards for excellence in teaching to be awarded to Faculty. Faculty awardees and the amount of the awards will be determined by the Facility JPO based on written criteria to be jointly developed by University and County. In developing written criteria, University and County shall include resident and medical student participation as necessary criteria. Parties agree to equally finance this Incentive Fund, with each party contributing $25,000 annually.

A. 8 **Primary County Facilities**. Those facilities listed in Exhibit 2 shall constitute the Primary County Facilities where Purchased Services may be performed.

A.9 **Information Physician Workload and Productivity.** The Parties shall work collaboratively to achieve both the clinical and operational goals as identified in the Hospital's mission and strategic plan. These include both short and long range goals, which will be refined and updated on an annual basis as part any revisions to this Addendum. To address a long range goal of improving information on attending staff workload and productivity, the parties agree to implement an initial two part solution:

    A.9.1 <u>AmIOn Physician Scheduling</u>. The Hospital shall provide the AmIOn electronic attending staff scheduling program for use by University. Within six months of providing the University access to AmIOn, or within six months of the execution of this Addendum, whichever is later, and in accordance with a timetable established by University and accepted by County, the University shall install

and operate the AmIOn electronic attending staff scheduling program in a manner that identifies physicians in all clinical departments providing Purchased Services at Hospital each day (the "Hospital Schedules").  Hospital will have online access to the Hospital Schedules through Am IOn.

A .9.1.1   The University shall be responsible for the input, security and access of all data into AmIOn.  To ensure accuracy, the University shall update physician scheduling data into AmIOn on not less than a daily basis and will periodically validate Hospital Schedules.

A.9.1.2   Upon request of the County, the University shall verify the accuracy of physician schedules in AmIOn as compared to actual physicians who have worked and the amount of hours worked by such physicians.  The above verification may include one, several or all departments/services in the Hospital.

A.9.2   The parties acknowledge that the Hospital and University have completed three Memoranda of Understanding to measure performance and productivity of Purchased Services for the Harris-Rodde Specialty Clinics Coverage, Echocardiography and Radiation Oncology, anticipated to be executed by the parties within one month of execution of this Addendum. Hospital and University mutually agree to work together to develop additional Memoranda to measure performance and productivity for other major clinical Purchased Services as agreed by the Parties.  The Parties shall use good faith efforts to complete and execute such Memoranda within twelve months of execution of this Addendum.

The Parties shall develop a mutually agreed upon system to track compliance with the performance and productivity goals identified in each Memorandum of Understanding (the "Tracking System").  When Hospital has reasonably determined that the performance and productivity goals under one (or more) Memorandum have not been met by University based on the data from the Tracking System, the Hospital shall notify the University in writing within twenty (20) days of such determination (the "Notice").  The Notice shall be delivered to the Office of the Dean of the Keck School of Medicine, with a copy to the Office of the General Counsel. The Notice shall identify the specific performance and productivity goal by type and amount of unmet services, as compared to the performance and productivity goal(s) under the applicable Memorandum as well as Hospital's efforts to correct any Hospital issues related to the performance and productivity goal(s) at issue.

Within thirty (30) business days of receiving the Notice from the Hospital, the University shall submit a corrective action plan to the Hospital which sets forth the specific action(s) to be taken to meet the performance and productivity goal(s) and time period for completion of the corrective action plan.  The Parties will work together to modify the corrective action plan to address each Party's concerns.

Disputes about each Party's compliance with the corrective action plan will be reviewed by an independent arbitrator selected by the Parties.  The arbitrator's fees will be equally borne by the Parties. If the arbitrator determines that, solely due to the acts or omissions of University, University has not implemented in good faith the material elements of the corrective action plan within the time period specified in the corrective action plan agreed to by the Parties, the Hospital may deduct from payment to be made to the University the Hospital's

actual and reasonable additional cost to provide the unmet services that directly result from such failure to meet the performance and productivity goals (except with respect to any goal established for new patients or new visits) through an alternative arrangement.

To the extent that the Parties desire University to provide services in excess of those established by the performance and productivity goals, they may increase those goals and provide for additional payment related to such services to University through an administrative amendment signed by both Parties, provided that such additional payment does not exceed the Contract Maximum Amount provided in Section A.3 of Addendum A.  To the extent that payment for such additional services would cause total payments due under this Addendum to exceed the Contract Maximum Amount, the Parties acknowledge that compensation may only be made for such additional services after the Governing Board approves a formal amendment to this Addendum A authorizing such supplemental services.

A.9.3. Medical Record Documentation Performance Goals.  The parties acknowledge the importance of accurate and timely documentation of patient medical information to facilitate patient treatment, care and services, particularly in the postgraduate physician teaching environment of the Hospital.  Such proper documentation is reflected in policies and standards applicable to the University, including, without limitation, the standards set forth by the Joint Commission (formerly defined as "JCAHO"), and policies issued by the County Department of Health Services.  In addition to other compliance obligations, the parties seek to emphasize compliance with the following:

A.9.3.1 *Joint Commission*.  The Parties agree to work together to maintain a medical record delinquency rate at or better than the full compliance threshold set forth by Joint Commission (IM 6.10; EP 11 "The medical record delinquency rate averaged from the last four quarterly measurements is not greater than 50% of the average monthly discharge (AMD) rate and no quarterly measurement is greater than the AMD rate.").  To that end, the University agrees to work with County toward compliance by ensuring that physicians meet this compliance threshold with respect to the physician components of the medical record.  For purposes of this section, a delinquent medical record is defined as a medical record available to the Physician for review and is further defined by Hospital Medical Staff Rules and Regulations.

A.9.3.2 *DHS Policy*.  The University agrees to work toward a 90% threshold compliance rate for the following components of DHS Policy 310.2, Supervision of Residents, or as subsequently amended by DHS, by ensuring that physicians meet this compliance threshold regarding the physician components of the medical records and activities which are set forth below. References to the specific provision of DHS Policy 310.2 are in parentheses.

(4.1)   An attending physician shall see and evaluate each patient prior to any operative procedure or delivery and shall document this evaluation in the medical record.

(4.2)   An attending physician is responsible to assure the execution of an appropriate informed consent for procedures and deliveries with consent form and progress note documenting the consent discussion in the medical record.

(4.4.1) If the attending is present for the operative or invasive procedure or delivery, he/she must document in the medical record that he/she has evaluated the patient and authorizes the procedure.

(4.4.2) If the attending physician is not present for the operative or invasive procedure or delivery, the supervisory resident shall document in the medical record that he/she has discussed the case with the attending and the attending authorizes the resident to proceed.

(4.5) An attending physician must assure an operative or procedure note is written or dictated within 24 hours of the procedure and shall sign the record of operation ("green sheet") in all situations for which direct attending physician supervision is required.

(5.1) An attending physician is responsible for supervision of the resident and appropriate evaluation of the patient for each emergency department visit.

(5.2) An attending physician or supervisory resident shall review and sign the patient's record prior to disposition.

(7.1) An attending physician shall see and evaluate each inpatient within 24 hours of admission and shall co-sign the resident's admission note or record his/her own admission note within 24 hours.

(7.2) An attending physician shall see and evaluate the patient at least every 48 hours and shall ensure that the resident includes in the progress note that he/she has discussed the case with the attending or the attending physician shall record his/her own note at least every 48 hours.

(7.3) An attending physician shall discuss the discharge planning with the resident. The resident shall document in the medical record the discussion of the discharge plan and the attending physician concurrence with the discharge plan prior to the patient's discharge, or the attending shall record his/her own note.

(8.1) An attending physician or supervisory resident shall discuss every new patient with the resident physician within 4 hours of admission of each such patient to the Intensive Care Unit. The resident shall document this discussion with the attending physician.

(8.2) An attending physician shall see and evaluate the patient within 24 hours after admission to the Intensive Care Unit, discuss this evaluation with the resident and document this evaluation and discussion in the medical record.

(8.3) An attending physician shall see and evaluate all admitted patients at least daily following admission and discuss this evaluation with the resident. The attending physician shall ensure that the resident includes in the progress note that he/she has discussed the case with the attending, or the attending physician shall record his/her own note to that effect.

The parties acknowledge that resident compliance of DHS policy requires that each party satisfy their respective obligations, with the Hospital employing residents, and the University employing the Faculty responsible for the oversight/teaching of residents.  To that end, the responsibilities of the University under this Agreement shall include proper teaching/instruction of the requirements of DHS policy as set forth in this section and appropriate

-7-

incorporation of the requirements of this section with resident competency evaluation.

A.9.3.3 *Monitoring and Corrective Action Regarding Compliance with DHS Policy*.  Monitoring and corrective action to determine and maintain compliance with Performance Goals set forth above shall be performed through the Hospital's existing quality assurance/quality improvement structure and committees, or as modified in accordance with Hospital bylaws, and rules and regulations.

In addition, within six months of the execution of this Addendum, the Hospital shall work with the University to establish a process for the University to monitor compliance with the Performance Goals set forth above.

A.9.4   Operative Procedures for Residents.  The University shall ensure that each department develops within 60 days of execution of this Addendum, and updates as needed to reflect any changes, or on an annual basis, whichever is more, the following:
1.  a list of residents designated as supervisory residents.
2.  a list of operative procedures that may be conducted by a supervisory resident to be approved by the Medical Executive Committee and Network Executive Committee.

A.9.4.1 *Clinical Core Measures*. The Parties agree that quality patient care is critical to the missions of the University and the County. To that end, the University shall use best efforts to achieve 90% compliance with the following clinical core measures:
1.    Heart Failure-3:ACEI or ARB for LVSD
2.    Heart Failure-2: Evaluation of LVS function
3.    Pneumonia 3b: Blood cultures performed in the Emergency Department prior to initial antibiotic received in the Hospital.
4.    Pneumonia 6b: Initial antibiotic selection for community acquired pneumonia in immunocompetent patients – non ICU patients.
5.    Pneumonia 6a: Initial antibiotic selection for community acquired pneumonia in immunocompentent patients – ICU patients
6.    Acute MI - 1: Aspirin on arrival.
7.    Acute MI - 2: Aspirin prescribed at discharge.
8     Acute MI - 3: ACEI or ARB for LVSD.
9.    Acute MI - 5: Beta blocker prescribed at discharge.
10.   Acute MI - 6: Beta blocker on arrival.
11.   Acute MI - 8a: Median time to primary PCI received within 90 minutes of hospital arrival.
12.   SCIP 1a: Prophylactic antibiotic received within one hour prior to surgical incision, overall rate.
13.   SCIP 2a: Prophylactic antibiotic selection for surgical patients, overall rate.
14.   SCIP 3a: Prophylactic antibiotics discontinued within 48 hours after surgery end time, overall rate.

A.9.4.2 *Monitoring and Corrective Action Regarding Compliance with Clinical Core Measures.*  Monitoring and corrective action to determine and maintain compliance with Performance Goals set forth in Paragraph A.9.4.1 above shall be performed through the Hospital's existing quality

assurance/quality improvement structure and committees, or as modified in accordance with Hospital bylaws, and rules and regulations.

**A.10** **COUNTY'S PHYSICIAN PAY PLAN.** The parties acknowledge that the County has recently approved a new physician pay plan, and will be approving a new rate structure for physician employees represented by a collective bargaining group, for reimbursement of County-employed physicians and dentists. In order to implement the foregoing, the parties agree to the following terms subject to the approval by the County physicians' collective bargaining group.

1. Faculty who are County employees, who receive funds derived from this Agreement and who are tenured Faculty as of the date of execution of this Addendum shall maintain their dual employment status at the County and the University.

2. All other Faculty who are County employees and who receive funds derived from this Agreement shall have the following options:

   a. Resign from County employment and receive all compensation from the University for all services to be provided at Primary County Facilities. The County shall pay to the University the annual base salary paid to the physician by County at the time such option is selected. University agrees to accept such employee and pay to him or her the base salary amount provided by the County. Nothing in this Agreement shall be construed to restrict any County employee from resigning from County service at any time upon his or her determination.

   b. Cease receiving any compensation by the University of funds derived from this Agreement for all services to be provided at Primary County Facilities and receive compensation from the County under the County's new pay plan, except as set forth below. The University agrees to provide to County the total of compensation of funds derived from this Agreement and paid by University to such Faculty for the most recent Contract Year. Further, the County shall reduce this compensation amount on a pro rata basis from the payments made by the County to the University under this Agreement. The University acknowledges that County employees are prohibited under County policy from working for more than 24 hours per week outside of County employment.

   Notwithstanding the foregoing, to the extent permitted by County outside employment, and other applicable, rules and policies, a County physician may provide services to the County through the University. In addition, a County physician may be eligible to receive funds distributed from the Management Performance Plan.

   Replacement (due to attrition) of physicians who choose option b shall be in accordance with section A.2.4.3 above.

   c. If the physician does not choose option a. or b., the physician shall continue to receive compensation from the County, under the old pay plan, and compensation from the University.

The parties agree to work collaboratively to implement these provisions within a time frame agreed to by the Parties. The parties contemplate holding a joint meeting with each Faculty who is eligible to select between option a. or b. above to discuss the pay

plan and other related matters such as reimbursement and benefits provided by the County and the University.

Nothing in this Agreement shall be construed to restrict the existing right of a County employee to resign from County employment at any time at his or her discretion.

Subject to section 2.1.2.2, the University is solely responsible for setting the compensation paid by the University to County employees in connection with services performed under this Agreement.