1  MARLAN B. WILBANKS (SBN 758223 - Admitted Pro Hac Vice)
2  mbw@wilbanksgouinlock.com
   SUSAN S. GOUINLOCK (SBN 303217 - Admitted Pro Hac Vice)
3  ssg@wilbanksgouinlock.com
4  WILBANKS & GOUINLOCK, LLP
   3490 Piedmont Road, NE, Suite 1010
5  Atlanta, Georgia  30305
6  Telephone:  (404) 842-1075

7  ALICE CHANG (SBN 239761)
8  alicechangjdmba@gmail.com
   1301 Kenwood Road, Unit 159B
9  Seal Beach, CA 90740
10 Telephone: (714) 507-6161

11 ELIOT J. RUSHOVICH (SBN 252343)
12 eliot@riselawfirm.com
   LISA M. WATANABE-PEAGLER (SBN 258182)
13 lisa@riselawfirm.com
   ELISSA A. WAIZMAN (SBN 329959)
14 elissa@riselawfirm.com
15 RISE LAW FIRM, PC
   8383 Wilshire Boulevard, Suite 315
16 Beverly Hills, CA 90211
17 Telephone: (310) 728-6588

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> **9/20/21**
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY:      SE         DEPUTY

18
   *Attorneys for Relators and Plaintiff-Relator*
19

20          **IN THE UNITED STATES DISTRICT COURT**

21          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

22

23 **[UNDER SEAL],**                    **CASE NO. CV 18-08311-ODW(AS)**
                    Plaintiffs,
24          v.                          **PART 7 OF 13**
                                        **(EXHIBITS 50 – 54)**
25 **[UNDER SEAL],**
26                  Defendants.         **FOURTH AMENDED COMPLAINT**

27

28          **[FILED IN CAMERA AND UNDER SEAL**
            **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**

1   MARLAN B. WILBANKS (SBN 758223 – Admitted Pro Hac Vice)
2   mbw@wilbanksgouinlock.com
    SUSAN S. GOUINLOCK (SBN 303217 -Admitted Pro Hac Vice)
3   ssg@wilbanksgouinlock.com
    WILBANKS & GOUINLOCK, LLP
4   3490 Piedmont Road, NE, Suite 1010
5   Atlanta, Georgia  30305
    Telephone:  (404) 842-1075
6

7   ALICE CHANG (SBN 239761)
8   alicechangjdmba@gmail.com
    1301 Kenwood Road, Unit 159B
9   Seal Beach, CA 90740
    Telephone: (714) 507-6161
10

11  ELIOT J. RUSHOVICH (SBN 252343)
12  eliot@riselawfirm.com
    LISA M. WATANABE-PEAGLER (SBN 258182)
13  lisa@riselawfirm.com
    ELISSA A. WAIZMAN(SBN 329959)
14  elissa@riselawfirm.com
    RISE LAW FIRM, PC
15  8383 Wilshire Boulevard, Suite 315
16  Beverly Hills, CA 90211
    Telephone: (310) 728-6588
17

18
    *Attorneys for Relators and Plaintiff-Relator*
19

20            **IN THE UNITED STATES DISTRICT COURT**

21         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

22

23                                    | **CASE NO. CV 18-08311-ODW(AS)**

24  **UNITED STATES OF AMERICA** *ex*
    *rel.* **IONM LLC**, a Delaware corporation   **PART 7 OF 13**
25  and *ex rel.* **JUSTIN**                      **(EXHIBITS 50 – 54)**
    **CHEONGSIATMOY, M.D**.;
26  **STATE OF CALIFORNIA** *ex rel.*             **FOURTH AMENDED COMPLAINT**
27  **IONM LLC**, a Delaware corporation and
    *ex rel.* **JUSTIN CHEONGSIATMOY,**
28

1    **M.D**; and **LOS ANGELES COUNTY** *ex*
2    *rel.* **IONM LLC**, a Delaware corporation;
     and *ex rel.* **JUSTIN**
3    **CHEONGSIATMOY, M.D.**, and
4    **JUSTIN CHEONGSIATMOY, M.D.**, in
     his individual capacity
5
6                    Plaintiffs,
7             v.
8
9    **UNIVERSITY OF SOUTHERN**
10   **CALIFORNIA**, a California corporation;
     and
11
12   **USC CARE MEDICAL GROUP, INC.**,
     a California corporation,
13
14                    Defendants.
15
16
17
18

19          **[FILED IN CAMERA AND UNDER SEAL**
20           **PURSUANT TO 31 U.S.C. § 3730(b)(2)]**
21
22
23
24
25
26
27
28

FOURTH AMENDED COMPLAINT EXHIBITS PART 7 OF 13 (50-54)
CASE NO. CV 18-08311-ODW(AS)

# Exhibit 50



Los Angeles County
Board of Supervisors

Gloria Molina
First District

Mark Ridley-Thomas
Second District

Zev Yaroslavsky
Third District

Don Knabe
Fourth District

Michael D. Antonovich
Fifth District

Mitchell H. Katz, M.D.
Director

Hal F. Yee, Jr., M.D., Ph.D.
Chief Medical Officer

Christina Ghaly, M.D.
Deputy Director, Strategic Planning

313 N. Figueroa Street, Suite 912
Los Angeles, CA 90012

Tel: (213) 240-8101
Fax: (213) 481-0503



To ensure access to high-quality,
patient-centered, cost-effective health
care to Los Angeles County residents
through direct services at DHS facilities
and through collaboration with
community and university partners.



June 18, 2013

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, California 90012

Dear Supervisors:

**AMENDMENT TO MEDICAL SCHOOL AFFILIATION AGREEMENT
BETWEEN THE COUNTY OF LOS ANGELES AND THE UNIVERSITY OF
SOUTHERN CALIFORNIA
(1st SUPERVISORIAL DISTRICT)
(3 VOTES)**

## SUBJECT

Request approval of an amendment to the Medical School Affiliation
Agreement with the University of Southern California to adjust staffing levels,
obtain participation of Medical School Affiliation Agreement providers as
Subject Matter Experts in the design, build and implementation of the
Department of Health Services' electronic health record system, and increase
the maximum contract amount accordingly.

**IT IS RECOMMENDED THAT THE BOARD:**

1.  Make a finding as required by Los Angeles County Code section 2.121.420
that contracting for the provision of physician services at LAC+USC Medical
Center (LAC+USC MC), as described herein, can continue to be performed
more feasibly by contracting with the private sector.

2.  Approve and instruct the Chairman to sign the attached Amendment No. 6
to Medical School Affiliation Agreement No. 75853 (MSAA) with the University
of Southern California (USC) for the provision of physician medical education
and patient care      services, effective upon Board approval to: a) include
additional purchased services  to increase surgical, radiological and
psychiatric capacity and cover various specialties resulting from attrition of

The Honorable Board of Supervisors
6/18/2013
Page 2

County physicians; b) reduce purchased services to decrease pathology services for a physician returning to County service; c) reduce the net contract maximum to account for the final effect of the Physician Pay Plan, d) enable Department of Health Services' (DHS) to utilize USC Subject Matter Experts (SME) for a maximum five-year period through June 30, 2018 to participate in the design, build and implementation of the DHS' electronic health record system known as ORCHID; and e) increase the overall maximum annual obligation of the MSAA from $126,703,786 to $134,885,834 for the period beginning July 1, 2013.

3.   Delegate authority to the Director of Health Services (Director), or his designee, to execute future MSAA Amendments to enable USC providers to assign "eligible professional" (EP) incentive payments available under the HITECH Act to DHS and permit a one-time only reimbursement, up to $1,500 per EP, either to USC for payment to the EP, or to directly each EP, to be applied toward the purchase of an electronic device and other DHS-approved technology.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION

Approval of the first recommendation is necessary to comply with Los Angeles County Section 2.121.420, as amended on November 21, 2006, whereby contracting for physician services is allowed upon a Board determination that the use of independent contractors is more feasible than the use of County employees.  The Department has evaluated the Agreement's physician services, and recommends the Board's determination thereof.

Approval of the second recommendation will amend the MSAA to increase the volume of physician services and adjust the staffing levels and costs based on current service needs, as described below:

Additional Purchased Services

Anesthesiologists.  In anticipation of an initial increase to the number of surgeries performed under the Affordable Care Act (ACA), LAC+USC MC plans to implement longer hours for its Operating Rooms in order to increase patient access and capacity. Additional anesthesiologists are needed to maximize surgical capacity and throughput by reducing the number of surgical overruns, delays, and cancellations resulting from a lack of such specialists.  It also has the added benefit of reducing the number of denied days and clinical risks resulting from surgical delays and cancellations, and reducing the extensive backlog of outpatient and inpatient surgical procedures.  DHS is requesting to add anesthesiologists (2.0 Full Time Equivalents or FTEs) at a total annual cost of $758,318.

Radiologists.  LAC+USC MC's Department of Radiology plays an important role by meeting the clinical demands for timely reads of diagnostic scans by a radiologist.  An additional radiologist is needed to increase the read capacity to support the diagnostic needs of DHS facilities and participating Community Partners, and update the Department of Radiology's standards, policies and protocols accordingly.  DHS is requesting to add a radiologist (1.0 FTE) at an annual cost of $412,189.

Psychiatrists.  Due in part to the increasing number of AB109 parolees who require emergency psychiatric services combined with an increasing general caseload volume, LAC+USC MC's Psychiatric Emergency Services (PES) is currently understaffed.  To ensure the provision of safe, efficient, and high-quality psychiatric care, the Department is proposing to add psychiatrists (4.0

The Honorable Board of Supervisors
6/18/2013
Page 3

FTEs) to the Agreement at a total annual cost of $1,056,000 (3.0 FTE of additional purchased service and 1.0 FTE through attrition.  The contract cost for the additional psychiatrists will be offset from AB 109 funds (available amount unknown at this time) based on claims submitted by LAC+USC MC.

Attrition.  The MSAA provides that upon the attrition of a County-employed physician, the Director may either hire a replacement or direct USC to provide such services using University physicians.  Since FY 2009-10, DHS had directed USC to provide such services for various specialties using under-expended Agreement funding to cover the cost.  With full implementation of Addendum A services, such funds are no longer available.  DHS is proposing to continue the purchased services of various specialists (18.5 FTEs, excluding the 1.0 FTE re-purposed to PES as set forth in the above paragraph) at a total annual cost of $4,683,384.

Physician Pay Plan.  In 2008, the Physician Pay Plan was offered to County physicians who were receiving a compensation from USC.  County physicians were given the option to receive all of their salary from either the University, or the County under the Pay Plan.  Physicians were also were given the option to remain "status quo" and continue to receive compensation from both parties.  The majority of these physicians opted to forgo their USC salary and instead receive such compensation from the County under the Pay Plan.  Overall, the net effect of these actions has reduced the contract maximum obligation level by $1,482,583.

ORCHID SMEs.  The implementation of ORCHID requires each of the DHS facilities to appoint SMEs from various disciplines to participate in the design, build, and implementation.  Each SME will assist in the analysis of current clinical processes, identification of best practices, workflow redesign, process standardization and change management, risk identification and mitigation, testing and validation, education and training and implementation support.  DHS determined it was beneficial for USC MSAA physicians to participate as SMEs with the DHS SMEs in the ORCHID implementation process.  USC SME participation is outside of the MSAA Purchased Services. Pursuant the recommended Amendment,  DHS will reimburse USC for those physicians serving as SMEs for the duration of the ORCHID project based on an all-inclusive hourly rate of $150, as well as up to $25,000 to cover SME traveling expenses to participate in ORCHID project meetings at the EHR vendor facilities in Kansas City, Missouri  The Amendment allows for an annual payment to USC not to exceed $3,000,000 for the USC SME physicians' participation, which shall not exceed a total of 20,000 hours annually.  Reimbursement of travel expenses for the USC SMES will be will be subject to the dollar limits on allowable travel expenses for County employees and based on presentation of receipts.

Reduced Purchased Services

On November 26, 2012, a University physician, a Senior Pathologist, officially transferred back to the County.  As a result, DHS is requesting to delete a Senior Pathologist (1.0 FTE) from the Agreement along with the annual cost of $270,260.

EPs

Approval of the third recommendation will enable the Director, or his designee, to amend the existing MSAA to require USC providers to assign or re-assign their EP incentive payment to the County/DHS to provide needed funding for the ORCHID implementation.  Under the HITECH Act, each USC provider utilizing ORCHID and demonstrating "meaningful use" could be eligible to receive up to $64,000 in incentives. Approval of the recommendation will also permit DHS to use up to $1,500 of this incentive to help fund the purchase of an electronic device and other DHS-approved

The Honorable Board of Supervisors
6/18/2013
Page 4

technology for each USC EP who assigns their incentive payments to County/DHS, on a one-time only basis during the term of the MSAA.  These actions are consistent with the Board's prior approval of delegated authority to DHS to amend other agreements to ensure assignment of EP incentives and reimbursement for qualified technology purchases up to $1,500.

## Implementation of Strategic Plan Goals

The recommended actions support Goal 1, Operational Effectiveness, of the County's Strategic Plan.

## FISCAL IMPACT/FINANCING

The maximum annual County obligation for LAC+USC MC under the Amendment in Fiscal Year (FY) 2013-14 will be $134,885,834, an increase of $8,182,048 from the previous fiscal year's maximum obligation of $126,703,786.  Funding will be requested in the DHS' FY 2013-14 Supplemental Budget Resolution Budget Request.  The cost of the additional purchased services and attrition will be offset by the reduction of vacant budgeted positions, AB109 revenue, physician pay plan adjustments, and resources.

The specific funding for the USC SME participation in ORCHID implementation was included in the total ORCHID project amount as part of the SME cost.

The incentive payments that DHS would receive under the ACA for each EP who assigns their EP incentive payment to DHS will offset the one-time only $1,500 maximum per individual reimbursement to each EP for the purchase of DHS-approved electronic devices or other technologies.

Funding for future years will be requested as necessary.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS

DHS entered into the current MSAA with USC August 1, 2006 through June 30, 2007, with a one-year automatic extension at the end of each contract year.  The term of the current Agreement is for a rolling five-year term unless either party serves notice of non-renewal to the other party, in which case the MSAA would expire in four years. The MSAA was subsequently amended to accommodate the Replacement Facility for the LAC+USC MC, adjust staffing levels and provide additional compensation to retain current physician staffing, and add additional purchased services and funding to meet LAC+USC MC patients' needs and ensure full compliance with accreditation standards.

County Counsel has advised that the portion of the Agreement related to academic and patient care service are not subject to the provisions of County Code Chapter 2.121, Contracting with Private Business (Proposition A).

The portion of the Agreement relating to the ORCHID SMEs contains provisions that enable termination of that portion of the Agreement by either party upon notice of non-renewal ninety 90 days prior to the end of the MSAA contract year.

County Counsel has reviewed and approved Exhibit I as to form.

The Honorable Board of Supervisors
6/18/2013
Page 5


**CONTRACTING PROCESS**

Not applicable.


**IMPACT ON CURRENT SERVICES (OR PROJECTS)**

The recommended Amendment adjusts the staffing levels in preparation of the projected increase in utilization under ACA implementation, and enables access to USC SMEs to assist the Department with its implementation of ORCHID.


Respectfully submitted,

Mitchell H. Katz, M.D.
Director

MHK:ck

Enclosures

c:   Chief Executive Office
     County Counsel
     Executive Office, Board of Supervisors

Contract No. <u>75853</u>

## AFFILIATION AGREEMENT

Amendment No. 6

THIS AMENDMENT is made and entered into this _____ day

of _____ , 2013,

      by and between                        COUNTY OF LOS ANGELES
                                                (hereafter "County")

      and                                THE UNIVERSITY OF SOUTHERN
                                                CALIFORNIA (hereafter "University").

WHEREAS, reference is made to that certain document entitled "AFFILIATION

AGREEMENT", dated August 29, 2006, as amended by Amendment to the Affiliation

Agreement dated November 14, 2008, Amendment No. 1 dated November 25, 2008,

Amendment to Affiliation Agreement dated November 14, 2008, Amendment No. 3

dated April 19, 2011, Amendment No. 4 dated June 28, 2011, and Amendment No.

5 dated November 13, 2012, further identified as County Agreement No. 75853

(collectively, hereafter "Agreement");

WHEREAS, it is the desire of the parties hereto to amend the Agreement and

add Addendum A-5 and Addendum A-5-a as described hereafter;

WHEREAS, said Agreement provides that changes may be made in the form of a

written amendment, which is formally approved and executed by both parties; and

NOW, THEREFORE, the parties hereby agree as follows:

    1.      This Amendment shall become effective July 1, 2013.

    2.      Any reference in the Agreement to Addendum A, A-1, A-2, A-3, or A-4

shall also refer to Addendum A-5, as appropriate.

    3.      Addendum A-5 shall be added to the Agreement, attached hereto and

incorporated herein by reference.

    4.      Addendum A-5-a shall be added to the Agreement, attached hereto

and incorporated herein by reference.

5.      Except for the changes set forth herein, the remaining terms and conditions of the Agreement shall remain in full effect.

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

HOA.986851.2                           -2-

IN WITNESS WHEREOF, the Board of Supervisors of the County of Los Angeles has caused this Amendment to be subscribed by its Chair and seal of said Board to be hereto affixed, and attested by the Executive Officer thereof, and Contractor has caused this Amendment to be subscribed in its behalf by its duly authorized officers, the day, month and year first above written.

COUNTY OF LOS ANGELES

By _____
      Chairman, Board of Supervisors

SACHI A. HAMAI,
Executive Officer Board
of Supervisors of the
County of Los Angeles

UNIVERSITY OF SOUTHERN CALIFORNIA
                                    Contractor

By _____ Todd Dickey _____  6-14-13
              Todd Dickey

By _____
              Deputy

Title Senior Vice President, Administration
      (AFFIX CORPORATE SEAL HERE)

APPROVED AS TO FORM
County Counsel

By _____
      Principal Deputy County Counsel

-3-

**USC ADDENDUM A-5**
**Purchased Services**

**Contract Year Ending June 30, 2014**

**A.1**    **General.**  Payment for Purchased Services will be made by County to University in the amounts set forth in Section A.3 below and Addendum A-5-a attached hereto and incorporated herein by reference.  Payment for Purchased Services shall be made in quarterly installments, each payable on the first business day of each Contract Year quarter.  In addition, if County requests increases in the volume of any Purchased Services identified in this Addendum A or Addendum A-5-a, County will pay for such services in advance on a quarterly basis.  University is not obligated to provide such supplemental services until University receives payment from County for those services. Except with regard to additional Purchased Services provided by University pursuant to Section A.2.4.3 *Attrition of County-Employed Physicians*, any new services which the Parties agree to commence during the Contract Year, of a nature not set forth in this Addendum A and Addendum A-5-a, will be provided pursuant to an amendment or separate agreement between the Parties, subject to the approval of the Governing Board; such new services will be taken into account in revising Addendum A for the next Contract Year.  Any such revisions to this Addendum A and Addendum A-5-a shall not take effect without a properly executed amendment.

**A.2**    **Purchased Services.**  University shall provide the following Purchased Services during the Contract Year beginning July 1, 2013 and ending June 30, 2014 . The type and volume of Purchased Services provided during the Contract Year shall continue on an annualized University Personnel FTE basis, as provided by University Personnel during the prior Contract Year.  With the exception of Subject Matter Expert Services set forth in Addendum A-5-a, all other Purchased Services shall be provided at the same overall level during the prior Contract Year unless otherwise expressed in this Addendum A.

   A.2.1   <u>Clinical Services.</u>  Except for those services which may be provided by persons other than University Personnel, University shall provide those clinical services sufficient to address the goals and responsibilities set forth in §5.4.

   A.2.2   <u>Non-Clinical Academic and Administrative Services.</u>  Except as provided by persons other than University Personnel, University shall provide academic and management services sufficient to address the goals and responsibilities set forth in §§ 5.3 and 5.5, respectively, including Subject Matter Expert services set forth in Addendum A-5-a .

   A.2.3   <u>Research.</u>  The Parties understand and agree that no funds paid under this Agreement shall be used to pay for non-clinical research. If it is determined that any funds are used to pay for non-clinical research, University shall reimburse County such amount.

   A.2.4   <u>Volume of Purchased Services.</u>  Until measures are developed to more accurately define the volume of Purchased Services, the Parties agree that the volume of all services will be measured on the basis of full time equivalents (FTEs) for physicians and other University Personnel.

      A.2.4.1 Intentionally omitted.

| | FTE COUNT | | |
| --- | --- | --- | --- |
| | Physician and Dentist FTEs* | Non-Physician FTEs** | Total FTEs |
| Base Contract as of Contract Year 2013 | 595.75 | 81.75 | 677.50 |
| New Contract Year 2014 | 34.50 | 0 | 34.50 |
| **Total** | **630.25** | **81.75** | **712.00** |

*The FTEs include a fraction of the effort of 9 direct County-paid physicians who receive a stipend from University (to be verified by the Hospital).

**The FTEs include Intra-Operative Monitoring (IOM) Technicians. University shall continue to provide IOM Technicians effective July 1, 2013 at the same rates set forth in Amendment No. 5 of this Agreement, and annually thereafter, unless University provides written notice to Director by February 15 to request changes effective July 1 of that same calendar year. County may terminate the FTEs related to IOM Technicians upon 90 days prior written notice. 

A.2.4.2   *Allocation of FTEs*.  The allocation of University Personnel FTEs among Departments may be changed upon written agreement of the Chief Medical Officer, CEO and University Representative that such reallocation optimizes the use of personnel in the performance of this Agreement.

A.2.4.3   *Attrition of County-Employed Physicians*.  Upon attrition of a County-employed physician in Primary County Facilities, Director may (1) hire a replacement or (2) direct University, for the remainder of the Contract Year to provide the services previously provided by such County physician through University-employed physicians, which shall constitute additional Purchased Services under this Agreement for which University shall be compensated during the Contract Year in addition to the contract maximum amount set forth in this Addendum A.

A.2.4.4   Intentionally omitted.

**A.3**   **Payment for Purchased Services.** County shall compensate University as set forth below.

| | Contract Year 2013 (annualized) |
| --- | --- |
| **Contract Maximum Amount (from MSOA Addendum A-4)** | **126,703,786** |

/

//

**Additional Funding Needed for Current Services:**

> **ADDITIONAL FTEs**

| | | |
|---|---|---|
| 1. | Anesthesiologist (2.0 FTE) | 758,318 |
| 2. | Radiologist (1.0 FTE) | 412,189 |
| 3. | Psychiatrist (4.0 FTE)* | 1,056,000 |

> *Includes 1.0 FTE of attrition that is being re-purposed.

| | | |
|---|---|---|
| 4. | Various Specialists (not to exceed 10.0 FTE)*<br>(EHR Subject Matter Experts) | 3,025,000 |

> *Effective 7/1/2013 through 6/30/2018 unless sooner cancelled
> or terminated as provided under Paragraph 8.1 of this Agreement.

| | | |
|---|---|---|
| 5. | Various University Physicians to<br>replace County-employed<br>Physicians as a result of attrition (18.5 FTE)* | 4,683,384 |

> *Excludes 1.0 FTE that is being re-purposed to emergency psychiatric services.

> **Subtotal (35.5 FTE)**          **9,934,891**

> **DELETED FTE**

> Senior Pathologist (1.0 FTE)          (270,260)

> **Subtotal (1.0 FTE)**          **(270,260)**

> **PHYSICIAN PAY PLAN ADJUSTMENT**          **(1,482,583)**

**Contract Maximum Amount (Contract Year 2014)**          **134,885,834**

### A.4  Volume of Purchased Services.

A.4.1.  <u>Academic Purchased Services.</u>  During the term of this Agreement, Academic Purchased Services will be performed by Faculty in accordance with the requirements of this Agreement.  The parties agree during the Contract Year to work together to develop a new methodology for determining payments for the provision of Academic Purchased Services under this Agreement.

A.4.2.  <u>Academic and Clinical Administrative Purchased Services.</u>  During the term of this Agreement, University shall provide Academic and Clinical Administrative Purchased Services as needed to support the Training Programs in accordance with the requirements of this Agreement.  The Parties agree during the Contract Year to work together to develop a new methodology for determining payments for the provision of University Academic and Clinical Administrative Purchased Services under this Agreement.

A.4.3.  <u>Mission Support.</u>  County is committed to promoting medical education in its community, as reflected through County's affiliation with University and County's participation in graduate medical education training programs accredited by the Accreditation Council for Graduate Medical Education.  The

Parties agree during Contract Year 2009 to work together to develop a methodology for providing mission support to University.

**A.5**  **Community-Based Health Services Planning.**  University agrees to participate in the County's community based planning efforts.  These planning efforts include but are not limited to: resizing the breadth and depth of primary and specialty care programs to meet local community needs, disease burden and public health initiatives; resizing the breadth and depth of tertiary and quaternary services to fit effectively within system-wide DHS clinical programs; expansion of outpatient diagnostic and therapeutic programs at Hospital and other community–based sites; sizing ACGME, ADA and other allied health programs in concert with service delivery planning; and developing, implementing and reporting evaluation metrics for the quality and efficiency of the service delivery program.

**A.6**  **Replacement Hospital Transition Planning.**  County agrees to participate with the University to maximize collaborative planning for the transition to the Hospital replacement facility during the term of this Addendum.  Through such planning, County agrees to provide adequate office space, on-call rooms, and other support space for University administration, clinical service, and teaching in the Hospital replacement facility.

County also agrees to make best efforts to ensure the continuing viability of University Training Programs in the Hospital replacement facility.  Pursuant to section 2.6.1 of this Agreement, University will notify County of any matters within the control of County in transitioning to the Hospital replacement facility that to the University's knowledge may compromise accreditation of any University Training Program.  In the event County receives such notice, County will cooperate with University to make all reasonable efforts to retain accreditation.  The parties understand and acknowledge that County has a continuing obligation to provide adequate non-physician staffing support pursuant to section. 3.3.4 of the Agreement.

**A.7**  **Faculty Teaching Incentive Fund**.  Facility JPO Committee will establish annual awards for excellence in teaching to be awarded to Faculty. Faculty awardees and the amount of the awards will be determined by the Facility JPO based on written criteria to be jointly developed by University and County.  In developing written criteria, University and County shall include resident and medical student participation as necessary criteria. Parties agree to equally finance this Incentive Fund, with each party contributing $25,000 annually.

**A. 8**  **Primary County Facilities**.  Those facilities listed in Exhibit 2 shall constitute the Primary County Facilities where Purchased Services may be performed.

**A.9**  **Information Physician Workload and Productivity.**  The Parties shall work collaboratively to achieve both the clinical and operational goals as identified in the Hospital's mission and strategic plan.  These include both short and long range goals, which will be refined and updated on an annual basis as part any revisions to this Addendum.  To address a long range goal of improving information on attending staff workload and productivity, the parties agree to implement an initial two part solution:

A.9.1  <u>Amion Physician Scheduling</u>.  The Hospital shall provide the Amion electronic attending staff scheduling program for use by University.  Within six months of providing the University access to Amion, or within six months of the execution of this Addendum, whichever is later, and in accordance with a timetable established by University and accepted by County, the University shall install

-4-

and operate the Amion electronic attending staff scheduling program in a manner that identifies physicians in all clinical departments providing Purchased Services at Hospital each day (the "Hospital Schedules").  Hospital will have online access to the Hospital Schedules through Amion.

A .9.1.1   The University shall be responsible for the input, security and access of all data into Amion.  To ensure accuracy, the University shall update physician scheduling data into Amion on not less than a daily basis and will periodically validate Hospital Schedules.

A.9.1.2   Upon request of the County, the University shall verify the accuracy of physician schedules in Amion as compared to actual physicians who have worked and the amount of hours worked by such physicians.  The above verification may include one, several or all departments/services in the Hospital.

A.9.2   The parties acknowledge that the Hospital and University have completed three Memoranda of Understanding to measure performance and productivity of Purchased Services for the Harris-Rodde Specialty Clinics Coverage, Echocardiography and Radiation Oncology, anticipated to be executed by the parties within one month of execution of this Addendum. Hospital and University mutually agree to work together to develop additional Memoranda to measure performance and productivity for other major clinical Purchased Services as agreed by the Parties.  The Parties shall use good faith efforts to complete and execute such Memoranda within twelve months of execution of this Addendum.

The Parties shall develop a mutually agreed upon system to track compliance with the performance and productivity goals identified in each Memorandum of Understanding (the "Tracking System").  When Hospital has reasonably determined that the performance and productivity goals under one (or more) Memorandum have not been met by University based on the data from the Tracking System, the Hospital shall notify the University in writing within twenty (20) days of such determination (the "Notice").  The Notice shall be delivered to the Office of the Dean of the Keck School of Medicine, with a copy to the Office of the General Counsel. The Notice shall identify the specific performance and productivity goal by type and amount of unmet services, as compared to the performance and productivity goal(s) under the applicable Memorandum as well as Hospital's efforts to correct any Hospital issues related to the performance and productivity goal(s) at issue.

Within thirty (30) business days of receiving the Notice from the Hospital, the University shall submit a corrective action plan to the Hospital which sets forth the specific action(s) to be taken to meet the performance and productivity goal(s) and time period for completion of the corrective action plan.  The Parties will work together to modify the corrective action plan to address each Party's concerns.

Disputes about each Party's compliance with the corrective action plan will be reviewed by an independent arbitrator selected by the Parties.  The arbitrator's fees will be equally borne by the Parties. If the arbitrator determines that, solely due to the acts or omissions of University, University has not implemented in good faith the material elements of the corrective action plan within the time period specified in the corrective action plan agreed to by the Parties, the Hospital may deduct from payment to be made to the University the Hospital's

actual and reasonable additional cost to provide the unmet services that directly result from such failure to meet the performance and productivity goals (except with respect to any goal established for new patients or new visits) through an alternative arrangement.

To the extent that the Parties desire University to provide services in excess of those established by the performance and productivity goals, they may increase those goals and provide for additional payment related to such services to University through an administrative amendment signed by both Parties, provided that such additional payment does not exceed the Contract Maximum Amount provided in Section A.3 of Addendum A.  To the extent that payment for such additional services would cause total payments due under this Addendum to exceed the Contract Maximum Amount, the Parties acknowledge that compensation may only be made for such additional services after the Governing Board approves a formal amendment to this Addendum A authorizing such supplemental services.

A.9.3. <u>Medical Record Documentation Performance Goals</u>**.**  The parties acknowledge the importance of accurate and timely documentation of patient medical information to facilitate patient treatment, care and services, particularly in the postgraduate physician teaching environment of the Hospital.  Such proper documentation is reflected in policies and standards applicable to the University, including, without limitation, the standards set forth by the Joint Commission (formerly defined as "JCAHO"), and policies issued by the County Department of Health Services.  In addition to other compliance obligations, the parties seek to emphasize compliance with the following:

A.9.3.1 *Joint Commission*.  The Parties agree to work together to maintain a medical record delinquency rate at or better than the full compliance threshold set forth by Joint Commission (IM 6.10; EP 11 "The medical record delinquency rate averaged from the last four quarterly measurements is not greater than 50% of the average monthly discharge (AMD) rate and no quarterly measurement is greater than the AMD rate.").  To that end, the University agrees to work with County toward compliance by ensuring that physicians meet this compliance threshold with respect to the physician components of the medical record.  For purposes of this section, a delinquent medical record is defined as a medical record available to the Physician for review and is further defined by Hospital Medical Staff Rules and Regulations.

A.9.3.2 *DHS Policy*.  The University agrees to work toward a 90% threshold compliance rate for the following components of DHS Policy 310.2, Supervision of Residents, or as subsequently amended by DHS, by ensuring that physicians meet this compliance threshold regarding the physician components of the medical records and activities which are set forth below. References to the specific provision of DHS Policy 310.2 are in parentheses.

(4.1)   An attending physician shall see and evaluate each patient prior to any operative procedure or delivery and shall document this evaluation in the medical record.

(4.2)   An attending physician is responsible to assure the execution of an appropriate informed consent for procedures and deliveries with consent form and progress note documenting the consent discussion in the medical record.

-6-

(4.4.1) If the attending is present for the operative or invasive procedure or delivery, he/she must document in the medical record that he/she has evaluated the patient and authorizes the procedure.

(4.4.2) If the attending physician is not present for the operative or invasive procedure or delivery, the supervisory resident shall document in the medical record that he/she has discussed the case with the attending and the attending authorizes the resident to proceed.

(4.5) An attending physician must assure an operative or procedure note is written or dictated within 24 hours of the procedure and shall sign the record of operation ("green sheet") in all situations for which direct attending physician supervision is required.

(5.1) An attending physician is responsible for supervision of the resident and appropriate evaluation of the patient for each emergency department visit.

(5.2) An attending physician or supervisory resident shall review and sign the patient's record prior to disposition.

(7.1) An attending physician shall see and evaluate each inpatient within 24 hours of admission and shall co-sign the resident's admission note or record his/her own admission note within 24 hours.

(7.2) An attending physician shall see and evaluate the patient at least every 48 hours and shall ensure that the resident includes in the progress note that he/she has discussed the case with the attending or the attending physician shall record his/her own note at least every 48 hours.

(7.3) An attending physician shall discuss the discharge planning with the resident. The resident shall document in the medical record the discussion of the discharge plan and the attending physician concurrence with the discharge plan prior to the patient's discharge, or the attending shall record his/her own note.

(8.1) An attending physician or supervisory resident shall discuss every new patient with the resident physician within 4 hours of admission of each such patient to the Intensive Care Unit. The resident shall document this discussion with the attending physician.

(8.2) An attending physician shall see and evaluate the patient within 24 hours after admission to the Intensive Care Unit, discuss this evaluation with the resident and document this evaluation and discussion in the medical record.

(8.3) An attending physician shall see and evaluate all admitted patients at least daily following admission and discuss this evaluation with the resident. The attending physician shall ensure that the resident includes in the progress note that he/she has discussed the case with the attending, or the attending physician shall record his/her own note to that effect.

The parties acknowledge that resident compliance of DHS policy requires that each party satisfy their respective obligations, with the Hospital employing residents, and the University employing the Faculty responsible for the oversight/teaching of residents. To that end, the responsibilities of the University under this Agreement shall include proper teaching/instruction of the requirements of DHS policy as set forth in this section and appropriate

-7-

incorporation of the requirements of this section with resident competency evaluation.

A.9.3.3 *Monitoring and Corrective Action Regarding Compliance with DHS Policy.* Monitoring and corrective action to determine and maintain compliance with Performance Goals set forth above shall be performed through the Hospital's existing quality assurance/quality improvement structure and committees, or as modified in accordance with Hospital bylaws, and rules and regulations.

In addition, within six months of the execution of this Addendum, the Hospital shall work with the University to establish a process for the University to monitor compliance with the Performance Goals set forth above.

A.9.4 <u>Operative Procedures for Residents.</u>  The University shall ensure that each department develops within 60 days of execution of this Addendum, and updates as needed to reflect any changes, or on an annual basis, whichever is more, the following:
1. a list of residents designated as supervisory residents.
2. a list of operative procedures that may be conducted by a supervisory resident to be approved by the Medical Executive Committee and Network Executive Committee.

A.9.4.1 *Clinical Core Measures*. The Parties agree that quality patient care is critical to the missions of the University and the County. To that end, the University shall use best efforts to achieve 90% compliance with the following clinical core measures:
1. Heart Failure-3:ACEI or ARB for LVSD
2. Heart Failure-2: Evaluation of LVS function
3. Pneumonia 3b: Blood cultures performed in the Emergency Department prior to initial antibiotic received in the Hospital.
4. Pneumonia 6b: Initial antibiotic selection for community acquired pneumonia in immunocompetent patients – non ICU patients.
5. Pneumonia 6a: Initial antibiotic selection for community acquired pneumonia in immunocompentent patients – ICU patients
6. Acute MI - 1: Aspirin on arrival.
7. Acute MI - 2: Aspirin prescribed at discharge.
8 Acute MI - 3: ACEI or ARB for LVSD.
9. Acute MI - 5: Beta blocker prescribed at discharge.
10. Acute MI - 6: Beta blocker on arrival.
11. Acute MI - 8a: Median time to primary PCI received within 90 minutes of hospital arrival.
12. SCIP 1a: Prophylactic antibiotic received within one hour prior to surgical incision, overall rate.
13. SCIP 2a: Prophylactic antibiotic selection for surgical patients, overall rate.
14. SCIP 3a: Prophylactic antibiotics discontinued within 48 hours after surgery end time, overall rate.

A.9.4.2 *Monitoring and Corrective Action Regarding Compliance with Clinical Core Measures.*  Monitoring and corrective action to determine and maintain compliance with Performance Goals set forth in Paragraph A.9.4.1 above shall be performed through the Hospital's existing quality

-8-

assurance/quality improvement structure and committees, or as
modified in accordance with Hospital bylaws, and rules and regulations.

USC ADDENDUM A-5-a

Subject Matter Expert Services

Contract Year Ending June 30, 2014

1.0    <u>DESCRIPTION OF SERVICES</u>:  Subject Matter Experts (SMEs) shall provide services described hereunder to assist the DHS' Electronic Health Record (EHR)  Project  in designing, building, and implementing a uniform, standardized, and fully integrated EHR solution across enterprise-wide care settings and standardized associated workflow processes through a single, unified data structure.  For purposes of this Addendum A-5-a, "EHR Project Manager" shall mean the County employee designated by DHS to oversee the implementation of the County's EHR, otherwise known as ORCHID, including the services described herein.

2.0    <u>ADDITION/DELETION OF SMES</u>:

    2.1    <u>Addition of SMEs</u>:

        2.1.1    The EHR Project Manager shall identify and approve University Physicians with the expertise, availability, and interest to serve as SMEs under this Agreement.  Such approval shall include the projected work effort required and expressed as an estimated number of hours required to complete the services under this Agreement not to exceed 20,000 hours annually (if 40 hours per week equals 1 Full Time Equivalent (FTE), then this approximates 10 FTEs for 50 weeks, or 400 hours per week for 50 weeks).  All work effort will be recorded and reimbursed by the hour.  Work effort by SMEs will vary in intensity over the course of the project. It is understood by all parties that hourly estimates for the purposes of reimbursement projections are intended to reflect average work effort over time, and is subject to change.

        2.1.2    The EHR Project Manager shall provide University with prior written notice of intent to add a SME, including the projected number of hours, for the University's approval, which shall not unreasonably be withheld, or denial.

-10-

2.1.3    University shall approve or deny the EHR Project Manager's request in writing or via e-mail within 5 business days from the date of request by the EHR Project Manager.

2.1.4    Upon approval by University, the EHR Project Manager or his designee shall establish the specific tasks for each SME under the terms and conditions of this Agreement.

2.2    <u>Deletion of SME's</u>:

2.2.1    Either the EHR Project Manager or the University shall have the right to immediately remove SMEs assigned to perform the tasks hereunder provided that the party initiating the SME's removal provides prior written notification thereof to the other party.

2.2.2    Removals of the SME shall be considered for the convenience of the initiating party except when such removal is for:

2.2.2.1    SMEs deleted as a result of cancellation or completion of the Agreement.

2.2.2.2    SMEs deleted as a result of his or her death or incapacitating illness or injury.

2.2.2.3    SMEs deleted if the SME removes him or herself from the employ of the University or no longer desires to perform services under this Agreement.

3.0    <u>SPECIFIC WORK REQUIREMENTS</u>:  During the term, and for purposes, of this Agreement, University Physicians, who serve as SMEs under the terms of this Addendum A-5-a, may provide all or some of the following services at any or all  County health care facilities as determined by the EHR Project Manager:

3.1    Collaborate with the EHR Project Manager, EHR County vendor, and other stakeholders in designing, building, and implementing the EHR.  SMEs will also be expected to collaborate with DHS employees and County-contracted physicians from other sites in standardizing clinical processes and operations at all DHS facilities.

-11-

3.2     Use their knowledge of patient care operations to provide professional expertise to guide the design of the EHR as well as assist in its implementation by actively participating on subject-specific "project teams" to implement EHR in various clinical settings such as the operating room, intensive care unit, and emergency room. Such projects may include, but not be limited to:

    3.2.1    On-line clinical documentation by all care providers.

    3.2.2    Electronic order entry for all care delivery orders.

    3.2.3    Medical Coding for documentation.

    3.2.4    Decision Support for documentation and electronic order. Entry.

    3.2.5    Integrated ancillary systems (such as Pharmacy, Laboratory, and Radiology).

    3.2.6    Management of the admission, discharge, and transfer (ADT)  cycle including patient scheduling, registration and the Enterprise Master Patient Index (EMPI).

3.3     Possess excellent communication and leadership skills to utilize in championing EHR and representing their area of expertise across all of DHS.

3.4     Identify, contact, and recruit for participation, and solicit input from other thought leaders in their area of expertise across DHS.

3.5     Participate in DHS-wide clinical advisory committees and related bodies.

3.6     Convene and lead standardization committees and workgroups as necessary where no such body already exists.

3.7     Collaborate with Physicians and other County staff in their area of expertise from other County health care facilities facilities to standardize processes and operations. This includes, but is not limited to,:

    3.7.1    Making application design decisions and documenting decision making using vendor supplied software tools.

-12-

3.7.2    Identify risks and conflicts and escalate them through EHR project leadership and governance as applicable.

3.7.3    Attend and participate at regular project team working meetings.

3.7.4    Attend and participate at other EHR ad-hoc meetings as necessary or as requested by EHR project leadership.

3.7.5    Attend and participate at on-site EHR project events at vendor facilities in Kansas City, Missouri.

3.7.6    Attend and participate in trainings requested by the EHR Project Manager.

3.8    Assist project team and overall EHR leadership with all aspects of the design, build, and implementation of the EHR, which includes but is not limited to,:

3.8.1    Analysis of current clinical processes.

3.8.2    Identification of best practices.

3.8.3    Workflow redesign.

3.8.4    Process standardization and change management.

3.8.5    Risk identification and mitigation.

3.8.6    Testing and validation.

3.8.7    Education and training.

3.8.8.    Implementation support.

Implementation support may include on-site participation as an expert super-user during go-live activities at facilities throughout DHS during the course of phases implementation, and may require working a variety of shifts in a support role in different areas of the enterprise, including night shifts.

3.9    Assist with marketing and communication of EHR project status and updates to other clinicians and staff in the SME's regular work area and department, which includes but is not limited to,:

3.9.1    Leading by example by doing the work, showing commitment and demonstrating to others it can be done.

3.9.2    Helping others move through the cultural change process.

3.9.3    Sharing what they learn to professional colleagues.

3.9.4    Exhibiting enthusiasm, patience, and professionalism.

3.9.5    Communicating a consistent message to all staff; both clinical and non-clinical.

4.0    PAYMENT:

4.0.1    Physicians serving as SMEs under this Agreement will record the hours worked on the project on a time log using mechanisms to be determined by County.

4.0.2    EHR project team leaders, as designated by the EHR Project Manager, will review and reconcile time logs on a bi-weekly basis and provide the EHR Project Manager and USC contract administrator with time-log reports on a monthly basis.

4.0.3    County shall pay University quarterly in advance as set forth in Paragraph A.1 of Addendum A-5, and based on the estimated number of hours approved by the EHR Project Manager and rates set forth under Paragraph 5.0 below.

4.0.4    County shall adjust future payments based on a quarterly reconciliation of the actual number of hours worked by SMEs during the payment period.

4.0.5    University agrees that should any SME perform services not requested nor authorized by the EHR Project Manager, services shall be deemed to be a gratuitous effort on the part of Contractor and the physician, and neither party shall have any claim against County for such services.

4.0.6    In no event shall County be required to reimburse University for hours performed in this Addendum, which is covered by funding received by University for non-SME services provided under this Agreement or any other County agreement, or under other private or governmental entities.

4.07    The Parties understand and agree that the reimbursement provided by the County to University under this Addendum is intended to backfill those physicians

-14-

services that a SME would otherwise be providing to the County under the Medical School Affiliation Agreement (MSAA) between the Parties. To that end, University shall utilize the total amount of the reimbursement received from the County for the actual FTE services provided under this Addendum to purchase the equivalent amount of FTEs for the provision of Purchased Services under MSAA.

5.0     RATE SCHEDULE

        5.0.1    Services shall be compensated at the all-inclusive rates of $150 per hour, notwithstanding Paragraph 5.0.2 below.

        5.0.2    County shall make travel arrangements and pay for the SME's airfare and hotel accommodations for on-site EHR project events at County's EHR vendor facilities in Kansas City, Missouri. During such events, County shall reimburse University for other travel expenses in accordance with County's Travel Reimbursement Guidelines, Attachment 1, attached hereto and incorporated herein by reference. The total County and University expenses for these events shall not exceed $25,000 during FY 2013-14.

6.0     TERM:  The term of services provided under Addendum A-5-a shall be effective July 1, 2013, and shall continue in full force and effect through June 30, 2018, unless sooner canceled or terminated, as provided in Paragraph 8.1 of this Agreement. Notwithstanding the foregoing, the County may terminate this Addendum for convenience at any time upon six (6) months prior written notice to the University.

# Exhibit 51

| Account | Account Name | ANNUAL BUDGET | | | ENDING JAN 2018 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Beginning Budget | Budget Adjustment | Current Budget | Beginning Budget | Budget Adjustment * | Current Budget | Actuals YTD | (Under)/ Over Budget | |
| | MSAA | $ 1,890,283 | | $ 1,890,283 | $ 1,102,665 | | $ 1,102,665 | 1,306,954 | 204,288.92 | Transfer to ⟨✕⟩ NCC |
| | Ryan White | $ 42,944 | | $ 42,944 | $ 25,051 | | $ 25,051 | 21,333 | (3,717.67) | |
| | Mgmt Performance | | $ 5,775 | $ 5,775 | | $ 2,567 | $ 2,567 | 2,110 | (456.67) | |
| | ACGME Director | $ 72,908 | | $ 72,908 | $ 42,530 | | $ 42,530 | 42,526 | (3.67) | |
| | Adden A-3/Stroke | $ 242,549 | | $ 242,549 | $ 141,487 | | $ 141,487 | 159,683 | 18,196.08 | Stroke Division |
| | Adden A-3/IOM | $ 242,551 | | $ 242,551 | $ 141,488 | | $ 141,488 | 141,489 | 0.92 | |
| | IOM Tech Support | $ 303,000 | | $ 303,000 | $ 176,750 | | $ 176,750 | 207,626 | 30,876.00 | Call & Call Back Pay |
| | Adden A10.A.3 /NCC | | $ 431,437 | $ 431,437 | $ - | $ 191,750 | $ 191,750 | - | (191,749.78) | |
| Budget adjustment amortized over 9 months | | $ 2,794,235 | $ 437,212 | $ 3,231,447 | $ 1,629,970 | 194,316 | $ 1,824,287 | 1,881,721 | 57,434.14 | |
| | | | | | | | | | | |
| *Budget adjustment amortized over 12 months* | | $ 2,794,235 | $ 437,212 | $ 3,231,447 | $ 1,629,970 | 255,040 | $ 1,885,011 | 1,881,721 | (3,289.75) | |

| * Budget Adjustments: | | Transaction Date | Budget Adj | Amortized over 9 months (Oct17-Jan18) | Amortized over 12 months (Jul17-Jan18) | Variance |
|---|---|---|---|---|---|---|
| | Mgmt Performance | Oct 18 | $ 5,775 | $ 2,567 | $ 3,369 | (802) |
| | Adden A10.A.3 /NCC | Oct 18 | $ 431,437 | $ 191,750 | $ 251,672 | (59,922) |
| | | | $ 437,212 | $ 194,316 | $ 255,040 | (60,724) |

# Exhibit 52

Department of Neurology
Division: Intraoperative Monitoring
Fiscl Year 2018 Budget

| Employee Type | Employee Name | Account Number | Account Name | Object Code | Earning Name | Actual Dec16 | FY2017 Projected Actual | FY2018 Budget | % Effort |
|---|---|---|---|---|---|---|---|---|---|
| Faculty | Gonzalez, Andres A. | | PSA NEUROLOGY | 11905 | Core Earnings | $ 12,500 | $ 150,006 | $ 150,006 | 43.68% |
| | | | MSOA-NEUROLOGY IOM ADDEN A-3 | 11905 | Core Earnings | | $ 55,037 | $ 55,037 | 16.03% |
| | | | NEUROLOGY-CLINICAL | 11235 | Core Earnings | $ 13,200 | $ 158,394 | $ 103,357 | 30.10% |
| | | | PSA NEUROLOGY | 11930 | Stipend Pay | $ 417 | $ 5,001 | $ 5,001 | 1.46% |
| | | | MSOA-NEUROLOGY IOM ADDEN A-3 | 11930 | Stipend Pay | $ 2,500 | $ 29,999 | $ 29,999 | 8.74% |
| | | | | | Total IBS | $ 28,617 | $ 343,400 | $ 343,400 | 100.00% |
| | | | | | | | | | |
| | | | NEUROLOGY-CLINICAL | 11216 | Keck Clinical Service Overload Pay | $ 8,976 | $ 99,552 | $ 99,552 | |
| | | | NEUROLOGY-CLINICAL | 14240 | Keck School Clinical Incentive | | $ 196 | $ 17,519 | |
| | | | | | Total Call and Incentive Pay | $ 8,976 | $ 99,748 | $ 117,071 | |
| | | | | | | | | | |
| | Gonzalez, Andres A. Total | | | | Total Compensation | $ 37,593 | $ 443,148 | $ 460,471 | |
| | | | | | | | $ - | | |
| | Shilian, Parastou | | MSOA-NEUROLOGY IOM ADDEN A-3 | 11905 | Core Earnings | $ 12,640 | $ 151,680 | $ 96,643 | 48.32% |
| | | | NEUROLOGY-CLINICAL | 11235 | Core Earnings | $ 4,027 | $ 48,320 | $ 103,357 | 51.68% |
| | | | | | Subtotal IBS | $ 16,667 | $ 200,000 | $ 200,000 | 100.00% |
| | | | | | | | | | |
| | | | NEUROLOGY-CLINICAL | 11216 | Keck Clinical Service Overload Pay | $ 6,936 | $ 90,576 | $ 90,576 | |
| | | | NEUROLOGY-CLINICAL | 14240 | Keck School Clinical Incentive | | $ 67,516 | $ 20,879 | |
| | | | | | Total Call and Incentive Pay | $ 6,936 | $ 158,092 | $ 111,455 | |
| | | | | | | | | | |
| | Shilian, Parastou Total | | | | Total Compensation | $ 23,603 | $ 358,092 | $ 311,455 | |
| | | | | | | | | | |
| | Cheongsiatmoy, Justin | | NEUROLOGY-CLINICAL | 11235 | Core Earnings | 18,750 | $ 225,000 | $ 225,000 | |
| | | | | | | | | | |
| Staff | Nguyen, Nancy ($29.72/hr) | | MSOA-NEUROLOGY IOM TECH SUPPORT | 12700 | Base Pay - Non Exempt | $ 4,755 | $ 61,818 | $ 61,818 | 58.01% |
| | | | | 12705 | Overload Pay-Non-Exempt ($11.27/hr) | $ 2,775 | $ 31,844 | $ 31,844 | 29.88% |
| | | | | 12707 | Meal Sanction Earnings | $ 30 | $ 297 | $ 297 | 0.28% |
| | | | | 12710 | Overtime Pay - Staff | $ 782 | $ 11,201 | $ 11,201 | 10.51% |
| | | | | 12711 | Double Time Pay - Staff | $ 22 | $ 1,411 | $ 1,411 | 1.32% |
| | Nguyen, Nancy Total | | | | | $ 8,364 | $ 106,571 | $ 106,571 | 100.00% |
| | | | | | | | | | |
| | Parikh, Pooja ($31.90/hr) | | MSOA-NEUROLOGY IOM TECH SUPPORT | 12700 | Base Pay - Non Exempt | $ 5,120 | $ 44,235 | $ 66,352 | 54.77% |
| | | | | 12704 | Rest Period Sanction Earnings | $ 191 | $ 1,539 | $ 2,309 | 1.91% |
| | | | | 12705 | Overload Pay-Non-Exempt ($11.27/hr) | $ 2,688 | $ 22,057 | $ 33,086 | 27.31% |
| | | | | 12707 | Meal Sanction Earnings | $ 223 | $ 1,354 | $ 2,031 | 1.68% |
| | | | | 12710 | Overtime Pay - Staff | $ 1,184 | $ 8,359 | $ 12,539 | 10.35% |
| | | | | 12711 | Double Time Pay - Staff | $ 342 | $ 3,214 | $ 4,821 | 3.98% |
| | Parikh, Pooja Total | | | | | $ 9,749 | $ 80,758 | $ 121,138 | 100.00% |
| | | | | | | | | | |
| | Vesely, Michael | | PSA NEUROLOGY | 11800 | Base Pay - Exempt | $ 7,157 | $ 85,880 | $ 85,880 | 81.79% |
| | | | MSOA-NEUROLOGY IOM TECH SUPPORT | 11800 | Base Pay - Exempt | $ 1,593 | $ 19,120 | $ 19,120 | 18.21% |
| | | | | 11216 | Overload Pay-Exempt ($2700/month) | | $ 10,800 | | 0.00% |
| | Vesely, Michael Total | | | | | $ 8,750 | $ 115,800 | $ 105,000 | 100.00% |
| | | | | | | | | | |
| | Total Salaries | | | | | $ 106,808 | $ 1,329,370 | $ 1,329,635 | |

Department of Neurology
Division: Intraoperative Monitoring
Fiscl Year 2018 Budget

| Employee Type | Employee Name | Account Number | Account Name | Object Code | Earning Name | Actual Dec16 | FY2017 Projected Actual | FY2018 Budget | % Effort |
|---|---|---|---|---|---|---|---|---|---|
| Account Summary | | XXXX | PSA NEUROLOGY | | Salaries | $ 20,074 | $ 240,887 | $ 240,887 | |
| | | | | | Fringe Benefits | $ 6,725 | $ 80,697 | $ 80,697 | |
| | | | | | Total | $ 26,799 | $ 321,584 | $ 321,584 | |
| | | | | | | | | | |
| | | XXXX | MSOA-NEUROLOGY IOM ADDEN A-3 | | Salaries | $ 15,140 | $ 181,679 | $ 181,679 | |
| | | | | | Fringe Benefits | $ 5,072 | $ 60,862 | $ 60,862 | |
| | | | | | Total | $ 20,212 | $ 242,541 | $ 242,541 | |
| | | | | | | | | | |
| | | XXXX | MSOA-NEUROLOGY IOM TECH SUPPORT | | Salaries | $ 19,706 | $ 217,250 | $ 246,829 | |
| | | | | | Fringe Benefits | $ 6,601 | $ 72,779 | $ 82,688 | |
| | | | | | Total | $ 26,307 | $ 290,029 | $ 329,517 | |
| | | | | | | | | | |
| | | XXXX | NEUROLOGY-CLINICAL | | Salaries | $ 51,888 | $ 689,555 | $ 660,240 | |
| | | | | | Fringe Benefits | $ 9,158 | $ 121,706 | $ 116,532 | |
| | | | | | Total | $ 61,046 | $ 811,261 | $ 776,772 | |
| | | | | | | | | | |
| **Total Salaries and Fringe Benefits** | | | | | | $ 134,364 | $ 1,665,414 | $ 1,670,414 | |
| | | | | | | | | | |
| | | | | | OT & Doubletime Pay: | | | | |
| | | | | | FY17 Projection (Salary & Fringe) | | | $ 46,204 | |
| | | | | | FY18 Budget (Salary & Fringe) | | | $ 19,687 | |
| | | | | | Variance | | | $ (26,516) | |

Department of Neurology
Division: Intraoperative Monitoring
Fiscl Year 2018 Budget

| Physicians | wRVU Target | Avg Net Coll per WRVU | Projected Collections | Earnings Credit | Less: Fixed Salary | Projected Incentive @ 35% |
|---|---|---|---|---|---|---|
| Gonzalez | 6,000 | 57.56 | $ 345,360 | $ 120,876 | $ (103,357) | $ 17,519 |
| Shilian | 6,000 | 59.16 | $ 354,960 | $ 124,236 | $ (103,357) | $ 20,879 |

Department of Neurology
Division: Intraoperative Monitoring
Fiscl Year 2018 Budget

| | Physicians | wRVU Target | Avg Net Coll per WRVU | Projected Collections | Earnings Credit | Less: Fixed Salary | Projected Incentive @ 35% |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# Exhibit 53

# CALIFORNIA

## PHYSICIAN AND NON-PHYSICIAN PRACTITIONER

## TIME STUDY IMPLEMENTATION PLAN

## STATE PLAN AMENDMENT 05-023
## &
## MEDI-CAL HOSPITAL/UNINSURED CARE DEMONSTRATION
## (No. 11-W-00193/9)

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

**PHYSICIAN AND NON-PHYSICIAN PRACTITIONER TIME STUDY
IMPLEMENTATION PLAN**

**STATE PLAN AMENDMENT 05-023
&
MEDI-CAL HOSPITAL/UNINSURED CARE DEMONSTRATION
(No. 11-W-00193/9)**

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | **Introduction** ……………………………………………………………… | **1** |
| II. | **Background** …………………………………………………………….... | **1** |
| III. | **Plan Goals, Principles, and Application** …………………………… | **2** |
| | A. Goals of the Plan | |
| | B. Principles of the Plan | |
| | C. Time Study Application | |
| IV. | **Principles of Claiming** …………………………………………………… | **4** |
| | A. General Information | |
| | B. Operation Principles | |
| V. | **Physician and Non-Physician Practitioner Cost Claiming Methodology** …. | **7** |
| | A. Identify and Allocate Costs | |
| | B. Support Allocated Cost by Approved Time Study | |
| VI. | **Claiming FFP and Payment Procedures** …………………………..…….…. | **22** |
| | A. Federal Financial Participation | |
| | B. Offset of Revenues | |
| | C. Timely Filing Requirements for Claiming FFP | |
| | D. Supporting Documentation | |
| VII. | **Time Study Training and Implementation** ……………………………..….... | **24** |
| | A. Time Study Training | |
| | B. Time Study Sampling and Participation | |
| | C. Time Study Conditions/Exceptions | |
| | D.  Assistance, Oversight, and Monitoring | |
| VIII. | **Statistically Invalid Time Study Quarters** …………………………………… | **28** |
| IX. | **Appendices** | |
| | A. University of California Physician Time Study | |
| | B. University of California Non-Physician Practitioner Time Study | |

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

TABLE OF CONTENTS (Continued)

C.    Non-University of California Non-Physician Practitioner Time Study
D.    Time Study Training (Power Point presentation)

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

# I.   INTRODUCTION



This document contains a detailed Implementation Plan (Plan) for physicians and non-physician practitioner time studies (time studies) required under State Plan Amendment (SPA) 05-023.  The time studies provided for in this Plan are designed to be used for claiming uncompensated Medicaid costs of providing physician and non-physician practitioner professional services to Medi-Cal beneficiaries by the government-operated hospitals or the government entities with which they are affiliated (including affiliated government-operated physician practice groups).  These providers are also known as designated public hospitals (DPHs), and are specified in the SPA.

The time studies also will be used to claim uncompensated costs incurred by DPHs for providing physician and non-physician practitioner professional services to the uninsured, as specified in Attachment F to the Special Terms and Conditions (STCs) of the section 1115 *Medi-Cal Hospital/Uninsured Care Demonstration* (No. 11-W-00193/9) (hospital financing waiver or waiver)

This Plan has been developed by the Department of Health Care Services (DHCS) in consultation with, and approval from, the Federal Centers for Medicare & Medicaid Services (CMS).

# II.   BACKGROUND



On December 21, 2007, CMS approved SPA 05-023, which allows for interim, supplemental payments to DPHs to reimburse them for the uncompensated cost of providing physician and non-physician practitioner professional services related to Medicaid inpatient and outpatient care to Medi-Cal beneficiaries.  This SPA is effective retroactive to July 1, 2005.  These interim supplemental payments approximate the difference between the fee-for-service (FFS) payments received by the DPHs and the actual reimbursable Medicaid costs incurred by the DPHs related to the professional or clinical component of physician or non-physician practitioner services eligible for Federal financial participation (FFP). The *Milestones Document* within SPA 05-023, required time studies to be conducted to account for clinical time for physician and non-physician practitioners in the non-University of California settings utilizing the Medicare approved time study, or in the University of California setting utilizing the methodology detailed in SPA 05-023.

In addition, CMS approved the cost finding methodology established in SPA 05-023 for inclusion in Attachment F of the STCs entitled *Funding and Reimbursement Protocol for Claiming Against the Safety Net Care Pool* for the

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

purpose of identifying uncompensated costs associated with physicians and non-physician practitioner professional or clinical services related to uninsured inpatient and outpatient care, and for claiming the DPHs' certified public expenditures (CPEs) against the Safety Net Care Pool (SNCP) established under the waiver.

Senate Bill (SB) 1100 (Stats 2005, ch.560), commencing with Article 5.2 of Chapter 7, Division 9 of the Welfare and Institutions (W&I) Code, was enacted to provide the statutory framework for the waiver, which is effective September 1, 2005, through August 31, 2010.

## III. Plan Goals, Principles, and Application



**A.  The goals of the Plan are to:**

1.  Sufficiently document requirements, timeframes, methodologies, and training requirements and materials.
2.  Establish and implement approved time studies to account for professional or clinical time of physician and non-physician practitioners for proper apportionment for claiming under SPA 05-023.
3.  Account for 100 percent of provider or non-clinical time for proper cost apportionment for claiming under the waiver.
4.  Ensure interim supplemental payments are supported by adequate and auditable documentation.
5.  Assure no duplicate payments.

**The following physician and non-physician practitioner costs are allowable for reimbursement under this Plan:**

1.  Uncompensated physician and non-physician practitioner professional or clinical services for the purpose of providing inpatient and outpatient care to Medi-Cal recipients.
2.  Uncompensated physician and non-physician practitioner professional or clinical services for the purpose of providing inpatient and outpatient care to the uninsured.
3.  Uncompensated physician and non-physician practitioner professional or clinical services for the purpose of providing inpatient and outpatient psychiatric care to Medi-Cal recipients and the uninsured.

DHCS will administer the reimbursement of physician and non-physician practitioner services in accordance with Medicare and Medicaid cost principles, and the cost finding methodologies as established in the STCs and SPA 05-023.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

**B.     Principles of the Plan**

The following principles guide the implementation of the Plan:

1.     Activities must be adequately captured to ensure proper apportionment to professional or clinical and provider or non-clinical components, and non-allowable activities.
2.     Time study methodology must capture 100 percent of time for participants for the period being measured.
3.     Time studies must meet the requirements to constitute statistically valid samples, if sampling is used to represent the results of the time study for a specific participant universe.
4.     Monitoring of potential for "duplicative" payments.
5.     Coordination of activities is expected between the DPHs and other government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups agencies related to activities performed.
6.     CMS reviews and approves programs and codes as meeting regulatory requirements as set forth in this Plan.

**C.     Time Study Application**

The following DPHs and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups will perform the following approved time studies:

State Government-operated University of California (UC) Hospitals

        UC Davis Medical Center
        UC Irvine Medical Center
        UC San Diego Medical Center
        UC San Francisco Medical Center
        UC Los Angeles Medical Center
        Santa Monica UCLA Medical Center

State Government-operated UC Hospitals will use the time studies specific to the UCs for physician and non-physician practitioners, and will apply the cost finding methodology established in the STCs and SPA 05-023.

Non-State Government-operated Hospitals (Non-UC)

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

<u>Physician and Non-Physician Practitioner Time Study Implementation Plan</u>

Los Angeles County Harbor/UCLA Medical Center
Los Angeles County Martin Luther King Jr./Drew Medical Center (for the
period July 1, 2005 through August 15, 2007 only)
Los Angeles County Olive View Medical Center
Los Angeles County Rancho Los Amigos National Rehabilitation Center
Los Angeles County University of Southern California Medical Center 

Non-State Government-operated hospitals will use the approved Medicare time study for physicians, will use the time study for non-physician practitioners, and will apply the cost finding methodology established in the STCs and SPA 05-023.

<u>Other Government-Operated Hospitals (Non-UC)</u>

Alameda County Medical Center
Arrowhead Regional Medical Center
Contra Costa Regional Medical Center
Kern Medical Center
Natividad Medical Center
Riverside County Regional Medical Center
San Francisco General Hospital
San Joaquin General Hospital
San Mateo County General Hospital
Santa Clara Valley Medical Center
Tuolumne General Hospital (for the period July 1, 2005 through June 30, 2007 only)
Ventura County Medical Center

Other Government-Operated Hospitals will use the approved Medicare time study for physicians, will use the time study for non-physician practitioners, and will apply the cost finding methodology established in the STCs and SPA 05-023.

## IV.  PRINCIPLES OF CLAIMING

### A.  <u>General Information</u>

Physician and non-physician practitioners may provide services and perform activities that fall into three specific components for the purpose of establishing proper claiming under Medicare and Medicaid cost principles. The three specific components are the clinical or professional component that is related to direct patient care services; the non-clinical or provider component that is related to services that are performed for the benefit of the provider with whom a physician or non-physician is associated; and other non-allowable activities.  The unreimbursed clinical or professional component costs that are allowable under

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

Medicare and Medicaid cost principles may be reimbursable under SPA 05-023. The unreimbursed non-clinical or provider component costs may be claimed under the waiver using an appropriate reimbursement mechanism and methodology. The time study is the primary mechanism and methodology for identifying and categorizing services and activities performed by physician and non-physician practitioners.

The activity/object codes in the time study represent the actual duties and responsibilities of the participants, consistent with the operational principles discussed below. Activity/object codes are used to allocate costs for reimbursement purposes under SPA 05-023 and waiver.

**B.    Operational Principles**

**1.    Application of Cost Principles**

In order for the cost of the physician and non-physician practitioners to be reimbursable under SPA 05-023 and the waiver, the activities related to physician and non-physician practitioners must be those that are identified as allowable under Medicare and Medicaid cost principles, and/or be identified as allowable under Attachment D of the STCs.

To the extent that a DPH has identified a physician and/or non-physician practitioner's activities as non-allowable for the purpose of cost claiming, and has identified the physician and/or non-physician practitioner as exempt from participating in the time study, the cost associated with the physician and/or non-physician practitioner will not be included in the DPHs' Interim Hospital Payment Rate Workbook (Workbook), a tool developed for reimbursement under the waiver.

**2.    Capture 100 Percent of Time**                                    ✱

In order to correctly identify the time and activities that are apportioned to the clinical or professional, and non-clinical or provider components and other non-allowable activities, an accepted allocation methodology, or time study, must be used.  The time study must incorporate a comprehensive list of the activities performed by the physician and non-physician practitioners whose costs are to be claimed under the SPA and waiver.  Specifically, the time study must reflect all of the time and activities *(whether allowable or unallowable for claiming)* performed by all physicians and non-physician practitioners providing services at a DPH and/or at a facility for which a DPH is claiming CPE under SPA 05-023 or waiver.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

The time study mechanism must entail careful documentation of all services provided, and work performed, by physicians and non-physician practitioners over a set period of time and is used to identify, measure, and allocate time that is attributable to the physician clinical or professional and non-clinical or provider components and non-allowable activities.  The unique responsibilities and functions performed by the time study participants, as well as the specific types of activities, are accounted for and included in the time study activity/object codes.  Activity/object codes, while not specific to all participants of the time study, are verified against the participant's classification and work/duty schedule to ensure that all activities being performed are identified and incorporated into the codes.

### 3.      Coding Structure

The time study activity/object codes must capture all activities performed by time study participants, must identify activities performed that are specific to the participants level of clinical or professional duties and non-clinical or provider duties, must identify activities that are clinical and professional, or non-clinical or provider related, and must identify services that are not allowable and therefore, not reimbursable. Non-allowable activities that are non-reimbursable are identified as those activities that are not related to providing services at a DPH and/or at a facility for which a DPH is claiming CPE under SPA 05-023 and waiver.

### 4.      Assure No Duplicate Payments

Federal, state and local governmental resources should be expended in the most cost-effective manner possible.  In determining the physician and non-physician practitioner services costs that are reimbursable under SPA 05-023 and waiver, duplication of CPEs for the purpose of reimbursement and duplicate payments are not allowable.  DPHs may not claim FFP for the costs of allowable physician and non-physician practitioner services that have been, or should have been, reimbursed through an alternative mechanism or funding source.  DPHs must provide assurance to DHCS of non-duplication through their Workbooks and the claiming process.

***Examples for which the costs may not be claimable as physician and non-physician practitioner cost due to the potential for duplicate CPE claiming:***

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

- Activities and/or services that been billed for **by** the physician and/or non-physician practitioner, and been compensated in full **to** the physician according to federal or state laws, rules, or regulations.
- Activities and/or services that have been compensated, but have not been sufficiently offset by a payment on the Workbook.
- Activities and/or services that have not been fully and accurately reported in the time study.
- Activities and/or services that have been compensated by a third party not related to activities/and or services under SPA 05-023 or waiver, and have not been sufficiently offset by a payment.
- Activities and/or services that are included as part of a managed care rate and are reimbursed by the managed care organization.
- Activities for which the charges have been mapped to more than one cost center.

In addition to ensuring no duplicate payments, as discussed above, time study participants must coordinate and consult with their appropriate time study reviewer/program staff to determine appropriate program-related activities.

**5.    Identify Direct Patient Care Services, Administrative Activities, and Non-Allowable Activities**

The time study and activity/object codes must capture and clearly distinguish clinical or professional services that are direct patient care related from non-clinical or provider services that are administrative and other non-reimbursable activities. Because the time study must capture 100 percent of time spent *(see Principle 2, above)* for physician and non-physician practitioners, activity/object codes are designed to capture and reflect all direct patient care services and non-clinical provider administrative and non-allowable activities that may be performed, only some of which are reimbursable under SPA 05-023 and waiver.

The time study methodology must identify the costs of certain non-clinical or provider administrative services and other non-allowable activities and ensure that those costs are not included for reimbursement under SPA 05-023 and waiver.  The activity codes used in the time study must distinguish among different types of activities, as well as identify whether the activities are non-allowable.

# V.   PHYSICAN AND NON-PHYSICIAN PRACTITIONER COST CLAIMING METHODOLOGY



**A.    Identify and Allocate Costs**

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

Since physician and non-physician practitioners provide inpatient and outpatient services to various programs at a DPH (e.g., Medicare, Medi-Cal, Managed Care, etc.), or at government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups; the cost related to the services to the program recipients are captured on the 2552-96 Medi-Cal cost report, or in the case of the UCs, the UC "Schools of Medicine," the costs of these activities must be identified and allocated to the various programs.  This allocation of costs involves the determination and application of the proportional share of allowable component costs to the programs.

Development of the proportional program share, referred to as the physician and non-physician practitioner professional services, must be based on the approved cost finding methodology.  The allocation of costs, once determined, must be included in the Workbook and the approved physician cost reporting schedule, and non-hospital cost forms, as applicable, for the purpose of establishing CPEs and receiving supplemental payments. This process is necessary to ensure that only the costs related to the programs are claimed under SPA 05-023 and waiver. The process for UC Hospitals and Non-UC hospitals is as follows:

Non-UC Hospitals

To the extent that the non-UC hospital establishes clinical or professional cost on its 2552-96 Medi-Cal cost report Worksheet A-8-2, the professional costs are:

- Limited to the allowable and auditable physician compensations that have been incurred by the hospital;

- For the professional, direct patient care furnished by the hospital's physicians in all applicable sites of service, including sites that are not owned or operated by an affiliated government entity;

- Identified as professional costs on Worksheet A-8-2, Column 4 of the cost report of the hospital claiming payment (or, for registry physicians only, Worksheet A-8, if the physician professional compensation cost is not reported by the hospital on Worksheet A-8-2 because the registry physicians are contracted solely for direct patient care activities (such as, no administrative, teaching, research, or any other provider component or non-patient care activities);

- Supported by a time study, accepted by Medicare for Worksheet A-8-2 reporting purposes, that identified the professional, direct patient care

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

activities of the physicians (not applicable to registry physicians discussed above); and

- Removed from hospital costs on Worksheet A-8.

Cost may be subject to further adjustments and offsets as established by Medicare and Medicaid reimbursement principles.

Reimbursement is allowed for other professional non-practitioner service costs that have also been identified and removed from hospital costs on the Medi-Cal cost report. The practitioner types to be included for the purpose of reimbursement are Certified Registered Nurse Anesthetists, Nurse Practitioners, Physician Assistants, Dentists, Certified Nurse Midwives, Clinical Social Workers, Clinical Psychologists, and Optometrists.

To the extent these practitioners' professional compensation costs are not included in Worksheet A-8-2, Column 4, but are removed from hospital costs through an A-8 adjustment on the Medi-Cal cost report, these costs may be recognized if they meet the following criteria:

- The practitioners must engage in the direct provision of care in addition to being Medicaid-qualified practitioners for whom the services are billable under Medi-Cal separate from hospital services;

- For all non-physician practitioners there must be an identifiable and auditable data source by practitioner type;

- A CMS-approved time study must be employed to allocate practitioner compensation between clinical and non-clinical costs; and

- The clinical costs resulting from the CMS-approved time study are subject to further adjustments and offsets, including adjustments to bring the costs in line with Medicare cost principles and offset of revenues received for services furnished by such practitioners to non-patients (patients for whom the hospital does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of CMS-approved time study.

  The resulting net clinical non-physician practitioner compensation costs are allowable costs.  The compensation costs for each non-physician practitioner type are identified separately.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

Total billed professional charges by cost center related to physician services are identified from hospital records. Similarly, for each non-physician practitioner type, the total billed professional charges are identified from hospital records. Los Angeles County hospitals, due to their all-inclusive billing limitations, do not have itemized physician or non-physician practitioner charges. Therefore, these hospitals are to use the hospital RVU system to apportion professional costs to uninsured services under the SNCP claiming. This is the same RVU system as that used by Los Angeles County hospitals for Medicare and Medi-Cal cost reporting purposes. Where charges are mentioned in this paragraph and later paragraphs in this subsection, Los Angeles County will use its RVUs.

A physician cost to charge ratio for each cost center is calculated by dividing the total costs for each cost center by the total billed professional charges for each cost center. For each non-physician practitioner type, a cost to charge ratio is calculated by dividing the total costs for each practitioner type by the total billed professional charges for each practitioner type.

The total uninsured costs related to physician and non-physician practitioner professional services are determined for each cost center by multiplying total uninsured charges by the respective cost to charge ratio for the cost center. Total uninsured costs to establish CPEs for the purpose of receiving supplemental payments and establishing SNCP claiming are determined by subtracting all revenues received for the uninsured physician and/or non-physician practitioner services from the uninsured costs. In addition, costs must be reduced by 17.79 percent to account for non-emergency care furnished to undocumented persons.

UC Hospitals

The physician compensation costs are identified from each UC School of Medicine's trial balance and reported on a CMS-approved UC physician/practitioner cost report.  These professional compensation costs are:

- Limited to identifiable and auditable costs that have been incurred by the UC School of Medicines' physician practice group(s) for the professional patient care furnished in all applicable sites of service, including services rendered at non-hospital physician office sites operated by the UC practice groups and at sites not owned or operated by the UC for which the UC practice group bills for and collects payment.

- Reduced by National Institute of Health (NIH) grants to the extent the research activities component is not removed via physician time studies.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

On the UC physician cost report, these physician compensation costs net of National Institute of Health grants as applicable, reported by cost centers/departments, are then allocated between clinical and non-clinical activities using a CMS-approved time-study.  Prior to July 1, 2008, the UCs may use a CMS-approved benchmark RVU methodology in lieu of the CMS-approved time study to allocate UC physician compensation costs between clinical and non-clinical activities only.  The result of the CMS-approved time study (or the benchmark RVU methodology before July 1, 2008) is the physician compensation costs pertaining only to clinical, patient care activities.

The physician clinical costs are subject to further adjustments and offsets, including any necessary adjustment to bring the costs in line with Medicare cost principles. However, Medicare physician reasonable compensation equivalents are not applied for uninsured professional cost determination purposes.  There will be offset of revenues received for services furnished by such professionals to non-patients (patients for whom the UC does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

Reimbursement for non-physician practitioner compensation costs will also be included. The practitioner types to be included on the UC physician/practitioner cost reports are Certified Registered Nurse Anesthetists, Nurse Practitioners, Physician Assistants, Dentists, Certified Nurse Midwives, Clinical Social Workers, Clinical Psychologists, and Optometrists.

These non-physician practitioner compensation costs are recognized if they meet the following criteria:

- The practitioners must engage in the direct provision of care in addition to being Medicaid-qualified practitioners for whom the services are billable under Medi-Cal separate from hospital services.

- The non-physician practitioner compensation costs are derived from an identifiable and auditable data source by practitioner type.

- A CMS-approved time study will be employed to allocate practitioner compensation between clinical and non-clinical costs.

- The clinical costs resulting from the CMS-approved time study are subject to further adjustments and offsets, including adjustments to bring the costs in line with Medicare cost principles and offset of revenues received for services furnished by such practitioners to non-patients (patients for whom

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

the UC does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

The resulting net clinical non-physician practitioner compensation costs are allowable costs. Each non-physician practitioner type is reported in its own cost center on the UC physician/practitioner cost report.

The above physician or non-physician practitioner compensation costs must not be duplicative of any costs claimed on the UC hospital cost reports.

Additional costs that can be recognized as professional direct costs are costs for non-capitalized medical supplies and equipments used in the furnishing of direct patient care.

Overhead costs will be recognized through the application of each UC's cognizant agency-approved rate for indirect costs.  The indirect cost rate will be applied to the total direct cost, calculated above, based on each center/department's physician and/or non-physician practitioner compensation costs determined to be eligible for Medicaid reimbursement and identifiable medical supply/equipment costs to arrive at total allowable costs for each cost center.

Other than the direct costs defined above and the application of an approved indirect rate, no other costs are allowed.

Total billed professional charges by cost center related to physician services are identified from provider records. Similarly, for each non-physician practitioner type, the total billed professional charges are identified from provider records.

A physician cost to charge ratio for each cost center is calculated by dividing the total costs for each cost center by the total billed professional charges for each cost center. For each non-physician practitioner type, a cost to charge ratio is calculated by dividing the total costs for each practitioner by the total billed professional charges for each practitioner type.

The total professional charges for each cost center related to eligible uninsured physician services, billed directly by UC, are identified using auditable UC financial records. UCs must map the claims to their cost centers using information from their billing systems. Each charge must be mapped to only one cost center to prevent duplicate mapping and claiming. These charges must be

<u>Physician and Non-Physician Practitioner Time Study Implementation Plan</u>

associated with services furnished during the period covered by the latest as-filed 2552-96 Medi-Cal cost report.

For each non-physician practitioner type, the eligible uninsured professional charges, billed directly by the UC, are identified using auditable UC financial records.  UCs must map the claims to non-physician practitioner type using information from their billing systems. Each charge must only be mapped to one practitioner type to prevent duplicate mapping and claiming. These charges must be associated with services furnished during the period covered by the latest as-filed 2552-96 Medi-Cal cost report.

The total uninsured costs related to physician practitioner professional services are determined for each cost center by multiplying total uninsured charges by the respective cost to charge ratio for the cost center.  For each non-physician practitioner type, the total uninsured costs related to non-physician practitioner professional services are determined by multiplying total uninsured charges by the respective cost to charge ratios.

The total uninsured costs eligible for SNCP claiming are determined by subtracting all revenues received for uninsured physician practitioner services from the uninsured costs.  The amount of the SNCP interim payment will be based on the costs for the period coinciding with the latest as-filed 2552-96 Medi-Cal cost report and the data sources for uninsured claims are from the auditable UC records.  All revenues received (other than the SNCP professional payments being computed here in this section) for the uninsured professional services will be offset against the computed cost; these revenues include payments from or on behalf of patients and payments from other payers. The total SNCP certifiable expenditures as computed above should be reduced by 17.79 percent to account for non-emergency care furnished to undocumented persons. The costs of non-emergency care furnished to undocumented persons are eligible for federal matching funds under the DSH program only.

The following pertains to both Non-UC and UC Hospitals:

The uninsured physician/practitioner cost computed can be trended to current year based on Market Basket update factor(s) or other medical care-related indices, as approved by CMS. Theses costs may be further adjusted to reflect increases and decreases in costs incurred resulting from changes in operations or circumstances as follows:

- Physician/practitioner costs not reflected on the filed physician/practitioner cost report from which the interim supplemental

payments are developed, but which would be incurred and reflected on the physician/practitioner cost report for the spending year.

- Physician/practitioner costs incurred and reflected on the filed physician/practitioner cost report from which the interim supplemental payments are developed, but which would not be incurred or reflected on the physician/practitioner cost report for the spending year.

Such costs must be properly documented by the hospital and subject to review by DHCS and CMS. The result is the uninsured physician/practitioner costs to be used for interim SNCP payment purposes.

**B.**   **Support Allocated Costs by Approved Time Study**

Because a time study must capture all activities that are specific to the participants' duties, activity/object codes must provide a complete and appropriate description of all activities and facilitate capturing 100 percent of the participants' time spent.

**1.**   **Activity/Object Codes**

The following activity codes will be used to capture time spent for physician and non-physician practitioners claiming certified public expenditures (CPE) under SPA 05-023 and the waiver.  Physician and non-physician practitioners that provide services at a DPH and/or at a facility for which a DPH is claiming CPE under SPA 05-023 and the waiver must complete a DHCS physician or non-physician practitioner time study, as applicable (see Appendices A-C) by documenting time spent on each of the following coded activities.

**Activity/Object Code 00001**      Direct Patient Care Services

Direct Patient Care Services are allowable activities that would be considered *professional* component costs under Medicare cost principles. Unreimbursed Direct Patient Care Medi-Cal services to Medi-Cal recipients would be eligible for payment under SPA 05-023, and unreimbursed Direct Patient Care uninsured care costs would be eligible for payment under the waiver as SNCP Physician/Practitioner CPEs.

**Activity/Object Code 00002**      Supervision and Training of Nurses, Technicians, etc.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

Supervision and Training of Nurses, Technicians, etc., are allowable activities that would be includable as ***provider*** component costs under Medicare cost principles.  Unreimbursed Medi-Cal services costs would be eligible to be claimed as hospital CPEs. Unreimbursed uninsured care costs would be eligible for payment as waiver SNCP or DSH Hospital CPEs.

**Activity/Object Code 00003**     Utilization Review and Other Committee Meetings

Utilization Review and Other Committee Meetings are allowable activities that would be includable as ***provider*** component costs under Medicare cost principles.  Unreimbursed Medi-Cal services costs would be eligible to be claimed as hospital CPEs. Unreimbursed uninsured care costs would be eligible for payment as waiver SNCP or DSH Hospital CPEs.

**Activity/Object Code 00004**     Quality Control, Medical Review, and Autopsies

Quality Control, Medical Review, and Autopsies are allowable activities that would be includable as ***provider*** component costs under Medicare cost principles.  Unreimbursed Medi-Cal services costs would be eligible to be claimed as hospital CPEs. Unreimbursed uninsured care costs would be eligible for payment as waiver SNCP or DSH Hospital CPEs.

**Activity/Object Code 00005**     Supervision of Interns and Residents – Physician Only

Supervision of Interns and Residents – Physician Only are allowable activities that would be includable as ***provider*** component costs under Medicare cost principles.  Unreimbursed Medi-Cal services costs would be eligible to be claimed as hospital CPEs. Unreimbursed uninsured care costs would be eligible for payment as waiver SNCP or DSH Hospital CPEs.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

Physician and Non-Physician Practitioner Time Study Implementation Plan

**Activity/Object Code 00006**     Teaching of Interns and Resident – Physicians Only

> Teaching of Interns and Resident – Physicians Only are allowable activities that would be includable as *provider* component costs under Medicare cost principles.  Unreimbursed Medi-Cal services cost would be eligible to be claimed as hospital CPEs.  Unreimbursed uninsured care costs would be eligible for payment as SNCP or DSH Hospital CPEs.

**Activity/Object Code 00007**     Teaching and Supervision of Allied Health Professionals – Physician Only

> Teaching and Supervision of Allied Health Professionals – Physician Only are allowable activities that would be includable as *provider* component costs under Medicare cost principles.  Unreimbursed Medi-Cal services cost would be eligible to be claimed as hospital CPEs.  Unreimbursed uninsured care costs would be eligible for payment as SNCP or DSH Hospital CPEs.

**Activity/Object Code 00008**     Other Administrative or Teaching

> Other Administrative or Teaching are allowable activities that would be includable as *provider* component costs under Medicare cost principles.  Unreimbursed Medi-Cal services cost would be eligible to be claimed as hospital CPEs.  Unreimbursed uninsured care costs would be eligible for payment as SNCP or DSH Hospital CPEs.

**Activity/Object Code 00009**     Conferences and Lectures

> Conferences and Lectures are allocable activities under Medicare cost principles.   Such costs will be proportionately allocated to all other activities, including professional component activities, provider component activities, and non-reimbursable activities.
>
> The allocated *professional* component costs as they relate to Medi-Cal recipients would be eligible for payment under SPA 05-023.  The allocated professional component costs as they relate to

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

the uninsured would be eligible for payment under the waiver as SNCP Physician/Practitioner CPEs.

The allocated *provider* component costs as they relate to Medi-Cal recipients would be eligible to be claimed as hospital CPEs.  The allocated provider component costs as they relate to the uninsured would be eligible for payment as SNCP or DSH Hospital CPEs.

**Activity/Object Code 00010**      Non-Productive Hours – Paid Sick Leave, Paid Vacations, etc.

Non-Productive Hours – Paid Sick Leave, Paid Vacations, etc. are allocable costs under Medicare cost principles.     Such costs will be proportionately allocated to all other activities, including professional component activities, provider component activities, and non-reimbursable activities.

The allocated *professional* component costs as they relate to Medi-Cal recipients would be eligible for payment under SPA 05-023.  The allocated professional component costs as they relate to the uninsured would be eligible for payment under the waiver as SNCP Physician/Practitioner CPEs.

The allocated *provider* component costs as they relate to Medi-Cal recipients would be eligible to be claimed as hospital CPEs.  The allocated provider component costs as they relate to the uninsured would be eligible for payment as SNCP or DSH Hospital CPEs.

**Activity/Object Code 00011**      Research (Non-Reimbursable)

Research – Non-Reimbursable is not allowable or allocable.  This activity would be treated as non-reimbursable under Medicare cost principles.

**Activity/Object Code 00012**      Other Non-Billable Activities

Other Nonbillable Activities is intended to capture all other time which the respondent does not believe is described by the other categories. Use of this category requires a description.  To the extent such description of time does not fall within any of the allowable categories, the time will be non-reimbursable.  An example would be consulting or other review activities

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

that, while compensated by the entity (e.g., UC), either pertains to or is chargeable to an outside entity.

## 2.    Activity/Object Code Descriptions

Major categories for the activity/object codes break down into four specific areas: Direct Patient Care Services, Hospital Administration and Teaching Services, Other Administrative and General, and Other Non-Billable Activities. Activity/Object Code descriptions are a follows:

Direct Patient Care Services

Direct patient care services are those services that would give rise to a separate physician bill in a private practice, and involve activities that are identifiable, medical services.

### Activity/Object Code 00001 --  Direct Patient Care Services

Direct patient care is the care which is medically reasonable, necessary and ordinarily furnished (absent research programs) in the treatment of patients by physicians and providers under the supervision of physicians as indicated by the medical condition of the patients.  Also, this definition intends that the appropriate level of care criteria must be met for the costs of this care to be reimbursable. Such care is represented by items and services (routine and ancillary) which may be diagnostic, therapeutic, rehabilitative, medical, psychiatric, skilled nursing, and other related professional health services.

- Use this code when performing duties and providing services which include diagnosis, treatment, therapeutic, rehabilitative, medical, psychiatric, etc.

- These direct patient care duties may occur in a teaching or non-teaching setting.

- Distinguish between teaching rounds (where the primary purpose is teaching and the clinical care is incidental) and clinical rounds (where the primary purpose is patient care and teaching is a by product of the activity.

- Clinical research conducted in conjunction with, and a part of, caring for patients is also considered patient care services if the services are considered usual patient care, and are not compensated through research funds.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

<u>Physician and Non-Physician Practitioner Time Study Implementation Plan</u>

- Routine services that would be provided absent a clinical trial, services required solely for the provision of the investigation item or service, and services needed for reasonable and necessary care for complications resulting from the clinical trial should be included in the Activity/Object Code.

<u>Hospital Administration and Teaching Services</u>

Generally these are services for which no patient bill is prepared or sent. These are usually activities which directly deal with the operation of the hospital and affect its operating efficiency.

**Activity/Object Code 00002  --  Supervision and Training of Nurses, Technicians, etc.**

- Use this code for the supervision and training of nurses, technicians, and other hospital staff, etc. in a setting that does not involve any of the approved medical education programs.

- In addition to supervision and training, activities for this code include review of care related to a specific patient, hospital or departmental administration, involving supervision of hospital employees.

**Activity/Object Code 00003  --  Utilization Review and Other Committee Meetings**

Use this code when performing utilization review, participating on committees, or attending meetings. Activities include:

- Meeting preparation and attendance for hospital, medical staff, and departmental meetings.

- Preparation and attendance at tumor boards and peer reviews.

**Activity/Object Code 00004  --  Quality Control, Medical Review, and Autopsies**

Use this code when performing quality control review or quality control investigation, or autopsies. Activities include:

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

- Participating individually or as a panel or board member in: quality assurance functions, informal and formal investigation, and medical review functions related to quality improvement.

- Autopsies performed at a physician's request, to advance the knowledge base regarding the patient.

## Activity/Object Code 5  --  Supervision of Interns and Residents – Physician Only

Use this code when performing duties related to the direct supervision of Interns/Residents. Activities include:

- Providing teaching and guidance during rounds, review with Interns/Residents regarding individual patient care.

- Time spent managing, planning, and evaluating the work of Interns/Residents.

Note: This activity code does not include direct patient care.

## Activity/Object Code 6  -- Teaching of Interns and Resident – Physicians Only

Use this code when performing duties related to teaching Intern/Residents. Activities include:

- Teaching in an approved educational program in a classroom, lecture hall, formal or subject appropriate setting.

- Preparation of materials and time spent preparing materials and subject matter for presentation.

## Activity/Object Code 7  --  Teaching and Supervision of Allied Health Professionals – Physician Only

Use this code when performing duties related to the teaching and/or supervision of Allied Health Professionals. Activities include:

- Teaching in an approved educational program in a classroom, lecture hall, formal or subject matter appropriate setting.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

- Preparation of materials and time spent preparing materials and subject matter for presentation.
- Supervision of Allied Health Professionals performing procedures related to specific patients.

**Activity/Object Code 8  --  Other Administrative or Teaching**

Use this code to include other time spent, as appropriate, related to other administrative or teaching functions. Activities must be fully described and explained, and should not be applicable to other teaching activity/object codes.

**Activity/Object Code 9 --  Conferences and Lectures**

Use this code when attending conferences and lectures, or similar education forums including continuing medical education classes. Activities include:

- Travel and attendance either as a presenter or attendee, planning, and preparation.

- Attendance at lectures or similar education forums, including continuing medical education classes and workshops to maintain active licensure status if done during compensation time.

**Activity/Object Code 10  --  Non-Productive Hours – Paid Sick Leave, Paid Vacations, etc.**

Self-Explanatory.

**Activity/Object Code 11  --  Research (Non-Reimbursable)**

Use this code for non-patient related activities which include:

- Research performed for scientific knowledge, planning, preparation of research materials and reports.

- Research involving a systematic, extensive study directed at better scientific knowledge of the science and diagnosis, treatment, cure, or prevention of mental or physical disease.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

<u>Physician and Non-Physician Practitioner Time Study Implementation Plan</u>

- Usually obtained in the laboratory or on chart review, and does not necessarily involve direct individual or collective patient care.

- To the extent that this activity is not done on hospital/facility time, (hospital/facility time includes time applicable to a Medical School Operating or Professional Services Agreement and other contracts,) this time should be <u>excluded</u> from your time study report.

**Activity/Object Code 12 --  Other Non-Billable Activities**

Use this code for other non-patient care related activities that are compensated by the hospital/County/UC; are not specified under other activity/object codes and would not ordinarily permit or generate a bill for patient care services, e.g., consulting or medical review that is chargeable to another entity (non-hospital, non-UC, etc.).

# VI. Claiming FFP and Payment Procedures



## A.    <u>Federal Financial Participation</u>

DPHs and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, must incur the expenditures for allowable costs associated with federally approved activities related to the STCs and SPA 05-023. No State General Fund will be available to support any payments.  DHCS will reimburse an amount equal to FFP, at the applicable Federal Medical Assistance Percentage (FMAP) for costs established through the cost claiming process.  In addition, DPHs will attest to DHCS that they expended funds totaling 100 percent of the cost they are claiming in the Workbook.

## B.    <u>Offset of Revenues</u>

A DPH may not claim any federal reimbursements for physician and non-physician practitioner services if its total cost has already been paid by other federal sources.  A governmental program may not be reimbursed in excess of its actual costs, i.e., make a profit.  Allocated costs must be offset by the amount of other funding and payment sources in order to assure there is no duplication of payment.  To the extent that other funding and payment sources have paid or would pay for the costs of physician and non-physician practitioner services, federal reimbursements are not available and the costs must be removed from the total reported costs.  The following are some of the funding categories that must be offset against unallowable costs:

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

- All payments for services related to "non-authorized" federal funds.
- All  expenditures that have previously been reimbursed by the Federal Government with federal funds.
- All additional payments or offsets identified as applicable under the STCs and SPA 05-023.

## C.    Timely Filing Requirements for Claiming FFP

The State must file claims for FFP within a two-year period that begins on the first day of the calendar quarter immediately following the quarter in which the expenditure was made.  The implementing regulations for timely filing are at *Subpart A of Title 45 of the Code of Federal Regulations (45 CFR)* and provide specific guidelines for determining when expenditure is made, so as to initiate the two-year filing period.  Federal regulations at *Section 95.13(d) of 45 CFR* indicate that a state agency's expenditure for administration is considered to have been made in the quarter the payment was actually made by the state agency.

Further, *Section 95.4* of *45 CFR* identifies a state agency as any agency of the state, including the state Medicaid agency, its fiscal agents, a state health agency, or any other state or local organization which incurs reimbursable expenses.

> *Example:  A hospital incurs reimbursable expenditures in January 2006. The end of the calendar quarter in which the expenditure occurs is March 31, 2006.  In order to meet the two-year filing limit timely, the state Medicaid agency must file a claim with CMS within two years after the calendar quarter in which the expenditure occurred, or by March 31, 2008.*

In determining the two-year filing limit, DHCS must give consideration to the expenditure reporting cycle.  The expenditure is not considered claimed until it is reported to CMS on the CMS-64 Expenditure Report, which is required to be filed with CMS 30 days after the end of a reporting quarter.

## D.    Supporting Documentation

DPHs must maintain records and be able to support the claims against the SNCP for physician and non-physician practitioner services.  DPHs are responsible for the proper documentation of all costs claimed under SPA 05-023 and waiver, and are subject to review by DHCS and CMS. In addition to completed time studies, documentation may include, but is not limited to:

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

Physician and Non-Physician Practitioner Time Study Implementation Plan

- Support for salaries and wages, including personnel activity reports/schedules.
- Verified accounting records that support costs and charges.
- Utilization statistics or RVUs to establish program allocations.

## VII. Time Study Training and Implementation

**\***

### A.    Time Study Training

All physician and non-physician practitioners whose costs are claimed on the Workbook must complete the required time study.  Physician and non-physician practitioners must receive adequate training before participating in their first time study.  Time study participants are expected to provide signed documentation as evidence of such training.  Attendance at the time study training session *cannot* be claimed during any study week by the time study participants.  The training will teach participants how to complete the time study form, how to report activities under the appropriate time study codes, the difference between direct patient care services, hospital administration and teaching services, and non-allowable activities, and where to obtain technical assistance, if needed.

The DPHs must have a mechanism in place to assess how often training is necessary and to revise the training schedule, if appropriate. To ensure consistent application, all training documentation must be maintained and available for audit purposes.  Documentation must show the content of the training provided to participating physician and non-physician practitioners and the frequency of training.  The frequency of training should take into account staff turnover and the need for additional training.

Each DPH will designate a minimum of one representative to receive training from DHCS prior to the DPH participating in the first time study. This representative will be responsible for providing training at their respective DPH and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups for time study participation and completion.   DHCS will provide technical assistance to the DPH representative on an as needed basis.

### B.    Time Study Sampling and Participation

The time study sampling process is approved for use in California as meeting the requirements for statistically valid as agreed upon between DHCS and CMS, and requires an assured randomized time period with a large enough sample of physician and non-physician practitioners to ensure that the time survey is

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

<u>Physician and Non-Physician Practitioner Time Study Implementation Plan</u>

statistically valid at the 95 percent or higher confidence level for a 5 percent error level.  DHCS will ensure the compliance of the DPHs and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, by performing a review of time study documentation for physician and non-physician practitioner services claimed under SPA 05-023 and waiver:

- A time study shall be conducted for each DPH and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, for one week of every quarter.  The random number generator function used to select the specific week uses a Microsoft and industry programming standard for generating computerized random numbers in computer code for each time-study quarter. The weeklong time study shall be randomly selected by DHCS and accepted as representative of the DPH for that quarter. A period of time, longer than a week, may be determined to be necessary for the time study to ensure that the time survey is statistically valid.

- Every physician and non-physician practitioner providing services at the DPH, and the government-operated entities with which the DPH is affiliated, including their affiliated government-operated physician practice groups, capturing activities through the time study, and reporting physician and non-physician practitioner costs on their hospital's respective Workbook, shall complete and sign a record of the actual activities engaged in by that physician or non-physician practitioner for all paid time throughout the work day during the period of the time study, by means of the detailed time study form developed by DHCS, and approved by CMS. The time study shall record all activities, and shall document time spent, resulting in the capture of 100 percent of each physician or non-physician practitioner's activities.

- The signed time study form shall include, at minimum:  1) the name of the physician or non-physician practitioner completing the time study and performing the allowable activities; 2) the physician or non-physician practitioner's department, job classification/position; 3) the state fiscal year quarter, and dates covered by the time study; 4) the activity/object code applicable to the time spent during the work day; and 5) a written description of the activity itself, if applicable; and signature of a supervisor/reviewer confirming that the time study form accurately represents the action and services performed by the physician or non-physician practitioner.  Appendices A-C display the approved and required

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

time study forms.  Time studies that do not meet the above standards may not be used for claiming CPE in the DPHs' respective Workbook.

For the purpose of establishing the time study duration and sample size criteria needed to satisfy the requirements for obtaining statistical validity at the 95 percent or higher confidence level for a 5 percent error level, when sampling is performed at the DPHs, the following is established:

- UC – Physicians: Physicians for all specialties and cost centers at the UC DPHs and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, total 4,255.  For the purpose of the time study, UC Physicians will account for 100 percent of their time using the approved time study form, and will not be sampled. Costs pertaining to these physicians will be allocated based on the actual time determined to be allowable/allocable. It is the intent of the UCs, that physicians not be part of the sampling process in order to sufficiently capture and document time spent.

- UC Non-Physician Practitioners: UC Non-Physician Practitioners for all specialties and cost centers at the UC DPHs and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, total 904. For the purpose of the time study, UC Non-Physician Practitioners will account for 100 percent of their time using the approved time study form, and will not be sampled. Costs pertaining to these non-physician practitioners will be allocated based on the actual time determined to be allowable/allocable. It is the intent of the UCs, that Non-Physician Practitioners not be part of the sampling process in order to sufficiently capture and document time spent.

- Non-UC Non-Physician Practitioners: Non-UC Non-Physician Practitioners for all specialties and cost centers at the Other Government-Operated Hospitals and Non-State Government-Operated Hospitals, and the government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, total 375.

**C.** **Time Study Conditions/Exceptions**

1. DHCS will randomly select the week of the time study period each quarter. DPH representatives will be notified of the selected time study dates 30 days prior to the beginning of the time study week. DHCS will notify time study participants no more than 5 days prior to the actual time study period and the time study form must be submitted 5 days after the time

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

study is completed.  The time study represents a sample of services and work which is used to determine the physician and non-physician practitioner costs reported on the Workbook.  Time study participants must complete the time study form within the time study period that is randomly selected by DHCS.

A one-week time study typically means studying five consecutive paid work days (skipping unpaid work days), starting on a randomly selected day in a quarter.  Should a work interruption occur during the course of the time study (such as a natural disaster), which prevents the participants from completing the time study for five consecutive paid work days, the time study will resume on the first feasible paid work day and continue thereafter until the consecutive five paid work days requirement is met.  For example, in a randomly selected time study week of Monday through Friday, if a time study was conducted on Monday and Tuesday of that week, and a disaster occurred on Wednesday through the rest of that week, two consecutive days would have been time studied for that week.  The time study should resume from the next feasible paid work day for three consecutive days to meet the five consecutive paid work days' requirement.  If another event causes a stoppage or results in an interruption/break in between the remaining consecutive days, the remaining time study would start from the next feasible paid work day until the five consecutive paid work days are completed.  In this case, the only break/s of the required five consecutive paid work week would be the disaster days.

2.    The DPH, and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, will randomly select a 10 percent sample of coded responses which will be submitted to DHCS each quarter for validation.  The validation will consist of reviewing the participant responses and the corresponding code assigned to determine if the code was accurate.  DHCS will review the results and independently code the activity and compare it to the activity recorded by the coder.  DHCS will require the DPH, and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups to submit a corrective action plan if there is a variance.

3.    If the response rate of the time studies submitted from the physician or non-physician practitioners at a DPH, and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, is 85 percent or higher, the time

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

studies not submitted from the remaining physician and non-physician practitioners may be excluded from the calculation of time study results.

4.   If the time study response rate is less than 85 percent of the physician and non-physician practitioners at a DPH, and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, CMS and DHCS will review the reasons for the non-response and determine how the total cost associated with those physician and non-physician practitioners who did not submit time studies will be determined.

5.   Payments made to the DPHs as a result of the time study, and the associated costs reported on the DPHs are subject to review through the Interim Reconciliation and Final Reconciliation process as established in Attachment F of the STCs.

**D.   <u>Assistance, Oversight, and Monitoring</u>**

In order to ensure that the time study is statistically valid as specified in Section VII. B., DHCS will provide assistance to clarify the CMS-approved sampling methodology to be applied. DHCS will monitor the DPHs' sampling and time study participation and response rates to ensure that DPHs adhere to statistical sampling criteria.

Should DHCS identify that approved time study and time study methodology has not been properly implemented by a DPH, DHCS will perform on-site monitoring to evaluate a DPH, and their government-operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, to ensure accurate CPE reporting and claiming.

# VIII. Statistically Invalid Time Study Quarters

In the event that there is a "state of emergency" or other disaster declared in the State of California that impact the statistical validity of the time study as defined in Section VII of this TSIP, under "Time Study Training and Implementation," DHCS will determine which affected quarter(s) are statistically invalid.

In this case, no time study will take place during the statistically invalid quarter(s) and the condition of the 85% or higher response rate will not be applicable. Instead, claiming will be based upon an average of the activity code percentages for the three most recent statistically valid time study quarters for which finalized percentages are available to DHCS.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

Physician and Non-Physician Practitioner Time Study Implementation Plan

This claiming methodology will apply to quarters occurring during the "state of emergency," beginning with the quarter in which the state of emergency is declared and ending with the quarter in which the "state of emergency" ends. California will notify CMS within 15 days, or as soon thereafter as practical, of determining that a quarter is statistically invalid, including the reason for the determination, along with details and dates of the declaration of emergency.

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

Physician and Non-Physician Practitioner Time Study Implementation Plan

## IX.    APPENDICES

**APPENDIX A**
University of California Physician Time Study

**APPENDIX B**
University of California Non-Physician Practitioner Time Study

**APPENDIX C**
Non-University of California Non-Physician Practitioner Time Study

**APPENDIX D**
Time Study Training (PowerPoint Presentation)

Revision on April 28, 2020 was made to include the Statistically Invalid Time Study Quarters Section

California Department of Health Care Services
Safety Net Financing

# Exhibit 54

Attachment 4.19-B
Page 52

STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT
STATE: <u>CALIFORNIA</u>

**REIMBURSEMENT TO SPECIFIED GOVERNMENT-OPERATED PROVIDERS
FOR COSTS OF PROFESSIONAL SERVICES**

This segment of Attachment 4.19-B provides reimbursement to eligible government-operated hospitals or the government entities with which they are affiliated (including affiliated government-operated physician practice groups), for the uncompensated Medicaid costs of providing physician and non-physician practitioner professional services to Medi-Cal beneficiaries. Only the otherwise uncompensated costs of professional services not claimed by the hospital as Medicaid inpatient hospital services under the hospital's provider number, or not otherwise recognized under the methodology set forth on page 46 et seq. of Attachment 4.19-A, the methodology for cost-based reimbursement under Supplement 5, or the methodologies for supplemental reimbursement for government operated outpatient hospital services or government operated clinic services set forth in other sections of this Attachment 4.19-B, are eligible for reimbursement under this segment of Attachment 4.19-B. In addition, all of the milestones contained in the CMS-approved "California SPA 05-023 MILESTONES DOCUMENT" must be met to ensure Federal financial participation.

Eligible professional costs are reported on the designated hospitals' Medi-Cal 2552 cost report and, in the case of the University of California (UC) hospitals, the UC School of Medicine physician/non-physician practitioner cost report as approved by the Centers for Medicare & Medicaid Services.

A.   General Reimbursement Requirements

   1.   The government-operated hospitals identified in Section B on page 53 of this attachment, and the government operated entities with which they are affiliated, including their affiliated government-operated physician practice groups, are eligible providers that will receive supplemental payments for the un-reimbursed Medicaid costs specified in Section C on page 53 of this attachment, below.

   2.   Eligible providers will receive Medi-Cal fee-schedule payments for professional services. In addition, the eligible providers will receive supplemental payments up to cost as specified in Section C on page 53 of this attachment. The reimbursement under this segment of Attachment 4.19-B is available only for Medicaid costs that are in excess of Medicaid fee schedule payments.

   3.   Notwithstanding any other provision of this State Plan, reimbursement for the otherwise uncompensated costs of Medicaid services described in this segment of Attachment 4.19-B, that are provided to Medi-Cal patients by physicians and non-physician practitioners of government-operated hospitals or the government entities with which they are affiliated, will be governed by this segment of Attachment 4.19-B.

TN No. __05-023_____
Supersedes                            **DEC 2 1 2007**
TN No. ___None_____      Approval Date_____    Effective Date___July 1, 2005___

4. Professional costs incurred by freestanding clinics that are not recognized as hospital outpatient departments on the 2552 and are reimbursable as clinic costs pursuant to TN 06-16 are not included in this protocol.  Professional costs incurred at clinics that operate on the hospital's license under state licensing laws will be included under this segment of Attachment 4.19-B to the extent they are not reimbursable as clinic costs pursuant to TN 06-16.  The physician office settings owned and operated by the UC Schools of Medicine are not considered freestanding clinics.

5. The supplemental payments determined under this segment of Attachment 4.19-B will be paid on a quarterly basis.

B.  Eligible Providers

1. The physician and non-physician practitioner professional costs being addressed in this protocol are limited to professional costs incurred by the governmental hospitals listed below, including any successor or differently named hospital, as applicable, and their affiliated government physician practice groups (i.e., practice group that is owned and operated by the same government entity that owns and operates the hospital).  These professional costs are reported on the designated hospitals' Medi-Cal 2552 cost report and, in the case of the University of California (UC) hospitals, the UC School of Medicine physician/non-physician practitioner cost report as approved by CMS.

**Government-Operated Hospitals:**

Alameda County Medical Center
Alameda Hospital (DPH date July 1, 2016)
Arrowhead Regional Medical Center
Contra Costa Regional Medical Center
Kern Medical Center
Natividad Medical Center
Riverside University Health System – Medical Center
San Francisco General Hospital
San Joaquin General Hospital
San Leandro Hospital (DPH date July 1, 2016)
San Mateo County General Hospital
Santa Clara Valley Medical Center
Tuolumne General Hospital (Closed June, 2007)
Ventura County Medical Center

**Los Angeles County (LA Co.) Hospitals:**

LA Co. Harbor/UCLA Medical Center
LA Co. Martin Luther King Jr./Drew Medical Center (Closed August, 2007)

Attachment 4.19-B
Page 54

LA Co. Olive View Medical Center
LA Co. Rancho Los Amigos National Rehabilitation Center
LA Co. University of Southern California Medical Center

**State Government-Operated University of California (UC) Hospitals:**

UC Davis Medical Center
UC Irvine Medical Center
UC San Diego Medical Center
UC San Francisco Medical Center
UC Los Angeles Medical Center
Santa Monica UCLA Medical Center (aka – Santa Monica UCLA Medical Center
& Orthopedic Hospital)

C.   Reimbursement Methodology

This interim supplemental payment will approximate the difference between the fee-for-service (FFS) payment and the allowable Medicaid costs related to the professional component of physician or non-physician practitioner services eligible for Federal financial participation.  This computation of establishing the interim Medicaid supplemental payments must be performed on an annual basis and in a manner consistent with the instructions below.

*1. Non-UC Provider Steps*

a.      The professional component of physician costs are identified from each hospital's most recently filed Medi-Cal 2552 cost report Worksheet A-8-2, Column 4. These professional costs are:

   1.      limited to allowable and auditable physician compensations that have been incurred by the hospital;
   2.      for the professional, direct patient care furnished by the hospital's physicians in all applicable sites of service, including sites that are not owned or operated by an affiliated government entity;
   3.      identified as professional costs on Worksheet A-8-2, Column 4 of the cost report of the hospital claiming payment (or, for registry physicians only, Worksheet A-8, if the physician professional compensation cost is not reported by the hospital on Worksheet A-8-2 because the registry physicians are contracted solely for direct patient care activities (i.e., no administrative, teaching, research, or any other provider component or non-patient care activities)

administrative, teaching, research, or any other provider component or non-patient care activities)

4. supported by a time study, accepted by Medicare for Worksheet A-8-2 reporting purposes, that identified the professional, direct patient care activities of the physicians (not applicable to registry physicians discussed above)

5. removed from hospital costs on Worksheet A-8.

b. The professional costs on Worksheet A-8-2, Column 4 (or Worksheet A-8 for registry physicians) are subject to further adjustments and offsets, including any necessary adjustment to bring the costs in line with Medicare cost principles. However, Medicare physician reasonable compensation equivalents are not applied for Medicaid physician professional cost determination purposes. There will be revenue offsets to account for revenues received for services furnished by such professionals to non-patients (patients whom the hospital does not directly bill for) and any other applicable non-patient care revenues that were not previously offset or accounted for by the application of time study.

c. Reimbursement for other professional practitioner service costs that have also been identified and removed from hospital costs on the Medi-Cal cost report. The practitioner types to be included are:

(1) Certified Registered Nurse Anesthetists
(2) Nurse Practitioners
(3) Physician Assistants
(4) Dentists
(5) Certified Nurse Midwives
(6) Clinical Social Workers
(7) Clinical Psychologists
(8) Optometrists

d. To the extent these practitioners' professional compensation costs are not included in Worksheet A-8-2, Column 4, but are removed from hospital costs through an A-8 adjustment on the Medi-Cal cost report, these costs may be recognized if they meet the following criteria:

1. the practitioners must engage in the direct provision of care in addition to being Medicaid-qualified practitioners for whom the services are billable under Medi-Cal separate from hospital services;

2. for all non physician practitioners there must be an identifiable and auditable data source by practitioner type;

3. a CMS-approved time study must be employed to allocate practitioner compensation between clinical and non-clinical costs;

---

TN No. ____05-023___
Supersedes
TN No. _____None____

Approval Date__DEC 2 1 2007__ Effective Date__July 1, 2005__

4.   the clinical costs resulting from the CMS-approved time study are subject to further adjustments and offsets, including adjustments to bring the costs in line with Medicare cost principles and offset of revenues received for services furnished by such practitioners to non-patients (patients for whom the hospital does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of CMS-approved time study.

The resulting net clinical non-physician practitioner compensation costs are allowable costs for this section of Attachment 4.19-B. The compensation costs for each non-physician practitioner type are identified separately.

e.   Professional costs incurred for freestanding clinics (clinics that are not recognized as hospital outpatient departments on the 2552) are separately reimbursable as clinic costs and therefore should not be included in this protocol, except that, until the effective date of TN 06-16, professional costs incurred at clinics that operate on the hospital's license under state licensing laws will be included under this segment of Attachment 4.19-B.

f.   Hospitals may additionally include physician support staff compensation, data processing, and patient accounting costs as physician-related costs to the extent that :

   1.   these costs are removed from hospital inpatient and outpatient costs because they have been specifically identified as costs related to physician professional services;
   2.   they are directly identified on ws A-8 as adjustments to hospital costs;
   3.   they are otherwise allowable and auditable provider costs; and
   4.   they are further adjusted for any non-patient-care activities such as research based on physician time studies.

If these are removed as A-8 adjustments to the hospital's general service cost centers, these costs should be stepped down to the physician cost centers based on the accumulated physician professional compensation costs. Other than the physician and non-physician practitioner compensation costs and the A-8 physician-related adjustments discussed above, no other costs are allowed for the purposes of this section of 4.19-B.

g.   Total billed professional charges by cost center related to physician services are identified from hospital records. Similarly, for each non-physician practitioner type, the total billed professional charges are identified from hospital records. Los Angeles County hospitals, due to their all-inclusive billing limitations, do not have itemized physician or non-physician practitioner charges. Therefore, these hospitals are to use the hospital RVU system to apportion professional costs to

Medicaid; this is the same RVU system as that used by Los Angeles County hospitals for Medicare and Medi-Cal cost reporting purposes. Where charges are mentioned in this paragraph and later paragraphs in this subsection, Los Angeles County will use its RVUs. References below to charges identified by the State's MMIS/claims system are not applicable to Los Angeles County hospitals.

h.  A physician cost to charge ratio for each cost center is calculated by dividing the total costs for each cost center as established in paragraphs a-f of subsection 1 by the total billed professional charges for each cost center as established in paragraph g of subsection 1 .For each non-physician practitioner type, a cost to charge ratio is calculated by dividing the total costs for each practitioner type as established in paragraphs a-f of subsection 1 by the total billed professional charges for each practitioner type as established in paragraph g of subsection 1.

i.  The total professional charges for each cost center related to covered Medi-Cal FFS physician services, billed directly by the hospital, are identified using paid claims data from the State's MMIS/claims system. Because the MMIS/claims system is based on CPT codes and does not track claims on a cost center basis, hospitals must map the claims to their cost centers using information from their hospital billing systems. Each charge may only be mapped to one cost center to prevent duplicate mapping and claiming. These charges must be associated with paid claims for services furnished during the period covered by the latest as-filed cost report.

For each non-physician practitioner type, the covered Medicaid FFS professional charges, billed directly by the hospital, are identified using paid claims data from State's MMIS/claims system. Because the MMIS/claims system is based on CPT codes and may not track claims by non-physician practitioner type, hospitals must map the charges to non-physician practitioner type using information from their hospital billing systems. Each charge may only be mapped to one practitioner type to prevent duplicate mapping and claiming. These charges must be associated with paid claims for services furnished during the period covered by the latest as-filed cost report.

The State will allow hospitals to bill Medi-Cal for those physician services that previously were covered under the all-inclusive hospital rates retroactive to 2005-06 in order to generate the charges for these services in the MMIS/claims system that can be used to determine the reimbursable professional services costs.

j.  The total Medicaid costs related to physician practitioner professional services are determined for each cost center by multiplying total Medicaid FFS charges as established in paragraph i of subsection 1 by the respective cost to charge ratio for the cost center as established in paragraph h of subsection 1.

For each non-physician practitioner type, the total Medicaid costs related to non-physician practitioner professional services are determined by multiplying total Medicaid FFS charges as established in paragraph i of subsection 1 by the respective cost to charge ratios as established in paragraph h of subsection 1.

k.   The total Medicaid costs eligible for Medicaid supplemental payment are determined by subtracting all Medicaid FFS physician/practitioner payments received from the Medicaid FFS costs as established in paragraph j of subsection 1.  The amount of the Medicaid interim supplemental payment will be based on the Medicaid fee schedule payments and costs for the period coinciding with the latest as-filed cost report; the data sources for paid claims are from the State's MMIS/claims system and auditable provider records.  All revenues received (other than the Medicaid physician supplemental payments being computed here in this section) for the Medicaid professional services will be offset against the computed cost; these revenues include payments from the State, patient co-payments, and payments from other payers.

l.   The Medicaid physician/practitioner amount computed in paragraph k of subsection 1 above can be trended to current year based on Market Basket update factor(s) or other medical care-related indices as approved by CMS.  The Medicaid amount may be further adjusted to reflect increases and decreases in costs incurred resulting from changes in operations or circumstances as follows:

(1).   Physician/practitioner costs not reflected on the filed physician/practitioner cost report from which the interim supplemental payments are developed, but which would be incurred and reflected on the physician/practitioner cost report for the spending year.

(2).   Physician/practitioner costs incurred and reflected on the filed physician/practitioner cost report from which the interim supplemental payments are developed, but which would not be incurred or reflected on the physician/practitioner cost report for the spending year.

Such costs must be properly documented by the hospital and subject to review by the State and CMS.  The result is the Medicaid physician/practitioner amount to be used for interim Medicaid supplemental payment purposes.

2. *UC Provider Steps*

a.   The physician compensation costs are identified from each UC School of Medicine's trial balance and reported on a CMS-approved UC physician/practitioner cost report.  These professional compensation costs are limited to identifiable and auditable costs that have been incurred by the UC School of Medicines' physician practice group(s) for the professional patient care

---

furnished in all applicable sites of service, including services rendered at non-hospital physician office sites operated by the UC practice groups and at sites not owned or operated by the UC for which the UC practice group bills for and collects payment.

The physician compensation costs are reduced by National Institute of Health (NIH) grants to the extent the research activities component is not removed via physician time studies.

b.  On the UC physician cost report, these physician compensation costs net of NIH grants as applicable, reported by cost centers/departments, are then allocated between clinical and non-clinical activities using a CMS-approved time-study. Prior to July 1, 2008, the UCs may use a CMS-approved benchmark RVU methodology in lieu of the CMS-approved time study to allocate UC physician compensation costs between clinical and non-clinical activities only. The result of the CMS-approved time study (or the benchmark RVU methodology before July 1, 2008) is the physician compensation costs pertaining only to clinical, patient care activities.

c.  The physician clinical costs are subject to further adjustments and offsets, including any necessary adjustment to bring the costs in line with Medicare cost principles. However, Medicare physician reasonable compensation equivalents are not applied for Medicaid professional cost determination purposes. There will be offset of revenues received for services furnished by such professionals to non-patients (patients for whom the UC does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

d.  Reimbursement for non-physician practitioner compensation costs will also be included. The practitioner types to be included on the UC physician/practitioner cost reports are:

    (1)  Certified Registered Nurse Anesthetists
    (2)  Nurse Practitioners
    (3)  Physician Assistants
    (4)  Dentists
    (5)  Certified Nurse Midwives
    (6)  Clinical Social Workers
    (7)  Clinical Psychologists
    (8)  Optometrists

e.  These non-physician practitioner compensation costs are recognized if they meet the following criteria:

(1)     the practitioners must engage in the direct provision of care in addition to being Medicaid-qualified practitioners for whom the services are billable under Medi-Cal separate from hospital services;

(2)     the non-physician practitioner compensation costs are derived from an identifiable and auditable data source by practitioner type;

(3)     a CMS approved time study will be employed to allocate practitioner compensation between clinical and non-clinical costs;

(4)     the clinical costs resulting from the CMS-approved time study are subject to further adjustments and offsets, including adjustments to bring the costs in line with Medicare cost principles and offset of revenues received for services furnished by such practitioners to non-patients (patients for whom the UC does not directly bill for) and other applicable non-patient care revenues that were not previously offset or accounted for by the application of the CMS-approved time study.

The resulting net clinical non-physician practitioner compensation costs are allowable costs under this section of Attachment 4.19-B. Each non-physician practitioner type is reported in its own cost center on the UC physician/practitioner cost report.

f.      The above physician or non-physician practitioner compensation costs must not be duplicative of any costs claimed on the UC hospital cost reports.

g.      Additional costs that can be recognized as professional direct costs are costs for non-capitalized medical supplies and equipments used in the furnishing of direct patient care.

h.      Overhead costs will be recognized through the application of each UC's cognizant agency-approved rate for indirect costs. The indirect rate will be applied to the total direct cost, calculated above, based on each center/department's physician and/or non-physician practitioner compensation costs determined to be eligible for Medicaid reimbursement and identifiable medical supply/equipment costs to arrive at total allowable costs for each cost center.

Other than the direct costs defined above and the application of an approved indirect rate, no other costs are allowed for the purpose of this section of 4.19-B.

i.      Total billed professional charges by cost center related to physician services are identified from provider records. Similarly, for each non-physician practitioner type, the total billed professional charges are identified from provider records.

j.    A physician cost to charge ratio for each cost center is calculated by dividing the total costs for each cost center as established in paragraphs a-h of subsection 2 by the total billed professional charges for each cost center as established in paragraph i of subsection 2. For each non-physician practitioner type, a cost to charge ratio is calculated by dividing the total costs for each practitioner type as established in paragraphs a-h of subsection 2 by the total billed professional charges for each practitioner type as established in paragraph i of subsection 2.

k.    The total professional charges for each cost center related to covered Medi-Cal FFS physician services, billed directly by UC, are identified using paid claims data from the State's MMIS/claims system. Because the MMIS/claims system is based on CPT codes and does not track claims on a cost center basis, UCs must map the claims to their cost centers using information from their billing systems. Each charge must be mapped to only one cost center to prevent duplicate mapping and claiming. These charges must be associated with paid claims for services furnished during the period covered by the latest as-filed cost report.

For each non-physician practitioner type, the covered Medicaid FFS professional charges, billed directly by the UC, are identified using paid claims data from State's MMIS/claims system. Because the MMIS/claims system is based on CPT codes and may not track claims by non-physician practitioner type, UCs must map the claims to non-physician practitioner type using information from their billing systems. Each charge must only be mapped to one practitioner type to prevent duplicate mapping and claiming. These charges must be associated with paid claims for services furnished during the period covered by the latest as-filed cost report.

The State will allow the UCs to bill Medi-Cal for those physician services that previously were covered under the all-inclusive hospital rates retroactive to 2005-06 in order to generate the charges for these services in the MMIS/claims system that can be used to determine the reimbursable professional services costs.

l.    The total Medicaid costs related to physician practitioner professional services are determined for each cost center by multiplying total Medicaid FFS charges as established in paragraph k of subsection 2 by the respective cost to charge ratio for the cost center established in paragraph j of subsection 2.

For each non-physician practitioner type, the total Medicaid costs related to non-physician practitioner professional services are determined by multiplying total Medicaid FFS charges as established in paragraph k of subsection 2 by the respective cost to charge ratios as established in paragraph j of subsection 2.

m.    The total Medicaid costs eligible for Medicaid supplemental payment are determined by subtracting all Medicaid FFS physician/practitioner payments

received from the Medicaid FFS costs as established in paragraph I of subsection 2. The amount of the Medicaid interim supplemental payment will be based on the Medicaid fee schedule payments and costs for the period coinciding with the latest as-filed cost report; the data sources for paid claims are from the State's MMIS/claims system and auditable provider records. All revenues received (other than the Medicaid physician supplemental payments being computed here in this section) for the Medicaid professional services will be offset against the computed cost; these revenues include payments from the State, patient co-payments, and payments from other payers..

n.   The Medicaid physician/practitioner amount computed in paragraph m above can be trended to current year based on Market Basket update factor(s) or other medical care-related indices as approved by CMS. The Medicaid amount may be further adjusted to reflect increases and decreases in costs incurred resulting from changes in operations or circumstances as follows:

   (1)   Physician/practitioner costs not reflected on the filed physician/practitioner cost report from which the interim supplemental payments are developed, but which would be incurred and reflected on the physician/practitioner cost report for the spending year.

   (2)   Physician/practitioner costs incurred and reflected on the filed physician/practitioner cost report from which the interim supplemental payments are developed, but which would not be incurred or reflected on the physician/practitioner cost report for the spending year.

   Such costs must be properly documented by the UCs and subject to review by the State and CMS. The result is the Medicaid physician/practitioner amount to be used for interim Medicaid supplemental payment purposes

D.   Interim Reconciliation

   The physician and non-physician practitioner interim supplemental payments determined under Section C on page 53 of Attachment 4.19-B which are paid for services furnished during the applicable state fiscal year are reconciled to the as-filed Medi-Cal 2552 and UC physician/practitioner cost reports for the same year once the cost reports have been filed with the State. The UC physician/practitioner cost report should be filed, reviewed, and finalized by the State in a manner and timeframe consistent with the Medi-Cal hospital cost report process. If, at the end of the interim reconciliation process, it is determined that a provider received an overpayment, the overpayment will be properly credited to the federal government; if a provider was underpaid, the provider will receive an adjusted payment amount. For purposes of this reconciliation the same steps as outlined for the interim payment method are carried out except as noted below:

1. For the determinations made under paragraphs a through h of subsection 1 and paragraphs a through j of subsection 2 of Section C, the costs and charges from the as-filed physician/practitioner cost report for the expenditure year are used.

2. For the determinations made under paragraph i of subsection 1 of Section C and paragraph k of subsection 2 of Section C, Medicaid fee-for-service professional charges for covered services furnished during the applicable fiscal year are used.  The State will perform those tests necessary to determine the reasonableness of the Medi-Cal program physician charges from the as-filed physician/practitioner cost report.  This will include reviewing the Medicaid program data generated from its MMIS/claims system for that period which corresponds to the most recently filed physician/practitioner cost report.  However, because the MMIS/claims system data would generally not include all paid claims until at least 18 months after the Fiscal Year Ending (FYE) of the cost report, the State will take steps to verify the filed Medicaid program data, including the use of submitted Medicaid claims.  Only Medicaid program data related to medical services that are eligible under the Medicaid physician/practitioner cost computation should be used in the apportionment process.

3. For the determinations made under paragraph k of subsection 1 of Section C and paragraph m of subsection 2 of Section C, Medicaid fee-for-service payments for professional services furnished during the applicable state fiscal year from the State's MMIS/claims system are used.  However, if MMIS charges are adjusted in subsection 2 above, Medicaid fee-for-service payment offsets will also need to be adjusted accordingly.

E.   Final Reconciliation

Once the Medi-Cal 2552 and the UC physician/practitioner cost report for the expenditure year have been finalized by the State, a reconciliation of the finalized costs to all Medicaid payments made for the same period will be carried out, including adjustments for overpayments and underpayments if necessary.  The same method as described for the interim reconciliation will be used except that the finalized Medi-Cal 2552 and UC physician/practitioner cost amounts and updated Medicaid data will be substituted as appropriate.  If, at the end of the final reconciliation process, it is determined that a hospital received an overpayment, the overpayment will be properly credited to the federal government.

Attachment 4.19-B
Page 64

STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT
STATE: <u>CALIFORNIA</u>

---

**REIMBURSEMENT FOR ADULT DAY HEALTH CARE CENTERS**

(1) Reimbursement for services provided in an Adult Day Health Care (ADHC) Center shall be equal to 90 percent of the rate established for Nursing Facilities – Level A for the corresponding rate year, pursuant to the methodology described in Attachment 4.19-D, beginning on page 10.

(2) For dates of service on or after March 1, 2009, through and including March 8, 2009, payments for services provided in an ADHC Center shall be the rate as calculated in paragraph (1), less 5 percent

(3) For dates of service March 1, 2011, through and including May 31, 2011, payments for services provided in ADHC Centers located within specified Medical Service Study Areas (MSSAs) in Alameda, Contra Costa, Los Angeles, Marin, Orange, Riverside, San Bernardino, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz and Ventura counties shall be the rate as calculated in paragraph (1), less 5 percent.

MSSAs are the defined geographic analysis unit for the California Office of Statewide Health Planning and Development (OSHPD). They are composed of one or more complete U.S. Census Bureau census tracts and are reproduced on the decadal census. The boundaries are approved by the Health Manpower Policy Commission and the U.S. Department of Health and Human Services, Health Resources Service and Administration (HRSA), formally recognizes California MSSAs as the Rational Service Area for medical service for California.  MSSAs are published on the OSHPD website at:
http://www.oshpd.ca.gov/General_Info/MSSA/AtoC.html.

(4) For dates of service June 1, 2011, through and including March 31, 2012, payments for services provided in ADHC Centers located within specified Medical Service Study Areas (MSSAs) in Alameda, Contra Costa, Los Angeles, Marin, Orange, Riverside, San Bernardino, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz and Ventura counties shall be the rate as calculated in paragraph (1), less 10 percent.

TN No  11-039
Supersedes                              MAR 2 7 2012
TN No.  11-009        Approval Date_____    Effective Date: December 1, 2011

Attachment 4.19-B
Page 65

STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT

State:   California

REIMBURSEMENT FOR ALTERNATIVE BIRTH CENTERS (FREE-STANDING BIRTH CENTERS) AND LICENSED OR OTHERWISE STATE-RECOGNIZED COVERED PROFESSIONALS PROVIDING SERVICES IN ALTERNATIVE BIRTH CENTERS

Alternative Birth Center services described in paragraph 29.a of Attachment 3.1-A and in paragraph 28.a of Attachment 3.1-B of the California State Plan are reimbursed at the lower of (1) the usual and customary rate, or (2) California Department of Health Care Services' (DHCS') published statewide all-inclusive rate per delivery.

Effective July 1, 2017, the statewide all-inclusive reimbursement rate for delivery services will not exceed 80 percent of the Diagnosis-Related Group (APR-DRG 560-1) for Vaginal Delivery rate received by general acute care hospitals.

Reimbursement rates for licensed or otherwise State-recognized covered professionals providing services in an Alternative Birth Center as described in paragraph 29.b of Attachment 3.1-A and in paragraph 28.b of Attachment 3.1-B are published on the DHCS Website referenced above.

Except as otherwise provided in the State Plan, State developed fee schedule rates are the same for both governmental and private providers of Alternative Birth Center services.  The agency's fee schedule was set effective July 1, 2017, for services provided on or after that date.  The DHCS rates are published on the DHCS Website at http://files.medi-cal.ca.gov/pubsdoco/rates/rateshome.asp.

TN: 17-039
Supersedes:              Approved Date: November 22, 2017     Effective Date: July 1, 2017
TN: 14-017