NICHOLS KASTER PLLP
4700 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
(612) 256-3200 (612) 338-4878

DESAI LAW FIRM, P.C.
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax: (949) 271-4190

ALICE CHANG
13048 Del Monte Dr, Apt 42F
Seal Beach, CA 90740
Tel: (714) 507-6161

REBEKAH L. BAILEY (SBN 258551)
bailey@nka.com
MATTHEW H. MORGAN (MN 304657)*
morgan@nka.com
KATE A. FISHER (MN 0392180)*
kfisher@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center; 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200; Fax: (612) 215-6870
**Admitted pro hac vice*

ALICE CHANG (SBN 239761)
alicechangjdmba@gmail.com
13048 Del Monte Dr., Apt 42F
Seal Beach, CA 90740
Telephone: (714) 507-6161

AASHISH Y. DESAI (SBN 187394)
aashish@desai-law.com
DESAI LAW FIRM, P.C.
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax: (949) 271-4190

*Attorneys for Relators and Plaintiff-Relator*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**.; **STATE OF CALIFORNIA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**; **LOS ANGELES COUNTY** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D.**; and **JUSTIN CHEONGSIATMOY, M.D.**, in his individual capacity,

Plaintiffs,

v.

Case No. 2:18-cv-08311-SSS (ASx)

Hon. Sunshine S. Sykes

**PART 8 OF 13**
**(EXHIBITS 55—89)**

**FIFTH AMENDED COMPLAINT**

NICHOLS KASTER PLLP
4700 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
(612) 256-3200 (612) 338-4878

DESAI LAW FIRM, P.C.
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax: (949) 271-4190

ALICE CHANG
13048 Del Monte Dr, Apt 42F
Seal Beach, CA 90740
Tel: (714) 507-6161

**UNIVERSITY OF SOUTHERN CALIFORNIA**, a California corporation;

and

**USC CARE MEDICAL GROUP, INC.**, a California corporation,

Defendants.

# Exhibit 55

# Physician Non-Physician Practitioner Supplemental Reimbursement Program

## PNPP Program Overview

Physician Non-Physician Practitioner Supplemental Reimbursement Program (PNPP) is a Certified Public Expenditure (CPE) program, which provides supplemental reimbursement to eligible government-operated hospitals or government entities, with which they are affiliated, for the uncompensated Medicaid costs of providing physician and non-physician practitioner professional services to Medicaid beneficiaries.

The California State Plan Amendment (SPA) No. 05-023, effective July 1, 2005, and approved by Centers for Medicare & Medicaid Services (CMS) on December 21, 2007, describes a supplemental reimbursement methodology for physician and non-physician practitioner professional costs.
SPA 16-020, approved by CMS on December 6, 2016, updated the State Plan language to reflect the current names of the Designated Public Hospital (DPH) participants and to account for any future hospital name changes.

State Plan, Attachment 4.19-B, pages 52-63 (SPA 05-023 and SPA 16-020) (/formsandpubs/laws/Documents/StatePlan_Attachment_4.19B_52-65.pdf) outlines the general supplemental reimbursement requirements, the eligible DPHs, and the reimbursement methodology. The State Plan authorizes a Time Study Implementation Plan (/provgovpart/Documents/PNPP/TimeStudyImplementationPlan.pdf), which describes the time study methodology in further detail. Time studies are required to account for 100% of provider clinical time of the following practitioners in the following settings including up to 4 separate cost pools:

1. University of California (UC) setting (physician practitioners)
2. UC setting (non-physician practitioners)
3. Non-UC setting (non-physician practitioners)
4. Non-UC setting (Medicare approved physician time studies)

## PNPP Program Provider Eligibility

The physician and non-physician practitioner costs are limited to professional costs incurred by the DPHs listed below, including any successor or differently named hospital, as applicable, and their affiliated government physician practice groups (i.e., practice group that is owned and operated by the same government entity that owns and operates the hospital). These professional costs are reported on the DPHs' Medi-Cal 2552 cost report and, in the case of the UC hospitals, the UC School of Medicine physician/non-physician practitioner cost report as approved by CMS.

Physician Non Physician Practitioner

| | |
|---|---|
| Government-Operated Hospitals: | |
| Alameda County Medical Center | Los Angeles County (LA Co.) Hospitals: |
| Alameda Hospital (DPH date July 1, 2016) | LA Co. Harbor/UCLA Medical Center |
| Arrowhead Regional Medical Center | LA Co. Martin Luther King Jr. /Drew Medical Center (Closed August 2007) |
| Contra Costa Regional Medical Center | LA Co. Olive View Medical Center |
| Kern Medical Center | LA Co. Rancho Los Amigos National Rehabilitation Center |
| Natividad Medical Center | LA Co. University of Southern California Medical Center |
| Riverside University Health System - Medical Center | State Government-Operated UC Hospitals: |
| San Francisco General Hospital | UC Davis Medical Center |
| San Joaquin General Hospital | UC Irvine Medical Center |
| San Leandro Hospital (DPH date July 1, 2016) | UC San Diego Medical Center |
| San Mateo County General Hospital | UC San Francisco Medical Center |
| Santa Clara Valley Medical Center | UC Los Angeles Medical Center |
| Tuolumne General Hospital (Closed June 2007) | Santa Monica UCLA Medical Center (aka - Santa Monica UCLA Medical Center & Orthopedic Hospital) |
| Ventura County Medical Center | |

## PNPP Reimbursement

PNPP supplemental payments approximate the difference between the Fee for Service (FFS) payment and the allowable Medicaid costs related to the professional component of physician or non-physician practitioner services eligible for Federal Financial Participation (FFP). PNPP supplemental payments are made on an annual basis as detailed in Attachment 4.19-B, pages 52-63 (SPA 05-023 and SPA 16-020) (/formsandpubs/laws/Documents/StatePlan_Attachment_4.19B_52-65.pdf)and the Time Study Implementation Plan (/provgovpart/Documents/MSPU/PNPP_ImpPlan.pdf).

## How To Contact Us

If you have any further questions, send inquiries to: PNPP@dhcs.ca.gov (mailto:PNPP@dhcs.ca.gov)

## Links

California State Plan, Attachment 4.19-B, pages 52-63 (SPA 05-023 and SPA 16-020) (/formsandpubs/laws/Documents/StatePlan_Attachment_4.19B_52-65.pdf)
Time Study Implementation Plan (/provgovpart/Documents/MSPU/PNPP_ImpPlan.pdf)

Last modified date: 10/27/2020 3:39 PM

**Non-Discrimination Policy and Language Access** (/Pages/Language_Access.aspx)

Access Health Care Language Assistance Services (SB 223) (/Pages/Health_Care_Language_Assistance_Services.aspx)

العربية (/Pages/Language_Access.aspx#arabic) | Հայերեն (/Pages/Language_Access.aspx#armenian) | ខ្មែរ (/Pages/Language_Access.aspx#cambodian) | 繁體中文 (/Pages/Language_Access.aspx#chinese) | فارسی (/Pages/Language_Access.aspx#farsi) | हिंदी (/Pages/Language_Access.aspx#hindi) | Hmoob (/Pages/Language_Access.aspx#hmong) | 日本語 (/Pages/Language_Access.aspx#japanese) | 한국어 (/Pages/Language_Access.aspx#korean) | ລາວ (/Pages/Language_Access.aspx#laotian) | ਪੰਜਾਬੀ (/Pages/Language_Access.aspx#punjabi) | Русский (/Pages/Language_Access.aspx#russian) | Español (/Pages/Language_Access.aspx#spanish) | Tagalog (/Pages/Language_Access.aspx#tagalog) | ภาษาไทย (/Pages/Language_Access.aspx#thai) | Tiếng Việt (/Pages/Language_Access.aspx#vietnamese)

About Us (/Pages/AboutUs.aspx) | Careers (/services/admin/jobs/Pages/default.aspx) | Conditions of Use (/pages/use.aspx) | Privacy Policy (/pages/privacy.aspx) | Contact Us (/Pages/contact_us.aspx) | Accessibility Certification (/Documents/DHCS-SIMM-25B-062819.pdf)

Copyright © 2021 State of California

# Exhibit 56

## State Compliance with Federal Certified Public Expenditures Regulations

Public entities (e.g., public hospitals) may certify that they spent funds on Medicaid items or services that are eligible for Federal matching funds. These funds are referred to as certified public expenditures (CPEs) and may be claimed as the State's share of Medicaid expenditures as long as the CPEs comply with Federal regulations and are being used for the required purposes (42 CFR § 433.51 and 45 CFR § 95.13.) We will determine whether States comply with Federal regulations for claiming CPEs, which are normally generated by local governments as part of their contribution to the coverage of Medicaid services.

| Announced or Revised | Agency | Title | Component | Report Number(s) | Expected Issue Date (FY) |
|---|---|---|---|---|---|
| Nov-16 | Centers for Medicare & Medicaid Services | State Compliance with Federal Certified Public Expenditures Regulations | Office of Audit Services | W-00-17-31110; various reviews | 2019 |

# EXHIBIT 57

University of Southern California

Current login: Justin Chen...

# LAC+USC Provider Time Study

- Home
- Instructions
- Activity Definitions
- FAQ
- Messages
- 1-Unit Code Profile
- 2-Add/Review Hours
- 3-Finalize Survey
- Edit Profile
- Logout

## Expanded Activity Definitions

1. Patient Care Services

   a. Direct Patient Care - consists of services that would give rise to a separate bill for your services in private practice. It includes activities that involve identifiable, direct medical services that contribute to the diagnosis and/or treatment of the patient, and that are similar to those you would render to a patient in a non-teaching setting.

   b. Supervision of Interns and Residents in the Provision of Patient Care - includes the time spent providing direct patient care while instructing an intern or resident on a procedure.

   c. Clinical Research - conducted in conjunction with, and as part of, caring for patients is also considered patient care services if the services are considered usual patient care and are not compensated through research funds. Usual patient care is the case that is medically reasonable, necessary, and ordinarily furnished [absent any research programs] in the treatment of patients by providers under the supervision of physicians as indicated by the medical condition of the patients. Also, this definition intends that the appropriate level of care criteria must be met for the costs of this care to be reimbursable. Such care is represented by items and services [routine and ancillary] that may be diagnostic, therapeutic, rehabilitative, medical, psychiatric, skilled nursing, and other related professional health services.

   d. *New!* Off-Premises Call Related to Patient Care - this consists of time spent in scheduled call coverage away from the hospital grounds. There is an expectation that the provider respond to telephone calls regarding patient care issues or, if need be, report for duty at the hospital to provide one of the other direct care activities.

2. Services to the Hospital

   a. Supervision of Interns and Residents without Direct Patient Care - relates to time involved in clinical rounds, or the review with interns and residents of individual patient care if such activities would not give rise to a separate bill for your services in private practice. Also include time spent scheduling, managing, planning, and evaluating the work of interns and residents.

   b. Teaching of Interns and Residents - refers to time spent performing services related to an approved educational program for physicians, dentists, or podiatrists [i.e., those involving interns, residents, and fellows]. Include time spent preparing and presenting instruction in a classroom, lecture hall, or other formal setting, including Grand Rounds. Do not include time spent instructing allied health professionals.

   c. Teaching and Training of Allied Health Professionals - includes time spent teaching and supervising the performance of trainees in approved educational programs for allied health professionals. Please include time spent preparing and presenting formal instruction to nurses or technicians who are enrolled in formal training programs. Also include time spent supervising these personnel on procedures related to specific patients.

   d.

1. General Hospital Administration refers to hospital or departmental administration and management, including the supervision of hospital employees; preparation for and attendance at hospital and medical staff committee meetings, departmental meetings, and other related matters, such as tumor boards, peer reviews, and quality control investigations; as well as autopsies.

2. Continuing Medical Education - attendance at lectures or similar educational forums, including continuing medical education classes.

3. *New!* Off-Premises Call Related to Hospital Administration - this consists of time spent in scheduled call coverage away from the hospital grounds. There is an expectation that the provider respond to telephone calls regarding administrative issues pertaining to the general operations of the hospital or, if need be, report for duty at the hospital to address an administrative issue requiring their presence.

3. Bench Research - This category includes activities involving a systematic, intensive study directed to a better scientific understanding of the science and art of diagnosing, treating, curing, and/or preventing mental or physical disease. Usually such knowledge is obtained in the laboratory or during chart review, and does not necessarily involve direct individual or collective patient care. **Bench research is not an activity funded under the MSOA and is typically not done on County time. Please contact your survey administrator if you feel that there are hours that should be entered in this category.**

4. Compensated Time Off - consists of vacation, sick leave, personal and holiday time that would have been worked at a County facility had there not been time off. Do not include time off on weekends unless you are typically scheduled to work weekend hours and are taking sick, personal, or vacation time off.

# Exhibit 58

**Cheongsiatmoy, Justin**

| | |
|---|---|
| **From:** | Cheongsiatmoy, Justin |
| **Sent:** | Tuesday, May 09, 2017 10:21 AM |
| **To:** | Matthews, Angelique |
| **Subject:** | FW: MSOA Mandated Provider Time Study (formerly "Blue Books") |
| **Importance:** | High |

---

From: Susana Astudillo [redacted]]
Sent: Tuesday, May 09, 2017 10:07 AM
To: Cheongsiatmoy, Justin
Subject: MSOA Mandated Provider Time Study (formerly "Blue Books")

Survey URL: http://pts.usc.edu
Username: Justin.Cheongsiatmoy
Password: 321432
Departmental Survey Administrator: Susana Astudillo [Neurology] Survey Administrator Email: [redacted]

This email sent to: Justin Cheongsiatmoy

This message is to notify you that you have been identified by your Departmental Survey Administrator as a provider of MSOA funded services; or that you are an LA County employed attending physician at LAC+USC or one of its affiliated health centers. All providers of these services are required to complete a Provider Time Study (PTS) survey twice a year in order to be in compliance with the county, state and federal government's cost reporting mandates; and to supply verification that the Keck School of Medicine is meeting its MSOA contractual service obligations.

The upcoming May 8th - May 21st Provider Time Study survey period will be administered electronically via a dedicated website with an easy data entry screen and a finalized hardcopy printout for your signature. Your reviewed finalized surveys should be returned to your Departmental Survey Administrator as soon as possible after the close of the survey period. At the top of this message is your username and password for logging into the survey website. After logging in, instructions for completing the survey can be viewed by clicking on the "INSTRUCTIONS" tab in the upper left corner of the web page or by clicking on the button for viewing the instructional video. If you have questions, please contact your Departmental Survey Administrator for assistance.

Thank you for your participation with this important process.

The PTS Survey Team

# Exhibit 59

**Cheongsiatmoy, Justin**

**From:** Susana Astudillo <[redacted]
**Sent:** Saturday, November 10, 2018 9:02 AM
**To:** Cheongsiatmoy, Justin
**Cc:** Matthews, Angelique
**Subject:** Re: MSOA Mandated Provider Time Study (formerly "Blue Books")

Thanks. Once completed, please email it me.
Best

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "Cheongsiatmoy, Justin" <Justin.Cheongsiatmoy@med.usc.edu>
Date: 11/10/18 12:22 AM (GMT-08:00)
To: Susana Astudillo <[redacted]>
Cc: "Matthews, Angelique" <Angelique.Matthews@med.usc.edu>
Subject: Re: MSOA Mandated Provider Time Study (formerly "Blue Books")

Hi Susana,

I have never filled out these MSOA provider time studies myself since Dr. Gonzalez has always ordered me to forward them to Angelique (on copy) and she has always completed and signed for me.

Angelique, please reply all and attach all the prior Provider Time Studies you filled out under my ID so I can understand what you have done.

Thanks,
Justin

---

**From:** Susana Astudillo <[redacted]>
**Sent:** Friday, October 26, 2018 1:46:31 PM
**To:** Cheongsiatmoy, Justin
**Subject:** MSOA Mandated Provider Time Study (formerly "Blue Books")

Survey URL: http://pts.usc.edu
Username: Justin.Cheongsiatmoy
Password: 321432
Departmental Survey Administrator: Susana Astudillo [Neurology]
Survey Administrator Email: [redacted]

This email sent to: Justin Cheongsiatmoy

This message is to notify you that you have been identified by your Departmental Survey Administrator as a provider of MSOA funded services; or that you are an LA County employed attending physician at LAC+USC or one of its affiliated health centers. All providers of these services are required to complete a Provider Time Study (PTS) survey twice a year

in order to be in compliance with the county, state and federal government's cost reporting mandates; and to supply verification that the Keck School of Medicine is meeting its MSOA contractual service obligations.

The upcoming October 8th - October 21st Provider Time Study survey period will be administered electronically via a dedicated website with an easy data entry screen and a finalized hardcopy printout for your signature. Your reviewed finalized surveys should be returned to your Departmental Survey Administrator as soon as possible after the close of the survey period. At the top of this message is your username and password for logging into the survey website.  After logging in, instructions for completing the survey can be viewed by clicking on the "INSTRUCTIONS" tab in the upper left corner of the web page or by clicking on the button for viewing the instructional video.  If you have questions, please contact your Departmental Survey Administrator for assistance.

Thank you for your participation with this important process.

The PTS Survey Team

# EXHIBIT 60

# LAC+USC Provider Time Study - Spring 2018: Mon - May 7th through Sun - May 20th

Provider: Cheongsiatmoy, Justin    Survey Status: Finalized    Department: Neurology

Date Printed: 2018-07-19

**List of Unit Codes Used in this Survey:**

| Unit Code | Site | Description | Service Category |
|---|---|---|---|
| 74214 | LAC-USC | SURGERY - OPERATING ROOM | ANCILLARY SERVICE |
| 68217 | LAC-USC | PHYSICIAN - NEUROLOGY | SERVICE WITHOUT DIRECT PATIENT CONTACT |

**Summary of Service Records:**

| | | Hours by Activity | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 05-07-2018 | 74214 | 4.0 | - | - | 20.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **4.0** | **-** | **-** | **20.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **05-07-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 05-08-2018 | 68217 | - | - | - | - | - | - | - | - | 1.0 | - | - | - |
| | 74214 | - | - | - | 23.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **-** | **-** | **-** | **23.0** | **-** | **-** | **-** | **-** | **1.0** | **-** | **-** | **-** |
| **05-08-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 05-09-2018 | 74214 | 8.0 | - | - | 16.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **16.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **05-09-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 05-10-2018 | 68217 | - | - | - | - | - | - | - | 2.0 | - | - | - | - |
| | 74214 | 5.0 | - | - | 17.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **5.0** | **-** | **-** | **17.0** | **-** | **-** | **-** | **2.0** | **-** | **-** | **-** | **-** |
| **05-10-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 05-11-2018 | 74214 | 5.0 | - | - | 19.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **5.0** | **-** | **-** | **19.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **05-11-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

# LAC+USC Provider Time Study - Spring 2018: Mon - May 7th through Sun - May 20th

Provider: Cheongsiatmoy, Justin    Survey Status: Finalized    Department: Neurology

Date Printed: 2018-07-19

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **05-12-2018** | **TOTAL HOURS: 0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **05-13-2018** | **TOTAL HOURS: 0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-14-2018 | 74214 | 8.0 | - | - | 16.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **16.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **05-14-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-15-2018 | 68217 | - | - | - | - | - | - | - | - | 1.0 | - | - | - |
| | 74214 | 6.0 | - | - | 17.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **6.0** | **-** | **-** | **17.0** | **-** | **-** | **-** | **-** | **1.0** | **-** | **-** | **-** |
| **05-15-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-16-2018 | 74214 | 8.0 | - | - | 15.0 | - | - | 1.0 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **15.0** | **-** | **-** | **1.0** | **-** | **-** | **-** | **-** | **-** |
| **05-16-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-17-2018 | 68217 | - | - | - | - | - | - | - | 2.0 | - | - | - | - |
| | 74214 | 3.0 | - | - | 19.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **3.0** | **-** | **-** | **19.0** | **-** | **-** | **-** | **2.0** | **-** | **-** | **-** | **-** |
| **05-17-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-18-2018 | 74214 | 6.0 | - | - | 18.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **6.0** | **-** | **-** | **18.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **05-18-2018** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **05-19-2018** | **TOTAL HOURS: 0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

# LAC+USC Provider Time Study - Spring 2018: Mon - May 7th through Sun - May 20th

Provider: Cheongsiatmoy, Justin    Survey Status: Finalized    Department: Neurology

Date Printed: 2018-07-19

| 05-20-2018 | TOTAL HOURS: 0 | INITIALS: x | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spring 2018 | TOTAL SURVEY HOURS: 240.0 | 53.0 | - | - | 180.0 | - | - | 1.0 | 4.0 | 2.0 | - | - | - |

# LAC+USC Provider Time Study - Spring 2018: Mon - May 7th through Sun - May 20th

Provider: Cheongsiatmoy, Justin    Survey Status: Finalized    Department: Neurology

Date Printed: 2018-07-19

**PHYSICIAN ALLOCATION SUMMARY**

| | ACTIVITIES | SURVEY-BASED PERCENTAGES | ALTERNATE PERCENTAGES |
|---|---|---|---|
| 1. | **PATIENT CARE** | | |
| | A. Direct patient care | 22.08 % | 0 % |
| | B. Supervision of interns and residents in the provision of patient care. | 0 % | % |
| | C. Clinical research. | 0 % | % |
| | D. Off-Premises Call Coverage - Patient Care. | 75 % | 0 % |
| 2. | **SERVICES TO THE HOSPITAL** | | |
| | A. Supervision of interns and residents [scheduling, planning, and evaluating the work of interns and residents, including clinical rounds]. | 0 % | 0 % |
| | B. Teaching of interns and residents [preparing for and presenting of instruction to interns and residents in classrooms and lecture halls or in other formal settings]. | 0 % | 0 % |
| | C. Teaching and supervision of allied health professionals [teaching and supervising the performance of trainees in approved allied health programs]. | 0.42 % | 0 % |
| | D. Administration | | |
| | 1. General administration [supervising the performance of employees, excluding interns and residents; committee meetings; and autopsies]. | 1.67 % | 0 % |
| | 2. Continuing medical education. | 0.83 % | 0 % |
| | 3. Off-Premises call coverage - Administrative. | 0 % | 0 % |
| 3. | **RESEARCH** | | |
| | Systematic studies directed towards better scientific knowledge, usually obtained in a laboratory with test tubes and animals. | 0 % | 0 % |
| 4. | **COMPENSATED TIME OFF** | | |
| | Vacation, holiday, sick leave, etc. | 0 % | 0 % |
| | **TOTAL** | **100%** | **0 %** |

These percentages represent the activities I will be providing during the current FY.

| Provider's Signature | Date |
|---|---|
| Department Chairman's Signature | Date |

Finalized

Date Received by Keck Admin/Finance:

# EXHIBIT 61

Keck School of Medicine of USC Department of Neurology
Patient Care Services at LAC+USC

| Dept/Division | IP/OP | Service | Frequency of Activity | Occurrences per Year | Avg. # of Faculty | Length of Activity (in hours) | Annual Hours | FTE* |
|---|---|---|---|---|---|---|---|---|
| Neurology | Inpatient | Neurology Neuro Critical Care Service (Gold)-Weekdays | Daily | 260 | 1 | 14 | 3640 | 2.07 |
| | Inpatient | Neurology Neuro Critical Care Service (Gold)-Weekends | Daily | 104 | 1 | 14 | 1456 | 0.83 |
| | Inpatient | Neurology Neuro Critical Care Service (Gold)-Fellow | Daily | 260 | 0 | 8 | 0 | - |
| | Inpatient | Neurology Stroke Service (Red)-Weekday | Daily | 260 | 1 | 8 | 2080 | 1.18 |
| | Inpatient | Neurology Stroke Service (Red)-Weekends | Daily | 104 | 1 | 8 | 832 | 0.47 |
| | Inpatient | General Inpatient Neurology Service: Primary & Consults (Green) - Weekdays | Daily | 260 | 1 | 8 | 2080 | 1.18 |
| | Inpatient | General Inpatient Neurology Service: Primary & Consults (Green) - Weekends | Daily | 104 | 1 | 4 | 416 | 0.24 |
| | Inpatient | IOM Technicians | Daily | 260 | 3 | 8 | 6240 | 3.55 |
| | Inpatient | IOM Attending | Daily | 260 | 1 | 8 | 2080 | 1.18 |
| | Clinics | General Neurology Clinic | Weekly | 104 | 4 | 4 | 1664 | 0.95 |
| | Clinics | Epilepsy Clinic | Weekly | 52 | 3 | 4.5 | 702 | 0.40 |
| | Clinics | Epilepsy Surgical Conference | Weekly | 52 | 8 | 2 | 832 | 0.47 |
| | Clinics | Epilepsy Dietary Clinic | Weekly | 52 | 1 | 2 | 104 | 0.06 |
| | Clinics | Neuro Oncology Clinic | Weekly | 52 | 1 | 4 | 208 | 0.12 |
| | Clinics | Tumor Board | Weekly | 52 | 1 | 2 | 104 | 0.06 |
| | Clinics | Neurology OB Clinic | Weekly | 52 | 1 | 3 | 156 | 0.09 |
| | Clinics | Multiple Sclerosis Clinic | Weekly | 52 | 4 | 2 | 416 | 0.24 |
| | Clinics | Movement Disorders Clinic | Weekly | 52 | 3 | 2 | 312 | 0.18 |
| | Clinics | Neuromuscular Clinic | Weekly | 52 | 1 | 2 | 104 | 0.06 |
| | Clinics | HIV Clinic | Weekly | 104 | 1 | 5 | 520 | 0.30 |
| | Clinics | Jail Clinic | Weekly | 52 | 1 | 2 | 104 | 0.06 |
| | Clinics | Pediatric Neurology | Weekly | 156 | 1 | 3 | 468 | 0.27 |
| | Procedures | EEG Reading | Weekly | 260 | 1 | 3 | 780 | 0.44 |
| | Procedures | EMG Procedures | Weekly | 156 | 1 | 10 | 1560 | 0.89 |
| | Procedures | Epilepsy Procedures - WADAs | Weekly | 52 | 1 | 4 | 208 | 0.12 |
| | On Call | IOM Attending - Call Weekdays | Daily | 260 | 1 | 16 | 4160 | 0.30 |
| | On Call | IOM Attending - Call Weekends | Daily | 104 | 1 | 24 | 2496 | 0.18 |
| | On Call | Neurology Neuro Critical Care Service (Gold) - Call Weekdays | Daily | 260 | 1 | 10 | 2600 | 0.18 |
| | On Call | Neurology Neuro Critical Care Service (Gold) - Call Weekends | Daily | 104 | 1 | 10 | 1040 | 0.07 |
| | On Call | Neurology Stroke Service (Red) - Call Weekdays | Daily | 260 | 1 | 16 | 4160 | 0.30 |
| | On Call | Neurology Stroke Service (Red) - Call Weekends | Daily | 104 | 1 | 16 | 1664 | 0.12 |
| | On Call | General Inpatient Neurology Service: Primary & Consults (Green) - Call Weekdays | Daily | 260 | 1 | 16 | 4160 | 0.30 |
| | On Call | General Inpatient Neurology Service: Primary & Consults (Green) - Call Weekends | Daily | 104 | 1 | 20 | 2080 | 0.15 |
| | On Call | EEG Reading - Call Weekdays | Daily | 260 | 1 | 24 | 6240 | 0.44 |
| | On Call | EEG Reading - Call Weekends | Daily | 104 | 1 | 24 | 2496 | 0.18 |
| Total | | | | 5,044.0 | | | 58,162.0 | 17.59 |
| *Based on 1,760 Hours Per Year | | | | | | | Faculty | 14.04 |
| | | | | | | | IOM Techs | 3.55 |
| | | | | | | | Total | 17.59 |

# EXHIBIT 62

# LAC+USC Provider Time Study - Fall 2012: Mon - Oct 22nd through Sun - Nov 4th

**Provider: Shilian, Parastou** **Survey Status: Finalized** **Department: Neurology**

**Date Printed: 2012-12-17**

**List of Unit Codes Used in this Survey:**

| Unit Code | Site | Description | Service Category |
|---|---|---|---|
| 74214 | LAC-USC | SURGERY - OPERATING ROOM | ANCILLARY SERVICE |
| 68217 | LAC-USC | PHYSICIAN - NEUROLOGY | SERVICE WITHOUT DIRECT PATIENT CONTACT |

**Summary of Service Records:**

| | | Hours by Activity | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 10-22-2012 | 74214 | 8.0 | - | - | 14.0 | - | - | 2.0 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **14.0** | **-** | **-** | **2.0** | **-** | **-** | **-** | **-** | **-** |
| **10-22-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 10-23-2012 | 68217 | - | - | - | - | - | - | - | - | 2.0 | - | - | - |
| | 74214 | 6.5 | - | - | 15.5 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **6.5** | **-** | **-** | **15.5** | **-** | **-** | **-** | **-** | **2.0** | **-** | **-** | **-** |
| **10-23-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 10-24-2012 | 74214 | 8.0 | - | - | 14.0 | - | - | 2.0 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **14.0** | **-** | **-** | **2.0** | **-** | **-** | **-** | **-** | **-** |
| **10-24-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 10-25-2012 | 74214 | 8.0 | - | - | 16.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **16.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **10-25-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 10-26-2012 | 74214 | 5.0 | - | - | 19.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **5.0** | **-** | **-** | **19.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **10-26-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

# LAC+USC Provider Time Study - Fall 2012: Mon - Oct 22nd through Sun - Nov 4th

**Provider: Shilian, Parastou** **Survey Status: Finalized** **Department: Neurology**

**Date Printed: 2012-12-17**

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-27-2012 | 74214 | - | - | - | 24.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **-** | **-** | **-** | **24.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **10-27-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-28-2012 | 74214 | - | - | - | 18.5 | - | - | 5.5 | - | - | - | - | - |
| | **Sum of Hours:** | **-** | **-** | **-** | **18.5** | **-** | **-** | **5.5** | **-** | **-** | **-** | **-** | **-** |
| **10-28-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-29-2012 | 74214 | 8.0 | - | - | 15.0 | - | - | 1.0 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **15.0** | **-** | **-** | **1.0** | **-** | **-** | **-** | **-** | **-** |
| **10-29-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-30-2012 | 68217 | - | - | - | - | - | - | - | - | 2.0 | - | - | - |
| | 74214 | 7.0 | - | - | 15.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **7.0** | **-** | **-** | **15.0** | **-** | **-** | **-** | **-** | **2.0** | **-** | **-** | **-** |
| **10-30-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-31-2012 | 74214 | 8.0 | - | - | 13.5 | - | - | 2.5 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **13.5** | **-** | **-** | **2.5** | **-** | **-** | **-** | **-** | **-** |
| **10-31-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-01-2012 | 74214 | - | - | - | 24.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | **-** | **-** | **-** | **24.0** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **11-01-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |

| Date of Service | Unit Code | 1A | 1B | 1C | 1D | 2A | 2B | 2C | 2D1 | 2D2 | 2D3 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-02-2012 | 74214 | 8.0 | - | - | 13.0 | - | - | 3.0 | - | - | - | - | - |
| | **Sum of Hours:** | **8.0** | **-** | **-** | **13.0** | **-** | **-** | **3.0** | **-** | **-** | **-** | **-** | **-** |

# LAC+USC Provider Time Study - Fall 2012: Mon - Oct 22nd through Sun - Nov 4th

**Provider: Shilian, Parastou** **Survey Status: Finalized** **Department: Neurology**

**Date Printed: 2012-12-17**

| 11-02-2012 | TOTAL HOURS: 24.0 | | | | | | INITIALS: | x | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 11-03-2012 | 74214 | - | - | - | 24.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | - | - | - | **24.0** | - | - | - | - | - | - | - | - |
| **11-03-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Date of Service** | **Unit Code** | **1A** | **1B** | **1C** | **1D** | **2A** | **2B** | **2C** | **2D1** | **2D2** | **2D3** | **3** | **4** |
| 11-04-2012 | 74214 | - | - | - | 24.0 | - | - | - | - | - | - | - | - |
| | **Sum of Hours:** | - | - | - | **24.0** | - | - | - | - | - | - | - | - |
| **11-04-2012** | **TOTAL HOURS: 24.0** | | | | | | **INITIALS:** | x | | | | | |
| **Fall 2012** | **TOTAL SURVEY HOURS: 336.0** | **66.5** | - | - | **249.5** | - | - | **16.0** | - | **4.0** | - | - | - |

# LAC+USC Provider Time Study - Fall 2012: Mon - Oct 22nd through Sun - Nov 4th

**Provider: Shilian, Parastou** **Survey Status: Finalized** **Department: Neurology**

**Date Printed: 2012-12-17**

**PHYSICIAN ALLOCATION SUMMARY**

| | ACTIVITIES | SURVEY-BASED PERCENTAGES | ALTERNATE PERCENTAGES |
|---|---|---|---|
| **1.** | **PATIENT CARE** | | |
| | A. Direct patient care | 19.79 % | 0 % |
| | B. Supervision of interns and residents in the provision of patient care. | 0 % | 0 % |
| | C. Clinical research. | 0 % | 0 % |
| | D. Off-Premises Call Coverage - Patient Care. | 74.26 % | 0 % |
| **2.** | **SERVICES TO THE HOSPITAL** | | |
| | A. Supervision of interns and residents [scheduling, planning, and evaluating the work of interns and residents, including clinical rounds]. | 0 % | 0 % |
| | B. Teaching of interns and residents [preparing for and presenting of instruction to interns and residents in classrooms and lecture halls or in other formal settings]. | 0 % | 0 % |
| | C. Teaching and supervision of allied health professionals [teaching and supervising the performance of trainees in approved allied health programs]. | 4.76 % | 0 % |
| | D. Administration | | |
| | 1. General administration [supervising the performance of employees, excluding interns and residents; committee meetings; and autopsies]. | 0 % | 0 % |
| | 2. Continuing medical education. | 1.19 % | 0 % |
| | 3. Off-Premises call coverage - Administrative. | 0 % | 0 % |
| **3.** | **RESEARCH** | | |
| | Systematic studies directed towards better scientific knowledge, usually obtained in a laboratory with test tubes and animals. | 0 % | 0 % |
| **4.** | **COMPENSATED TIME OFF** | | |
| | Vacation, holiday, sick leave, etc. | 0 % | 0 % |
| | **TOTAL** | **100%** | **0 %** |

These percentages represent the activities I will be providing during FY 2012-2013.

| | |
|---|---|
| Provider's Signature | Date |
| Department Chairman's Signature | Date |

Finalized

Date Received by Keck Admin/Finance:

# Exhibit 63



# Surgical Neurophysiology

**DATE OF STUDY:** 10/29/2012

**STUDY #:** UH-12- 697

**REFERRING PHYSICIAN:** PATRICK HSIEH, M.D.

**PATIENT HISTORY:** This is a 44 year old female with cervical myelopathy

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939), free run EMG (95861),TOF (95937)

**RESULTS:** During C4-C6 anterior cervical discectomy and fusion the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring. Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

3 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative spinal cord or c4-C6 root impairment was seen.

PARASTOU SHILIAN, D.O

Electronic Signature 10/30/2012 10:23:10 AM

# Exhibit 64



# Surgical Neurophysiology

**DATE OF STUDY:** 10/29/2012

**STUDY #:** UH-12- 698

**REFERRING PHYSICIAN:** PATRICK HSIEH M.D.

**PATIENT HISTORY:** This is a 72 year old female with lumbar herniated nucleus pulposus.

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939), free run EMG (95861),TOF (95937)

**RESULTS:** During minimally invasive L4-L5 the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring. Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

2 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative spinal cord or L4, L5 root impairment was seen.

**PARASTOU SHILIAN, D.O**

**Electronic Signature10/30/2012 10:25:43 AM**



# Exhibit 65



# Surgical Neurophysiology

**DATE OF STUDY:** 10/30/2012

**STUDY #:** UH-12- 699

**REFERRING PHYSICIAN:** MARCK SPOONAMORE MD/WILLIAM MOURADIAN MD.

**PATIENT HISTORY:** This is a 23 year old male with herniated L3-S1 disc, and spondylolisthesis

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939), free run EMG (95861),TOF (95937)

**RESULTS:** During L3-S1 transforaminal lumbar interbody fusion the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring. Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

6 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative spinal cord impairment was seen.

**COMMENTS:** Due to the intermittent use of muscle relaxants during critical portions of the procedure no information can be given on specific nerve root function. Clinical correlation is advised.

**PARASTOU SHILIAN, D.O.**
**Electronic signature 10/30/2012 3:55:13 PM**

# Exhibit 66



# Surgical Neurophysiology

**DATE OF STUDY:** 11/1/2012

**STUDY #:** UH-12- 704

**REFERRING PHYSICIAN:** MARK SPOONAMORE M.D.

**PATIENT HISTORY:** This is a 69 year old male with lumbar spinal stenosis.

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939), free run EMG (95861),TOF (95937)

**RESULTS:** During L1-S1 transforaminal lumbar interbody fusion the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring. Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

7 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative spinal cord impairment was seen.

**COMMENTS:** Due to the intermittent use of muscle relaxants during critical portions of the procedure no information can be given on specific nerve root function. Clinical correlation is advised.

**PARASTOU SHILIAN, D.O.**
**Electronic signature 11/2/2012 11:15:59 AM**

MR#
ACCOUNT#



# Exhibit 67



# Surgical Neurophysiology

**DATE OF STUDY:** 11/01/2012

**STUDY #:** UH-12- 705

**REFERRING PHYSICIAN:** Charles Liu, M.D.

**PATIENT HISTORY:** This is a 27 year old female with a right temporal lobe lesion.

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939).

**RESULTS:** During right pterional craniotomy the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

6 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative cortical impairment was seen.

**PARASTOU SHILIAN, D.O.**
**Electronic signature 11/5/2012 8:33:28 AM**

MR#
ACCOUNT#



# EXHIBIT 68

# USC Keck Provider Activity Contradicts LAC+USC PTS

Surgery Date: Saturday, November 3, 2012
Monitoring Time: 10:15AM – 1:25PM (3 hours and 10 minutes)

Events

| Time | Priority | Text |
|---|---|---|
| 10:15:15 AM | Medium | uppers and lowers ssep baseline |
| 10:15:27 AM | Medium | bite block in placed |
| 10:16:17 AM | Medium | uppers and lowers mep baseline |
| 10:27:20 AM | Medium | begin incision |
| 10:36:32 AM | Medium | bp 148/66, hr 67, temp 36.8 |
| 10:36:44 AM | Medium | desf 0.3 |
| 10:37:30 AM | Medium | alot bovie |
| 10:49:16 AM | Medium | meps variables probably due to electrode position, reported baseline to dr Shillian |
| 10:50:43 AM | | Stored Impedance |
| 10:52:46 AM | Medium | exposure |
| 10:58:09 AM | Medium | left upper ssep variable probably due to electrode position |
| 11:00:47 AM | Medium | drilling |
| 11:23:19 AM | Medium | scope in |
| 11:27:33 AM | Medium | exposure done |
| 11:29:20 AM | | Stored Impedance |
| 11:35:59 AM | Medium | resecting and removing grids |
| 11:49:25 AM | Medium | resecting |
| 12:20:45 PM | Medium | stop surgery( dr Liu angry) |
| 12:36:06 PM | Medium | cont resecting |
| 13:04:22 PM | Medium | scope out |
| 13:06:16 PM | Medium | last grid was removed |
| 13:07:24 PM | Medium | washout |
| 13:10:36 PM | High | Closing |
| 13:25:14 PM | Medium | placing bone graft |

Go To
Edit
Print
Delete
Undelete All
Show History
Go To Time
Close



# Surgical Neurophysiology

**DATE OF STUDY:** 11/3/2012

**STUDY #:** UH-12- 707

**REFERRING PHYSICIAN:** CHARLES LIU M.D.

**PATIENT HISTORY:** This is a 36 year old male with intractable seizures

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939),

**RESULTS:** During right temporal craniotomy for grids and stips removed the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were absent in the bilateral upper and lower extremity MEP and bilateral upper extremity SSEP. During the procedure, the remaining potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring

4 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative cortical impairment was seen.

**COMMENTS**: Absence of motor evoked potentials in the bilateral upper and lower extremities and somatosensory evoked potentials in the bilateral upper extremities suggest a baseline abnormality and likely related to electrode positioning. Clinical correlation is advised.

**PARASTOU SHILIAN, D.O.**
**Electronic signature 11/5/2012 8:48:27 AM**

# EXHIBIT 69

# USC Keck Provider Activity Contradicts LAC+USC PTS

Surgery Date: Saturday, November 3, 2012
Monitoring Time: 3:05PM – 5:23PM (2 hours and 18 minutes)

Events

| Time | Priority | Text |
|---|---|---|
| 15:05:39 PM | Medium | bite block in placed |
| 15:21:00 PM | Medium | pt still under muscle relaxante |
| 15:28:07 PM | | EMG - Stored EMG 0mA |
| 15:33:38 PM | Medium | bp 132/59, hr 74, temp 36.8 |
| 15:33:52 PM | Medium | sevf 0.5 |
| 15:35:02 PM | Medium | requested anerst to put pt on tiva/ decreased gas |
| 15:37:17 PM | Medium | surg pause |
| 15:39:23 PM | Medium High | Begin Incision |
| 15:54:26 PM | Medium | drilling |
| 16:21:31 PM | Medium | scope |
| 16:21:56 PM | Medium | burst suppression |
| 16:24:26 PM | Medium | pt on burts suppression |
| 16:29:24 PM | Medium | dura was open |
| 16:52:53 PM | Medium | temporal clip on |
| 16:53:34 PM | Medium | permanent clip on |
| 16:53:55 PM | Medium | removing temporal clip |
| 16:55:05 PM | Medium | no more burst suppression |
| 16:59:20 PM | Medium | anest requested used inhalation agent |
| 16:59:43 PM | Medium | sevf 0.4 |
| 17:02:29 PM | High | Closing |
| 17:02:34 PM | Medium | placing hemostasis |
| 17:03:07 PM | Medium | closing dura |
| 17:04:50 PM | Medium | scope out |
| 17:04:56 PM | Medium | final meps/ meps are presents |
| 17:09:02 PM | Medium | cont closing dura |
| 17:23:18 PM | Medium | placing bone flap |



# Surgical Neurophysiology

**DATE OF STUDY:** 11/03/2012

**STUDY #:** UH-12- 708

**REFERRING PHYSICIAN** Charles Liu M.D.

**PATIENT HISTORY:** This is a 50 year old female with a left middle cerebral artery aneurysm

**MONITORING MODALITIES:** upper and lower limb somatosensory evoked potentials (95938), upper and lower limb motor evoked potentials (95939)

**RESULTS:** During left craniotomy aneurysm clipping the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, these potentials remained stable. No adverse electrodiagnostic events were encountered during monitoring.

3 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** No evidence of intraoperative cortical impairment was seen.

**PARASTOU SHILIAN, D.O.**
**Electronic signature 11/5/2012 8:42:14 AM**

# EXHIBIT 70

| | | 74214 | 74214 | 74214 | 66217 | 68217 |
|---|---|---|---|---|---|---|
| **Dates** | **Total hours** | **1a Direct** | **1d remaining** | **2c remote** | **2d1 admin** | **2d2 cme** |
| 05/08/2017 | 15 | 8 | 9 | 7 | | |
| 05/09/2017 | 11 | 8 | 12 | 3 | | 1 |
| 05/10/2017 | 5h 15min | 6 | 16 | | 2 | |
| 05/11/2017 | 5h 15min | 6 | 18 | | | |
| 05/12/2017 | 9 | 8 | 15 | 1 | | |
| **05/13/2017** | 2h 45min | | | | | |
| **05/14/2017** | Ø | | | | | |
| 05/15/2017 | 5h 41min | 6 | 18 | | | |
| 05/16/2017 | 5h 15min | 6 | 15 | | 2 | 1 |
| 05/17/2017 | 11 | 8 | 13 | 3 | | |
| 05/18/2017 | Ø | Ø | 24 | | | |
| 05/19/2017 | 4h 20min | 5 | 19 | | | |
| **05/20/2017** | Ø | | | | | |
| **05/21/2017** | Ø | | | | | |
| | | 1a | 1d | 2c | 2d1 | 2d2 |

# EXHIBIT 71

## Keck School of Medicine – Finance & Budget

The Office of Finance & Budget serves as the point of contact regarding financial matters at the Keck School of Medicine. The Office of Finance & Budget has the responsibility of monitoring and reporting financial activity for: 1) Current Unrestricted ("CU") accounts, 2) The County Professional Services Agreement ("MSOA"), Faculty Practice Plan billings ("Rebillables") and 3) Restricted, Endowment and Scholarship accounts.

USC policies officially recognize that time spent providing patient care to University patients must be distinct and separate from the time spent providing patient care to County patients.

"Institutional effort does not include time devoted to activities compensated directly by LAC+USC Medical Center County (MSOA)."

## Financial and Business Services

Home Departments Contact Us

Home › Departments › Financial Analysis › Effort Certification › Guidance › Types of Effort and Salary

# Types of Effort and Salary

**What is Institutional Effort?**

Institutional effort is the total time spent by a faculty or exempt staff member on university activities. This includes teaching, research, patient care, service and administrative duties. university responsibilities are reflected in and required by the individual's appointment letter, contract or job description with the university.

Institutional effort also includes research and clinical activities paid for or managed by the Health Research Association, USC Care Medical Group, Inc. and medical directorships.

Institutional effort does not include time devoted to activities compensated directly by LAC+USC Medical Center (MSOA) (i.e., direct county-paid employees), Children's Hospital Medical Group (CHMG), USC Roski Eye Institute or USC Alfred Mann Institute.

# Financial and Business Services

## Types of Effort and Salary

### What is Institutional Effort?

Institutional effort is the total time spent by a faculty or exempt staff member on university activities. This includes teaching, research, patient care, service and administrative duties. university responsibilities are reflected in and required by the individual's appointment letter, contract or job description with the university.

Institutional effort also includes research and clinical activities paid for or managed by the Health Research Association, USC Care Medical Group, Inc. and medical directorships.

Institutional effort does not include time devoted to activities compensated directly by LAC+USC Medical Center (MSOA) (i.e., direct county-paid employees), Children's Hospital Medical Group (CHMG), USC Roski Eye Institute or USC Alfred Mann Institute.

### What is institutional base salary?

Institutional base salary (IBS) is the total guaranteed USC salary set in advance by the provost for the year (including core salary, supplemental salary, administrative stipend and fixed clinical salary, but excluding incentive payments or bonuses) that is paid to a faculty or staff employee for Institutional Effort (including teaching, research, administration, service and patient care activities, but excluding overload teaching.)

IBS includes core salary and supplemental salary. Your USC core salary is included no matter the ultimate source of the funds (MSOA, CHMG (re-billable), sponsored projects or other USC funding sources). Supplemental salary includes stipends, fixed clinical salary and other USC supplementary salary — providing that it is set in advance, awarded according to university policy and consistently applied. These can include administrative stipends and clinical supplements.

Please note that a faculty member's institutional base salary often is not the same as his/her total compensation. This is because IBS does not include certain money you receive from USC, including:

- clinical incentives (usually paid quarterly)
- clinical bonuses (usually paid annually)
- teaching overloads
- summer pay administrative stipends for nine-month faculty
- summer research supplements for nine-month faculty
- bonuses that are not set in advance and part of regular salary commitment
- housing subsidies
- education loan repayments

Institutional base salary (IBS) also excludes any income you may earn outside of your duties to USC and any income that is outside of institutional effort. For example:

- external consulting
- direct pay from LAC+USC Medical Center
- pay from USC Roski Eye Institute
- pay from Children's Hospital Medical Group

A faculty member's offer letter or continuing appointment letter should reflect his or her IBS for the current fiscal year.

## Why is IBS important for effort reporting?

IBS is the salary that a grantee includes in its NIH and other grant proposal budgets, and the salary that is allocated to federal grants through the university's payroll allocation and effort reporting systems. In general, federal sponsors require that IBS be paid by the grantee itself.

IBS is the basis for determining how much salary should be charged to grants and contracts. For example, if an individual proposes to devote 10 percent of his or her effort to the project, 10 percent of his or her IBS should be budgeted (if there is no cost sharing approved by the dean, and if the person is under the NIH cap).

Salary is charged to the grant or contract based on a good faith estimate of effort actually expended, unless a salary cap (such as the NIH cap) is involved. The salary charged, as a percentage of IBS, then is the same as the percent of effort for effort certification. The effort charged can never exceed the effort devoted to a sponsored project.

For example, if you charge $10,000 of salary to a grant over the year and have an annual IBS of $100,000, that is a certification that your annual effort to the grant is 10 percent of your institutional effort. At USC, certification is done more often than once a year, usually on a quarterly or semester basis, so actual certification percentages are based on salary charged for the certification period and a pro-rated IBS.

## What is included in the Other Institutional Effort category in eCert?

Effort for teaching, administration, service and patient care is included in the Other Institutional Effort category.

This category also includes:

- medical directorships
- any Voluntary Uncommitted Cost-Share effort
- USC Care Medical Group effort

Non-IBS effort, with the exception of summer research funding for nine-month faculty, is not included in this category and does not have to be certified. Summer research supplements for nine-month faculty must be certified even though they are not included in IBS.

## Is effort calculated based on a 40-hour workweek?

Effort is not calculated based on a 40-hour workweek or any other number of hours a week. Instead, for a full-time employee, it is based on 100 percent of effort for USC.

## Do part-time employees certify to less than 100 percent effort?

No, they certify to 100 percent effort as well, even if their appointment level is less than 100 percent. They are certifying USC effort, not some percentage of the total week. For example, an employee with a 60 percent appointment split evenly between two grants would certify to 50 percent of USC effort on one grant and 50 percent of USC effort on the other grant for a total of 100 percent effort.

## My administrative appointment is at-will and subject to termination with a 90-day notice.  Does that affect my IBS?

No. The administrative stipend is still considered part of the IBS for proposing and charging effort, even if the appointment can be terminated. In the event that an appointment is terminated, increased, reduced or revised, then the IBS should be adjusted at that time.

DEPARTMENTS

Financial Analysis

Audits

Effort Certification

Guidance

Basics of Effort Reporting

Certification

# Office of Finance & Budget



## Keck School of Medicine – Finance & Budget

The Office of Finance & Budget serves as the point of contact regarding financial matters at the Keck School of Medicine. The Office of Finance & Budget has the responsibility of monitoring and reporting financial activity for: 1) Current Unrestricted ("CU") accounts, 2) The County Professional Services Agreement ("MSOA"), Faculty Practice Plan billings ("Rebillables") and 3) Restricted, Endowment and Scholarship accounts.

## The principal functions of the Keck School of Medicine Office of Finance & Budget are as follows:

- Serve as the primary interface with the University Comptroller's Office as well as the Office of Budget and Planning.

- Oversee the annual budgeting process at the Keck School of Medicine.

- Compile financial reports for management, University departments and outside entities.

- To be a resource regarding University financial policies and procedures.

- Provide assistance to departments and staff regarding financial and related matters.

### Contact Us

Office of Finance & Budget
Keck School of Medicine
University of Southern California
1975 Zonal Ave, KAM 317
Los Angeles, CA 90089-9025
**Phone:** (323) 442-2718

Keck School of Medicine of USC

More news + (/news/)

Education (/education/)
Research (/research/)
Clinical (/clinical-departments/)
Giving (/giving-to-usc/)
About Us (/about-us/)

Explore

About (/about-us/)
Basic Science Departments (/about-us/departments-institutes/basic-science-departments/)
Clinical Departments (/about-us/departments-institutes/clinical-departments/)
Dean's Site (https://dean.keck.usc.edu/)
Education (/education/)
Faculty (/faculty-search/)
For the Media (https://keck.usc.edu/for-media)
Institutes (/about-us/departments-institutes/institutes/)
myKeck (https://my.usc.edu/portal/guest.php)
News & Events (/keck-school-news-events/)
Research (/research/about-keck-school-of-medicine-research/)
Research Training (/research/research-training-education/)
Student Services (/education/student-services/)

Stay Connected

(https://[illegible]

Keck School

1975 Zonal Ave.
Los Angeles, CA 90033
323-442-1100

Dean's Office

(323) 442-1900
Monday – Friday
7:30 a.m. – 5:00 p.m.

Contact Us (/contact-us/)
Alumni (http://keck.usc.edu/salerni/)
Directory (http://departmentsdirectory.usc.edu/medicine.html)
Maps & Directions (/about-us/visiting-keck-school-of-medicine/maps-directions/)

© 2021 Keck School of Medicine of USC

# EXHIBIT 72

DEPARTMENT OF NEUROLOGY
CALL SERVICES
2016 ESTIMATED BUDGET
Schedule E

| Account Number | Account Name | Obj Code | Employee Name | Division | Salary Allocations | Fringe Benefits | Salary and FB |
|---|---|---|---|---|---|---|---|
| [redacted] | NEUROLOGY-CLINICAL | 11216 | Ben Youssef, Ramzi | Neuro Rehab | $ 32,640.00 | $ 5,760.96 | $ 38,400.96 |
| | | | Emanuel, Benjamin | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Emanuel, Benjamin | Tele-Stroke | $ 25,800.00 | $ 4,553.70 | $ 30,353.70 |
| | | | Gonzalez, Andres A. | IOM | $ 95,472.00 | $ 16,850.81 | $ 112,322.81 |
| | | | Kim-Tenser, May Anne | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Maraian, Arousiak Varpetian | Neuro Rehab | $ 32,640.00 | $ 5,760.96 | $ 38,400.96 |
| | | | Renda, Natalie | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Sanossian, Nerses | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Shilian, Parastou | IOM | $ 95,472.00 | $ 16,850.81 | $ 112,322.81 |
| | | | Sung, Gene Yong | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Tenser, Matthew | Tele-Stroke | $ 25,800.00 | $ 4,553.70 | $ 30,353.70 |
| 88-2122-3000 OVERLOADS | | | | | $ 380,824.00 | $ 67,215.44 | $ 448,039.44 |

# EXHIBIT 73

DEPARTMENT OF NEUROLOGY
CALL SERVICES
2017 ESTIMATED BUDGET
Schedule E

| Account Number | Account Name | Obj Code | Employee Name | Division | Salary (Overloads) | Fringe Benefits | Salary and FB |
|---|---|---|---|---|---|---|---|
| [redacted] | NEUROLOGY-CLINICAL | 11216 | Ben Youssef, Ramzi | Neuro Rehab | $ 32,640.00 | $ 5,760.96 | $ 38,400.96 |
| | | | Emanuel, Benjamin | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Emanuel, Benjamin | Tele-Stroke | $ 16,830.00 | $ 2,970.50 | $ 19,800.50 |
| | | | Gonzalez, Andres A. | IOM | $ 97,308.00 | $ 17,174.86 | $ 114,482.86 |
| | | | Kim-Tenser, May Anne | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Maraian, Arousiak Varpetian | Neuro Rehab | $ 32,640.00 | $ 5,760.96 | $ 38,400.96 |
| | | | Renda, Natalie | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Renda, Natalie | Tele-Stroke | $ 16,830.00 | $ 2,970.50 | $ 19,800.50 |
| | | | Sanossian, Nerses | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Shilian, Parastou | IOM | $ 97,308.00 | $ 17,174.86 | $ 114,482.86 |
| | | | Sung, Gene Yong | Stroke | $ 14,600.00 | $ 2,576.90 | $ 17,176.90 |
| | | | Tenser, Matthew | Tele-Stroke | $ 16,830.00 | $ 2,970.50 | $ 19,800.50 |
| 88-2122-3000 OVERLOADS | | | | | $ 383,386.00 | $ 67,667.64 | $ 451,053.64 |

# EXHIBIT 74

| DEPARTMENT OF NEUROLOGY | | | | | | |
|---|---|---|---|---|---|---|
| CALL SERVICE OVERLOADS | | | | | | |
| 2018 ESTIMATED BUDGET | | | | | | |
| Schedule E | | | | | | |
| | | | | | | |
| Account Number | Account Name | Obj Code | Employee Name | Division | Salary (Overloads) | Fringe Benefits |
| [redacted] | NEUROLOGY-CLINICAL | 11216 | Ben Youssef, Ramzi | Neuro Rehab | $ 32,640.00 | $ 5,760.96 |
| | | | Emanuel, Benjamin | Stroke | $ 24,333.33 | $ 4,294.83 |
| | | | Emanuel, Benjamin | Tele-Stroke | $ 129,270.83 | $ 22,816.30 |
| | | | Gonzalez, Andres A. | IOM | $ 107,038.80 | $ 18,892.35 |
| | | | Kim-Tenser, May Anne | Stroke | $ 24,333.33 | $ 4,294.83 |
| | | | Kim-Tenser, May Anne | Tele-Stroke | $ 129,270.83 | $ 22,816.30 |
| | | | Hsu, Steven | Neuro Rehab | $ 32,640.00 | $ 5,760.96 |
| | | | Bulic, Sebina | Stroke | $ 24,333.33 | $ 4,294.83 |
| | | | Bulic, Sebina | Tele-Stroke | $ 129,270.83 | $ 22,816.30 |
| | | | Shilian, Parastou | IOM | $ 87,577.20 | $ 15,457.38 |
| | | | Tenser, Matthew | Tele-Stroke | $ 23,268.75 | $ 4,106.93 |
| 88-2122-3000 OVERLOADS | | | | | $ 743,977.25 | $ 131,311.99 |

| Salary and FB | | |
|---|---|---|
| $   38,400.96 | | |
| $   28,628.17 | | |
| $ 152,087.14 | | |
| $ 125,931.15 | | |
| $   28,628.17 | | |
| $ 152,087.14 | | |
| $   38,400.96 | | |
| $   28,628.17 | | |
| $ 152,087.14 | | |
| $ 103,034.58 | | |
| $   27,375.68 | | |
| $ 875,289.24 | | |

| | | | TELESTROKE | | | | |
|---|---|---|---|---|---|---|---|
| | | KH - Stroke | Coast Plaza | Good Sam | Gardena | St. Francis | St. Louise |
| Month | # of Days | Call Overload | Call Overload | Call Overload | Call Overload | Call Overload | Call Overload |
| January | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| February | 28 | 5,600.00 | 4,760.00 | 7,140.00 | 3,570.00 | 7,140.00 | 8,925.00 |
| March | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| April | 30 | 6,000.00 | 5,100.00 | 7,650.00 | 3,825.00 | 7,650.00 | 9,562.50 |
| May | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| June | 30 | 6,000.00 | 5,100.00 | 7,650.00 | 3,825.00 | 7,650.00 | 9,562.50 |
| July | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| August | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| September | 30 | 6,000.00 | 5,100.00 | 7,650.00 | 3,825.00 | 7,650.00 | 9,562.50 |
| October | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| November | 30 | 6,000.00 | 5,100.00 | 7,650.00 | 3,825.00 | 7,650.00 | 9,562.50 |
| December | 31 | 6,200.00 | 5,270.00 | 7,905.00 | 3,952.50 | 7,905.00 | 9,881.25 |
| Estimated Annual Budget per program | | 73,000.00 | 62,050.00 | 93,075.00 | 46,537.50 | 93,075.00 | 116,343.75 |
| | | | | | | | |
| Estimated Annual Budget per person | | 24,333.33 | 20,683.33 | 23,268.75 | 15,512.50 | 31,025.00 | 38,781.25 |

# EXHIBIT 75

DEPARTMENT OF NEUROLOGY
CALL SERVICE OVERLOADS
2019 ESTIMATED BUDGET
Schedule E

| Account Number | Account Name | Obj Code | Employee Name | Division | Salary (Overloads) | Fringe Benefits | Salary and FB |
|---|---|---|---|---|---|---|---|
| [redacted] | NEUROLOGY-CLINICAL | 11216 | Ben Youssef, Ramzi | Neuro Rehab | $ 32,505.00 | $ 5,737.13 | $ 38,242.13 |
| | | | Bulic, Sebina | Good Sam Inpt | $ 82,256.04 | $ 14,518.19 | $ 96,774.23 |
| | | | Bulic, Sebina | Stroke | $ 24,333.33 | $ 4,294.83 | $ 28,628.17 |
| | | | Bulic, Sebina | Tele-Stroke | $ 157,193.33 | $ 27,744.62 | $ 184,937.96 |
| | | | Emanuel, Benjamin | Good Sam Inpt | $ 58,470.00 | $ 10,319.96 | $ 68,789.96 |
| | | | Emanuel, Benjamin | Stroke | $ 24,333.33 | $ 4,294.83 | $ 28,628.17 |
| | | | Emanuel, Benjamin | Tele-Stroke | $ 157,193.33 | $ 27,744.62 | $ 184,937.96 |
| | | | Gonzalez, Andres A. | IOM | $ 107,487.60 | $ 18,971.56 | $ 126,459.16 |
| | | | Hsu, Steven | Neuro Rehab | $ 32,505.00 | $ 5,737.13 | $ 38,242.13 |
| | | | Kim-Tenser, May Anne | Good Sam Inpt | $ 24,540.00 | $ 4,331.31 | $ 28,871.31 |
| | | | Kim-Tenser, May Anne | Stroke | $ 24,333.33 | $ 4,294.83 | $ 28,628.17 |
| | | | Kim-Tenser, May Anne | Tele-Stroke | $ 157,193.33 | $ 27,744.62 | $ 184,937.96 |
| | | | Poblete, Roy | Good Sam Inpt | $ 41,454.00 | $ 7,316.63 | $ 48,770.63 |
| | | | Shilian, Parastou | IOM | $ 87,944.40 | $ 15,522.19 | $ 103,466.59 |
| | | | Tenser, Matthew | Tele-Stroke | $ 21,900.00 | $ 3,865.35 | $ 25,765.35 |
| 88-2122-3000 OVERLOADS | | | | | $ 1,033,642.04 | $ 182,437.83 | $ 1,216,079.87 |

# EXHIBIT 76

---

**From:** Parikh, Pooja
**Sent:** Wednesday, January 17, 2018 3:50 PM
**To:** Gonzalez, Andres; Shilian, Parastou; Cheongsiatmoy, Justin
**Subject:** aneurysm case with mortality
**Attachments:** [redacted] 1-8-2018 7-52 AM.iomdata

[redacted]

This patient passed away next day due to ICH. During surgery aneurysm ruptured but bleeding was controlled. No significant IOM changes. Attached file.

# EXHIBIT 77

**From:** Gonzalez, Andres
**Sent:** Wednesday, January 24, 2018 10:13 AM
**To:** Michael Vesely
**Cc:** Chen, Jonathan; Cheongsiatmoy, Justin; Shilian, Parastou
**Subject:** Fwd: IOM County

We need to talk about this case.
Can you get the smd file.

Begin forwarded message:

**From:** "Giannotta, Steven" <[redacted]>
**Subject: IOM County**
**Date:** January 24, 2018 at 9:57:31 AM PST
**To:** "Andres A Gonzalez, MD" <[redacted]>
**Cc:** "Lucas, Joshua" <[redacted]

Andres: Not sure of your involvement with overseeing county services. We had a large acoustic in an 18 yr old yesterday. I don't feel comfortable unless I can hear the facial nerve irritability trains while I am working. It was very unreliable and I was told the nerve was "quiet". At the end of the case, another tech came in the room and we were taking the last bit of tumor out with absolutely no evidence of injury, verbally from the tech, or aurally. We lost the nerve and had to repair it. When I went to stimulate the proximal stump, nothing happened. The tech said "oh, wait a minute....OK now" and the nerve stimulated. We must have better QC over there for this type of case or we can't do acoustic tumors there. What can we do? Steve

Steven Giannotta, MD
Professor and Chair
Department of Neurological Surgery
Keck School of Medicine of USC

# EXHIBIT 78





**USC University Hospital**
**Intraoperative Neurophysiology**
1500 San Pablo St. Suite 2500. Los Angeles, CA 90033 (323) 442-8852

DATE OF STUDY: 2/7/2008
STUDY #: UH08-57
REFERRING PHYSICIAN: Thomas Chen, M.D.

**PATIENT HISTORY:** This is a 62 year old male with severe cervical myelopathy.

**MONITORING MODALITIES:** upper limb somatosensory evoked potentials,(95925) lower limb somatosensory evoked potentials, (95926) upper limb transcranial motor evoked potentials, (95928) lower limb transcranial motor evoked potentials, (95929) free run EMG (95861)

**RESULTS:** During C3-C6 posterior cervical laminectomy and fusion the aforementioned modalities were monitored.

The surgeon was informed at baseline that the patient's potentials were difficult to monitor on the bilateral upper (hands) and lower extremity MEP's, and on the left upper extremity SSEP. During the procedure, amplitude decreases were seen on all upper and lower extremity SSEP's. Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

5 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** During the procedure, the SSEP potentials showed severe changes that were persistent in the upper extremities and transient in the lower extremities. No changes were seen in the bilateral arm MEP's. Please see comment.

**COMMENTS:** The changes seen in the upper and lower extremity somatosensory evoked potentials suggest that an interruption of this pathway occurred. The absence of motor evoked potentials in the upper (hands) and lower extremities suggest either a baseline abnormality, anesthetic effect, or an intrinsic variability of this modality.

**ANDRES A. GONZALEZ, M.D.**
Electronically signed 2/14/2008 2:41:30 PM

**MR #**
**ACCOUNT #**

# EXHIBIT 79



**USC University Hospital**
**Intraoperative Neurophysiology**
1500 San Pablo St. Suite 2500. Los Angeles, CA 90033 (323) 442-8852

DATE OF STUDY: 4/2/2008

STUDY #: UH08-149

REFERRING PHYSICIAN: Thomas Chen, M.D.

**PATIENT HISTORY:** This patient is a 71 yr old male with an ependynoma.

**MONITORING MODALITIES:** upper limb somatosensory evoked potentials, (95925) lower limb somatosensory evoked potentials, (95926) upper limb transcranial motor evoked potentials, (95928) lower limb transcranial motor evoked potentials, (95929) free run EMG (95861).

**RESULTS:** During T12 laminectomy for tumor removal the aforementioned modalities were continuously monitored.

The surgeon was informed at baseline that the patient's potentials were adequate for monitoring bilaterally. During the procedure, amplitude decreases were seen on the left lower extremity SSEP and MEP.

Free running EMG recording was provided. The OR physicians were promptly made aware of any spontaneous discharges suggesting irritation of any of the relevant nerves.

6 hours were spent monitoring. The surgeons were kept informed of the monitoring status and any significant changes.

**IMPRESSION:** During the procedure, the potentials showed moderate changes that were persistent.

**COMMENTS:** The changes seen in the lower extremity motor and somatosensory evoked potentials during resection suggest that an interruption of this pathway occurred. Clinical correlation is advised.

**ANDRES GONZALEZ, M.D.**
Electronically signed 5/1/2008 11:46:58 AM

**MR#**
**ACCOUNT#**

# EXHIBIT 80

Chui, Helena

Tue 2/13/2018 8:49 PM

To: Cheongsiatmoy, Justin <Justin.Cheongsiatmoy@med.usc.edu>; Cc:Hagy, Richard <Richard.Hagy@med.usc.edu>;

Dear Justin

We feel very fortunate to have you on our team in the Department of Neurology. I have only heard and experienced positive feedback about your collegiality and skills.

Rick and I will submit the Department of Neurology budget to KSOM administration for you with 75K MSAA (as you stated).

I should let you know, however, that KSOM plans to put department requests for increased MSAA support in a conditional category, pending approval of the Board of Supervisors for the new LAC+USC contract to become effective July 1, 2018. LAC and USC have been worked very hard on this budget negotiation, and many of us expect it to pass.

HC

Helena Chui MD
Department of Neurology University of Southern California

# EXHIBIT 81

From: **Cheongsiatmoy, Justin** <Justin.Cheongsiatmoy@med.usc.edu>
Date: Fri, Jun 29, 2018 at 10:27 PM
Subject: Billing
To: Matthews, Angelique <Angelique.Matthews@med.usc.edu>

Hey Angelique,

I wanted to share with you - after my meeting with Dr. Chui today, I was offered an official
faculty appointment for the upcoming academic year which Dr. Hagy already drafted and
presented to me. So I will see you in the office Monday after all.

On another note, as you know, over the last two years since I started working at USC, Andres
and Parastou have instructed me to bill ENTs on my hospital-guarantee plan telling me what I
bill does not impact me because I was not eligible for incentive as a junior faculty. But now that I
will be on a faculty incentive plan starting July 1 and I recently learned there are issues with
billing ENT cases, I don't feel comfortable billing them.

I am afraid that Andres and Parastou will continue to force me to bill them if they find out I am
no longer following their orders which I now know should not be done. So moving forward, for
the ENT billing sheets that are given to me, I will just hand them back untouched with the rest of
my completed billing stack for you to file away.


Thanks,

Justin

# Exhibit 82



| Time | Priority | Text |
|---|---|---|
| 10:14:43 AM | | EMG - Start Store Timelock Stim |
| 10:15:33 AM | | EMG - Stop Store Timelock Stim |
| 10:16:00 AM | Medium | stim at 0.1mA= no responses seen in facial nerve EMG |
| 10:16:33 AM | Medium | bovie |
| 10:17:41 AM | Medium | tof=4/4 |
| 10:18:03 AM | Medium | resecting tumor |
| 10:19:48 AM | Medium | cusa in use |
| 10:46:24 AM | Medium | continue resecting tumor |
| 11:18:38 AM | Medium | T=34.9, ABP=129/72(92), HR=80, SPO2=100, SEVO=0 |
| 11:22:25 AM | Medium | CONT. RESECTION |
| 11:32:43 AM | Medium | cont. resection |
| 12:05:18 PM | | EMG - Stored EMG (Stim 0.1 mA w/response seen) 0.1/0mA1.81V |
| 12:15:03 PM | Medium | CUSA in use. |
| 12:32:01 PM | Medium | T=35.4, ABP=140/82(101), HR=87, SPO2=100, SEVO=0 |
| 12:59:37 PM | Medium | Dr Giannotta reports he accidently transected the facial nerve |
| 13:05:27 PM | Medium | ENT surgeons take over |
| 13:17:16 PM | Medium | Drilling |
| 13:59:17 PM | Medium | Stim 0.1 NR |
| 14:04:03 PM | Medium | continue resecting |
| 14:06:22 PM | | EMG - Stored EMG (train of firing in masseter), stim 0.1 response in masseter 0.1/0mA |
| 15:01:43 PM | Medium | resected tumor |
| 15:01:53 PM | Medium | wash out |
| 15:06:56 PM | Medium High | Surgeon is suturing. |
| 15:39:05 PM | High | Closing |
| 15:56:11 PM | Medium | end monitoring |

# Exhibit 83



# County of Los Angeles
# CHIEF EXECUTIVE OFFICE

Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

SACHI A. HAMAI
Chief Executive Officer

Board of Supervisors
HILDA L. SOLIS
First District

MARK RIDLEY-THOMAS
Second District

SHEILA KUEHL
Third District

JANICE HAHN
Fourth District

KATHRYN BARGER
Fifth District

December 12, 2018

To: Supervisor Janice Hahn, Chair
Supervisor Hilda L. Solis
Supervisor Mark Ridley-Thomas
Supervisor Sheila Kuehl
Supervisor Kathryn Barger

From: Sachi A. Hamai
Chief Executive Officer

**REQUEST FOR SALARY ADJUSTMENT FOR DR. BRAD SPELLBERG, MEDICAL DIRECTOR III (UC)**

This is to advise you that we intend to adjust the salary for Dr. Brad Spellberg, Medical Director III (UC), through authorization of a Y-rate, pursuant to County Code Section 6.08.040C. A Y-rate may be authorized by the Chief Executive Officer (CEO) when an employee, because of a change of status, would receive a reduction in salary that is not merited under the circumstances. The Y-rate contemplated for Dr. Spellberg would maintain his current total compensation.

Dr. Spellberg serves as the Chief Medical Officer for LAC+USC Medical Center. He is compensated on the Management Physicians Pay Plan, range E28, at a base salary of $23,568 per month/$282,816 per year. He also receives an 8.25 percent residency bonus pursuant to County Code Section 6.08.450 C, and a monthly MegaFlex allowance of 17 percent. Dr. Spellberg's total compensation from Los Angeles County is approximately $29,850 per month/$358,195 per year as of October 1, 2018.

Historically, The Chief Medical Officer for LAC+USC Medical Center has negotiated a salary with the University of Southern California (USC) Keck School of Medicine as part of an Associate Dean faculty appointment. The duties of this appointment are related to the Chief Medical Officer position at LAC+USC Medical Center. Due to the fact that these duties are consistent with Dr. Spellberg's County position as Hospital Chief Medical Officer, the Health Agency and County Counsel recommend that this salary be paid by the County.

Accordingly, the intent is to provide a Y-rate of $6,579.70 per month/$78,956.40 per year to maintain Dr. Spellberg's total compensation at the same level, effective May 1, 2018. This will provide Dr. Spellberg with total compensation of $458,195 per year, including the residency bonus and MegaFlex contribution. The Y-rate will be adjusted as Dr. Spellberg

receives step increases and general salary movement in order to maintain total compensation at a level consistent with the lost $100,000 annual salary from USC. Should Dr. Spellberg leave the role of Chief Medical Officer, the Y-rate will be terminated. In accordance with current practice, unless otherwise instructed by the Board of Supervisors by December 20, 2018 (10 business days from date of memorandum), the CEO will authorize the Y-rate for Dr. Spellberg as described in this memorandum.

Finally, the Department of Health Services has identified three other County physicians who receive a salary from the University of California Los Angeles (UCLA) School of Medicine. Dr. Anish Mahajan serves as the Chief Medical Officer for Harbor-UCLA Medical Center, and Dr. Darrell Harrington and Dr. Pamela Dynes are the Designated Institutional Officials (DIOs) for Harbor-UCLA and Olive View-UCLA Medical Centers, respectively. Historically, the Chief Medical Officer for Harbor-UCLA Medical Center has negotiated a salary with the UCLA School of Medicine as part of an Associate Dean faculty appointment. The duties of this appointment are related to the Chief Medical Officer position at Harbor-UCLA Medical Center. Due to the fact that these duties are consistent with Dr. Mahajan's County position as Hospital Chief Medical Officer, the Health Agency and County Counsel recommend that this salary be paid by the County.

Drs. Harrington and Dynes oversee all County physician residency training programs affiliated with UCLA. According to the rules established by the Accreditation Committee for Graduate Medical Education, the nationwide entity that monitors and accredits physician training programs, each sponsoring institution (hospital) must have a DIO who is responsible for oversight of all training programs. Because this high-level function is consistent with the mission and training of these County hospitals, the Health Agency and County Counsel also recommend that on a going forward basis these salaries be paid by the County. The County and the UCLA School of Medicine are in discussions to arrange for the details of this transition. Once discussions are complete, the Chief Executive Office will provide the details of these salary recommendations for Drs. Mahajan, Harrington, and Dynes in a subsequent memorandum.

If you have any questions regarding this matter, please contact Maryanne Keehn at (213) 974-0470 or Edward A. Morrissey, Principal Deputy County Counsel at (213) 974-1554.

SAH:JJ:MM:MTK
EAM:PB:mst

c: Executive Office, Board of Supervisors
County Counsel
Health Agency
Health Services

N:\BENEFITS & COMP POLICY\SPECIAL PAY REQUESTS (NON-MAPP)\Y-Rate\CMOs\DHS - CMOs - Dr. Spellberg - BOS Memo.docx

# EXHIBIT 84

From: **Lucchinetti, Claudia F., M.D.**
Date: Wed, May 1, 2019 at 1:09 PM
Subject: Re: [EXTERNAL] Re: Follow up
To: Justin Cheongsiatmoy
Cc: von Bormann, Alexander G. (Georg)

Dear Justin:

As part of our hiring process, and as discussed with you, we contacted the Keck School of Medicine at the University of Southern California on multiple occasions to obtain information regarding your clinical skills and practice. Information regarding your clinical skills and practice has not been provided by Keck/USC and we have been advised by Dr. Chui that Keck/USC will be unable to provide any information other than confirmation of your position and dates of employment. At this point, based on our inability to obtain this information, we are withdrawing the conditional offer made to you in my letter of January 31, 2019.

We are sorry that this is the result, but as we have shared with you, we require this information as part of the hiring process. If, in the future, Keck/USC will provide this information, we will certainly consider our needs at that time and any information that Keck provides.

Thank you for your interest in Mayo Clinic. We wish you all the best in your future endeavors.

Claudia

**Claudia F. Lucchinetti, M.D.** | Consultant and Chair | Department of Neurology | Eugene and Marcia Applebaum Professor of Neurosciences | Mayo Clinic College of Medicine | Admin. Secretary: 507-284-2675 | Medical Secretary:507-284-4458 | Fax: 507-266-0178 | **clucchinetti@mayo.edu**
**Mayo Clinic** | 200 First Street SW | Rochester, MN 55905 | www.mayoclinic.org

# EXHIBIT 85



September 20, 2018

Dear USC community,

Over the past few weeks, I have been heartened by the depth of our community's commitment to this university. As I continue to gather feedback from so many of you, I see a strong dedication to improving our campus culture, and a deep desire for meaningful changes in how we engage with one another on our campuses. These are key to our community's healing process, and this commitment is shared among me and the entire senior leadership team.

We will continue to work closely with you. The Task Force on Workplace Standards and Employee Wellness has solicited a number of outstanding suggestions from faculty and staff, and these suggestions have translated into changes that ensure greater accountability and increased communication among the units and teams that receive and handle complaints. Some of the specific details surrounding these changes still need to be worked out, and we will continue to seek input from faculty, staff, and students. As we move forward, we will adjust our changes in response to feedback, and provide you with periodic updates. This progress and related announcements are being posted at **change.usc.edu**.

Currently, our anticipated changes encompass the broad areas of ethics and core values; culture change; reporting and investigations; and human resources. As part of these changes, we will introduce needed infrastructure and technologies, recruit new leadership in critical areas, and revisit important policies and procedures with far-reaching input.

Among our most pressing priorities, there was a clear and immediate need to improve in the area of complaint reporting, so we have already established the **Office of Professionalism and Ethics (OPE)**. This new unit is transforming USC's system for complaint monitoring and investigation, creating a centralized flow of information that improves our ability to address sensitive matters swiftly and systematically. OPE directs and monitors any allegations that may require review or investigation at all levels and across both campuses.

Supporting this change, a number of leadership roles across USC's legal and compliance departments have been redefined. Specifically, to centralize investigative, compliance, and audit functions under one division, the Office of Professionalism and Ethics, the Office of Compliance, and the Office of Audit Services have been moved under the direct oversight of our senior vice president for legal affairs and professionalism, Carol Mauch Amir. In her expanded role, Ms. Amir oversees two distinct operations at the university: the three offices mentioned above are under her purview, while she continues to oversee the Office of the General Counsel.

University of Southern California
Los Angeles, California 90089-0012 • Tel: 213 740 2111 • Fax: 213 821 1342

The Office of Professionalism and Ethics is led by Michael Blanton, the university's first vice president for professionalism and ethics.  Mr. Blanton provides regular updates to the chair of the Audit and Compliance Committee of the USC Board of Trustees, as well as the president of the university.  This ensures that serious complaints reach the trustees and the university's senior leadership in a timely manner.

In the Office of Compliance, Laura LaCorte has been named vice president of ethics and compliance and chief compliance officer.  She is working closely with all members of our community to help define and instill a culture of ethics throughout the university.  Ms. LaCorte will also provide regular updates to the Audit and Compliance Committee of the USC Board of Trustees and the president.

In the Office of the General Counsel, Stacy Bratcher has been appointed vice president and managing general counsel.  In this capacity, she manages the office's day to day functions, while continuing to work closely with Tom Jackiewicz, senior vice president and CEO of Keck Medicine of USC, on matters related to our medical enterprise.

Finally, the Office of Audit Services is led by Andrew Tinseth, our associate senior vice president for audit service.  He, too, provides regular updates to the Audit and Compliance Committee of the USC Board of Trustees and the president.

These changes complement the ongoing work of our entire USC community as we move forward with increased transparency and accountability.  They also represent a major part of the cultural change that USC is striving to achieve.  We have set our expectations high, as all of us remain committed to advancing a campus culture that reflects our core values.

Sincerely,

Wanda M. Austin
Interim President

# Exhibit 86

**MEMORANDUM**

**TO:** Michael Quick, Provost and Senior Vice President of Academic Affairs, via email (mquick@usc.edu and uscprovost@usc.edu)

**FROM:** Justin Cheongsiatmoy, MD (justin.cheongsiatmoy@med.usc.edu)

**SUBJECT:** Retaliation as a Result of Reporting Fraud, Waste, and Abuse at USC

**DATE:** February 5, 2019

Dear Provost Quick:

I am writing you directly with the hope of resolving a situation that has become untenable for everyone involved. As you know, last year, after reporting significant fraud occurring within the Intraoperative Neurophysiological Monitoring (IONM) division, I was stripped of all my faculty privileges, placed on a "paid leave of absence," and banned from "teaching, research, or patient care duties … and … [coming] to USC's campus."

These actions were in violation of Section 8-D(3) of the USC Faculty Handbook, which states: "suspension without loss of pay and usual faculty privileges can only be done as part of the initiation of dismissal proceedings and only if, **in the judgment of the Provost**, immediate harm to the faculty member or others is threatened by his or her continuance." My complete personnel record, which I recently received from your outside legal counsel, shows there was never any grievance or complaint against me in this regard, or any other.

In fact, just prior to my reporting of the fraud, the Chair of Neurology in February 2019 personally commended me, writing: "We feel very fortunate to have you on our team in the Department of Neurology. I have only heard and experienced positive feedback about your collegiality and skills."

USC's actions are also in direct violation of Section 6-A(9)(a) of the Handbook regarding fundamental fairness, which states that "any procedures for disciplinary action must provide a prompt, fair, adequate, reliable, and impartial process from the final investigation to the final result." Moreover, "[t]here will be equitable information gathering from both the reporting party and the responding party to the violation."

Section 6-B(8) of the Handbook states that "as provided in government regulations, the University, or an officer, employee, or agent of the University, may not retaliate…against any individual for exercising their rights…" USC's policies specifically state that such retaliation may include, but is not limited to:

- "Adverse employment or academic action…such as giving a poor academic or employment recommendation, or causing the individual to be demoted or terminated or not…hired…"

- **"Limiting employment opportunities, such as providing a poor reference"**

- "Exclusion from employment opportunities or limiting scholarly activities such as teaching, research or publication"

- "Spreading negative information about the individual"

- "Shunning or ostracizing an individual"

I am at a loss for how USC could so blatantly disregard all of these procedures and safeguards.  Perhaps I wrongly assumed that given the scandals that USC Keck has faced over the past two years, my complaints would not be met with such a dysfunctional response.

Now, on top of my unjustified and retaliatory suspension, it appears USC is also intent on destroying my career by attempting to limit my employment opportunities outside of USC.  As you can see from the attached correspondences over the last three months, I have asked -- and USC has refused -- to release a factually accurate, positive letter of recommendation, which is clearly supported by the written record as to my excellent standing at USC prior to reporting the fraud.

Despite all of this, I have in the past week received a fantastic offer to join the faculty of another institution.  This offer states that my appointment is explicitly "contingent upon an opportunity to speak with [my] current department chair, Dr. Chang Chui, regarding [my] employment in the Department of Neurology, at the Keck School of Medicine."

The chair of this other institution will be reaching out to Dr. Chui next week (the week of February 11).  I hope and expect that you will advise Dr. Chui to follow federal and California law, as well as USC's own policies on anti-retaliation, in communicating with my prospective employer.  I hope and expect that her comments will reflect the excellent annual reviews in my file, and the "positive feedback about [my] collegiality and skills" that Dr. Chui acknowledged—before my reporting of the fraud.

I am saddened that my tenure at USC has been cut short in this way, but with this new opportunity, permanent harm to my career may still be avoided.  I hope you view this the same way, and will do everything in your power to make this right.

**Cheongsiatmoy, Justin**

**From:** Michael Quick <mquick@usc.edu>
**Sent:** Wednesday, February 06, 2019 7:12 AM
**To:** Cheongsiatmoy, Justin
**Cc:** USC Provost
**Subject:** Re: Retaliation as a Result of Reporting Fraud, Waste, and Abuse at USC (See 19 page memo attached)

Dear Dr. Cheongsiatmoy,

I am in receipt of your letter. I am going to send it to our office of Professionalism and Ethics, which has recently been created to investigate issues such as the one you have sent me.

--Michael

********************
Michael W. Quick, Ph.D.
Provost and Senior Vice President
for Academic Affairs
Shelly & Ofer Nemirovsky Provost's Chair
University of Southern California
3551 Trousdale Parkway, ADM 102
Los Angeles CA 90089-4019
(phone) 213.740.2101
(email) mquick@usc.edu
(web) provost.usc.edu
(twitter) @uscprovost

---

**From:** "Cheongsiatmoy, Justin" <Justin.Cheongsiatmoy@med.usc.edu>
**Date:** Tuesday, February 5, 2019 at 22:32
**To:** Michael Quick <mquick@usc.edu>
**Cc:** USC Provost <uscprovost@usc.edu>
**Subject:** Retaliation as a Result of Reporting Fraud, Waste, and Abuse at USC (See 19 page memo attached)

See 19 page memo attached.

# Exhibit 87

## MEMORANDUM

**TO:** Carol Folt, President of USC, via email (president@usc.edu)

Wanda Austin, Interim President of USC, via email (wma2@usc.edu)

Michael Quick, Provost of USC, via email (uscprovost@usc.edu and mquick@usc.edu)

Elizabeth Graddy, Interim Provost of USC, via email (graddy@usc.edu)

Office of Professionalism and Ethics, via email (ope@usc.edu)

Laura Mosqueda, Dean, Keck School of Medicine, via email (laura.mosqueda@med.usc.edu)

Judy Garner, Vice Dean of Faculty Affairs, Keck School of Medicine, via email (jgarner@med.usc.edu)

Helena Chui, Chair of Department of Neurology, via email (helena.chui@med.usc.edu)

Justin Cheongsiatmoy, via email (cheongsi@usc.edu and justin.cheongsiatmoy@med.usc.edu and iomneurologist@gmail.com)

**FROM:** Justin Cheongsiatmoy, MD (cheongsi@usc.edu)

**SUBJECT:** Requesting Your Time-Sensitive Help with Retaliation as a Result of Reporting Fraud

**DATE:** June 24, 2019

---

I am an Assistant Professor of Neurology and Intraoperative Neurophysiological Monitoring ("IONM") specialist at Keck School of Medicine of USC. I am writing you directly in hopes that you will intervene in a situation that has become untenable. As the attached prior correspondence shows, I have made many attempts to reach out to various senior management at USC – asking for help in preventing further retaliation against me for reporting significant fraud, waste, and abuse by the Department of Neurology.

As you are aware, in late 2018, USC received a subpoena from the California Department of Insurance ("DOI") seeking information related to the IONM division. In apparent belief that I am responsible for the DOI's investigation, USC "reassigned [me] to no duties until further notice," stripped me of all "teaching, research and patient care duties," and banned me from setting foot on campus since the time USC received the DOI's subpoena.

USC then went a step further and sabotaged my attempts to leave USC and obtain new employment. Specifically, in January 2019, I received faculty appointment at the Mayo Clinic, which is ranked the #1 neurology program in the nation. The faculty appointment was "contingent upon the opportunity to speak with [my] Department Chair, Dr. Chang Chui regarding [my] employment in the Department of Neurology at

the Keck School of Medicine." Despite repeated requests, and a spotless employment record (prior to the time that I raised concerns of fraud), Dr. Chui refused to respond to the Mayo Clinic's requests, and the Mayo Clinic rescinded its job offer to me.

In a May 1, 2019 letter from the Neurology Chair at Mayo Clinic, Dr. Claudia Lucchinetti wrote: "…we contacted the Keck School of Medicine at the University of Southern California on multiple occasions to obtain information regarding your clinical skills and practice. Information regarding your clinical skills and practice has not been provided by Keck/USC and we have been advised by Dr. Chui that Keck/USC will be unable to provide any information other than confirmation of your position and dates of employment. At this point, based on our inability to obtain this information, we are withdrawing the conditional offer made to you in my letter of January 31, 2019." See attached.

While the Mayo Clinic opportunity was hanging in the balance, I reached out to as many of you as I could, seeking assistance. In February 2019, I wrote President Austin reiterating the fraud and retaliation because I knew she was "in the unique position to make a positive difference in what is already an untenable situation for everyone involved." I wrote a similar letter to Provost Quick informing him of the fraud and explaining that I received a faculty appointment to join another academic institution which was contingent upon speaking with USC. I asked Provost Quick for help in doing "everything in his power to make this right."

Provost Quick replied to my message stating "I am in receipt of your letter. I am going to send it to our office of Professionalism and Ethics, which has recently been created to investigate issues such as the one you have sent me." See attached. To date, I have not received any information regarding the status of any investigation, or any contact at all from the Office of Professionalism and Ethics. I have always been willing and able to provide whatever information the Office of Professionalism and Ethics might need to complete its investigation, but I have received no contact from them.

Even though President Austin, Provost Quick, and Carol Mauch Amir (who as you know, led the Office of Professionalism and Ethics) are stepping down following my reporting of fraud, these departures do not absolve USC of the adverse actions taken against me, nor provide USC senior management with the opportunity to claim lack of awareness with regards to the damages this institution has inflicted upon me.

Although USC's retaliatory treatment has already derailed my career, I have managed to secure another offer to join the academic faculty of an esteemed institution. I am informed the offer will be finalized within the next few weeks. I am hereby providing notice that upon receipt of the formal offer and provided USC does not further retaliate and cause me to lose yet another employment opportunity as it did with my faculty appointment from the Mayo, I will be resigning from USC. As indicated in my prior correspondence, I had hoped to pursue a long career at USC and was hopeful that USC would take my complaints of fraud seriously. It is apparent, sadly, that there is no such hope, and my only option is to resign.

I again plead with all of you to not sabotage this second opportunity for me to leave USC. My departure from USC should be a win-win proposition. If USC takes any further adverse action or fails to provide requested information to my prospective employer, the situation will only be made worse for both me, and USC.

I am again asking you to make the right decision and allow us to mutually part ways.

Sincerely,

Justin Cheongsiatmoy

# Exhibit 88

Keck School of Medicine of USC

LAURA MOSQUEDA, M.D.
*Dean*
*Professor of Family Medicine and Geriatrics*
*Keck School of Medicine of USC*
*Professor of Gerontology*
*USC Davis School of Gerontology*

June 27, 2019

Justin Cheongsiatmoy, M.D.
Assistant Professor of Clinical Neurology

Dear Professor Cheongsiatmoy,

I'm writing you about your appointment as a faculty member in the Keck School of Medicine.

A faculty committee and the chair of the Department of Neurology carefully examined your record as a faculty member. As a result of this appraisal, they have recommended you not be reappointed, in accordance with the provisions of the Faculty Handbook.

The dean has approved that recommendation and therefore you will not be reappointed as an Assistant Professor of Clinical Neurology in the 2019-2020 fiscal year. Your last day of employment at USC will be June 30, 2019.

I want to provide you some information about health and dental insurance. Your current coverage ends on June 30, 2019. You may elect to continue your coverage for up to 18 months under the provisions of the federal Consolidated Omnibus Budget Reconciliation Act (COBRA). Information will be sent to your home by the Benefits Administration office. Your election must be returned to the Benefits Administration office postmarked within 60 days from your termination date or the date of notification, whichever is later. HMO participants who fully exhaust their initial 18 months of federal COBRA coverage may be eligible for an additional 18 months under Cal COBRA. If you elect to make use of COBRA, you would be responsible for the full premiums plus a 2% administrative fee. If you do not elect COBRA within 60 days, the COBRA opportunity would be forfeited. You may contact the Benefits Administration office at (323) 740-6027 or benefits@usc.edu with questions concerning your rights under COBRA.

We wish you well in all your future endeavors.

Sincerely,

Laura Mosqueda, MD
Dean, Keck School of Medicine

cc: Helena Chui, MD, Chair

# EXHIBIT 89



March 27, 2020

**VIA FEDEX - OVERNIGHT**

Susan Gillin
Chief of the Administrative & Civil Remedies Branch
Office of Counsel to the Inspector General
Department of Health and Human Services
330 Independence Avenue, S.W.
Cohen Building, Room 5527
Washington D.C. 20201

**Re: USC Care Medical Group, Inc.'s Voluntary Disclosure Regarding Federal Healthcare Program Physician Claims For Intraoperative Neurophysiological Monitoring Services**

Dear Ms. Gillin:

This office represents USC Care Medical Group, Inc. ("USC Care"), the medical faculty practice plan of the University of Southern California ("USC"), a California non-profit public benefit corporation, doing business as Keck Medicine of USC ("Keck Medicine of USC") concerning the matters addressed in this letter. We are writing on behalf of USC Care pursuant to the Office of Inspector General's ("OIG") Provider Self-Disclosure Protocol (April 17, 2013) ("OIG-SDP") to disclose a matter that USC Care has identified with respect to its federal healthcare program claims for Intraoperative Neurophysiological Monitoring ("IONM") professional physician services. We are also requesting acceptance of USC Care into the OIG's Voluntary Self-Disclosure Program with respect to this matter.

## USC CARE'S VOLUNTARY DISCLOSURE

### I. DESCRIPTION OF MATTER BEING DISCLOSED

Between approximately January 1, 2014 and July 1, 2019, USC Care incorrectly submitted approximately 2,457 claims by USC Care physicians for intraoperative neurophysiological monitoring services ("IONM Services") which were performed remotely in a manner that was not compliant with the requirements of HCPCS Code G0453 and CPT Code 95941. As a result, USC Care was overpaid approximately **$168,628** by federal health care programs, consisting of Medicare, TRICARE, Medi-Cal (and out of state Medicaid), and California Children's Services, for these services. These codes require "real time" monitoring of patients during surgery. These IONM overpayments fall into two categories.

First, USC Care incorrectly billed IONM physician services provided during otolaryngology ("ENT") surgeries because the monitors in the ENT operating rooms lacked the

required technical capability to transmit the nervous system data in real time to the IONM physicians so that they could continuously monitor the patients' nervous system during such surgeries from their remote monitoring location (known as "the Control Room"). Since HCPCS Code G0453 and CPT Code 95941 both require such a real time data connection as a condition of payment, USC Care's IONM claims for these ENT surgeries were incorrect because no remote continuous monitoring was performed. This category involves approximately 307 claims for which USC Care was overpaid **$89,223.19** by federal healthcare programs.

Second, USC Care also submitted incorrect claims for IONM physician services that were provided by a fellow on Mondays and Thursdays, but were billed by two IONM physicians who were not physically present in the Control Room to supervise the fellow or monitor the surgeries because they were taking an "academic research" day. Since the CMS-1500 claim forms required the provider of services to be accurately identified, USC Care's IONM claims were incorrect because the two IONM physicians identified as providers did not perform or supervise the billed monitoring services. This category involves approximately 1,575 claims to federal healthcare programs for which USC Care was overpaid **$79,404.98**.

As further detailed below, USC Care's internal investigation and self-assessment has concluded that these incorrect IONM claims were caused by Andres A. Gonzalez, M.D., the IONM Program Chief, who supervised the staffing, medical oversight, and billing of the IONM program. For reasons that are not clear, Dr. Gonzales mistakenly concluded that HCPCS Code G0453 and CPT Code 95941 could be billed for ENT surgeries even if physicians were not monitoring the cases in "real time" because the proximity of the Control Room to operating rooms allowed the IONM physicians to immediately go to those rooms if there was an emergency during a surgery. Dr. Gonzalez was also responsible for scheduling his and another IONM physician's academic research days. He erroneously advised the IONM physicians that they could bill fellow's services as their own even though they were not physically present because the IONM physicians were remotely available to supervise the fellow upon request.

As a result of Dr. Gonzalez's handling of the IONM billing in these cases, his employment contract will not be renewed and his employment will end in June 2020. USC Care revised the IONM Program's policies and procedures to make clear that remote monitoring cannot be billed without a real-time data connection between the operating room and the Control Room. USC Care also clarified and re-educated the IONM physicians that a fellow's monitoring services cannot be billed by IONM physicians unless the physicians are physically present in the Control Room to supervise the fellow and the proper modifier is included in their billing information. Based on this remediation, USC Care is confident that these billing errors will not be repeated given their unusual and unique cause.

While USC Care is in the process of refunding overpayments to federal health care programs for these IONM claims, and this process is now largely complete, this disclosure is being made in an abundance of caution because USC Care has concluded that these claims may potentially have violated the False Claims Act, 31 U.S.C. §§ 3729 - 3733 ("FCA").

## II. BASIC INFORMATION

### A. Identification Of Disclosing Entity

In accordance with the OIG-SDP, USC Care provides the following "basic information" as part of its voluntary disclosure:

USC Care is a California non-profit public benefit corporation and the medical faculty practice plan for physicians who provide services to patients of Keck Medicine of USC, a multi-disciplinary university-based system of hospitals and outpatient facilities, including Keck Hospital of USC.[1]

USC Care is located at 1520 San Pablo Street, Los Angeles, California 90033.

The name and address of USC Care's designated legal representatives for purposes of this voluntary disclosure are:

Mark Hardiman
Jonathan Radke
Nelson Hardiman LLP
1100 Glendon Avenue, 14th Floor
Los Angeles, CA 90024
Tel: (310) 203-2800
Emails: mhardiman@nelsonhardiman.com
jradke@nelsonhardiman.com

### B. Type Of Health Care Provider and Federal Programs Implicated

USC Care is a medical faculty practice group and is enrolled in the Medicare program as a physician practice organization. The group's Medicare provider number is W18762, its Medi-

[1] USC is the sole corporate member of USC Care. As the faculty practice plan, USC Care has a contractual relationship with Keck Medicine of USC that allows USC's faculty physicians to provide medical services at USC's hospitals, as well as other hospitals not owned by USC, through USC Care.

Cal provider number is GR0100430, and its NPI is 1902846306. The group's tax identification number is 95-4540991.

The federal health care programs implicated in this matter are Medicare, Medi-Cal/Medicaid, TRICARE, and California Children's Services (the "Federal Programs"). The federal government contractors involved are Noridian Healthcare Solutions LLC ("Noridian"), the Medicare Administrative Contractor ("MAC") for Jurisdiction E, and Health Net Federal Services, which administers the TRICARE program for the Western Region. California's Medi-Cal and Children's Services programs are administered through the California Department of Healthcare Services.

### C. <u>Pending Government Inquiry</u>

On November 1, 2018, Keck Medicine of USC received an Investigative Subpoena for Documents (the "Subpoena") from the California Department of Insurance ("CDI"), a copy of which is enclosed as Exhibit A.[2] The CDI Subpoena requested communications, including "chat logs," between USC Care physicians who provided IONM professional services billed to commercial insurance companies in connection with CDI's investigation of whether Keck Hospital of USC and USC Care engaged in "billing for services not rendered" and "upcoding" in violation of California's Insurance Frauds Prevention Act, California Insurance Code § 1871.7. Keck Medicine of USC has produced documents in response to this state agency subpoena.

USC Care has not received any notice from any federal health care program or agency that Keck Medicine of USC is under investigation for IONM claims to any such program. However, in 2019, CDI requested and received Keck Medicine of USC's consent to share the documents produced in response to the CDI Subpoena with the U.S. Department of Justice, indicating that this agency may be investigating the IONM claims to federal health care programs.

## III. USC CARE'S INVESTIGATION REPORT

Since 2006, Keck Medicine of USC's Intraoperative Neurophysiological Monitoring Program (the "IONM Program") has provided all aspects of surgical neurophysiology in order to reduce the risk of damaging the nervous system during surgery. IONM services involve, among other things, recording and assessing electrical potentials from the nervous system during surgical operations, allowing providers to detect deficits before they become permanent injuries following an operation. At Keck Medicine of USC, the IONM Program consists of

[2] The exhibits to this voluntary disclosure letter can be found on the enclosed thumb drive.

intraoperative monitoring, brain mapping and brain implants, and provides services to approximately 1,800 patients annually through Keck Hospital of USC.

## A. IONM Program And Physicians

Keck Medicine of USC's IONM Program is part of the Department of Neurology. During the relevant time period of 2014 through 2019, IONM Program attending physicians included Andres A. Gonzalez, M.D., the IONM Program Chief, Parastou Shilian, D.O., and Justin A. Cheongsiatmoy, M.D. In addition, between 2016 and 2019, the IONM Program also had two fellows – Dr. Jonathan Chen (July 2016 – June 2017) and Dr. John Parker (July 2017 – June 2019) – who provided IONM services.

A 1997 graduate of the Colombian School of Medicine, Dr. Gonzalez completed a research fellowship at Harvard University and a clinical fellowship at UCLA in neurophysiology before joining the USC faculty in 2006. Apart from being Chief of the IONM Program, he is also co-director of the Neurology Residency Program and an Assistant Professor of Neurology.

Dr. Shilian graduated from the Western University of Health Sciences College of Osteopathic Medicine of the Pacific in 2008 and is board certified in neurology and clinical neurophysiology. Following her neurology residency at LAC/USC Medical Center, she completed fellowships in clinical neurophysiology and intraoperative neurophysiological monitoring at USC. She joined the IONM Program in 2014. She is also an Assistant Professor of Neurology.

Dr. Cheongsiatmoy is a 2010 graduate of the David Geffen School of Medicine at UCLA and was credentialed as a billing physician for IONM services at USC on or about July 1, 2016. According to Dr. Gonzalez, Dr. Cheongsiatmoy was hired to expand the IONM Program and to provide additional IONM services for the program whose volume had grown too large for two physicians to handle.

Drs. Gonzalez, Shilian and Cheongsiatmoy provided and billed their IONM professional services through USC Care, the faculty practice plan.

## B. IONM Services

The IONM Program's three attending physicians (Gonzalez, Shilian, and Cheongsiatmoy) and fellow typically monitored surgeries from a single room (the "Control Room") located one floor below the operating rooms in Keck Hospital of USC.

During the surgeries, the IONM Program physicians, including the fellow, monitored cases simultaneously on multiple monitors in the Control Room, with the fellow being

supervised by the physicians who were present that day. This process allowed the IONM physicians to collectively work together to make quick decisions in potentially life threating situations with dramatic consequences, such as paralysis or death. In addition, if an IONM clinical issue arose during a surgery that required an IONM physician to focus on that specific case, this team approach ensured seamless monitoring and continuity of care because the other physicians were available to continue monitoring the other cases.

Except for Otolaryngology ("ENT") surgery cases, the IONM software could be accessed remotely through nearly any device, including iPhones, iPads, and computers. Although monitoring could be performed at a location outside of Keck Hospital of USC, the general practice was for each physician to monitor and supervise the cases from the Control Room in the hospital during regular business hours. It was rare that an IONM physician monitored a case inside the operating room because the IONM Program allowed the IONM physicians to remotely monitor the multiple surgeries typically scheduled each day during overlapping time periods from the Control Room.

The IONM Program was very busy and often had numerous surgeries scheduled on the same day. According to Dr. Gonzalez, this presented significant staffing challenges for the IONM Program when monitoring was ordered for numerous overlapping surgeries because there were only four IONM physicians, including the fellow. In particular, the Medicare billing code for IONM services (HCPCS code G0453) requires exclusive monitoring of the surgery and does not permit a physician to bill monitoring for overlapping surgeries. Since Medicare beneficiaries made up a significant portion (30 to 50 percent) of the IONM cases, Medicare IONM services were often not billed because although monitored simultaneously with other surgeries (which is permissible and within the standard of care for payors other than Medicare), an IONM physician was not always available to exclusively monitor each Medicare IONM surgery.

### C. Monitoring Of ENT Surgeries

Generally, the IONM equipment allowed for remote monitoring of all surgeries with one exception. ENT surgeries could not be remotely monitored because the IONM equipment that was used lacked that technical capability and could not provide a remote monitoring connection to the Control Room or to the monitoring physicians' mobile devices. As a result, the IONM physicians did not monitor the ENT surgeries with a real time connection.

Rather, for ENT surgeries, IONM services were monitored by the ENT surgeons and IONM technicians[3] inside the operating rooms. If needed, these surgeons and technicians

[3] All of the IONM technicians were certified in Neurophysiological Intraoperative Monitoring or supervised by a licensed technician.

communicated with the IONM physicians in the Control Room by text or phone call. In some cases, the technician would text or email a screen shot of the data to the IONM physician for review. For example, if the ENT surgeon stimulated a nerve, either accidentally or intentionally, the technician could measure and communicate the monitoring response via phone, text or email to the IONM physician in the Control Room who could review the data and discuss the response with the surgeon using the same methods. In addition, because the Control Room was near the operating rooms, an IONM physician was available to go to the operating room in an emergency or if requested to do so by the ENT surgeon or IONM technician. But to be clear, the IONM physicians did not have a "real time" connection to the ENT surgeries as required by Medicare rules. As a result, these services should not have been billed.

According to Dr. Gonzalez, although initially the IONM team tried to always have a physician in the operating room during an ENT surgery, the volume of surgery cases at Keck Hospital of USC ultimately did not allow for operating room monitoring of any case, including ENT cases. Nevertheless, Dr. Gonzalez incorrectly believed that the IONM physicians could bill for the ENT surgeries because they were "continuously involved with the case," "responsible if anything happens" and immediately available in the nearby vicinity to respond.

### D. IONM Physician "Academic Research" Days

As IONM Program Chief, Dr. Gonzalez set the weekly schedule of the IONM team for monitoring. As a general matter, all three IONM physicians and the fellow were present at Keck Hospital of USC providing monitoring services on Tuesdays, Wednesdays and Fridays. Only Drs. Gonzalez and Shilian worked on call over the weekends. On Mondays, Dr. Gonzalez took an "academic research" day and was not present in the Control Room. On Thursdays, Dr. Shilian was not present in the Control Room because this was her academic research day. These two physicians began taking academic research days in 2016 when the IONM Program brought on fellows.

Although Drs. Gonzalez and Shilian were not physically present or monitoring cases in the Control Room on their academic research days, they were immediately available for consultation via their mobile devices. In addition, the fellow was directly supervised by the attending physicians who were present on Mondays or Thursdays. As a result, Drs. Gonzalez and Shilian would only login to monitor a case remotely on their academic research day if requested by the fellow or one of the other physicians present in the Control Room.

The following chart depicts the precise weekly schedule of all IONM physicians:

| Day | Physicians Present in IONM Control Room | Physicians Not Present in IONM Control Room |
|---|---|---|

| | | |
|---|---|---|
| **Monday** | Dr. Cheongsiatmoy<br>Dr. Shilian<br>Fellow | Dr. Gonzalez took an academic research day and was generally not at the hospital but was available for consultation when needed and could remotely monitor on his mobile devices. |
| **Tuesday** | Dr. Cheongsiatmoy<br>Dr. Gonzalez<br>Dr. Shilian<br>Fellow | |
| **Wednesday** | Dr. Cheongsiatmoy<br>Dr. Gonzalez<br>Dr. Shilian<br>Fellow | |
| **Thursday** | Dr. Cheongsiatmoy<br>Dr. Gonzalez<br>Fellow | Dr. Shilian took an academic research day and was generally not present at the hospital but was available for consultation when needed and could remotely monitor on her mobile devices. |
| **Friday** | Dr. Cheongsiatmoy<br>Dr. Gonzalez<br>Dr. Shilian<br>Fellow | |
| **Saturday** | Dr. Gonzalez (on call)<br>Dr. Shilian (on call) | Dr. Cheongsiatmoy<br>Fellow |
| **Sunday** | Dr. Gonzalez (on call)<br>Dr. Shilian (on call) | Dr. Cheongsiatmoy<br>Fellow |

On each day of the business week (Monday through Friday), the three attending physicians would bill for IONM services, with one of the physicians assigned as the primary biller for that day, including services provided by the fellow.[4] This billing division remained the

[4] As an example of billing division between the IONM physicians, if there were ten total cases in a day, seven of which were private insurance cases, and three of which were Medicare cases (with two that overlapped in terms of timing), one physician (the person acting as the primary

same on Mondays and Thursdays even though either Dr. Gonzalez or Dr. Shilian was not present in the Control Room to supervise the fellow and provide continuous monitoring because they were taking an academic research day. As a result, certain Monday and Thursday claims for monitoring identified Dr. Gonzalez or Dr. Shilian as the rendering physician even though the services were provided by the fellow and supervised by other physicians in the Control Room.

Dr. Gonzalez believed that he and Dr. Shilian could bill for the monitoring of cases performed by the fellow on their academic research days because the fellow was supervised by at least one attending physician who was physically present on those days in the Control Room. In addition, Dr. Gonzalez and Dr. Shilian were still immediately available for consultation on their academic research days.

### E. IONM Coding

The Medicare program covers IONM services as part of the physician fee schedule. *See* 77 Fed. Reg. 68892, 69069 (Nov. 16, 2012). Prior to 2013, Medicare paid for remote monitoring billed under American Medical Association's ("AMA") Current Procedural Terminology ("CPT") Code 95920, which was used for both in-person and remote monitoring. 78 Fed. Reg. 74230, 74305 (Dec. 10, 2013). However, in 2013, the CPT Editorial Panel deleted CPT Code 95920 and replaced it with two new codes, CPT Code 95940 for continuous intraoperative monitoring inside the operating room, and CPT Code 95941 for continuous remote intraoperative monitoring from outside the operating room. *Id*. Given these changes, Medicare created HCPCS Code G0453 to be used instead of CPT Code 95941 for remote monitoring, while maintaining its adoption of CPT Code 95940 for in-person monitoring.

Thus, since 2013, three time-based codes have been used for IONM services, distinguished primarily by payor, location of services, and type of monitoring service performed:

- HCPCS Code G0453 (Medicare and TRICARE): Continuous intraoperative neurophysiology monitoring, from outside the operating room (remote or nearby), per patient, (attention directed exclusively to one patient), each 15 minutes.

---

biller for that day) would bill for the seven private pay cases, one physician would bill for the two Medicare cases that did not overlap, and one physician would bill for the last Medicare case. USC Care generally did not permit a fellow to bill for services. See USC Care, *Billing for Fellows Participating in Private Practice*, Standard B-407 (12/01/1997), available at https://ooc.usc. edu/healthcare-compliance/usc-care-medical-group-compliance-standards/b-407-billing-fellows-participating-private-practice/.

- CPT Code 95941 (Medicaid and California Children's Services): Continuous intraoperative neurophysiology monitoring, from outside the operating room (remote or nearby) or for monitoring of more than one case while in the operating room, per hour.

- CPT Code 95940 (Medicare, TRICARE, Medicaid and California Children's Services): Continuous intraoperative neurophysiology monitoring in the operating room, one-on-one monitoring requiring personal attendance, each 15 minutes.

HCPCS code G0453 allows continuous remote monitoring for Medicare and TRICARE patients, but specifically requires that "attention [be] directed exclusively to one patient." That is, code G0453 can be billed "only for undivided attention by the monitoring physician to a single beneficiary, not for monitoring of multiple beneficiaries simultaneously." 78 Fed. Reg. at 74305.[5]

CPT code 95941 similarly applies to continuous "real time" monitoring of Medicaid and California Children's Services surgeries, in which the "monitoring professional must be solely dedicated to performing the intraoperative neurophysiologic monitoring and must be available to intervene at all times during the service as necessary, for the reported time period(s)." *See* 2014 AMA CPT Coding Manual, pg. 403. However, in contrast to HCPCS code G0453, CPT code 95941 permits physician monitoring of "one or more simultaneous cases" so long as the physician has the immediate ability to transfer cases to another physician if one of the cases requires the physician's intervention. *Id.*

CPT code 95940 applies to Medicare, Medicaid, TRICARE and California Children's Services and requires exclusive and continuous monitoring by a physician inside the operating room. 2014 AMA CPT Manual, pg. 403. The physician must be physically present inside the operating room and providing one-on-one patient monitoring. *Id.* Thus, no other cases may be monitored during the same time period. *Id.*

According to Dr. Gonzalez, the IONM Program used primarily two of these time-based codes for their services: G0453 for Medicare and TRICARE cases and 95941 for all other cases, including Medi-Cal patients. CPT code 95940, which requires exclusive and continuous

---

[5] Although CMS noted that some commenters opposed this Medicare one-on-one physician monitoring model, CMS decided that this requirement "precludes inaccurate payment in cases where multiple patients are being monitored simultaneously" and also prevents physicians from billing for "more than 60 minutes of work during a 60 minute time frame." 78 Fed. Reg. at 74305.

monitoring by a physician inside the operating room, was rarely, if ever, used by the IONM group because their practice was premised on remote monitoring.

In addition, the IONM physicians also billed CPT base codes with a 26 modifier for the professional component (i.e., interpretation and report) of the type of neurophysiologic monitoring performed, including, most commonly, an electromyography ("EMG"),[6] motor evoked potentials ("MEP"),[7] or short-latency somatosensory evoked potentials ("SSEP")[8] study.

### F. <u>USC Care Billing Of IONM Physician Professional Services</u>

The only IONM claims to Federal Programs were submitted by USC Care for the IONM physicians' professional services.[9] Each IONM Program physician was responsible for providing supporting records and determining the appropriate codes for the professional service, including those applicable to Medicare and private payors. In addition, the IONM Program was responsible for ensuring that the billing complied with coverage conditions, including the Medicare prohibition on simultaneous monitoring of multiple beneficiaries.

## IV. REASONS WHY USC CARE BELIEVES A VIOLATION OF THE FEDERAL FALSE CLAIMS ACT MAY HAVE OCCURRED

Under the FCA, the essential elements of civil liability for presenting false claims are (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, by a person to the United States for payment or approval, (3) with knowledge that the claim was false. *See* 31 U.S.C. § 3729(a)(1)(A); *U.S. v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001). To satisfy the "knowledge" requirement, there must be evidence that the person (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to establish knowledge under the FCA. *Id*.

---

[6] CPT code 95860, 95861, 95863, 95864, 95865, or 95870.

[7] CPT code 95929, 95930, or 95939.

[8] CPT code 95925, 95926, or 95938.

[9] Under Medicare, Keck Hospital of USC is reimbursed for the technical component ("TC") of the CPT base codes through the Medicare Severity-Diagnosis Related Group ("MS-DRG") assigned to the surgery patient's hospital stay. Medicare does not permit Keck Hospital of USC to separately bill the TC of HCPCS code G0453. The hospital also does not bill the technical component of CPT Code 95941 to Medi-Cal or any other Federal Program.

A. **USC Care's Claims For IONM Services That Were Not Provided During ENT Surgeries**

Based on USC Care's review of applicable coverage rules, it has concluded that its claims for IONM professional physician services during ENT surgeries should not have been billed to Federal Programs because the IONM physicians did not continuously monitor the ENT surgeries. In particular, because the software used by the ENT surgeons did not allow for a remote "real time" connection, the IONM physicians were unable to continuously monitor ENT surgeries, which were instead monitored by the ENT surgeons and the IONM technicians who relayed information to the IONM Program physicians via text messages and/or telephone calls. Although the IONM physicians were located in the Control Room, continuously involved in each ENT case, and immediately available to discuss the cases in person if necessary, they were not "continuously" monitoring by way of an electronic "real time" connection the ENT cases that were billed to Federal Programs within the meaning of either HCPCS Code G0453 or CPT Code 95941. For the same reasons, USC Care does not believe that the IONM physicians could properly bill for the professional component of the monitoring modality used (e.g., EMG, SSEP or MEP) in ENT surgery cases.

USC Care does not believe that Dr. Gonzalez had a specific intent to defraud Federal Programs. First, Dr. Gonzalez was entirely candid during USC Care's internal investigation and brought the issue of IONM billing for ENT surgeries to USC Care's attention. Second, Dr. Gonzalez appeared to have a genuine (albeit mistaken) belief that the IONM Program could bill remote monitoring without a "real-time" data connection because the Control Room was located "nearby" in the same building as the operating rooms.[10] Third, Dr. Gonzalez sought to ensure

[10] Dr. Gonzalez's belief was based on the fact that both HCPCS code G0453 and CPT code 95941 require "continuous" monitoring, but neither the AMA nor Medicare define the coding terms "remote" and "nearby" as they relate to the standards for supervision. Because the term "nearby" is described separately from the term "remote," Dr. Gonzalez believed that the term "nearby" refers to the direct supervision model that some providers used prior to 2013 in accordance with CPT code 95920. Under that model, continuous monitoring could arguably include a provider who was in the vicinity and available to respond. However, USC Care found no controlling authority to support this interpretation as it relates to HCPCS code G0453 and CPT code 95941. Given that the services also require a "real time connection" and a professional who is performing the monitoring, USC Care concluded that the proper interpretation is that the terms "remote" or "nearby" simply refer to the proximity of the location where the "continuous" monitoring takes place in relation to the operating rooms. That is, monitoring that is performed outside of the operating rooms can be "nearby" in Keck Hospital of USC or be "remote" if off site. This interpretation was confirmed by USC billing consultants and Marc Nuwer, M.D., the

that the IONM Program physicians were actively involved in monitoring of ENT surgeries despite the lack of a remote data connection by requiring the IONM technicians to provide periodic updates to the IONM physicians who were immediately available to consult via mobile devices if any clinical issues came up. In Dr. Gonzalez's view, this process was essentially equivalent to a "real time" connection, particularly as it related to patient safety issues. Finally, Dr. Gonzalez enforced HCPCS code G0453's requirement of exclusive monitoring for Medicare surgery cases when such compliance resulted in the IONM physicians' provision of substantial monitoring services that were free and could not be billed. His enforcement of Medicare billing rules under these circumstances appears inconsistent with an intent to defraud the program.

Nevertheless, USC Care believes that Dr. Gonzalez's enforcement of the "continuous" remote monitoring billing requirements (including the existence of a real-time remote connection) for all other surgeries could arguably support a finding that he acted in reckless disregard of whether the IONM Program's billing of HCPCS code G0453 and CPT code 95941 for monitoring of ENT surgeries was correct. The fact that Dr. Gonzalez initially tried to always have an IONM Program physician in the operating room during ENT surgeries, but had insufficient physicians to permit such operating room monitoring, also indicates that he was not sure that his justification for billing IONM Program monitoring services for these surgeries was correct.

### B. USC Care's Claims For IONM Services That Were Not Provided By The Billing Physicians On Their Academic Research Days

USC Care has also concluded that its IONM claims for Drs. Gonzalez's and Shilian's professional physician services on their "academic research" days should not have been billed to Federal Programs because these physicians did not personally provide such services. Specifically, Drs. Gonzalez and Shilian each took an academic research day on Mondays and Thursdays, respectively, and were not present in the Control Room to supervise the fellow who performed the monitoring services. The two physicians then incorrectly billed monitoring services on their academic research days without indicating that they were supervising the fellow and not personally providing the "continuous" monitoring services being billed under their provider numbers.

Again, USC Care does not believe that Dr. Gonzalez, who was responsible as Chief of the IONM Program for the decision to bill his and Dr. Shilian's IONM professional monitoring

---

Director of the Clinical Neurophysiology Program at UCLA, who was contacted after Dr. Gonzalez identified him as a local IONM expert on this issue.

services on their academic research days, had a specific intent to defraud Federal Programs. In particular, the billed monitoring services were in fact provided by the fellow, who was supervised by the other attending physicians who were present in the Control Room on Mondays and Thursdays. In addition, Dr. Gonzalez appeared to sincerely believe, although mistakenly, that he and Dr. Shilian could bill for the fellow's monitoring services under their general supervision (i.e., while not physically present in the Control Room, they were immediately available to remotely consult with the fellow by mobile devices).[11]

However, USC Care has concluded that Dr. Gonzalez's incorrect authorization of billing by Dr. Shilian and himself on their academic research days could again potentially support a finding that he was acting in reckless disregard of applicable billing rules. In particular, Dr. Gonzalez arguably should have known that the billing of IONM services on their academic research days could not be justified as remote supervision of the fellow when other attending physicians were in the Control Room to supervise on the days that he and Dr. Shilian were physically absent.

## V. USC CARE'S RESPONSE TO ITS INCORRECT BILLING OF IONM PROFESSIONAL PHYSICIAN SERVICES

In August 2018, USC Care opened an investigation of the IONM Program's billing practices after Dr. Cheongsiatmoy, the newest IONM Program physician at the time,[12] complained to both Dr. Gonzalez and Helena Chui, M.D., the Chair of the Department of Neurology, that the program was engaged in "fraud," including billing for monitoring services not performed.[13]

---

[11] Medicare does allow a teaching physician to bill for services furnished by a fellow when the supervising physician is present during the "critical" or "key" portions of the service. *See* 42 C.F.R. §§ 415.170, 415.172; Medicare Claims Processing Manual, Publication 100-04, Chapter 12, Section 100. However, Dr. Gonzalez's and Dr. Shilian's claims on their academic research days did not include the required "GC modifier" and they were not present in the Control Room to personally supervise any aspect of the fellow's monitoring services. Instead, actual supervision of the fellow on their academic research days was provided by other attending physicians.

[12] According to Dr. Gonzalez, Dr. Cheongsiatmoy's two-year income guarantee ended in June 2018 and his subsequent request to be paid the same amount as Dr. Gonzalez and Dr. Shilian under USC's faculty plan was denied.

[13] Nelson Hardiman, LLP was retained to assist the investigation after Keck Medicine received the CDI Subpoena (described above) in November 2018.

**A. The Internal Investigation**

As part of USC Care's investigation, interviews were conducted of Dr. Gonzalez, Dr. Shilian, Dr. Chui, and Grace Barba, the manager of USC Care's billing department. In addition, USC Care interviewed Lynn Chu, a billing and compliance expert employed by Compliance Concepts, Inc., an outside consultant that had conducted prior audits and training sessions for the IONM Program physicians. USC Care also spoke with Dr. Nuwer, the Director of UCLA's Clinical Neurophysiology Program, about the proper interpretation of HCPCS code G0453 and CPT code 95941.[14]

In addition, USC Care reviewed the IONM Program's policies and procedures, the IONM Program physicians' documentation of monitoring services (including billing information), and examples of USC Care claims for IONM professional physician services.

As detailed above, USC Care's investigation found that its claims for IONM professional physician services should not have been submitted for (a) ENT surgeries because no continuous remote monitoring was provided and (b) Dr. Gonzalez's and Dr. Shilian's services on academic research days when they did not perform the services nor supervise the performing fellow. USC Care found that Dr. Cheongsiatmoy's other allegations about inadequate documentation and improper group billing by the IONM Program were not substantiated.

**B. USC Care's Remediation Of Its IONM Billing Errors**

Based on its investigation findings of billing errors, USC Care identified (a) all claims submitted by USC Care between January 1, 2014 and July 1, 2019 to Medicare and any other Federal Program for IONM professional physician services (HCPCS code G0453 and CPT code 95941) of ENT surgeries, as well as for the professional component of the monitoring modality used (e.g., EMG, SSEP or MEP) for such surgeries, and (b) all claims submitted by USC Care between 2016 and August 2018 to Medicare and any other Federal Program for IONM services by Drs. Gonzalez and Shilian on their academic research days.

---

[14] A list of witnesses and their contact information is attached as Appendix A. Please note that these witnesses may be contacted through the University's outside legal counsel, Mark Hardiman and Jonathan Radke.

USC Care then directed that any USC Care overpayments received from Medicare and other Federal Programs for these two categories of incorrect claims be refunded.[15] USC Care's refund of these overpayments included all Federal Program, secondary payer and patient payments. The overpayment and refund amounts are further detailed in the next section regarding USC Care's estimate of damages in this matter. This refund process is ongoing but has largely been completed.

USC Care also instituted a bill hold and prohibited IONM physicians from billing IONM physician services unless real time monitoring was provided with the appropriate monitor. Likewise, the IONM physicians were directed not to bill for fellow services unless they are physically present in the Control Room to supervise the fellow and the proper modifier is included in their billing information. The IONM Program's policies and procedures have been revised to reflect these new directives.[16] In addition, IONM physicians were provided mandatory training regarding IONM billing requirements in March 2019 by Compliance Concepts, Inc., the outside billing consultant that had conducted prior audits and training sessions for the IONM physicians.

Finally, USC Care has informed Dr. Gonzalez that his employment contract as a USC physician and faculty member will not be renewed when it expires in June 2020 based on USC Care's assessment that he was the individual primarily responsible for USC Care's substantial billing errors and overpayments because he incorrectly authorized the IONM physician claims for ENT surgeries and academic research days as Chief of the IONM Program. USC Care has not disciplined Dr. Shilian based on its conclusion that she followed Dr. Gonzalez's directions and accepted his billing justifications in good faith given his position as the IONM Program Chief and his role as her mentor, including during her fellowship with the program.

## VI. USC CARE'S ESTIMATE OF DAMAGES RESULTING FROM ITS INCORRECT IONM CLAIMS

Between January 1, 2014 and July 1, 2019, USC Care submitted 307 claims to Federal Programs for IONM monitoring of ENT surgeries when there was no real time remote connection that allowed these cases to be continuously monitored by the IONM physicians at

---

[15] USC Care has also refunded overpayments made by commercial insurers on IONM claims involving ENT surgeries.

[16] *See* USC Care, *Documentation and Coding Guidelines for Intraoperative Neurophysiology Monitoring (IONM)*, Standard DC-326 (10/01/2019), available at https://ooc.usc.edu/healthcare-compliance/usc-care-medical-group-compliance-standards/documentation-and-coding-guidelines-for-ionm/.

Keck Hospital of USC. Based on these USC Care claims, USC Care's estimate of single damages relating to the monitoring of ENT surgeries is **$89,223.19**. These overpayments and resulting refunds are broken out by Federal Program as follows:

| Federal Program | Overpayment & Refund |
|---|---|
| Medicare Part B (Noridian) | $ 65,897.73 |
| Gold Coast Health Plan | $ 8,261.91 |
| Department of Health Care Services MS-1101 | $ 4,795.62 |
| TRICARE | $ 2,618.10 |
| Kern Health Systems | $ 1,985.86 |
| Anthem Blue Cross Medi-Cal | $ 1,458.35 |
| WPS Tricare for Life | $ 631.91 |
| Southland San Gabriel Valley Me Medi-Cal | $ 348.84 |
| La Care Healthcare | $ 303.45 |
| Omnicare Medical Group Medi-Cal HMO | $ 301.87 |
| Healthnet Medi-Cal | $ 283.68 |
| Dept Of Public Health & Social Services | $ 283.20 |
| Pacific IPA Pipa Medi-Cal | $ 264.45 |
| Medicaid Out of State Health Plans of Nevada | $ 223.20 |
| United Healthcare Medicare Advantage PPO | $ 209.98 |
| Caremore Medicare Advantage | $ 177.80 |
| Altamed Health Services Medi-Cal | $ 168.78 |
| Anthem Blue Cross Medicare Advantage PPO | $ 144.95 |
| Prospect Medical Systems Medi-Cal HMO | $ 138.95 |
| Lakeside Medical Group Medi-Cal | $ 127.96 |
| Global Care Medical Group Medi-Cal HMO | $ 84.41 |
| California Health & Wellness | $ 75.41 |
| Exceptional Care Medi-Cal HMO | $ 64.31 |
| Healthcare La Medi-Cal HMO | $ 64.31 |
| South Atlantic Medical Group Medi-Cal HMO | $ 64.31 |
| Aetna Medicare Advantage PPO | $ 55.79 |
| Altamed Health Services Medicare Advantage | $ 51.04 |
| Easy Choice Health Plan Medicare Advantage | $ 44.76 |
| CalOptima Medi-Cal | $ 37.63 |
| Accountable Healthcare IPA | $ 28.71 |

| Federal Program | Overpayment & Refund |
|---|---|
| Medicare Secondary | $ 25.92 |
| **Total:** | **$89,223.19** |

USC Care is still identifying whether Federal Programs were payors for 114 claims totaling $11,611.79 submitted to 13 plans[17] which require a manual review of the underlying claim documentation to determine whether the payor was a Federal Program versus a commercial plan.

On June 30, 2018, USC Care submitted approximately 1,575 claims to Medicare that identified Dr. Gonzalez or Dr. Shilian as the rendering provider of IONM services provided on Mondays and Thursdays when neither physician was present at the hospital and supervising the IONM fellow who monitored the surgeries. USC Care's estimate of single damages to the Medicare program relating to these services is **$79,404.98**.[18] USC Care is still in the process of identifying any overpayments from other Federal Programs relating to this category of claims.

USC Care expects to supplement this disclosure with the additional information described above regarding any additional Federal Program overpayments in the next few weeks, although they expect that the amount of any such overpayments will be low.

Spreadsheets detailing the IONM claim overpayment amounts for ENT surgeries and the refunds that have been processed are enclosed as Exhibits B and C, respectively.[19] Similar spreadsheets detailing the Medicare overpayments and refunds for IONM academic research days are enclosed as Exhibits D and E, respectively.

---

[17] The 13 payors being checked manually are Preferred IPA, Health Plans of Nevada, HealthCare LA IPA, Coastal Communities IPA, Axminster Medical Group, Choice Care Network, Santa Barbara Medical Foundation, Torrance Hospital IPA, LA Care Health Plan – Direct Referrals, Physician's Healthways IPA, Coventry Health Care, Non Contract Medical Group IPA, and DHS Managed Care systems.

[18] This overpayment amount includes reimbursement received for Dr. Gonzalez's Monday claims ($44,566) and Dr. Shillian's Thursday claims ($34,839) for IONM monitoring services.

[19] Note that Exhibit C reflects total refunds of $84,815.41 for monitoring of ENT surgeries which is lower than Exhibit B's total overpayment amount of $89,223.19 for this category of claims. The difference of $4,407.78. consists of refunds that were previously made on the IONM claims for miscellaneous reasons unrelated to the billing issue regarding ENT surgeries being disclosed.

## VII. USC CARE'S SELF-ASSESSMENT

USC Care is subject to a robust compliance program as a part of the Keck Medicine of USC health system.[20] While USC Care's incorrect IONM claims relating to ENT surgeries and academic research days were not discovered by the regular audits of the IONM physicians' billings and their supporting documentation, USC Care's root cause analysis indicates that this was not due to compliance program weaknesses, but because the billing errors were largely the result of Dr. Gonzalez's mistaken direction of the IONM Program and, by their unique nature, were unlikely to be detected by the Compliance Program's standard and industry-accepted compliance monitoring tools.

### A. Keck Medicine of USC's Compliance Program

The foundation for Keck Medicine of USC's Compliance Program is the Department of Health and Human Services, Office of the Inspector General's (OIG) Model Compliance Program Guidance for Hospitals (February 1998) and its additional supplemental guidance (January 2005). Based on this guidance, USC's Compliance Program has a compliance plan based on the following elements:

- Commitment and support from executive leaders;
- Institutional policies, standards and expectations;
- Education and outreach efforts to ensure that workforce members understand their roles and responsibilities;
- Monitoring and auditing activities to ensure the effectiveness of internal controls;
- On- going assessments and proactive responses to emerging risks and regulatory developments;
- Safe mechanisms for reporting compliance concerns, including a Help Hotline that supports anonymous reporting;
- Timely investigations of reported concerns and protection of complainants from retaliation;
- Appropriate sanctions and corrective actions to address non- compliance when it occurs;
- Process improvement projects as needed to enhance compliance efforts; and

[20] As noted earlier in this letter, Keck Medicine of USC is a multi-disciplinary university-based system of hospitals and outpatient facilities, including Keck Hospital of USC and USC Care.

- Evaluations of program effectiveness and annual reporting.[21]

Oversight for the Compliance Program is provided through a governance structure which flows from senior Keck Medicine of USC leadership and each clinical department up through two compliance committees, the USC Office of Compliance and to the Audit & Compliance Committee of the USC Board of Trustees:

Day- to- day responsibilities for the Compliance Program rest with the Associate Senior Vice President, Compliance, USC Office of Compliance, through Keck Medicine of USC's Chief Administrative Integration and Risk Officer to the Deputy Healthcare Compliance Officer and staff:

[21] A full description of USC's Compliance and Ethics Program is available at: http://ooc.usc.edu/sites/ooc.usc.edu/files/pdfs/USC- Compliance- Plan.pdf.

With respect to USC Care, the Compliance Program also has a specific Faculty Provider Compliance Program, the cornerstones of which are (a) an Office of Compliance monitoring program, guided by Keck Medicine of USC's data analytics[22] and government- identified risk areas, which conducts regular reviews of USC Care established physicians' procedural and diagnosis code assignments, medical record supporting documentation and code abstractions every other year prior to their re- credentialing date, as well as focused reviews of provider risk areas; (b) education of USC Care physicians, including a mandatory compliance orientation for all new physicians regarding use of CMS guidelines for documentation, coding and billing, as well as mandatory annual compliance refresher training, online compliance modules for physicians that need to be completed annually and at the time of recredentialing, and yearly compliance education for each University department; and (c) structured reporting of USC Care physician monitoring results, key initiatives, new policies or revisions, and compliance workplan items to Keck Medicine of USC's Quarterly Healthcare Compliance Committee (consisting of the physician liaison and administrator for each department) and at the department- specific physician liaison meetings.[23]

The Office of Compliance shares the monitoring results with the specific USC Care physician and his or her department representative. USC Care physicians who do not successfully complete a monitoring round are subject to education requirements and a re- audit. USC Care Physicians who fail three rounds of monitoring are placed on concurrent review status with a compliance bill hold in the centralized billing system. Supplemental monitoring is also

---

[22] Since 2014, Keck Medicine of USC has used REVEAL/md, a predictive analytic software that quickly identifies audit risk exposure for physicians' coding based on the physician's specialty and CMS's national billing averages and mimics the same statistical methodology used by auditors to compare each physician against known risk indicators. Monthly billing activity for USC Care is uploaded into REVEAL/md which then provides a monthly snapshot of physicians, E/M codes, modifier usage and departments or specialties that may potentially pose an audit risk based on CMS's national billing averages.

[23] The department- specific physician liaison meetings are also held on a quarterly basis and include the USC Care physician liaison for the department, the department administrator, the Office of Revenue Cycle Management director, the coding director, the billing manager, the faculty provider compliance manager and a coding/documentation specialist from the Office of Compliance. There is a standing agenda for these meetings consisting of credit balances, missing charges, monitoring results with required charge corrections and/or refunds, Medicare denials for coding and compliance reasons, and any other topics relating to the department.

conducted for established USC Care physicians who fail their first round of monitoring or who are identified as needing such monitoring by the Office of Compliance.[24]

**B. <u>USC Care's Root Cause Analysis Of Its Incorrect IONM Billing</u>**

USC Care's root cause analysis indicates that the primary cause of its incorrect IONM claims relating to ENT surgeries and academic research days was Dr. Gonzalez's mistaken direction of the IONM Program with respect to these billings. As Program Chief, he directed that IONM monitoring be billed for ENT surgeries and that claims be submitted under his and Dr. Shilian's provider numbers on academic research days that he scheduled after Dr. Parker was hired as a fellow. He also incorrectly assured other IONM physicians, most notably Dr. Shilian, that his misinterpretations of the IONM billing rules were correct. While he appeared to genuinely believe that billing remote monitoring for ENT surgeries without a remote data connection was permissible because IONM physicians were nearby and that he and Dr. Shillian could bill for a fellow's monitoring services on their academic research days as supervising physicians, these justifications were incorrect interpretations of the applicable billing codes. In addition, his rationalizations were undermined by the IONM Program's use of remote data connections to monitor all other surgeries and by other physicians being present in the Control Room to supervise the fellow on the academic research days. In USC Care's view, Dr. Gonzalez's mistakes were a serious misjudgment and reflected a leadership failure on the critical compliance issue of correct billing.

Secondarily, USC Care believes that Dr. Gonzalez's judgment was likely clouded by the IONM Program's heavy utilization, including the frequent monitoring of Medicare surgeries which could not be billed by the IONM physicians because of HCPCS code G0453's prohibition on simultaneous monitoring of multiple Medicare cases. However, if Dr. Gonzalez had a concern that the IONM Program was overburdened, he should have requested more resources. In USC Care's view, the fact that the IONM Program was very busy does not reasonably explain or excuse Dr. Gonzalez's ill advised billing decisions.

Unfortunately, the unique nature of these billing errors also made them unlikely to be detected by the USC Compliance Office's regular monitoring of billing by USC Care physicians, including IONM Program physicians. With respect to ENT surgeries, the lack of a real time data connection on the monitors being used by the physicians was not reflected on the claims or

---

[24] More detailed information about Keck Medicine of USC's Compliance Program can be found in the Office of Compliance's "Healthcare Compliance Executive Program Summary" and "Faculty Provider Compliance Program Overview," enclosed as Exhibits F and G, respectively.

IONM physician documentation of the monitoring services, which relied significantly on the monitoring technician's report of the data produced by the monitor but not actually transmitted to the Control Room. Similarly, without knowledge of the academic research days, the Compliance Office's monitoring of claims submitted under Dr. Gonzalez's or Dr. Shillian's provider numbers, including the review of supporting documentation, did not reveal that they were not present in the Control Room to supervise the fellow's services. For example, during the relevant time period, Compliance Concepts, Inc., a University compliance consultant, conducted regular reviews of IONM Program billing and documentation, but did not discover either billing error. Instead, USC Care first learned that the ENT surgery monitors had no real time data connection when Dr. Gonzalez candidly brought up the issue during its investigation and likewise only discovered the billing on academic research days when Dr. Cheongsiatmoy complained about the practice. Neither of these billing errors are of a type that would be identified by accepted compliance monitoring tools, including regular reviews of claims and supporting documentation. As a result, USC Care does not believe that discovery of its incorrect IONM claims was delayed by any weaknesses in Keck Medicine of USC's otherwise comprehensive and robust compliance monitoring program.

Finally, USC Care does not believe that these unique and somewhat unusual IONM billing errors are systemic or likely to be repeated in the future. In particular, USC Care has eliminated both of the incorrect billing practices relating to ENT surgeries and academic research days. In addition, as previously noted, USC Care has informed Dr. Gonzalez that his faculty appointment will not be renewed when it expires in June 2020[25] because of its loss of confidence in his leadership as a result of the signficiant billing errors that he expressly authorized and which resulted in unacceptable overpayments by Medicare and other Federal Programs.[26] With his departure, USC Care is confident that the same or similar billing errors are unlikely to occur.

## VIII. CERTIFICATION AND SETTLEMENT AUTHORITY

---

[25] The four-month delay before Dr. Gonzalez departs is necessary for USC Care to find a new and qualified physician to replace him as Chief of the IONM Program without disrupting the continuity of the program's high quality and critical remote monitoring services for Keck Medicine of USC's surgery patients.

[26] Holding Dr. Gonzalez accountable is consistent with Keck Medicine of USC's Compliance Program which emphasizes holding leaders and managers responsible for understanding and adhering to relevant policies and procedures, seeking clarification when questions arise, and effectively monitoring compliance within their respective areas of oversight.

A certification by Thomas Jackiewicz, Senior Vice President and Chief Executive Officer for Keck Medicine of USC, concerning the truthfulness of the information contained in this voluntary disclosure letter, investigation report, and self-assessment, is attached at the end of this letter. Mr. Jackiewicz is also authorized to enter into a settlement agreement on behalf of USC Care.

**IX. CONCLUSION**

Based on the foregoing, USC Care requests that it be accepted in the OIG's voluntary disclosure program with respect to its incorrect IONM claims because it is committed to complying with all applicable laws and regulations, and cooperating with the government to refund any federal healthcare program overpayments that it may have received.

We look forward to working with the OIG to complete this voluntary disclosure process in a comprehensive and satisfactory manner.

Should you have any questions or require additional information, please call Mark Hardiman or Jonathan Radke at (310) 203-2800 or email them at mhardiman@nelson hardiman.com and jradke@nelsonhardiman.com.

Sincerely,

NELSON HARDIMAN, LLP

*M.S. Hardiman*

By: Mark Hardiman

Enclosure - Thumb Drive

Susan Gillin
Chief of the Administrative & Civil Remedies Branch
March 27, 2020
Page 25

**CERTIFICATION**

On behalf of USC Care Medical Group, Inc., I hereby certify that, to the best of my knowledge, the foregoing voluntary disclosure letter, investigation report, and self-assessment contains truthful information and is based on a good faith effort to bring the matter to the government's attention for the purpose of resolving any potential liabilities to the government.

Thomas Jackiewicz
Thomas Jackiewicz (Mar 27, 2020)

Thomas Jackiewicz
Chief Executive Officer, Keck Medicine of USC
Senior Vice President, USC

298207-1

# EXHIBIT A

MICHAEL J. LEVY
Deputy General Counsel
J. SCOTT MCNAMARA
Fraud Liaison Bureau Chief
MITCHELL S. NEUMEISTER (SBN 285817) – ATTORNEY TO BE NOTICED
False Claims Attorney
300 Capitol Mall, 16th Floor
Sacramento, CA 95814
Telephone: 916-492-3133
Fax: 916-324-1883
Email: Mitch.Neumeister@insurance.ca.gov
*Attorney for Dave Jones, Insurance Commissioner*

BEFORE THE CALIFORNIA DEPARTMENT OF INSURANCE
OFFICE OF THE INSURANCE COMMISSIONER
STATE OF CALIFORNIA

**IN THE MATTER OF INVESTIGATION NO. LIQT-2018-00046; AND RELATED ISSUES**

**INVESTIGATIVE SUBPOENA FOR DOCUMENTS**

[Insurance Code §§ 12924; 1872.3]

**NOTICE TO THE PERSON SERVED:**

You are served on behalf of Keck Medicine at University of Southern California

Pursuant to the powers conferred by California Insurance Code sections 12924 and 1872.3, subdivision (b), on the Insurance Commissioner, as head of the California Department of Insurance, which powers and authority to conduct the above entitled investigation have been delegated to the undersigned, an officer of that Department,

Keck Medicine at University of Southern California

("WITNESS") **IS HEREBY COMMANDED** to produce the documents, books, records, papers, files, and other tangible and electronic items (collectively, "ITEM(s)") described below to this Investigative Subpoena which are in WITNESS'S custody, possession or control, or the custody, possession or control of WITNESS'S subsidiaries, affiliates, parents, predecessors, successors, employees, partners, officers, agents or representatives, whether or not the present location of any of the ITEMs designated is in California at the California Department of Insurance, Office of the Insurance Commissioner, 300 Capitol Mall, 16th Floor Sacramento, CA 95814, Attention: False Claims Attorney Mitch Neumeister, **within 30 days of service of subpoena**.

## INSTRUCTIONS FOR COMPLIANCE

1. NO ITEM REQUESTED HEREIN SHALL BE DESTROYED OR DISCARDED until the undersigned officers have made a written determination that the ITEM in question is not necessary in furtherance of this investigation. Any decision to permit a partial or limited response to a request in the subpoena is not a waiver of the request and does not extinguish your obligation to maintain and preserve all ITEMS called for by this subpoena.

2. YOU MUST TAKE IMMEDIATE STEPS TO PRESERVE ALL DOCUMENTS REQUESTED IN THIS SUBPOENA.

3. The Relevant Period of this subpoena is January 1, 2008 through the final response date of this subpoena unless otherwise expressly stated herein. All responsive ITEMs created, maintained or altered during the Relevant Period must be produced unless otherwise expressly stated below to this subpoena.

4. If WITNESS claims that an ITEM or a portion of an ITEM is privileged and WITNESS

withholds it from production for that reason, WITNESS must create and submit a privilege log which lists (1) the author(s) and their capacities; (2) the recipients (including CC's and BCC's) and their capacities; (3) other individuals with access to the ITEM; (4) the type of ITEM; (5) the subject matter of the ITEM; (6) the date on the ITEM; and (7) an explanation setting forth the factual and legal basis for your claim that the document is privileged.

5. To the extent responsive ITEMs exist in electronic or computerized format, please contact the officer issuing this subpoena to discuss the manner and format in which the ITEMs are to be produced so as to facilitate the production of full and complete copies in a usable format. In the absence of an agreement regarding the manner and format of this production, the following instructions shall apply:

a. The information shall be provided on CD/DVD or external hard drive formatted as follows: (1) Native files converted to bates numbered single page tiff files; (2) multi-page text files named based on the associated bates number containing extracted or OCR text; (3) image load files in Opticon or Ipro format; (4) Concordance data file to include all metadata fields including Sha-1 hash value and attachment range for compound documents; (5) any Excel, Access or other database document or native document that includes formulas in native file format; (6) any audio files in WAV file format; and (7) any video files in any AVI format.

b. The response shall include all documents and computer programs necessary to the accurate conversion, analysis, and review of the electronic data, including but not limited to operating instructions, manuals, user guides, keys, legends, and codes for systems, programs, files and data fields.

## DEFINITIONS

A. "AND" and "OR" have both conjunctive and disjunctive meanings.

B. "CHAT LOGS" means all communication between HEALTHCARE PROVIDERS RELATED to the interpretation and communication of IONM SERVICES.

C. "COMMUNICATION" OR "COMMUNICATIONS" means every disclosure, transfer, exchange OR transmission of information, whether oral, written, OR electronic, AND

whether face-to-face, by telecommunications, telephone (including texts AND iMessage), computer (including texts, instant messaging, iMessage, SnapChat, Slack, etc.), emails, mail, telecopier, facsimile (fax) machine, OR otherwise including attachment(s).

D. "DOCUMENT" OR "DOCUMENTS" means the original AND all non-identical copies AND drafts, regardless of origin OR location, of any information, writing (as defined in California Evidence Code section 250), OR data stored in paper, electronic, tape, OR any other format, including without limitation written OR printed matter, video OR audio, image-bearing film, photographs AND images, AND electronically stored information. It further includes without limitation letters, telegrams, telexes, facsimiles (faxes), correspondence, memoranda, email, video, voicemail, reports, agreements, studies, calendar OR diary entries, minutes, pamphlets, handwritten notes, charts, tabulations, records of meetings, conferences, digital OR electronic messages (including without limitation instant messages, snapchats, Slack channels), OR COMMUNICATIONS, telephone OR other conversations OR COMMUNICATIONS, AND tapes OR slides, as well as computer files, directories, AND programs in whatever form.

E. "HEALTH CARE PROVIDER" OR "HEALTH CARE PROVIDERS" means any person employed by a medical practice, hospital, institutional account, pharmacy, academic institution OR any other healthcare facility entity (including without limitation individuals with the following titles: Administrative Assistant; Administrative Medical Assistant; Administrator; Analyst; Assistant Administrator; Assistant Director of Nursing; Billing Manager; Billing Specialist; Case Manager; Medical Assistant; Nurse Assistant; Nursing Assistant; Pharmacy Technician; Nurse; Claims Specialist; Clerk; Clinical Nurse Manager; Clinical Research Associate; Clinical Specialist; Coder; Director of Nursing; Director of Operations; Doctor; Fellow; Intern; Resident; Medical Technician; Nurse; Executive Assistant; Nurse Practitioner; Office Clerk; Health Services Manager; Healthcare Administrator; Healthcare Management; Healthcare Specialist; Hospital Administrator; IT Specialist; Information Technology Specialist; Therapist; Medical Assistant; Receptionist; Medical Associate; Medical Billing Specialist; Medical Claims

and Billing Specialist; Medical Coder; Technologist; Manager; Office Assistant; Office Manager; Office Specialist; Clerk; Technician; Technologist; Director of Nursing Services; Nurse; Nurse Aide; Clinical Educator; Nurse Manager; Nurse Midwife; Nurse Paralegal; Nurse Practitioner; Nursing Assistant; Office Assistant; Office Clerk; Office Manager; Office Nurse; Operations Manager; Attendant; Patient Access Supervisor; Patient Care Associate; Patient Services Representative; Patient Services Technician; Pharmacist; Pharmacy Clerk; Pharmacy Technician; Physician; Physician Aide; Physician Assistant; Program Director; Program Manager; Programmer; Project Manager; Nurse Practitioner; Quality Coordinator; Receptionist; Registered Nurse (RN); Case Manager; Data Coordinator; First Assistant; Researcher, Research Assistant; Research Associate; Staffing Coordinator; Supervisor; OR Supply Technician).

F. "IONM SERVICES" means Intraoperative Neurophysiological Monitoring provided by YOU.

G. "KECK MEDICINE OF UNIVERSITY OF SOUTHERN CALIFORNIA" OR "YOU" OR "YOUR" means Keck Medicine at University of Southern California AND Keck Medical Center of USC AND University of Southern California AND USC Verdugo Hills Hospital AND USC Care Medical Group AND Keck School of Medicine at University of Southern California AND its associated schools including but not limited to the Keck School of Medicine AND its subsidiaries, predecessors, successors, parents, AND affiliates including LAC+USC Medical Center AND their parent corporations, subsidiaries, divisions, predecessors, successors, assignors, present AND former directors, officers, employees, AND agents, including any third-party entities that provide billing, charging, OR auditing services.

H. "RELATING TO" OR "RELATED TO" means constituting, containing, concerning, discussing, describing, analyzing, identifying, referring to, relating to, referencing, documenting, governing, regulating, directing, evidencing OR stating.

**DOCUMENTS AND THINGS TO BE PRODUCED**

1. All CHAT LOGS created by a HEALTHCARE PROVIDER RELATED TO IONM SERVICES performed at the KECK MEDICINE AT UNIVERSITY OF SOUTHERN CALIFORNIA.
2. All COMMUNICATIONS between HEALTHCARE PROVIDERS who provide IONM SERVICES at the KECK MEDICINE OF THE UNIVERSITY OF SOUTHERN CALIFORNIA.

**FOR FAILURE TO COMPLY WITH THE COMMANDS OF THIS SUBPOENA, YOU WILL BE SUBJECT TO THE PROCEEDINGS AND PENALTIES PROVIDED BY LAW.**

Dated: November 1, 2018

MITCHELL S. NEUMEISTER
*Attorney for California Insurance Commissioner Dave Jones*

# EXHIBIT F

# University of Southern California
# Office of Compliance



# Healthcare Compliance
# Executive Program Summary

# TABLE OF CONTENTS

**KECK MEDICINE OF USC COMPLIANCE PROGRAM OVERVIEW 3**

SCOPE 3
PURPOSE 3
KEY COMPLIANCE PROGRAM ELEMENTS 4
KEY AREAS OF REGULATORY RISK 4
COMPLIANCE ROLES AND RESPONSIBILITIES 5
COMPLIANCE GOVERNANCE STRUCTURE 6
COMPLIANCE REPORTING RELATIONSHIPS AND KEY CONTACTS 6
USC OFFICE OF COMPLIANCE HEALTHCARE CONTACTS 7
USC HELP & HOTLINE 7

**INTERACTIONS WITH INDUSTRY 8**

OPEN PAYMENTS DATABASE 8
RELATIONSHIPS WITH INDUSTRY 9
HOSPITAL AND CLINIC GUIDELINES FOR INDUSTRY REPRESENTATIVES 9

**OTHER KEY COMPLIANCE RESOURCES AND POLICIES 10**

ANNUAL HEALTHCARE COMPLIANCE WORK PLANS 10
USC OFFICE OF COMPLIANCE WEBSITE 10
HIPAA PRIVACY POLICIES 10
OTHER KEY POLICIES 10

# Keck Medicine of USC
# Compliance Program Overview

## Scope

The Keck Medicine of USC Compliance Program develops and maintains hospital and clinical compliance programs for:

Keck Hospital of USC

USC Norris Cancer Hospital

USC Eye Institute – Keck Medical Center of USC in Ophthalmology

USC Verdugo Hills Hospital

USC Care Medical Group

## Purpose

USC promotes an organizational culture that supports ethical conduct and a commitment to compliance with laws and regulations. The compliance program provides reasonable assurance that Keck Medicine of USC:

1. Complies in all material respects with federal, state and local laws applicable to its operations;
2. Satisfies the conditions of participation and conditions of payment for healthcare programs funded by state and federal governments and the terms of contractual arrangements;
3. Detects and deters criminal conduct or other forms of misconduct by Keck Medicine of USC workforce members;
4. Promotes self-monitoring and provides for, in appropriate circumstances, voluntary disclosures of violations of law and regulations; and,
5. Establishes, monitors, and enforces high professional and ethical standards.

## Key Compliance Program Elements

The foundation for Keck Medicine of USC's Compliance Program is the Department of Health and Human Services, Office of the Inspector General's (OIG) Model Compliance Program Guidance for Hospitals (February 1998) and its additional supplemental guidance (January 2005). Based on this guidance, USC's Compliance Program has developed a compliance plan based on the following elements:

- Commitment and support from executive leaders
- Institutional policies, standards and expectations
- Education and outreach efforts to ensure that workforce members understand their roles and responsibilities
- Monitoring and auditing activities to ensure the effectiveness of internal controls
- On-going assessments and proactive responses to emerging risks and regulatory developments
- Safe mechanisms for reporting compliance concern, including a Help and Hotline that supports anonymous reporting
- Timely investigations of reported concerns and protection of complainants from retaliation
- Appropriate sanctions and corrective actions to address non-compliance when it occurs
- Process improvement projects as needed to enhance compliance efforts
- Evaluations of program effectiveness and annual reporting

You can review a full description of The University of Southern California's Compliance and Ethics Program at: http://ooc.usc.edu/sites/ooc.usc.edu/files/pdfs/USC-Compliance-Plan.pdf.

## Key Areas of Regulatory Risk

The USC Office of Compliance collaborates with operational leaders at Keck Medicine of USC and other university offices, including Internal Audit and the Office of the General Counsel, to respond to issues involving the following healthcare regulatory risk areas:

- Stark and Anti-Kickback Laws
- False Claims Act
- Relationships with Industry
- Conflicts of Interest
- EMR Documentation and Coding
- Billing and Reimbursement Issues
- Research Compliance
- HIPAA Privacy and Security

The USC Office of Compliance uses a risk-based approach to develop the annual Healthcare Compliance Plan which prioritizes our work efforts for the upcoming year. We look at both internal and external resources to identify and capture relevant regulatory compliance risks for

potential monitoring. Development of specific hospital compliance work plans occurs through discussions with senior leadership and key managers, reviews of new regulations, risks identified by the Office of Inspector General through audit reports and fraud alerts. Risks are then prioritized based on probability, severity and level of existing controls. The goal is to work systemically from strategic goals to risk identification, analysis, to identification of a scalable list of risk priorities that can be effectively reviewed within our existing compliance resources.

## Compliance Roles and Responsibilities

Keck Medicine's commitment to compliance is imbedded in the expectation that all members of the organization will meet the professional, ethical and regulatory standards associated with their individual roles.

- ***Persons in executive leadership positions*** are champions responsible for the successful implementation and sustenance of compliance and related operational programs within their specific area of oversight. Through service on the Hospital Compliance Committee, executive leaders support the full implementation of the Hospital Compliance and Ethics Program, which is inclusive of the annual Hospital Compliance Work Plan, and implementation of identified corrective actions.

- ***Faculty, staff and residents*** are responsible for understanding and adhering to relevant policies and procedures, participating in required education, fulfilling recordkeeping requirements, reporting compliance concerns, seeking clarification when questions arise, and responding in a timely manner to requests for information associated with audits, monitoring and investigations.

- ***Persons in management or supervisory positions*** are expected to communicate compliance and operational expectations, ensure that appropriate education is completed, implement and enforce policies, and monitor compliance within their respective areas of oversight.

- ***Compliance professionals and compliance liaisons*** monitor developments in the regulatory environment, establish entity-specific policies and procedures, work closely with operational departments to develop internal controls, receive and investigate allegations of non-compliance, develop and implement effective monitoring programs, conduct risk assessments, and deliver role-based education based on organizational risk.

## Compliance Governance Structure

Oversight for the Compliance Program is provided through a governance structure which flows from senior hospital leadership and each clinical department up through two compliance committees, the USC Office of Compliance and to the Audit & Compliance Committee of the USC Board of Trustees:



## Compliance Reporting Relationships and Key Contacts

Day-to-day responsibilities for the Compliance Program rest with the Associate Senior Vice President, Compliance, USC Office of Compliance, through Keck Medicine of USC's Chief Administrative Integration and Risk Officer to the Deputy Healthcare Compliance Officer and staff:



## USC Office of Compliance Healthcare Contacts

| | |
|---|---|
| Ajay Vyas<br>Assistant V.P. Healthcare Compliance Officer | 323.442.8588 Office |
| Stacy Lentz<br>Director, Hospital Compliance | 323.442.9693 Office |
| Teresa Bernau<br>Assistant Director, Hospital Compliance | 323.442.6837 Office |
| Nancy Gonzalez<br>Faculty Provider Compliance Manager | 323.442.9061 Office |
| Open<br>Coding and Documentation Specialist | 323.865.7077 Office |
| Heather Pivko<br>Privacy Specialist | 323.442.7517 Office |
| Lou Carbajal<br>Administrative Assistant | 323.865.7076 Office |

## USC Help & Hotline (213.740.2500)

The USC Office of Professionalism and Ethics operates the USC Help & Hotline, a 24/7 number that provides an additional avenue of contract for reporting concerns. Callers may choose to be anonymous when using this resource. Healthcare compliance-related calls are investigated by compliance office staff. Calls involving Human Resources issues or other areas of university operations are referred to the appropriate department for investigation.

USC has a non-retaliation policy that protects any person who reports a concern in good faith.

Contact Help and Hotline by phone at **(213) 740-2500** or **(800) 348-7454** or file on the web at **www.mycompliancereport.com**, and enter **UOSC** as the access code.

## Interactions with Industry

Interactions with industry are fundamental to the mission of an academic medical center and provide important support to Keck Medicine of USC to carry out high quality and leading edge medicine, research, medical education, and scientific advancements that improve medical care. These interactions, however, also raise concerns that financial and other aspects of these relationships may create conflicts of interest that can bias, or appear to bias, medical judgment and decision-making.

The USC Office of Compliance, working in partnership with leaders at Keck Medicine of USC, has developed policy and procedures that strike a balance among those interactions that should be permitted because there is little risk of a conflict of interest, to those interactions that require active management or should be prohibited to limit conflicts of interest that could either impair independent judgment or decision-making or create the appearance that independent judgment or decision-making is impaired.

We manage industry interactions through review of the federal government's Open Payments Database, policy guidance under the Relationships with Industry (RWI) Policy, and specific hospital guidelines for industry representatives who seek access to our hospitals and clinics.

## Open Payments Database

The Physician Payments Sunshine Act, administered by the Centers for Medicare and Medicaid Services, provides greater transparency around the financial relationships among pharmaceutical and device manufacturers, group purchasing organizations, physicians, and teaching hospitals. Manufacturers are required to annually report payments or transfers of value, whether made directly or indirectly, for:

- Education
- Research and Grants
- Travel
- Honoraria
- Speaking fees
- Meals
- Educational items such as textbooks



Ownership and investment interests of physicians and their immediate family members are also reportable.

The USC Compliance Program monitors the Open Payments Database, identifies potential payments to our physicians, and submits these payments for review to the clinical departments. Clinical departments are responsible for addressing potential or actual conflict of interest and for implementing appropriate internal controls to manage the conflict.

## Relationships with Industry

USC's Relationships with Industry Policy supports meaningful interactions with industry that serve the academic mission and the health of the public. This policy fundamentally supports the goals of the Physician Sunshine Payment Act as well as federal Anti-Kickback laws by providing guidance to USC Healthcare Professionals who have either on-site or off-site interactions with industry. This policy covers:

- Consulting and speaking engagements
- Disclosure and approval of consulting arrangements
- Industry-sponsored events and conferences
- Gifts, invitations and free meals
- Education grants and trainee scholarships
- Research projects
- Medical device training and education
- Pharmaceutical samples and discounts
- Site access
- Recusal from Purchasing Decisions

The policy can be found at: http://policy.usc.edu/industry-relationships/

USC Healthcare Professionals are also required to disclose consulting activities on behalf of industry and research-related conflicts of interest using USC's *diSClose* database at https://disclose.usc.edu.

## Hospital and Clinic Guidelines for Industry Representatives

Hospital and clinic guidelines for industry representatives are used to manage access to Keck Medicine of USC facilities, protect patient privacy, comply with infection control policies, and ensure the integrity of the pharmacy and supply formularies and contract and purchasing functions. Industry representatives are required to be credentialed through our RepTrax system, and must comply with our access and appointment guidelines.

The policy is located at: http://intranet.uscuh.com/uscuh_policies/administration/current/1-137.pdf.

## Other Key Compliance Resources and Policies

### *Annual Healthcare Compliance Work Plans*

Annual work plans for Keck and Norris Hospitals, USC Verdugo Hills Hospital, and USC Care are reviewed and approved by Keck Medicine of USC leadership and the Governing Board.

### *USC Office of Compliance Website*

The USC Office of Compliance website is a comprehensive resource for the healthcare compliance program, including information about Information Security policies and guidance. Visit the site at: http://ooc.usc.edu/

### *HIPAA Privacy Policies*

University policies that implement the Health Insurance Portability and Accountability Act (HIPAA) and provide guidance to USC faculty and staff are at: http://policy.usc.edu/hipaa/

### *Other Key Policies*

- Conflict of Interest in Research at http://policy.usc.edu/research-conflict-interest/
- Conflict of Interest in Professional and Business Practices at http://policy.usc.edu/conflict-of-interest/
- Cooperation with Compliance Investigations at http://policy.usc.edu/cooperation-with-compliance-investigations/
- Detecting and Preventing Fraud and Abuse in Federal Health Care Programs at http://ooc.usc.edu/sites/ooc.usc.edu/files/pdfs/CO-111-Detecting-and-Preventing-Fraud-and-Abuse-in-Federal-Health-Care-Programs.pdf
- Know the Code – Code of Ethics of the University of Southern California at http://ooc.usc.edu/sites/ooc.usc.edu/files/pdfs/Know-the-Code-with-Nikias-Signature.pdf
- Institutional Conflict of Interest in Research at http://policy.usc.edu/institutional-research-conflict-interest/

# EXHIBIT G

*Faculty Provider Compliance Program Overview*

Monitoring guided by data analytics and government-identified risk areas, provider education, structured reporting and key initiatives to the Keck health system are some of the main pillars of the Faculty Provider Compliance Program.  Our monitoring program has expanded to include School of Dentistry and School of Pharmacy as well as all providers credentialed with the USC Care Medical Group.

**Monitoring Program**

The provider monitoring program ensures that all procedural and diagnosis code assignments, supervision requirements, medical record supporting documentation and code abstraction performed conform to the USC Compliance Standards & Procedures. This is accomplished through regular provider monitoring and focused reviews on areas of risk as identified by the Office of Inspector General (OIG), Centers for Medicare and Medicaid Services (CMS), REVEAL/md data analysis, high volume billing and previously identified billing errors.  Clinical documentation is reviewed against the billed services claim form and the appropriate finding codes and comments are assigned for each reviewed case.  Monitoring results for each provider or division are shared with the specific provider and the assigned department or division representative.  Post-monitoring education is conducted as needed, as are required re-audits for providers who do not successfully complete a monitoring round.  Providers who fail 3 rounds of monitoring are placed on concurrent review status with a compliance bill hold in the centralized billing system (GECB).  Supplemental monitoring is also conducted for established providers who fail their first round of monitoring and/or as identified and assigned by the Office of Compliance.  New providers are monitored within 90 days of joining USC and established providers are monitored every other year prior to their re-credentialing date.

Department-specific monitoring results are shared with the Department Physician Liaison and Administrator during quarterly meetings.  The monitoring process was originally managed by each respective department which resulted in inconsistent processes between the departments and problematic reporting.  The management and oversight of the monitoring program was moved into the Office of Compliance in early 2011.  This change enforced a consistent process of sample selection and monitoring completion.  It also allowed our office to track and trend findings in a more uniform manner.  As new technology (EMR) or specialty/department-specific errors have been identified, new finding codes are suggested and reviewed and approved by the Quarterly Healthcare Compliance Committee. This allows for more detailed findings to be tracked and reported.

*Please refer to attachments, policy MA-500 for complete monitoring policy, Monitoring Cycle graphic and Finding Codes and Score sheet.*

**Data Analytics**

REVEAL/md is predictive analytic software that quickly identifies audit risk exposure for our providers. As part of the monitoring and focused review process, REVEAL/md software is used to identify risks associated with Evaluation and Management (E/M) codes and associated modifier usage based on the provider's specialty and CMS' national billing averages.

REVEAL/md, added to the program in 2014, mimics the same statistical methodology used by auditors to compare each provider on known risk indicators providing the needed evidence to put together an efficient and effective work plan. Monthly billing activity for USC Care Medical Group is uploaded into REVEAL/md which then provides a monthly snapshot of providers, E/M codes, modifier usage and departments or specialties that may potentially pose an audit risk based on CMS' national billing averages. This data has been used in the last 2 years to conduct focused reviews of identified risk areas that potentially cross over multiple departments or divisions.

*Please see REVEAL/md reports for November 2018.*

**Education**

***New Provider Orientation***

All newly credentialed providers attend an orientation with the Office of Compliance to introduce the compliance program and review applicable policies and billing/documentation guidelines. The Office of Compliance uses CMS's guidelines for documentation, coding and billing as the gold standard unless a patient's insurance has a higher standard in writing. Below is the agenda for Compliance orientations:

- Office of Compliance Program
- Policy review
    - Relationships with Industry and CMS' Open Payments
    - Billing Monitoring
    - Documentation Standards
        - Timely documentation
        - Authorship and Documentation Integrity
        - Finalizing documents and Bylaws
- Evaluation and Management (E/M) Documentation Review
- New vs Established patients
- Requirements for History, Exam, Assessment/Plan, Billing based on Time, Consultations
- Modifiers
- Diagnosis
- Teaching Physician Requirements
- Non-Physician Practitioner Rules (NPP)
- Available Resources at USC
    - Help and Hotline

***Online Education***

As required for Initial Credentialing and Re-credentialing providers, online education is assigned through the HealthStream education portal. HIPAA and general Healthcare Compliance courses are assigned to all incoming faculty and staff. Billing providers are also assigned applicable billing course modules covering general billing guidelines, teaching physician rules and evaluation and management coding training. Refresher compliance courses are assigned on an annual basis for all staff. Faculty are re-credentialed every two years and are assigned compliance training for each re-credentialing period.

***Annual Compliance Education***

Yearly compliance education for each department is a required element of the USC Compliance Program, policy ED-200. The Office of Compliance works with the Physician Liaison and Administrator to identify timely topics and the scheduling of the education. Topics for inclusion are: current monitoring results, new coding or billing rules, Keck policy changes relating to documentation, Case review, and any other topics of interest relating to compliance risks.

**Reporting**

Trending of monitoring results, key initiatives, new policies or revisions, and workplan items are topics of discussion and review at the Quarterly Healthcare Compliance Committee and also at the department-specific Physician Liaison meetings. The Quarterly Healthcare Compliance Committee (QHCC) consists of the physician liaison and administrator for each department (all Keck School of Medicine (KSOM) departments as well as School of Dentistry and School of Pharmacy). Management and executives from USC Care Medical Group and the Keck Hospitals are invited to attend QHCC also.

The department-specific Liaison meetings are also held on a quarterly basis and include the Physician Liaison for the department, the administrator and/or clinic manager, Office of Revenue Cycle Management Director, the Coding Director and Billing Manager along with the Faculty Provider Compliance Manager and Coding/Documentation specialist from the Office of Compliance. There is a standing agenda for these meetings which consists of: credit balances, missing charges, monitoring results with required charge corrections and/or refunds, Medicare denials for Coding and Compliance reasons and any other topics relating to the department. These meetings allow the office of Compliance to build a strong working relationship with each of the physician liaisons.