**NICHOLS KASTER PLLP**
4700 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
(612) 256-3200 (612) 338-4878

REBEKAH L. BAILEY (SBN 258551)
bailey@nka.com
MATTHEW H. MORGAN (MN 304657)*
morgan@nka.com
KATE A. FISHER (MN 0392180)*
kfisher@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center; 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200; Fax: (612) 215-6870
*Admitted pro hac vice

ALICE CHANG (SBN 239761)
alicechangjdmba@gmail.com
13048 Del Monte Dr., Apt 42F
Seal Beach, CA 90740
Telephone: (714) 507-6161

**DESAI LAW FIRM, P.C.**
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax (949) 271-4190

AASHISH Y. DESAI (SBN 187394)
aashish@desai-law.com
DESAI LAW FIRM, P.C.
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax: (949) 271-4190

**ALICE CHANG**
13048 Del Monte Dr., Apt 42F
Seal Beach, CA 90740
Tel: (714) 507-6161

*Attorneys for Relators and Plaintiff-Relator*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**.; **STATE OF CALIFORNIA** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D**; **LOS ANGELES COUNTY** *ex rel.* **IONM LLC**, a Delaware corporation and *ex rel.* **JUSTIN CHEONGSIATMOY, M.D.**; and **JUSTIN CHEONGSIATMOY, M.D.**, in his individual capacity, | Case No. 2:18-cv-08311-SSS (ASx)<br><br>Hon. Sunshine S. Sykes<br><br>**PART 12 OF 13 (EXHIBITS 135—149)**<br><br>**FIFTH AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |

FIFTH AMENDED COMPLAINT EXS. PART 12 OF 13 (135-149)  CASE NO. CV 18-08311-SSS(ASx)


NICHOLS KASTER PLLP
4700 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
(612) 256-3200 (612) 338-4878

DESAI LAW FIRM, P.C.
3200 Bristol Street, Ste. 650
Costa Mesa, CA 92626
Tel: (949) 614-5830, Fax: (949) 271-4190

ALICE CHANG
13048 Del Monte Dr, Apt 42F
Seal Beach, CA 90740
Tel: (714) 507-8261

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNIVERSITY OF SOUTHERN CALIFORNIA**, a California corporation;

    and

**USC CARE MEDICAL GROUP, INC.**, a California corporation,

      Defendants.

FIFTH AMENDED COMPLAINT EXS. PART 12 OF 13 (135-149)  CASE NO. CV 18-08311-SSS(ASx)

# Exhibit 135

## Faculty Compensation Plan and Incentive Formula
## USC Department of Neurology
## Effective July 1, 2010

The Department of Neurology (Neurology) faculty compensation plan was developed to address the overall goals of the department, the Keck School of Medicine of the University of Southern California, and the Doctors of USC. The plan was created to be financially attainable for the department, establish fair and market-competitive salaries, and reward faculty productivity. It is subject to policies and directives of the University of Southern California. This compensation plan is subject to review; changes require approval by the Dean and University. All compensation plans must be in full compliance with the Stark laws. Each individual's compensation must not be more than fair market value, commercially reasonable, and not take into account, directly or indirectly, the volume or value of designated health service referrals (Stark Compliance).

Neurology is working toward the goal of a comprehensive Faculty Compensation Plan where Faculty earn compensation for work done and where they are incentivized and rewarded for exceptional productivity. The guiding principles applied to Neurology's evolving Faculty Compensation Plan include:

- Encourage and grow activities within our mission of research, patient care and teaching;
- Provide competitive compensation compared to the marketplace in order to attract and retain the best talent;
- Ensure Faculty are incentivized to increase productivity in alignment with strategic goals of Neurology, Keck School of Medicine and the University;
- Funding sources are commensurate to faculty work effort dedicated to the purpose of those funding sources (e.g. MSOA funding is allocated based on work effort expended at LAC+USC Medical Center);
- The compensation methodology is transparent and fairly and evenly applied;
- Faculty profiles are individualized depending upon interests, experience, competencies, and goals. Productivity targets are established depending upon the Faculty member's effort profile (clinical, clinical research, basic science research, clinical-educator);
- Department's expectation is that Faculty member is able to fund 2/3rd's or more of their guaranteed salary after three years from the hire date; and
- Faculty new hires are contingent upon available Department and Divisional funding.

### Compensation Plan
*Faculty compensation is comprised of a fixed salary, <u>guaranteed</u> for one year, (X+Y) and a <u>variable</u> incentive component (Z).*

### Institutional Base Salary (Fixed Annual Salary and Administrative Stipends)
A fixed annual salary is disbursed on a monthly basis over the fiscal year and is comprised of academic (X) and clinical components (Y). Clinical component (Y) is based on medical practice effort. In addition to the

fixed annual salary (X+Y), the department provides administrative stipends to those who fill certain administrative roles. The institutional base salary (IBS), eligible salary effort for grants, will be comprised of the fixed annual salary and administrative stipends. Please see the chart below for illustration.

| Approved FY10 Faculty Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Eligible Salary Effort for Grants (IBS) | | | | | | |
| Fixed Annual Salary | | | | | | |
| Academic Salary (X) (CU Grants MSO A Gifts) | Clinical (Y) (Practice) | Admin. Stipend | Clinical Incentive (Z) (Variable)* | Total Fixed Annual Salary | Total IBS | FY10 Total Compensation |
| 34% or 30% Fringe | 17.65% Fringe | 34% or 30% Fringe | 17.65% Fringe | | | |
| 50,000 | 50,000 | 10,000 | 2,500 | 100,000 | 110,000 | 112,500 |

### Academic Component (X)

Academic component (X) is based on research, teaching and administrative effort and may include funding from MSOA, gifts, endowments, grants, departmental unrestricted budget or other sources. Faculty effort spent at Los Angeles County hospitals is compensated through the academic component.

Department and division contributions to the academic component are individualized based on the faculty member's distribution of effort, divisional resources, and departmental resources and needs. The department will distribute MSOA funds based on the faculty members' responsibilities at LAC+USC Medical Center.

For newly recruited faculty members, the Department may support a percentage of protected time for research. After 3 years, the faculty member or Division is expected to assume responsibility for funding research time through grant support in compliance with Government regulations.

### Clinical Component (Y)

Guaranteed medical practice income (Y) may include either: 1) the initial guaranteed medical practice income for newly recruited faculty or 2) a percentage of historical private practice income for established faculty members.

For a newly recruited faculty member, the initial guaranteed practice income will be determined during the recruitment process. For established faculty, the Chair will establish target clinical income each year for every faculty member taking into consideration historical collections, changes in faculty duties, etc. A portion of this target clinical income will become the clinical component or "Y" component of the faculty member's salary, as recommended by the chair and subject to change annually. In certain circumstances, the Chair may not guarantee any portion of a faculty member's targeted clinical income in cases where there is low anticipated targeted clinical income generation or a faculty member has prior incidents of non-

compliance with USC Care practice policies and procedures (e.g. timely dictations, timely charge submission, etc.).

## Administrative Stipends

In addition to the fixed annual salary (X+Y), the Department provides administrative stipends to those who fill certain administrative roles (see table below). These positions are recommended by the Department chair for specified terms (subject to the University at-will policy). At the end of each term, the position is opened. Another faculty member may be appointed or the previous faculty member may be reappointed for another term. The administrative stipend is then assigned to the newly appointed or reappointed person. Stipend assignments and rates are reviewed and recommended by the chair annually. The current stipend rates are:

| Role | Stipend | Funding Source | Expected Duration |
|---|---|---|---|
| Residency Director | $54,000 | MSOA | 3-5 years, depending on ACGME accreditation |
| Medical Student Clerkship | $25,000 | Keck School | 3 years |
| LAC+USC Chief | $25,000 | MSOA | 3 years |
| LAC+USC Ambulatory Chief | $25,000 | MSOA | 3 years |
| LAC+USC ICU Chief | $25,000 | MSOA | 3 years |
| LAC+USC Neurophysiology Chief | $15,000 | MSOA | 3 years |
| Neurology Practice Director University Hospital | $15,000 | Medical Practice | 3 years |
| Practice CMO | $15,000 | Medical Practice | 3 years |
| Practice Compliance Officer | $15,000 | Medical Practice | 3 years |
| Director Infusion Center | $15,000 | Medical Practice | 3 years |
| Faculty Affairs | $10,000 | Department | 3 years |

## Incentive (Z)

Neurology intends to develop a comprehensive incentive-based compensation plan encompassing the strategic goals and objectives of all three missions of the Department including Research, Education and Patient Care. We are limited in our resources initially and begin our variable incentive program with medical practice only.

## Incentive Payments

Neurology's incentive payments are calculated as follows:

Budget Period (April – March , annually)

1. Prior to beginning of the fiscal year, Chair determines budgeted target collections for each faculty member for services personally performed based on historical information and individual faculty profile, targeted collections, managed care contracts, market data, etc.

2. Prior to the beginning of the fiscal year, the Chair determines through the budgeting process the percentage of projected net collections that may be available for distribution to physicians after expenses paid, to be the *collection credit for the individual* based on break-even operations.

3. Prior to the beginning of each fiscal year, the Chair re-determines the (Y) component for each faculty member.

Quarterly (Calculation Date: September 30, December 31, March 31, June 30)

1. Net collections for each faculty member for services personally performed are summed.

2. *Collection credit %* is applied to the summation of quarterly collections to calculate the gross incentive.

3. Individual faculty medical practice income (Y) is subtracted from gross incentive to calculate adjusted gross incentive available .

4. If (Z) is positive, and the faculty member is in good standing (including compliant with USC Care practice policies and procedures) any directly related physician business expenses will be deducted from the adjusted gross incentive  available to determine the incentive payment (Z) and the amount is paid the following month.

In accordance with Keck School of Medicine policy:

- Clinical incentive will not be paid out unless the department is in a surplus position, and has sufficient funds after expenses to cover the cost of the incentive payments including fringe benefits.

- Incentive payments will be calculated and paid periodically.  The period will be not less than three months nor longer than annually.

- Incentive Payments Upon Separation:  A faculty member who is non-reappointed in accordance with USC policies may receive incentive payments calculated in accordance with the Department's then current compensation formula, in regard to services performed prior to the effective date of non-reappointment, provided that he or she has satisfied all conditions to qualifying for the incentive payment, and provided the Department has met the conditions for making a payout as stipulated in the compensation plan and Keck School requirements.  Any such incentive payment will be made at the effective date of the non-reappointment, based on a good faith estimate by the Keck School of the amount that the faculty member would have received at the end of the incentive period, but pro-rated to reflect the days that the faculty member actually worked during that period.

Faculty members who voluntarily leave their employment with USC, or are dismissed for cause or terminated for poor performance as provided in the Faculty Handbook, are not eligible to receive incentive payments on or after their separation.

*Department Expenses:*

The department will be responsible for all chair approved expenses including, but not limited to, fringe benefits and annual malpractice premium. Directly related physician business expenses such as medical licenses, cell phone expense, membership dues, credentialing, journals, professional travel and other individual physician expenses may be submitted to be paid by the department upon approval of the Chair or Senior Department Administrator and deducted from the individual's adjusted gross incentive available quarterly.

*Change in Faculty Profile During the Year*

Faculty may receive grants from time to time during the academic year that require a change in their faculty profile (e.g. reducing the amount of teaching or clinical effort and increasing research effort.) Changes in funding sources and percentage effort can be adjusted mid-year. However, the total fixed annual salary can only be changed at the beginning of the fiscal year. Please see the following example:

Faculty A Profile July 1
|  |  |
|---|---|
| LAC+USC | 30% (funded from MSOA) |
| Research | 30% (funded from HRA) |
| Clinical 40% | (funded from private practice) |

Faculty A Profile January 30 – After Receiving NIH Grant with 20% Salary Support
|  |  |
|---|---|
| LAC+USC | 10% (funded from MSOA) |
| Research | 50% (funded from HRA and NIH) |
| Clinical | 40% (funded from private practice) |

Approved:

_____
Helena Chui, M.D.
Chair, Department of Neurology

6/18/10
Date

_____
Coreen Rodgers
COO, Keck School of Medicine

6-18-10
Date

# Exhibit 136

# USC Department of Neurosurgery

**Date:**       December 15, 2011

**To:**         Scott Evans, PharmD
               Chief Operating Officer, Keck Hospital of USC

               Jon Spees
               Chief Financial Officer, Keck Hospital of USC

**From:**       Steven Giannotta, MD
               Chair, Department of Neurosurgery

I appreciate the time that you spent with me discussing Neurosurgery resource needs. I have always believed that the key to the success of the department is a strong partnership with University Hospital, now the Keck Hospital of USC. Neurosurgery faces unique challenges at USC and those challenges have cumulated into negative financial consequences for the department. The fundamental hurdle we face is the lack of an emergency room coupled with underfunding from LAC+USC Medical Center for work performed.

The department has historically been able to overcome our lack of an emergency room through a strong referral base from the community driving elective volume. However, that elective volume is becoming more difficult to attract as the marketplace becomes more competitive. Neurosurgeons have flooded the marketplace while community hospitals heavily market neurosurgical high margin services. Despite heavy competition in the marketplace, there continues to be a significant number of cases that are ideally suited to be performed in an academic medical center environment. We have highly specialized neurosurgeons that offer services and skills not available in the community. Our strength is our talent.

With our existing faculty, we are performing approximately 800 neurosurgical cases and 300 neuro-interventional cases annually. Our case volume is not sufficient to support our faculty salaries. We have capacity to perform 1,200 neurosurgical cases and 400 neuro-interventional cases at Keck Medical Center. Attracting this volume into Keck Medical Center will generate significant margin to Keck Hospital. Neurosurgery already provides significant margin business to the hospital. However, my hope is to significantly grow that margin. In return, the department requests support to achieve our projected growth targets through clinical financial support and a robust marketing program. With this assistance, the department will be in a position to support many of the research and academic infrastructure needs that we discussed.

## Three Year Neurosurgery Growth Plan

### *Expanded Service Location*

I believe it is imperative for the department to expand its services beyond the Boyle Heights campus over the next 18 to 24 months. I have resisted moving off-campus for fear of a) jeopardizing our resident program and b) losing our own faculty to the community. However, I have come to believe that in order for us to survive and to grow, we must expand our service sites. Our plan includes the following:

- Pasadena clinic: Currently, the Pasadena market is one of our most competitive and difficult to penetrate. We believe having an actual presence on the ground will help us tremendously. Both of the neuro-oncologists and Dr. Hsieh will be incorporated into the Pasadena clinic. This presence will expose our brain tumor and spine center to the local market. We intend for cases generated from this clinic to travel

1

back to Keck Hospital.  I would like to see the marketing plan for the Pasadena clinic to include our brain tumor program and neurosurgery spine.

- Local Hospital association:  We are interested in identifying a hospital that could provide a steady source of tertiary care referrals by building a relationship through a neuro-interventionalist (see recruitment).

- Extended site Hospital association:  We are interested in identifying a hospital(s) where we may be in a position to perform highly specialized skills for infrequent cases (e.g. epilepsy surgery at Hoag).  Our strategy is to reach out to a hospital that is not too far away for tertiary referrals and work locally in that hospital on a part-time basis.  The purpose of this strategy would be to work with local physicians, gain notoriety through skilled procedures, etc.

*Marketing Support*

I would like to see a robust one to two year marketing plan developed and implemented specific to neurosurgical services.  We market ourselves through continuing medical education events, physician and staff outreach meetings to referring physicians, emergency room visits, mailings, clinical briefs, and other haphazard methods.  However, our competition is bombarding the market with advertisements, internet marketing, and overt public relations media events.  The general public is much more likely to know about neurosurgery at UCLA or Cedars than USC.  This lack of general public awareness is a hurdle we need help to overcome.  I am most concerned about raising awareness in the following areas:

- Brain Tumor/Neuro-oncology:  The institution invested heavily in neuro-oncology this year.  We have two new neuro-oncologists and two surgeons dedicated to brain tumor, Drs. Tom Chen and Gabriel Zada.  I would like to see this program heavily marketed.  This is an entirely new program and the community and referring community does not know it exists.

- Cerebrovascular Center:  We have a talented and comprehensive team at USC that includes neurosurgery, neurology, neuro-intervention, and neuro-radiology.  The team has done a good job marketing itself to emergency rooms and other referring physicians.  However, the general community is not aware of highly skilled talent at USC.

- Epilepsy Surgery:  Our neurosurgeon, Dr. Charles Liu, has been very successful in building a strong epilepsy surgical program at LAC+USC Medical Center.  We are one of the premier sites in the country.  I would like to see this story translated to the Keck Medical Center and marketed to attract more patients to the private side.

- Spine Surgery:  The Back and Spine Center marketing program is scheduled to run for three months.  We will require ongoing marketing support for spine program to be competitive in this marketplace.

*Public Relations*
- We would like to hire an outside public relations consultant to promote our core neurosurgical team.  Many of my colleagues across the country have been successful through the use of public relations consultants.  Specifically, I would like a resource dedicated to promoting neurosurgeons in media such as television news interviews, radio interviews, magazine and news articles, etc.  Cost:  $5,000 to $10,000 per month.

*Recruitment Needs*
- Neurosurgeon Spine:  Dr. Patrick Hsieh is an outstanding spine surgeon and offers Keck Medical Center talent and skills that only a handful of surgeons in the country provide.  He is being heavily recruited nationally and locally.  I would like to hire an additional spine neurosurgeon for July 2012 to partner with

Dr. Hsieh. Ideally, we would like to hire a neurosurgeon in the area with existing volume. However, these recruits are very expensive. We will likely recruit a junior surgeon out of fellowship. The medical center needs a surgeon specializing in spine deformity that would complement the existing services. Cost: $400,000 plus fringe year one.

- Functional Neurosurgery: Functional neurosurgery is the future. We have outstanding opportunities related to functional neurosurgery in research at USC. We do not have a full-time functional neurosurgeon. I would like to recruit our Chief Resident July 2012 who completed a one year fellowship with Ali Rezai, one of the most famous functional neurosurgeons in the world. Cost: $400,000 plus fringe year one.

- Neuro-intervention: We believe recruiting a multi-purpose neuro-interventionalist located at an affiliated hospital would be in a position to help build our program volume. As community hospitals have invested in stroke programs, they find themselves short a neuro-interventionalist due to the shortage in the area. If we hired a neuro-interventionalist dedicated to outreach and growth, we could cover an outside hospital through neuro-interventional and neurosurgical call coverage with back-up from our own staff. We would be in a position to direct tertiary volume to Keck Hospital when appropriate.

*Ongoing Physician Support*

- The hospital offers support to the department through the 1206d clinic. This helps us tremendously as the cost of operating our clinic is no longer a burden to us. However, unless our case volume improves, we will continue to be unable to support all of our faculty salary needs.
  - Dr. Hsieh threatened to leave the department last year. With your help, we increased his salary to $600,000. Dr. Hsieh's collections are only $750,000. We do not have funding to cover his salary.
  - Our neuro-interventional service is the largest drain on our department. The service is a necessity for many reasons including providing services in our acute cerebrovascular program and residency training. However, physician income from the procedures is very low. Physician income for both Drs. Mack and Amar for fiscal year 2012 will approximate $500,000. Salary requirements from the clinical practice exceed the amount earned from collections.

- I have grave concerns about neurosurgery's ability to support both spine and neuro-interventional programs ongoing. However, both programs are critical to our success and highly lucrative for the hospital. Currently, we will experience a $190,000 shortfall in faculty salary support for fiscal year 2012 related to Dr. Patrick Hsieh. I expect for this shortfall to grow as Dr. Mack's recruitment fund support diminishes. I ask for either a medical directorship for these programs or other such ongoing faculty support to help the department.

- We have not been able to afford any incentive pay to the faculty since last December. The incentive pay calculation is as follows: collections x 45% of earnings less fixed clinical pay (collections x 45% of earnings x 80%). Not paying our incentive causes low morale among our faculty. Providing ongoing physician support will enable us to generate enough physician service income to pay our incentive.

*Clinical Support Needs*

- We greatly appreciate the hospital's willingness to convert neurosurgery's clinic to 1206d. Absorbing our clinical expenses is a critical step in stabilizing our financial situation. However, since the addition of Drs. Mack, Hsieh and Zada, we are performing 10% more case volume than five years ago with no additional clinical nursing support. Our clinical nursing staff is unable to support our patient service load. Our faculty unanimously request additional inpatient nursing support in the form of an inpatient Nurse Practitioner. We need this support in order to help our service with efficiency and patient service.

*Website Development*

3

- Our website has been an enormous frustration for me. I do not understand the recent politics concerning my ability to promote our neurosurgery website. I want a self-contained neurosurgery website on the Keck Medical Center domain. I want to be able to have a resource that will build out the website to my satisfaction.

### Academic Support

- The department of neurosurgery spent over $2 million in foundation monies and reserves to support clinical staff after Tenet terminated clinical support to us in 2008. This money was reserved to support our academic and research mission for items such as editorial services, resident and faculty travel to annual meetings, laboratory supplies, start-up funds for research projects, etc. I believe through an annual stipend to the Chair of $200,000 per year, I can accomplish our academic needs. Simultaneously, I believe that the department can build reserves from philanthropic giving and growth in our clinical program to replenish funds to support these activities in the future.

- We have several clinical trials projects in process, but lack sufficient funding to support our clinical trials coordinator. Without this employee, these projects will fail and we will be unable to continue support for these trials. We need funding for two years for our clinical trials coordinator until our clinical trials operation is stabilized and fully functional.

### Summary

Despite a weak financial position, the Department of Neurosurgery continues to rank in the top five academic neurosurgery programs in the country. In addition, we have recently attracted top faculty to the program including Drs. Patrick Hsieh, William Mack and Gabriel Zada. I believe implementation of this plan coupled with our outstanding talent, that our department will become one of the premier neurosurgery clinical departments in the country.

Summary Chair Support Request

| Description | Year One | Year Two | Year Three |
|---|---|---|---|
| **Expanded Service Location** | | | |
| Pasadena Clinic Marketing | $10,000 | $5,000 | $5,000 |
| Neuro-intervention Recruitment | see below | see below | see below |
| **Marketing** | | | |
| Plan | 250,000 | 150,000 | 150,000 |
| Public Relations | 120,000 | 120,000 | 120,000 |
| Website | **75,000** | – | – |
| **Recruitment Needs** | | | |
| Neurospine | **588,250** | **250,000** | **125,000** |
| Functional Neurosurgeon | **470,600** | **235,300** | **117,650** |
| Neuro-interventionalist | **350,000** | **190,000** | **87,500** |
| **Ongoing Physician Support** | | | |
| Neuro-spine Directorship | **176,475** | **176,475** | **176,475** |
| Endovascular Directorship | **176,475** | **176,475** | **176,475** |
| **Clinical Support Needs** | | | |
| Nurse Practitioner | **147,400** | **147,400** | **147,400** |
| **Academic Support** | | | |
| Chair stipend | **200,000** | **200,000** | **200,000** |
| Clinical Research Assistant | **$87,100** | **87,100** | |

Note: All salaries include fringe

# Exhibit 137

DRAFT

**Keck Medical Center of USC**

# USC Department of Neurosurgery
## Proposal for Spine Institute at USC
### September 21, 2012

We recognize USC must make significant investments in order to bring into reality our vision to build the leading world-class integrated spine program on the west coast. As outlined in our vision paper, USC has enormous potential for spine including developing leading programs in all spine pathologies. We believe our first priority is to develop the private enterprise at Keck Medical Center. We have outlined key components of our proposal below.

**Structure**:

- We propose creating USC Spine Institute initially within the Department of Neurosurgery. It will be led by the Director of the USC Spine Institute, initially reporting to the Department Chair of Neurosurgery.

- By FYE 2018, we envision that the USC Spine Institute will enjoy the following features:

  o The Institute Director will have a reporting relationship directly to the Dean and will represent USC Spine Institute on all relevant clinical and research committees.

  o The Institute will be funded directly through a mission support formula established between the hospital and the Institute. In addition, the Institute will be funded through its grants, physician service revenue and other funding and that the Institute will operate independently.

  o The Institute will tithe a portion of its revenue to the USC Department of Neurosurgery.

- We believe the inclusion of Orthopedic Surgery will significantly enhance the success of the USC Spine Institute. With the recent recruitment of a new Orthopedic Surgery chair, we will work over the near future to encompass orthopedics into the Spine Institute structure.

**Recruitment of Surgeons**:

- 2 FTE spine fellowship trained neurosurgeons available for immediate hire
- 2 additional FTEs available once 2 FTEs generating average 8,500 wRVUs each

DRAFT                                    Proposal for Spine Institute at USC

**Recruitment PM&R:**

- 1 FTE PM&R available for immediate hire
- 1 additional FTE available in FY 2015, depending upon need
- Appointment to be held in Neurosurgery

**Support Staff**:

- 1 FTE Spine Administrator
- 2 FTE NP/PA (1 inpatient/1 outpatient)
- 1 FTE dedicated PT
- 1 FTE patient care coordinator

**Fellowship**:

- 1 FTE Spine Fellowship

**Spine Clinic:**

- Initially, spine clinic will be in the existing neurosurgery clinic in HCCII and Pasadena clinic. In addition, if the business plan supports it, the spine clinic may expand to other satellite sites such as Beverly Hills or Orange County. Within three to five years upon the build out of HCCIII, the spine clinic will be in dedicated, independent space.

**Compensation Structure:**

- Compensation for initial recruits of the USC Spine Institute will be guaranteed for five years and is based on a multiple of the FY 2012 MGMA 75th%tile Neurosurgery wRVU physician earnings per wRVU ($93) and a pre-negotiated wRVU base (between 8,000 and 10,000 wRVU). Guarantee includes Dr. Patrick Hsieh. Additional wRVU earnings over the base will be paid in quarterly payments in the form of an incentive.

- Additional compensation for a medical directorship of the USC Spine Institute will be allocated in the amount of $150,000.

- Funding for compensation will be derived from hospital revenue, physician service revenue, grants, MSOA, and other relevant sources.

- After year five, faculty members of the USC Spine Institute, will transition to a traditional compensation plan. The formula will be designed agreeable to the USC Spine Institute Director, Keck Medical Center, and Keck School of Medicine. The compensation plan will include 80% of total guaranteed academic and clinical salary and the rest incentive.

DRAFT                                Proposal for Spine Institute at USC

**Marketing/Business Development**:

- Development of five year marketing plan primarily directed to Los Angeles consumers including:
    - Website launch within six months
    - Ongoing media campaign
    - Internet advertising
    - Brochures
    - Outcomes book
- Annual Spine Symposium

**Quality Committee**

- Hospital will develop and hold monthly quality review meetings specific to spine service.  The hospital will track relevant outcome data specifically tracking readmission rates, length of stay data and infection rates.

**Research**

- 1 FTE PhD dedicated to developing translational and basic science research in biomechanics and stem cell research.  Funding will be off-set by any grant funding received.
- 1 FTE research coordinator dedicated to spine research.  Funding will be off-set by any grant funding received.

**Keck School of Medicine of USC**
**Department of Neurosurgery**
1540 Alcazar Street, Suite 215,  Los Angeles, California 90089-0080; Tel: 323 442 7686; Fax: 323 442 7689

Page 3

DRAFT                                    Proposal for Spine Institute at USC

## Summary of Proposed Investment at Keck Hospitals (*in 000's*)

| Investment | FYE 1 | FYE 2 | FYE 3 | FYE 4 | FYE 5 |
|---|---|---|---|---|---|
| *Recruitments* | | | | | |
| Retention | $930 | $930 | $930 | $930 | $930 |
| Professor – Recruit (base) | 930 | 930 | 930 | 930 | 930 |
| Associate Prof. – Recruit (base) | 753 | 753 | 753 | 753 | 753 |
| Professor – Medical Director | 150 | 150 | 150 | 150 | 150 |
| Neurosurgery Add. Recruits | | | 700 | 700 | 1,400 |
| PM&R | 250 | 250 | 250 | 250 | 250 |
| Total Faculty Salaries | $3,013 | $3,013 | $3,713 | $3,713 | $4,413 |
| Fringe (17.65%) | $531 | $531 | $655 | $655 | $778 |
| Total Faculty SWB | $3,544 | $3,544 | $4,368 | $4,368 | $5,191 |
| *Other* | | | | | |
| Support Staff | $570 | $570 | $570 | $570 | $570 |
| Fellowship | 100 | 100 | 100 | 100 | 100 |
| Marketing | 350 | 350 | 350 | 350 | 350 |
| PhD | 100 | 100 | 100 | 100 | 100 |
| Research Coordinator | 87 | 87 | 87 | 87 | 87 |
| Total Investment | $4,751 | $4,751 | $5,575 | $5,575 | $6,398 |

**Keck School of Medicine of USC**
**Department of Neurosurgery**
1540 Alcazar Street, Suite 215,  Los Angeles, California 90089-0080; Tel: 323 442 7686; Fax: 323 442 7689

Page 4

# Exhibit 138

 **USC** University of
Southern California

# USC Office of Culture, Ethics and Compliance

## Billing for Teaching Physicians

| | | | | | |
|---|---|---|---|---|---|
| *Title: Billing for Teaching Physicians* | | | | | |
| *Standard #:* | **B-406** | *Issued:* | 12/01/1997 | *Reviewed/Revision Date:* | 08/21/2000, 10/06/2009, 05/05/2011, 01/16/2012, 12/09/2014 |

## STANDARD

Phys c an serv ces are prov ded to pat ents by facu ty members of USC Care Med ca Group, as we as by phys c ans enro ed n accred ted nternsh p, res dency, and fe owsh p programs w th the USC system, and appropr ate non phys c an prov ders. On y those profess ona serv ces prov ded by b ab e prov ders or res dent phys c ans adequate y superv sed by facu ty phys c ans, and documented n the med ca record, are b ab e to th rd party payers and/or pat ents. USC s comm tted to fu comp ance w th the aws and regu at ons that app y to our nst tut on, nc ud ng a federa hea th care programs (such as Med care and Med Ca ) requ rements, and s comm tted to prepare and subm t accurate c a ms cons stent w th such requ rements.

USC has adopted the pr nc p es of b ng for teach ng phys c an serv ces as estab shed by the Med care program, except when spec fic payers requ re a h gher standard. For examp e, a payer may requ re persona nvo vement of the teach ng phys c an for a serv ces (as opposed to the pr mary care except on) n order to b for profess ona component serv ces.

USC Hea thcare Comp ance Program w promote b ng pract ces that:

Educate prov ders n the accurate b ng and documentat on requ red n the var ed med ca or surg ca nc dences;
Prov de a centra zed area for support and nteract on when quest ons ar se and;
Promote documentat on by phys c ans to reflect accurate nvo vement by the teach ng phys c an n the key port ons of serv ces/procedures;

Examp es of appropr ate teach ng phys c an statement documentat on:

Teach ng Phys c an and Res dent at d fferent t mes: saw and exam ned the pat ent and agree w th the res dent's find ngs and p an as wr tten (see res dents note for deta s).
Teach ng Phys c an and Res dent together: was present w th the res dent dur ng the h story and exam. d scussed the case w th the res dent and agree w th the find ngs and p an as documented n the res dent's note. Except/Add t ona y:
_____.
Eva uat on and Management w th Procedure wh ch s ess than 5 m nutes. saw and exam ned the pat ent and d scussed w th the

res dent. was present for the ent re procedure and presrgn ha th re th re procedure.

Eva uat on and Management w th Procedure wh ch s greater than 5 m nutes. saw and exam ned the pat ent and d scussed w th the res dent, agree w th the res dent's note and was present for the key and cr t ca port ons of the procedure/surgery and was mmed ate y ava ab e to prov de ass stance.

Eva uat on and Management w th EKG. saw and exam ned the pat ent and d scussed w th the res dent, agree w th the res dent's note and have read the EKG. have rev ewed and/or ed ted the res dent's nterpretat on and agree.

Procedure wh ch s ess than 5 m nutes. was present for the ent re procedure.

Surgery/Procedure. was present for the key and cr t ca port ons of the procedure/surgery and was mmed ate y ava ab e to prov de ass stance.

D agnost c Tests. persona y rev ewed the f m(s) and/or test(s) and agree w th the res dent's nterpretat on.

EKG. have read the EKG and agree w th the res dent's nterpretat on.

Endoscopy Procedures. was present for the ent re procedure from the nsert on of the scope unt t was w thdrawn.

De very. was present for the De very.

Other TP Statement: _____.


Quest ons regard ng po c es, procedures or nterpretat ons shou d be d rected to the USC Office of Cu ture, Eth cs and Comp ance at (323) 442 8588 or USC He p & Report ng L ne at (213) 740 2500 or (800) 348 7454.

Site by USC ITS Web Services   [ ]   Privacy Notice     Notice of Non-Discrimination

# Exhibit 139

# GRADUATE MEDICAL EDUCATION COMMITTEE

# POLICY AND PROCEDURE MANUAL

## LAC+USC MEDICAL CENTER

## AND

## THE KECK SCHOOL OF MEDICINE OF THE

## UNIVERSITY OF SOUTHERN CALIFORNIA

**Effective Date: July 1, 2011**

Introduction

This manual provides residents and faculty with the major policies and procedures for resident participation in Graduate Medical Education at LAC+USC Medical Center and the Keck School of Medicine of the University of Southern California. Residents are both learners and employees of the Los Angeles County Department of Health Services or the University of Southern California. As such, all resident are responsible for remaining compliant with the policies and procedures governing employees of the appropriate employer. In addition, residents are required to be compliant with the policies and procedures of the institutions to which they are assigned for educational rotations. Each participating educational site has their policies and procedures electronically available on the intranet or internet. You are advised to reference the appropriate web site to familiarize yourself with site specific policies. This manual includes the guidelines and procedures for discipline and due process in the event that your program takes an action that is adverse to you.

The GMEC has adopted the statement that follows from the introduction to the ACGME Common Program Requirements Effective July 1, 2011:

"Residency is an essential dimension of the transformation of the medical student to the independent practitioner along the continuum of medical education. It is physically, emotionally, and intellectually demanding, and requires longitudinally-concentrated effort on the part of the resident. The specialty education of physicians to practice independently is experiential, and necessarily occurs within the context of the health care delivery system. Developing the skills, knowledge, and attitudes leading to proficiency in all the domains of clinical competency requires the resident physician to assume personal responsibility for the care of individual patients. For the resident, the essential learning activity is interaction with patients under the guidance and supervision of faculty members who give value, context, and meaning to those interactions. As residents gain experience and demonstrate growth in their ability to care for patients, they assume roles that permit them to exercise those skills with greater independence. This concept—graded and progressive responsibility—is one of the core tenets of American graduate medical education. Supervision in the setting of graduate medical education has the goals of assuring the provision of safe and effective care to the individual patient; assuring each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishing a foundation for continued professional growth."

| | |
|---|---|
| Adopted by the Graduate Medical Education Committee Steering Committee | March 23, 1999 |
| Approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | May 5, 1999 |
| Approved by the Executive Council Keck School of Medicine of USC | June 9, 1999 |

| | |
|---|---|
| Revision adopted by the Graduate Medical Education Committee Steering Committee | November 28, 2000 |
| Revision approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | December 6, 2000 |
| Revision approved by the Executive Council Keck School of Medicine | January 17, 2001 |

| | |
|---|---|
| Revision adopted by the Graduate Medical Education Committee Steering Committee | June 23, 2003 |
| Revision approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | July 7, 2003 |
| Revision approved by the Executive Council Keck School of Medicine | November 2, 2003 |

| | |
|---|---|
| Revision adopted by the Graduate Medical Education Committee Steering Committee | June 27, 2007 |
| Revision approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | July 11, 2007 |
| Revision approved by the Executive Council Keck School of Medicine | July 10, 2007 |

| Revision adopted by the Graduate Medical Education Committee Steering Committee | May 26, 2010 |
|---|---|
| Revision approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | June 2, 2010 |
| Revision approved by the Executive Council Keck School of Medicine | June 1, 2010 |

| Revision adopted by the Graduate Medical Education Committee Steering Committee | May 25, 2011 |
|---|---|
| Revision approved by the Executive Committee Attending Staff Association, LAC+USC Medical Center | August 1, 2011 |
| Revision approved by the Executive Council Keck School of Medicine | July 31, 2011 |

# TABLE OF CONTENTS

**Section 1:    General Information on Institutional Sponsorship of Graduate
Medical Education Programs**

Relationship of LAC+USC Medical Center and Keck School of
Medicine of USC for Graduate Medical Education Programs…….. 1
Organizational Commitment to Graduate Medical Education…………1
Accreditation for Patient Care……………………………………………..2

**Section II:   Institutional Oversight of Graduate Medical Education Programs**

Graduate Medical Education Committee (GMEC)……………….…… 3
Responsibilities of GMEC…………………………………………… 3
Organization and Oversight of GME Programs……………………3
Supervision of Residents………………………………………..…… 3
Administrative System for Oversight of GME Programs………….…3
Institutional Polices for GME Programs……………………………4
Resident Eligibility, Selection, Evaluation, Promotion and
Discipline Policies………… …………………………….………4
Liaison with GME Programs ……………………………………...4
Review ACGME Letters of Accreditation and Monitor
Corrective Action ……………………………………….........4
Review and Approval of Major Changes to an Existing
Residency Program ……………………………………………4
Review and Approval of Applications for New GME Programs…..5
Internal Reviews of GME Programs……………………………....7
Environment of learning ………………........................................7
Organizational System for Communication with Residents……….....7
Resident Work Environment and Duty Hours………………….......7
Funding and Support for GME Programs…………………………....8
Institutional Curriculum Issues…………………………………….....8
Review and Revision of GME Policy Manual……………………..8
Composition of GMEC…………………………………………….....8
Meetings of GMEC……………………………………………...… .9
Departmental/Divisional GMEC……………………………….....10
Institutional Agreements…………………………….…………...10
Letters of Agreement……………………………………………....11

## Section III: Institutional GME Policies

Eligibility, Selection, Appointment, Evaluation, Promotion and Discipline of
Residents……………………..…………………………………..…….. 13
    Resident Recruitment, Eligibility and Selection…………………..….. 13
    Resident Evaluation…………………………………………………….. 15
    Performance Standards………………………………………………... 15
    Resident Responsibilities……………………………………………… 15
    Faculty Responsibilities………………………………..…………….. 16
    Resident Performance Evaluation………………………………….…..17
    Resident Participation in Program Evaluation………………………… 18
    Faculty Teaching……………………………………………………….18
    Service Rotations……………………………………………………… 18
    Resident Evaluation of Overall Curriculum…………………………...18
    Faculty Evaluation of Overall Curriculum…………………………… 18
    Responsibility for Evaluation of Program and Faculty……………….. 18
    Resident Promotion……………………………………………………. 19
    Resident Participation in Educational Activities……………………… 19
    Support, Benefits, and Conditions of Employment for Residents…….. 20
    Financial Support……………………………………………………… 20
    Research………………………………………………………….…...20
    Absence from Duty and Leaves of Absence…………………………...20
    Sick Time……………………………………………………………… 21
    Vacation Time………………………………………………………….21
    Bereavement Leave……………………………………………………. 21
    Release Time for Examinations……………………………………….22
    Leave of Absence……………………………………………………...22
    Leave without Remuneration…………………………………………..22
    Effect of Absence on Certification of Training……………………….. 23
    Family Medical Leave Absence………………………………………. 23
    Maternity/Paternity…………………………………………………… 24
    Industrial Injury Leave (Workman's Compensation)………………… 24
    Disclosure to Applicants……………………………………………… 24
    Resident Contracts……………………………………………………. 24
    Non-renewal of resident contracts ……………………………………25
    Liability Insurance……………………………………………………. 25
    Insurance……………………………………………………………… 26
    Counseling, Medical and Psychological Support Services…………… 26
    Physician Impairment………………………………………………… 27
    Residency Closure/Reduction…………………………………………27
    Moonlighting (Outside Employment)…………………………………28

Restrictive Covenants……………………………………………..…... 28
Maintenance of Resident and Residency Program Records ………….. 29
Work Environment for Residents…………………………………..  29
Supervision……………………………………………………….... 30
Duty Hours Introduction…………………………………………….. 30
Duty Hour Policy in the Learning and Working Environment………...32
    Professionalism, Patient Safety and Personal Responsibility…...32
    Transitions of Care……………………………………………33
    Alertness Management/Fatigue ……………………………......33
    Supervision of Residents ……………………………………34
    Clinical Responsibilities……………………………………...36
    Teamwork……………………………………………………36
    Duty Hours……………………………………………………36
        Maximum Hours Work Per Week (80 hour rule)………...37
        Duty Hour Exceptions (88-hour maximum exception)......37
        Moonlighting …………………………………………….39
        Mandatory Free Time Off Duty (1 in 7 day rule)...............39
        Maximum Duty Period Length …………………………39
          GY-1 (16 hour maximum rule)……………………39
          GY-2 and above (24 hour + 4 hour rule)………….40
            Unusual Circumstances for exceptions ……40
        Minimum Time Off Between Scheduled Duty Periods …41
        Maximum Frequency of In-house Night Float ………….41
        Maximum In-House On-Call Frequency………………...42
        At-Home Call……………………………………………42

**Section IV: Guidelines for Discipline and Grievance Resolution for Resident**
       **Physicians**
Policies and Procedures to Be Used for Discipline and Grievances…...43
County of Los Angeles Personnel Policies……………………………43
University of Southern California Policies for Residents……………...43
Memorandum of Understanding (MOU) Between the Los Angeles
    County Committee of Interns and Residents (CIR) and the
    County of Los Angeles…………………………………………43
Resident Physician Contracts (USC)…………………………………43
Medical Staff Manuals and Policy and Procedures Manuals (USC)…..43
Physician Postgraduate (Resident Physician) Personnel Policy and
    Procedure Manual and LAC+USC Medical Center Medical
    Staff Manual……………………………………………………44
Department Resident Training Policy Manual………………………... 44

Procedures for Discipline and Due Process……………………………… 45
Purpose and Intent……………………………………………………..45
Non-Disciplinary Action………………………………………………45
Disciplinary Action……………………………………………………45
Unacceptable Off-the-Job Conduct……………………………………45
Unacceptable On-the-Job Conduct……………………………………46
Progressive Discipline…………………………………………………46
Non-Progressive Discipline……………………………………………47
Multiple Violations……………………………………………………47
Steps for Discipline……………………………………………………47
Levels of Discipline……………………………………………………49
Preliminary Warning…………………………………………………..50
Final Warning…………………………………………………………51
Institutional Probation…………………………………………………51
Termination (Dismissal/Release)……………………………………...53
Nonacademic Reasons…………………………………………………53
Academic (Professional Knowledge and Clinical Judgment) Reasons.55
Management's Role…..…………………………………………………57
Grievance Procedure…………………………………………………..59

**Section V:   Graduate Medical Education Internal Review Policy**
Internal Review Policy…………………………………………………61
Composition of Internal Review Committee…………………………..62
Interviews with Representatives from the Program Under Review……62
Materials and Data for Review Committee……………….. ……..64
Protocol for Internal Review Committee………………………………65
Format for Internal Review Report……………………………………69
Internal Review Program Information Form…………………………72
Documents Required for Internal Review………………………………78

**SECTION I:  GENERAL INFORMATION ON INSTITUTIONAL
SPONSORSHIP OF GRADUATE MEDICAL EDUCATION
PROGRAMS**

**A.   The Sponsoring Institution: University of Southern California/ Los
Angeles County+University of Southern California Medical Center
(USC/LAC+USC).**

Recognizing the importance of Graduate Medical Education (GME) in the
continuum of medical education, the Keck School of Medicine of the University of
Southern California and the Los Angeles County Department of Health Services
sponsors GME programs accredited by the Accreditation Council for Graduate
Medical Education (ACGME) and the American Board of Obstetrics and
Gynecology (ABOG).  The ACGME has designated the Sponsoring Institution at
USC/LAC+USC, which conducts its major teaching efforts at LAC+USC Medical
Center and Keck Hospital of USC.  The LAC+USC Medical Center is a publically
hospital owned and operated by the County of Los Angeles to provide care for all
patients including those that are medically indigent  and those otherwise without
access to health care.  It is a Level 1 Trauma Center and a regional Burn Center.
Keck Hospital of USC is a non-profit, private facility owned and operated by the
University of Southern California.   The two institutions provide residents with the
majority of their educational experience.

**B.   Organizational Commitment to Graduate Medical Education.**

The Keck School of Medicine and LAC+USC Medical Center both recognize the
importance of the Graduate Medical Education (GME) programs to their respective
missions.  Accordingly, LAC+USC Medical Center and the Keck School of
Medicine have entered into a contractual partnership to provide the support and
resources for GME.   The contract, the Medical School Operating Agreement
(MSOA) between the Department of Health Services and the University of
Southern California establishes that the faculty of the Keck School of Medicine are
responsible for the teaching and supervision of residents.  Oversight authority is
delegated to the Designated Institutional Official who also serves as the Associate
Dean Graduate Medical Education.  The DIO reports to the Chief Medical Officer,
LAC+USC Healthcare Network and to the Dean, Keck School of Medicine.  The
DIO is the Chair, Graduate Medical Education Committee (GMEC), which is a
standing committee of the Attending Staff Association (ASA), which is the
Organized Medical Staff structure.  The DIO is a member of the ASA Executive

1

Committee and as Associate Dean GME is a member of the Dean's Executive Council of the Keck School of Medicine.

**C. <u>Accreditation for Patient Care</u>.**

LAC+USC Medical Center and the Keck Hospital of USC are accredited by the Joint Commission, as are all the major affiliating institutions participating in the residency training programs.

## SECTION II:  INSTITUTIONAL OVERSIGHT OF GRADUATE MEDICAL EDUCATION PROGRAMS

### A.  Graduate Medical Education Committee (GMEC)

The Graduate Medical Education Committee (GMEC) is charged with the responsibility to ensure that the Sponsoring Institution and each of its residency programs are in substantial compliance with the ACGME's Institutional, Common, Specialty and Subspecialty Requirements.

The GMEC is a standing committee of the Executive Committee of the Attending Staff Association of LAC+USC Medical Center and reports to the Executive committee.  The GMEC communicates the needs of the educational programs to the Dean, the DHS Governing Body and the Medical Staff through direct reports by the DIO and through the Executive Committee of the Attending Staff Association.

### B.  Responsibilities of GMEC

GMEC is responsible to:

1.  Organize and oversee the GME programs sponsored by USC/LAC+USC Medical Center.

2.  Ensure that each educational program provides appropriate guidance and supervision of the resident to provide safe and quality patient care while facilitating the resident's professional and personal development and safety. Responsibility also includes developing and maintaining an ethical and professional environment in which the educational curricular requirements, as well as the applicable requirements for scholarly activity, can be met.  The GMEC shall regularly assess the quality of the educational programs.

3.  Maintain an administrative system to oversee all residency programs.  This administrative system consists of the Office of Graduate Medical Education, which is under the direction of the Director of Graduate Medical Education and Associate Dean for Graduate Medical Education in the Keck School of Medicine, and the Graduate Medical Education Committee.

4.  Recommend to the Executive Committee of the Attending Staff and Executive Council of the Keck School of Medicine Institutional Policies applicable to all residency programs regarding the quality of education and the work environment for the residents in each program.

5.  Recommend institutional guidelines and policies for the eligibility, selection, evaluation, promotion, and dismissal of residents for approval of the Executive Committee of the Attending Staff Association and Executive Council of the Keck School of Medicine and implement those guidelines and policies when approved.  These guidelines and policies should define:

    a.  Criteria for satisfactory educational progress, progressive responsibility and advancement within a residency program.
    b.  Tools for evaluation of resident progress in meeting educational objectives.
    c.  Procedures for adjudication of resident complaints and grievances relevant to the GME programs.  These policies and procedures must satisfy the requirements of fair procedures and apply to residents in the sponsoring and participating institutions.

6.  Establish and maintain appropriate oversight of residency programs and liaison with Program Directors; assure the Program Directors establish and maintain proper oversight of and liaison with appropriate personnel of other institutions participating in programs sponsored by LAC+USC Medical Center and University of Southern California.

7.  Regularly review all ACGME Letters of Notification and monitor action plans for the correction of citations.

8.  Review requests for major changes (i.e., any change requiring ACGME and RRC approval) to an existing ACGME-accredited residency or fellowship program.  All requests must be submitted to the GMEC for review and approval.  A written request must be based on sound educational rationale and must consider the impact on current residents, the consequences of change to residents in other programs and must not jeopardize ACGME Institutional, Common and program specific requirements.  Examples include, but are not limited to:
    a.  All applications for ACGME accreditation of new programs and subspecialties;
    b.  Changes in resident complement;

c.   Additions and deletions of participating institutions used in a program;
d.   Appointments of new Program Directors;
e.   Progress reports requested by any Review Committee;
f.   Responses to all proposed adverse actions;
g.   Requests for increases or any change in resident duty hours
h.   Requests for "inactive status" or to reactivate a program;
i.   Voluntary withdrawals of ACGME-accredited programs;
j.   Requests for an appeal of adverse actions
k.   Written appeal presentations to the ACGME
l.   Major changes in program structure or length of training

9.   Review of applications for new residency programs seeking ACGME accreditation and recommend approval to the Sponsoring Institution:

a.   GMEC will establish oversight of new residency programs prior to the initial accreditation of the program.
b.   A Program Director or Department wishing to establish a new residency program shall submit an application for a new program to the GMEC. The GMEC must approve the program before submitting the application for accreditation to the applicable ACGME-RRC or other accrediting body.  The application for review and approval by the GMEC must include the Program Information Form and supporting material to be submitted to the RRC or other accrediting body.   The Program Director shall attach a cover letter addressing any additional requirements for information not covered in the application for accreditation.
c.   GMEC will review applications for new programs to ensure:
   i)   Quality of the educational experience for the residents is sufficient to comply with accreditation standard.
      (1) Sufficient number and diversity of patients.
      (2) Appropriate clinical and procedural experience.
      (3) Curriculum with competetency-based goal and objectives for the program and each rotation by year of training.
      (4) Curriculum includes appropriate scholarly activity, including research, if required by accrediting RRC
         (a) Protected time for research/scholarly activity as required
         (b) Space for conducting research as required
         (c) Funding and other support research as required.
      (5) Didactic instruction to include conferences, journal club, lectures.
      (6) Educational impact:

5

    (a) Assurance of lack of adverse impact on existing residency programs, particularly the general specialty residency program and other related subspecialty programs that may be affected.

    (b) Definition of educational benefit, if any, for existing programs.

(7) Policies on resident selection, evaluation, promotion, and discipline.

(8) System for administration of the educational program.

    (a) Policies and procedures for evaluation of curriculum.

    (b) Documentation resident, faculty and Program Director activities as required for accreditation.

    (c) Adequate support staff for administration of the new residency program.

ii) Faculty resources are available and committed to supervising and educating the residents.

    (1) Qualifications of Program Director

    (2) Qualifications of faculty

    (3) Quantity of faculty

    (4) Policies and procedures for supervision of residents are defined

iii) The Sponsoring Institution will commit financial and human resources to supporting the new program. The sponsoring institution and/or clinical department would have to show evidence that it is willing to assume financial responsibility for the program (or has guarantees of sufficient reimbursement from hospitals or other facilities in which the residents or fellows will practice for the duration of the training period). If the funding to support the residency/fellowship is one or more hospitals, the Program Director must provide letter(s) of commitment signed by the administrator or CEO of the hospital(s) participating in the program. The letter must state definitively that the hospital will provide the funding for the duration of training of the resident or fellow. Funding for the program must be sufficient to cover the following expenses of a residency or fellowship program:

    (1) Funding is available for resident salaries, benefits, and insurance coverage including health insurance, professional liability (malpractice) insurance, and disability insurance.

    (2) Participating institutions, if contemplated or required to meet educational requirements, will commit to supporting the new

program, including willingness to execute the necessary affiliation agreement and letters of agreement.

(3) Working environment and ancillary support is sufficient and appropriate for the new residents and the residency program.

(a) Work space is available and will be committed to the residents.

(b) Sleeping quarters, if needed for the residents taking on-call duty, will be available.

(c) Ancillary staff, if needed, will be available to assure the appropriate balance between the education requirements of the residents and the service needs of the institution.

iv) <u>Program approval</u>.  While a new residency or fellowship program would be under the auspices of a department, the Dean KSOM and the CEO, LAC+USC Medical Center must give final approval as to its relevance to the academic and clinical missions and resources.

v) <u>Applicability to Program Changes</u>.  The guidelines for review and approval apply to major changes in an existing accredited program (i.e., any change that require RRC approval).  Examples include, but are not limited to, changing a current program to an alternate site, adding additional site(s) to an existing program, and petitioning the RRC to increase or decrease the resident complement.

10. Conduct Internal Reviews of ACGME accredited programs at the designated midpoint of the accreditation cycle including subspecialty programs to assess their compliance with the ACGME Institutional, Common and Subspecialty Program Requirements. (See protocol).

11. Assure an environment of learning in which issues can be raised and resolved without fear of intimidation or retaliation.  This includes:

a. Provision of an organizational system for communication and exchange of information on all issues pertaining to residents and their educational programs.  The Memorandum of Understanding between County of Los Angeles and the Committee of Interns and residents (JCIR) recognizes the CIR as the resident organization to facilitate regular assessment of resident concerns.  A forum must exist for all residents to raise concerns.

    b. Procedures to address concerns of individual residents in a confidential and protected manner.

    c. Establishment and implementation of fair institutional policies and procedures for academic or other disciplinary actions taken against residents.

    d. Establishment and implementation of fair institutional policies and procedures for adjudication of resident complaints and grievances related to actions, which could result in dismissal, non-renewal of a resident's contract, or other actions that could significantly threaten a resident's intended career development.

12. Monitor the residency programs in establishing an appropriate work environment and the duty hours of residents (see duty hour policy).

13. Make recommendations on the appropriate funding for resident positions, including benefits and support services.

14. Assure that the residents' curriculum provides a regular review of ethical, socioeconomic, medical/legal, and cost-containment issues that affect GME and medical practice.  The curriculum must also provide:

    a. an appropriate introduction to communication skills and to research design, statistics, and critical review of the literature necessary for acquiring skills for lifelong learning.

    b. Appropriate resident participation and departmental scholarly activity, as set forth in the applicable Program requirements.

15. Review and revise this GME policy manual approximately every three years.


**C.  <u>Composition of the GMEC</u>**

1. Membership on the Graduate Medical Education Committee includes the following:

    a. Program Directors of specialty residency programs and up to two program directors representative of subspecialty residency programs.

    b. The DIO who serves as the Director of Graduate Medical Education is a permanent member of the GMEC and Chairs  the GMEC.

    c. Resident members of the GMEC are selected by their peers and are voting members of the committee.

    d. Administrative members to include 1 member each from LAC+USC Medical Center, Keck School of Medicine, University/Norris Hospital.

2. Twelve (12) resident members of the GMEC will be appointed annually as follows:

    a. Four (4) peer-selected residents with voting privileges from the Executive Council of the LAC+USC Medical Center chapter of CIR (elected to the CIR Executive council by the membership of the CIR) will serve one-year terms.

    b. Eight (8) peer-selected residents with voting privileges from the eight programs with the next highest complements of residents not represented by the four residents selected by CIR.

## D.  Meetings of the GMEC

1. The GMEC meets once monthly on the fourth Wednesday of the month unless there is a change in date announced to membership in advance

2. Emergency meetings may be called at anytime
    a. Three members constitutes a quorum
    b. Emergency meetings can be conducted through e-mail, if necessary

3. Since the GMEC is a subcommittee of the Attending Staff Association, all minutes of meetings are protected by State and Federal rules of confidentiality. A statement of protection will appear as follows:

"The information contained in this document and any attachment is privileged and confidential under state law, including Evidence Code section 1157 relating to medical professional peer review documents and Government Code Section 6254 relating to personnel records.

"This message, including any attachments, contains confidential information intended for a specific individual and purpose.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited."

## E.  **Departmental/Divisional GMEC**

The responsibility for developing and maintaining a resident educational program rests with the parent academic department/division.  Because of this direct responsibility for compliance with ACGME requirements, each department/division must establish a GMEC to oversee the residency/subspecialty training programs.

1.   Composition of Departmental/Divisional GMEC at a minimum must include:

   a.   Program Director at the parent institution and Program Directors at major participating institutions.
   b.   Faculty considered key teaching and administrative personnel
   c.   Resident members to include peer-selected residents for each level of training in the program.  Residents mustl have voting privileges.

2.   Responsibilities of Departmental/Divisional GMEC include:

   a.   Overseeing and monitoring the department's educational program(s) for residents and fellows, including the general specialty residency program in its medical specialty as well as related subspecialty training programs.
   b.   Establishing and periodically reviewing the goals and objectives for each program within the department and communicating those goals and to faculty, residents and applicants to the program.
   c.   Establishing a curriculum to accomplish the goals and objectives.
   d.   Evaluating the effectiveness of teaching program and teaching faculty in meeting those goals and objectives.  This shall include a mechanism for residents to submit at least annually confidential evaluations of the faculty and the educational experiences to the Program Director or to a designated institutional official.
   e.   Evaluating resident performance in accordance with policies established by USC/LAC+USC Medical Center and with ACGME requirements

## F.  **Institutional Agreements**

When resident education occurs in a major participating institution, the sponsoring institution continues to have responsibility for the quality of that educational experience and must retain authority over the residents' activities.  A major participating institution is defined by the ACGME as "an institution to which residents rotate for a required experience and/or those that require explicit approval

10

by the appropriate RRC prior to utilization.  Major participating institutions are listed as part of an accredited program in the Graduate Medical Education Directory".

Current institutional agreements (master affiliation agreement) must exist with all of its major participating institutions.  The institutional agreement provides the contractual basis between the sponsoring and participating institutions for exchange of residents.  The content of the institutional agreement must address issues such as responsibility for training, supervision and evaluation of residents, salaries and fringe benefits, coverage for professional liability, emergency health care services at the outside facility, reimbursement for the cost of salaries and fringe benefits for the residents, worker's compensation insurance, compliance with the policies and procedures of the Medical Staff of the participating institution, indemnification, record keeping and a number of other issues.

For residents employed by the County of Los Angeles, there is a "boiler plate' affiliation agreement that has been approved and mandated by the Board of Supervisors.  Copies of executed affiliation agreements between County of Los Angeles and other institutions for physicians in postgraduate training are on file in the Office of Graduate Medical Education.

Before agreeing to a recurring exchange of residents going to or coming from other institutions, the Program Director is responsible to have a properly executed affiliation agreement in place to cover the exchange of residents.  The Office of GME will assist the Program Directors to accomplish the required affiliation agreement(s).

## G.  Letters of Agreement

The ACGME requires that each accredited program shall establish appropriate letters of agreement between the sponsoring institution and the participating institution(s) which must be renewed at a minimum every five (5) years..  These letters of agreement are required for recurring exchanges of residents (bilateral or unilateral) and even for the occasional, non-recurring elective rotation if it is one month or longer.  Even if the program meets the ACGME's requirements to be considered an integrated program wherein the faculty of a department supervise the residents at all the training sites, letters of agreement are still necessary because the participating institution must commit its resources to support the residents.

A letter of agreement that fulfills the Institutional Requirements of the ACGME should:

1. Identify the officials at the participating institution or facility who will assume administrative, educational, and supervisory responsibility for the resident(s);
2. outline the educational goals and objectives to be attained within the participating institutions;
3. specify the period of assignment of the residents to the participating institution, the financial arrangements, and the details for insurance and benefits;
4. determine the participating institution's responsibilities for teaching, supervision, and formal evaluation of the residents' performances; and
5. establish with the participating institution the policies and procedures that govern the residents' education while rotating to the participating institution.

The Program Requirement of the ACGME may establish additional requirements for letters of agreement for a residency program. Program Directors are responsible to review both the Institutional Requirements and their Program Requirements when preparing letters of agreement.

12

## SECTION III:    INSTITUTIONAL GME POLICIES

## RECRUITMENT, ELIGIBILITY, SELECTION, APPOINTMENT, EVALUATION, PROMOTION AND DISCIPLINE OF RESIDENTS

Each residency program must establish and implement formal written criteria and processes for the selection, evaluation, promotion, and dismissal of residents in compliance with both the Institutional and Program Requirements for the specialties and subspecialties of the ACGME RRCs.

## A.   <u>Resident Recruitment, Eligibility, Selection and Appointment</u>

1. Each residency program shall select from among eligible applicants on the basis of their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity.  Programs must not discriminate with regard to gender, sexual orientation, race, age, religion, color, national origin, disability, veteran status or any other applicable legally protected status.

2. In selecting from among qualified applicants for GY-1 positions, all sponsored programs participate in the National Resident Matching Program (NRMP)

3. In selecting from among qualified applicants for positions above the GY-1 level, all of the sponsored programs participate in an organized matching program, where available, such as the National Resident Matching Program (NRMP).

4. Applicants with one of the following qualifications are eligible for appointment to accredited residency programs:

   a. Graduates of medical schools in the United States and Canada accredited by the Liaison Committee on Medical Education (LCME.)
   b. Graduates of colleges of osteopathic medicine in the United States accredited by the American Osteopathic Association (AOA).
   c. Graduates of medical schools outside the United States and Canada who meet the requirements of the Medical Board of California for residency training and meet one of the following qualifications:
      i)  Have received a currently valid certificate from the Educational Commission for Foreign Medical Graduates or
      ii) Have a full and unrestricted license to practice medicine in a U.S.

13

licensing jurisdiction.

d. Graduates of medical schools outside the United States who have completed a
Fifth Pathway program provided by an LCME-accredited medical school.

e. Applicants to advanced levels of residency training must comply with the
requirements for licensure by the Medical Board of California.

American/Canadian medical school graduates:  Residents who have had 24
months of residency training in an accredited training program anywhere in the
United States or Canada must have a California Medical License in hand before
they can start their 25th month of residency training in an accredited residency
program in California.

International medical school graduates:  Residents who have had 36 months of
residency training in an accredited training program anywhere in the United
States or Canada must have a California Medical License in hand before they
can start their 37th month of residency training in an accredited residency
program in California.

Residency programs must not enroll non-eligible physicians, as the enrollment
of non-eligible residents may be cause for withdrawal of accreditation of the
involved program.

f.  Candidates invited for an Interview:  All those invited for an interview must
be informed, in writing or electronic means, of the terms, conditions, and
benefits of their appointment including financial support, vacation, parental,
sick, and other leaves of absence, professional liability, hospitalization, health,
disability, and other insurance provided for the residents and their families; and
the conditions under which the Sponsoring Institution provides call rooms,
meals, laundry services or their equivalents.

**B. <u>Resident Evaluation</u>:**

The following performance standards are in accord with the General Requirements of the Essentials of Accredited Residencies in Graduate Medical Education and in accordance with the Bylaws, Rules and Regulations of the Medical Staff of the sponsoring and participating institutions.

These performance standards will be included in the institutional resident's manual distributed to each resident and in the departmental resident's manual:

1.    <u>Performance Standards</u>:
    a.    <u>Resident Responsibilities</u>:
        1.  Accepting responsibility for the delivery of care for all assigned inpatients under the supervision of assigned attending physicians and/or more senior residents.
        2.  Accepting responsibility for the delivery of various aspects of care to assigned outpatients, with the level of care and responsibility defined by the particular service.
        3.  Maintaining standards of care as defined by the Bylaws, Rules and Regulations of the Medical Staff of LAC+USC Medical Center (and other institutions participating in accredited residency training programs) and of the recognized organizations accrediting LAC+USC Medical Center and the training programs supervised by the Keck School of Medicine, by the laws of California and regulations of the State Health Department and as judged to be satisfactory by the individual Keck School of Medicine departments concerned.
        4.  Willingness to accept guidance, criticism, and evaluation from those of more experience, and to defer final decisions related to patient care to those who are in a supervisory capacity.
        5.  Adopting a spirit of self-education to go beyond mere essentials, in the promotion of academic excellence for self and for the betterment of patient care as promulgated by the Keck School of Medicine and the LAC+USC Medical Center and its affiliated hospitals participating in the training program.
        6.  The orderly signing over of all patients to another physician when going off duty and carrying this out in a more formal, verbal, and written manner when rotating off service.
        7.  A willingness to accept certain documentation of responsibilities involving patient care, especially concerning timely completion of

paperwork of acceptable declaratory and medical/legal standard and within a reasonable time frame as mandated by the State, JCAHO, and the Medical Staff Rules and Regulations.

8. The recognition that advancement to the next year of a residency program must be based on evidence of satisfactory progressive scholarship and professional growth of the trainee, including demonstrated ability to assume graded and increasing responsibility for patient care as outlined by the General Requirements of the Essentials of Accredited Residencies in Graduate Medical Education and acceptance that the determination of this standard of professional growth is the responsibility of the Program Director with advice from members of the teaching staff.

b. Faculty Responsibilities:

1. Curriculum: The Program Director and faculty will design and provide a curriculum of instruction in the specialty leading residents to acquire the knowledge, skills, and judgment required to practice the specialty independently and competently. The Program Director and faculty will develop a written set of goals and objectives for the overall residency program and for specific rotations or at least for content areas of the curriculum. The goals and objectives must integrate the six general competencies (patient care; medical knowledge, interpersonal and communication skills, professionalism, practice-based learning and systems-based practice). These goals and objectives shall be distributed to applicants, residents and the teaching faculty. Further, the Program Director and faculty shall evaluate at least annually the success of the curriculum in meeting the goals and objectives of the residency program; residents written input shall be considered in this evaluation.

2. Graduated Responsibility: The faculty shall supervise the activities of the residents and give them opportunities to assume graduated responsibility as they progress through the curriculum. Opportunities for graduated responsibility will depend on demonstrated progress in attaining the goals and objectives of the residency program.

3. Program of Feedback: There will be verbal feedback from Program Directors and/or other supervising physicians for residents during and at the conclusion of each service rotation.

At the end of a rotation, a written evaluation of the resident's performance will be carried out by one or more supervisory physicians using forms established for this purpose so as to maintain comparative objectivity.  The resident may expect that the overall nature of this written evaluation will be discussed with him/her, and that any perceived substandard performance or other difficulties will be discussed before the end of the rotation in an effort to help initiate corrective action.  At least twice a year, the house officer's Program Director will meet with the resident to provide overall feedback as a formal part of the program, in compliance with the Essentials of Accredited Residencies in Graduate Medical Education.

4.  <u>Right of Access to Evaluations</u>:  Residents shall have the right to discuss their personal record with their Program Director and/or Director of Graduate Medical Education.

2.  <u>Resident Performance Evaluation</u>:

a.  There shall be verbal feedback from Program Directors and/or other supervising physicians for residents during and at the conclusion of each service rotation.

b.  At the end of a rotation, a written evaluation of the resident's performance shall be submitted electronically using tools established for this purpose so as to maintain comparative objectivity.  The evaluation must be based on progress toward attaining competency in each of six general competency areas (patient care; medical knowledge, interpersonal and communication skills, professionalism, practice-based learning and systems-based practice). The resident's performance will be measured against the written statement of objectives for the residency program.  Discussion with the resident is required.  In the event that there are issues during the month with substandard performance or other difficulties, the attending will discuss these with the resident before the end of the rotation in an effort to help initiate corrective action.

c.  At least twice a year, the resident's Program Director or designee will meet with the resident to provide overall feedback as a formal part of the program, in compliance with Common Program Requirements.

d.  Residents shall have the right to view their evaluations 24/7 and discuss their evaluations with their Program Director and/or Director of Graduate Medical Education.

**C.  <u>Resident Participation In Program Evaluation</u>**:

1.  <u>Faculty teaching</u>.  Electronic anonymous, confidential evaluations of faculty by residents are required on a yearly basis and suggested for each major rotation.

2.  <u>Rotational evaluation</u>.  Electronic, anonymous and confidential evaluations of rotations by residents are required on a yearly basis and suggested after each major rotation. The forms used for this written feedback will include a variety of questions asking for comments about the resident's educational experience on each rotation.

3.  <u>Resident evaluation of the overall program</u>.  Electronic, anonymous and confidential evaluations of the program will be required from each resident at least annually. The residents shall be asked to evaluate whether the curriculum and program is meeting the written goals and objectives for the residency program.  The Program Director shall define manner in which this evaluation of the curriculum is accomplished.  The evaluation must be structured so that the residents can evaluate the educational experience and provide input to the annual review of the program and curriculum in meeting the goals and objectives established for the program.

4.  <u>Faculty evaluation of the overall curriculum</u>.  The faculty shall evaluate the program in writing electronically at least annually. Such evaluation will be used for the annual program review.

5.  <u>Responsibility for evaluation of program and faculty</u>.  This process of evaluation of the program and the faculty shall be the responsibility of the Program Director.  These evaluations will be maintained in the departmental office and will be available for review by the GMEC, the Internal Review Committee and the RRC site visitor, if required.

**D.  Resident Promotion**:

1. Advancement to the next year of a residency program must be based on evidence of satisfactory performance in the six general competencies including demonstrated ability to assume graded and increasing responsibility for patient care as outlined in the Institutional, Common and Specialty program requirements.

2. Determination of promotion is the responsibility of the Program Director.  The program director should have a representative faculty committee that objectively and fairly evaluates the performance of all residents on an annual basis. Minutes of the evaluation proceedings must be protected by peer review statute.

**E.  Resident Participation in Educational Activities:**

1. All residency programs must ensure that residents have the opportunity to:

   a. Develop a personal program of learning to foster continued professional growth with guidance from the teaching staff.
   b. Participate in safe, effective, and compassionate patient care, under supervision, commensurate with their level of advancement and responsibility.
   c. Participate fully in the educational and scholarly activities of their program and, as required, assume responsibility for teaching and supervising other residents and students.
   d. Participate as appropriate in institutional programs and medical staff activities and adhere to established practices, procedures, and policies of the institution.
      1. All residents should receive instruction in quality-assurance/performance improvement.
      2. To the degree possible and in conformance with state law, residents should participate in appropriate components of the institution's performance improvement program.
   e. Participate as appropriate through peer-nominated representation on institutional committees and councils whose actions affect their education and/or patient care.

2. The sponsoring institution and its residency programs must provide an educational program for residents regarding physician impairment, including substance abuse.

## F. Support, Benefits, and Conditions of Appointment for Residents

1. Financial Support:  As the Sponsoring Institution, USC/LAC+USC provide the resources for the vast majority of residency positions under the direction of the faculty of the Keck School of Medicine.

   a. Research participation:  LAC+USC Medical Center funding for support of residency positions shall be used to support resident activates in research only if the resident's period of participation in the research can be included in activities that meet the requirements established by the ACGME and/or the applicable specialty board. Research not required by the ACGME as part of the curriculum must be funded by sources other than LAC+USC Medical Center.

   b. Compensation for research:  Residents who elect to participate in research that will result in monetary compensation to them shall obtain the written permission from their Department Chair to do so. Residents who receive monetary compensation for participation in a research project shall not be placed in conflict of interest between their duties as resident physicians and their participation in research. Further, when receiving compensation for research, the resident shall participate in the research outside his/her normal duty hours as a resident physician.

2. Absence(s) from Duty and Leave(s) of Absence:  The resident must report absence from duty for reason of illness to 1) the Director of the program in which the resident is enrolled, and 2) the resident supervisor of the service to which the resident is assigned.  A telephone number where the resident may be contacted must be left in case the director or resident supervisor needs to contact the resident.

   Those residents off duty with a communicable or reportable illness must notify the Employee Health Services Office, ext. 5235.  This is important for clearance to return to work and may be important for epidemiology surveillance of colleagues.

20

a. <u>Sick Time</u>:

Sick time is accrued to a maximum of eight (8) days per year and County offers a "buy back" option for unused sick time if certain conditions are met. The resident should check with his/her department if interested in "selling Back" unused sick time. Only accrued sick time may be used to cover an absence due to illness. That is, a resident may not use sick time that has not been credited to his/her account but expects to accrue in the future. Absence due to illness that a resident cannot cover with accumulated sick time must be charged either against accumulated vacation time or as absence without pay upon approval of the Program Director.

b. <u>Vacation Time</u>:
1. In lieu of other vacation and holiday allowances, resident physicians are entitled to 24 days paid vacation each year, with departmental approval. Unused vacation, up to ten (10) days per year, may be deferred (with Program Director approval only) until the end of training and will then be paid.
2. When a resident is prevented from working his/her regular assignment as a result of a holiday, he/she may be reassigned to another work location for that day. If he/she is not reassigned his/her pay or vacation will not be charged.
3. Absence for marriage must be covered by accrued vacation with the approval of the department.
4. Leave for interview purposes are the resident's responsibility to cover with accrued vacation and must be approved by the individual's departmental office and by the department to which assigned.

c. <u>Bereavement Leave</u>:

A full time monthly recurrent or monthly temporary employee who qualifies for bereavement leave receives 8 hours bereavement leaves per year if he or she has completed at least 200 days of active service the prior calendar year, and 4 hour of bereavement leave if such employee has completed less that 200 days of active service.

   d.  <u>Release Time for Examinations</u>:
1. All residents taking the USMLE Step III examination or its equivalent and Board Certification will be released from all duties as per agreements in the most recent MOU between the CIR and DHS.
2. The Medical Center accepts responsibility for the coverage of the resident physician while taking USMLE, in-training exams, and Board Certification exam when taken in Los Angeles or when assigned to an examination center outside Los Angeles. Such coverage is subject to adequate prior notice from the resident to the department to which assigned.

   e.  <u>Leave of Absence</u>:
1. The Program Director or designee for any appropriate reason may grant a resident an unpaid leave of absence.
2. The granting of such leave is discretionary with the appointing power, except for military leave and some provisions of maternity/paternity leave.
3. Unpaid leaves of absence are usually granted for such circumstances as: special education, education, recovery from an illness or injury assisting another public jurisdiction, employment by a labor union, maternity/paternity leave. "Personal reasons" is not an acceptable reason by itself. (See Family Medical Leave Act below.)
4. All absences must be reported to the resident's immediate supervisor and to the program office.  Anticipated absences must have the prior approval of the departmental office.
5. Leave of Absence must be reported to the Office of Graduate Medical Education on a "Leave of Absence" form.

   f. Leave <u>Without Remuneration</u>:
1. Elective rotations that are not approved as part of the curriculum and not required by the ACGME/RRC taken at non-County institutions that are allowable only by written permission from Program Director and only if the resident uses  accrued vacation time or takes a leave of absence without pay.
2. Professional liability insurance must be provided by the receiving institution.  It is the responsibility of the resident to make sure that professional liability (malpractice) insurance is provided when at non-County institutions.

3. Health insurance does not extend to physicians on leave of absence without pay unless the resident makes the premium payments directly to the insurance Agency.

b. Effect of Absence on Certification of Training:
1. The resident's department, the ACGME, and the applicable medical specialty board have defined the length of training that a resident must serve in order to satisfy the minimum requirements for the specialty and to qualify to sit for the certifying examination of the specialty board.
2. The department shall make its training requirements known to residents upon application to the program and again at the time of acceptance into the program.
3. Aside from regularly scheduled vacation time, the resident may be required to "make up" all other absences from scheduled work hours if one or more periods of absence results in the resident falling below the minimum requirements for certification of completion of training.
4. Residents should consult the Department policy guidelines, the ACGME requirements for the specific specialty/subspecialty, and/or the medical specialty board requirements.

h. Family Medical Leave Absence and the Family and Medical Leave Act of 1993:
1. The Family Medical Leave Absence (FML) is intended to allow employees to balance their work and the needs of family life by taking reasonable unpaid leave for medical reasons, the birth or adoption of a child, the care of a spouse or parent who has a serious health condition.
2. The Family Medical Leave Act (FMLA) provides up to twelve (12) weeks of unpaid, job-protected leave to "eligible employees" for certain family and medical reasons. An employer is required to give an employee FMLA if the employee has worked at least one (1) year and 1,250 hours over the previous 12 months. FMLA is unpaid leave. However, a resident may elect to use accrued time in accordance with management and the Office of Human Resources approval. A department may, at its discretion and with proper approvals, grant a longer leave of absence.

    i. Maternity/Paternity Leave:
1. Pregnancy and childbirth is considered a medical disability.
2. A pregnant employee may work as long as she wishes provided her physician certifies she is physically and medically capable of performing all of the duties of the position without risk to herself, the unborn child, or posing a liability to the County.
3. The department may require medical certification allowing the employee to continue work.
4. Request for leave of absence for reasons associated with pregnancy must be submitted in writing to the supervisor with a certification from the physician giving the dates her temporary disability will begin and end.  Based on the certification submitted, the employee may be granted sick leave benefits (up to the available benefit levels).

    j. Industrial Injury Leave (Worker's Compensation):
1. An employee should report an industrial injury/illness to his/her supervisor within 24-hours.
2. Failure to report an injury/illness may result in delayed medical services and possible loss of benefits.

3. Disclosure to Applicants:
Applicants for GME programs must be informed in writing or electronically of the terms and conditions of employment and benefits including financial support, vacations, professional leave, parental leave, sick leave, professional liability insurance, hospital and health insurance, disability insurance, and other insurance benefits for the residents and their family, and the conditions under which living quarters, meals and laundry or their equivalents are to be provided.

4. Resident Contracts:
a. Terms and conditions of appointment. Regardless of the source of funding for stipends, residents will be provided with a written agreement or contract outlining the terms and conditions of their appointment to an educational program. The GMEC shall monitor the implementation of these terms and conditions by the Program Directors.  The contract must contain or reference at least the following:

1. Financial support
2. Vacation policies
3. Professional liability insurance

    4. Disability insurance and other hospital and health insurance benefits for the resident and their family

    5. Professional, parental, and sick leave benefits

    6. Conditions under which living quarters, meals, and laundry or their equivalents are to be provided

    7. Counseling, medical, psychological, and other support services

    8. Institutional policies covering sexual and other forms of harassment.

  b. <u>Institutional Policies</u>:  The contract delineates or references specific policies regarding:

    i. resident's  responsibilities (see statement of resident's responsibilities below under "Resident Performance Evaluation")

    ii. duration of appointment and conditions for reappointment

    iii. professional  activities outside the educational program

    iv. grievance procedures related to actions, which could result in dismissal, non-renewal of a resident's contract, or other actions that could significantly threaten a resident's intended career development.

  c. <u>Non-renewal of Contracts</u>:  Programs shall provide their residents a written notice of intent not to renew a resident's contract no later than four months prior to the end of the resident's current contract.  (For residents covered under the CIR MOU, notice of non-renewal must be given to the resident on or before November 15th.)  However if the primary reason(s) for the non-renewal occur(s) within the four months prior to the end of the contract, programs shall provide their residents as much written notice of the intent not to renew as the circumstances will reasonably allow, prior to the end of the contract.  Residents must be allowed to implement the institution's grievance procedures as addressed in Section IV:  "Guidelines for Discipline and Grievance Resolutions for Resident Physicians" when they have received a written notice of intent not to renew their contracts.

5. <u>Liability Insurance</u>:

The County of Los Angeles provides residents in GME with professional liability (malpractice) coverage for the duration of training through a self-insurance program.  This coverage by the County of Los Angeles is limited to resident's participation in care of patients who are enrolled as patients of LAC+USC Medical Center or other County facilities as part of their

assignments within the residency program.  When residents take rotations outside LAC+USC Medical Center, the institutional affiliation agreement requires the participating institution to provide professional liability coverage for the duration of their rotation.  Such coverage provides legal defense and protection against awards from claims reported or filed after the completion of GME if the alleged acts or omissions of the residents are within the scope of the educational program.  The coverage to be provided is consistent with the institution's coverage for other medical/professional practitioners.  Current residents and applicants for residency are provided with details of the institution's professional liability coverage for residents. The Keck School of Medicine provides professional liability coverage for residents employed by USC through the insurance coverage of the academic department responsible for the residency program.

6. <u>Insurance</u>:
   a. <u>Residents Employed by County of Los Angeles</u>. The County of Los Angeles provides a cafeteria-style benefit program under Internal Revenue Code 125 that includes health, dental, life, and accidental dismemberment options. County also purchases disability insurance for residents; the disability insurance program is administered by the CIR.

   b. <u>Residents Employed by USC</u>.  USC provides a benefit program that includes a deferred compensation retirement program, health benefits, dental benefits, pretax payment accounts, various insurance products, and a disability plan.

   c. Enrollment in either the County or the USC benefit plan is not automatic and requires the resident to enroll within 60 days of initial hire.

7. <u>Counseling, Medical and Psychological Support Services</u>:  Confidential counseling, medical and psychological support services are available to residents.

   a. <u>Emergency Care</u>:  Emergency medical treatment for injuries on the job is available through the Employee Health Service (323) 409-5235, during routine work hours and through the Emergency Room, LAC+USC Medical Center, after hours and on weekends with follow up through Employee Health Service.  Counseling and psychological

support services are available for initial evaluation and short term intervention for acute situations by resident self-referral or referral by the resident's Program Director through the Well-Being Committee.

b. <u>Non-Emergent Care</u>: Medical treatment for non-job related injury or illness is available to residents through their health insurance coverage. Residents are free to choose their physician for medical care and may elect to seek treatment from USC faculty physicians through USC Care [1-800-USC CARE or 1-800-872-2273] or from a private physician of his/her choice.

c. <u>Treatment of Physician Impairment including Substance Abuse</u>: Treatment for impairments including drug or alcohol abuse is available as part of the counseling and psychological support services described above.

8. <u>Physician Impairment</u>:
Institutional policies that describe how physician impairment, including due to substance abuse, is part of the institutional policy manual.

9. <u>Residency Closure/Reduction</u>:
If the Sponsoring Institution (USC/LAC+USC Medical Center) intends to reduce the size of a residency program or to close a residency program or the Institution, it will inform the GMEC, DIO and all affected residents as soon as possible. In the event of such a reduction or closure, County of Los Angeles and/or Keck School of Medicine will make every effort to allow residents already in the program or the Institution to complete their education. If any residents are displaced by the closure of the Institution, a program (s) or a reduction in the number of residents, every effort will be made to allow residents already in the Institution or program to complete their education or assist the residents in identifying and enrolling in an ACGME accredited program in which they can continue their education.

10. <u>Moonlighting</u>:

Each residency program shall have a written policy that addresses professional activities outside the educational program to include moonlighting.

    a.    Residents, like other County employees, may be permitted to work 24 hours per week in outside employment (96 hours per month), provided that such employment:
1. does not interfere with their educational program
2. written permission from program director is on file
3. must not represent a conflict of interest or suggest capping or in any way reflect adversely on the Medical Center.

    b.    Before engaging in outside work, the resident must notify the Program Director and receive written permission to moonlight to ensure compliance with ACGME requirements and County Ordinance restrictions (regarding hours worked and the nature of the moonlighting).

    c.    The residents must not be required to engage in "moonlighting."

    d.    All residents engaged in moonlighting must be licensed for unsupervised medical practice.

    e.    When a department hires a resident to moonlight at a facility within the LAC+USC Healthcare Network (e.g., employment under Section 170), the department hiring the resident to moonlight is responsible to determine:
1. whether the resident has unrestricted licensure for medical practice from the Medical Board of California, and
2. whether the resident has the appropriate training and skills to carry out assigned duties—that is, the department shall not hire a resident to moonlight until the resident has been credentialed and privileged for the duties that will be assigned according to the Bylaws of the Attending Staff Association.

    f.    When a resident engages in moonlighting, the Program Director must acknowledge in writing that she/he is aware that the resident is moonlighting, and that this information is made part of the; resident's folder

11. <u>Restrictive Covenants</u>:  ACGME accredited residencies must not require residents to sign a non-competition guarantee in return for fulfilling their educational obligations.

## G.  Maintenance of Records

The administrative offices of the programs will be responsible to maintain personnel records for all residents enrolled in the department's residency program(s). These records shall include:

1. Dates of training
2. Credentials of the residents:
   a. Copies of diploma(s)
   b. California Medical Licenses
   c. ECFMG certificate, if applicable
   d. Visa documents, if applicable
   e. Training certificate(s) issued to the resident
3. Curriculum Vitae (CV)
4. Evaluations of resident performance on assigned rotations
5. Semiannual feedback from Program Director to each resident
6. End-of training summary evaluation of the resident
7. Disciplinary action, if any, and outcome and /or resolution.
8. Schedules of residents assignments per rotation at the Sponsoring Institution and participating institutions.

## H.  Work Environment, Supervision,  and Duty Hours for Residents

1. Work Environment:
   Sponsoring institutions must provide services and develop systems to minimize the work of residents that is extraneous to their educational programs, ensuring that the following conditions are met:

   a. Residents on duty in the hospital are provided adequate and appropriate food services and sleeping quarters.
   b. Patient support services, such as intravenous services, phlebotomy services, and laboratory services, as well as messenger and transporter services, are provided in a manner appropriate to and consistent with educational objectives and patient care.
   c. An effective laboratory, medical records and radiologic information retrieval system is in place to provide for appropriate conduct of the educational programs and quality and timely patient care.
   d. Appropriate security measures are provided to residents in all locations

including but not limited to parking facilities, on-call quarters hospital and institutional grounds, and related clinical facilities (e.g., medical office building).

2. <u>Supervision</u>:

    a. The GMEC is responsible to provide oversight of residency programs to assure that residents are appropriately supervised.
    b. Residents must be supervised by teaching staff in such a way that the residents assume progressively increasing responsibility according to their level of education, ability, and experience.
    c. On-call schedules for teaching staff must be structured to ensure that supervision is available to residents 24/7.
    d. The teaching staff must determine the level of responsibility accorded to each resident (Direct or Indirect as per Duty Hour Policy below).
    e. Each program shall establish policies on the supervision of residents through explicit written descriptions of supervisory lines of responsibility for the care of patients.  Such guidelines must be communicated to all members of the program's teaching faculty and to residents.

3. <u>Duty Hours</u>:
Each residency program is responsible to establish formal policies governing resident duty hours that foster resident education and facilitate the care of patients and are consistent with ACGME Common Program Requirements and Sponsoring Institution Policy.

    a. The GMEC shall monitor resident duty hours to ensure compliance with the institutional and Program Requirements of the specialties and subspecialties that apply to each program.
    b. At the time of the internal review of each program, the GMEC shall review departmental policies on resident duty hours.
    c. The educational goals of the program and learning objectives of residents must not be comprised by excessive reliance on residents to fulfill institutional service obligations. Duty hours, however, must reflect the fact that responsibilities for continuing patient care are not automatically discharged at specific times.  Programs must ensure that residents are provided appropriate backup support when patient care responsibilities are especially difficult or prolonged.
    d. Resident duty hours and on-call time periods must not be excessive.  The structuring of duty hours and on-call schedules must focus on the needs of

the patient, continuity of care, and the educational needs of the resident. Duty hours must be consistent with the institutional and Program Requirements that apply to each program.

e. These formal policies on resident duty hours must apply to all institutions to which a resident rotates.

f. Duty Hour Policy:  the current Institutional Duty Hour Policy as of July 1, 2011 is as follows:

**LAC + USC MEDICAL CENTER/KECK SCHOOL OF MEDICINE**

**RESIDENT DUTY HOUR POLICY IN THE LEARNING AND WORKING
ENVIRONMENT EFFECTIVE JULY 1, 2011
(adapted from ACGME Common Program Requirements effective July 1, 2011)**

VI.A. Professionalism, Personal Responsibility, and Patient Safety

VI.A.1. Each program and the Sponsoring Institution will educate the residents and faculty members concerning the professional responsibilities of physicians to appear for duty appropriately rested and fit to provide the services required by their patients.

VI.A.2. Each program must be committed to and responsible for promoting patient safety and resident well-being in a supportive educational environment.

VI.A.3. The program director must ensure that residents are integrated and actively participate in interdisciplinary clinical quality improvement and patient safety programs.

VI.A.4. The learning objectives of the program must:

VI.A.4.a) be accomplished through an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events; and,

VI.A.4.b) not be compromised by excessive reliance on residents to fulfill non-physician service obligations.

VI.A.5. The program director and Sponsoring Institution must ensure a culture of professionalism that supports patient safety and personal responsibility. Residents and faculty members must demonstrate an understanding and acceptance of their personal role in the following:

VI.A.5.a) assurance of the safety and welfare of patients entrusted to their care;

VI.A.5.b) provision of patient- and family-centered care;

VI.A.5.c) assurance of their fitness for duty;

VI.A.5.d) management of their time before, during, and after clinical assignments;

VI.A.5.e) recognition of impairment, including illness and fatigue, in themselves and in their peers;

VI.A.5.f) attention to lifelong learning;

VI.A.5.g) the monitoring of their patient care performance improvement indicators; and,

VI.A.5.h) honest and accurate reporting of duty hours, patient outcomes, and clinical experience data.

VI.A.6. All residents and faculty members must demonstrate responsiveness to patient needs that supersedes self-interest. Physicians must recognize that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested provider.

VI.B. Transitions of Care

VI.B.1. Programs must design clinical assignments to minimize the number of transitions in patient care.

VI.B.2. The Sponsoring Institutions and programs must ensure and monitor effective, structured hand-over processes to facilitate both continuity of care and patient safety.

VI.B.3. Programs must ensure that residents are competent in communicating with team members in the hand-over process.
VI.B.4. The sponsoring institution must ensure the availability of schedules that inform all members of the health care team of attending physicians and residents currently responsible for each patient's care.

VI.C. Alertness Management/Fatigue Mitigation

VI.C.1. The programs must:

33

VI.C.1.a) educate all faculty members and residents to recognize the signs of fatigue and sleep deprivation;

VI.C.1.b) educate all faculty members and residents in alertness management and fatigue mitigation processes; and,

VI.C.1.c) adopt fatigue mitigation processes to manage the potential negative effects of fatigue on patient care and learning, such as naps or back-up call schedules.

VI.C.2. Each program must have a process to ensure continuity of patient care in the event that a resident may be unable to perform his/her patient care duties.

VI.C.3. The Sponsoring Institution must provide adequate sleep facilities and/or safe transportation options for residents who may be too fatigued to safely return home.  Taxi-cab fare will be made available for this purpose.

VI.D.  Supervision of Residents

VI.D.1. In the clinical learning environment, each patient must have an identifiable, appropriately-credentialed and privileged attending physician (or licensed independent practitioner as approved by each Review Committee) who is ultimately responsible for that patient's care.

VI.D.1.a) This information should be available to residents, faculty members, and patients.

VI.D.1.b) Residents and faculty members should inform patients of their respective roles in each patient's care.

VI.D.2. The programs must demonstrate that the appropriate level of supervision is in place for all residents who care for patients. Supervision may be exercised through a variety of methods. Some activities require the physical presence of the supervising faculty member. For many aspects of patient care, the supervising physician may be a more advanced resident or fellow. Other portions of care provided by the resident can be adequately supervised by the immediate availability of the supervising faculty member or resident physician, either in the institution,

34

or by means of telephonic and/or electronic modalities. In some circumstances, supervision may include post-hoc review of resident delivered care with feedback as to the appropriateness of that care.

VI.D.3. Levels of Supervision
To ensure oversight of resident supervision and graded authority and responsibility, the program must use the following classification of supervision:

> VI.D.3.a) Direct Supervision – the supervising physician is physically present with the resident and patient.

> VI.D.3.b) Indirect Supervision:

>> VI.D.3.b).(1) with direct supervision immediately available – the supervising physician is physically within the hospital or other site of patient care, and is immediately available to provide Direct Supervision.

>> VI.D.3.b).(2) with direct supervision available – the supervising physician is not physically present within the hospital or other site of patient care, but is immediately available by means of telephonic and/or electronic modalities, and is available to provide Direct Supervision.

> VI.D.3.c) Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided aftercare is delivered.

VI.D.4. The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members.

> VI.D.4.a) The program director must evaluate each resident's abilities based on specific criteria. When available, evaluation should be guided by specific national standards-based criteria.
> VI.D.4.b) Faculty members functioning as supervising physicians should delegate portions of care to residents, based on the needs of the patient and the skills of the residents.

VI.D.4.c) Senior residents or fellows should serve in a supervisory role of junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow.

VI.D.5. Programs must set guidelines for circumstances and events in which residents must communicate with appropriate supervising faculty members, such as the transfer of a patient to an intensive care unit, or end-of-life decisions.

VI.D.5.a) Each resident must know the limits of his/her scope of authority,and the circumstances under which he/she is permitted to act with conditional independence.

VI.D.5.a).(1) In particular, PGY-1 residents should be supervised either directly or indirectly with direct supervision immediately available. [Each Review Committee will describe the achieved competencies under which PGY-1 residents progress to be supervised indirectly, with direct supervision available.]

VI.D.6. Faculty supervision assignments should be of sufficient duration to assess the knowledge and skills of each resident and delegate to him/her the appropriate level of patient care authority and responsibility.

VI.E. Clinical Responsibilities
The clinical responsibilities for each resident must be based on PGY-level, patient safety, resident education, severity and complexity of patient illness/condition and available support services.[Optimal clinical workload will be further specified by each Review Committee.]

VI.F. Teamwork
Residents must care for patients in an environment that maximizes effective communication. This must include the opportunity to work as a member of effective interprofessional teams that are appropriate to the delivery of care in the specialty.[Each Review Committee will define the elements that must be present in each specialty.]

VI.G. Resident Duty Hours

VI.G.1. Maximum Hours of Work per Week
Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities and all moonlighting.

VI.G.1.a) Duty Hour Exceptions
The GMEC will only approve exceptions for up to 10% or a maximum of 88 hours to selected rotations in Neurosurgery.

VI.G.1.a).(1) In preparing a request for an exception the program director must follow the duty hour exception policy from the ACGME Manual on Policies and Procedures.

1.    LAC+USC Medical Center/Keck School of Medicine must have a Favorable Status from its most recent review by the ACGME Institutional Review Committee.

2.    The program requesting the exception must have full accreditation without warning, proposed or confirmed adverse action. A copy of the current accreditation status must accompany the proposal.

3.    The RRC for the program requesting an exception allows for exceptions to the 80-hour work limit.

4.    The request defines the percent (%) exception to the 80-hour rule up to a maximum of 10% only and does not violate other duty hour rules as defined in this policy including the maximum of 30 continuous duty hours.

5.    Additional required documentation includes:

1.    Patient Safety: information must be submitted that describes how the program and institution will monitor, evaluate and

ensure patient safety with extended resident work hours.

2.    Educational rationale: the request must be based on sound educational rationale which should be described in relation to the program's stated goals and objectives for the particular assignments, rotations, and level(s) of training for which the increase is requested. Blanket exceptions for the entire educational program should be considered the exception, not the rule. Sound educational rationale will be based on:

a.    The request defines the specific knowledge, skills and/or attitudes that will be acquired during the additional duty hours requested that could not be reasonably acquired during the 80-hour work limit. Procedural competency requirements identified in the Specialty or Subspecialty Program Requirements that can not be acquired within the 80-hour workweek must be included.

b.    The request addresses the need for continuity of care essential for competency that could not reasonably be acquired during the 80-hour workweek.

3.    Moonlighting Policy: Specific information regarding the program's moonlighting policies for the periods in question must be included.

4.    Call schedules: Specific information regarding the resident call schedule during the times specified for the exception must be provided.

38

5.    Faculty Monitoring: Evidence of faculty development activities regarding the effects of resident fatigue and sleep deprivation must be appended.

6.    Accreditation status: A copy of the current ACGME accreditation letter must accompany the request.

VI.G.1.a).(2) Prior to submitting the request to the Review Committee, the program director must obtain approval of the GMEC and DIO. The DIO must prepare a written statement of Institutional Endorsement and append this duty-hour exception policy to the statement.

VI.G.2. Moonlighting (see page 28)

VI.G.2.a) Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program.

VI.G.2.b) Time spent by residents in Internal and External Moonlighting (as defined in the ACGME Glossary of Terms) must be counted towards the 80-hour Maximum Weekly Hour Limit.

VI.G.2.c) PGY-1 residents are not permitted to moonlight.

VI.G.3. Mandatory Time Free of Duty

Residents must be scheduled for a minimum of one day free of duty every week (when averaged over four weeks). At-home call cannot be assigned on these free days.

VI.G.4. Maximum Duty Period Length

VI.G.4.a) Duty periods of PGY-1 residents must not exceed 16 hours in duration.

VI.G.4.b) Duty periods of PGY-2 residents and above may be scheduled to a maximum of 24 hours of continuous duty in the hospital. Programs must encourage residents to use alertness management strategies in the context of patient care responsibilities. Strategic napping, especially after 16 hours of continuous duty and between the hours of 10:00 p.m. and 8:00 a.m. is strongly suggested.

VI.G.4.b).(1) It is essential for patient safety and resident education that effective transitions in care occur. Residents may be allowed to remain on-site in order to accomplish these tasks; however, this period of time must be no longer than an additional four (4) hours.

VI.G.4.b).(2) Residents must not be assigned additional clinical responsibilities after 24 hours of continuous in-house duty.

VI.G.4.b).(3) In unusual circumstances, residents, on their own initiative ,may remain beyond their scheduled period of duty to continue to provide care to a single patient. Justifications for such extensions of duty are limited to reasons of required continuity for a severely ill or unstable patient, academic importance of the events transpiring, or humanistic attention to the needs of a patient or family.

VI.G.4.b).(3).(a) Under those circumstances, the resident must:
VI.G.4.b).(3).(a).(i) appropriately hand over the care of all other patients to the team responsible for their continuing care; and,

VI.G.4.b).(3).(a).(ii) document the reasons for remaining to care for the patient in question and submit that documentation in every circumstance to the program director.

VI.G.4.b).(3).(b) The program director must review each submission of additional service, and track both

40

individual resident and program-wide episodes of additional duty.

VI.G.5. Minimum Time Off between Scheduled Duty Periods

VI.G.5.a) PGY-1 residents should have 10 hours, and must have eight hours, free of duty between scheduled duty periods.

VI.G.5.b) Intermediate-level residents [as defined by the Review Committee] should have 10 hours free of duty, and must have eight hours between scheduled duty periods. They must have at least 14 hours free of duty after 24 hours of in-house duty.

VI.G.5.c) Residents in the final years of education [as defined by the Review Committee] must be prepared to enter the unsupervised practice of medicine and care for patients over irregular or extended periods.

VI.G.5.c).(1) This preparation must occur within the context of the 80-hour, maximum duty period length, and one-day-off-in seven standards. While it is desirable that residents in their final years of education have eight hours free of duty between scheduled duty periods, there may be circumstances [as defined by the Review Committee] when these residents must stay on duty to care for their patients or return to the hospital with fewer than eight hours free of duty.

VI.G.5.c).(1).(a) Circumstances of return-to-hospital activities with fewer than eight hours away from the hospital by residents in their final years of education must be monitored by the program director.

VI.G.6. Maximum Frequency of In-House Night Float

Residents must not be scheduled for more than six consecutive nights of night float. [The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]

VI.G.7. Maximum In-House On-Call Frequency

PGY-2 residents and above must be scheduled for in-house call no more frequently than every-third-night (when averaged over a four-week period).

VI.G.8. At-Home Call

VI.G.8.a) Time spent in the hospital by residents on at-home call must count towards the 80-hour maximum weekly hour limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one-day-in-seven free of duty, when averaged over four weeks.

VI.G.8.a).(1) At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.

VI.G.8.b) Residents are permitted to return to the hospital while on at-home call to care for new or established patients. Each episode of this type of care, while it must be included in the 80-hour weekly maximum, will not initiate a new "off-duty period".

## RESPONSIBILITY

Administration
Director, Graduate Medical Education Committee
Graduate Medical Education Committee
Program Directors, Faculty, Residents
Each accredited ACGME program at LAC+USC Medical Center/Keck School of Medicine must have a Resident Duty Hour Policy that meets ACGME Institutional Program Requirements, Common Program and Specialty or Subspecialty Program Requirements. The Resident Duty-Hour Policy must be approved by the Institutional GMEC.

## REFERENCES

ACGME Institutional Requirements
ACGME Common Program Requirements
ACGME Specialty and Subspecialty Program Requirements
Handbook of Policies for Physicians in Residency Training Program at LAC+USC Medical Center

SECTION IV:  GUIDELINES FOR DISCIPLINE AND GRIEVANCE
**RESOLUTION FOR RESIDENT PHYSICIAN**

## A.   POLICIES AND PROCEDURES TO BE USED FOR DISCIPLINE AND GRIEVANCES

These guidelines are intended to assist resident physicians and resident training Program Directors in carrying out appropriate disciplinary procedures whenever performance or behavioral problems arise and to ensure that due process is afforded all parties in the event of disputes over personnel policy or practice.

| Residents Employed by County of Los Angeles | Residents Employed by University of Southern California |
|---|---|
| **1. County of Los Angeles Personnel Policies** All resident physicians employed by the County of Los Angeles work under the overall policies described in this document.  Issues such as working conditions, harassment, discrimination, employees' behavior, absenteeism, illness, insubordination, etc. are covered in a general manner in this manual. Residents alleged to have problems in these areas should be handled in accordance with the procedures outlined herein.  A copy is available for reference in the Office of Graduate Medical Education. | **1. University of Southern California Personnel Policies** All resident physicians employed by the University of Southern California work under the overall policies described in this document.  Issues such as working conditions, harassment, discrimination, employee behavior, absenteeism, illness, insubordination, etc. are covered in a general manner in this manual. Residents alleged to have problems in these areas should be handled in accordance with the procedures outlined herein. A copy is available for reference in the Office of Graduate Medical Education. |
| **2. Memorandum of Understanding (MOU) between the Los Angeles County Committee of Interns and Residents (CIR) and the County of Los Angeles** This document addresses issues specific to the resident physician such as vacation time, leave of absence, and educational leave, etc. Resident salaries and other similar specific issues are | **2. Resident Physician Contracts** Issues such as vacation time, leave of absence, educational leave, and resident salaries, fringe benefits, and other conditions of employment are addressed in the Resident Physician Contract between USC and the residents employed by USC. **3. Medical Staff Manuals and Policy and Procedure Manuals of Facilities** |

| | |
|---|---|
| addressed in this document.<br>A copy of the CIR MOU is available for reference in the Office of Graduate Medical Education. The GME staff and the LAC+USC Office of Human Resources can assist a resident with specific questions.<br>**3. Physician Postgraduate (Resident Physician) Personnel Policy and Procedure Manual and LAC+USC Medical Center Medical Staff Manual.**<br>These documents describe specific areas of professional responsibility with which both resident physicians and Medical Staff Physicians must comply. Examples of these areas include specific patient care issues, licensure requirements, on-call duties, and maintenance of medical records. As employees of Los Angeles County assigned to the LAC+USC Medical Center, residents are expected to adhere to these policies. | **to which Residents are assigned**<br>Specific areas of professional responsibility with which both resident physicians and medical staff physicians must comply are described in Medical Staff Manuals and Policy and Procedure Manuals of facilities to which residents are assigned as part of the educational curriculum of their residency program. Examples of these areas include specific patient care issues, licensure requirements, and on-call records. As physicians practicing under the direction of faculty in each of the facilities, residents are expected to adhere to these policies of the healthcare facilities. |

**4. Department Resident Training Policy Manual**

Based upon ACGME requirements for accreditation of residency training programs, each department with a training program must have a document that outlines basic academic standards that its residents must maintain in order to achieve satisfactory completion of the program. In any dispute about the medical knowledge, clinical judgment, quality of patient care or professional conduct of the resident, the resident should consult his/her specific departmental training policy manual.

## PROCEDURES FOR DISCIPLINE AND DUE PROCESS

### 1.  Purpose and Intent

These guidelines state the general practices and policies of LAC+USC Medical Center and the University of Southern California regarding resident discipline. These guidelines are designed to assist Program Directors and managers in determining when and how to impose discipline and to inform residents of the Medical Center's and Keck School of Medicine's policies and practices in this area.  To the extent feasible and practical, the intent is to have a single policy and procedure for discipline of residents.  Where the policies of the two institutional sponsors, LAC+USC Medical Center and Keck School of Medicine, cannot be resolved into a single policy, the separate policies are shown side by side.

The purpose of discipline is to ensure the quality of care for patients and resident adherence to acceptable and reasonable standards of performance and conduct.

The application of these guidelines requires the consideration of many factors and the use of good judgment.  While these guidelines list factors to be considered in discipline matters, they should be used in consultation with the Director of Graduate Medical Education and/or the Office of Human Resources.

### 2.  Non-disciplinary Action

Not all inappropriate behavior will require the imposition of discipline. In some cases non-disciplinary actions such as counseling may be appropriate.  The purpose to non-disciplinary action is to inform the resident of a potential problem and to help correct the problem before it becomes significant.

Some examples of non-disciplinary actions are: counseling the resident about work and or performance problems before they become significant, i.e., leaving the work area without permission, not answering pages, unexcused absences or re-training to improve performance. Non-disciplinary actions should occur as soon as possible after the unacceptable behavior or poor performance is first noted.

### 3.  Disciplinary Action

### A.  Unacceptable Off-the-job conduct

Normally, employees cannot be disciplined for misconduct that occurs while off the job.

| **Residents Employed by LAC+USC Medical Center.** | **Residents Employed by the Keck School of Medicine.** |
|---|---|
| Any unacceptable behavior or conduct by residents while off duty in which common sense dictates as unprofessional or which may affect or reflect negatively on the resident's department, the Medical Center, the Department of Health Services, or the County of Los Angeles, may subject a resident to discipline.<br><br>Off-the-job conduct may also subject a resident to discipline when it is deleterious to the Civil Service system or County government without being specifically related to a particular job. For example, a resident who falsifies a resume, or cheats on a Civil Service examination application, is subject to disciplinary action, including termination. | Any unacceptable behavior or conduct by residents while off duty, which common sense dictates as unprofessional or which may affect or reflect negatively on the resident's department, the Keck School of Medicine, or the University of Southern California, may subject a resident to discipline. |

**B. Unacceptable On-the-Job Conduct**

Unacceptable on-the-job behavior encompasses failure of a resident to perform his/her assigned duties so as to meet stated or implied standards of performance.

Unacceptable behavior or conduct may include, but is not limited to, qualitative as well as quantitative elements of performance, such as failure to exercise sound judgement, failure of a resident to follow instructions or to comply with policies and procedures of his/her employer (County and Medical Center or University of Southern California, as the case may be), failure to report information accurately and completely, failure to deal effectively with the public, and failure to make productive use of human, financial and other assigned resources.

**C. Progressive Discipline**

The paramount concern and overriding consideration in all discipline matters is the potential for harm to patients and quality of care for the patient.

Considerations regarding the circumstances surrounding any misconduct and the likelihood of its recurrence are also relevant. The imposition of discipline should be consistent with the concept of progressive discipline, if appropriate.

The degree of discipline imposed must be determined by the specific circumstances of each case. The disciplinary steps from least to most severe are: preliminary warning, final warning, institutional probation and termination. The most severe disciplinary sanction, termination can be imposed upon a single incident, if appropriate. It is not necessary to impose every level of discipline before imposing a given level.

### D. Non-Progressive Discipline

Circumstances in some situations may require bypassing progressive discipline.

Conduct, which may not be appropriate for progressive discipline, is conduct that a resident should know to be unacceptable without specific notice from the resident's employer. This includes behavior such as dishonesty, illegal conduct, or any conduct that places the Medical Center or other facility, to which the training Program Director may assign the resident, in violation of any state, federal law or court order.

The seriousness of the conduct, the frequency of its occurrences, and the attitude of the employee regarding the conduct are among factors that may require non-progressive discipline.

These acts may result in termination without consideration of prior service or imposition of previous discipline.

### 4. Multiple Violations

There are situations in which separate and distinct violations may occur within a single incident. All violations should be considered in determining the appropriate level of discipline to be imposed.

### 5. Steps for Discipline

The imposition of the proper discipline stems from a determination of the facts, an evaluation of whether the facts reflect the employee misconduct, a judgement on the significance of the misconduct and the proper disciplinary

action response.  The determination of the facts always involves an investigation by the Program Director.

| **Residents employed by LAC+USC Medical Center.** | **Residents Employed by the Keck School of Medicine.** |
|---|---|
| Conducting an investigation may also require management to involve one of the following:  the Office of Graduate Medical Education, the Office of Human Resources staff, the Department of Health Services Inspections and Audits Division, the County Department of Auditor-Controller, the County Sheriff's Department or other local, state or federal law enforcement agencies.  Allegations of resident misconduct involving patient care shall be reported to the chief of Staff/Medical Director of the facility where the incident occurred.  The Chief of Staff will decide whether the investigation of the alleged misconduct should involve others in addition to the resident's Program Director.

Please note:  Involving anyone else except the Office of Graduate Medical Education and the Office of Human Resources is to be coordinated through the Office of Human Resources.

The extent of the investigation is determined by the nature and seriousness of the allegations, performance problem or misconduct.

An evaluation of the facts shall be done prior to the imposition of any discipline.  Any alleged misconduct must be | Conducting an investigation may also require management to involve one of the following:  the Office of Graduate Medical Education, the Office of Human Resources staff, and other investigative agencies that may be appropriate to the circumstances of the incident.  Allegations of resident misconduct involving patient care shall be reported to the Chief of Staff/Medical Director of the facility where the incident occurred.  The Chief of Staff will decide whether the investigation of the alleged misconduct should involve others in addition to the resident's Program Director. |

| | |
|---|---|
| analyzed and investigated. Misconduct may result from violation(s) of Civil Service Rules, County policies, departmental policies, Medical Center policies, state or federal law, local ordinances, court orders, or implied or specified standards of professional behavior. | |

Disciplining an employee should be an impartial step taken with the intent of correcting the misconduct or poor performance before it becomes more severe or an incorrigible pattern. Discipline should be imposed as soon as possible after the incident or problem occurred.

Finally, the judgment of whether discipline is appropriate should be based upon several factors.

| Residents Employed by LAC+USC Medical Center. | Residents Employed by the Keck School of Medicine. |
|---|---|
| A. Seriousness of the offense, the impact, actual or potential, upon the Medical Center and/or the community;<br>B. The length of service and overall performance of the resident;<br>C. The attitude and the culpability of the resident; and<br>D. Previous discipline and the length of time since imposed. | A. Seriousness of the offense, the impact, actual or potential, upon the University and /or the community;<br>B. The length of service and overall performance of the resident;<br>C. The attitude and the culpability of the resident; and<br>D. Previous discipline and the length of time since imposed. |

## 6. Levels of Discipline

When a Program Director identifies a resident performance problem (academic or other professional performance inclusive of behavioral issues) that could lead to failure to meet acceptable standards by the end of the academic year, the department should give the resident **written** notification of the deficiencies and to outline a plan of correction.

The following process should be followed in monitoring the competency of any resident. In most, but not every instance, all steps should be used in sequence. The **recommendation for immediate removal from the job** (summary suspension) should be reserved for issues of gross professional misconduct such as abandonment of patient care, forging prescriptions and similar misdeeds.

## A.  Preliminary Warning

A written Preliminary Warning is normally issued when an incident and/or deficiency impact upon departmental operation, either academic or non-academic, or when prior actions have not corrected the pattern of behavior or performance.  Examples of problems that may lead to such action include but are not limited to:  unexcused absences, deficiencies in medical knowledge and/or clinical judgment, failure to seek help when needed, etc.

The written warning must state that it is a "preliminary warning" letter and contain the following elements:

1. Describe or document the misconduct and its lack of acceptability; The written warning must detail the deficiencies in behavioral, academic and/or clinical performance for or on which the resident failed to meet the acceptable standards and the impact this deficiency had on this performance.
2. Identify previous counseling or discipline;
3. Reference the expectations for future performance or conduct;
4. Identify the disciplinary consequences of repetition, continuation, or lack of improvement.
5. Incorporate the resident's stated reasons for his or her action; and
6. Request the resident to sign and date the document.  This acknowledges only that the resident has received the document.  If the resident refuses to sign, the Program Director should request that another management employee be present to witness the refusal of the resident to sign for the document.  The Program Director should amend the document to include a notation that the resident refused to sign.  The Program Director, and the management representative, should then affix their signature and date to the document directly below the notation.

A resident is entitled to file a written grievance at any step during this process (See Grievance Procedure).

## B. Final Warning

A written Final Warning usually is the second phase of progressive discipline. The elements of the letter of Final Warning are the same as the letter of Preliminary Warning.

The written warning must state that it is a letter of "final warning" and contain the following elements:

1. Describe or document the misconduct and its lack of acceptability; The written warning must detail the deficiencies in behavioral, academic and/or clinical performance for or on which the resident failed to meet the acceptable standards and the impact this deficiency had on this performance.
2. Identify previous counseling or discipline;
3. Reference the expectations for future performance or conduct;
4. Identify the disciplinary consequences of repetition, continuation, or lack of improvement.
5. Incorporate the resident's stated reasons for his or her action; and
6. Request the resident to sign and date the document. This acknowledges only that the resident has received the document. If the resident refuses to sign, the Program Director should request that another management employee be present to witness the refusal of the resident to sign for the document. The Program Director should amend the document to include a notation that the resident refused to sign. The Program Director, and the management representative, should then affix their signature and date to the document directly below the notation.

A resident is entitled to file a written grievance at any step during this process (See Grievance Procedure).

## C. Institutional Probation

If the resident has not corrected the problems and/or areas of deficiency outlined in written warning(s), then the Residency Program Director may initiate the process of placing the resident on Institutional Probation, However, if the problems are sufficiently severe, this step can be initiated directly per section 3.C-D.

**The following elements must be included in the written notice to Resident Physician with regard to Institutional Probation.**

1. Specific reason(s) for placing the resident on Institutional Probation (i.e., in what areas specifically is the resident deficient).

   The written notification must detail the deficiencies in behavioral, academic and/or clinical performance in which the resident failed to meet acceptable or reasonable standards.

2. Specific dates of the probationary period. The duration of the period for performance improvement must be specified and reasonably associated with the deficiency. A probationary period is usually for six (6) months.

   Under no circumstances can the dates be retroactive (i.e., the beginning of the probationary period cannot be prior to the date the resident receives his/her written notification nor can the probationary period be indefinite or unreasonable.

3. Program of Remedial Action and Education including Academic and/or Behavioral issues.

   A program of corrective action shall be stated for the resident to follow. The residents should be provided with ongoing **written** feedback, particularly on continued deficiencies.

   When necessary, this will include the appointment of one or more faculty to work with the resident on a regular basis, using a planned individualized format. This format may include supervision of history and physical examination, close follow-up and care of certain patients, tutorial sessions, etc.

   During the probationary period the Program Director or faculty designed to supervise the resident's remedial training and/or review the resident's behavioral issues will meet periodically with the resident for counseling. At minimum, such counseling shall occur at least at the mid-point and at the end of the probationary period. These counseling sessions will be to inform the resident of his/her progress in resolving the deficiencies. A written confirmation of these counseling sessions will be given to the resident within five (5) business days after the counseling sessions.

4. Specific expectations the resident must meet to be taken off probationary status and the consequences that will follow if the resident fails to meet these expectations.

5. Request the resident to sign and date the document. If the resident refuse to sign, the Program Director should request that another management. Employee be present to witness the refusal of the resident to sign for the document. The Program Director should amend the document to include a notation that the resident refused to sign. The Program Director, and the management representative, should then affix their signature and date to the document directly below the notation.

Prior to giving the resident written notice of Institutional Probation, the Program Director shall submit the letter to the Office of Graduate medical Education for review as to appropriateness of the form of the letter. Copies of the letter notifying the resident of placement on probation and any subsequent written notification of any actions taken regarding the probation must be filed immediately with the Office of GME.

A resident is entitled to file a written grievance at any step during this process (See Grievance Procedure).

## D. Termination (Dismissal/Release)

### 1. Nonacademic Reasons

If a Physician is to be recommended for termination for nonacademic reason, the following procedure **must** be followed.

| Residents Employed by LAC+USC Medical Center. | Residents Employed by the Keck School of Medicine. |
|---|---|
| a. A recommendation shall be submitted in writing by the Program Director to the Director of Graduate Medical Education.<br>b. The Director of Graduate Medical Education will review the recommendation along with | a. A recommendation shall be submitted in writing by the Program Director to the Associate Dean for Graduate Medical Education.<br>b. The Associate Dean for Graduate Medical Education will review the |

| | |
|---|---|
| documentation provided, and if appropriate, submit a written recommendation for termination to the Director of Human Resources, LAC+USC Medical Center and the Chief of the Medical Staff.<br><br>c. The Office of Human Resources will review the recommendation along with the documentation provided, and if appropriate, assist the Department Chair in proceeding with the termination (e.g., investigation, writing the termination letter, etc.)<br><br>d. The termination letter will specify the reasons for the resident's release and detail the appeal process available to the resident. The appeal process, known as "liberty interest," affords the resident the right to respond to this termination action either orally, in writing or both. | recommendation along with the documentation provided, and if appropriate, submit a written recommendation for termination to the Dean, Keck School of Medicine.<br><br>c. The Dean, Keck School of Medicine, or designee will review the recommendation along with the documentation provided, and if appropriate, assist the Department Chair in proceeding with the termination (e.g., investigation, writing the termination letter, etc).<br><br>d. The termination letter will specify the reasons for the resident's release and detail the appeal process available to the resident. The appeal process affords the resident the right to respond to the termination action either orally, in writing, or both. |
| A resident is entitled to file a written grievance at any step during this process (See Grievance Procedure). | A resident is entitled to file a written grievance at any step during this process (See Grievance Procedure). |

## 2. Academic (Professional Knowledge and Clinical Judgment) Reasons

When termination of a resident physician is necessary for academic reasons, the following procedure must be followed.

| Residents Employed by LAC+USC Medical Center. | Residents Employed by the Keck School of Medicine. |
|---|---|
| a. The resident is notified, in writing, that his/her dismissal from the Residency Program is being recommended. This notification must detail the reasons for this recommendation and notify the resident he/she is entitled to a departmental pre-termination hearing. | a. The resident is notified, in writing, that his/her dismissal from the Residency Program is being recommended. This notification must detail the reasons for this recommendation and notify the resident he/she is entitled to a departmental pre-termination hearing. |
| b. A departmental pretermination hearing with the resident must be held and the resident is entitled to have representation at this hearing. However, the Program Director or Department Chair must have five (5) working days advance notice of such intention to be represented. The pretermination hearing will be held with the Training Program Director and/or the Department Chair. | b. A departmental pretermination hearing with the resident must be held and the resident is entitled to have representation at this hearing. However, the Program Director or Department chair must have five (5) working days advance notice of such intention to be represented. The pretermination hearing will be held with the Training Program Director and/or the Department Chair. |
| c. If after the pretermination hearing, the recommendation for the resident's termination remains, a written recommendation is forwarded to the Chief of Staff. A copy of this recommendation is forwarded to the resident notifying him/her this decision may be appealed to the Chief of Staff. | c. If after the pretermination hearing, the recommendation for the resident's termination remains, a written recommendation is forwarded to the Dean, Keck School of Medicine. A copy of this recommendation is forwarded to the resident notifying him/her that this decision may be appealed to |

d. The resident may appeal this recommendation by submitting a written appeal letter to the Chief of Staff within ten (10) business days from receipt of the letter recommending dismissal.

e. The Chief of Staff shall appoint a Residency Review Committee to review this recommended action. The Director of Graduate Medical Education, who shall be a nonvoting member, shall chair this Residency Review Committee. The membership shall consist of (5) persons: three (3) staff members and two (2) senior level residents, none of whom shall be a member of the resident's department.

f. The resident shall have the right to appear before the Residency Review Committee with representation if so desired. However, the resident must notify the Chief of Staff at least five (5) business days in advance of such intent to be represented.

g. The Residency Review Committee shall submit a written report of its findings and recommendations to the Chief of Staff within fifteen (15) business days from the hearing date.

h. The Chief of Staff's decision shall be rendered, in writing, to the resident, within ten (10) business days of receipt of the Residency Review Committee's recommendations.

i. If the Chief of Staff sustains the

the Dean.

d. The resident may appeal this recommendation by submitting a written appeal letter to the Dean within ten (10) business days from receipt of the letter recommending dismissal.

e. The Dean shall appoint a Residency Review Committee to review this recommended action. The Associate Dean for Graduate Medical Education, who shall be a nonvoting member, shall chair this Residency Review Committee. The membership shall consist of five (5) persons: three (3) faculty members and two (2) senior level residents, none of whom shall be a member of the resident's department.

f. The resident shall have the right to appear before the Residency Review Committee with representation if so desired. However, the resident must notify the Dean at least five (5) business days in advance of such intent to be represented.

g. The Residency Review Committee shall submit a written report of its findings and recommendations to the Dean within fifteen (15) business days from the hearing date.

h. The Dean shall render his decision, in writing, to the resident, within ten (10) business days of receipt of the Residency Review Committee's recommendations.

| | |
|---|---|
| resident's dismissal from the Residency program, the Chief of Staff will notify, in writing, the Office of Human Resources to proceed with the termination of the resident.<br><br>j. The Office of Human Resources will review the documentation provided, and, if appropriate, write a termination letter notifying the resident that he/she is being dismissed from County service.<br><br>k. The termination letter will specify the reasons for the resident's release from County service and detail the appeal process available to the resident. The appeal process, known as "liberty interest" gives the resident the right to respond to this termination action either orally in writing, or both.<br><br>**Please note: The resident may not be taken off duty until the effective date of termination detailed in the termination letter.**<br><br>**A resident is entitled to file a written grievance at any step during this process (See grievance Procedure).** | i. If the Dean sustains the resident's dismissal from the Residency program, the Dean will notify, in writing, the resident of his/her termination.<br><br>The Dean's decisions are final and without further appeal. |

## 7. Management's Role

Before any potential disciplinary action is considered, the following points should be followed:

1. Investigate and consider all sources of relevant information (facts, not opinions);

2.  Verify information;
3.  Consult with all applicable parties.
4.  Analyze the facts thoroughly and objectively;
5.  Summarize the matter in writing;
6.  Determine if the level of discipline is appropriate; and

| **Residents Employed by LAC+USC Medical Center**. | **Residents Employed by the Keck School of Medicine.** |
|---|---|
| 7.  Consider other factors, such as the liability or potential liability incurred by the Medical Center or County, the jeopardy to public safety, and the harm or risk of harm to persons or property.<br><br>If, at the time a disciplinary action is being contemplated, the department is uncertain regarding the appropriate action to take, or if a resident is uncertain regarding his/her due process rights, either party should contact the Office of Graduate Medical Education for assistance. Residents may also wish to contact the JCIR. | 7.  Consider other factors, such as the liability or potential liability incurred by the University of Southern California, the jeopardy to public safety, and the harm or risk of harm to persons or property.<br><br>If, at the time a disciplinary action is being contemplated, the department is uncertain regarding the appropriate action to take, or if a resident is uncertain regarding his/her due process rights, either party should contact the Office of Graduate Medical Education for assistance. |

## GRIEVANCE PROCEDURE

| **Residents Employed by LAC+USC Medical Center.** | **Residents Employed by the Keck School of Medicine.** |
|---|---|
| The resident may appeal all actions through formal grievance procedures. The resident may obtain grievance forms from the Office of Graduate Medical Education, the Office of Human Resources or JCIR and initiate such procedures.<br><br>To be considered timely, the resident must file a grievance with the Program Director and send a copy to the Office of Human Resources within ten (10) business days from receipt of the document/action being grieved. If the grievance is filed in an untimely manner (i.e. exceeds ten business days,) the Program Director and the Office of Human Resources are not required to accept it.<br><br>However, if the grievance is filed timely and denied, the resident may file the grievance at the second level with the Department Chair.  If the second level grievance is filed timely and denied, the resident may file the grievance at the third level at the Medical Center Office of Human Resources.<br><br>**It is imperative that Management responses to grievances at all levels be given within the ten (10) business day time frame, even if the grievance is denied, due to the requirements of the JCIR MOU.   Failure to respond or** | University residents may use the University's Staff Grievance Procedures in effect when a grievance is filed. The current Staff Grievance Procedures may by found on the University website (http://policies.usc.edu) |

| | |
|---|---|
| **failure to respond in a timely manner at any level automatically results in the granting of the grievance.** | |

GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC) UNIVERSITY OF SOUTHERN CALIFORNIA/LAC+USC MEDICAL CENTER

## INTERNAL REVIEW POLICY AND PROTOCOL

## I.  PURPOSE

The Accreditation Council for Graduate Medical Education (ACGME) requires the Sponsoring Institution (SI) to perform an Internal Review of each its ACGME programs at approximately the mid-point between effective date of accreditation and the proposed date for the next site visit.  Timely completion of the Internal Review with GMEC monitoring of the program director's corrective action plan meets ACGME institutional and program requirements and provides a structured mechanism for the SI and its programs to continuously improve the quality of residency education.

The GMEC of the University of Southern California/ LAC+USC Medical Center as the Sponsoring Institution will conduct a minimum of one Internal Review in accordance with ACGME Institutional Requirements Section IV for each of its ACGME accredited residency programs at approximately the mid-point date identified in the program's most recent Letter of  Notification of accreditation. The mid-point will correspond to the approximate date that the GMEC reviews and approves the written Internal Review Report.   Review of required documentation, interviews and the written report will be completed by the internal review committee within the 60 days immediately preceding the review and approval by the GMEC.  Additional Internal Reviews may be scheduled at the discretion of the GMEC.

The Internal Review will assess the program's compliance with Institutional, Common and specialty/subspecialty requirements, educational objectives and the effectiveness of meeting those objectives, educational and financial resources, effectiveness in addressing areas of non-compliance and concerns in previous letters of notification and internal reviews, resolution of issues identified in the most recent ACGME resident survey, duty hour compliance,  effectiveness of using educational tools and outcome measures to assess the level of competency for each resident in each of the ACGME general competencies, and effectiveness of annual, written program improvement efforts to include as a minimum  a) resident performance using aggregated resident competency evaluations; b) faculty development; c) graduate performance outcome data including  certifying examination results; and d) program quality measures including written,

confidential resident and faculty evaluations of the program as per Common
Program Requirements (V.C.) effective July 1, 2011.

## II. COMPOSITION OF INTERNAL REVIEW COMMITTEE (IRC)

The Internal Review Committee (IRC) will be omprised of the following five
members:
- A. **Chairperson (1)**
  1. A program director or associate program director appointed by the
     DIO, who is from a program and Department not under review.
- B. **Faculty (1)**
  At least one faculty member appointed by the IRC Chairperson who is
  knowledgeable about GME and is not from the program or
  Department under review.  Additional faculty may be appointed by
  the IRC Chairperson.
- C. **Resident (1)**
  At least one resident appointed by the IRC Chairperson who is in an
  approved ACGME program and is not from the program or
  Department under review.  Additional residents may be appointed
  by the IRC Chairperson.
- D. **Institutional Administrator (1)**
  1. Institutional administrator appointed by the DIO who          is
     not administrator of the program or Department under review.
- E. **Director, Graduate Medical Education or designee (1)**

## III.    INTERVIEW PROCESS

The Internal Review Committee will interview at least three separate groups for
approximately 45 to 60 minutes each as follows:

**A.** <u>**Program Director**</u>.  This interview must include the Program Director
and may include the Associate Program Director (s) and/or Residency
Program Coordinator as per the Program Director.

**B.** <u>**Faculty:**</u> A minimum of two (2)  faculty other than the program director
must be interviewed  for programs with $\leq$ 10 residents; a minimum of
four (4) faculty for programs with $\leq$40 residents; and a minimum of 6
faculty for programs with >40 residents.  Faculty must be selected by the
program director and should be significantly involved in the educational

program. At least one faculty representative should be a member of the program's GMEC.

**C.** **Residents:** A minimum of two (2) peer-selected residents from each post-graduate year of the program must be interviewed.  There is no maximum to the number of residents who can participate.  For programs with <12 residents, all residents available on the day of the IRC review must participate in the interview. Residents must be relieved of all duties during the interview session. Residents must be interviewed as a group without the program director or faculty present.

**D.** **Other interviews:**  The Department Chair may participate in the faculty interview session at the discretion of the Program Director or may be interviewed by the IRC in a separate 15-minute session as per the request of the Department Chair, Program Director or IRC.  A separate interview session with the Department Chair does not exclude the requirement to interview the Program Director, Faculty and Residents in three separate sessions.  Participation by the Department Chair is encouraged.

**CONFIDENTIALITY OF THE INTERVIEW PROCESS AND DOCUMENTS RELEVANT TO THIS INTERNAL REVIEW, THE INTERNAL REVIEW REPORT AND THE CORRECTIVE ACTION PLAN:**

The GMEC is a subcommittee of the Attending Staff Association and is bound by the bylaws of that association with regards to conduct of all activities. Each IRC member will be required to sign a statement of confidentiality to ensure the following for the internal review report and any notes or conversation regarding the process and content of the report:

**"The information contained in this document and any attachment is privileged and confidential under state law, including Evidence Code section 1157 relating to medical professional peer review documents and Government Code Section 6254 relating to personnel records"**

## IV.    MATERIALS TO BE REVIEWED BY THE IRC
### A. Institutional, Common and Specialty/subspecialty requirements

| ATTACHMENT | CONTENT | CHECK |
|---|---|---|
| 1 | Completed Internal Review Program Information Form | ___ |
| 2 | Copy of last ACGME accreditation letter of notification and Internal Review and corrective action plans for any citations, concerns, areas of improvement, etc. | ___ |
| 3 | Copy of last ACGME Resident Survey and Corrective action plan for any areas shaded in gray | ___ |
| 4 | Curriculum with goals and objectives that integrate the six general competencies for your program and for each year of the program | ___ |
| 5 | Summary of curriculum changes since last ACGME site visit | ___ |
| 6 | A list of the internal and external outcome measures used to assess the quality of your program as part of your annual program review and.documentation the Program has implemented a process that links Educational outcomes with program improvement | ___ |
| 7 | Tools currently in use in your program to evaluate: | |
| | Six general competencies | ___ |
| | Six-month required summative evaluations | ___ |
| | Final evaluation of graduating residents | ___ |
| | Form used by residents to evaluate faculty | ___ |
| | Form used by residents to evaluate the program | ___ |
| 8 | A narrative including one (1) learning activity for each of the following: | |
| | Developing effective communication | ___ |
| | Team leadership | ___ |
| | Quality improvement | ___ |
| | Commitment to professional and/ethical behavior | ___ |
| | Systems-based practice | ___ |
| | Scholarly activity | ___ |
| 9 | Block diagram for each year of the program | ___ |
| 10 | Master schedule for current year residents | ___ |
| 11 | Resident and faculty call schedules for last 3 months | ___ |
| 12 | Conference Schedule for current academic year | ___ |
| 13 | Minutes of program's GMEC for past year including Annual Program Review | ___ |
| 14 | Certification board scores for past 3 years | ___ |
| 15 | Tracking data on graduates | ___ |
| 16 | Program policies for | |
| | Selection of residents | ___ |
| | Promotion of residents | ___ |
| | Disciplinary action and grievance | ___ |
| 17 | Competency based goals and objectives for program and for each major rotation for each year of residency | ___ |
| 18 | Policy for resident duty hours in the learning and working environment (Sec VI of Common Program Requirements | ___ |
| 19 | Copies of your current Letters of Agreement | ___ |
| Available | Have files for 2 current residents and 2 recent graduates | ___ |

V.    PROTOCOL FOR INTERNAL REVIEW COMMITTEE

A. Program director will receive Internal Review Protocol and IR Program Information Form from the GME office 90 days prior to the proposed review date.

B. Program director to submit IR Program Information Form and required supporting documents to GME office at least 14 days prior to the review. A completed PIF may also be required at the discretion of the DIO and Internal Review Chair.

C. GME office to coordinate selection of committee members and schedule interview sessions at least 14 days prior to the review so that interviews can be completed in a single 3-hour block of time.

D. GME office to distribute copies of Program Information Form and supporting materials (Section IV) to internal review committee 10 days prior to review.

**E. Interview with the Program Director should address:**
1. Effectiveness of data supported corrective action plans in addressing and resolving previous ACGME/RRC citations and concerns from previous Internal Review.
2. Effectiveness of resolving areas highlighted in gray as non-compliant from the most recent ACGME Resident Survey.
3. Review that the overall and each year's competency-based goals and objectives meet milestones of learning.
4. Identify that appropriate tools are being used to evaluate the goals and objectives including milestones of learning
5. Review program's of dependable measures to assess individual resident's competency
6. Review internal and external educational outcomes used for the annual program review
7. Assess program's written annual quality improvement plan based on required outcome measures in use.
8. Adequacy of the educational and financial resources to meet the educational goals and objectives
9. Compliance with ACGME/RRC program requirements
10. Review learning activities for developing effective communication, team leadership, quality improvement, commitment to professional and ethical behavior, systems-based practice and scholarly activity including research design and critical review of the literature for life-long learning.

**11.** Monitoring and compliance of resident duty hours in the learning and work environment with consideration of the following as per Section VI of Common Program Requirements effective 7/1/2011:

A) Professionalism, Personal Responsibility, and Patient Safety;

B) Transitions of care;

C) Alertness management and fatigue;

D) Supervision of Residents;

E) Clinical Responsibilities;

F) Teamwork and

G) Duty hours compliance

12. Monitoring of resident well-being and safety

13. Autonomy of Program Director in decision making regarding the educational program

14. Documentation of appropriate evaluations in residents' files

15. Unmet educational needs of the program

**F.  Interview with Faculty should address:**

1.  Familiarity with six general competencies.

2.  Commitment to the educational goals and objectives.

3.  Role in establishing, reviewing and improving curriculum.

4.  Involvement in teaching, supervision and evaluation.

5.  Faculty involvement in mentoring residents.

6.  Faculty role in maintaining an environment of inquiry and scholarly activity including adequacy of resources such as laboratory space, equipment, computers, statisticians, etc. and faculty professional development.

7.  Understanding, commitment and oversight of resident duty hours in the learning and working environment.

8.    Unmet educational needs of the program.

**G. Interview with Residents should address:**

1.  Validation that residents were peer selected for interview session for programs with complement $\geq 12$ residents.

2.  Program strengths and weaknesses: In general, the IRC should draw conclusions of strengths and weaknesses through open-ended questions. Positive comments or concerns identified in the IRC report should reflect agreement by the majority of residents interviewed.

3.  Balance between education and service

4.  Adequacy of faculty supervision and teaching

5. Familiarity with program policies
6. Identify if residents believe that curriculum content adequately addresses the six general competencies.
7. Case logs should be reviewed to document residents are at 30th percentile for surgical procedures.
8. Duty hours in the learning and working environment including provisions for adequate backup support when patient care responsibilities are difficult or prolonged
9. Adequacy of institutional support including medical records, phlebotomy/IV, transport, messengers, nurses, social workers, food service, laboratory
10. Availability and privacy of on-call rooms
11. Appropriate security and personal safety
12. Adequacy of medical information systems including    laboratory and radiology retrieval
13. Frequency of evaluations by faculty and discussion of same
14. Semi-annual meetings with program director
15. Opportunity for residents to anonymously and confidentially evaluate faculty, the educational program and working environment without fear of intimidation or retaliation
16. Unmet educational needs of the program and other areas for improvement

## I. **IRC written report and GMEC follow up**

1. The IRC Chair with assistance from GME office  is responsible for preparing the Internal Review Committee Report using the attached reporting template.
2. The written report should be submitted to the GME Director in MS Word format within 30 calendar days of the date of the Internal Review interviews.
3. The report will be placed on the agenda of the GMEC at the monthly meeting immediately following submission of the report. The report, discussion and action will be documented in the minutes of the GMEC.
4. Upon approval by the GMEC, the report will be submitted to the Program Director for review.
5. The DIO and GME staff will meet with the program director to provide guidance and support for the CAP.

6.  A written corrective action plan (CAP) with supporting documentation to each concern in Section XIII of the report  must be submitted to the GMEC within 1 to 6 months depending upon concerns, proximity to external review and as determined by a vote of the GMEC.

7.  Presentation of the written CAP will be scheduled on the GMEC agenda as per the vote of GMEC upon IRC report approval.  The program director will be invited to the meeting to present the CAP. Discussion and action by the GMEC will be recorded in the minutes. The CAP must be approved by the GMEC or returned to the program director for further action.  If necessary, a revised CAP regarding any unresolved concerns will be required within 1 to 6 months of the original CAP as per vote of the GMEC.  A CAP is not final until approved by the GMEC without need for additional revisions.

8.  **Once the GMEC has voted final approval of the IRC report and the CAP, the DIO will forward a confidential copy to: GME office; Program Director;  Department Chair;  CEO LAC+USC Medical Center;  Dean, Keck School of Medicine of USC; Chief Medical Officer, LAC+USC Medical Center and the President, Attending Staff Association.**

**Internal Review Committee Report Template:**

Program Reviewed:
Date of Internal Review Interviews:
Current resident complement:
Accreditation Status
Effective Date of Accreditation:
Date of next ACGME site visit:
Accreditation cycle:
Midpoint of accreditation cycle:
Date report approved by GMEC:

The text of the report should be divided into **XIV** sections as follows:

I.      **Membership of Internal Review Committee (name and title)**

II.     **Materials Reviewed**

III.    **Program Director and faculty interviewed (names and titles)**

IV.     **Names of peer-selected residents interviewed with year of residency**

V.      **Format of interviews**

VI.     **General comments regarding strengths of the program**

VII.    **Educational and financial resources for effective administration of the program**

VIII.   **Concerns regarding the need for additional corrective actions to address ACGME citations and previous Internal Review concerns**

IX.     **Concerns identified from the ACGME Residency Survey**

        **DUTY HOUR DOMAIN (see Section XI. G. of this report)**


        **FACULTY DOMAIN:**


        **EVALUATION DOMAIN:**

69

**EDUCATIONAL CONTENT DOMAIN:**

**RESOURCE DOMAIN:**

X.    **Adequacy of competency-based goals and objectives to achieve milestones of learning**

XI.    **Compliance with ACGME minimum standards for resident duty hours in the learning and working environment including:**

A. Professionalism, Personal Responsibility and Patient Safety

B. Transitions of care

C. Alertness Management/Fatigue Mitigation

D. Supervision of Residents

E. Clinical Responsibilities

F. Teamwork

G. Resident Duty Hours

XII.    **Compliance with ACGME outcome project including the program's effectiveness in conducting and documenting an annual program review and implementing the program quality improvement efforts recommended in the annual review report**

XIII.    **Summary of concerns identified by the Internal Review Committee from materials reviewed, interviews and sections VI-XII above that must be addressed in the written corrective action plan**

XIV.    **Summary statement including proposed date for submission by the program director to the GMEC of a written corrective action plan to this internal review report**

**Internal Review Committee's Checklist:**

**PLEASE ANSWER "YES" OR "NO" TO THE FOLLOWING:**

1. Was the Internal Review PIF complete?                    Yes__No__
2. Were the residents peer selected?                        Yes__No__
3. Were all citations from ACGME letter resolved?           Yes__No__
4. Were issues on resident ACGME survey resolved?           Yes__No__
5. Duty hour compliance in learning/work environment? Yes__No__
    A. Compliance with Professionalism, Personal
       Responsibility, Patient Safety            Yes    No
    B. Compliance with Transitions of care        Yes    No
    C. Alertness Management/Fatigue mitigation    Yes    No
    D. Supervision of Residents                   Yes    No
    E. Clinical Responsibilities                  Yes    No
    F. Teamwork                                   Yes    No
6. Were goals and objectives competency based?             Yes__No__
7. Sufficient tools to measure resident competency?        Yes__No__
8. Was there a semi-annual evaluation?                     Yes__No__
9. Was the language in the final evaluation appropriate? Yes__No__
10. Were there GMEC minutes for past year?                 Yes__No__
11. Did the minutes contain an annual program review?      Yes__No__
12. Did the minutes verify use of outcome measures?        Yes__No__
13. Do faculty discuss evaluations with residents?         Yes__No__
14. Do residents participate in research?                  Yes__No__
Did you identify learning activities for each of the following (15-20):
15. Developing effective communication?                    Yes__No__
16. Team leadership?                                        Yes__No__
17. Quality improvement and patient safety?                Yes__No__
18. Commitment to professional/ethical behavior?           Yes__No__
19. Systems-based practice?                                Yes__No__
20. Scholarly activity?                                     Yes__No__
21. Do residents keep an educational portfolio?            Yes__No__
22. Does the program require individual learning plans? Yes__No__
23. Monitoring of medical record compliance?               Yes__No__

24. Is there substantial compliance with requirements?    Yes__No__
25. Are there sufficient education and financial resources?Yes_ No__
26. Do case logs document 30th percentile nationally?    Yes__No__

USC/LAC+USC MEDICAL CENTER
INTERNAL REVIEW PROGRAM INFORMATION FORM
**(ATTACHMENT 1)**

I.    IDENTIFYING INFORMATION

Program Name  _____

Program Director_____

Date Program Director last reviewed the program requirements _____

Date Program Director last reviewed the current PIF template  _____

Board Certification(s) and Date _____% Time for GME_____

Division Head (if applicable) _____

Department Chair _____

Number of Residents: _____ U.S. Graduates _____IMG _____

Gender of Residents:    # Males _____ # Females _____

Number of Full-time Faculty: _____ Number Board Certified _____

Number of Part-time Faculty: _____ Number of Volunteer Faculty _____

II.    GRADUATE MEDICAL EDUCATION COMMITTEE (GMEC) FOR THE PROGRAM

A. Membership of the Program GMEC:  # faculty _____ # residents _____

B. Does the membership include site directors from affiliating institutions?    **Y    N**
   If no, describe your mechanism for maintaining communication with them to
   ensure the quality of the educational experience for the residents:

   _____
   _____

C. Frequency of GMEC meetings: Monthly ____Quarterly_____Other_____

**III.    ACGME/RRC LETTER OF NOTIFICATION: (ATTACH LATEST ACGME
ACCREDITATION LETTER AS "ATTACHMENT 2" FOLLOWED BY AN
UPDATED (LAST 3 MONTHS) CORRECTIVE ACTION PLAN TO ALL
NUMBERED CITATIONS, CONCERNS, ETC).**

   A. Date of last ACGME site visit: _____
      1.  Did the program receive any citations, concerns, comments, and/or areas to be
        reviewed at the time of the next site survey in the accreditation letter?    **Y  N**
      2.  Use a separate sheet to identify an updated (last 3 months) Corrective
        Action Plan that addresses each citation or concern in the Letter of Accreditation**.**

   B. Date of last Internal Review: _____
      1.  Did the IRC identify concerns that have not been fully corrected?        **Y   N**
      2.  Identify actions planned for full correction as part of **Attachment 2.**

## IV.    ACGME RESIDENT SURVEY

   A. Provide a copy of your most recent ACGME Resident Survey (**Attachment 3.**)
   B. Provide a corrective action plan to all areas identified in gray exceeding the national
     average and plan to correct any duty hour violations identified on the survey as part of
     **Attachment 3.**

## V. EDUCATIONAL PROGRAM

   **A.** Competencies

   1. Provide a copy of your curriculum, complete with goals and objectives, that is
used for teaching the following six general competencies: patient care skills, medical
knowledge, interpersonal and communication skills, professionalism, practice-based
learning and systems-based practice **(Attachment 4).**

   2. Please identify any major curriculum changes since the last ACGME site survey
**(Attachment 5).**

   3. Provide a list of the internal and external outcome measures used to assess the quality
of your program as part of your annual program review.**(Attachment 6).**
As a minimum the list must include:
      1) aggregated resident data
      2) faculty professional development activities and scholarly activity
      3) board certification results
      4) in-training examination results
      5) written confidential evaluations of the program by residens and faculty

6) resident's scholarly activity

7) graduate surveys of program quality

4. Provide a list of 1-3 summative and formative evaluation tools used for each of the six competencies by filling out the table below.  Attach examples of these tools **(see checklist for Attachment 7)**.

| General Competencies | | | |
|---|---|---|---|
| | Evaluation Tool # 1 | Evaluation Tool #2 | Evaluation Tool #3 |
| Patient Care | | | |
| Medical Knowledge | | | |
| Interpersonal and Communication Skills | | | |
| Professionalism | | | |
| Practice Based Learning | | | |
| Systems Based Learning | | | |

B. Goals and Objectives

    1. Do you have written goals and objectives for the overall program?  **Y  N**

    2. Do you have written goals and objectives for each required rotation? **Y  N**

    3. Do you have written goals and objectives for each elective rotation?  **Y  N**

    4. Do you have written goals and objectives for each year of training?  **Y  N**

    5. Do your goals and objectives identify progressive responsibility?   **Y  N**

    6. Do your goals and objectives identify milestones for learning?    **Y  N**

    7. Are the written goals and objectives reviewed annually by the
       Program Director and the program's GMEC?                     **Y  N**

    8. Are written goals and objectives reviewed annually by the faculty?  **Y  N**

## C. Curriculum

1. Is the curriculum evaluated at least annually to ensure that it meets the goals and objectives established for your program?            **Y  N**

2. Does each trainee in your program receive the same curriculum?    **Y  N**

3. Does each trainee have the opportunity to develop a course of training to meet individual needs and interests?            **Y  N**

4. Identify the number of elective months in the overall program    **#** _____

5. Describe in **Attachment 8** one resident learning activity for each:

    1. Developing effective communication

    2. Team leadership

    3. Quality Improvement and patient safety

    4. Commitment to professional and ethical behavior

    5. Systems-based practice including legal issues,
       Practice management, cost containment.

    6. Research design, statistics and critical review of the literature
       necessary for lifelong learning

D. Learning and Teaching Environment

    1. Check all those that apply to the learning opportunities for your residents

        i. Bedside rounds                                _____

        ii. Small group seminars                     _____

        iii. Large group conferences such as grand rounds    _____

        iv. Lectures designated for residents          _____

        v. Journal Club                             _____

        vi. Morbidity and Mortality Conference       _____

        vii. Autopsy review                       _____

        viii. Structured computer based learning     _____

    2. Does your RRC specify the number and types of procedures residents must perform?                                   **Y  N**

    3. Do you document procedures using a procedure log at 30th %?    **Y  N**

    4. Does your RRC require dedicated research time for residents?    **Y  N**

    5. How many publications in the past two years have been authored or co-authored by residents?                        _____

    6. Identify the number of peer-review publications by faculty in the last 3 years.                             _____

## VI. RESIDENT RECRUITMENT

    A.  Were you able to fill through the match in the past two years?     **Y  N**
    B.  Do you predict any trouble with filling in the future?     **Y  N**

## VII. RESIDENT POLICIES

    A.  Do you have a written policy for selection of residents?     **Y  N**
    B.  Do you have a written policy for promotion of residents?     **Y  N**
    C.  Do you have a written policy for disciplinary action for residents?     **Y  N**
    D.  Do you have a written policy for resident responsibilities?     **Y  N**
    E.  Do you have a written policy for resident supervision?     **Y  N**
    F.  Do you have a written policy for resident duty hours?     **Y  N**
    G.  Are your residents on duty more than 80 hours per week averaged over
        28  days?     **Y  N**
    H.  Do your residents have 1 day in 7 off-duty averaged over 28 days?     **Y  N**
    I.  Do your residents take call more frequently than every third night?     **Y  N**
    J.   Do your interns remain on duty for more than 16 hours?     **Y   N**
    K.   Do your residents have a 24-hour limit on on-call duty with an added period
        of up to 4 hours for continuity and transfer of care, educational debriefing
        and didactic activities including a statement that no new patients may be
        accepted after 24 hours?     **Y  N**
    L.  Do your residents have a 10-hour minimum off-duty period between
        Routine duty periods?     **Y  N**
    M  For residents taking call from home and are called into the hospital, is
        the time spent in the hospital counted toward the weekly duty hour limit?     **Y  N**
    N. Do you have a moonlighting policy to monitor moonlighting activities?     **Y  N**
    O.  Do you have a written policy to monitor and support the physical and
        emotional well being of residents including the monitoring of residents for the adverse
        effects of sleep loss and fatigue mitigation to promote an educational environment and
        safe patient care?     **Y  N**
    P.  Do you routinely for monitoring resident work hours?     **Y  N**
    Q.  Do you have policies and a mechanism for evaluating the following:
        -Compliance with Professionalism, Personal Responsibility,Patient Safety?**Y  N**
        -Compliance with Transitions of Care (handoffs)?     **Y  N**
        -Compliance with Altertness management/fatigue mitigation?     **Y  N**
        -Compliance with Supervision of residents?     **Y  N**
        -Compliance with Clinical Responsibilities?     **Y  N**
        -Compliance with Teamwork?     **Y  N**

## VIII. EVALUATION

Do you have a global evaluation form addressing the 6 competencies that is reviewed with
    each resident at least every 6 months?    **Y  N**

Does the program director and/or associate program director meet with each resident every 6
    months to review their progress?    **Y  N**

Does your faculty provide written evaluations of residents after
    every rotation?    **Y  N**

Does your faculty discuss their written evaluations with the resident?    **Y  N**

Do your residents provide anonymous written evaluations of the faculty?    **Y  N**

Do your residents provide written evaluations of the curriculum?    **Y  N**

Do you provide an organized method for residents to communicate
    and exchange information on their working environment and educational
    program without fear of intimidation or retaliation?    **Y  N**

For residents transferring out of your program, do you send written
    verification of the previous educational experiences and a summative
    evaluation of performance including assessment of the six general
    competencies?    **Y  N**

For residents transferring into the program, do you receive written
    verification of previous educational experiences and a summative
    evaluation of performance including an assessment of the six general competencies?
    **Y  N**

Does your final evaluation for residents completing the program state that
    "the resident has sufficient competence to enter practice without direct
    supervision"?    **Y   N**

Does your program have annual program improvement efforts in the
    following areas: a) resident performance using aggregated resident data:
    b) faculty development; c) graduate performance data including the certifying
    examination: and d) program quality as per the Common Program
    Requirements (V.C.).    **Y   N**

## IX.    SUPPORTING DOCUMENTATION

A.  Please provide **Attachments 9-19** as identified in the checklist on the next page
    (**See SECTION X**).

B.  Please have two (2) resident files available for review by the Internal Review Committee
    for residents currently in your program and two (2) files available for residents who
    completed your program in the past year

## X. DOCUMENTS REQUIRED FOR THE INTERNAL REVIEW
(Please summit documents at least 2 weeks before the review)

| ATTACHMENT | CONTENT | CHECK |
|---|---|---|
| 1 | Completed Internal Review Program Information Form | ___ |
| 2 | Copy of last ACGME accreditation letter of notification and Internal Review and corrective action plans for any citations, concerns, areas of improvement, etc. | ___ |
| 3 | Copy of last ACGME Resident Survey and Corrective action plan for any areas shaded in gray | ___ |
| 4 | Curriculum with goals and objectives that integrate the six general competencies for your program and for each year of the program | ___ |
| 5 | Summary of curriculum changes since last ACGME site visit | ___ |
| 6 | A list of the internal and external outcome measures used to assess the quality of your program as part of your annual program review and.documentation the Program has implemented a process that links Educational outcomes with program improvement | ___ |
| 7 | Tools currently in use in your program to evaluate: | |
| |    Six general competencies | ___ |
| |    Six-month required summative evaluations | ___ |
| |    Final evaluation of graduating residents | ___ |
| |    Form used by residents to evaluate faculty | ___ |
| |    Form used by residents to evaluate the program | ___ |
| 8 | A narrative including one (1) learning activity for each of the following: | |
| |    Developing effective communication | ___ |
| |    Team leadership | ___ |
| |    Quality improvement | ___ |
| |    Commitment to professional and/ethical behavior | ___ |
| |    Systems-based practice | ___ |
| |    Scholarly activity | ___ |
| 9 | Block diagram for each year of the program | ___ |
| 10 | Master schedule for current year residents | ___ |
| 11 | Resident and faculty call schedules for last 3 months | ___ |
| 12 | Conference Schedule for current academic year | ___ |
| 13 | Minutes of program's GMEC for past year including Annual Program Review | ___ |
| 14 | Certification board scores for past 3 years | ___ |
| 15 | Tracking data on graduates | ___ |
| 16 | Program policies for | |
| |    Selection of residents | ___ |
| |    Promotion of residents | ___ |
| |    Disciplinary action and grievance | ___ |
| 17 | Competency based goals and objectives for program and for each major rotation for each year of residency | ___ |
| 18 | Policy for resident duty hours in the learning and working environment (Sec VI of Common Program Requirements | ___ |
| 19 | Copies of your current Letters of Agreement | ___ |

Available     Have files for 2 current residents and 2 recent graduates     ___

- PLEASE SUBMIT FIVE (5) COPIES OF ALL REQUESTED INFORMATION TO THE GMEC OFFICE AT LEAST 14 DAYS PRIOR TO YOUR INTERNAL REVIEW COMMITTEE INTERVIEWS.

- PLEASE USE NUMBERED TABS TO SEPARATE THE REQUIRED ATTACHMENTS 1-19.

- PLEASE BRING THE REQUESTED RESIDENT FILES (SEE #20 ABOVE) WITH YOU TO THE INTERVIEW.  THE RESIDENT FILES SHOULD CONTAIN THEIR EVALUATIONS AND EVIDENCE OF SCHOLARLY ACTIVITY.  PERSONAL INFORMATION SHOULD BE KEPT IN A SEPARATE FILE AND SHOULD NOT BE INCLUDED WITHIN THE RESIDENT'S PEER REVIEW INFORMATION TO PROTECT THE CONFIDENTIALITY OF THE DOCUMENTS.

- PRIOR TO THE IRC MEETING YOU SHOULD REVIEW YOUR PROGRAM REQUIREMENTS AND YOUR CURRENT ACGME PIF TEMPLATE TO ASSIST YOU IN COMPLETING THE DOCUMENTS FOR THIS REVIEW.

**THANK YOU IN ADVANCE FOR YOUR PREPARATION OF COMPLETE AND UPDATED DOCUMENTS FOR THIS INTERNAL REVIEW AND FOR YOUR LEADERSHIP IN GRADUATE MEDICAL EDUCATION.**

# Exhibit 140

| Employee | Last Name | First Name | Degree | Title | NTT | Core | Supp | Core + S | Total Ad | Total IBS | Core | Supp | Core + S | Total Ad | Total IBS | Core % | Supp % | Fixed % | IBS % | Total $ | Administrative Title | Comments and Justifications | % FTE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Approved FY17 Salary** | | | | | **Proposed FY18 Salary** | | | | | **Variance** | | | | | | | |
| 0166661 | Acosta | Frank | M.D. | Professor of Clinical Neurological Surgery | NTT | 755,000 | | | | 755,000 | 755,000 | | | | 755,000 | | 0.00% | 0.00% | | 0 | | | 100 |
| 0073805 | Amar | Arun | M.D. | Associate Professor of Clinical Neurological Surgery | NTT | 45,000 | 75,000 | 120,000 | | | 45,000 | 75,000 | 120,000 | | | | 0.00% | 0.00% | | 0 | Director of Endovascular Services, Keck Hospital of USC (75,000) | | 100 |
| 2014310 | Attenello | Frank | M.D., MS | Assistant Professor of Clinical Neurological Surgery | NTT | 400,000 | 10,000 | 410,000 | | | 400,000 | 10,000 | 410,000 | | | | 0.00% | 0.00% | | 0 | Director, Neurosurgical Quality Improvement | New hire 7/1/2016 | 100 |
| 0030852 | Chen | Thomas | M.D., Ph.D. | Professor of Neurological Surgery | T | 125,000 | 280,000 | 405,000 | 125,000 | 530,000 | 125,000 | 280,000 | 405,000 | 125,000 | 530,000 | 0.00% | 0.00% | 0.00% | 0.00% | 0 | Director, Brain Tumor Center at Keck Hospital of USC (75,000); Director, Neurosurgery, Good Samaritan Hospital (50,000) | | 100 |
| 0280631 | Cho | Hee-Yeon | Ph.D. | Assistant Professor of Research Neurological Surgery | NTT | 60,000 | | | | 60,000 | 60,000 | | | | 60,000 | | 0.00% | 0.00% | | 0 | | NEW HIRE 9/15/2014 - Fixed term ended 9/14/2016 | 100 |
| 2008256 | Danilov | Camelia | Ph.D. | Assistant Professor of Research Neurological Surgery | NTT | 65,000 | | | | 65,000 | 65,000 | | | | 65,000 | | 0.00% | 0.00% | | 0 | | NEW HIRE 9/15/2014 - Fixed term ended 8/14/2016 | 100 |
| 0090008 | Hsieh | Patrick | M.D. | Associate Professor of Clinical Neurological Surgery | NTT | 930,000 | | | | 930,000 | 930,000 | | | | 930,000 | | 0.00% | 0.00% | | 0 | | Proposed 75,000 administrative stipend is still under review | 100 |
| 0072266 | Lee | Brian | M.D., Ph.D. | Assistant Professor of Clinical Neurological Surgery | NTT | 450,000 | 25,000 | 475,000 | | | 450,000 | 25,000 | 475,000 | | | | 0.00% | 0.00% | | 0 | Director, Stereotactic and Functiona Neurosurgery | New hire 7/1/2016 | 100 |
| 0094045 | Liu | Charles | M.D., Ph.D. | Professor of Clinical Neurological Surgery | NTT | 625,000 | 37,750 | 662,750 | | | 625,000 | 37,750 | 662,750 | | | | 0.00% | 0.00% | | 0 | Director, USC Neurorestoration Center (25,000); Director, Surgical Epilepsy Program, Hoag Memorial Hospital (12,750) | | 100 |
| 0166367 | Liu | John | M.D. | Professor of Clinical Neurological Surgery | NTT | 930,000 | 150,000 | 1,080,000 | | | 930,000 | 150,000 | 1,080,000 | | | | 0.00% | 0.00% | | 0 | Co-Director, USC Spine Center (150,000) | | 100 |
| 0128910 | Mack | William | M.D. | Associate Professor of Neurological Surgery (Clinical Scholar) | NTT | 400,000 | 100,000 | 500,000 | | | 400,000 | 100,000 | 500,000 | | | | 0.00% | 0.00% | | 0 | Director, Neurointerventional Program, Keck Hospital of USC (75,000); Director, Neurosurgery Ambulatory Services, Keck Medical Center of USC (25,000) | | 100 |
| 0095136 | Minea | Radu | M.D. | Assistant Professor of Research Neurological Surgery | NTT | 72,000 | | | | 72,000 | 72,000 | | | | 72,000 | | 0.00% | 0.00% | | 0 | | | 100 |
| 2005595 | Neman-Ebrah | Josh | Ph.D. | Assistant Professor of Neurological Surgery | TT | 75,000 | 28,000 | 103,000 | | 103,000 | 75,000 | 28,000 | 103,000 | | 103,000 | 0.00% | 0.00% | 0.00% | 0.00% | 0 | | TDD 6/30/2023 | 100 |
| 2026947 | Nunez | Blanca | MS, PA | Instructor of Clinical Neurological Surgery | NTT | 115,000 | | | | 115,000 | 115,000 | | | | 115,000 | | 0.00% | 0.00% | | 0 | | New hire 10/15/2016 | 100 |
| 0197653 | Russin | Jonathan | M.D. | Assistant Professor of Clinical Neurological Surgery | NTT | 425,000 | 25,000 | 450,000 | | | 425,000 | 25,000 | 450,000 | | | | 0.00% | 0.00% | | 0 | Assistant Surgical Director, USC Neurorestoration Center (25,000) | NEW HIRE 7/1/2016 - Salary guaranteed until 6/30/2017 | 100 |

| ID | Last | First | Degree | Title | Track | | | | | | | | | | | | | | | | Notes | | FTE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0053539 | Swenson | Stephen | Ph.D. | Assistant Professor of Research Neurological Surgery | NTT | | | 72,432 | | 72,432 | | | | 72,432 | | 72,432 | | 0.00% | 0.00% | 0 | | | 100 |
| 0179469 | Tenser | Matthew | M.D. | Assistant Professor of Clinical Neurological Surgery | NTT | | | 250,000 | 25,000 | 275,000 | | | | 250,000 | 25,000 | 275,000 | | 0.00% | 0.00% | 0 | Director, Vascular Neurology, Good Samaritan Hospital | | 100 |
| 0090853 | Wang | Weijun | M.D., MHA | Assistant Professor of Research Neurological Surgery | NTT | | | 60,000 | | 60,000 | | | | 60,000 | | 60,000 | | 0.00% | 0.00% | 0 | | | 100 |
| 0061848 | Weiss | Martin Har | M.D. | Professor of Neurological Surgery | T | 74,155 | 50,663 | 124,818 | | 124,818 | 74,155 | 50,663 | 124,818 | | 124,818 | 0.00% | 0.00% | 0 | | On 50% phased-retirement 7/1/15-6/30/17 -100% FTE is Core 148,310, Supplemental 96,106 | 100 |
| 0046779 | Yu | Cheng | Ph.D. | Clinical Neurological Surgery | NTT | | | 193,725 | 19,373 | 213,098 | | | | 193,725 | 19,373 | 213,098 | | 0.00% | 0.00% | 0 | Radiation Safety Officer, Keck Medical Center of USC (19,373) | | 100 |
| 0123367 | Zada | Gabriel | M.D. | Associate Professor of Neurological Surgery (Clinical Scholar) | NTT | | | 425,000 | 25,000 | 450,000 | | | | 425,000 | 25,000 | 450,000 | | 0.00% | 0.00% | 0 | Director, Stereotactic Radiosurgery Center, Keck Medical Center of USC | | 100 |
| **Part-Time** | | | | | | | | | | | | | | | | | | | | | | | |
| 0036633 | Gruen | John Peter | M.D. | Clinical Associate Professor of Neurological Surgery (Part Time) | NTT | | | 15,000 | | 15,000 | | | | 15,000 | | 15,000 | | 0.00% | 0.00% | 0 | | | 45 |
| 0013214 | Larsen | Donald | M.D. | Clinical Professor of Neurological Surgery (Part-Time) | NTT | | | 8,777 | | 8,777 | | | | 8,777 | | 8,777 | | 0.00% | 0.00% | 0 | | Non-exempt 168.78/hr - Reduction in FTE to 5% from 100% eff 4/1/2015 | 5 |
| 0091104 | Liker | Mark A. | M.D. | Clinical Assistant Professor of Neurological Surgery (Part Time) | NTT | | | 50,540 | | 50,540 | | | | 50,540 | | 50,540 | | 0.00% | 0.00% | 0 | | | 50 |
| **Clinical Fellows** | | | | | | | | | | | | | | | | | | | | | | | |
| 2023046 | Walcott | Brian | M.D. | Clinical Instructor of Neurological Surgery (Fellow) | NTT | | | 90,000 | | 90,000 | | | | 90,000 | | 90,000 | | 0.00% | 0.00% | 0 | | Fixed-term 7/1/2016-6/30/2017 | 100 |

# Exhibit 141

Jump to Schedule: Form 990

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 | TIN: 95-4540991 |

Form **990**

Department of the Treasury
Internal Revenue Service

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Go to **www.irs.gov/Form990** for instructions and the latest information.

OMB No. 1545-0047

**2017**

Open to Public
Inspection

**A  For the 2018 calendar year, or tax year beginning 07-01-2017  , and ending 06-30-2018**

**B** Check if appl cable:
- ☐ Address change
- ☐ Name change
- ☐ In tial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Appl cation pending

**C** Name of organization
USC CARE MEDICAL GROUP INC
% UNIV OF SOUTHERN CALIFORNIA

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
1510 SAN PABLO ST Suite 649

City or town, state or province, country, and ZIP or foreign postal code
LOS ANGELES, CA  900334613

**D** Employer identification number

95-4540991

**E** Telephone number

(323) 442-5955

**G** Gross receipts $ 333,545,918

**F**  Name and address of principal officer:
RANDOLPH SIWABESSY
1510 SAN PABLO ST649
LOS ANGELES, CA  900334613

**H(a)**  Is this a group return for
subordinates?  ☐ Yes  ☑ No

**H(b)**  Are all subordinates
included?  ☐ Yes  ☐ No
If "No," attach a list. (see instructions)

**H(c)**  Group exemption number ▶

**I** Tax-exempt status:  ☑ 501(c)(3)  ☐ 501(c) (  ) ◀ (insert no.)  ☐ 4947(a)(1) or  ☐ 527

**J  Website:** ▶ WWW.KECKMEDICINE.ORG

**K** Form of organization:  ☑ Corporation  ☐ Trust  ☐ Associat on  ☐ Other ▶

**L** Year of formation: 1995  |  **M** State of legal dom cile: CA

## Part I  Summary

**1** Briefly describe the organization's mission or most significant activities:
SEE SCHEDULE O

**2** Check this box ▶ ☐

**3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . . | **3** | 12
**4** Number of independent voting members of the governing body (Part VI, line 1b) . . . . . | **4** | 1
**5** Total number of individuals employed in calendar year 2017 (Part V, line 2a) . . . . . | **5** | 0
**6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . | **6** | 12
**7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . . | **7a** | 0
**b** Net unrelated business taxable income from Form 990-T, line 34 . . . . . . . . | **7b** | 0

| | Prior Year | Current Year |
|---|---|---|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | 0 | 0 |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . . . | 308,190,750 | 333,545,918 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . . | 0 | 0 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) . | 0 | 0 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 308,190,750 | 333,545,918 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 0 | 0 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 305,367,700 | 331,294,945 |
| **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 305,367,700 | 331,294,945 |
| **19** Revenue less expenses. Subtract line 18 from line 12 . . . . . . | 2,823,050 | 2,250,973 |

| | Beginning of Current Year | End of Year |
|---|---|---|
| **20** Total assets (Part X, line 16) . . . . . . . . . . . | 42,668,788 | 46,076,008 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . . . | 31,406,319 | 32,567,655 |
| **22** Net assets or fund balances. Subtract line 21 from line 20 . . . . | 11,262,469 | 13,508,353 |

## Part II  Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my
knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has

any knowledge.

| **Sign Here** | | | 2019-05-09 |
|---|---|---|---|
| | Signature of officer | | Date |
| | RANDOLPH SIWABESSY  Treasurer/CFO | | |
| | Type or print name and title | | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date 2019-05-07 | Check ☐ if self-employed | PTIN P00641463 |
|---|---|---|---|---|---|
| | Firm's name ▶ Pr cewaterhouseCoopers LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 101 SEAPORT BLVD SUITE 500  BOSTON, MA  02210 | | | Phone no. (617) 530-5000 | |

May the IRS discuss this return with the preparer shown above? (see instructions)  .  .  .  .  .  .  .  .  .  .  .  .  ☑ **Yes** ☐ **No**

**For Paperwork Reduction Act Notice, see the separate instructions.**      Cat. No. 11282Y      Form **990** (2017)

---

Form 990 (2017)          Page **2**

| Part III | **Statement of Program Service Accomplishments** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III  .  .  .  .  .  .  .  .  .  .  .  .  ☑

**1**   Briefly describe the organization's mission:

_____

_____

_____

_____

**2**   Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O.

**3**   Did the organization cease conducting, or make significant changes in how it conducts, any program services?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O.

**4**   Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a**   (Code: _____ ) (Expenses $   331,294,945   including grants of $ _____ ) (Revenue $   333,545,918 )

PATIENT CARE - SEE SCHEDULE O

_____

**4b**   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

**4c**   (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

_____

_____

_____

_____

_____

_____

_____

_____

**4d**   Other program services (Describe in Schedule O.)

(Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

**4e**   **Total program service expenses** ▶   331,294,945

Form **990** (2017)

Form 990 (2017)                                                                                                   Page **3**

| Part IV | Checklist of Required Schedules | | Yes | No |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | **1** | Yes | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? . . . | **2** | | No |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?*If "Yes," complete Schedule C, Part I* . . . . . . . . . . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . . . . . | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* . . . . . . . . . . | **5** | | No |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures?*If "Yes," complete Schedule D, Part II* . . . | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services?*If "Yes," complete Schedule D, Part IV* | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If "Yes," complete Schedule D, Part V* . . . . . | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* | **11a** | Yes | |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | **11d** | Yes | |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | Yes | |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | No |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | **12a** | | No |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | Yes | |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . | **14b** | | No |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I*(see instructions) . . . . . | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . | **18** | | No |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . | **21** | | No |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . | **22** | | No |

Form 990 (2017)                                                                                           Page **4**

| Part IV | **Checklist of Required Schedules** *(continued)* | | | |
|---|---|---|---|---|
| | | | Yes | No |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | **23** | Yes | |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K If "No," go to line 25a* | **24a** | | No |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . | **24c** | | |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* | **25a** | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* | **25b** | | No |
| **26** | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from orpayables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes,"complete Schedule L, Part II* | **26** | | No |
| **27** | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee,substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons?*If "Yes," complete Schedule L, Part III* | **27** | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| **a** | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . | **28a** | | No |
| **b** | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . | **28b** | | No |
| **c** | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . . . | **28c** | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | No |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . | **30** | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . | **31** | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . | **32** | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulationssections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . | **33** | Yes | |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . | **34** | Yes | |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | Yes | |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **35b** | | No |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . | **36** | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes?*If "Yes," complete Schedule R, Part VI* | **37** | | No |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | **38** | Yes | |
| Part V | **Statements Regarding Other IRS Filings and Tax Compliance** | | | |
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . ☐ | | | |
| | | | Yes | No |
| **1a** | Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . **1a** ⟨0⟩ | | | |
| **b** | Enter the number of Forms W-2G included in line 1a.*Enter -0-*if not applicable . **1b** ⟨0⟩ | | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . | **1c** | | |

Form **990** (2017)

Form 990 (2017)                                                                                                    Page **5**

| | | | |
|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return    . . **2a** 0 | **2b** | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | **3a** | No |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* . . . | **3b** | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **4a** | No |
| **b** | If "Yes," enter the name of the foreign country: ▶ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . . | **5a** | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | **5b** | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? | **5c** | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | **6a** | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . | **6b** | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . | **7a** | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | **7b** | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . | **7c** | No |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . **7d** | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | **7e** | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | **7f** | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . | **7g** | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . | **7h** | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . | **8** | |
| **9a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . | **9a** | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | **9b** | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . **10a** | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities **10b** | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | |
| **a** | Gross income from members or shareholders . . . . . . . . . **11a** | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . **11b** | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | **12a** | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. **12b** | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? **Note.** See the instructions for additional information the organization must report on Schedule O. | **13a** | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . **13b** | | |
| **c** | Enter the amount of reserves on hand **13c** | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | **14a** | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . | **14b** | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see instructions and file Form 4720, Schedule N . . . . | **15** | |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O . . . . . . . . . . | **16** | |

Form **990** (2017)

Form 990 (2017)    Page **6**

## Part VI

**Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O  See instructions*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . ☑

### Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | **1a** 12 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | **1b** 1 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . | **2** | Yes | |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . | **6** | Yes | |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . | **7a** | Yes | |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . | **7b** | Yes | |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . | **8a** | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . | **8b** | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . | **9** | | No |

### Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . | **11a** | | No |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. . . . | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes,"describe in Schedule O how this was done* . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . | **13** | Yes | |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . | **15a** | | No |
| **b** | Other officers or key employees of the organization . . . . . . . . . . | **15b** | | No |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . | **16a** | Yes | |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . | **16b** | Yes | |

### Section C. Disclosure

| | |
|---|---|
| **17** | List the States with which a copy of this Form 990 is required to be filed▶  CA |
| **18** | Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only)available for public inspection. Indicate how you made these available. Check all that apply. <br> ☐ Own website  ☐ Another's website  ☑ Upon request  ☐ Other (explain in Schedule O) |
| **19** | Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year. |
| **20** | State the name, address, and telephone number of the person who possesses the organization's books and records: <br> ▶UNIV OF SOUTHERN CALIFORNIA UNIVERSITY GARDENS   LOS ANGELES, CA 90089 (213) 821-1900 |

UNIV OF SOUTHERN CALIFORNIA UNIVERSITY GARDEN ... 669 (213) 821-1908

Form **990** (2017)

---

Page 7

---

Form 990 (2017)                                                                                          Page **7**

Part VII | **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . ☑

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

List persons in the following order: individual trustees or directors; institutional trustees; officers; key employees; highest compensated employees; and former such persons.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) JOHN KUSMIERSKY<br>DIRECTOR | 0.5<br>1.0 | X | | | | | | 0 | 0 | 0 |
| (2) JAMES M STATEN<br>DIRECTOR | 0.5<br>50.75 | X | | | | | | 0 | 1,800,032 | 157,605 |
| (3) THOMAS E JACKIEWICZ<br>VICE CHAIRMAN/PRESIDENT | 0.5<br>50.0 | X | | X | | | | 0 | 2,322,895 | 42,215 |
| (4) JAMES G ELLIS<br>DIRECTOR | 0.5<br>50.25 | X | | | | | | 0 | 653,720 | 47,703 |
| (5) LAURA MOSQUEDA<br>CHAIRMAN (AS OF 5/1/18) | 0.5<br>50.25 | X | | X | | | | 0 | 524,352 | 40,308 |
| (6) INDERBIR SINGH GILL MD<br>DIRECTOR | 0.5<br>40.0 | X | | | | | | 0 | 2,594,021 | 113,943 |
| (7) ROHIT VARMA MD<br>DIRECTOR (UNTIL 10/5/17) | 0.5<br>50.25 | X | | | | | | 0 | 1,423,257 | 48,210 |
| (8) MARK TODD<br>DIRECTOR | 0.5<br>0.0 | X | | | | | | 0 | 320,649 | 55,860 |
| (9) TED BUDGE<br>DIRECTOR | 0.5<br>0.0 | X | | | | | | 0 | 410,771 | 56,758 |
| (10) STEVEN L GIANNOTTA<br>DIRECTOR | 0.5<br>0.0 | X | | | | | | 0 | 754,847 | 50,564 |
| (11) EDWARD GRANT<br>DIRECTOR | 0.5<br>0.0 | X | | | | | | 0 | 540,989 | 50,068 |
| (12) HELENA CHUI | 0.5 | X | | | | | | 0 | 168,555 | 39,195 |

| DIRECTOR | 0.0 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| (13) DAVID PENG | 0.5 | X | | | | | | 0 | 557,754 | 56,265 |
| DIRECTOR | 0.0 | | | | | | | | | |
| (14) RANDOLPH SIWABESSY | 40.0 | | | X | | | | 0 | 423,036 | 29,100 |
| TREASURER & CFO | 0.0 | | | | | | | | | |
| (15) LIL DELCAMPO | 10.0 | | | X | | | | 0 | 272,588 | 60,506 |
| SECRETARY | 50.0 | | | | | | | | | |
| (16) CARMEN PULIAFITO | 0.0 | | | | | X | | 0 | 1,829,046 | 47,094 |
| FORMER VICE CHAIR | 30.0 | | | | | | | | | |
| (17) MELODY TUW | 0.0 | | | | | X | | 0 | 206,932 | 53,341 |
| FORMER TREASURER/CFO | 40.0 | | | | | | | | | |

Form **990** (2017)

---

Page 8

---

Form 990 (2017)                                                                                                     Page **8**

Part VII    **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to** Part VII, **Section A** . . . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . . . ▶ | | | | | | | | 0 | 14,803,444 | 948,735 |

**2**   Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . | **3** | Yes | |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . | **4** | Yes | |

| 5 | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . | **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| **(A)** Name and business address | **(B)** Description of servces | **(C)** Compensation |
|---|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA, 3500 S FIGUEROA STREET LOS ANGELES, CA  900898003 | MANAGEMENT FEES | 331,232,868 |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 1

Form **990** (2017)

---

Form 990 (2017)                                                                 Page **9**

| Part VIII | **Statement of Revenue** |

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . ☐

| | | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|
| **1a** | Federated campaigns . . | **1a** | | | |
| **b** | Membership dues . . | **1b** | | | |
| **c** | Fundraising events . . | **1c** | | | |
| **d** | Related organizations | **1d** | | | |
| **e** | Government grants (contributions) | **1e** | | | |
| **f** | All other contributons, gifts, grants, and similar amounts not included above | **1f** | | | |
| **g** | Noncash contributions included in lines 1a - 1f:$ _____ | | | | |
| **h** | **Total.** Add lines 1a-1f . . . . . . . ▶ | | 0 | | |

| | | Business Code | | | |
|---|---|---|---|---|---|
| **2a** | PATIENT CARE | 900099 | 217,243,246 | 217,243,246 | |
| **b** | USC HOSPITAL SUPPORT - OTHER | 900099 | 83,642,949 | 83,642,949 | |
| **c** | CONTRACTS AND SERVICE AGREEMENTS | 900099 | 32,659,723 | 32,659,723 | |
| **d** | | | | | |
| **e** | | | | | |
| **f** | All other program service revenue . | | | | |
| **9** | **Total.** Add lines 2a–2f . . . . . ▶ | | 333,545,918 | | |

| **3** | Investment income (including dividends, interest, and other similar amounts) . . . . . . . ▶ | 0 | | |
|---|---|---|---|---|
| **4** | Income from investment of tax-exempt bond proceeds ▶ | 0 | | |
| **5** | Royalties . . . . . . . . . . . . ▶ | 0 | | |

| | | (i) Real | (ii) Personal | | |
|---|---|---|---|---|---|
| **6a** | Gross rents | | | | |
| **b** | Less: rental expenses | | | | |
| **c** | Rental income or (loss) | 0 | 0 | | |
| **d** | Net rental income or (loss) . . . . . ▶ | | | 0 | |

| | | (i) Securities | (ii) Other | | |
|---|---|---|---|---|---|
| **7a** | Gross amount from sales of assets other than inventory | | | | |
| **b** | Less: cost or other basis and | | | | |

**Other Revenue**

| | | | | | |
|---|---|---|---|---|---|
| | sales expenses | | | | |
| **c** Gain or (loss) | | | | | |
| **d** Net gain or (loss) . . . . . ▶ | | 0 | | | |
| **8a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c). See Part IV, line 18 . . . . . **a** | | 0 | | | |
| **b** Less: direct expenses . . . **b** | | 0 | | | |
| **c** Net income or (loss) from fundraising events . . ▶ | | 0 | | | |
| **9a** Gross income from gaming activities. See Part IV, line 19 . . . **a** | | 0 | | | |
| **b** Less: direct expenses . . . **b** | | 0 | | | |
| **c** Net income or (loss) from gaming activities . . ▶ | | 0 | | | |
| **10a** Gross sales of inventory, less returns and allowances . . **a** | | 0 | | | |
| **b** Less: cost of goods sold . . **b** | | 0 | | | |
| **c** Net income or (loss) from sales of inventory . . ▶ | | 0 | | | |
| Miscellaneous Revenue | Business Code | | | | |
| **11a** | | | | | |
| **b** | | | | | |
| **c** | | | | | |
| **d** All other revenue . . . . | | | | | |
| **e Total.** Add lines 11a–11d . . . . . ▶ | | 0 | | | |
| **12 Total revenue.** See Instructions. . . . . ▶ | | 333,545,918 | 333,545,918 | | |

Form **990** (2017)

---

Page 10

**Part IX** **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 | 0 | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 | 0 | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, line 15 and 16. | 0 | | | |
| **4** Benefits paid to or for members | 0 | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . | 0 | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . | 0 | | | |
| **7** Other salaries and wages | 0 | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | 0 | | | |
| **9** Other employee benefits . . . | 0 | | | |
| **10** Payroll taxes . . . . . . . . | 0 | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . | 0 | | | |
| **b** Legal . . . . . | 0 | | | |
| **c** Accounting . . . . . | 0 | | | |

| | | | | | |
|---|---|---|---|---|---|
| **d** Lobbying . . . . . . . . . | 0 | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | 0 | | | | |
| **f** Investment management fees . . . . . | 0 | | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 0 | | | | |
| **12** Advertising and promotion . . . . | 0 | | | | |
| **13** Office expenses . . . . . . . . | 0 | | | | |
| **14** Information technology . . . . . . | 0 | | | | |
| **15** Royalties . . . | 0 | | | | |
| **16** Occupancy . . . . . . . . . | 0 | | | | |
| **17** Travel . . . . . . . . . . | 0 | | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . | 0 | | | | |
| **19** Conferences, conventions, and meetings . . . | 0 | | | | |
| **20** Interest . . . . . . . . . . | 0 | | | | |
| **21** Payments to affiliates . . . . . | 0 | | | | |
| **22** Depreciation, depletion, and amortization . . | 62,077 | 62,077 | | | |
| **23** Insurance . . . . | 0 | | | | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | | |
| **a** MANAGEMENT FEES | 331,232,868 | 331,232,868 | | | |
| **b** | | | | | |
| **c** | | | | | |
| **d** | | | | | |
| **e** All other expenses | | | | | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 331,294,945 | 331,294,945 | 0 | | 0 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ ☐ if following SOP 98-2 (ASC 958-720). | | | | | |

Form **990** (2017)

---

Page 11

---

Form 990 (2017)                                                                                     Page **11**

| Part X | **Balance Sheet** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . ☐

| | | **(A)** Beginning of year | | **(B)** End of year |
|---|---|---|---|---|
| **1** | Cash–non-interest-bearing . . . . . | 0 | **1** | 0 |
| **2** | Savings and temporary cash investments . . . . . . | 0 | **2** | 0 |
| **3** | Pledges and grants receivable, net . . . . | 0 | **3** | 0 |
| **4** | Accounts receivable, net . . . . . . | 28,490,561 | **4** | 30,555,903 |
| **5** | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees. Complete Part II of Schedule L . . | 0 | **5** | 0 |
| **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L . . . | 0 | **6** | 0 |
| **7** | Notes and loans receivable, net . . . . . | 0 | **7** | 0 |
| **8** | Inventories for sale or use . . . . . . | 0 | **8** | 0 |
| **9** | Prepaid expenses and deferred charges . . . | 58,276 | **9** | 58,276 |
| **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D **10a** 413,950 | | | |
| **b** | Less: accumulated depreciation **10b** 62,077 | 413,950 | **10c** | 351,873 |
| **11** | Investments—publicly traded securities . | 0 | **11** | 0 |
| **12** | Investments—other securities. See Part IV, line 11 . . . . . | 0 | **12** | 0 |
| **13** | Investments—program-related. See Part IV, line 11 . . . . . | 0 | **13** | 0 |
| **14** | Intangible assets . . . . . . . | 0 | **14** | 0 |

Assets

| | | | | |
|---|---|---|---|---|
| **15** | Other assets. See Part IV, line 11 . . . . | 13,706,001 | **15** | 15,109,956 |
| **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . | 42,668,788 | **16** | 46,076,008 |
| **17** | Accounts payable and accrued expenses . . . . . . | 10,878,836 | **17** | 11,810,632 |
| **18** | Grants payable . . . . | 0 | **18** | 0 |
| **19** | Deferred revenue . . . . . . | 3,071 | **19** | 232,611 |
| **20** | Tax-exempt bond liabilities . . . . | 0 | **20** | 0 |
| **21** | Escrow or custodial account liability. Complete Part IV of Schedule D | 0 | **21** | 0 |
| **22** | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons. Complete Part II of Schedule L . . . | 0 | **22** | 0 |
| **23** | Secured mortgages and notes payable to unrelated third parties . . . | 0 | **23** | 0 |
| **24** | Unsecured notes and loans payable to unrelated third parties . . . | 0 | **24** | 0 |
| **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | 20,524,412 | **25** | 20,524,412 |
| **26** | **Total liabilities.** Add lines 17 through 25 . . . | 31,406,319 | **26** | 32,567,655 |
| | **Organizations that follow SFAS 117 (ASC 958), check here ▶** ☑ **and complete lines 27 through 29, and lines 33 and 34.** | | | |
| **27** | Unrestricted net assets | 11,262,469 | **27** | 13,508,353 |
| **28** | Temporarily restricted net assets . . . . . . . | 0 | **28** | 0 |
| **29** | Permanently restricted net assets . . . . . | 0 | **29** | 0 |
| | **Organizations that do not follow SFAS 117 (ASC 958), check here ▶** ☐ **and complete lines 30 through 34.** | | | |
| **30** | Capital stock or trust principal, or current funds . . . | | **30** | |
| **31** | Paid-in or capital surplus, or land, building or equipment fund . . . | | **31** | |
| **32** | Retained earnings, endowment, accumulated income, or other funds . . | | **32** | |
| **33** | Total net assets or fund balances . . . . . | 11,262,469 | **33** | 13,508,353 |
| **34** | Total liabilities and net assets/fund balances . . . . . . . | 42,668,788 | **34** | 46,076,008 |

*(Left margin label: Liabilities / Net Assets or Fund Balances)*

Form **990** (2017)

Form 990 (2017)                                                                                          Page **12**

**Part XI**   **Reconcilliation of Net Assets**

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . | **1** | 333,545,918 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . | **2** | 331,294,945 |
| **3** | Revenue less expenses. Subtract line 2 from line 1 . . . . | **3** | 2,250,973 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | 11,262,469 |
| **5** | Net unrealized gains (losses) on investments . . . . . | **5** | |
| **6** | Donated services and use of facilities . . . . . . | **6** | |
| **7** | Investment expenses . . . . . . . . | **7** | |
| **8** | Prior period adjustments . . . . . . . . | **8** | -5,089 |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) . . . | **9** | |
| **10** | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | 13,508,353 |

**Part XII**   **Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . ☐

| | | **Yes** | **No** |
|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990:  ☐ Cash  ☑ Accrual  ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | Yes |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☑ Consolidated basis    ☐ Both consolidated and separate basis | | |

| | | | | 2c | Yes | |
|---|---|---|---|---|---|---|

c If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant?

If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O.

3a As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133?

| | 3a | | |
|---|---|---|---|

b If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits.

| | 3b | | |
|---|---|---|---|

Form **990** (2017)

---

Form 990 (2017)

## Additional Data

**Return to Form**

Software ID:

Software Version:

**Form 990, Special Condition Description:**

Special Condition Description

↑ Back to Top

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 | TIN: 95-4540991 |
|---|---|---|

**SCHEDULE A**
(Form 990 or 990EZ)

Department of the Treasury
Internal Revenue Service

## Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

**2017**

Open to Public
Inspection

| Name of the organization<br>USC CARE MEDICAL GROUP INC | Employer identification number<br>95-4540991 |
|---|---|

| Part I | Reason for Public Charity Status (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state: _____

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university: _____

10 ☑ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement

(see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e  ☐  Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f  Enter the number of supported organizations .................................. _____

g  Provide the following information about the supported organization(s).

| **(i)** Name of supported organization | **(ii)** EIN | **(iii)** Type of organization (described on lines 1- 10 above (see instructions)) | **(iv)** Is the organization listed in your governing document? | | **(v)** Amount of monetary support (see instructions) | **(vi)** Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.      Cat. No. 11285F      **Schedule A (Form 990 or 990-EZ) 2017**

---

Page 2

---

Schedule A (Form 990 or 990-EZ) 2017                                                                      Page **2**

**Part II**   **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv), 170(b)(1)(A)(vi), and 170(b)(1)(A)(ix)**
(Complete only if you checked the box on line 5, 7, 8, or 9 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

| Calendar year (or fiscal year beginning in) ▶ | **(a)** 2013 | **(b)** 2014 | **(c)** 2015 | **(d)** 2016 | **(e)** 2017 | **(f)** Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | | | | | | |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf. . . . | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | |
| **4** **Total.** Add lines 1 through 3 | | | | | | |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f). . | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4. | | | | | | |

**Section B. Total Support**

| Calendar year (or fiscal year beginning in) ▶ | **(a)** 2013 | **(b)** 2014 | **(c)** 2015 | **(d)** 2016 | **(e)** 2017 | **(f)** Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4. . | | | | | | |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . | | | | | | |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on. . | | | | | | |
| **10** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | | | | | | |
| **11** **Total support.** Add lines 7 through 10 | | | | | | |

**12** Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . . . . . . | **12** | |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Section C. Computation of Public Support Percentage**

| | | |
|---|---|---|
| **14** Public support percentage for 2017 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . . | **14** | |
| **15** Public support percentage for 2016 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . . | **15** | |

**16a** **33 1/3% support test—2017.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . ▶ ☐

**b** **33 1/3% support test—2016.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . ▶ ☐

**17a** **10%-facts-and-circumstances test—2017.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**b** **10%-facts-and-circumstances test—2016.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.**

Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18   Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Schedule A (Form 990 or 990-EZ) 2017**

--- Page 3 ---

Schedule A (Form 990 or 990-EZ) 2017 | | Page **3**

| **Part III** | **Support Schedule for Organizations Described in Section 509(a)(2)** |
|---|---|

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

**Section A. Public Support**

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | 0 | 0 | 0 | 0 | 0 | 0 |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | 223,779,635 | 263,957,260 | 286,781,027 | 308,190,750 | 333,545,918 | 1,416,254,590 |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . | | | | | | 0 |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . | | | | | | 0 |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | 0 |
| **6** **Total.** Add lines 1 through 5 | 223,779,635 | 263,957,260 | 286,781,027 | 308,190,750 | 333,545,918 | 1,416,254,590 |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | 0 |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | 0 |
| **c** Add lines 7a and 7b. . | | | | | | 0 |
| **8** **Public support.** (Subtract line 7c from line 6.) | | | | | | 1,416,254,590 |

**Section B. Total Support**

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6. . . . | 223,779,635 | 263,957,260 | 286,781,027 | 308,190,750 | 333,545,918 | 1,416,254,590 |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources . . | | | | | | 0 |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | 0 |
| **c** Add lines 10a and 10b. | | | | | | 0 |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on. | | | | | | 0 |
| **12** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . | | | | | | 0 |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12.) . | 223,779,635 | 263,957,260 | 286,781,027 | 308,190,750 | 333,545,918 | 1,416,254,590 |

**14   First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Section C. Computation of Public Support Percentage**

| | | | |
|---|---|---|---|
| **15** | Public support percentage for 2017 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . | **15** | 100.000 % |
| **16** | Public support percentage from 2016 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . | **16** | 100.000 % |

**Section D. Computation of Investment Income Percentage**

| | | | |
|---|---|---|---|
| **17** | Investment income percentage for **2017** (line 10c, column (f) divided by line 13, column (f)) . . . . . . | **17** | 0 % |
| **18** | Investment income percentage from **2016** Schedule A, Part III, line 17 . . . . . . . . . . . . . . | **18** | 0 % |

**19a 33 1/3% support tests—2017.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . ▶ ☑

**b   33 1/3% support tests—2016.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is

**3b** 33 1/3% support tests—2013. If the organization did not check a box on line 14, line 19a, and line 20 or line 3a, and line 3b is
not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . ▶ ☐

**20    Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . ▶ ☐

Schedule A (Form 990 or 990-EZ) 2017

---

Schedule A (Form 990 or 990-EZ) 2017                                                                                    Page **4**

| Part IV | Supporting Organizations |
|---|---|

(Complete only if you checked a box on line 12 of Part I. If you checked 12a of Part I, complete Sections A and B. If you checked 12b of Part I, complete Sections A and C. If you checked 12c of Part I, complete Sections A, D, and E. If you checked 12d of Part I, complete Sections A and D, and complete Part V.)

| Section A. All Supporting Organizations | | | |
|---|---|---|---|
| | | **Yes** | **No** |
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated  If designated by class or purpose, describe the designation  If historic and continuing relationship, explain* | | |
| | **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)* | | |
| | **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below* | | |
| | **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination* | | |
| | **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.* | | |
| | **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 12a or 12b in Part I, answer (b) and (c) below* | | |
| | **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* | | |
| | **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* | | |
| | **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable)  Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document)* | | |
| | **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | | |
| | **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | | |
| | **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** | | |
| | **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | | |
| | **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | | |
| | **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** | | |
| | **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** | | |
| | **9b** | | |
| **c** | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** | | |
| | **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below* | | |
| | **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)* | | |
| | **10b** | | |

Schedule A (Form 990 or 990-EZ) 2017

Schedule A (Form 990 or 990-EZ) 2017          Page **5**

| Part IV | Supporting Organizations (continued) | | |
|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | | |
| | **11a** | | |
| **b** | A family member of a person described in (a) above?    **11b** | | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI*    **11c** | | |

**Section B. Type I Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint orelect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* ***Part VI*** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities  If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors ortrustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to suchpowers during the tax year* | | |
| | **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) thatoperated, supervised, or controlled the supporting organization?*If "Yes," explain in* ***Part VI*** *how providing such benefitcarried out the purposes of the supported organization(s) that operated, supervised or controlled the supportingorganization* | | |
| | **2** | | |

**Section C. Type II Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees ofeach of the organization's supported organization(s)? *If "No," describe in* ***Part VI*** *how control or management of thesupporting organization was vested in the same persons that controlled or managed the supported organization(s)* | | |
| | **1** | | |

**Section D. All Type III Supporting Organizations**

| | | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization'stax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of theForm 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governingdocuments in effect on the date of notification, to the extent not previously provided? | | |
| | **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s)or (ii) serving on the governing body of a supported organization? *If "No," explain in* ***Part VI*** *how the organizationmaintained a close and continuous working relationship with the supported organization(s)* | | |
| | **2** | | |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in theorganization's investment policies and in directing the use of the organization's income or assets at all times during the taxyear? *If "Yes," describe in* ***Part VI*** *the role the organization's supported organizations played in this regard* | | |
| | **3** | | |

**Section E. Type III Functionally-Integrated Supporting Organizations**

| **1** | Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**: | | |
|---|---|---|---|
| **a** | ☐ The organization satisfied the Activities Test. Complete **line 2** below. | | |
| **b** | ☐ The organization is the parent of each of its supported organizations. Complete **line 3** below. | | |
| **c** | ☐ The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions) | | |

| | | Yes | No |
|---|---|---|---|
| **2** | Activities Test. **Answer (a) and (b) below.** | | |
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supportedorganization(s) to which the organization was responsive? *If "Yes," then in* ***Part VI identify those supportedorganizations and explain*** *how these activities directly furthered their exempt purposes, how the organization wasresponsive to those supported organizations, and how the organization determined that these activities constitutedsubstantially all of its activities* | | |
| | **2a** | | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of theorganization's supported organization(s) would have been engaged in? *If "Yes," explain in* ***Part VI*** *the reasons for theorganization's position that its supported organization(s) would have engaged in these activities but for the organization'sinvolvement* | | |
| | **2b** | | |
| **3** | Parent of Supported Organizations. **Answer (a) and (b) below.** | | |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each ofthe supported organizations? *Provide details in* ***Part VI.***    **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of itssupported organizations? *If "Yes," describe in* ***Part VI.*** *the role played by the organization in this regard*    **3b** | | |

**Part V**    **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations**

1 ☐    Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov.20, 1970 (explain in Part VI). **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred forproduction or collection of gross income or formanagement, conservation, or maintenance of propertyheld for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 fromline 4) | 8 | | |

| **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-useassets (see instructions for short tax year or assets held for part of year): | 1 | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | **Discount** claimed for blockage or other factors (explain in detail in Part VI): | | | |
| 2 | Acquisition indebtedness applicable to non-exempt useassets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 1-1/2% ofline 3 (for greater amount, see instructions). | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4from line 3) | 5 | | |
| 6 | Multiply line 5 by .035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| **Section C - Distributable Amount** | | Current Year |
|---|---|---|
| 1 | Adjusted net income for prior year (from Section A,line 8, Column A) | 1 | |
| 2 | Enter 85% of line 1 | 2 | |
| 3 | Minimum asset amount for prior year (from Section B,line 8, Column A) | 3 | |
| 4 | Enter greater of line 2 or line 3 | 4 | |
| 5 | Income tax imposed in prior year | 5 | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4,unless subject to emergency temporary reduction (seeinstructions) | 6 | |

7 ☐    Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions)

**Schedule A (Form 990 or 990-EZ) 2017**

Schedule A (Form 990 or 990-EZ) 2017      Page **7**

**Part V**    **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations (continued)**

| **Section D - Distributions** | | Current Year |
|---|---|---|
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | |
| 4 | Amounts paid to acquire exempt-use assets | |
| 5 | Qualified set-aside amounts (prior IRS approval required) | |
| 6 | Other distributions (describe in **Part VI**). See instructions | |
| 7 | **Total annual distributions.** Add lines 1 through 6. | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**). See instructions | |

| 9 | Distributable amount for 2017 from Section C, line 6 | |
|---|---|---|
| 10 | Line 8 amount divided by Line 9 amount | |

| Section E - Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2017 | (iii) Distributable Amount for 2017 |
|---|---|---|---|
| 1 Distributable amount for 2017 from Section C, line 6 | | | |
| 2 Underdistributions, if any, for years prior to 2017 (reasonable cause required-- explain in Part VI). See instructions. | | | |
| 3 Excess distributions carryover, if any, to 2017: | | | |
| a | | | |
| b From 2013. . . . . . . . | | | |
| c From 2014. . . . . . . . | | | |
| d From 2015. . . . . . . . | | | |
| e From 2016. . . . . . . . | | | |
| f Total of lines 3a through e | | | |
| g Applied to underdistributions of prior years | | | |
| h Applied to 2017 distributable amount | | | |
| i Carryover from 2012 not applied (see instructions) | | | |
| j Remainder. Subtract lines 3g, 3h, and 3i from 3f. | | | |
| 4 Distributions for 2017 from Section D, line 7: $ | | | |
| a Applied to underdistributions of prior years | | | |
| b Applied to 2017 distributable amount | | | |
| c Remainder. Subtract lines 4a and 4b from 4. | | | |
| 5 Remaining underdistributions for years prior to 2017, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, explain in Part VI. See instructions. | | | |
| 6 Remaining underdistributions for 2017. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, explain in Part VI. See instructions. | | | |
| 7 Excess distributions carryover to 2018. Add lines 3j and 4c. | | | |
| 8 Breakdown of line 7: | | | |
| a Excess from 2013. . . . . . . | | | |
| b Excess from 2014. . . . . | | | |
| c Excess from 2015. . . . . | | | |
| d Excess from 2016. . . . . | | | |
| e Excess from 2017. . . . . | | | |

Schedule A (Form 990 or 990-EZ) (2017)

---

Page 8

---

| Part VI | Supplemental Information. Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions). |
|---|---|

| Facts And Circumstances Test |
|---|
| |

| Return Reference | Explanation |
|---|---|

Schedule A (Form 990 or 990-EZ) 2017

---

## Additional Data

Return to Form

Software ID:
Software Version:

↑ Back to Top

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 | TIN: 95-4540991 |

**SCHEDULE D**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Supplemental Financial Statements

► **Complete if the organization answered "Yes," on Form 990,**
**Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.**
► **Attach to Form 990.**
► **Go to www.irs.gov/Form990 for the latest information.**

OMB No. 1545-0047

**2017**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| USC CARE MEDICAL GROUP INC | 95-4540991 |

**Part I**    **Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | **(a)** Donor advised funds | **(b)** Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year . . . . . . . | | |

5    Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control?. . . . . . . . . . . . .    ☐ Yes ☐ No

6    Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ☐ Yes ☐ No

**Part II**    **Conservation Easements.** Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1    Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)    ☐ Preservation of an historically important land area

☐ Protection of natural habitat    ☐ Preservation of a certified historic structure

☐ Preservation of open space

2    Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | **Held at the End of the Year** |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . . . . | **2a** | |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . . | **2b** | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . . | **2c** | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register . . . | **2d** | |

3    Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ►_____

4    Number of states where property subject to conservation easement is located ►_____

5    Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds?. . . . . . . . . . . . .    ☐ Yes ☐ No

6    Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
►_____

7    Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
► $_____

8    Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ☐ Yes ☐ No

9    In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

**Part III**    **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a    If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b    If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . . . . . . ► $_____

(ii) Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . . . . . ► $_____

2    If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the

2    If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items:

a    Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . ▶ $ _____

b    Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . ▶ $ _____

For Paperwork Reduction Act Notice, see the Instructions for Form 990.          Cat. No. 52283D      **Schedule D (Form 990) 2017**

Schedule D (Form 990) 2017                                                                                        Page **2**

**Part III**    **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

3    Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a    ☐ Public exhibition                          d    ☐ Loan or exchange programs

b    ☐ Scholarly research                         e    ☐ Other _____

c    ☐ Preservation for future generations

4    Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

5    During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . .    ☐ Yes    ☐ No

**Part IV**    **Escrow and Custodial Arrangements.**
     Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a   Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . . . . . . .    ☐ Yes    ☐ No

b    If "Yes," explain the arrangement in Part XIII and complete the following table:

| | Amount |
|---|---|
| c  Beginning balance . . . . . . . . . . . . . . .  **1c** | |
| d  Additions during the year . . . . . . . . . . . .  **1d** | |
| e  Distributions during the year . . . . . . . . . .  **1e** | |
| f  Ending balance . . . . . . . . . . . . . . . . .  **1f** | |

2a   Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . .    ☐ Yes    ☐ No

b    If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . .  ☐

**Part V**    **Endowment Funds.** Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | (a)Current year | (b)Pr or year | (c)Two years back | (d)Three years back | (e)Four years back |
|---|---|---|---|---|---|
| 1a  Beginning of year balance  . . . . | | | | | |
| b  Contributions  . . . . | | | | | |
| c  Net investment earnings, gains, and losses | | | | | |
| d  Grants or scholarships  . . . | | | | | |
| e  Other expenditures for facilities and programs  . . . | | | | | |
| f  Administrative expenses  . . . . . | | | | | |
| g  End of year balance  . . . . . . | | | | | |

2    Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

a    Board designated or quasi-endowment ▶ ..............................................

b    Permanent endowment ▶ ...........................

c    Temporarily restricted endowment ▶ ...................................
     The percentages on lines 2a, 2b, and 2c should equal 100%.

3a   Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| (i) unrelated organizations  . . .  .  .  .  .  .  .  .  .  .  .  . | **3a(i)** | | |
| (ii) related organizations  .  .  .  .  .  .  .  .  .  .  .  .  . | **3a(ii)** | | |
| b  If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R?  .  .  .  .  .  .  .  .  . | **3b** | | |

4    Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI**    **Land, Buildings, and Equipment.**
     Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | (a) Cost or other basis (investment) | (b) Cost or other basis (other) | (c) Accumulated depreciat on | (d) Book value |
|---|---|---|---|---|
| 1a  Land  .  .  .  .  .  . | | | | |
| b  Buildings  .  .  .  .  . | | | | |
| c  Leasehold improvements | | 413,950 | 62,077 | 351,873 |
| d  Equipment  .  .  .  . | | | | |

| e | Other . . . . . . | | | | |
|---|---|---|---|---|---|

**Total.** Add lines 1a through 1e.*(Column (d) must equal Form 990, Part X, column (B), line 10(c) )* . . ▶ | 351,873

Schedule D (Form 990) 2017

─── Page 3 ───

Schedule D (Form 990) 2017                                                                                                            Page **3**

**Part VII**  **Investments   Other Securities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.
See Form 990, Part X, line 12.

| (a) Description of security or category<br>(including name of security) | (b)<br>Book<br>value | (c) Method of valuation:<br>Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives  . . . . . . . . | | |
| **(2)** Closely-held equity interests  . . . . . . . . | | |
| **(3)** Other _____ | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

**Part VIII**  **Investments   Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation:<br>Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

**Part IX**  **Other Assets.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) DUE FROM USC | 12,393,651 |
| (2) PARTNERSHIP INVESTMENT | 2,716,305 |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |

| Total. *(Column (b) must equal Form 990, Part X, col (B) line 15 )* . . . . . . . . . . . ▶ | | 15,109,956 |
|---|---|---|

**Part X**  **Other Liabilities.** Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.
See Form 990, Part X, line 25.

| **1.** | **(a)** Description of liability | **(b)** Book value |
|---|---|---|
| (1) Federal income taxes | | 0 |
| LIABILITY RESERVE | | 6,542,000 |
| OTHER LIABILITIES | | 82,891 |
| DUE TO USC | | 13,899,521 |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | | 20,524,412 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

**Schedule D (Form 990) 2017**

Schedule D (Form 990) 2017            Page **4**

**Part XI**    **Reconciliation of Revenue per Audited Financial Statements With Revenue per Return**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements . . . . . . | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains (losses) on investments . . . . | **2a** | | |
| b | Donated services and use of facilities . . . . | **2b** | | |
| c | Recoveries of prior year grants . . . . . . . | **2c** | | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| e | Add lines **2a** through **2d** . . . . . . . . . | | **2e** | |
| 3 | Subtract line **2e** from line **1** . . . . . . . . | | **3** | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| b | Other (Describe in Part XIII.) . . . . . . . | **4b** | | |
| c | Add lines **4a** and **4b** . . . . . . . . . . | | **4c** | |
| 5 | Total revenue. Add lines **3** and **4c**. (This must equal Form 990, Part I, line 12.) . . . . . . | | **5** | |

**Part XII**    **Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements . . . . . . . . | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities . . . . . . | **2a** | | |
| b | Prior year adjustments . . . . . . . . | **2b** | | |
| c | Other losses . . . . . . . . . . | **2c** | | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| e | Add lines **2a** through **2d** . . . . . . . . | | **2e** | |
| 3 | Subtract line **2e** from line **1** . . . . . . . . | | **3** | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line **1**: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | **4a** | | |
| b | Other (Describe in Part XIII.) . . . . . . . | **4b** | | |
| c | Add lines **4a** and **4b** . . . . . . . . . | | **4c** | |
| 5 | Total expenses. Add lines **3** and **4c**. (This must equal Form 990, Part I, line 18.) . . . . . . | | **5** | |

**Part XIII**    **Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|
| SCHEDULE D, PART X, LINE 2: | THE ORGANIZATION'S FINANCIAL STATEMENTS WERE AUDITED AS PART OF CONSOLIDATED FINANCIAL STATEMENTS WHICH DO NOT HAVE A FIN 48 FOOTNOTE AS ANY UNCERTAIN TAX POSITIONS WERE DEEMED IMMATERIAL. |

**Schedule D (Form 990) 2017**

## Additional Data

**Return to Form**

Software ID:

Software Version:

↑ Back to Top

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 | TIN: 95-4540991 |
|---|---|---|

**Schedule J**
(Form 990)

### Compensation Information

OMB No. 1545-0047

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**
► Complete if the organization answered "Yes" on Form 990, Part IV, line 23.
► Attach to Form 990.
► Go to *www.irs.gov/Form990* for instructions and the latest information.

**2017**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

| Name of the organization | Employer identification number |
|---|---|
| USC CARE MEDICAL GROUP INC | 95-4540991 |

**Part I    Questions Regarding Compensation**

|  |  | Yes | No |
|---|---|---|---|
| 1a | Check the appropiate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | |

☐ First-class or charter travel
☐ Travel for companions
☐ Tax idemnification and gross-up payments
☐ Discretionary spending account

☐ Housing allowance or residence for personal use
☐ Payments for business use of personal residence
☐ Health or social club dues or initiation fees
☐ Personal services (e.g., maid, chauffeur, chef)

| b | If any of the boxes in line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain. | **1b** | | |
|---|---|---|---|---|
| 2 | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked in line 1a?    . | **2** | | |
| 3 | Indicate which, if any, of the following the organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III. | | | |

☐ Compensation committee
☐ Independent compensation consultant
☐ Form 990 of other organizations

☐ Written employment contract
☐ Compensation survey or study
☐ Approval by the board or compensation committee

| 4 | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
|---|---|---|---|---|
| a | Receive a severance payment or change-of-control payment?.   .   .   .   .   .   .   .   .   .   .   . | **4a** | Yes | |
| b | Participate in, or receive payment from, a supplemental nonqualified retirement plan?.   .   .   .   .   .   . | **4b** | Yes | |
| c | Participate in, or receive payment from, an equity-based compensation arrangement?.   .   .   .   .   .   . | **4c** | | No |
|  | If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | | |
|  | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| 5 | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| a | The organization?.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   . | **5a** | | No |
| b | Any related organization?.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   . | **5b** | | No |
|  | If "Yes," on line 5a or 5b, describe in Part III. | | | |
| 6 | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |

| | | | | | |
|---|---|---|---|---|---|
| a | The organization?. | | | **6a** | No |
| b | Any related organization?. | | | **6b** | No |
| | If "Yes," on line 6a or 6b, describe in Part III. | | | | |
| 7 | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III. | | | **7** | No |
| 8 | Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III. | | | **8** | No |
| 9 | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)?. | | | **9** | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**    Cat. No. 50053T    **Schedule J (Form 990) 2017**

---

Page 2

Schedule J (Form 990) 2017

**Part II    Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additio

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organiza instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits |
|---|---|---|---|---|---|---|
| | | **(i) Base compensation** | **(ii) Bonus & incentive compensation** | **(iii) Other reportable compensation** | | |
| **1** JAMES M STATEN<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 1,322,160 | 200,000 | 277,872 | 127,000 | 30,605 |
| **2** THOMAS E JACKIEWICZ<br>VICE CHAIRMAN/PRESIDENT | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 1,503,947 | 450,000 | 368,948 | 27,000 | 15,215 |
| **3** JAMES G ELLIS<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 547,895 | 70,000 | 35,825 | 27,000 | 20,703 |
| **4** LAURA MOSQUEDA<br>CHAIRMAN (AS OF 5/1/18) | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 450,546 | 50,000 | 23,806 | 27,000 | 13,308 |
| **5** INDERBIR SINGH GILL MD<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 2,147,566 | | 446,455 | 27,000 | 86,943 |
| **6** ROHIT VARMA MD<br>DIRECTOR (UNTIL 10/5/17) | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 1,160,529 | 125,000 | 137,728 | 27,000 | 21,210 |
| **7** MARK TODD<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 275,149 | 40,000 | 5,500 | 27,000 | 28,860 |
| **8** TED BUDGE<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 371,842 | 25,000 | 13,929 | 27,000 | 29,758 |
| **9** STEVEN L GIANNOTTA<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 609,847 | 100,000 | 45,000 | 27,000 | 23,564 |
| **10** EDWARD GRANT<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 445,295 | 50,000 | 45,694 | 27,000 | 23,068 |
| **11** HELENA CHUI<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 168,555 | 0 | 0 | 17,684 | 21,511 |
| **12** DAVID PENG<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 439,780 | 0 | 117,974 | 27,000 | 29,265 |
| **13** RANDOLPH SIWABESSY<br>TREASURER & CFO | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 322,881 | 67,404 | 32,751 | 27,000 | 2,100 |
| **14** LIL DELCAMPO<br>SECRETARY | (i) | 0 | 0 | 0 | 0 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | (ii) | 245,977 | - 1,611 | - | 27,000 | - 33,506 |
| **15** CARMEN PULIAFITO FORMER VICE CHAIR | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | - 623,831 | - 124,000 | - 1,081,215 | 27,000 | - 20,094 |
| **16** MELODY TUW FORMER TREASURER/CFO | (i) | 0 | 0 | 0 | 0 | 0 |
| | (ii) | - 201,932 | - 5,000 | - 0 | 22,088 | - 31,253 |

Schedule J (Form 990) 2017

| Part III | Supplemental Information |
|---|---|
| Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete ||

| Return Reference | Explanation |
|---|---|
| SCHEDULE J, PART II | NONE OF THE OFFICERS AND DIRECTORS OF THIS ORGANIZATION RECEIVED ANY COMPENSATION FROM THE FI 2017, THE INDIVIDUALS REPORTED ON SCHEDULE J, PART II WERE EMPLOYEES OF THE UNIVERSITY OF SOUTH ORGANIZATION. SCHEDULE J, PART I, LINE 4A: CARMEN PULIAFITO, MD RECEIVED $875,000 IN CONNECTION W POSITION AND SEPARATION FROM THE UNIVERSITY. THIS AMOUNT IS INCLUDED IN SCHEDULE J, PART II, COLU M. STATEN: DURING CALENDAR YEAR 2017, SR VP FINANCE/CFO, PARTICIPATED IN A RETENTION PROGRAM AT RELATED ORGANIZATION. A PAYMENT OF $500,000 (ACCRUING AT $100,000 PER YEAR) IS SCHEDULED TO VEST SUBSTANTIAL RISK OF FORFEITURE. AN ACCRUAL OF $100,000 HAS BEEN INCLUDED IN SCHEDULE J, PART II, C 457(F) SUPPLEMENTAL RETIREMENT PLAN TO PROVIDE MAKE-UP BENEFITS TO EMPLOYEES WHOSE COMPENSAT CONTRIBUTIONS TO THE USC DEFINED CONTRIBUTION RETIREMENT PLAN. AS OF JANUARY 1, 2005, THE PLAN TO FUTURE MAKE-UP BENEFITS, WERE NO LONGER PERMITTED TO DEFER THESE BENEFITS. |

## Additional Data

**Software ID:**

**Software Version:**

↑ Back to Top

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 | | TIN: 95-4540991 |
|---|---|---|---|

**SCHEDULE O**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**
Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
► Attach to Form 990 or 990-EZ.
► Go to *www.irs.gov/Form990* for the latest information.

OMB No. 1545-0047

**2017**

Open to Public
Inspection

Name of the organization
USC CARE MEDICAL GROUP INC

**Employer identification number**
95-4540991

| Return Reference | Explanation |
|---|---|
| FORM 990, PART I, LINE 1 & PART III, LINE 1: | TO PROMOTE HEALTH BY ENGAGING IN THE PRACTICE OF MEDICINE FOR PATIENTS OF HOSPITALS AFFILIATED WITH THE UNIVERSITY OF SOUTHERN CALIFORNIA KECK SCHOOL OF MEDICINE AND ELSEWHERE. TO PROVIDE MEDICAL CARE TO THE SICK AND INJURED WHO MAY COME TO THIS CORPORATION FOR DIAGNOSIS, TREATMENT AND CARE WITHOUT REGARD TO RACE, COLOR, CREED, SEX, AGE OR ABILITY TO PAY FOR SERVICES AND PARTICULARLY TO PROVIDE SUCH MEDICAL CARE FOR PERSONS WHO SEEK SUCH CARE AT HOSPITALS AND OTHER HEALTH CARE FACILITIES AFFILIATED WITH THE UNIVERSITY. |
| FORM 990, PART VI, LINE 2: | CERTAIN DIRECTORS OF THIS ORGANIZATION SIT ON THE BOARD OR ARE TRUSTEES OF THE MAY ROBERTS DEWRIGHT TRUST, A RELATED ORGANIZATION OF THE UNIVERSITY OF SOUTHERN CALIFORNIA: - JAMES M STATEN - ROHIT VARMA, MD (UNTIL 10/5/2017) - LAURA MOSQUEDA (FROM 10/6/2017) ALL OF THE INDIVIDUALS LISTED IN FORM 990, PART VII ARE EMPLOYEES AT THE UNIVERSITY OF SOUTHERN CALIFORNIA, EXCEPT FOR JOHN KUSMIERSKY. FORM 990, PART VI, LINES 6, 7A AND 7B: THE SOLE CORPORATE MEMBER OF THE ORGANIZATION IS THE UNIVERSITY OF SOUTHERN CALIFORNIA, A CALIFORNIA TAX-EXEMPT ORGANIZATION. THE CORPORATE MEMBER HAS THE AUTHORITY TO APPROVE DIRECTORS ELECTED BY THE BOARD AND REMOVE DIRECTORS AND THE AUTHORITY TO APPROVE CHANGES TO THE BYLAWS. ACTIONS REQUIRING APPROVAL OF THE CORPORATE MEMBERS INCLUDE ANY CHANGES TO THE COMPOSITION OF THE BOARD OF DIRECTORS, BYLAW CHANGES, CERTAIN PROPERTY TRANSACTIONS, BUDGET APPROVAL, AND APPROVAL OF CERTAIN CONTRACTS AND PURCHASE AGREEMENTS. |
| FORM 990, PART VI, LINE 11B: | THE ORGANIZATION'S FORM 990 IS REVIEWED AT SEVERAL LEVELS. THE ORGANIZATION ENGAGES AN EXTERNAL PUBLIC ACCOUNTING FIRM TO ASSIST IN THE PREPARATION AND REVIEW OF ITS FORM 990 AND WHO SIGNS AS PAID PREPARER. THE REVIEW OF THE FINAL FORM 990 IS CONDUCTED BY THE USC COMPTROLLER'S OFFICE PRIOR TO IT BEING FILED. |
| FORM 990, PART VI, LINES 12, 13, 14 AND 16: | RELATED ORGANIZATIONS OF THE UNIVERSITY OF SOUTHERN CALIFORNIA FOLLOW THE UNIVERSITY'S POLICIES. PURSUANT TO THE CONFLICT OF INTEREST POLICY, IF AN INDIVIDUAL BELIEVES OR SUSPECTS THAT A CONFLICT OF INTEREST MAY EXIST, IT SHOULD BE DISCLOSED TO THE CHAIRMAN OF THE BOARD. USC CARE MEDICAL GROUP, INC. FOLLOWS THE UNIVERSITY OF SOUTHERN CALIFORNIA'S WRITTEN DOCUMENT RETENTION, WHISTLEBLOWER, AND JOINT VENTURE POLICIES WHICH WERE PREVIOUSLY ISSUED BY UNIVERSITY MANAGEMENT AND ARE CURRENTLY IN EFFECT. ALL POLICIES GO TO THE CLINICAL PRACTICES COMMITTEE FOR APPROVAL. |
| FORM 990, PART VI, LINE 19: | THE ORGANIZATION'S BYLAWS ARE MADE AVAILABLE TO THE PUBLIC UPON REQUEST. THE ORGANIZATION FILES UNDER CONSOLIDATED FINANCIAL STATEMENTS WITH THE UNIVERSITY OF SOUTHERN CALIFORNIA AND ALSO FOLLOWS THE UNIVERSITY'S POLICIES. THE FINANCIAL STATEMENTS AND CONFLICT OF INTEREST POLICIES ARE MADE AVAILABLE TO THE PUBLIC ON THE UNIVERSITY OF SOUTHERN CALIFORNIA'S WEBSITE. |
| FORM 990, PART VII, COLUMN (B) | THE INDIVIDUALS REPORTED AS RECEIVING COMPENSATION FROM A RELATED ORGANIZATION IN COLUMNS (E) AND (F) IN FORM 990, PART VII ARE EMPLOYEES AT THE UNIVERSITY OF SOUTHERN CALIFORNIA, A TAX-EXEMPT RELATED ORGANIZATION. EACH OF THESE INDIVIDUALS HAS DEVOTED AN AVERAGE OF 40-50 HOURS PER WEEK TO THEIR POSITIONS AT THE UNIVERSITY OF SOUTHERN CALIFORNIA. |
| FORM 990, PART VII: | USC CARE MEDICAL GROUP, INC. REIMBURSES THE UNIVERSITY OF SOUTHERN CALIFORNIA FOR USE OF ITS EMPLOYEES AND OTHER OPERATING COSTS. |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.      Cat. No. 51056K      Schedule O (Form 990 or 990-EZ) 2017

---

## Additional Data

Return to Form

Software ID:
Software Version:

↑ Back to Top

| efile Public Visual Render | ObjectId: 201901359349302420 - Submission: 2019-05-15 |
|---|---|

**SCHEDULE R**
(Form 990)

Department of the Treasury
Internal Revenue Service

**Related Organizations and Unrelated Partnerships**
► Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or
► Attach to Form 990.
►Go to *www.irs.gov/Form990* for the latest information.

Name of the organization
USC CARE MEDICAL GROUP INC

Emp

95-4

| **Part I** | **Identification of Disregarded Entities** Complete if the organization answered "Yes" on Form 990, Part IV, line 33. |
|---|---|

| (a)<br>Name, address, and EIN (if applicable) of disregarded entity | (b)<br>Primary activity | (c)<br>Legal domicile (state<br>or foreign country) | (d)<br>Total income | End-of- |
|---|---|---|---|---|
| **(1)** USC CARE MEDICAL NON-CONTRACTED LLC<br>1510 SAN PABLO ST STE 649<br>LOS ANGELES, CA 90033<br>27-0318583 | HEALTHCARE | CA | 167,359 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II    Identification of Related Tax-Exempt Organizations** Complete if the organization answered "Yes" on Form 990, Part IV
related tax-exempt organizations during the tax year.

| (a)<br>Name, address, and EIN of related organization | (b)<br>Primary activity | (c)<br>Legal dom cile (state<br>or foreign country) | (d)<br>Exempt Code section | Pub<br>(if s |
|---|---|---|---|---|
| **(1)** UNIVERSITY OF SOUTHERN CALIFORNIA<br>UNIVERSITY GARDENS - UGB203<br><br>LOS ANGELES, CA 90089<br>95-1642394 | EDUCATION | CA | 501(C)(3) | 2 |
| **(2)** ICT PRODUCTIONS INC<br>C/O USC UGB 203<br><br>LOS ANGELES, CA 90089<br>95-4843260 | EDUC. MEDIA | CA | 501(C)(3) | 12A, |
| **(3)** LORD FOUNDATION OF CALIFORNIA<br>C/O USC UGB203<br><br>LOS ANGELES, CA 90089<br>95-3168340 | USC SUPPORT | CA | 501(C)(3) | 12A, |
| **(4)** DAVID X MARKS FOUNDATION<br>C/O USC UGB 203<br><br>LOS ANGELES, CA 90089<br>95-6034304 | USC SUPPORT | CA | 501(C)(3) | 12A, |
| **(5)** SURVIVORS OF SHOAH VISUAL HISTORY FDN<br>C/O USC 650 W 35TH ST<br><br>LOS ANGELES, CA 90089<br>95-4474965 | EDUC. MEDIA | CA | 501(C)(3) | 7 |
| **(6)** CLASSICAL PUBLIC RADIO NETWORK LLC<br>7409 SOUTH ALTON COURT<br><br>CENTENNIAL, CO 80112<br>84-1474681 | EDUC. MEDIA | CO | 501(C)(3) | 7 |
| **(7)** USC Verdugo Hills Hospital Foundat on<br>1812 VERDUGO BLVD<br><br>GLENDALE, CA 91208<br>95-3247823 | USC SUPPORT | CA | 501(C)(3) | 12A, |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**          Cat. No. 50135Y

Schedule R (Form 990) 2017

**Part III    Identification of Related Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on For
one or more related organizations treated as a partnership during the tax year.

| (a)<br>Name, address, and EIN of<br>related organization | (b)<br>Primary activ ty | (c)<br>Legal<br>domicile<br>(state or<br>foreign<br>country) | (d)<br>Direct<br>controlling<br>entity | (e)<br>Predominant<br>income(related,<br>unrelated,<br>excluded from tax<br>under sections<br>512-514) | (f)<br>Share of<br>total income | (g)<br>Share of<br>end-of-yea<br>assets |
|---|---|---|---|---|---|---|
| **(1)** USCSCA SURGICAL HOLDINGS LLC<br><br>1510 SAN PABLO STTREET<br>LOS ANGELES, CA 02210 | SURGERY CENTE | CA | NA | | | |

| (2) LAZARD EMERGING MARKETS INST<br><br>20 TRAFALGAR SQUARE STE 449<br>NASHUA, NH 03063 | INVESTMENTS | NH | NA | | | |
| (3) WELLINGTON TRUST CO NA CTF REAL TO<br><br>200 CONGRESS STREET<br>BOSTON, MA 02210 | INVESTMENTS | MA | NA | | | |
| (4) LARDAS HOLDINGS LLC<br><br>863 BUNGALOW DRIVE<br>EL SEGUNDO, CA 90245<br>47-2640552 | INVESTMENTS | CA | na | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Part IV**  **Identification of Related Organizations Taxable as a Corporation or Trust** Complete if the organization answered "Ye
it had one or more related organizations treated as a corporation or trust during the tax year.

| (a)<br>Name, address, and EIN of<br>related organizat on | (b)<br>Primary activity | (c)<br>Legal<br>dom cile<br>(state or foreign<br>country) | (d)<br>Direct controlling<br>entity | (e)<br>Type of ent ty<br>(C corp, S corp,<br>or trust) | (f)<br>Share of to<br>income |
|---|---|---|---|---|---|
| **(1)** MAY ROBERTS DEWRIGHT TRUST<br><br>UNIVERSITY GARDENS - UGB203<br>LOS ANGELES, CA 900898003<br>95-6284845 | USC SUPPORT | CA | NA | T | |
| **(2)** INTEGRATED DIGITAL ASSET CORPORATION<br><br>UNIVERSITY GARDENS - UGB203<br>LOS ANGELES, CA 900898003<br>95-4680904 | 3RD PARTY CON | CA | NA | C | |
| **(3)** CHARITABLE REMAINDER TRUSTS (241) | FUNDRAISING | CA | NA | T | |
| **(4)** POOLED INCOME FUND (1) | FUNDRAISING | CA | NA | T | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

––––––––––––––––––––––––––––––––––––––   Page 3   ––––––––––––––––––––––––––––––––––––––

Schedule R (Form 990) 2017

**Part V**  **Transactions With Related Organizations** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35

**Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

**1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV?

**a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity .   .   .   .   .   .   .   .   .

**b** Gift, grant, or capital contribution to related organization(s) .   .   .   .   .   .   .   .   .   .   .   .   .

**c** Gift, grant, or capital contribution from related organization(s) .   .   .   .   .   .   .   .   .   .   .

**d** Loans or loan guarantees to or for related organization(s)   .   .   .   .   .   .   .   .   .   .   .   .

**e** Loans or loan guarantees by related organization(s) .   .   .   .   .   .   .   .   .   .   .   .   .

**f** Dividends from related organization(s) .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

**g** Sale of assets to related organization(s) .   .   .   .   .   .   .   .   .   .   .   .   .   .

**h** Purchase of assets from related organization(s) .   .   .   .   .   .   .   .   .   .   .   .

**i** Exchange of assets with related organization(s) .   .   .   .   .   .   .   .   .   .   .   .

**j** Lease of facilities, equipment, or other assets to related organization(s) .   .   .   .   .   .   .   .

**k** Lease of facilities, equipment, or other assets from related organization(s) .   .   .   .   .   .   .   .

| | | |
|---|---|---|
| **l** | Performance of services or membership or fundraising solicitations for related organization(s) | |
| **m** | Performance of services or membership or fundraising solicitations by related organization(s) | |
| **n** | Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | |
| **o** | Sharing of paid employees with related organization(s) | |
| **p** | Reimbursement paid to related organization(s) for expenses | |
| **q** | Reimbursement paid by related organization(s) for expenses | |
| **r** | Other transfer of cash or property to related organization(s) | |
| **s** | Other transfer of cash or property from related organization(s) | |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and

| (a)<br>Name of related organization | (b)<br>Transaction type (a-s) | (c)<br>Amount involved |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Page 4

Schedule R (Form 990) 2017

**Part VI** **Unrelated Organizations Taxable as a Partnership** Complete if the organization answered "Yes" on Form 990, Part IV

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a)<br>Name, address, and EIN of entity | (b)<br>Primary activity | (c)<br>Legal domicile (state or foreign country) | (d)<br>Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e)<br>Are all partners section 501(c)(3) organizations? | | (f)<br>Share of total income | (g)<br>Share of end-of-year assets | (h)<br>Dispro- portionate alloca |
|---|---|---|---|---|---|---|---|---|
| | | | | **Yes** | **No** | | | **Yes** |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

---

— Page 5 —

Schedule R (Form 990) 2017

| Part VII | **Supplemental Information** |
|---|---|

Provide additional information for responses to questions on Schedule R (see instructions).

| Return Reference | Explanation |
|---|---|
| PART IV, LINE 4 COLUMN (C) | THE LEGAL DOMICILES OF THE CHARITABLE REMAINDER TRUSTS INCLUDE: CA, CO, FL, HI, IL, IN, NV, NY, NC, P |

---

## Additional Data

**Software ID:**
**Software Version:**

---

---

---

---

# Exhibit 142

# OpenPaymentsData.**CMS**.gov     🔍 Search Open Payments

Home     Search Tool     Summary Data     Data Explorer     Download Data     About     T     Sign In

# PATRICK C HSIEH     

📍 1520 SAN PABLO ST
SUITE 3800
LOS ANGELES, CA 90033-5310

🗄 Allopathic & Osteopathic Physicians | Neurological Surgery

⚠ Review or dispute your reported data

Address shown may reflect one of the following: practice location, hospital affiliation, or third party billing assignment.
Additional addresses may be found in the NPI Registry.

**Filters:** ❓                                                        ⟳ Reset Filters

Year:

All Years                                                                          ⌄

Payment Type: ❓

General Payments                                                                   ⌄

Company Making Payment:

All Companies                                                                      ▾

Nature of Payment: ❓

All Natures of Payments                                                            ⌄

General Payments

## $426,135.01

(335 payments)

Research Payments

## N/A

6/8/2021                                    Entity Profile Page - Open Payments Data - CMS

Associated Research Funding

# $357,195.38

(63 payments)

Ownership and Investment Interest

# N/A

## General Payments across All Years





Measure:  ☑ Mean   ☐ Median   ❓

\*Includes full years of data only.

## Top Companies Making General Payments in All Years



Entity Profile Page - Open Payments Data - CMS



Displaying records **1–10** of 17.

## General Payments by Nature of Payment in All Years



| Nature of Payment | Amount | Payments | Amount (%) |
|---|---|---|---|
| Consulting Fee ⓘ | $146,010.80 | 23 | 34.3% |
| Services other than consulting... ⓘ | $135,972.50 | 21 | 31.9% |
| Royalty or License ⓘ | $97,673.92 | 11 | 22.9% |
| Travel and Lodging ⓘ | $35,264.92 | 96 | 8.3% |
| Food and Beverage ⓘ | $10,237.87 | 183 | 2.4% |
| Honoraria ⓘ | $975.00 | 1 | 0.2% |

6/8/2021                          Entity Profile Page - Open Payments Data - CMS

## List of General Payments in 2019 ⓘ

View these records in Advanced Search ⤢ for more details.                        Download Data

| Company Making Payments ⬍ | Nature of Payment ⬍ | Date ⬍ | Total Amount ⬍ |
|---|---|---|---|
| Medtronic USA, Inc. | Royalty or License | 06/03/2019 | $8,290.00 |
| Medtronic USA, Inc. | Royalty or License | 08/28/2019 | $7,712.00 |
| Medtronic USA, Inc. | Royalty or License | 11/25/2019 | $7,675.00 |
| Medtronic USA, Inc. | Royalty or License | 02/22/2019 | $6,489.00 |
| NuVasive, Inc. | Royalty or License | 08/14/2019 | $2,116.81 |
| NuVasive, Inc. | Royalty or License | 05/13/2019 | $1,823.07 |
| NuVasive, Inc. | Royalty or License | 02/06/2019 | $1,153.81 |
| Medtronic USA, Inc. | Food and Beverage | 09/12/2019 | $118.93 |

Displaying records **1–8** of 8.

# OpenPaymentsData.CMS.gov A federal government website managed by the Centers for Medicare & Medicaid Services, 7500 Security Boulevard, Baltimore, MD 21244

SIGN UP FOR EMAIL UPDATES        Data.CMS.gov        OpenPaymentsData.CMS.gov

Data.Medicare.gov        Data.Medicaid.gov        Data.HealthCare.gov        FOIA        No Fear Act

Privacy Policy        Privacy settings        FAQ's        CMS contact info        Help with file formats & plug-ins

# Exhibit 143



S A E O CAL ORN A | Business, Consumer Services and Housing Agency                                  GAV N NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                    KEV N K SH, D REC OR

2218 Kausen Drive  Suite 100  Elk Grove  CA  95758
(800) 884 1684 (Voice)  (800) 700 2320 (TTY) | California s Relay Service at 711
http //www dfeh ca gov  Email  contact center@dfeh ca gov

June 21, 2021

Elissa Waizman
8383 Wilshire Boulevard Suite 315
Beverly Hills, California 90211

RE:     **Notice to Complainant's Attorney**
        DFEH Matter Number: 202106-13943521
        Right to Sue: Cheongsiatmoy / University of Southern California

Dear Elissa Waizman:

Attached is a copy of your complaint of discrimination filed with the Department of Fair
Employment and Housing (DFEH) pursuant to the California Fair Employment and
Housing Act, Government Code section 12900 et seq. Also attached is a copy of your
Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Department of Fair Employment and Housing



S A E O CAL ORN A | Business, Consumer Services and Housing Agency                          GAV N NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                          KEV N K SH, D REC OR
2218 Kausen Drive  Suite 100  Elk Grove  CA  95758
(800) 884 1684 (Voice)  (800) 700 2320 (TTY) | California s Relay Service at 711
http //www dfeh ca gov  Email  contact center@dfeh ca gov

June 21, 2021

RE:    **Notice of Filing of Discrimination Complaint**
      DFEH Matter Number: 202106-13943521
      Right to Sue: Cheongsiatmoy / University of Southern California

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit. A
copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

This matter may qualify for DFEH's Small Employer Family Leave Mediation pilot
program. Under this program, established under Government Code section 12945.21,
a small employer with 5 -19 employees, charged with violation of the California Family
Rights Act, Government Code section 12945.2, has the right to participate in DFEH's
free voluntary mediation service. Under this program both the employee requesting an
immediate right to sue and the employer charged with the violation may request that all
parties participate in DFEH's free voluntary mediation service. A request for mediation
must be made within 30 days of receipt of the Notice of Case Closure and Right to Sue.
If mediation is requested, the employee is prohibited from filing a civil action until
mediation is complete. The employee's statute of limitations to file a civil action,
including for all related claims not arising under section 12945.2, is tolled from DFEH's
receipt of a mediation request under section 12945.21 until mediation is complete.  To
request DFEH Small Employer Family Leave Mediation, email
DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number indicated on
the Right to Sue notice.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing



S  A  E O  CAL  ORN A | Business, Consumer Services and Housing Agency                    GAV N NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**

KEV N K SH, D REC  OR

2218 Kausen Drive  Suite 100  Elk Grove  CA  95758
(800) 884 1684 (Voice)  (800) 700 2320 (TTY) | California s Relay Service at 711
http //www dfeh ca gov  Email  contact center@dfeh ca gov

June 21, 2021

Justin Cheongsiatmoy
c/o Rise Law Firm, 8383 Wilshire Boulevard, Suite 315
Beverly Hills, California 90211

RE:   **Notice of Case Closure and Right to Sue**
      DFEH Matter Number: 202106-13943521
      Right to Sue: Cheongsiatmoy / University of Southern California

Dear Justin Cheongsiatmoy:

This letter informs you that the above-referenced complaint filed with the Department of
Fair Employment and Housing (DFEH) has been closed effective June 21, 2021
because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

This matter may qualify for DFEH's Small Employer Family Leave Mediation pilot
program. Under this program, established under Government Code section 12945.21, a
small employer with 5 -19 employees, charged with violation of the California Family
Rights Act, Government Code section 12945.2, has the right to participate in DFEH's
free voluntary mediation service. Under this program both the employee requesting an
immediate right to sue and the employer charged with the violation may request that all
parties participate in DFEH's free voluntary mediation service. A request for mediation
must be submitted to the DFEH within 30 days of receipt of the Notice of Case Closure
and Right to Sue. If mediation is requested, the employee is prohibited from filing a civil
action until mediation is complete. The employee's statute of limitations to file a civil
action, including for all related claims not arising under section 12945.2, is tolled from
DFEH's receipt of a mediation request under section 12945.21 until mediation is
complete.  To request DFEH Small Employer Family Leave Mediation, email
DRDOnlinerequests@dfeh.ca.gov and include the DFEH matter number indicated on
the Right to Sue notice.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

Sincerely,

S  A  E O   CAL   ORN A | Business, Consumer Services and Housing Agency                    GAV N NEWSOM, GOVERNOR

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

KEV N K SH, D REC  OR

2218 Kausen Drive  Suite 100   Elk Grove   CA   95758
(800) 884 1684 (Voice)   (800) 700 2320 (TTY) | California s Relay Service at 711
http //www dfeh ca gov   Email  contact center@dfeh ca gov

Department of Fair Employment and Housing

**COMPLAINT OF EMPLOYMENT DISCRIMINATION
BEFORE THE STATE OF CALIFORNIA
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING
Under the California Fair Employment and Housing Act
(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**

Justin Cheongsiatmoy                                    DFEH No. 202106-13943521

                                 Complainant,

vs.

University of Southern California
3551 Trousdale Parkway, ADM 304
Los Angeles, California 90089

                                 Respondents

_____

**1.** Respondent **University of Southern California**  is an **employer University of Southern California** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Justin Cheongsiatmoy**, resides in the City of **Beverly Hills,** State of **California.**

**3**. Complainant alleges that on or about **October 17, 2019**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's ancestry, national origin (includes language restrictions).

**Additional Complaint Details:** During the course of Justin Cheongsiatmoy, M.D.'s employment, high ranking members of the University engaged in a campaign of severe and/or pervasive harassment against Justin Cheongsiatmoy, M.D. based on his national origin and/or ancestry.  The conduct ranged from name calling and threatening statements to personnel management adverse actions carried out by the harassers and designed to communicate a hostile message based on Justin Cheongsiatmoy, M.D.'s national origin and/or ancestry.

-1-
*Complaint – DFEH No. 202106-13943521*

Date Filed: June 21, 2021

VERIFICATION

I, **Elissa A. Waizman**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On June 21, 2021, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Beverly Hills, CA**

Date Filed: June 21, 2021

# Exhibit 144

| 830 | Tech in-room | data collect start | data collection end | tech out of room | admin time | TOTAL TIME | Location | YR 13 | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | MR# | TECH | IOM MD | Category | Procedure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAC 16-026 | 600 | 700 | 1130 | 1200 | 0.5 | 6.5 | 20 | 1/20 | | | TUCHMAN | 39 | | NN/PP | S | Spine | C3-T3 LAMINECTOMY &FUSION |
| LAC 16-027 | 1230 | 1330 | 1345 | 1400 | 0.5 | 2 | 7 | 1/20 | | | TUCHMAN | 18 | | NN/PP | S | Spine | C3-C6 PSF |
| LAC 16-028 | 1430 | 1520 | 1815 | 1900 | 0.5 | 5 | 9 | 1/21 | | | CHRISTIAN | 68 | | MV | G | Craniotomy | Suboccipital craniotomy for mass resection |
| LAC 16-029 | 330 | 430 | 830 | 900 | 0.5 | 6 | 20 | 1/22 | | | BROWN | 30 | | MV | G | Spine | C3-T2 PSF wC5-C7 lami |
| LAC 16-030 | 930 | 1000 | 1345 | 1400 | 0.5 | 5 | 14 | 1/22 | | | BROWN | 28 | | MV | G | ENT | Total thyroidectomy |
| LAC 16-031 | 1000 | 1030 | 1230 | 1300 | 0.5 | 3.5 | 23 | 1/22 | | | SPOONAMORE | 43 | | PP | G | Spine | L5-S1 lami/disc. |
| LAC 16-032 | 1000 | 1130 | 1600 | 1630 | 0.5 | 7 | 7 | 1/22 | | | CHRISTIAN | 39 | | NN | G | Spine | C4-C8 ACDF |
| LAC 16-033 | 730 | 830 | 1230 | 1330 | 0.5 | 8.5 | 7 | 1/25 | | | TUCHMAN | 85 | | PP/NN | S | Spine | T2-T13 Lami for tumor removal |
| LAC 16-034 | 730 | 810 | 1045 | 1130 | 0.5 | 4.5 | 14 | 1/25 | | | MACERI | 55 | | MV | S | ENT | Right facial nerve decompression |
| LAC 16-035 | 730 | 800 | 1025 | 1030 | 0.5 | 3.5 | 14 | 1/26 | | | BROWN | 37 | | PP | S | ENT | Left thyroidectomy |
| LAC 16-036 | 1330 | 1430 | 1700 | 1700 | 0.5 | 4 | 14 | 1/25 | | | BROWN | 58 | | NN | S | ENT | Total thyroidectomy |
| LAC 16-037 | 730 | 800 | 1100 | 1100 | 0.5 | 4 | 15 | 1/26 | | | KARI | 60 | | NN | S | ENT | Left tympanoplasty |
| LAC 16-038 | 730 | 900 | 1630 | 1700 | 0.5 | 10 | 14 | 1/27 | | | BROWN | 22 | | MV | S | ENT | Total thyroidectomy |
| LAC 16-039 | 730 | 900 | 1315 | 1330 | 0.5 | 6.5 | 15 | 1/27 | | | BROWN | 57 | | NN | S | ENT | Left tympanoplasty |
| LAC 16-040 | 800 | 1000 | 1630 | 1700 | 0.5 | 9.5 | 7 | 1/27 | | | ATTENELLO | 41 | | PP | S | Craniotomy | Craniotomy for left frontoparietal mass |
| LAC 16-041 | 730 | 830 | 1130 | 1230 | 0.5 | 5.5 | 7 | 1/28 | | | GIANNOTTA | 42 | | PP/NN | G | Craniotomy | R retrosigmoid craniotomy for MVD |
| LAC 16-042 | 1030 | 1045 | 1130 | 1230 | 0.5 | 2.5 | 15 | 1/28 | | | PEPPER | 46 | | MV | G | ENT | Rt parotidectomy |
| LAC 16-043 | 1330 | 1430 | 1630 | 1930 | 0.5 | 6.5 | 7 | 1/28 | | | CHRISTIAN | 57 | | NN/PP | G | Spine | C3-C6 lami and fusion |
| LAC 16-044 | 1000 | 1130 | 1630 | 1730 | 0.5 | 8 | 23 | 1/29 | | | SPOONAMORE | 35 | | PP | G | Spine | L4-L5 TLIF |
| LAC 16-045 | 930 | 1130 | 1700 | 1730 | 0.5 | 8.5 | 7 | 1/29 | | | GIANNOTTA | 39 | | NN | G | Craniotomy | Right crani for tumor resection |
| LAC 16-046 | 800 | 1000 | 1330 | 1400 | 0.5 | 6.5 | 7 | 1/31 | | | ATTENELLO | 59 | | NN | S | Spine | C3-C6 lami and fusion |
| LAC 16-047 | 730 | 1030 | 1600 | 1630 | 0.5 | 9.5 | 7 | 2/1 | | | GIANNOTTA | 29 | | PP | G | Craniotomy | Right crani for tumor resection |
| LAC 16-048 | 730 | 830 | 1330 | 1400 | 0.5 | 7 | 14 | 2/1 | | | MACERI | 45 | | MV | S | ENT | Rt tympanoplasty |
| LAC 16-049 | 1200 | 1230 | 1345 | 1400 | 0.5 | 2.5 | 15 | 2/1 | | | MACERI | 59 | | NN | S | ENT | Parathyroidectomy |
| LAC 16-050 | 1430 | 1510 | 1610 | 1630 | 0.5 | 2.5 | 15 | 2/1 | | | PAQUET | 56 | | MV | S | ENT | Parathyroidectomy |
| LAC 16-051 | 730 | 900 | 13:15 | 13:30 | 0.5 | 6.5 | 7 | 2/2 | | | RUSSIN | 57 | | PP | S | Craniotomy | Left Craniotomy for Aneurysm Clipping |
| LAC 16-052 | 800 | 900 | 930 | 1000 | 0.5 | 2.5 | 9 | 2/3 | | | CHRISTIAN | 59 | | PP | S | Spine | T4-T9 PSF |
| LAC 16-053 | 830 | 900 | 1130 | 1200 | 0.5 | 4 | 15 | 2/3 | | | KOKOT | 68 | | NN | S | ENT | Parotidectomy |
| LAC 16-054 | 1130 | 12:45 | 1600 | 1630 | 0.5 | 7.5 | 7 | 2/3 | | | CHRISTIAN | 25 | | PP/NN/MV | S | Spine | T4-T9 PSF |
| LAC 16-055 | 830 | 1000 | 1230 | 1300 | 0.5 | 5 | 7 | 2/4 | | | TUCHMAN | 29 | | PP | G | Spine | C6-C7 ACDF |
| LAC 16-056 | 1000 | 1100 | 1400 | 1430 | 0.5 | 5 | 7 | 2/5 | | | ZADA | 37 | | NN | G | Spine | right crani for tumor resection |
| LAC 16-057 | 1000 | 1100 | 1500 | 1600 | 0.5 | 6.5 | 23 | 2/5 | | | TUCHMAN | 34 | | PP | G | Spine | right crani for tumor resection |
| LAC 16-058 | 800 | 1000 | 1630 | 1700 | 0.5 | 9 | 7 | 2/8 | | | GIANNOTTA | 39 | | PP/NN | S | Craniotomy | Left crani for tumor resection |
| LAC 16-059 | 745 | 800 | 930 | 945 | 0.5 | 2.5 | 15 | 2/9 | | | ROBERT | 40 | | PP | S | ENT | Left tympanoplasty |
| LAC 16-060 | 1100 | 1200 | 1500 | 1530 | 0.5 | 4.5 | 7 | 2/9 | | | RUSSIN | 61 | | NN/PP | S | Craniotomy | Crani for aneurysm |
| LAC 16-061 | 730 | 900 | 1020 | 1100 | 0.5 | 3.5 | 7 | 2/10 | | | ATTENELLO | 76 | | PP/MV | S | Craniotomy | Brain biopsy |
| LAC 16-062 | 1230 | 1300 | 2000 | 2030 | 0.5 | 8.5 | 7 | 2/10 | | | CHRISTIAN | 37 | | PP/NN | S | Spine | C3-T2 PSF |
| LAC 16-063 | 730 | 900 | 1100 | 1130 | 0.5 | 4.5 | 15 | 2/11 | | | PEPPER | 29 | | MV | G | ENT | Total thyroidectomy |
| LAC 16-064 | 800 | 900 | 1230 | 1300 | 0.5 | 5.5 | 7 | 2/11 | | | CHRISTIAN | 60 | | PP/NN | G | Spine | C1-C2 |
| LAC 16-065 | 930 | 1030 | 1615 | 1700 | 0.5 | 8 | 23 | 2/12 | | | CHRISTIAN | 59 | | PP | J | Spine | T4-T10 PSF |
| LAC 16-066 | 930 | 1300 | 1345 | 1600 | 0.5 | 3.5 | 14 | 2/12 | | | ATTENELLO | 52 | | MV | J | ENT | right crani for tumor resection |
| LAC 16-067 | 1330 | 1345 | 1600 | 1700 | 0.5 | 6 | 7 | 2/16 | | | BROWN | 43 | | MV | J | ENT | Total thyroidectomy |
| LAC 16-068 | 1130 | 1330 | 1630 | 1700 | 0.5 | 6 | 7 | 2/16 | | | TUCHMAN | 49 | | PP/NN | S | Craniotomy | Craniotomy for tumor resection |
| LAC 16-069 | 545 | 730 | 1200 | 1230 | 0.5 | 7.5 | 7 | 2/17 | | | RUSSIN | 53 | | NN/PP | S | Craniotomy | Craniotomy for aneurysm clipping |
| LAC 16-070 | 1400 | 1500 | 1900 | 1930 | 0.5 | 5.5 | 7 | 2/17 | | | ATTENELLO | 52 | | PP/NN | G | Spine | T10-T11 Laminectomy & Tumor removal |
| LAC 16-071 | 800 | 930 | 1945 | 2030 | 0.5 | 12 | 7 | 2/18 | | | RUSSIN | 8 | | PP | G | Craniotomy | Crani for aneurysm & AVM |
| LAC 16-072 | 830 | 1000 | 1400 | 1430 | 0.5 | 6.5 | A1 | 2/18 | | | AMAR | 50 | | MV | G | ANGIO | ICA aneurysm embolized |
| LAC 16-073 | 1330 | 1400 | 1600 | 1630 | 0.5 | 3 | 15 | 2/18 | | | PEPPER | 53 | | NN | G | ENT | right parathyroid |
| LAC 16-074 | 900 | 1130 | 1830 | 1900 | 0.5 | 10 | 7 | 2/19 | | | ZADA | 48 | | NN | G | Craniotomy | right crani for tumor resection |
| LAC 16-075 | 930 | 1100 | 1400 | 1430 | 0.5 | 5.5 | 23 | 2/19 | | | LIU | 84 | | PP | G | spine | C2 ACDF |

# EXHIBIT 145

Excerpts of Selected OR Log Sheets



| YR 16 | Tech in room | data collection start | data collection end | tech out of room | total time | Location | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | INVOICE / INSURANCE | MR# | TCH | Procedure | MD | SMD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/2/2016 | 6:45 | 7:45 | 15:45 | 16:45 | 10 | KH | | | spoonsamore | 45 | workers comp | | biotronic | ALIF | gonzalez | Y |
| 2/2/2016 | 6:45 | 8:00 | 14:00 | 14:40 | 7.32 | KH | | | liu, j | 43 | kaiser permanente | | mm | l5-s1 alif and L5 pelvis posterior spinal fusion | gonzalez | Y |
| 2/2/2016 | 7:00 | 8:15 | 10:20 | 10:30 | 3 | KH | | | friedman | 79 | medicare | | ak | left translab crani revision | shilian | ENT |
| 2/2/2016 | 7:00 | 8:30 | 11:45 | 12:30 | 5.5 | KH | | | acosta | 49 | Health Net Medical HMO - | | jn | L3-l2 posterior decompression and fusion w | gonzalez | ENT |
| 2/2/2016 | 7:30 | 8:30 | 11:30 | 11:50 | 3 | KH | | | friedman | 26 | blue cross | | ch | right retrosigmoid crani | gonzalez | N |
| 2/2/2016 | 6:50 | 10:00 | 20:00 | 20:45 | 13.92 | KH | | | hsieh | 68 | blue shield | | JB | T10 Pelvis psf | gonzalez | Y |
| 2/2/2016 | 12:15 | 13:30 | 16:30 | 17:30 | 5.25 | KH | | | friedman | 58 | blue card blue shield | | ak/jn | right retrosigmoid crani | gonzalez | Y |
| 2/1/2016 | 7:15 | 7:45 | 8:30 | 8:45 | 1.5 | KH | | | friedman | 11 | medi-cal | | ak | left cochlear implant | shilian | ENT |
| 2/1/2016 | 6:40 | 8:30 | 10:30 | 11:15 | 4.58 | KH | | | Wang | 43 | blue cross prudent buyer | | JB | hardware removal | gonzalez | Y |
| 2/1/2016 | 7:45 | 9:30 | 17:30 | 18:00 | 11.25 | KH | | | hsieh | 66 | medicare | | MM/JB | tlif | gonzalez | Y |
| 2/1/2016 | 6:15 | 9:00 | 19:00 | 20:00 | 13.75 | KH | | | acosta | 09 | blue cross | | biotronic | ALIF, PSF, l5-S1 | shilian | N |
| 2/1/2016 | 8:30 | 9:30 | 13:30 | 14:30 | 6 | KH | | | kokor | 33 | state of california | | MD | thyroidectomy | shilian | ENT |
| 2/1/2016 | 9:00 | 9:45 | 11:00 | 11:15 | 2.25 | KH | | | friedman | 26 | aetna ppo | | ak | right tympanoplasty with mastoidectomy | shilian | ENT |
| 1/29/2016 | 8:15 | 9:30 | 12:15 | 12:30 | 4.25 | KH | | | hsieh | 81 | kaiser | | ak | mis L4-L5 lami, psf | gonzalez | Y |
| 1/29/2016 | 8:30 | 10:00 | 14:00 | 15:00 | 6.5 | KH | | | russin | 69 | medicare | | mm/ch | rt pteronial craniotomy for clip ligation of m | shilian | Y |
| 1/29/2016 | 11:20 | 12:00 | 13:30 | 14:00 | 2.67 | KH | | | Kokot | 55 | blue shiel | | JB | thyroidectomy | tran | ENT |
| 1/29/2016 | 13:00 | 14:15 | 16:15 | 17:30 | 4.5 | KH | | | hsieh | 99 | medicare | | ak | L1-c2 lami and psf | gonzalez | Y |
| 1/28/2016 | 7:00 | 8:00 | 11:00 | 11:45 | 4.75 | KH | | | maceri | 56 | medicare | | mod | lobectomy & parathyroidectomy | shilian | ENT |
| 1/28/2016 | 6:45 | 8:45 | 15:15 | 16:15 | 9.5 | KH | | | zada | 31 | blue cross | | jb/ak/m | right pterional craniotomy | gonzalez | Y |
| 1/28/2016 | 9:30 | 11:00 | 13:15 | 14:00 | 4.5 | KH | | | zada | 66 | medicare | | ak | left temporal craniotomy | gonzalez | Y |
| 1/28/2016 | 11:45 | 12:30 | 16:00 | 16:30 | 4.75 | KH | | | hsieh | 37 | cross ppo | | mod | total thyroidectomy | shilian | ENT |
| 1/27/2016 | 6:45 | 8:30 | 19:00 | 20:00 | 13.25 | KH | | | acosta | 47 | tricare west region | | sp | T4-Pelvis PSF, L4 PSO, iliac crest harvesting, | shilian | Y |
| 1/27/2016 | 14:30 | 16:00 | 18:00 | 18:50 | 4.33 | KH | | | wang | 69 | medicare | | ak | l3-l5 decompression, l4-l5 tlif | tran | Y |
| 1/26/2016 | 7:00 | 7:45 | 10:30 | 11:00 | 4 | KH | | | maceri | 66 | medicare | | mod | total thyroidectomy | shilian | ENT |
| 1/26/2016 | 7:00 | 8:00 | 10:30 | 11:30 | 4.5 | KH | | | hsieh | 47 | self pay | | ch | rt retrosigmoid crani | gonzalez | Y |
| 1/26/2016 | 6:30 | 8:30 | 16:00 | 17:00 | 10.17 | KH | | | hsieh | 24 | blue shield | | ch | L3-L4 OLIF | gonzalez | Y |
| 1/26/2016 | 7:15 | 8:30 | 12:00 | 12:45 | 5.5 | KH | | | liu, j | 20 | kaiser permanente hmo | | mod | mis L4-L5 lami | gonzalez | Y |
| 1/26/2016 | 11:00 | 11:30 | 13:00 | 14:00 | 3 | KH | | | maceri | 36 | blue card blue cross | | mod | completion thyroidectomy | Tran | ENT |
| 1/26/2016 | 12:00 | 13:00 | 16:00 | 17:00 | 5 | KH | | | friedman/giannotta | 58 | self pay | | ch | rt retrosigmoid crani | gonzalez | Y |
| 1/25/2016 | 7:15 | 7:45 | 8:30 | 8:45 | 1.5 | KH | | | friedman | 4 | medi-cal | | ak | lt cochlear implant | shilian | ENT |
| 1/25/2016 | 7:00 | 8:00 | 11:30 | 12:30 | 5.5 | KH | | | hsieh | 53 | united healthcare hmo | | ch | l1-l5 lami, s1-s5 partial sacrectomy & L4-pe | shilian | Y |
| 1/25/2016 | 7:00 | 8:45 | 19:30 | 20:30 | 12.45 | KH | | | acosta | 6 | medicare | | jn | T4-Pelvis PDF, L4 PSO, & L2-L3 lam lectomy | gonzalez | Y |
| 1/25/2016 | 9:45 | 10:45 | 11:15 | 12:30 | 2 | KH | | | friedman | 10 | medi-cal | | ak | lt tympanoplasty revision and mastoidectom | shilian | ENT |
| 1/25/2016 | 8:45 | 10:00 | 11:45 | 12:15 | 3.5 | KH | | | Kokot | 47 | self pay | | JB | thyroidectomy | tran | ENT |
| 1/25/2016 | 10:00 | 11:45 | 16:15 | 16:50 | 6.83 | KH | | | wang | 71 | blue cross | | min/jn | L4-l5 decompression and fusion | shilian | Y |
| 1/25/2016 | 13:00 | 13:45 | 16:15 | 17:00 | 4 | KH | | | hsieh | 67 | medicare | | ak | mis L4-L5 lami | tran | Y |
| 1/22/2016 | 16:30 | 17:15 | 18:00 | 18:45 | 2.25 | KH | | | Kokot | 46 | blue cross prudent buyer | | mod | parotidectomy | shilian | ENT |
| 1/22/2016 | 8:30 | 9:30 | 14:00 | 14:30 | 6 | KH | | | maceri | 68 | medicare | | mod | parathyroidectomy | shilian | ENT |
| 1/22/2016 | 7:45 | 9:45 | 10:45 | 10:45 | 3 | KH | | | giannotta | 73 | blue shield Sr hmo | | ak | rt retrosigmoid crani for mvd | gonzalez | Y |
| 1/22/2016 | 8:30 | 10:00 | 16:00 | 17:00 | 8.5 | KH | | | liu, j | 62 | kaiser permanente | | jb/ak/ch | L1-L2 dlif, L1-2 extension fusion & L1-2 lami | gonzalez | Y |
| 1/22/2016 | 12:00 | 14:00 | 16:30 | 16:30 | 4.5 | KH | | | maceri | 52 | blue cross hmo | | mod | total thyroidectomy | shilian | ENT |
| 1/22/2016 | 14:30 | 15:30 | 16:45 | 17:15 | 2.75 | KH | | | maceri | 61 | blue cross prudent buyer | | mod | completion thyroidectomy | shilian | ENT |
| 1/22/2016 | 17:15 | 18:00 | 19:30 | 20:30 | 3.25 | KH | | | maceri | 63 | medicare | | mod | completion thyroidectomy | shilian | ENT |
| 1/22/2016 | 16:45 | 19:00 | 22:00 | 23:54 | 7.15 | KH | | | hsieh | 40 | blue shield hmo | | ch | left superficial parotidectomy | shilian | Y |
| 1/21/2016 | 6:30 | 8:00 | 12:00 | 12:45 | 6.25 | KH | | | Spoonamore | 56 | city of LA workers'com app | | jn | L5-S1 posterior TLIF with laminectomy | gonzalez | Y |
| 1/21/2016 | 13:00 | 14:15 | 17:30 | 19:00 | 6 | KH | | | spoonamore | 70 | icw group work comp | | jn | L5-S1 TLIF | gonzalez | Y |
| 1/21/2016 | 11:00 | 14:45 | 20:45 | 21:15 | 10.25 | KH | | | russin | 52 | blue cross prudential | | mm | left superficial temporal artery to mca bypass | gonzalez | Y |
| 1/20/2016 | 6:45 | 9:30 | 15:00 | 15:00 | 8.5 | KH | | | chen | 23 | blue shield HMO | | mm/jb | rt pterionical craniotomy for aneurysm clippi | gonzalez | Y |
| 1/20/2016 | 6:45 | 9:30 | 11:00 | 11:30 | 4.75 | KH | | | chen | 27 | self pay | | mm/jb | left posterior craniotomy | gonzalez | Y |
| 1/20/2016 | 7:00 | 9:30 | 18:45 | 19:45 | 12.75 | KH | | | acosta | 50 | pencol Medi-Cal hmo | | ak/jn | l8-l9 corpectomy & cage & l4-l3 pdf | shilian | Y |
| 1/20/2016 | 12:00 | 14:15 | 16:15 | 17:45 | 5.75 | KH | | | chen | 49 | medicare | | mm | C2-C4 laminectomy | tran | Y |
| 1/19/2016 | 7:15 | 7:45 | 10:30 | 11:15 | 4 | KH | | | maceri | 25 | cigna ppo | | mod | total thyroidectomy | shilian | ENT |

| YR 16 | Tech in room | data collection start | data collection end | tech out of room | total time | MD time | admin time | Locati on | LAST NAME | FIRST NAME | REF PHYSI CIAN | AGE | INVOICE / INSURANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/9/2016 | 15:22 | 16:22 | 17:44 | 18:44 | 3.3667 | 1.37 | | 2 KH | | | zada | 68 | Blue Shield HMO |
| 11/8/2016 | 7:30 | 7:58 | 8:50 | 9:50 | 2.3333 | 0.87 | | 1.467 KH | | | macer | 73 | medicare |
| 11/8/2016 | 6:45 | 8:10 | 13:38 | 14:30 | 7.75 | 5.47 | | 2.283 KH | | | spoon | 73 | Medicare |
| 11/8/2016 | 7:00 | 8:17 | 12:08 | 12:45 | 5.75 | 3.85 | | 1.9 KH | | | hsieh | 83 | kaiser permanente |
| 11/8/2016 | 6:50 | 8:45 | 14:45 | 15:30 | 8.6667 | 6 | | 2.667 KH | | | russin | 70 | health net |
| 11/8/2016 | 10:00 | 11:00 | 13:15 | 14:15 | 4.25 | 2.25 | | 2 KH | | | Macer | 70 | Medicare |
| 11/8/2016 | 13:50 | 14:28 | 17:49 | 18:15 | 4.4167 | 3.35 | | 1.067 KH | | | hsieh | 66 | blue cross |
| 11/8/2016 | 16:30 | 17:22 | 20:22 | 20:30 | 4 | 3 | | 1 KH | | | bulic | 70 | medicare |
| 9/28/2016 | 7:00 | 8:35 | 9:40 | 10:00 | 3 | 1.08 | | 1.917 KH | | | chen | 64 | aetna PPO |
| 11/7/2016 | 6:40 | 8:02 | 9:40 | 10:00 | 3.3333 | 1.63 | | 1.7 KH | | | hsieh | 73 | USC network |
| 11/7/2016 | 10:30 | 11:30 | 14:25 | 15:25 | 4.9167 | 2.92 | | 2 KH | | | wang | 66 | medicare |
| 11/7/2016 | 10:45 | 11:45 | 15:30 | 16:00 | 5.25 | 3.75 | | 1.5 KH | | | hsieh | 61 | Blue Shield IFP PPO |
| 11/7/2016 | 11:30 | 12:30 | 15:30 | 16:30 | 5 | 3 | | 2 KH | | | liu, j | 76 | blue shield PPO |
| 11/7/2016 | 14:45 | 15:45 | 18:24 | 19:24 | 4.65 | 2.65 | | 2 KH | | | chen | 44 | anthem blue cross |
| 11/7/2016 | 15:07 | 16:07 | 20:39 | 21:39 | 6.5333 | 4.53 | | 2 KH | | | wang | 52 | aetna PPO |
| 11/17/2016 | 13:00 | 13:38 | 17:12 | 17:48 | 4.8 | 3.57 | | 1.233 KH | | | emanu | 42 | kaiser |
| 11/5/2016 | 7:30 | 10:30 | 16:38 | 17:38 | 10.133 | 6.13 | | 4 KH | | | chen | 52 | york insurance |
| 11/4/2016 | 8:45 | 9:26 | 12:24 | 12:30 | 3.75 | 2.97 | | 0.783 KH | | | kokot | 82 | medicare |
| 11/4/2016 | 8:30 | 9:34 | 10:45 | 11:00 | 2.5 | 1.18 | | 1.317 KH | | | hsieh | 71 | medicare |
| 11/4/2016 | 11:39 | 12:39 | 14:43 | 15:43 | 4.0667 | 2.07 | | 2 KH | | | hsieh | 59 | blue shield covered CA |
| 11/4/2016 | 12:00 | 12:45 | 15:36 | 16:36 | 4.6 | 2.85 | | 1.75 KH | | | liu, j | 74 | medicare |
| 11/4/2016 | 12:43 | 13:43 | 16:12 | 17:12 | 4.4833 | 2.48 | | 2 KH | | | kokot | 54 | care 1st HMO Healthcare LA IPA |
| 11/3/2016 | 6:40 | 8:15 | 13:00 | 13:30 | 6.8333 | 4.75 | | 2.083 KH | | | chen | 52 | workers comp |
| 11/3/2016 | 6:40 | 8:27 | 13:00 | 13:40 | 7 | 4.55 | | 2.45 KH | | | spoon | 53 | workers comp |
| 11/3/2016 | 10:00 | 10:49 | 21:47 | 22:47 | 12.783 | 11 | | 1.817 KH | | | russin | 66 | medicare |
| 11/3/2016 | 14:00 | 15:30 | 18:51 | 19:15 | 5.25 | 3.35 | | 1.9 KH | | | chen | 35 | health net HMO |
| 11/2/2016 | 7:00 | 8:19 | 11:04 | 12:04 | 5.0667 | 2.75 | | 2.317 KH | | | hah | 65 | medicare |
| 11/2/2016 | 6:40 | 8:44 | 11:44 | 12:15 | 5.5833 | 3 | | 2.583 KH | | | chen | 44 | Beech street |
| 11/2/2016 | 13:04 | 14:04 | 20:17 | 21:17 | 8.2167 | 6.22 | | 2 KH | | | hah | 72 | Health net SR HMO |
| 11/2/2016 | 13:30 | 14:15 | 16:37 | 17:00 | 3.5 | 2.37 | | 1.133 KH | | | chen | 86 | Medicare |
| 11/2/2016 | 13:00 | 14:15 | 17:30 | 18:00 | 5 | 3.25 | | 1.75 KH | | | liu, C | 22 | SPA |
| 11/1/2016 | 7:30 | 7:55 | 12:20 | 13:20 | 5.8333 | 4.42 | | 1.417 KH | | | spoon | 75 | medicare |
| 11/1/2016 | 7:00 | 8:13 | 13:41 | 14:41 | 7.6833 | 5.47 | | 2.217 KH | | | hsieh | 20 | anthem blue cross HMO |
| 11/1/2016 | 7:40 | 8:40 | 19:40 | 20:40 | 13 | 11 | | 2 KH | | | giannc | 23 | kern health systems |
| 10/31/2016 | 7:00 | 8:02 | 14:47 | 15:47 | 8.7833 | 6.75 | | 2.033 KH | | | liu, j | 50 | screen actors guild- Blue cross PPO |
| 10/31/2016 | 7:30 | 8:10 | 14:00 | 14:00 | 6.5 | 4.68 | | 1.817 KH | | | hsieh | 79 | medicare |
| 10/31/2016 | 6:45 | 8:20 | 11:30 | 12:00 | 5.25 | 3.17 | | 2.083 KH | | | hah | 78 | medicare |
| 10/31/2016 | 12:00 | 14:13 | 17:16 | 17:30 | 5.5 | 3.05 | | 2.45 KH | | | hah | 71 | medicare |
| 10/31/2016 | 14:30 | 15:24 | 17:57 | 18:57 | 4.45 | 2.55 | | 1.9 KH | | | hsieh | 42 | blue cross covered california |
| 10/31/2016 | 16:45 | 17:45 | 19:00 | 20:00 | 3.25 | 1.25 | | 2 KH | | | kokot | 48 | anthem blue cross HMO |
| 10/31/2016 | 17:30 | 17:47 | 21:42 | 23:00 | 5.5 | 3.92 | | 1.583 KH | | | hah | 67 | Medicare |
| 10/28/2016 | 8:30 | 10:02 | 11:28 | 12:30 | 4 | 1.43 | | 2.567 KH | f | d | giannc | 32 | blue card plan blue cross |
| 10/28/2016 | 9:30 | 10:30 | 12:45 | 13:45 | 4.25 | 2.25 | | 2 KH | | | zada | 35 | care 1st HMO healthcare |
| 10/28/2016 | 10:15 | 11:15 | 12:15 | 13:15 | 3 | 1 | | 2 KH | | | kokot | 50 | anthem blue cross |
| 10/28/2016 | 13:00 | 15:12 | 17:30 | 18:30 | 5.5 | 2.3 | | 3.2 KH | s | j | giannc | 36 | blue cross covered CA |
| 10/27/2016 | 7:00 | 8:15 | 9:00 | 9:15 | 2.25 | 0.75 | | 1.5 KH | | | friedm | 44 | aetna |
| 11/8/2016 | 16:32 | 17:32 | 19:57 | 20:57 | 4.4167 | 2.42 | | 2 KH | | | Bulic | 61 | Medi-cal |
| 10/27/2016 | 9:30 | 9:48 | 10:50 | 11:00 | 1.5 | 1.03 | | 0.467 KH | | | friedm | 59 | health net HMO |
| 10/27/2016 | 11:30 | 11:45 | 12:57 | 13:15 | 1.75 | 1.2 | | 0.55 KH | | | friedm | 43 | usc network |
| 10/27/2016 | 6:40 | 12:45 | 16:45 | 17:00 | 10.333 | 4 | | 6.333 KH | | | russin | 18 | medi-caid out of state |
| 10/27/2016 | 13:15 | 14:07 | 15:15 | 15:35 | 2.3333 | 1.13 | | 1.2 KH | | | friedm | 60 | care 1st Medi-Cal HMO |
| 10/26/2016 | 7:15 | 8:45 | 10:30 | 11:06 | 3.85 | 1.75 | | 2.1 KH | | | zada | 49 | inland empire health plan |
| 10/26/2016 | 8:00 | 8:45 | 12:45 | 13:18 | 5.3 | 4 | | 1.3 KH | | | amar | 57 | medi-cal |
| 10/26/2016 | 6:45 | 9:24 | 11:44 | 12:30 | 5.75 | 2.33 | | 3.417 KH | | | zada | 74 | miscellaneous HMO plan |
| 10/26/2016 | 9:00 | 10:16 | 14:20 | 15:20 | 6.3333 | 4.07 | | 2.267 KH | | | ziegler | 65 | medicare |
| 10/26/2016 | 10:30 | 11:21 | 18:28 | 19:30 | 9 | 7.12 | | 1.883 KH | | | acosta | 73 | caremore SR HMO |
| 10/26/2016 | 13:00 | 14:09 | 16:05 | 17:05 | 4.0833 | 1.93 | | 2.15 KH | | | zada | 69 | Medicare |
| 10/26/2016 | 12:00 | 14:13 | 18:51 | 20:00 | 8 | 4.63 | | 3.367 KH | | | russin | 52 | health net Medical HMO |
| 10/26/2016 | 13:00 | 14:26 | 18:34 | 19:30 | 6.5 | 4.13 | | 2.367 KH | | | gill | 75 | medicare |



| YR 16 | Tech in room | data collection start | data collection end | tech out of room | total time | MD time | admin time | Locati on | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | INVOICE / INSURANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/12/2016 | 7:00 | 8:39 | 12:39 | 13:39 | 9.65 | 4 | 2.65 | KH | | | hah | 70 | alignment health |
| 10/12/2016 | 12:00 | 15:47 | 23:10 | 23:45 | 11.75 | 7.38 | 4.367 | KH | | | chen | 30 | Inland Empire Health |
| 10/12/2016 | 14:00 | 15:50 | 18:00 | 18:30 | 4.5 | 2.17 | 2.333 | KH | | | chen | 59 | medical |
| 10/11/2016 | 7:00 | 9:00 | 15:30 | 16:00 | 9 | 6.5 | 2.5 | KH | | | liu, j | 72 | health net |
| 10/11/2016 | 9:30 | 10:30 | 18:15 | 19:15 | 9.75 | 7.75 | 2 | KH | | | Hsieh | 63 | blue cross |
| 10/11/2016 | 10:20 | 11:20 | 14:00 | 16:01 | 5.6833 | 2.67 | 3.017 | KH | | | acosta | 43 | medicare |
| 10/11/2016 | 12:00 | 13:55 | 20:07 | 21:07 | 9.1167 | 6.2 | 2.917 | KH | | | acosta | 67 | medicare |
| 10/11/2016 | 15:30 | 17:53 | 21:30 | 22:30 | 7 | 3.62 | 3.383 | KH | | | chen | 59 | health net |
| 10/10/2016 | 8:51 | 7:51 | 19:20 | 20:20 | 11.483 | 11 5 | 0 | KH | | | hah | 70 | alignment health HMO |
| 10/10/2016 | 6:40 | 8:00 | 14:00 | 14:30 | 7.8333 | 6 | 1.833 | KH | | | Hsieh | 53 | kaiser permanente |
| 10/10/2016 | 7:15 | 8:20 | 11:35 | 12:00 | 4.75 | 3.25 | 1.5 | KH | | | wang | 31 | blue shield |
| 10/10/2016 | 10:00 | 11:56 | 15:57 | 16:30 | 6.5 | 4.02 | 2.483 | KH | | | liu, j | 77 | medicare |
| 10/10/2016 | 11:00 | 12:02 | 13:45 | 14:30 | 3.5 | 1.72 | 1.783 | KH | | | chen | 38 | health net |
| 10/10/2016 | 12:00 | 13:49 | 16:33 | 17:30 | 5.5 | 2.73 | 2.767 | KH | | | wang | 56 | blue cross |
| 10/10/2016 | 13:15 | 14:15 | 16:45 | 0.7534722 | 4.8333 | 2.5 | 2.333 | KH | | | kokot | 42 | blue cross |
| 10/10/2016 | 15:45 | 16:45 | 17:45 | 18:45 | 3 | 1 | 2 | KH | | | Hsieh | 89 | medicare |
| 10/10/2016 | 17:00 | 18:00 | 22:30 | 23:30 | 6.5 | 4.5 | 2 | KH | | | chen | 73 | medicare |
| 10/8/2016 | 8:00 | 10:05 | 13:59 | 14:45 | 6.75 | 3.9 | 2.85 | KH | | | hsieh | 41 | health net |
| 10/7/2016 | 8:15 | 9:15 | 11:15 | 12:15 | 4 | 2 | 2 | KH | | | kokot | 61 | medical |
| 10/7/2016 | 8:30 | 9:36 | 12:31 | 13:30 | 5 | 2.92 | 2.083 | KH | | | wang | 73 | medicare |
| 10/7/2016 | 13:00 | 13:30 | 15:00 | 15:30 | 2.5 | 1.5 | 1 | KH | | | liker | 71 | medicare |
| 10/7/2016 | 12:41 | 13:41 | 14:29 | 15:30 | 2.8167 | 0.8 | 2.017 | KH | | | chen | 50 | medicare |
| 10/7/2016 | 16:00 | 16:52 | 18:37 | 19:00 | 3 | 1.75 | 1.25 | KH | | | kokot | 69 | blue shield |
| 10/6/2016 | 6:45 | 8:00 | 14:36 | 15:26 | 8.6833 | 6.6 | 2.083 | KH | | | hah | 68 | medicare |
| 10/6/2016 | 6:40 | 8:30 | 13:37 | 14:00 | 7.3333 | 5.12 | 2.217 | KH | | | spoon | 63 | medicare |
| 10/6/2016 | 8:30 | 9:32 | 10:23 | 10:30 | 2 | 0.85 | 1.15 | KH | | | kari | 66 | medicare |
| 10/6/2016 | 10:45 | 11:13 | 13:19 | 13:45 | 3 | 2.1 | 0.9 | KH | | | kari | 76 | Health Net |
| 10/5/2016 | 7:00 | 8:02 | 10:47 | 11:30 | 4.5 | 2.75 | 1.75 | KH | | | wang | 65 | kaiser |
| 10/5/2016 | 6:45 | 8:44 | 13:30 | 14:30 | 7.75 | 4.77 | 2.983 | KH | | | wang | 67 | tristar risk |
| 10/5/2016 | 6:45 | 8:46 | 15:06 | 15:50 | 9.0833 | 6.33 | 2.75 | KH | | | acosta | 80 | medicare |
| 10/5/2016 | 8:00 | 9:55 | 14:00 | 14:30 | 6 | 3.53 | 2.467 | KH | | | chen | 50 | health net |
| 10/5/2016 | 11:30 | 13:07 | 17:05 | 18:00 | 6.5 | 3.97 | 2.533 | KH | | | wang | 76 | medicare |
| 10/5/2016 | 16:45 | 17:12 | 19:45 | 20:19 | 3.5667 | 2.55 | 1.017 | KH | | | acosta | 72 | medicare |
| 10/4/2016 | 6:40 | 8:06 | 10:01 | 11:00 | 4.3333 | 1.92 | 2.417 | KH | | | hsieh | 74 | kaiser |
| 10/4/2016 | 7:15 | 8:15 | 11:30 | 12:30 | 5.25 | 3.25 | 2 | KH | | | liu, j | 83 | kaiser |
| 10/4/2016 | 10:26 | 11:26 | 13:13 | 14:13 | 3.7833 | 1.78 | 2 | KH | | | acosta | 66 | united |
| 10/4/2016 | 12:30 | 13:02 | 15:39 | 16:00 | 3.5 | 2.62 | 0.883 | KH | l | d | Hsieh | 47 | blue shield |
| 10/4/2016 | 13:17 | 14:17 | 18:14 | 19:14 | 5.95 | 3.95 | 2 | KH | | | liu, j | 58 | kaiser |
| 10/4/2016 | 17:00 | 18:34 | 19:35 | 20:00 | 3 | 1.02 | 1.983 | KH | | | Hsieh | 57 | blue shield |
| 10/3/2016 | 6:45 | 7:52 | 13:07 | 13:30 | 6.75 | 5.25 | 1.5 | KH | | | Hsieh | 57 | blue cross |
| 10/3/2016 | 7:00 | 8:26 | 13:20 | 13:20 | 6.3333 | 4.17 | 2.167 | KH | | | wang | 71 | aetna |
| 10/3/2016 | 6:45 | 9:00 | 13:00 | 13:00 | 6.25 | 4 | 2.25 | KH | | | liu, j | 77 | kaiser seniors |
| 10/3/2016 | 9:00 | 10:25 | 14:55 | 20:45 | 11.75 | 4.5 | 7.25 | KH | | | Hah | 44 | EHS/Pacific Alliance / Care 1st |
| 10/3/2016 | 13:55 | 15:08 | 17:52 | 18:50 | 4.9167 | 2.73 | 2.183 | KH | | | wang | 47 | kaiser |
| 10/3/2016 | 14:26 | 15:14 | 16:27 | 17:00 | 2.5667 | 1.22 | 1.35 | KH | | | Hsieh | 43 | blue shield |
| 10/3/2016 | 14:30 | 15:39 | 19:35 | 20:30 | 6 | 3.93 | 2.067 | KH | | | liu | 70 | medicare |
| 10/3/2016 | 14:30 | 15:47 | 21:28 | 22:15 | 7.75 | 5.68 | 2.067 | KH | | | liu, j | 67 | |
| 10/3/2016 | 17:30 | 18:07 | 18:52 | 19:05 | 1.5833 | 0.75 | 0.833 | KH | | | kokot | 30 | blue shield |
| 10/3/2016 | 19:30 | 19:50 | 21:46 | 22:15 | 2.75 | 1.93 | 0.817 | KH | | | Kokot | 73 | USC network |
| 10/2/2016 | 9:15 | 11:52 | 16:15 | 17:52 | 8.6167 | 4.38 | 4.233 | KH | | | russin | 40 | kaiser |
| 9/30/2016 | 9:00 | 9:19 | 10:45 | 10:50 | 1.8333 | 1.43 | 0.4 | KH | | | kokot | 68 | medicare |
| 9/30/2016 | 7:30 | 9:30 | 11:00 | 12:00 | 4.5 | 1.5 | 3 | KH | | | gianni | 84 | medicare |
| 9/30/2016 | 8:30 | 9:57 | 12:11 | 12:45 | 4.25 | 2.23 | 2.017 | KH | | | Hsieh | 76 | medicare |
| 9/30/2016 | 13:00 | 13:04 | 16:00 | 16:45 | 5.25 | 2.93 | 2.317 | KH | | | liu | 77 | kaiser seniors |
| 9/30/2016 | 12:45 | 14:34 | 17:10 | 18:00 | 5.25 | 2.6 | 2.65 | KH | | | emanu | 32 | kern |
| 9/30/2016 | 19:00 | 20:21 | 23:33 | 0:00 | 5 | 3.2 | 1.8 | KH | | | kokot | 57 | blue shield |
| 9/29/2016 | 6:45 | 8:21 | 12:44 | 13:45 | 7 | 4.38 | 2.617 | KH | | | spoon | 65 | york insurance |
| 9/29/2016 | 6:45 | 8:52 | 15:41 | 16:00 | 9.25 | 6.82 | 2.433 | KH | | | russin | 30 | blue cross |
| 9/29/2016 | 10:45 | 12:04 | 14:58 | 15:30 | 4.75 | 2.9 | 1.85 | KH | | | hah | 93 | medicare |

| YR 17 | Tech in room | data collection start | data collection end | tech out of room | total time | MD time | admin time | Location | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | INVOICE / INSURANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/17/2017 | 14:45 | 15:57 | 22:10 | 22:50 | 8.08 | 6.22 | 1 87 | KH | | | wang | 74 | kaiser senior |
| 4/17/2017 | 17:30 | 18:16 | 20:31 | 20:40 | 3.17 | 2.25 | 0 92 | KH | | | hsieh | 47 | la care |
| 4/17/2017 | 20:42 | 21:20 | 22:00 | 22:10 | 1.47 | 0.67 | 0 80 | KH | | | kokot | 79 | medicare |
| 4/14/2017 | 10:00 | 9:58 | 13:50 | 14:30 | 4.50 | 3.87 | 0.63 | KH | | | hsieh | 58 | United |
| 4/14/2017 | 9:45 | 10:15 | 17:15 | 18:45 | 9.00 | 7.00 | 2 00 | KH | | | friedman | 24 | blue card |
| 4/14/2017 | 8:30 | 10:25 | 13:27 | 14:15 | 5.75 | 3.03 | 2.72 | KH | | | zada | 18 | aetna |
| 4/14/2017 | 11:00 | 12:21 | 13:45 | 14:11 | 3.18 | 1.40 | 1.78 | KH | | | | 67 | medicare |
| 4/14/2017 | 14:30 | 15:41 | 23:29 | 23:59 | 9.48 | 7.80 | 1.68 | KH | | | hsieh | 48 | medi-cal |
| 4/13/2017 | 6:30 | 7:41 | 11:13 | 11:30 | 5.00 | 3.53 | 1.47 | KH | | | fleischman | 47 | tricare west |
| 4/13/2017 | 8:00 | 8:33 | 12:47 | 13:30 | 5.50 | 4.23 | 1 27 | KH | | | hah | 70 | medicare |
| 4/13/2017 | 15:30 | 16:21 | 17:31 | 18:20 | 2.83 | 1.17 | 1.67 | KH | | | zada | 40 | blue cross |
| 4/12/2017 | 7:45 | 8:15 | 14:49 | 15:30 | 7.75 | 6.57 | 1.18 | KH | | | acosta | 72 | medicare |
| 4/12/2017 | 7:15 | 8:31 | 10:49 | 11:30 | 4.25 | 2.30 | 1 95 | KH | | | zada | 45 | medi-cal |
| 4/12/2017 | 12:00 | 13:44 | 17:21 | 18:00 | 6.00 | 3.62 | 2 38 | KH | | | wang | 66 | medicare |
| 4/11/2017 | 7:00 | 7:49 | 11:10 | 12:10 | 5.17 | 3.35 | 1 82 | KH | | | maceri | 55 | medicare |
| 4/11/2017 | 7:00 | 8:16 | 15:41 | 16:30 | 9.50 | 7.42 | 2 08 | KH | | | liu, J | 55 | kaiser permanen |
| 4/11/2017 | 6:45 | 8:20 | 12:06 | 12:50 | 6.08 | 3.77 | 2 32 | KH | | | hsieh | 72 | medicare |
| 4/10/2017 | 6:45 | 8:08 | 15:58 | 16:30 | 9.75 | 7.83 | 1 92 | KH | | | hsieh | 67 | medicare |
| 4/10/2017 | 10:00 | 11:20 | 16:10 | 16:20 | 6.33 | 4.83 | 1 50 | KH | | | wang | 67 | medicare |
| 4/10/2017 | 13:00 | 14:23 | 18:29 | 19:05 | 6.08 | 4.10 | 1 98 | KH | | | russin | 55 | kaiser |
| 4/10/2017 | 15:30 | 16:30 | 19:33 | 20:33 | 5.05 | 3.05 | 2 00 | KH | | | russin | 61 | medicare |
| 4/10/2017 | 16:30 | 17:53 | 20:40 | 21:30 | 5.00 | 2.78 | 2 22 | KH | | | wang | 66 | Medicare |
| 4/10/2017 | 16:30 | 18:02 | 22:55 | 23:35 | 7.08 | 4.88 | 2 20 | KH | | | hsieh | 64 | self pay |
| 4/8/2017 | 7:00 | 8:51 | 11:13 | 11:55 | 4.92 | 2.37 | 2 55 | KH | | | chen | 77 | medicare |
| 4/7/2017 | 9:00 | 9:52 | 11:09 | 11:18 | 2.30 | 1.28 | 1 02 | KH | | | kokot | 71 | medicare |
| 4/7/2017 | 8:50 | 9:52 | 12:42 | 13:00 | 4.17 | 2.83 | 1 33 | KH | | | liu, J | 45 | kaiser |
| 4/7/2017 | 8:30 | 10:14 | 13:30 | 14:30 | 6.00 | 3.27 | 2.73 | KH | | | giannotta | 63 | blue shield |
| 4/7/2017 | 11:15 | 11:32 | 13:30 | 13:45 | 2.50 | 1.97 | 0 53 | KH | | | kokot | 32 | blue cross |
| 4/7/2017 | 13:30 | 14:30 | 19:15 | 20:15 | 6.75 | 4.75 | 2 00 | KH | | | kokot | 54 | blue cross |
| 4/6/2017 | 6:50 | 8:18 | 12:16 | 12:45 | 5.92 | 3.97 | 1 95 | KH | | | spoonamo | 76 | medicare |
| 4/6/2017 | 7:00 | 8:25 | 11:40 | 12:10 | 5.17 | 3.25 | 1 92 | KH | | | chen | 50 | blue shield |
| 4/6/2017 | 13:00 | 14:15 | 15:10 | 15:30 | 2.50 | 0.92 | 1 58 | KH | | | chen | 67 | medicare |
| 4/6/2017 | 14:45 | 15:40 | 19:46 | 20:30 | 5.75 | 4.10 | 1.65 | KH | | | spoonamo | 68 | medicare |
| 4/6/2017 | 16:00 | 17:30 | 19:00 | 20:00 | 4.00 | 1.50 | 2 50 | KH | | | chen | 70 | medicare |
| 4/5/2017 | 6:55 | 8:06 | 9:46 | 10:00 | 3.08 | 1.67 | 1.42 | KH | | | wang | 36 | usc network |
| 4/5/2017 | 7:30 | 8:24 | 12:54 | 13:30 | 6.00 | 4.50 | 1 50 | KH | | | acosta | 72 | united |
| 4/5/2017 | 10:45 | 12:23 | 14:11 | 14:30 | 3.75 | 1.80 | 1 95 | KH | | | wang | 64 | blue cross |
| 4/5/2017 | 8:00 | 12:49 | 22:19 | 23:30 | 15.50 | 9.50 | 6 00 | KH | | | wang | 74 | medicare |
| 4/5/2017 | 15:15 | 16:59 | 18:28 | 19:15 | 4.00 | 1.48 | 2 52 | KH | | | zada | 64 | medicare |
| 4/5/2017 | 15:00 | 18:09 | 20:32 | 21:00 | 6.00 | 2.38 | 3.62 | KH | | | chen | 43 | LA care medical |
| 4/5/2017 | 17:00 | 18:28 | 21:48 | 22:15 | 5.25 | 3.33 | 1 92 | KH | | | russin | 52 | health net HMO |
| 4/4/2017 | 6:45 | 8:01 | 9:49 | 10:15 | 3.50 | 1.80 | 1.70 | KH | | | hsieh | 62 | cigna PPO |
| 4/4/2017 | 7:00 | 8:25 | 9:58 | 10:45 | 3.75 | 1.55 | 2 20 | KH | | | friedman | 23 | blue shield |
| 4/4/2017 | 8:00 | 8:57 | 12:57 | 13:45 | 5.75 | 4.00 | 1.75 | KH | | | hsieh | 23 | tricare |
| 4/4/2017 | 11:05 | 11:49 | 15:27 | 16:30 | 5.42 | 3.63 | 1.78 | KH | | | friedman | 30 | charity |
| 4/4/2017 | 11:45 | 12:45 | 16:35 | 17:15 | 5.50 | 3.83 | 1.67 | KH | | | hsieh | 23 | blue cross |
| 4/3/2017 | 7:00 | 8:52 | 20:55 | 21:55 | 14.92 | 12.05 | 2 87 | KH | a | s | hsieh | 53 | kaiser |
| 3/31/2017 | 8:50 | 9:55 | 12:55 | 13:25 | 4.58 | 3.00 | 1 58 | KH | | | hsieh | 79 | medicare |
| 3/31/2017 | 9:00 | 10:00 | 11:55 | 12:30 | 3.50 | 1.92 | 1 58 | KH | | | giannotta | 32 | blue cross PPO |
| 3/31/2017 | 10:30 | 11:30 | 13:00 | 14:00 | 3.50 | 1.50 | 2 00 | KH | | | liker | 81 | medicare |
| 3/31/2017 | 13:35 | 14:35 | 16:35 | 17:15 | 3.67 | 2.00 | 1.67 | KH | | | giannotta | 59 | heritage provide |
| 3/30/2017 | 7:00 | 8:05 | 11:43 | 12:15 | 5.25 | 3.63 | 1.62 | KH | | | hah | 64 | united |
| 3/30/2017 | 7:00 | 8:14 | 12:45 | 13:45 | 6.75 | 4.52 | 2 23 | KH | | | spoonamo | 71 | medicare |
| 3/30/2017 | 7:00 | 8:17 | 14:29 | 15:00 | 8.00 | 6.20 | 1 80 | KH | | | hsieh | 70 | medicare |
| 3/30/2017 | 7:45 | 8:34 | 12:15 | 13:00 | 5.25 | 3.68 | 1 57 | KH | | | chen | 59 | anthem blue cro |
| 3/30/2017 | 10:15 | 11:15 | 16:25 | 16:45 | 6.50 | 5.17 | 1 33 | KH | | | russin | 30 | medicare |
| 3/30/2017 | 12:45 | 13:25 | 18:40 | 19:15 | 6.50 | 5.25 | 1 25 | KH | | | hah | 39 | anthem blue cro |
| 3/30/2017 | 14:00 | 16:19 | 19:00 | 20:00 | 6.00 | 2.68 | 3 32 | KH | | | russin | 29 | united |
| 3/30/2017 | 16:00 | 16:45 | 21:15 | 22:00 | 6.00 | 4.50 | 1 50 | KH | | | russin | 26 | care 1st HMO |
| 3/30/2017 | 19:00 | 20:11 | 21:16 | 22:00 | 3.00 | 1.08 | 1 92 | KH | | | hsieh | 60 | blue shield |
| 3/29/2017 | 6:45 | 8:40 | 14:00 | 14:30 | 7.75 | 5.33 | 2.42 | KH | | | acosta | 69 | medicare |
| 3/29/2017 | 6:40 | 8:40 | 15:02 | 16:00 | 9.33 | 6.37 | 2.96 | KH | | | chen | 48 | LA care non cont |
| 3/29/2017 | 8:30 | 9:35 | 15:10 | 16:30 | 8.00 | 5.58 | 2.42 | KH | | | amar | 61 | cigna PPO |
| 3/29/2017 | 11:30 | 12:12 | 15:45 | 16:30 | 5.00 | 3.55 | 1.45 | KH | | | wang | 56 | cigna PPO |
| 3/29/2017 | 15:00 | 17:31 | 19:18 | 20:00 | 5.00 | 1.78 | 3 22 | KH | | | acosta | 63 | united |
| 3/29/2017 | 16:45 | 17:54 | 21:28 | 22:00 | 5.25 | 3.57 | 1.68 | KH | | | chen | 61 | medi-cal |
| 3/28/2017 | 7:00 | 7:54 | 10:00 | 11:00 | 4.00 | 2.10 | 1 90 | KH | | | maceri | 56 | blue shield |
| 3/28/2017 | 7:00 | 8:12 | 13:08 | 14:10 | 7.17 | 4.93 | 2 23 | KH | | | spoonamo | 83 | medicare |
| 3/28/2017 | 6:45 | 8:25 | 15:25 | 16:40 | 9.92 | 7.00 | 2 92 | KH | | | hsieh | 70 | medicare |
| 3/28/2017 | 7:15 | 8:43 | 14:37 | 15:37 | 8.37 | 5.90 | 2.47 | KH | | | liu, J | 47 | workers comp |

| PT # | Tech in-room | data collect start | data collection end | tech out of room | admin time | TOTAL TIME | Location | YR 14 | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | INVOICE / INSURANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 880 | 6:55 | 8:30 | 13:00 | 13:30 | | | OR | 9/15 | | | | 56 | USC BLUE CROSS PPO |
| 881 | 14:00 | 16:00 | 18:00 | 18:30 | | | OR | 9/15 | | | | 44 | PROSPECT MEDICAL GROUP |
| 882 | | 8:30 | 12:30 | | | | OR | 9/15 | | | | 50 | HEALTH NET HMO |
| 883 | | 8:30 | 10:00 | | | | OR | 9/15 | | | | 66 | WORKERS COMP |
| 884 | | 12:20 | 15:20 | | | | OR | 9/15 | | | | 50 | BLUE CROSS |
| 885 | 21 00 | 22:00 | | | | | OR | 9/15 | | | | 22 | BLUE CROSS |
| 886 | 07,00 | 8:00 | 10:00 | 10:15 | | | OR | 9/15 | | | | 31 | ANTHEM BLUE CROSS PPO |
| 887 | 10:45 | 11:45 | | | | | OR | 9/15 | | | | 79 | MEDICARE |
| 888 | 9:30 | 12:00 | 15:00 | 15:35 | | | OR | 9/15 | | | | 33 | INLAND EMP RE HEALTH |
| 889 | | 15:30 | 18:30 | | | | OR | 9/15 | | | | 54 | UNITED HEALTHCARE CHOICE PLUS |
| 890 | 8:30 | 9:00 | 14:00 | 15:30 | | | OR | 9/15 | | | | 55 | BLUECROSS |
| 891 | | 8:30 | 13:30 | | | | OR | 9/16 | | | | 34 | MEDICARE |
| 892 | | 13:00 | 16:30 | | | | OR | 9/16 | | | | 55 | MOL NA MEDI CAL HMO |
| 893 | 6:15 | 8:27 | 12:10 | 13:15 | | | OR | 9/16 | | | | 66 | MEDICARE |
| 894 | 6:45 | 7:45 | 10:15 | 10:15 | | | OR | 9/16 | | | | 34 | BLUE SH ELD PPO |
| 895 | 10:15 | 12:15 | 15:30 | | | | OR | 9/16 | | | | 69 | MEDICARE |
| 896 | 7:15 | 8:00 | 8:45 | 9 30 | | | OR | 9/16 | | | | 70 | MEDICARE |
| 897 | 9:30 | 10:30 | 13:00 | 13:30 | | | OR | 9/16 | | | | 31 | CIGNA |
| 898 | | 14:30 | 17:30 | | | | OR | 9/16 | | | | 45 | BLUE CROSS |
| 899 | 7:00 | 9:30 | 13:30 | | | | OR | 9/17 | | | | 47 | HEALTH NET |
| 900 | 6:50 | 9:30 | 13:30 | 14:00 | | | OR | 9/17 | | | | 81 | MEDICARE |
| 901 | 6:45 | 8:15 | 15:15 | 15:45 | | | OR | 9/17 | | | | 39 | HEALTH NET |
| 902 | 6:50 | 8:00 | 12:00 | 12:30 | | | OR | 9/18 | | | | 74 | MEDICARE |
| 903 | 7:00 | 9:30 | 11:30 | 13:30 | | | OR | 9/18 | | | | 52 | UNITED HEALTH CARE CHOICE PLUS |
| 904 | 6:45 | 8:15 | 15:45 | 16:15 | | | OR | 9/18 | | | | 63 | GOLD COAST HEALTH PLAN HMO |
| 905 | 14:00 | 15:00 | 19:00 | 20:25 | | | OR | 9/18 | | | | 41 | BLUE CROSS |
| 906 | 13:30 | 14:30 | 19:00 | 19:00 | | | OR | 9/18 | | | | 58 | ANTHEM BLUE CROSS PRUDENT BUYER |
| 907 | 13:00 | 14:00 | 17:45 | 18:00 | | | OR | 9/17 | | | | 69 | MEDICARE |
| 908 | 14:00 | 15:30 | 19:30 | 21:30 | | | OR | 9/20 | | | | 48 | HEALTH NET HMO |
| 909 | 7:00 | 8:15 | 10:15 | 11:45 | | | OR | 9/21 | | | | 34 | BLUE CROSS |
| 910 | 12:00 | 12:45 | 15:45 | 16:45 | | | OR | 9/21 | | | | 63 | INLAND EMP RE HEALTH |
| 911 | | 11:30 | 12:30 | | | | OR | 9/16 | | | | 63 | HELATH NET HMO |
| 912 | | 11:30 | 12:30 | | | | OR | 9/19 | | | | 58 | MEDICARE ACUTE |
| 913 | | 16:00 | 17:00 | | | | OR | 9/19 | | | | 70 | MEDICARE |
| 914 | 6:55 | 8:00 | 14:30 | 15:00 | | | OR | 9/22 | | | | 58 | BLUE SHIELD |
| 915 | 10:00 | 11:30 | 13:30 | 14:00 | | | OR | 9/22 | | | | 68 | CAREMORE |
| 916 | 6:45 | 8:30 | | | | | OR | 9/22 | | | | 65 | MEDICARE |
| 917 | 19:30 | 22:00 | 2:15 | | | | OR | 9/22 | | | | 57 | LA CARE HEALTH PLAN |
| 918 | 6:45 | 8:45 | 12:00 | 13:00 | | | OR | 9/23 | | | | 61 | MEDICARE |
| 919 | | 8:00 | 10:30 | | | | OR | 9/23 | | | | 52 | L BERTY MUTUAL INS |
| 920 | 7:00 | 9:00 | 12:00 | 13:45 | | | OR | 9/23 | | | | 41 | BLUE SHIELD |
| 921 | | 13:30 | 17:30 | | | | OR | 9/23 | | | | 57 | BLUE CROSS |
| 922 | 6:50 | 8:00 | 11:30 | 12:00 | | | OR | 9/24 | | | | 72 | MEDIVARE |
| 923 | 13:00 | 3:30 | 16:30 | 17:15 | | | OR | 9/24 | | | | 51 | BLUE CARD PLAN |
| 924 | 7:00 | 8:00 | 11:30 | 12:20 | | | OR | 9/24 | | | | 61 | BLUE SHIELD |
| 925 | 9:00 | 11:15 | 15:15 | 15:45 | | | OR | 9/24 | | | | 46 | INLAND EMP RE HEALTH |
| 926 | | 10:00 | 12:30 | | | | OR | 9/23 | | | | 64 | BLUE CROSS |
| 927 | | 14:00 | 16:30 | | | | OR | 9/23 | | | | 53 | MEDICARE |
| 928 | | 12:00 | 13:30 | | | | OR | 9/22 | | | | 48 | UNITED HEALTH CARE |
| 929 | | 10:00 | 11:30 | | | | OR | 9/22 | | | | 50 | AETNA |
| 930 | | 8:00 | 9 30 | | | | OR | 9/22 | | | | 21 | BLUE SHIELD |
| 931 | 6:45 | 8:45 | 13:00 | 13:30 | | | OR | 9/25 | | | | 51 | CALOPT MA |
| 932 | 12:30 | 13:30 | 18:30 | 19:30 | | | OR | 9/25 | | | | 59 | AETNA PPO |
| 933 | 12:30 | 14:30 | 17:30 | 17:30 | | | OR | 9/25 | | | | 29 | AETNA PPO |
| 934 | 8:30 | 9:45 | 13:45 | 14:30 | | | OR | 9/26 | | | | 51 | LA CARE HEALTH PLAN |
| 935 | 8:15 | 9:45 | 18:45 | 19:15 | | | OR | 9/26 | | | | 68 | MEDICARE |
| 936 | | 14:00 | 16:30 | | | | OR | 9/26 | | | | 45 | BLUE SHIELD |
| 937 | | 9:30 | 12:30 | | | | OR | 9/26 | | | | 65 | BLUE SHIELD |
| 938 | 8:45 | 9:30 | 12:45 | 13:30 | | | OR | 9/26 | | | | 87 | UNITED HEALTHCARE |
| 939 | 6:50 | 8:15 | 17:00 | | | | OR | 9/26 | | | | 67 | UNITED HEALTHCARE |
| 940 | 6:45 | 8:00 | 11:00 | 12:00 | | | OR | 9/28 | | | | 51 | BLUE CROSS PRUDENT |
| 941 | 12:25 | 13:30 | 18:00 | | | | OR | 9/29 | | | | 60 | BLUE CROSS MEDICAL |
| 942 | 16:30 | 21:00 | 23:45 | | | | OR | 9/29 | | | | 50 | MEDICARE |
| 943 | 9:00 | 9:30 | 15:00 | 16:15 | | | OR | 9/26 | | | | 58 | BLUE SH ELD PP |
| 944 | 16:00 | 17:00 | 18:00 | 18:15 | | | OR | 9/29 | | | | 39 | BLUE CROSS |
| 945 | 7:00 | 8:00 | 12:00 | 12:40 | | | OR | 9/29 | | | | 81 | MEDICARE |
| 946 | 6:50 | 8:30 | 11:30 | 12:00 | | | OR | 9/30 | | | | 76 | MEDICARE |
| 947 | 7:00 | 8:00 | 20:00 | 20:00 | | | OR | 9/29 | | | | 69 | MEDICARE |
| 948 | 6:45 | 8:15 | 14:30 | 15:00 | | | OR | 9/30 | | | | 53 | AETRA PPO |
| 949 | H3 30 | 14:30 | 19:30 | 20:00 | | | O2 | 9/30 | | | | 73 | HS EH |
| 950 | 7:00 | 8:30 | 12:00 | 12:40 | | | OR | 9/30 | | | | 54 | BLUE SH ELD PPO |
| 951 | 13 00 | 13:20 | 17:30 | 16:00 | | | OR | 9/30 | | | | 56 | HEALTH NET |
| 952 | 9:00 | 9:45 | 12:15 | 12:50 | | | OR | 9/30 | | | | 73 | MEDICARE |
| 953 | 8:30 | 9:45 | 12:30 | 13:00 | | | OR | 9/30 | | | | 67 | BLUE CARD |
| 954 | 13:00 | 13:45 | 17:00 | 17:30 | | | OR | 9/30 | | | | 49 | CIGNA PPO |
| 955 | 17:15 | 18:00 | 20:45 | 21:30 | | | OR | 9/30 | | | | 44 | BLUE SHIELD |
| 956 | 10:45 | 12:15 | 14:30 | 14:30 | | | OR | 10/1 | | | | 60 | SELF PAY |
| 957 | 13:15 | 17:45 | 20:45 | 21:00 | | | OR | 10/1 | | | | 33 | BLUE CROSS |
| 958 | 12:15 | 14:00 | 18:00 | 18:30 | | | OR | 10/1 | | | | 46 | SELF PAY |
| 959 | | 14:00 | 16:30 | | | | OR | 10/1 | | | | 47 | BLUE CROSS |
| 960 | 8:15 | 9:30 | 11:45 | 12:30 | | | OR | 10/3 | | | | 59 | CARE 1ST HEALTH |
| 961 | 8:45 | 10:00 | 11:15 | 12:00 | | | OR | 10/3 | | | | 35 | BLUE CROSS MEDICAL |
| 962 | 11:45 | 13:00 | 14:30 | 15:45 | | | OR | 10/3 | | | | 63 | HEALTH NET HMO |
| 963 | 15:00 | 16:00 | 18:00 | 19:30 | | | OR | 10/3 | | | | 33 | BLUE CROSS |
| 964 | 7:00 | 9:15 | 13:30 | 14:30 | | | OR | 10/4 | | | | 56 | MEDICAL |
| 965 | 15:30 | 18:00 | 21:00 | 21:30 | | | OR | 10/5 | | | | 67 | HEALTH NET HMO |
| 966 | 6:45 | 8:15 | 10:45 | 12:00 | | | OR | 10/6 | | | | 35 | TRICARE WESTREION1276713 |
| 967 | 12:30 | 14:00 | 16:00 | 17:00 | | | OR | 10/6 | | | | 82 | MEDICARE |

| PT # | Tech in-room | data collect start | data collection end | tech out of room | admin time | TOTAL TIME | Location | YR 14 | LAST NAME | FIRST NAME | REF PHYSICIAN | AGE | INVOICE / INSURANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1232 | 10:30 | 11:00 | 11:30 | 11:45 | | | OR | 12/2 | | | | 72 | MEDICARE |
| 1233 | 6:50 | 8:00 | 16:40 | 17:50 | | | OR | 12/8 | | | | 46 | BLUE SHIELD |
| 1234 | 6:50 | 9:00 | 15:30 | 17:45 | | | OR | 12/8 | | | | 64 | MEDICARE |
| 1235 | 6:40 | 8:00 | 12:00 | 12:45 | | | OR | 12/8 | | | | 70 | |
| 1236 | 14:00 | 15:30 | 20:20 | 23:00 | | | OR | 12/8 | | | | 56 | CARE FIRST MEDICAL |
| 1237 | 10:00 | 11:15 | 12:00 | 12:30 | | | OR | 12/8 | | | | 76 | MEDICARE |
| 1238 | 14:00 | 15:45 | 17:45 | 18:30 | | | OR | 12/8 | | | | 31 | BLUE CROSS |
| 1239 | 10:30 | 11:00 | 14:30 | 14:30 | | | OR | 12/8 | | | | 87 | MEDICARE |
| 1240 | 8:00 | 8:15 | 14:30 | 15:30 | | | OR | 12/8 | | | | 32 | UNITED HEALTHCARE |
| 1241 | 8:00 | 9:30 | 14:30 | 15:30 | | | OR | 12/8 | | | | 59 | LA CARE MEDICAL |
| 1242 | 6:30 | 8:00 | 10:15 | 11:30 | | | OR | 12/8 | | | | 56 | MEDICARE |
| 1243 | 6:50 | 8:00 | 11:00 | 11:30 | | | OR | 12/9 | | | | 53 | UNITED HEALTHCARE |
| 1244 | 6:45 | 8:15 | 11:45 | 11:45 | | | OR | 12/9 | | | | 55 | BLUE SHIELD |
| 1245 | 7:00 | 8:00 | 11:30 | 12:30 | | | OR | 12/9 | | | | 49 | |
| 1246 | 12:00 | 13:00 | 16:00 | 17:00 | | | OR | 12/9 | | | | 58 | BLUE CARD |
| 1247 | 12:30 | 13:30 | 16:00 | 16:30 | | | OR | 12/9 | | | | 82 | MEDICARE |
| 1248 | 12:00 | 13:00 | 17:00 | 18:00 | | | OR | 12/9 | | | | 48 | GEHA |
| 1249 | 11:00 | 12:30 | 16:00 | 16:30 | | | OR | 12/9 | | | | 65 | |
| 1250 | 7:30 | 7:45 | 9:30 | 10:30 | | | OR | 12/9 | | | | 34 | BLUE CROSS |
| 1251 | 12:00 | 13:15 | 15:30 | 16:15 | | | OR | 12/9 | | | | 71 | EASY CHO RE SR |
| 1252 | 7:00 | 8:30 | 12:30 | 13:30 | | | OR | 12/10 | | | | 61 | BLUE CROSS |
| 1253 | 12:30 | 13:45 | 17:00 | 18:30 | | | OR | 12/10 | | | | 60 | BLUE SHIELD |
| 1254 | 6:50 | 8:30 | 11:05 | 12:30 | | | OR | 12/10 | | | | 44 | BLUE SHIELD |
| 1255 | 7:00 | 9:00 | 13:00 | 14:00 | | | OR | 12/10 | | | | 56 | CARE FIRST MEDICAL |
| 1256 | 6:30 | 8:30 | 12:30 | 12:30 | | | OR | 12/10 | | | | 47 | ASSURANT HEALTH |
| 1257 | 6:35 | 8:00 | 12:15 | 13:30 | | | OR | 12/11 | | | | 78 | MEDICARE ACUTE |
| 1258 | 7:30 | 9:00 | 11:40 | 12:30 | | | OR | 12/11 | | | | 35 | AETNA |
| 1259 | 13:45 | 14:30 | 18:30 | 19:30 | | | OR | 12/11 | | | | 77 | MEDICARE |
| 1260 | 14:00 | 15:00 | 17:10 | 18:30 | | | OR | 12/10 | | | | 45 | MEDICARE |
| 1261 | 8:30 | 10:15 | 12:15 | 13:15 | | | OR | 12/12 | | | | 63 | BLUE SH ELD |
| 1262 | 14:00 | 14:30 | 15:00 | 15:30 | | | OR | 12/12 | | | | 66 | CAREMORE SR |
| 1263 | 8:30 | 10:30 | 13:00 | 14:00 | | | OR | 12/12 | | | | 71 | MEDICARE |
| 1264 | 14:00 | 15:30 | 17:00 | 18:00 | | | OR | 12/12 | | | | 69 | UNITED HEALTHCARE SR |
| 1265 | 17:00 | 18:45 | 13:30 | 14:15 | | | OR | 12/12 | | | | 70 | UNITED HEALTHCARE |
| 1266 | 15:00 | 17:00 | 19:30 | 19:30 | | | OR | 12/12 | | | | 26 | AETNA |
| 1267 | | 13:30 | 17:30 | | | | OR | 12/1 | | | | 45 | |
| 1268 | 7:15 | 8:00 | 12:30 | 12:30 | | | OR | 12/1 | | | | 85 | |
| 1269 | 11:45 | 12:15 | 14:00 | 14:15 | | | OR | 12/2 | | | | 23 | |
| 1270 | 9:00 | 9:30 | 10:15 | 10:30 | | | OR | 12/2 | | | | 24 | |
| 1271 | 7:30 | 8:00 | 8:45 | 9:30 | | | OR | 12/2 | | | | 65 | |
| 1272 | 7:15 | 8:00 | 10:00 | 10:30 | | | OR | 12/2 | | | | 37 | |
| 1273 | 15:00 | 16:15 | 18:15 | 19:15 | | | OR | 12/2 | | | | 7 | CAREMORE |
| 1274 | 7:00 | 9:00 | 13:30 | 13:30 | | | OR | 12/13 | | | | 58 | MEDICAL |
| 1275 | | 8:15 | 10:45 | | | | OR | 12/15 | | | | 19 | BLUE SHIELD |
| 1276 | 9:30 | 9:45 | 10:45 | 11:00 | | | OR | 12/9 | | | | 49 | |
| 1277 | | 10:30 | 11:00 | | | | OR | 12/9 | | | | 19 | |
| 1278 | | 11:45 | 12:30 | | | | OR | 12/9 | | | | 48 | |
| 1279 | 6:45 | 8:45 | 14:00 | 15:00 | | | OR | 12/15 | | | | 26 | |
| 1280 | 6:55 | 9:00 | 15:00 | 15:30 | | | OR | 12/15 | | | | 64 | CAREMORE SR |
| 1281 | 6:45 | 8:30 | 9:30 | 10:30 | | | OR | 12/16 | | | | 28 | AETNA STUDENT |
| 1282 | 14:00 | 15:00 | 20:30 | 21:30 | | | OR | 12/16 | | | | 54 | BLUE SHIELD |
| 1283 | 7:00 | 8:00 | 12:30 | 13:30 | | | OR | 12/16 | | | | 46 | |
| 1284 | | 14:00 | 18:00 | | | | OR | 12/16 | | | | 50 | |
| 1285 | 6:45 | 8:55 | 12:30 | 12:30 | | | OR | 12/17 | | | | 52 | |
| 1286 | 7:00 | 7:40 | 9:45 | 10:00 | | | OR | 12/17 | | | | 80 | MEDICARE |
| 1287 | 11:00 | 13:00 | 14:00 | 15:00 | | | OR | 12/17 | | | | 72 | |
| 1288 | 6:45 | 8:15 | 11:15 | 12:30 | | | OR | 12/18 | | | | 62 | SEDGWICK CMS |
| 1289 | 6:50 | 10:00 | 16:00 | 17:00 | | | OR | 12/18 | | | | 31 | BLUE SHIELD |
| 1290 | 15:00 | 15:30 | 17:30 | 18:00 | | | ANGIO | 12/18 | | | | 70 | MEDICARE |
| 1291 | 18:30 | 19:30 | 22:30 | 23:00 | | | ANGIO | 12/18 | | | | 35 | AETNA |
| 1292 | 8:00 | 10:15 | 13:30 | 14:50 | | | OR | 12/19 | | | | 35 | AETNA |
| 1293 | 11:30 | 12:30 | 16:30 | 17:30 | | | OR | 12/19 | | | | 70 | MEDICARE |
| 1294 | 6:45 | 8:00 | 11:30 | 12:30 | | | OR | 12/22 | | | | 61 | MEDICARE |
| 1295 | 7:00 | 8:00 | 12:00 | 13:00 | | | OR | 12/22 | | | | 49 | UNITED HEALTHCARE |
| 1296 | 7:15 | 8:15 | 14:30 | 14:30 | | | OR | 12/22 | | | | 71 | MEDICARE |
| 1297 | 14:30 | 15:15 | 16:45 | 17:45 | | | OR | 12/22 | | | | 22 | USC NETWORK |
| 1298 | 17:00 | 18:00 | 19:50 | 19:50 | | | OR | 12/18 | | | | 80 | |
| 1299 | 7:30 | 8:00 | 11:00 | 11:30 | | | OR | 12/23 | | | | 18 | UNITED HEALTHCARE |
| 1300 | 11:30 | 12:30 | 14:00 | 14:15 | | | OR | 12/23 | | | | 65 | MEDICARE |
| 1301 | 14:15 | 15:00 | 17:00 | 18:00 | | | OR | 12/23 | | | | 58 | BLUE CARD |
| 1302 | 12:00 | 13:45 | 16:45 | 17:30 | | | OR | 12/24 | | | | 48 | LA CARE MEDI-CAL |
| 1303 | 7:00 | 8:00 | 9:00 | 9:00 | | | OR | 12/15 | | | | 19 | |
| 1304 | | 7:30 | 9:45 | | | | OR | 12/16 | | | | 57 | |
| 1305 | | 10:45 | 12:00 | | | | OR | 12/16 | | | | 56 | |
| 1306 | | 12:45 | 14:45 | | | | OR | 12/16 | | | | 58 | |
| 1307 | 7:00 | 7:45 | 8:45 | 9:00 | | | OR | 12/16 | | | | 49 | |
| 1308 | | 13:00 | 15:45 | | | | OR | 12/26 | | | | 56 | |
| 1309 | | | | | | | | | | | | | |
| 1310 | 13:30 | 14:30 | 15:30 | 16:00 | | | OR | 12/29 | | | | 74 | |
| 1311 | 14:00 | 14:30 | 16:30 | 17:00 | | | OR | 12/29 | | | | 64 | MEDICARE |
| 1312 | 6:50 | 8:30 | 13:00 | 13:45 | | | OR | 12/29 | | | | 50 | BLUE SHIELD |
| 1313 | 10:30 | 12:00 | 14:00 | 14:30 | | | OR | 12/29 | | | | 74 | MEDI VARE |
| 1314 | 7:50 | 9:45 | 12:15 | 13:00 | | | OR | 12/30 | | | | 55 | MEDI CARE |
| 1315 | 15:00 | 15:30 | 18:00 | 18:45 | | | OR | 12/30 | | | | 23 | AETNA |
| 1316 | 13:50 | 15:30 | 17:05 | 18:00 | | | OR | 12/30 | | | | 84 | MEDICARE ACUTE PART B |
| 1317 | 6:55 | 8:30 | 13:00 | 13:45 | | | OR | 1/0 | | | | 26 | BLUE CARD PLANE |
| 1318 | | | | | | | | | | | | | |
| 1319 | | | | | | | | | | | | | |

# Exhibit 146



# Exhibit 147


























































aoperative Note
nal Report *

## * Final Report *

**cedure Date:** 7/17/2015                          **Study #:** LAC 15-271
**erring Physician:** Alexander Tuchman, M.D.       **Technician:** NN
**#:** 7

**ient History:** 27y/o m hx of achondroplasia with known L3-5 spinal stenosis, planned for OR in Sept (here but
not find notes), with worsening back pain x2 months and numbness x 2weeks. Pt notes his back pain has become
earable and he cannot perform activities of daily living. Pain began while attempting a front-flip 2 months ago. He
es his pain is so bad at times that he falls, most recently yesterday. Also states he lost sensation in his legs
terday, causing his fall. Pain is back and down b/l buttocks, lateral thigh and to shin, L>R. The numbness comes in
es. Pt seen prior at OVMC 1 mo ago and seen to have stenosis, worst at L3/4 and 4/5 and a surgery was planned
sept, does not know what kind. C/o possible perirectal numbness (he isn't sure if it's numb or just pain), but no
ntinence. He does have trouble initiating due to pain. Denies focal weakness, other numbness or tingling, f/c.

**gical Procedure:** L2-L4 lami and fusion

**NITORING MODALITIES:**

EPs (somatosensory evoked potentials), TcMEPs (transcranial motor evoked potentials) and free run EMG.

**SULTS:**

ing the procedure the aforementioned modalities were continuously monitored.

surgeon was informed at baseline that the patient's potentials amplitudes were adequate for monitoring
terally. These waveforms remained stable throughout the procedure. No adverse electrodiagnostic events were
ountered during monitoring. 6.5 hours were spent monitoring, and the surgeons were kept informed of the
nitoring status and any significant changes.

**'RESSION:**

natosensory evoked potentials and Transcranial Motor evoked potentials were continuously monitored during
gery. The following changes were observed. Bilateral lower extremity SSEP decreased.

ase see comment.

MMENT: The changes seen in the (upper and lower extremity somatosensory evoked potentials during
ninectomy suggest that an interruption of this pathway occured. Clinical correlation is (strongly advised.

nature Line
ctronically Signed on 07/17/2015 06:38 PM PDT

_____

ely, Michael







rative Report
nal Report *

## * Final Report *

rative Report
ORT OF OPERATION

'ARTMENT: NEUROLOGY-PY  DATE OF OPERATION: July 17, 2015

'ENDING SURGEON: Alexander Tuchman, MD

'TATED BY: Daniel Kramer, MD

RATING SURGEON: Daniel Kramer, MD

OPERATIVE DIAGNOSIS: L2-L3, L3-L4, and L4-L5 lumbar stenosis.

TOPERATIVE DIAGNOSIS: L2-L3, L3-L4, and L4-L5 lumbar stenosis.

CEDURE PERFORMED: L2 through L4 laminectomy, and L2 through L4 posterior spinal fusion, with L5 partial laminectomy.

ICATIONS FOR PROCEDURE: This is a 27-year-old male with history of achondroplasia with a long history of back pain radiating down
eral legs, with worsening of the back pain and numbness that shot down the back and sides of both legs in an approximately L5 distribution,
no evidence of urinary incontinence, or bowel or bladder symptoms, or saddle anesthesia, however, PVR was done in the ER and it was
   There was also some concern for myelopathic signs, however, an MRI was done of the C-spine and T-spine, which showed no
ormalities other than a mild disk bulge in the cervical spine. His lumbar spine, however, had multiple disk bulges, congenital canal stenosis,
nentum hypertrophy, and compression of the nerve roots at L2-L3, worse at L3-L4, and at L4-L5, with moderate to mild compression at
.l. The decision was to take the patient to the operating room for decompression. After conferring with multiple spine surgeons, it was
rmined that, due to the achondroplasia and the high risk of failure rate and kyphotic deformity in these patients, that at up-front fusion was
oreferred option. The patient was consented, with the risks, benefits, and alternatives explained to the patient including, but not limited to,
bness, weakness, tingling, CSF leak, particularly in these patients as their dura is known to be anecdotally thinner, as well as paralysis,
:e, coma, and death. All questions were answered and concerns addressed, and the patient agreed to the procedure, so the patient was taken
e operating room. Neuromonitoring of SSEPs and MEPs was being done during this case.

CRIPTION OF PROCEDURE: The patient was placed under general anesthesia and intubated in the usual fashion, and then flipped prone
a Jackson table and OSI frame. A midline incision of the lumbar spine was marked out, and an x-ray was done, localizing the incision over
rea of interest. Then, the patient was prepped and draped in the usual fashion. A surgical pause was done, correctly identifying the patient,
edure, side, and location of surgery. 1% lidocaine with epinephrine was injected to the incision, approximately 7 cc. The incision was
ied using a #10 blade. The tissue was dissected using Bovie cautery, and hemostasis was achieved using Bovie and bipolar cautery. The
e was dissected down to subperiosteal dissection along the lamina and spinous process. Once a sufficient area was cleaned out, 2 Allis
ps were placed over the interspinous ligament, and a lateral x-ray was obtained, correctly identifying that we were over the L3 area. Thus,
ncision was opened inferiorly and superiorly to expose the L2, L4, and part of L5 lamina. Over the L2, L3, and L4 areas, the facets were
)sed out to the TPs bilaterally. The L4-L5 facet was left intact and just the lamina was exposed over L5. At this time, a matchstick bur was
:d over the pedicle at the junction of the mid TP, the pars, and the inferior facet. The facet was bitten down where necessary using a
)le-action rongeur. This was true for all L2, L3, and L4 pedicles bilaterally. The matchstick drill was used to create a hole through the
:x, and a Lenke probe was tunneled to approximately 15 mm angled outward, and a ball-tip probe was used to search for any breaches.
1, the Lenke probe was tunneled angled inward at the appropriate angles per the pedicle to approximately 30 mm, and then the ball-tip
e was again placed into the tunneling site, and felt down to the cortical bone. Then, a 37 mm length tap was used along the same trajectory
g the pedicles, was tapped down, and again, the ball-tip probe was used to probe to the cortical region of the vertebral body, and then sized






erative Report
nal Report *



opriately for each screw. Then, Medtronic Legacy screws were placed into each pedicle. In the left L2 screw, a lateral breach had been
d, and so, a re-drilled hole and re-probed in the same aforementioned fashion was done to track along the pedicle, and the screw was
ed. Once all the pedicle screws were placed, all 6 pedicle screws, a lateral and AP x-ray was obtained. It was noted that the L2 on the right
was lateral to the facet, and this screw was removed and then replaced more medially, again, drilling a new bur hole and placing the screw.
his time, another AP and lateral was obtained, showing appropriate placement, and all the screws were done using the straightforward
oach. Then, stimulation was obtained for each screw. On the right side, all stimulation was within normal limits of either no stimulation or
'e 15 before there was any stimulation noted through the neuromonitoring. Then the left side was done, and the L2 screw was noted to be
ulated at 7, and the L4 screw was noted to be stimulated at 5 minimally, but stimulation was still noted, so the L2 and L4 screws on the left
were replaced with more medial positioning as it was assumed that there was a lateral breach and it was stimulating the exiting nerve root.
oth cases, the stimulation was to the vastus lateralis. The screws were replaced, and no stimulation was noted on either screw. Then, the
side was restimulated, and the L4 screw was noted to have stimulation at 11, where it had previously been 16, so this screw was also
aced, and also replaced more medially without any issue, and again, all screws were placed with the same technique using a matchstick,
ce probe, and ball-tip. No obvious breaches were noted except for the aforementioned breaches at bilateral L2, but the stimulation was then
itive due to either having no stimulation or greater than 15. Once this was done, the laminectomy was begun. Double-action rongeur was
to bite off the spinous processes of the lamina. Then the matchstick drill was used to thin out the bone and expose the ligamentum flavum.
ta #2 and #3 Kerrison were used to bite down the bone and remove the ligamentum flavum and expose laterally until the dura was noted to
ompletely free, and no areas of compression were noted. The dura was noted to be extremely thin and in the inferior portion, first a small
l leak was noted after ligamentum was removed, being adherent to the ligament. This was stitched closed using a 4-0 Nurolon. Then 2
er durotomies were noted with nerve roots exposed in the inferior portion. These were noted to be too large to repair primarily. The nerve
s were carefully re-contained within the dural. Motors and sensories were run with no significant change, and so, a 3 x 3 piece of DuraGen
cut to size and placed over the area, and DuraSeal was sprayed over all the areas. No active CSF leak was noted at this time. The
oscope was brought in for this exploration and repair. Once this repair was done, again, the area was exposed out laterally, and over the L5
space, it was noted to be decompressed. At this time, the Cobalt rods were placed and the screw caps were tightened down over the rods
had lordosis placed in them, and then they were final tightened. Then the area was irrigated copiously with 3 L of LR with bacitracin on
ity irrigation. Then autograft, which had been bitten down to a small size, and DBX paste was placed over the TPs and area of fusion after
natchstick drill had been used to drill down some of the cortical bone on the TPs and remaining lamina and facets. At this time, it was
d that the SSEPs had a slight reduction, however, no obvious changes in the motor. A 15 blade was used to make 2 small incisions above
nain incision, and tonsils were used to tunnel beneath the fascia. Then, two 10 flat JPs were cut to size and tunneled over the incision.
n, the muscular layer was closed using 0 Vicryl. The fascia was closed using 0 Vicryl in a very watertight fashion. The dermis was closed
g 2-0 Vicryl, and the skin was closed using staples. The JP drains were stitched in place using 3-0 nylon and 3-0 Biosyn with Steri-Strips,
the area was covered with bacitracin and island dressing. The patient was flipped back prone, extubated, and sent to the ICU.

DINGS: L2-L3, L3-L4, L4-L5 stenosis.

/PLICATIONS: Durotomy with primary repair.

\INS: Two 10 flat JPs.

IDS: As per Anesthesia, however, 2 of FFP and 2 of packed red blood cells were given to the patient.

IMATED BLOOD LOSS: Approximately 1 L.

CIMENS: None.

POSITION: ICU.

\DITION: Stable.

was discussed with Dr. Tuchman, who agrees.







rative Report
nal Report *

ated By:  Daniel Kramer, MD

ander Tuchman, MD

MODL
#:  068374/663075607

**ature Line**
tronically Signed on 07/28/2015 09:53 AM PDT
_____
man, Alexander, MD

y Signed by: Tuchman, Alexander, MD, Attend






in OR Intraoperative Record
nal Report *

## * Final Report *

### : Main OR Intraop Nursing Record (Verified)

**SC Main OR Intraop Nursing Record Summary**

| | |
|---|---|
| :imary Physician: | Tuchman, Alexander |
| ise Number: | USCOR-2015-2569 |
| .nalized Date/Time: | 07/17/15 20:20:31 |
| :. Name: | |
| .O.B./Sex: | Male |
| d Rec #: | |
| ysician: | KIM, HYUNG |
| .nancial #: | 1001028785 |
| :. Type: | I |
| om/Bed: | 148/A |
| lmit/Disch: | 07/13/15 13:03:00 - |
| .stitution: | |

**afety Checklist 2) Time Out - USC MOR**

e-Care Text:
   A.10 Confirms patient identity A.20 Verifies operative procedure, surgical site, and laterality A.20.1 Verifies
   consent for planned procedure A.30 Verifies allergies
                      **Entry 1**

| | | | |
|---|---|---|---|
| 1 members of the am ceased tivity and nfirmed patient, te, procedure, d consents | Yes | Confirmed site marked and visible | Yes |
| rgeon states case uration, critical nonroutine eps, and ticipated blood ss | Yes | Fire Precautions/Risks Reviewed | Yes |
| esthesia team views any tient-specific ncerns | Yes | Antibiotic prophylaxis given prior to surgery | Yes |
| levant imaging splayed? | Yes | Time Out Time | 07/17/15 14:55:00 |
| me Out Members | EY, VIEN, Kramer, Daniel R, Valerio, Regalado Angelo | | |

st-Care Text:
   E.30 Evaluates verification process for correct patient, site, side, and level surgery

### urgical Procedures - USC MOR

e-Care Text:
   A.20 Verifies operative procedure, sugical site, and laterality A.20.2 Assesses the risk for unintended
   retained foreign body Im.20 Performs required counts
                      **Entry 1**

| | | | |
|---|---|---|---|
| :ocedure :scription | | | |
| :rocedure | Laminectomy Lumbar | **Procedure Code** | Laminectomy with |





in OR Intraoperative Record
nal Report *



exploration and/or
decompression of spinal
cord and/or cauda
equina, without
facetectomy,
foraminotomy or
discectomy (eg, spinal
stenosis), 1 or 2
vertebral segments;
lumbar, except for
spondylolisthesis

| | | | |
|---|---|---|---|
| imary Procedure | Yes | Attending Surgeon of Record | Tuchman, Alexander |
| :art | 07/17/15 13:44:00 | Stop | 07/17/15 19:15:00 |
| esthesia Type | General | Surgical Service | Orthopedic (SN) |
| und Class | 1-Clean | | |

st-Care Text:
    0.730 The patinet's care is consistent with the individualized perioperative plan of care

## ase Times - USC MOR

### Entry 1

| | | | |
|---|---|---|---|
| tient | | | |
| atient In Room Time | 07/17/15 12:09:00 | Patient Out Room Time | 07/17/15 19:23:00 |
| se | | | |
| rocedure Start Time | 07/17/15 13:44:00 | Procedure Stop Time | 07/17/15 19:15:00 |

## ase Attendance - USC MOR

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| se Attendee | Tuchman, Alexander | Wedemeyer, Michelle Ariana | Valerio, Regalado Angelo |
| le Performed | Surgeon - Attending | Surgical Resident | CRNA |
| me In | 07/17/15 12:09:00 | 07/17/15 12:09:00 | 07/17/15 11:56:00 |
| me Out | 07/17/15 19:23:00 | 07/17/15 19:23:00 | 07/17/15 19:23:00 |
| ocedure(s) | Laminectomy Lumbar | Laminectomy Lumbar | Laminectomy Lumbar |

| | Entry 4 | Entry 5 | Entry 6 |
|---|---|---|---|
| se Attendee | Kramer, Daniel R | GARCIA, VERONICA | Benbassat, Maxim N. |
| le Performed | Surgical Resident | Scrub - Primary | Anesthesiologist - Attending |
| me In | 07/17/15 12:09:00 | 07/17/15 12:09:00 | 07/17/15 11:56:00 |
| me Out | 07/17/15 19:23:00 | 07/17/15 15:25:00 | 07/17/15 14:48:00 |
| ocedure(s) | Laminectomy Lumbar | Laminectomy Lumbar | Laminectomy Lumbar, Laminectomy Lumbar |

| | Entry 7 | Entry 8 | Entry 9 |
|---|---|---|---|
| se Attendee | LUTHER, MERILEE | KY, VIEN | MORENO, EVELYN |
| le Performed | Circulator - Relief | Circulator - Primary | Circulator - Relief |
| me In | 07/17/15 12:30:00 | 07/17/15 12:09:00 | 07/17/15 14:35:00 |
| me Out | 07/17/15 15:20:00 | 07/17/15 15:37:00 | 07/17/15 14:50:00 |
| ocedure(s) | Laminectomy Lumbar | Laminectomy Lumbar | Laminectomy Lumbar |

| | Entry 10 | Entry 11 | Entry 12 |
|---|---|---|---|
| se Attendee | Miller, Margaret L. | Kabigting, Julito | MATT, CHARLES |
| le Performed | Anesthesiologist - Attending | Radiology Tech | Scrub - Relief |
| me In | 07/17/15 14:49:00 | 07/17/15 14:55:00 | 07/17/15 15:20:00 |





in OR Intraoperative Record
nal Report *



| | | | |
|---|---|---|---|
| me Out | 07/17/15 17:43:00 | 07/17/15 17:30:00 | 07/17/15 19:23:00 |
| ocedure(s) | Laminectomy Lumbar, | Laminectomy Lumbar | Laminectomy Lumbar |
| | Laminectomy Lumbar | | |

| | Entry 13 | Entry 14 |
|---|---|---|
| se Attendee | TOMSON, JOHN | Thangathurai, Duraiyah |
| le Performed | Circulator - Relief | Anesthesiologist - Attending |
| me In | 07/17/15 15:20:00 | 07/17/15 17:44:00 |
| me Out | 07/17/15 19:23:00 | 07/17/15 19:23:00 |
| ocedure(s) | Laminectomy Lumbar | Laminectomy Lumbar |

neral Comments:
    R.J. AUSTERMAN NS4 SCRUBBED IN. WILLIAM HESTER MEDTRONIC REP IN THE ROOM. SSEP MONITOR TECH N. NGUYEN PRESENT
    IN OR.

## atheter, Drains, Tub - USC MOR
e-Care Text:
    A.310 Identifies factors associated with an increased risk for hemorrhage or fluid and electrolyte imbalance
    Im.250 Administers care to invasive device sites
                        Entry 1

| | | | |
|---|---|---|---|
| vice Description | TRAY, CATH, FOLEY, TEMP | Device Type | Indwelling |
| | SENSE, SURESTEP, 16FR | | |
| cation | Penis | Balloon Inflation Amount | 10ml |
| esent on Arrival? | No | Inserted By | LUTHER, MERILEE |
| 'd at End of Case? | No | | |
| ainage Details | | | |
| rainage? | Yes | Amount | Measured in Milliliters (mL) |
| olor | Yellow | Consistency | Watery |
| rainage System | Dependent drainage bag | | |
| tcome Met (O.60) | Yes | | |

st-Care Text:
    E.340 Evaluates tubes and drains are intact and functioning as planned O.60 Patient is free from signs and
    symptoms of injury caused by extraneous objects
neral Comments:
    DR KRAMER & REGGIE VALERIO CRNA NOTIFIED OF CLOUDY URINE

## ounts Verification - USC MOR
e-Care Text:
    A.20 Verifies operative procedure, sugical site, and laterality A.20.2 Assesses the risk for unintended
    retained foreign body Im.20 Performs required counts
                        Entry 1

| | | | |
|---|---|---|---|
| ocedure | Laminectomy Lumbar | | |
| itial Counts | | | |
| nitial Counts | KY, VIEN, GARCIA, | Items included in | Sponges, Sharps |
| erformed By | VERONICA | the Initial Count | |
| vity Count | | | |
| osing Counts | | | |
| losing Counts | MATT, CHARLES, TOMSON, | Items included in | Sponges, Sharps |
| erformed By | JOHN | the Closing Count | |
| nal Counts | | | |
| inal Count Status | Correct | Final Counts Performed By | TOMSON, JOHN, MATT, CHARLES |
| tems Included in | Sponges, Sharps | | |
| inal Count | | | |
| tcome Met (O.20) | Yes | | |

st-Care Text:
    E.50 Evaluates results of the surgical count O.20 Patient is free from unintended retained foreign objects







n OR Intraoperative Record
nal Report *



## ounts Ver Additional - USC MOR

**e-Care Text:**
A.20 Verifies operative procedure, surgical site, and laterality A.20.2 Assesses the risk for unintended retained foreign body Im.20 Performs required counts

**Entry 1**

| | | | |
|---|---|---|---|
| dditional Count<br>pe | Shift Change | Additional Count<br>Participants | MATT, CHARLES, TOMSON,<br>JOHN |
| unt Status | Correct | Items Counted | Sponges, Sharps |
| tcome Met (O.20) | Yes | | |

**st-Care Text:**
E.50 Evaluates results of the surgical count O.20 Patient is free from unintended retained foreign objects

## atient Positioning - USC MOR

**e-Care Text:**
A.240 Assesses baseline skin condition A.280 Identifies baseline musculoskeletal status A.280.1 Identifies physical alterations that require additional precautions for procedure-specific positioning A.510.8 Maintains patient's dignity and privacy Im.120 Implements protective measures to prevent skin/tissue injury due to mechanical sources Im.40 Positions the patient Im.80 Applies safety devices

**Entry 1**

| | | | |
|---|---|---|---|
| ocedure | Laminectomy Lumbar | Body Position | Prone |
| ft Arm Position | Tucked and padded at<br>side | Right Arm Position | Other/See Comments |
| ft Leg Position | Other/See Comments | Right Leg Position | Other/See Comments |
| et Uncrossed? | Yes | Pressure Points<br>Checked | Yes |
| dditional<br>formation | BLE PLACED OVER<br>PILLOWS/GEL PAD UNDER<br>KNEES AND ALL PRESSURE<br>PONTS WERE PADDED.<br>JACKSON TABLE USED. | Positioning Device | Elbow Protector,<br>Positioner - Head,<br>Table - Other see<br>comments |
| sitioned By | KY, VIEN, Kramer,<br>Daniel R, Valerio,<br>Regalado Angelo | Safety Strap<br>Applied? | Yes |
| cation | Above Knees | Outcome Met (O.80) | Yes |

**st-Care Text:**
E.10 Evaluates for signs and symptoms of physical injury to skin and tissue E.290 Evaluates musculoskeletal status O.80 Patient is free from signs and symptoms of injury related to positioning

## eassessment of Body - USC MOR

**Entry 1**

| | | | |
|---|---|---|---|
| te/Time Checked | 07/17/15 16:30:00 | Site | Arm, right, Leg, left,<br>Leg, right |

## kin Prep - USC MOR

**e-Care Text:**
A.30 Verifies allergies A.20 Verifies procedure, surgical site, and laterality A.510.8 Maintains paritnet's dignity and privacy Im.270 Performs Skin Preparation Im.270.1 Implements protective measures to prevent skin and tissue injury due to chemical sources A.300.1 Protects from cross-contamination

**Entry 1**

| | | | |
|---|---|---|---|
| in Prep | | | |
| rep Agents (Im.270) | Iodine Povacrylex and<br>Isopropyl Alcohol | Prep By | KY, VIEN |
| rep Area (Im.270) | Back | Skin Prep Agent Dry<br>Without Pooling | Yes |
| ir Removal | | | |
| air Removal Methods | No hair removal<br>performed | | |
| tcome Met (O.100) | Yes | | |



n OR Intraoperative Record

nal Report *

st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.100 Patient is free from signs
and symptoms of chemical injury

neral Comments:
    DURAPRED >3 MINUTE DRY TIME WAS MAINTAINED PRIOR TO DRAPING.

## eneral Case Data - USC MOR

e-Care Text:
    A.350.1 Classifies surgical wound

**Entry 1**

| se Information | | | |
|---|---|---|---|
| )R | USC NICU | **Case Level** | 5 |
| )ound Class | 1-Clean | **Specialty** | Orthopedic (SN) |
| .SA Class | 2 | | |
| :eop Diagnosis | Lumbar spinal stenosis | | |

st-Care Text:
    O.760 Patient receives consistent and comparable care regardless of the setting

## mplant Log - USC MOR

e-Care Text:
    A.20 Verifies operative procedure, surgical site, and laterality A.20.1 Verifies consent for planned procedure
Im.350 Records implants inserted during the operative or invasive procedure

| | Entry 1 | Entry 2 |
|---|---|---|
| )plant/Explant )plant | Implant | Implant |
| lentification )escription | PATCH DURA 3X3IN DRFRM CRNL BVN CLGN MTRX RSRB DRPLS STRL | DBX PUTTY 5CC |
| lize | 3 x 3 | 10 cc |
| lerial Number | | 078130515511080039 |
| .ot Number | ct002897 | |
| lanufacturer | CODMAN & SHURTLEFF | MTF |
| :atalog # | 801478 | 131137663 |
| ixpiration Date | | 03/19/16 |
| .age Data | | |
| :mplant Site | Back | Back |
| )uantity | | |
| ltcome Met (O.30) | Yes | Yes |

st-Care Text:
    E.30 Evaluates verification process for correct patient, site, side and level surgery O.30 Patient's procedure
is performed on the correct site, side, and level

## edication Administration - USC MOR

e-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.10 Patient is free from

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| .me Administered | 07/17/15 13:44:00 | 07/17/15 14:48:00 | 07/17/15 18:00:00 |
| :dication | LIDOCAINE 0.5%/EPI 1:200K INJ, 50 ML INJ | FLOSEAL 10 ml | VANCOMYCIN 500 mg VIAL |
| )ute of Admin | Intramuscular | Topical | Intraspinal |
| )se | 1 | 4 | 2 |
| )lume | 7 mL | 30 mL | 1 gm |
| .ministered By | Kramer, Daniel R | Kramer, Daniel R | Kramer, Daniel R |
| ltcome Met (O.130) | Yes | Yes | Yes |

st-Care Text:
    E.20 Evaluates response to medications O.130 Patient receives appropriately administerd medication(s)

## -Ray and Images - USC MOR





in OR Intraoperative Record
nal Report *



e-Care Text:
 A.240 Assesses baseline skin condition A.240.1 Assesses history of previous radiation exposure Im.110
 Implements protective measures to prevent injury due to radiation sources

**Entry 1**

| te | Back | X-Ray Type | C-Arm |
|---|---|---|---|
| otective Devices | Thyroid Shield | Outcome Met (O.110) | Yes |
| ed | | | |

st-Care Text:
 E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.110 Patient is free from signs
 and symptoms of radiation injury

neral Comments:
 C- ARM TECH PRESENT.

## atient Care Devices – USC MOR
e-Care Text:
 A.200 Assesses risk for normothermis regulation A.40 Verifies presence of prosthetics or corrective devices
 Im.280 Implements thermoregulation measures Im.60 Uses supplies and equipment within safe parameters

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| quipment Type | WARMER BAIR HUGGER *USC | PUMP, ALP 501 COMPRESSION *USC | TABLE JACKSON *USC |
| rial Number | 06072 | 28999 | 5574 |
| ttings (if plicable) | | | |
| ad Number (if plicable) | | | |
| te Sterilized | | | |
| mments | | | |
| tcome Met (O.700) | Yes | Yes | Yes |

st-Care Text:
 E.10 Evaluates signs and symptoms of physical injury to skin and tissue O.700 Patient is free from signs and
 symptoms of injury caused by extraneous objects

## urgical Irrigation – USC MOR
e-Care Text:
 A.280 Verifies allergies A.310 Identifies factors associated with an increased risk for hemorrhage or fluid and
 electrolyte imbalance Im.210 Administers prescribed solutions A.280.1 Implements protective measures to prevent
 skin or tissue injury due to thermal sources

| | Entry 1 | Entry 2 |
|---|---|---|
| rigant | Yes | Yes |
| rigant Used: | BACITRACIN 50,000 UNITS IN 1 LITER NORMAL SALINE (NS) | SOD CHL .9 IRR USP 3000ML C/4 |
| rigant Volume In | | 3000 mL |
| rigant Volume Out | | 3000 mL |
| l irrigation ditives must be tered in the Med ministration gment. | | |
| tcome Met (O.300) | Yes | Yes |

st-Care Text:
 E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.300 Patient is free from signs
 and symptoms of injury due to thermal sources

neral Comments:
 STERILE WATER TO CLEAN INSTRUMENTS

## autery – USC MOR
e-Care Text:
 A.240 Assesses baseline skin condition A280.1 Identifies baseline musculoskeletal status Im.50 Implements
 protective measures to prevent injury due to electrical sources  Im.60 Uses supplies and equipment within safe
 parameters In.80 Applies safety devices







in OR Intraoperative Record
nal Report *



| | Entry 1 | Entry 2 |
|---|---|---|
| :U Type | Electrosurgical Unit | Electrosurgical Unit |
| lentification | F8C59739A | F8C59739A |
| mber | | |
| cessories Used | | |
| :U Settings | | |
| iipolar Setting | 15 | |
| llend Setting | | |
| :oag Setting | 35 | 35 |
| :ut Setting | 35 | 35 |
| nstrument/Model | PENCIL | |
| ype | | |
| )ther Settings | | |
| ercentage | | |
| ower Level | | |
| emperature | | |
| .Celsius) | | |
| 'otal Times Used | | |
| :ounding Pad | | |
| .tails | | |
| irounding Pad | Yes | Yes |
| leeded? | | |
| irounding Pad Lot | 50910150X  EXP 2017-04 | 51470386X |
| lumber | | |
| lithin Expiration | Yes | Yes |
| :ate? | | |
| irounding Pad Site | Arm upper | Back upper |
| irounding Pad Site | Right | Left |
| )etail | | |
| lair Removed Under | No | No |
| irounding Pad | | |
| lair Removed Using: | | |
| :kin Condition | Intact | Intact |
| inder Grounding Pad | | |
| 'erified By | LUTHER, MERILEE | KY, VIEN |
| :oke Evacuation | No | No |
| vvice Used | | |
| :oke Evacuation | | |
| ut: | | |
| itcome Met (0.10) | Yes | Yes |

:st-Care Text:
   E.10 Evaluates for signs and symptoms of physical injury to skin and tissue O.10 Patient is free from signs and
   symptoms of injury related to thermal sources

ressing/Packing – USC MOR

e-Care Text:
   A.350 Assesses susceptibility for infection Im.250 Administers care to invasive devices Im.290 Administer care
   to wound sites  Im.300 Implements aseptic technique

| | Entry 1 | | | |
|---|---|---|---|---|
| :in Prep Agent | Yes | | | |
| :moved Prior to | | | | |
| :essing? | | | | |
| :essing Item | | | | |
| :tails | | | | |
| :ressing Item | Non-adhesive dressing | **Tape (Im.290)** | | Wound Closure Strip |
| .Im.290) | | | | |
| .te | Back mid | **Outcome Met (O.200)** | | Yes |

:st-Care Text:
   E.320 Evaluate factors associted with increased risk for postoperative infection at the completion of the
   procedure O.200 Patient's wound perfusion is consistent with or improved from baseline levels

:kin Assessment – USC MOR







in OR Intraoperative Record
nal Report *

e-Care Text:
    A.240 Assesses baseline skin condition Im.120 Implements protective measures to prevent skin or tissue injury
    due to mechanical sources Im.280.1 Implements protective measures to prevent skin or tissue injury due to
    thermal sources Im.360 Monitors for signs and symptons of infection
             Entry 1

| in Integrity | Intact | Outcome Met (O.60) | Yes |
|---|---|---|---|

st-Care Text:
    E.10 Evaluates for signs and symptoms of physical injury to skin and tissue E.270 Evaluate tissue perfusion
    O.60 Patient is free from signs and symptoms of injury caused by extraneous objects

### afety Checklist 3) Sign Out - HAR MOR
e-Care Text:
    Im.330 Manages specimen handling and disposition
             Entry 1

| urse verbally nfirms with team ie name of the erative ocedure(s) and rrect CPT code | Yes | Nurse verbally confirms with team specimen identity and label | NA |
|---|---|---|---|
| urse verbally nfirms with team y equipment oblems to be ddressed | NA | The nurse confirmed with the surgeon and the incision is: | Closed |
| re the strument, sponge, d needle counts rrect? | Yes | All team members review key concerns for recovery and management of patient | Yes |
| is this case a auma case? | No | Was this an endoscopic case? | No |
| is an implant used r this case? | Yes | | |

st-Care Text:
    E.800 Ensures continuity of care E.50 Evaluates results of the surgical count

### eparture from OR - USC MOR
             Entry 1

| ansport Time | 07/17/15 19:23:00 | Patient Handoff Status | Awake |
|---|---|---|---|
| ansfer Evaluation eassessment | ESU Pad Site Checked, Tubes Drains Chains Secured, Warm Blanket Applied, Pressure Areas Checked, Sterile Dressing Intact | Skin Condition | Warm, Dry |
| tient Handoff atus | Extubated | Oxygen in Use? | Yes |
| ow Rate | 6 L/min | Airway Device | Nasal Cannuale or Mask |
| st-op Destination scharge | ICU | Via | Bed |
| eport Given By ime | TOMSON, JOHN 07/17/15 19:23:00 | Report Given To | MADRONA, DON GILBERT |
| ischarged/Transferr d | | | |

### ase Comments
    <None>




Page 8 of 9
(Continued)



in OR Intraoperative Record
.nal Report *

Finalized By: TOMSON, JOHN

ocument *Signatures*
.gned By:
    TOMSON, JOHN 07/17/15 20:20



# Exhibit 148





# Exhibit 149

RUDY EXELROD ZIEFF & LOWE LLP

Attorneys

351 CALIFORNIA STREET, SUITE 700
SAN FRANCISCO, CALIFORNIA 94104
PH (415) 434-9800
FX (415) 434-0513
www.rezlaw.com

Direct line:  (415) 394-6078
dal@rezlaw.com

MARK S. RUDY (Ret.)†
ALAN B. EXELROD*
STEVEN G. ZIEFF*†
DAVID A. LOWE
JOHN T. MULLAN
CHAYA M. MANDELBAUM
MICHELLE G. LEE
ERIN M. PULASKI
WILLIAM P. McELHINNY
MEGHAN F. LOISEL
ZOË R. DeGEER

* Of Counsel
† A Professional Corporation

May 10, 2021

**<u>VIA ELECTRONIC SUBMISSION</u>**

PAGA Administrator
455 Golden Gate Avenue, 9th Floor
San Francisco, CA  94104

   Re: Labor Code Private Attorneys General Act
     *Justin Cheongsiatmoy v. University of Southern California and USC Care*
     *Medical Group, Inc.*
     Our File No.:  8683

Dear Administrator:

   Our office represents Justin Cheongsiatmoy, M.D. in connection with his claims against University of Southern California and USC Care Medical Group, Inc. (collectively, "USC") for violations of the California Labor Code.  This letter is written pursuant to California Labor Code section 2699.3(a), to provide the Agency with notice of USC's Labor Code violations.

   Dr. Cheongsiatmoy is a former Assistant Professor of Neurology within the Division of Intraoperative Neurophysiology within USC's Keck School of Medicine.  Dr. Cheongsiatmoy began working at USC on July 1, 2016.

   After joining USC, Dr. Cheongsiatmoy reported his concerns about the Division of Intraoperative Neurophysiology's procedures to USC's Chair of the Department of Neurology. Specifically, Dr. Cheongsiatmoy reported to USC management that USC's intraoperative monitoring policies were causing overpayments to various payers and creating unsafe working conditions which put both medical personnel and patients at risk.  Soon after reporting his concerns, Dr. Cheongsiatmoy was retaliated against in violation of Labor Code sections 1102.5, 6310, and 232.5.  USC ostracized Dr. Cheongsiatmoy, made it difficult for him to perform his work, placed him on involuntary leave, and ultimately terminated him in late June 2019.

   After Dr. Cheongsiatmoy's termination, he learned that USC was undermining his ability to secure a new position by making defamatory statements and misrepresentations to potential new employers in violation of Labor Code section 1050.  As a result of USC's defamation, Dr. Cheongsiatmoy was unable to obtain comparable new employment.

# RUDY EXELROD ZIEFF & LOWE LLP

PAGA Administrator
May 10, 2021
Page 2

Based on the foregoing, Dr. Cheongsiatmoy asserts claims under sections 1102.5, 6310, 232.5, and 1050 of the Labor Code on behalf of himself and other current or former employees that have suffered these violations. USC is liable for civil penalties not exceeding ten thousand dollars ($10,000) for each violation of Labor Code section 1102.5 and penalties pursuant to Labor Code section 2699(f) for violations of Labor Code sections 6310 and 1050.

Please notify this office, within the time period set by Labor Code section 2699.3(a), whether or not the Agency intends to investigate the Labor Code violations alleged herein on behalf of Dr. Cheongsiatmoy and all other current or former employees.

We look forward to your response and thank you for your attention to this matter.

Sincerely,

RUDY, EXELROD, ZIEFF & LOWE, LLP

DAVID A. LOWE

DAL/em